## **<u>EXHIBIT A</u>**

C110765

**FILED**
**Nov 18, 2025**
*NL*
**by Email**

JUDICIAL CENTRE OF CALGARY
CLERK OF THE COURT

| | |
|---|---|
| COURT FILE NUMBER | **2501-18462** |
| COURT | **COURT OF KING'S BENCH OF ALBERTA** |
| JUDICIAL CENTRE | **CALGARY** |
| APPLICANTS | **IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, RSC 1985, c C-36, AS AMENDED** |
| | **AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA ULC, CANTANA ENERGY GMBH, CNE OIL & GAS S.R.L, CANACOL ENERGY COLOMBIA S.A.S., SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S.** |
| DOCUMENT | **PRE-FILING REPORT OF KPMG INC., IN ITS CAPACITY AS PROPOSED MONITOR OF CANACOL ENERGY LTD.** |
| | **NOVEMBER 17, 2025** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT: | **PROPOSED MONITOR** KPMG Inc. Bay Adelaide Centre 333 Bay Street, Suite 4600 Toronto, ON Paul van Eyk / Katherine Forbes / Duncan Lau Tel:  (416) 777-8281 / (416) 777-8107 / (416) 476-2184 Email: pvaneyk@kpmg.ca, katherineforbes@kpmg.ca, duncanlau@kpmg.ca |
| | **PROPOSED MONITOR'S COUNSEL** Bennett Jones LLP 3400 One First Canadian Place, P.O. Box 130 Toronto, ON   M5X 1A4 Raj S. Sahni / Kelsey Meyer Tel:  (416) 777-4804 / (403) 298-3323 Email: sahnir@bennettjones.com, meyerk@bennettjones.com |

1

## TABLE OF CONTENTS

**I. INTRODUCTION** ................................................................................................ **3**

**II. PURPOSE OF REPORT** ................................................................................... **4**

**III. TERMS OF REFERENCE** .............................................................................. **5**

**IV. KPMG'S QUALIFICATIONS TO ACT AS MONITOR** ................................. **6**

**V. BACKGROUND** ................................................................................................. **6**

**VI. OBJECTIVES OF THE CCAA PROCEEDINGS** ........................................... **14**

**VII. CREDITORS** ................................................................................................. **14**

**VIII. CASH FLOW FORECAST** ......................................................................... **18**

**IX. CRITICAL VENDOR PAYMENTS** ............................................................... **20**

**X. PROPOSED COURT ORDERED CHARGES** ................................................ **20**

**XI. CASH MANAGEMENT SYSTEM** ................................................................. **23**

**XII. FOREIGN PROCEEDINGS** ......................................................................... **25**

**XIII. COMEBACK MOTION** ............................................................................... **26**

**XIV. PROPOSED MONITOR'S CONCLUSION AND RECOMMENDATIONS** ............. **27**

**APPENDICES**

**APPENDIX "A" –**   PROPOSED MONITOR'S CONSENT TO ACT

**APPENDIX "B" –**   THE APPLICANTS' CASH FLOW FORECAST

## I. INTRODUCTION

1. Canacol Energy Ltd. ("**Canacol**") and its subsidiaries 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Cantana Energy GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S. (collectively, the "**Applicants**" or the "**Canacol Group**") are a group of companies engaged in exploration, development, production, processing and sale of natural gas in Colombia. Canacol is a publicly traded international oil and gas company headquartered in Calgary, Alberta.

2. KPMG Inc. ("**KPMG**" or the "**Proposed Monitor**") understands that Canacol Group intends to make an application (the "**Application**") before the Court of the King's Bench of Alberta (the "**Court**") returnable on November 18, 2025, seeking an Initial Order (the "**Proposed Initial Order**") pursuant to the *Companies' Creditors Arrangement Act,* R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), among other things:

   a) declaring that the Applicants are companies to which the CCAA applies;

   b) granting a stay of proceedings (the "**Stay of Proceedings**") in respect of the Applicants for up to ten (10) days, until such time as the Applicants' Comeback Motion (as defined herein) is heard and determined;

   c) appointing KPMG as the CCAA monitor in the Applicants' proposed CCAA proceedings (in such capacity, the "**Monitor**"), with the powers set out in the Proposed Initial Order;

   d) authorizing the Applicants to:

      i) continue to use the Cash Management System (as defined herein);

      ii) make payment of all obligations owing in respect of employee wages and benefits, and applicable source deductions, whether incurred prior to or after the commencement of the CCAA proceedings;

      iii) make payment of obligations owing in respect of goods and services supplied to the Applicants prior to the date of the Proposed Initial Order by critical vendors to the

3

extent required to ensure ongoing supply of critical goods and services, subject to prior approval by the Monitor, up to a maximum aggregate amount of $2,000,000 (such payments, being the "**Critical Vendor Payments**");

e) authorizing the Monitor to act as foreign representative for the purpose of having the CCAA proceedings recognized in any jurisdiction outside Canada including, without limitation, the United States of America, the Republic of Colombia, the Republic of Panama, the Plurinational State of Bolivia and/or Switzerland; and

f) granting the Administration Charge and the Directors' Charge (each as defined herein).

## II. PURPOSE OF REPORT

3. This report (the "**Report**") has been prepared by KPMG in its capacity as Proposed Monitor. The purpose of the Report is to provide the Court with information pertaining to:

a) KPMG's qualifications to act as Monitor (if appointed);

b) summary background on the Applicants and their CCAA proceedings (the "**CCAA Proceedings**"), the objectives of the CCAA Proceedings, and the Canacol Group's creditors;

c) the cash flow projections of the Applicants (the "**Cash Flow Forecast**");

d) the priority charges sought in the Proposed Initial Order;

e) the rationale for certain other relief sought by the Applicants in the Proposed Initial Order, including the ability to make the Critical Vendor Payments;

f) certain other relief that the Proposed Monitor understands that the Applicants intend to include in the Comeback Motion; and

g) the Proposed Monitor's conclusions and recommendations.

## III. TERMS OF REFERENCE

4. Capitalized terms used but not defined in this Report are defined in the Affidavit of Jason Bednar sworn November 16, 2025 (the "**Bednar Affidavit**"), filed by the Applicants as part of their materials in support of the Application and the Proposed Initial Order.  This Report should be read in conjunction with the Bednar Affidavit, as certain information contained in the Bednar Affidavit has not been included herein in order to avoid unnecessary duplication.

5. In preparing this Report, KPMG has relied solely on information and documents provided to it by the Applicants and their respective advisors, including unaudited, draft and/or internal financial information, financial projections prepared by the Applicants, discussions with management of the Applicants, and the affidavit of the Applicants' executive (collectively, the "**Information**").  In accordance with industry practice, except as otherwise described in the Report, KPMG has reviewed the Information for reasonableness, internal consistency, and use in the context in which it was provided.  However, KPMG has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would comply with Generally Accepted Auditing Standards ("**GAAS**") pursuant to the *Chartered Professional Accountant of Canada Handbook* and, as such, KPMG expresses no opinion or other form of assurance contemplated under GAAS in respect of the Information.

6. Future orientated financial information contained in the Cash Flow Forecast is based on the Applicants' estimates and assumptions regarding future events.  Actual results will vary from the information presented even if the hypothetical assumptions occur, and variations may be material.  Accordingly, the Proposed Monitor expresses no assurance as to whether the Cash Flow Forecast will be achieved.

7. If the Proposed Initial Order is granted, and KPMG is appointed as Monitor, KPMG will make available all Court documents and other material documents pertaining to the CCAA Proceedings on its website at https://kpmg.com/ca/canacol.  In addition, KPMG has arranged for an email address canacol@kpmg.ca through which creditors of the Applicants or other interested parties can make inquiries related to the CCAA Proceedings.

8. Unless otherwise stated, all monetary amounts noted herein are expressed in United States ("**US**") **dollars.**

## IV. KPMG'S QUALIFICATIONS TO ACT AS MONITOR

9. KPMG is a trustee within the meaning of section 2(1) of the *Bankruptcy and Insolvency Act* (Canada). Further, KPMG is not subject to any of the restrictions on who may be appointed as Monitor set out in section 11.7(2) of the CCAA. Specifically, neither KPMG nor its officers or employees are or have been, at any point in the past two years:

   a) a director, an officer or an employee any of the Applicants;

   b) related to any of the Applicants or to any director or officer of any of the Applicants; or

   c) the auditor, accountant or legal counsel, or a partner or an employee of the auditor, accountant or legal counsel of the any of the Applicants.

10. KPMG has experience acting as CCAA monitor and in other court-officer capacities in insolvency proceedings. The senior professional personnel at KPMG with primary carriage of this matter are certified Chartered Insolvency and Restructuring Professionals and Licensed Insolvency Trustees and have acted in insolvency matters of a similar nature and scale across Canada, including acting as foreign representative in cross-border and international proceedings.

11. Should the Court grant the Proposed Initial Order, KPMG has consented to act as Monitor. Furthermore, the Proposed Monitor has retained Bennett Jones LLP to act as its independent counsel in these CCAA Proceedings. A copy of the Proposed Monitor's consent to act is attached hereto as **Appendix "A"**.

## V. BACKGROUND

12. Detailed information with respect to the Applicants' business, operations and causes of insolvency are detailed extensively in the Bednar Affidavit. The Proposed Monitor has reviewed the Bednar Affidavit and believes, based on the Information available to it, that it provides a fair and sufficient summary of the business and affairs of the Applicants and the

causes of its insolvency. The information contained in this Report represents a summary of the background to the proposed CCAA Proceedings.

**Corporate Structure and Business**

13. Canacol, the parent of the Canacol Group, was incorporated under the *British Columbia Company Act* on July 20, 1970, and was continued under the *Alberta Business Corporations Act* (the "**ABCA**") on November 24, 2004.

14. Canacol is a publicly traded company with its common shares listed on the Toronto Stock Exchange under trading symbol "CNE", the OTCQX International Premier under the trading symbol "CNNEF" and (3) the Bolsa de Valores de Colombia, the principal stock exchange of Colombia, under trading symbol "CNEC".

15. Canacol has numerous subsidiaries as follows:

| The Canacol Group by Entity | | |
|---|---|---|
| **Country** | **Entity** | **Function** |
| Canada | Canacol Energy Ltd. ("**Canacol**") | Publicly listed parent company |
| **Canadian Subsidiaries** | | |
| Canada | 2654044 Alberta Ltd. ("**265 Alberta**") | Holding company |
| Canada | Canacol Energy ULC ("**Canacol ULC**") | Holding company |
| Canada | 2498003 Alberta ULC ("**249 Alberta**") | Holding company |
| **Colombian Subsidiaries** | | |
| Colombia | Canacol Energy Colombia S.A.S. ("**Canacol Colombia**") | Contractor under certain of the E&P Contracts (defined herein) |
| Colombia | CNE Energy S.A.S. ("**CNE Energy Colombia**") | Holding company |
| Colombia | CNE Oil & Gas S.A.S. ("**CNE O&G Colombia**") | Primary operating company; Contractor under certain of the E&P Contracts |
| **Other Subsidiaries** | | |
| Panama | CNE Oil & Gas S.R.L ("**CNE Panama**") | Contractor under certain of the E&P Contracts |
| Switzerland | Cantana Energy GmbH ("**Cantana Switzerland**") | Contractor under certain of the E&P Contracts |
| Switzerland | Shona Holding GmbH ("**Shona Switzerland**") | Holding company |

a) 265 Alberta, Canacol ULC, and 249 Alberta are referred to herein as the "**Canadian Subsidiaries**";

b) Canacol Colombia, CNE Energy Colombia, and CNE O&G Colombia are referred to herein as the "**Colombian Subsidiaries**"; and

c) Cantana Switzerland and Shona Switzerland are referred to herein as the "**Swiss Subsidiaries**".

16. The Canacol Group has the following offices:

| Entity | Offices | Function |
|---|---|---|
| Canacol Group | Suite 2000, 215 - 9th Avenue S.W., Calgary, Alberta | Head office |
| Canacol Energy Ltd. | 1000 Livingston Place, 250 - 2nd Street S.W., Calgary, Alberta | Registered Office |
| Swiss Subsidiaries | Pilatusstrasse 41, 6003 Luzern, Switzerland | Registered Office |
| CNE Panama | Punta Pacífica, Edificio PH Oceanía Business Plaza, Torre 2000, Nivel 18, Oficina 18E, | Registered Office |
| Colombian Subsidiaries | C11 113 No. 7-45 To. B Of 1501, Bogota D.C., Colombia | Registered Office |

17. Each of the Colombian Subsidiaries, the Swiss Subsidiaries, and CNE Panama have assets in Canada by virtue of deposits held in Canadian financial institutions.

18. The Canacol Group's core business centers on discovering, producing, and selling natural gas in northern Colombia, mainly through the Colombian Subsidiaries.

19. The Applicants hold interests in approximately 13 onshore oil and gas production, development, appraisal and exploration properties (the "**Oil and Gas Properties**") across Colombia, concentrated in the Llanos and Magdalena regions. Canacol's interest in the Oil and Gas Properties was acquired pursuant to the exploration and production contracts (each an "**E&P Contract**") and exploration and exploitation contracts (each an "**E&E Contract**") with Agencia Nacional de Hidrocarburos ("**ANH**") (the National Hydrocarbon Agency) in Colombia. Applicable royalties are paid to ANH and are determined in accordance with a sliding scale depending on produced volume of oil and gas.

20. Most sales are under long-term, fixed-price Offtake Agreements as defined and further discussed below.

21. The Canacol Group is also involved in producing and selling crude oil, although this represents a minor segment of the Applicants' overall business.

<u>Employees</u>

22. The Canacol Group employs approximately 381 full-time employees, of which 29 are employed in Canada and 352 are employed in Colombia.

23. The Canacol Group also engages the services of professionals on a contract or consultant basis in Colombia and the United States.

24. The Proposed Monitor understands the Applicants' employees do not benefit from a company-backed pension plan. Further, the Applicants' employees in Canada are not represented by a union; however, certain Colombian employees are members of trade unions.

<u>Customers</u>

25. The Canacol Group sells gas to Colombian customers pursuant to standard form gas offtake agreements (collectively, the "**Offtake Agreements**"). The Offtake Agreements primarily fall into the following categories:

a) firm-95% ("**CF95**") contracts – these are "take-or-pay" contracts whereby the respective Canacol Group entity, as "**Seller**", commits to delivering the maximum daily energy quantity accepted by the customer and the customer pays at least a minimum amount equal to 95% of the contracted quantity monthly. If the Seller is unable to deliver the agreed upon quantity, it is subject to a regulatory compensation formula for shortfalls;

b) conditional firm ("**CFC**") contracts – contracts whereby the Seller commits to delivering the maximum contracted energy quantity each month, except during "probable scarcity" conditions, and the customer pays a minimum of 95% of contracted

quantity monthly. Similar to CF95, Canacol is subject to a regulatory compensation formula for any shortfalls; and

c) interruptible ("**CI**") contracts – contracts whereby the gas quantity to be supplied is flexible with no "take-or-pay' obligation and both the Seller and customer can halt supply at any time on six hours' notice, without compensation or liability.

26. Pricing under the Offtake Agreements is determined at a fixed price.

**Financial Position**

27. Canacol's fiscal year-end is December 31. Included below is a summary of the Applicants' consolidated income statement for the twelve-month periods ended September 30, 2025, and December 31, 2024, respectively:

| The Canacol Group Summary Income Statement in USD '000s | | |
|---|---|---|
| **For the 12 month period ended** | **9/30/2025** | **12/31/2024** |
| **Revenue** | | |
| Total revenue, net of royalties | 319,085 | 375,916 |
| **Total Revenue** | 319,085 | 375,916 |
| **Expenses** | | |
| Operating & transportation | 41,935 | 52,741 |
| General & administrative | 32,691 | 33,975 |
| Depletion & depreciation | 75,640 | 81,784 |
| Foreign exchange (gain) loss | (111) | 3,993 |
| Other | 20,203 | 12,394 |
| Total expenses | 170,358 | 184,887 |
| **Income before finance expense & income taxes** | **148,727** | **191,029** |
| Net finance expense | 71,236 | 68,975 |
| **Income before income taxes** | 77,491 | 122,054 |
| Income tax expense (recovery) | 38,606 | 154,786 |
| **Net income (loss)** | **38,885** | **(32,732)** |

28. For the twelve-month period ended September 30, 2025 ("**TTM September 2025 Period**"), the Applicants generated revenues of approximately $319.1 million and incurred expenses, other than finance expense and income tax expense, of $170.4 million resulting in income before finance expense and income taxes of $148.7 million.  The Company incurred finance

expense of $71.2 million and income tax expense of 38.6 million which resulted in net income of approximately $38.9 million for the TTM September 2025 Period.

29. During the fiscal year ended December 31, 2024 (**"FY24"**), the Company generated revenues of approximately $375.9 million and incurred expenses, other than finance expense and income tax expense, of $184.9 million resulting in income before finance expense and income taxes of $191.0 million. The Company also incurred finance expense of $69.0 million and income tax expense of $154.8 million which resulted in net loss of approximately $32.7 million in FY24.

30. In the TTM September 2025 Period, the Company experienced a decrease in revenue and income before finance expense and income tax expense of approximately $56.8 million and $42.3 million, respectively, as compared to FY24, primarily due to a decrease in natural gas sales volumes.

31. The Canacol Group's declining sales volumes are the result of depletion of the natural gas reserves from fields situated on the Oil & Gas Properties. In order to generate consistent volumes, the Canacol Group must discover new reservoirs and establish production offsetting the natural depletion of existing natural gas reserves. Despite significant capital expenditures in drilling efforts over the TTM September 2025 Period, the Canacol Group was unable to establish commercially recoverable reserves, which combined with the natural decline in production in respect to the existing reserves, have negatively impacted the Canacol Group's revenue, income before finance expense and income taxes and free cash-flow.

32. Included below is the Canacol Group's unaudited balance sheet as at September 30, 2025, and audited balance sheet as at December 31, 2024:

| The Canacol Group Summary Balance Sheet USD '000s | 9/30/2025 | 12/31/2024 |
|---|---|---|
| **Assets** | | |
| Cash & cash equivalents | 36,539 | 79,201 |
| Other current assets | 73,476 | 94,627 |
| Non current assets | 1,182,403 | 1,041,949 |
| **Total assets** | 1,292,418 | 1,215,777 |
| **Liabilities** | | |
| Current portion of long-term debt | 42,172 | 12,500 |
| Trade and other payables | 107,607 | 87,368 |
| Other current liabilities | 36,902 | 45,415 |
| Long-term debt | 672,200 | 703,428 |
| Other non-current liabilities | 47,935 | 45,925 |
| **Total liabilities** | 906,816 | 894,636 |
| Equity | 385,602 | 321,141 |
| **Total liabilities & equity** | 1,292,418 | 1,215,777 |

33. As at September 30, 2025, the Applicants had total assets with a net book value of approximately $1.3 billion and total liabilities with a net book value of $900 million. Long-term debt, including the current portion, in the amount of approximately $714.4 million comprises secured and unsecured loans, the details of which are discussed in a later section of this Report.

34. As noted above, the Applicants have incurred significant capital expenditures in the face of declining revenues, and as further discussed below, Canacol made significant debt repayments in recent months as a result of its underperformance. Over the 9-month period ended September 30, 2025, its cash reserves were depleted by approximately $42.7 million, net of foreign exchange impact. The Applicants' cash on hand as at September 30, 2025, was $36.5 million, a decrease of approximately 54% compared to December 31, 2024, as summarized in the Canacol Group's cash flow statement for the 9-month period ended September 30, 2025, below.

| The Canacol Group Summary Cashflow Statement in USD '000s | |
|---|---|
| **For the 9 month period ended** | **9/30/2025** |
| **Operating Activities** | |
| Net income (loss) and comprehensive income (loss) | 64,319 |
| Non-cash adjustments | 57,924 |
| Change in non-cash working capital | 13,958 |
| Cash flow from operating activities | 136,201 |
| **Investing Activities** | |
| Expenditures on exploration and evaluation assets | (69,177) |
| Expenditures on property, plant and equipment | (77,561) |
| Other investing activities | 17,797 |
| Cashflow from investing activities | (128,941) |
| **Financing Activities** | |
| Net draw on long-term debt, net of fees | (8,959) |
| Net financing expense paid | (41,020) |
| Lease principal payments | (3,653) |
| Other | - |
| **Cashflow from financing activities** | (53,632) |
| Change in cash and cash equivalents | (46,372) |
| Cash and cash equivalents, beginning of period | 79,201 |
| Foreign exchange impact | 3,710 |
| **Cash and cash equivalents, end of period** | 36,539 |

35. As further discussed below, the Proposed Monitor understands that the debt service payments are due to the Applicants' lenders in the aggregate amount of approximately $25.4 million by the end of November, 2025, as follows:

   a) amortization payment on the Macquarie Debt (as defined herein) of $6.7 million;

   b) interest payment on the RCF (as defined herein) of $4.5 million; and

   c) interest payment on the Senior Notes (as defined herein) of $14.2 million.

36. The Canacol Group's cash on hand as at November 17, 2025, was approximately $17.2 million, inclusive of amounts held in the Promigas Trust (as defined and discussed further herein) of $6.7 million. The Proposed Monitor understands that the Applicants are not projected to have sufficient liquidity to fund their operations, or its near-term debt service

13

obligations, in the ordinary course based on significant debt levels and historical challenges related to operations as noted above.

## VI. OBJECTIVES OF THE CCAA PROCEEDINGS

37. The Proposed Monitor understands the primary objectives of the CCAA Proceedings are to:

a) provide a stay of proceedings to protect the Applicants' assets and facilitate the Canacol Group's ongoing operations;

b) ensure the Applicants have the necessary working capital to maximize the value of their business for the benefit of the Applicants' stakeholders, while providing the opportunity to restructure its business and affairs; and

c) provide a forum to explore restructuring options including a going concern sale and investment solicitation process (the "**SISP**") for the business, assets and/or shares of the Applicants that would seek to preserve creditor and stakeholder value.

38. Should the Court grant the Proposed Initial Order, the Monitor (in its then capacity) intends to work in collaboration with the Applicants to, among other things, to develop a SISP or recapitalization plan for their business. The Proposed Monitor will also work to determine the Applicants' interim financing requirements of the CCAA Proceedings in furtherance of the Canacol Group's restructuring.

## VII. CREDITORS

**Secured Indebtedness**

Macquarie Bank Ltd. Credit Facility

39. As discussed in the Bednar Affidavit, the Proposed Monitor understands that the Canacol Group's only secured lender is Macquarie Bank Ltd. ("**Macquarie**"). Canacol, as borrower, and Macquarie are parties to a credit agreement dated September 3, 2024 (the "**Macquarie Credit Agreement**"), pursuant to which Macquarie made available a secured term loan facility in an aggregate commitment of up to $75 million (the "**Macquarie Debt**"). The initial

draw under the Macquarie Debt was to be $50 million, with a further commitment of $25 million to be made available for a 12-month period should certain production metrics be met.

40. As security for the Macquarie Debt, the Macquarie Credit Agreement contemplates United States and Colombian collateral documents that are intended to give Macquarie (i) a first-priority security interest in the Canacol Group's assets in Colombia and the United States, (ii) springing control over certain United States and Colombian collection accounts pursuant to the DACAs (as defined herein), and (iii) pledges of the shares of Canacol's key Colombian and Panamanian subsidiaries.

41. The Macquarie Credit Agreement stipulates a maturity date of September 15, 2026, subject to earlier repayment and/or maturity, triggered by failure by the Canacol Group to meet certain specified production metrics, or failure to provide required reporting.

42. As at the date of this Report, only the initial draw of $50 million was advanced. Further, due to lower than targeted contractual volumes having been realized over the two months ended June 30, 2025, accelerated amortization of the loan was triggered beginning September 15, 2025. To date, $14.9 million has been repaid to Macquarie, and as noted above, the next partial repayment in the amount of $6.7 million is due on November 18, 2025.

**Potential Priority Creditors**

43. The Proposed Monitor understands that the Canacol Group is current on all GST and source deductions.

**Unsecured Indebtedness**

<u>Revolving Syndicated Credit Facility</u>

44. As noted in the Bednar Affidavit, Canacol is the borrower under a Revolving Credit and Guarantee Agreement dated February 14, 2025, with Deutsche Bank Trust Company Americas, as Administrative Agent, and CitiGroup Global Markets Inc. Deutsche Bank, AG and JP Morgan Chase Bank, N.A., as joint lead arrangers and joint bookrunners, and a syndicate of lenders, which extends an unsecured revolving credit facility with an aggregate commitment of $200 million (the "**RCF**").

45. The RCF matures on February 14, 2027, and is fully drawn as at the date of this Report.

46. The RCF is guaranteed by certain subsidiaries of Canacol, namely, Canacol ULC, Canacol Colombia, CNE O&G Colombia, CNE Energy Colombia, CNE Panama, and Shona Switzerland.

47. The next interest payment on the RCF in the approximate amount of $4.5 million, as noted above, is due on November 21, 2025.

Indenture

48. Canacol completed a private offering of senior unsecured notes (the "**Senior Notes**") in the aggregate principal amount of $500 million with a maturity date of November 24, 2028, pursuant to an indenture dated November 24, 2021, whereby Canacol is the issuer and Citibank, N.A., is Trustee, Security Registrar and Paying Agent. The Senior Notes mature on November 24, 2028.

49. The Proposed Monitor understands that on March 26, 2025, Canacol repurchased $5 million of the Senior Notes for $2.75 million such that the aggregate principal amount on the Senior Notes outstanding is now $495 million.

50. The Senior Notes bear interest at a fixed rate of 5.750% per annum, payable semi-annually in arrears on May 24 and November 24 of each year. As noted above, the next interest payment is due on November 24, 2025, in the amount of approximately $14.2 million.

51. The Senior Notes are guaranteed on a senior unsecured basis by the following Canacol subsidiaries: Canacol ULC, Canacol Colombia, CNE O&G Colombia, CNE Energy Colombia, CNE Panama, and Shona Switzerland.

Letters of Credit

52. The Canacol Group is required to provide guarantees for its work commitments in respect of the E&P Contracts, as described above. As at June 30, 2025, the Canacol Group had letters of credit outstanding totaling approximately $61.3 million in guarantee of those work commitments on exploration blocks and other contractual commitments. Certain of these

letters of credit expire as of December 31, 2025, and will need to be renewed or replaced at that time.

<u>Trade Creditors</u>

53. The Canacol Group's principal trade creditors are based in Colombia and support the Canacol Group's core exploration, development, and production operations. These creditors provide critical services, including oil and gas operational and technical consulting, comprehensive drilling services, production support (such as lubricants, steel, processing, and compression), as well as distribution and logistics. Additionally, they provide IT and telecommunications solutions, staffing, human resources, and facilities.

54. As at September 30, 2025, amounts payable to trade creditors totaled $107.6 million.

**Legal Proceedings**

<u>The Class Action Proceeds</u>

55. As discussed in the Bednar Affidavit, a proposed class action (the "**Proposed Class Action**") was commenced against Canacol in early 2025 alleging market misrepresentation in connection with a pipeline (the Medellin pipeline) project. The proposed action alleges that Canacol omitted certain material facts regarding its progress towards completing the Medellin pipeline project. The Proposed Class Action is not yet certified.

56. The Proposed Monitor understands that Canacol denies all allegations made in the Statement of Claim issued in connection with the Proposed Class Action and intends to oppose certification of the Proposed Class Action.

<u>The Arbitral Award</u>

57. As discussed in the Bednar Affidavit, following a dispute arising from CNE O&G Colombia's and CNE Panama's termination of natural gas supply contracts with VP Ingenergía ("**VPI**"), the Colombian Arbitration and Conciliation Center of the Bogotá Chamber of Commerce (the "**Arbitral Tribunal**") was convened to address the dispute. The Arbitral Tribunal determined a net amount payable by CNE O&G Colombia and CNE Panama

of approximately $22 million (the "**Arbitral Award**") which is expected to become binding on November 20, 2025.

58. The Proposed Monitor understands that Canacol is reviewing the Arbitral Award in light of invoices it says remain unpaid by VPI, and Colombian court payment orders in Canacol's favour amounting to approximately $25 million, and that it is separately pursuing an international arbitration claiming sums exceeding $76 million.

## VIII. CASH FLOW FORECAST

59. The Applicants, in consultation with the Proposed Monitor, have prepared the Cash Flow Forecast for the purpose of projecting the estimated liquidity needs of the Applicants for the period from November 16, 2025, to December 27, 2025 (the "**Forecast Period**"). A copy of the Cash Flow Forecast, accompanying notes and a report containing prescribed representations regarding the preparation of the Cash Flow Forecast are attached hereto as **Appendix "B"**.

The Cash Flow Forecast has been prepared by the Applicants on a conservative basis using probable and hypothetical assumptions set out in the notes to the Cash Flow Forecast.

| The Canacol Group 6-Week Cash Flow Forecast In USD ($000's); unaudited | |
| --- | --- |
| **CCAA Week** | |
| **Week Ending** | |
| | |
| **Receipts** | |
| Receipts | 45,877 |
| **Total receipts** | **45,877** |
| **Operating disbursements** | |
| Pre-filing expense | (2,000) |
| Operating expenses | (8,816) |
| Royalties | (3,363) |
| Salaries and bonuses | (2,954) |
| Capital expenditures | (15,098) |
| Tax payable | (2,883) |
| Professional fees | (1,000) |
| **Total operating disbursements** | **(36,115)** |
| **Net cash flow** | **9,762** |
| **Opening cash** | 17,208 |
| Net cash flow | 9,762 |
| **Ending cash** | **26,970** |

60. Forecast operating cash receipts over the Forecast Period total approximately $45.9 million and relate to collections of monthly payments from the customers of the Canacol Group primarily in connection with its sales through the long-term, fixed-price Offtake Agreements.

61. Forecast operating disbursements over the Forecast Period total approximately $36.1 million and primarily consist of capital expenditures ($15.1 million), operating expenses ($8.8 million) and royalties ($3.4 million).

62. Net cash flow is forecast to be approximately $9.8 million over the Forecast Period.

63. The Proposed Monitor notes that the Cash Flow Forecast has been prepared solely for the purpose described above, and readers are cautioned that it may not be appropriate for other purposes.

64. As noted in the Bednar Affidavit and as further discussed below, the Applicants have proposed in the Proposed Initial Order that they be authorized (but not obligated) to make Critical Vendor Payments for amounts owing for goods and services supplied prior to the date of the Proposed Initial Order by certain critical third-party suppliers up to a maximum amount of $2 million. Accordingly, for conservatism, the maximum amount of $2 million has been included in the Cash Flow Forecast. Critical Vendor Payments will be limited to what is necessary to preserve value and maintain operations, and can only be made in consultation with, and with consent of, the Monitor.

**Interim Financing**

65. The Cash Flow Forecast projects adequate liquidity through December 27, 2025. It is anticipated that the Applicants will require interim financing to fund their business and operations, including letters of credit, and the CCAA Proceedings including a SISP. If appointed, the Monitor intends to work with the Applicants to evaluate its liquidity requirements and to secure interim financing, subject to this Court's approval.

## IX. CRITICAL VENDOR PAYMENTS

66. As noted above, as at September 30, 2025, amounts owing to trade creditors by the Applicants totaled approximately $108 million. The Applicants are requesting that this Court authorize the Applicants to make Critical Vendor Payments to certain critical third-party suppliers, to the extent necessary to preserve value and maintain operations, up to an amount of $2 million in aggregate. The Proposed Initial Order contemplates that Critical Vendor Payments can only be made in consultation with, and with consent of, the Monitor.

67. The Proposed Monitor is of the view that the uninterrupted, timely supply natural gas is necessary to preserving the Canacol Group's business and that payment of certain Critical Vendor Payments may be necessary. The Proposed Monitor understands that any critical suppliers are anticipated to relate to oil and gas operational and technical consulting, comprehensive drilling services, and production support. The maximum amount of the proposed Critical Vendor Payments authorization represents only a fraction of the Canacol Group's significant trade payables.

68. Accordingly, the Proposed Monitor supports the Applicants' request for authorization to make up to $2 million in Critical Vendor Payments, to the extent necessary and subject to prior approval by the Monitor, prior to the hearing of the Comeback Motion.

## X. PROPOSED COURT ORDERED CHARGES

69. The Proposed Initial Order provides for two (2) priority charges (collectively the "**Proposed Charges**") on the current and future assets, undertakings and properties of the Applicants wherever located, including all proceeds thereof, that rank in priority to all other charges except for the claims of Macquarie (in respect only of and limited to the Property over which Macquarie has valid and enforceable secured claims), in the following order:

a) First, the Administration Charge (as defined below, to the maximum amount of $1 million); and

b) Second, the Directors' Charge (as defined below, to a maximum of $1 million).

70. As discussed in detail below, the Proposed Monitor understands that the Applicants intend to seek i) increases to the quantum, and ii) priority ranking of the Proposed Charges in the ARIO (as defined herein) when the Comeback Motion is heard, on notice to the secured creditors. Each of the Proposed Charges are described in more detail below.

**Administration Charge**

71. The Proposed Initial Order provides a charge for the ten-day period prior to the hearing for Comeback Motion on all Property of the Applicants in favour of the Proposed Monitor, counsel to the Proposed Monitor, and the Applicants' counsel (collectively, the "**Insolvency Professionals**"), as security for their respective fees and disbursements incurred in respect of the Application in the aggregate amount of $1,000,000 (the "**Administration Charge**"). The Proposed Monitor understands that the Insolvency Professionals are intended to include corporate and restructuring counsel of the Applicants in Canada, the United States, and Colombia, and restructuring counsel of the Proposed Monitor in Canada and the United States.

72. The Proposed Monitor is of the view that the Administration Charge is reasonable and appropriate in the circumstances, having considered, among other things:

a) the size of the court-ordered charge has been calculated in consultation with the Proposed Monitor, taking into account the expected future costs of all of the Insolvency Professionals covered by the Administration Charge in respect of the CCAA Proceedings and the recognition proceedings, and the cadence of payment of invoices;

b) the amount of the Administration Charge is limited to an amount necessary to ensure the beneficiaries of the Administration Charge have adequate protection to the date of the hearing for the Comeback Motion, and considers any retainers estimated to be available at the commencement of the CCAA Proceedings; and

c) the proposed ranking of the Administration Charge in the Proposed Initial Order does not contemplate ranking in priority to Macquarie, who the Proposed Monitor understands to be the Canacol Group's sole secured lender.

**Directors' Charge**

73. The Proposed Initial Order provides for a charge in the maximum amount of $1 million to secure the Applicants' indemnity obligations to the current directors and officers of the Applicants (the "**Directors and Officers**") against obligations and liabilities that they may incur as directors or officers of the Applicants after the commencement of these CCAA Proceedings (the "**Directors' Charge**").

74. The Directors and Officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent such coverage is insufficient to pay an indemnified amount. As per the Bednar Affidavit, the Proposed Monitor understands that the Applicants maintains directors' and officers' liability insurance but that these policies may have various exceptions, exclusions and carve-outs, and may not provide sufficient coverage against potential liabilities that may be incurred during the proposed CCAA Proceedings.

75. The amount of the Directors' Charge has been calculated by the Applicants, in consultation with the Proposed Monitor, taking into consideration the employee payroll and related expenses (including source deductions) of the Canacol Group, as well as other employment related liabilities, that attract potential liability for the Directors and Officers during the period prior to the granting of the ARIO (i.e. approximately one (1) bi-weekly payroll period). As noted above, the Proposed Monitor understands that any excise duties and sales taxes were up to date as at the date of this Report.

76. The Proposed Monitor understands that due to the potential for personal liability, the Directors' Charge is critical to the continued involvement of the Directors and Officers during the CCAA Proceedings. As the Applicants will require the participation and experience of the Directors and Officers to facilitate the successful restructuring in the proposed CCAA Proceedings, including in operating the business and working with stakeholders, the Proposed Monitor believes that the Directors' Charge (both the amount and the priority ranking) is required and reasonable in the circumstances.

## XI. CASH MANAGEMENT SYSTEM

### Overview

77. As outlined in the Bednar Affidavit, the Applicants have an integrated cash management system (the "**Cash Management System**"), which is critical to the Canacol Group's international operations.

78. The Canacol Group holds nearly 60 bank accounts in support of its treasury function, primarily at various financial institutions in Canada, the United States and Colombia. Canacol Energy Colombia, and Canacol Energy Argentina S.A. each hold accounts in Bolivia and Argentina, respectively. The Proposed Monitor understands that many of these accounts are interrelated, serving to collect funds from customers, make operating, financing, and investing disbursements across the business.

79. Collections from the corporate group's customers are primarily deposited as follows:

   a) if subject to the Promigas Trust Arrangement, into the Promigas Trust at the financial institution of the Promigas Trustee in Colombia (each as later defined); or

   b) if not subject to the Promigas Trust Arrangement, into accounts subject to deposit account control agreements (each a "**DACA**") pursuant to the Macquarie Credit Agreement, at financial institutions in Colombia and the United States.

80. The Proposed Monitor understands that most operating disbursements are made from Colombian and US bank accounts.

81. The Proposed Monitor further understands that the Canacol Group's bank accounts located at the Bank of Nova Scotia in Canada are primarily to used to make debt service payments to Macquarie, RCF and the holders of Secured Notes, and funds flow from the DACA accounts to make such disbursements. On November 12, 2025 and November 14, 2025, the corporate group transferred $4,024,000 and $3,700,000, respectively from DACA accounts to its accounts with the Bank of Nova Scotia. As noted above, the Proposed Monitor understands that certain debt service payments are due to Macquarie, RCF, and the holders of the Senior Notes throughout the remainder of November, 2025.

23

**Promigas Trust Arrangement**

82. CNE Oil & Gas Colombia S.A.S. and Canacol Energy Colombia S.A.S. ("**CECSAS**") are parties (in such capacity, the "**Settlors**") to a trust arrangement effective as of January 26, 2021 in favour of Promigas S.A. E.S.P. ("**Promigas**") to secure transportation fees earned by Promigas pursuant to a transportation agreement amongst the parties (the "**Promigas Trust Arrangement**").

83. Pursuant to the Promigas Trust Arrangement, collections from customers who purchase natural gas from the corporate group using the Promigas pipeline covered by the transportation agreement are received directly into the accounts of the Promigas Trust Arrangement (the "**Promigas Trust**"). Funds in the Promigas Trust are administered by the trustee (the "**Promigas Trustee**") as follows:

    a) first, to pay obligations owing to Promigas;

    b) next, to maintain a prescribed reserve in the Promigas Trust; and

    c) last, to make other payments as directed by Settlors and to transfer any surplus from the Promigas Trust to the Settlors.

84. The Promigas Trust Arrangement predates the Macquarie Credit Agreement and the Promigas Trust is not subject to any DACAs. However, pursuant to the Macquarie Credit Agreement, any surplus in the Promigas Trust is required to be transferred to accounts of the Settlors which are subject to DACAs. The Proposed Monitor understands that, as of the date of this Report, there are no surplus funds being held by the Promigas Trust.

85. In the Proposed Monitor's view, the ongoing operation of the Cash Management System will not be prejudicial to any creditor or other stakeholder, and ought to be maintained during the CCAA Proceedings.

## XII. FOREIGN PROCEEDINGS

86. As described earlier in this Report, the Canacol Group's exploration and production assets and operations are located in Colombia. As noted above, the Applicants' operations are further supported by bank accounts and lending arrangements based located in the United States.

87. The Proposed Initial Order contemplates that the Monitor will be appointed as the foreign representative and authorized to seek recognition of these proceedings outside of Canada.

88. Accordingly, if the Proposed Initial Order is granted, the Applicants and the Monitor intend to proceed as soon as possible with commencing proceedings under Chapter 15 of the United States Code and will seek to have the CCAA Proceedings recognized as a foreign main proceeding and the Proposed Initial Order enforced in the United States. This will include a request for an order granting provisional relief under Chapter 15 of the United States Code and implementing a stay of proceedings in the United States, pending further order of the court of competent jurisdiction in the United States. The Monitor is of the view that obtaining relief under Chapter 15 to recognize the CCAA Proceedings is necessary to maintain the flow of funds in the ordinary course of operations, given that the Canacol Group's lenders, and several of its bank accounts, are located in the United States.

89. The Proposed Monitor has engaged Pachulski Stang Ziehl & Jones LLP to represent the Monitor (if appointed) as foreign representative in the Chapter 15 proceedings.

90. Likewise, the Monitor (if appointed) intends to immediately file an application to have the CCAA Proceedings recognized with the Superintendency of Companies of Colombia, the Colombia Courts and any other Colombian authorities pursuant to Title III of Law 1116 of 2006 of the Republic of Colombia.

91. The Proposed Monitor is of the view that protection in the United States and Colombia are necessary to preserve the going concern value of Canacol's business and further agrees that the Chapter 15 proceedings should be commenced immediately. The Proposed Monitor has reviewed the circumstances, including facts set out in the Bednar Affidavit, and consulted with its legal counsel (over which consultations it does not waive privilege), and agrees with the affiant's conclusion that Canada is the centre of main interest for the Canacol Group.

## XIII. COMEBACK MOTION

92. Should the Court grant the Proposed Initial Order, the Proposed Monitor understands that the Applicants intend**s** to bring a motion returnable within the ten (10) day stay period (the "**Comeback Motion**") seeking an amendment and restatement of the Initial Order (such order, the "**ARIO**") that will, among other things:

    a) extend the stay of proceedings until a date to be determined by the Court in the week beginning January 26, 2026, subject to the Court's availability, and granting other customary Comeback Hearing relief under the CCAA

    b) increase the quantum of the Administration Charge and the Directors' Charge (to the extent necessary), and providing for the priority ranking of the Administration Charge and the Directors' Charge such that the Proposed Charges rank in priority to all other security, charges and encumbrances in favour of any person over the Property;

    c) authorize the Applicants to obtain interim financing from a lender to be confirmed (the "**Proposed DIP Lender**") pursuant to a debtor-in-possession facility term sheet to finance working capital requirements and other general corporate purposes, and grant a priority charge in favour of the Proposed DIP Lender over the Applicants' Property to secure such interim financing;

    d) grant Canacol relief from certain securities law reporting obligations under federal, provincial and other applicable law until further order of the Court; and

    e) grant such other relief as may be required to advance the Applicants' restructuring efforts.

93. Should the Court grant the Proposed Initial Order, KPMG (in its then capacity as Monitor) will report to the Court in connection with the Comeback Motion and any other relief sought by the Applicants.

## XIV. PROPOSED MONITOR'S CONCLUSION AND RECOMMENDATIONS

94. The Canacol Group is facing a looming liquidity crisis. Without CCAA protection and access to its cash on hand, a shut-down of the Applicants' operations is inevitable, which would have an adverse impact on the Applicants' stakeholders, including employees, customers, and trade partners. The stay of proceedings and related relief granted under the CCAA (and pursuant to the foreign recognition proceedings) will provide the Applicants with an opportunity to restructure their business and affairs for the benefit of their stakeholders.

95. According to the Bednar Affidavit, it is without the funds required to meet its significant debt service obligations as they become due this month, which would result in events of default and related cross-defaults under credit agreements with Macquarie, RCF, and the holders of the Secured Notes. In the circumstances, the Canacol Group is seeking protection under the CCAA to afford itself the necessary breathing room to stabilize its business and pursue its restructuring.  The CCAA Proceedings would provide a forum to develop and execute on a going concern SISP that would seek to maximize creditor and stakeholder value.

96. As noted in the Bednar Affidavit, the Proposed Monitor understands that since 2024, the Canacol Group has pursued additional liquidity from both existing and new lenders to address its liquidity constraints, engaging Plexus Capital ("**Plexus**") to source, negotiate, and advise on potential financings.

97. Over the past year, with Plexus's assistance, the Proposed Monitor understands that Canacol pursued multiple transactions at varying stages of advancement. Specifically, it undertook:

   a) three (3) separate efforts to refinance indebtedness to Macquarie via the RCF lenders, each reaching the term sheet phase but failing to progress further;

   b) three (3) separate efforts to increase commitments under, or extend amortization of, the Macquarie Credit Facility, each again reaching term sheet stages but not successfully closing;

   c) discussions with a major international bank that reached verbal consensus but did not receive approval by the prospective lender to proceed to a written term sheet; and

d) recent and ongoing efforts with a private investment group to refinance the Macquarie Debt.

98. The Proposed Monitor understands that several parties remain interested in the Applicants' business and their significant asset base. In this regard, it is the Proposed Monitor's expectation that there will be a market for the SISP, and the interim financing requirements of the Applicants.

99. For the reasons set out in this Report, the Proposed Monitor is of the view that the relief requested by the Applicants is both appropriate and reasonable. The Proposed Monitor is also of the view that granting the relief requested will provide the Applicants the best opportunity to restructure under the CCAA, thereby preserving value for the benefit of the Applicants' stakeholders. As such, the Proposed Monitor supports the Applicants' application for CCAA protection and respectfully recommends that the Court grant the relief sought by the Applicants in the Proposed Initial Order.

All of which is respectfully submitted this 17th day of November 2025.


**KPMG Inc.**
**In its capacity as Proposed Monitor of**
**Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC,**
**Cantana Energy GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona**
**Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S.**

**And not in its personal or corporate capacity**


Per:



_____
**Paul van Eyk**
**CPA, CA-IFA, CIRP, LIT, Fellow of INSOL**
President




_____
**Katherine Forbes**
**CPA, CA, CIRP, LIT**
Senior Vice President

# Appendix "A"

| | |
|---|---|
| COURT FILE NUMBER | |
| COURT | COURT OF KING'S BENCH OF ALBERTA |
| JUDICIAL CENTRE | CALGARY |
| MATTER | IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36, AS AMENDED |
| | AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA ULC, CANTANA ENERGY GMBH, CNE OIL & GAS, S.R.L, CANACOL ENERGY COLOMBIA S.A.S., SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S. |
| APPLICANTS | CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA ULC, CANTANA ENERGY GMBH, CNE OIL & GAS, S.R.L, CANACOL ENERGY COLOMBIA S.A.S., SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S. |
| DOCUMENT | **CONSENT TO ACT AS MONITOR** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | **Gowling WLG (Canada) LLP** 1 First Canadian Place 100 King Street West, Suite 1600 Toronto ON M5X 1G5 Attn: **Clifton Prophet/ Sam Gabor/ Katherine Yurkovich** Telephone (416) 862-3509/ (403) 298-1946/ (416) 862-4342 Facsimile (416) 862-7661 Email: clifton.prophet@gowlingwlg.com / sam.gabor@gowlingwlg.com File No. G10088627 |

## CONSENT TO ACT AS MONITOR

**KPMG INC.** does hereby consent to act as Monitor of Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Cantana Energy GmbH, CNE Oil & Gas, S.R.L, Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S.  if appointed by the Court.

An electronic copy of this Consent to Act as Monitor shall be as effective as an original.

**DATED** at Toronto, Ontario, this 16th day of November, 2025.

**KPMG INC.**

Per:    _Katherine Forbes_
Name:    Katherine Forbes
Title:    Senior Vice President

# Appendix "B"

*Alberta*
**COURT OF KING'S BENCH OF ALBERTA**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C.1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF
CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA
ULC, CANTANA ENERGY GMBH, CNE OIL & GAS S.R.L, CANACOL ENERGY COLOMBIA S.A.S.,
SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S.**

**(collectively the "Canacol Group" or the "Applicants")**

**MONITOR'S REPORT ON CASH FLOW STATEMENT**
(paragraph 23(1)(b) of the CCAA)

The attached statement of projected cash flow of the Applicants prepared as of the 17th day of November 2025, consisting of the period from November 16, 2025 to December 27, 2025 (the "**Cash Flow Forecast**"), has been prepared by management of the Applicants, in consultation with the Monitor for the purpose described in Note 1, using the probable and hypothetical assumptions set out in the notes to the Cash Flow Forecast.

Our review and consultation consisted of inquiries, analytical procedures and discussions related to information supplied by management and employees of the Applicant. Since hypothetical assumptions need not be supported, our procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Cash Flow Forecast. We have also reviewed the support provided by management for the probable assumptions and the preparation and presentation of the Cash Flow Forecast.

Based on our review, nothing has come to our attention that causes us to believe that, in all material respects:

  a)  the hypothetical assumptions are not consistent with the purpose of the Cash Flow Forecast;
  b)  as at the date of this report, the probable assumptions developed by management are not suitably supported and consistent with the plans of the Applicants or do not provide a reasonable basis for the Cash Flow Forecast, given the hypothetical assumptions; or
  c)  the Cash Flow Forecast does not reflect the probable and hypothetical assumptions.

Since the Cash Flow Forecast is based on assumptions regarding future events, actual results will vary from the information presented even if the hypothetical assumptions occur, and the variations may be material. Accordingly, we express no assurance as to whether the Cash Flow Forecast will be achieved.

The Cash Flow Forecast has been prepared solely for the purpose described in the notes thereto and readers are cautioned that it may not be appropriate for other purposes.

Dated at Toronto, in the Province of Ontario, this 17th day of November 2025.

**KPMG Inc.**
**In its capacity as Proposed Monitor of**
**Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta Energy
GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S.,
and CNE Oil & Gas S.A.S.**

**And not in its personal or corporate capacity**

_____

Katherine Forbes
CPA, CA, CIRP, LIT

*Alberta*
## COURT OF KING'S BENCH OF ALBERTA

### IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,* R.S.C.1985, c. C-36, AS AMENDED

### AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA ULC, CANTANA ENERGY GMBH, CNE OIL & GAS S.R.L, CANACOL ENERGY COLOMBIA S.A.S., SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S. (collectively the "Applicants")

### MANAGEMENT'S REPORT ON CASH FLOW STATEMENT
(paragraph 10(2)(b) of the CCAA)

The management of the Canacol Group have developed the assumptions and prepared the attached statement of projected cash flow as of the 17th day of November 2025, consisting of the period from November 16, 2025 to December 27, 2025 (the "**Cash Flow Forecast**").

The hypothetical assumptions are reasonable and consistent with the purpose of the Cash Flow Forecast described in the notes therein, and the probable assumptions are suitably supported and consistent with the plans of the Applicants and provide a reasonable basis for the Cash Flow Forecast. All such assumptions are disclosed in the notes therein.

Since the Cash Flow Forecast is based on assumptions regarding future events, actual results will vary from the information presented, and the variations may be material.

The Cash Flow Forecast has been prepared solely for the purpose described in the notes therein, using the probable and hypothetical assumptions set out therein. Consequently, readers are cautioned that the Cash Flow Forecast may not be appropriate for other purposes.

Dated at Calgary, in the Province of Alberta, this 17th day of November 2025.

**Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Cantana Energy GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S.**

_____
Jason Begnar
Chief Financial Officer

**The Canacol Group**

**Cash Flow Forecast**

**In USD ($000's); unaudited**

| | Notes | Forecast 1 22-Nov-25 | Forecast 2 29-Nov-25 | Forecast 3 6-Dec-25 | Forecast 4 13-Dec-25 | Forecast 5 20-Dec-25 | Forecast 6 27-Dec-25 | Total |
|---|---|---|---|---|---|---|---|---|
| **CCAA Week** | | | | | | | | |
| **Week Ending** | | | | | | | | |
| | 1, 11 | | | | | | | |
| **Receipts** | | | | | | | | |
| Receipts | 2 | 346 | 20,748 | 1,000 | 1,000 | 1,000 | 21,783 | 45,877 |
| **Total receipts** | | **346** | **20,748** | **1,000** | **1,000** | **1,000** | **21,783** | **45,877** |
| | | | | | | | | |
| **Operating disbursements** | | | | | | | | |
| Pre-filing expense | 3 | (1,000) | (1,000) | - | - | - | - | (2,000) |
| Operating expenses | 4 | (1,060) | (2,244) | (1,106) | (1,106) | (1,106) | (2,194) | (8,816) |
| Royalties | 5 | - | (1,657) | - | - | - | (1,707) | (3,363) |
| Salaries and bonuses | 6 | - | (973) | - | (990) | - | (990) | (2,954) |
| Capital expenditures | 7 | (2,734) | (2,734) | (2,408) | (2,408) | (2,408) | (2,408) | (15,098) |
| Tax payable | 8 | (19) | (1,321) | (55) | (55) | (55) | (1,378) | (2,883) |
| Professional fees | 9 | - | (400) | (100) | (100) | (100) | (300) | (1,000) |
| **Total operating disbursements** | | **(4,813)** | **(10,329)** | **(3,669)** | **(4,659)** | **(3,669)** | **(8,977)** | **(36,115)** |
| | | | | | | | | |
| **Net cash flow** | | **(4,467)** | **10,419** | **(2,669)** | **(3,659)** | **(2,669)** | **12,806** | **9,762** |
| | | | | | | | | |
| **Opening cash** | 10 | 17,208 | 12,741 | 23,161 | 20,492 | 16,833 | 14,164 | 17,208 |
| Net cash flow | | (4,467) | 10,419 | (2,669) | (3,659) | (2,669) | 12,806 | 9,762 |
| **Ending cash** | | **12,741** | **23,161** | **20,492** | **16,833** | **14,164** | **26,970** | **26,970** |

**The Canacol Group**
**6-Week Cash Flow Forecast**
**Notes and Summary of Assumptions**

**In the Matter of the CCAA Proceedings of Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Cantana Energy GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S.**
**(collectively the "Applicants")**

**Disclaimer**

In preparing this cash flow forecast (the "**Cash Flow Forecast**"), the Applicants have relied upon unaudited financial information and have not attempted to further verify the accuracy or completeness of such information. Since the Cash Flow Forecast is based on assumptions about future events and conditions that are not ascertainable, the actual results achieved during the Cash Flow Forecast period will vary from the Cash Flow forecast, even if the assumptions materialize, and such variations may be material. There is no representation, warranty, or other assurance that any of the estimates, forecasts or projections will be realized.

The Cash Flow Forecast is presented in US dollars. All defined terms that are not otherwise defined herein are to have the same meaning ascribed to them in the pre-filing report of the Monitor dated November 17th, 2025 (the "**Pre-Filing Report**").

| | |
|---|---|
| **Note 1** | **Purpose of the Cash Flow forecast** |
| | The purpose of the Cash Flow Forecast is to present the estimated cash receipts and disbursements of the Applicants for the period from November 16, 2025 to December 27, 2025, in respect of its proceedings under the CCAA. The Cash Flow Forecast has been prepared by management of the Canacol Group, in consultation with the Monitor based on available financial information at the date of the Pre-Filing Report. Readers are cautioned that this information may not be appropriate or relied upon for any other purpose. |
| **Note 2** | **Receipts** |
| | Majority of the Applicants' receipts are generated through sale of natural gas through long-term, fixed price contracts to residential and commercial end users. Customer receipts are forecasted based on contracted volumes and primarily received on a prepaid basis from its customers. |
| **Note 3** | **Pre-Filing Payments** |
| | These disbursements relate to amounts owing for goods and services supplied prior to the filing date by certain third-party suppliers, up to a maximum aggregate amount of $2.0 million, if in the opinion of the Canacol Group, the supplier is critical to the ongoing operations and business of the Canacol Group. Pre-filing payments are subject to prior approval by the Monitor. |
| **Note 4** | **Operating expenses** |
| | Operating expenses are comprised of expenses related to producing, treating and delivering natural gas and general business expenses, including maintenance, insurance, utilities, equipment rental, and general and administrative costs. Operating expenses are forecasted based on historical run rates and are assumed to be paid COD. |
| **Note 5** | **Royalties** |
| | Royalties are paid to ANH at the end of each month for the exploration or production of natural gas based on the production volume of the Canacol Group each month. |
| **Note 6** | **Capital Expenditures** |
| | Capital expenditures include amounts paid for exploration, drilling and workovers, compression and other costs for the purpose of producing natural gas and crude oil for sale. Capital |

expenditures are forecasted based on historical run rates and the Canacol Group's planned exploration and drilling efforts. These expenses are assumed to be paid COD.

**Note 8**     **Tax Payable**

Tax remittances include withholding taxes paid to the Colombian government.

**Note 9**     **Professional Fees**

Professional fees include payments to the Applicant's legal counsel in Canada and the US, the Proposed Monitor, the Proposed Monitor's legal counsel in Canada and the US.

**Note 10**     **Opening Cash**

Opening cash balance includes amounts held in the Applicants' bank accounts including the Promigas Trust amount of $6.7 million.

**Note 11**     **Letters of Credit**

The forecast excludes any potential impact of the upcoming expiry of the letters of credit which is still under consideration by the Canacol Group.