## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CANACOL ENERGY LTD.,[1] *et al.*<br><br>Debtors in a Foreign Proceeding. | Chapter 15<br><br>Case No. 25- 12572<br><br>(Joint Administration Requested) |

### DECLARATION OF JASON BEDNAR IN SUPPORT OF (I) VERIFIED CHAPTER 15 PETITIONS, (II) FOREIGN REPRESENTATIVE'S MOTIONS FOR ORDERS GRANTING PROVISIONAL RELIEF AND FINAL RELIEF IN AID OF CANADIAN PROCEEDING, AND (III) RELATED RELIEF

I, Jason Bednar, to the best of my information and belief, state as follows:

1.      I am the Chief Financial Officer of Canacol Energy Ltd. ("Canacol", and together with its subsidiaries, the "Canacol Group"),[2] and as such, I am fully familiar with the facts and circumstances set forth herein.

2.      I submit this declaration (the "Declaration") on behalf of Canacol, and its affiliated debtors (collectively, the "Debtors"), 2498003 Alberta ULC ("249 Alberta"), 2654044 Alberta Ltd. ("265 Alberta"), Canacol Energy ULC ("Canacol ULC"), Cantana Energy GmbH ("Cantana Switzerland"), CNE Oil & Gas S.R.L. ("CNE Panama"), Canacol Energy Colombia S.A.S. ("Canacol Colombia"), Shona Holding GmbH ("Shona Switzerland"), CNE Energy S.A.S. ("CNE Energy Colombia"), and CNE Oil & Gas S.A.S. ("CNE O&G Colombia") in support of (a) the *Motion for (I) Recognition of Foreign Main Proceeding (or, in the Alternative, Foreign Nonmain*

---

[1]      The Debtors, along with the last four digits of each Debtor's unique identifier, as applicable, are as follows: Canacol Energy Ltd. (2074); Cantana Energy GmbH (8873); CNE Oil & Gas S.R.L. (9803); Canacol Energy ULC (0350); Shona Holding GmbH (2126); Canacol Energy Colombia S.A.S. (5633); CNE Energy S.A.S (0691); CNE Oil & Gas S.A.S. (6580); 2498003 Alberta ULC (4611); and 2654044 Alberta Ltd. (3429). The Foreign Representative's service address for purposes of these Chapter 15 Cases is c/o KPMG Inc., Bay Adelaide Centre, Suite 4600 333 Bay Street, Toronto, Ontario, Canada M5H 2S5.

[2]      All of the Debtors, as defined herein, are members of the Canacol Group.

*Proceeding), (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* and (b) the *Motion for Provisional Relief in Aid of Canadian Proceeding Pursuant to Section 1519 of the Bankruptcy Code* submitted by KPMG Inc. ("KPMG"), the court-appointed monitor (in such capacity, "Monitor") and authorized foreign representative (in such capacity, the "Foreign Representative") of the Debtors. I am authorized to submit this Declaration on behalf of the Debtors.

3.      In my role as the Chief Financial Officer of the Canacol Group, I am familiar with the history, day-to-day operations, assets, financial condition, business affairs, and books and records of each the Debtors. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by other employees of the Debtors or their affiliates, the officers and directors of the Debtors, or other professionals retained by the Debtors; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. I am an individual over the age of 18 and, if I am called upon to testify, I will testify competently to the facts set forth herein.

## I.      BACKGROUND

### A.      The Debtors' Business Operations

4.      The Canacol Group is a highly integrated oil and natural gas enterprise engaged in the exploration, development, production, processing and sale of oil and natural gas, primarily in the country of Colombia. Canacol centrally manages all corporate and treasury activities of the Canacol Group from the corporate head office in Calgary, Alberta, Canada (the "Head Office"). Canacol leases the Head Office pursuant to a lease agreement with Morguard 9th Avenue Limited Partnership.

5.      Exploration is the search phase. It typically involves reviewing geological information and acquiring modern subsurface imaging; drilling a limited number of exploration wells where the data indicates promising gas accumulations; and, if an exploration well confirms a discovery, conducting follow-up appraisal work and preparing a development plan.

6.      If a discovery is commercial, the Canacol Group develops it by drilling producing wells and connecting those wells to its central gas treatment facility, known as Jobo. At Jobo, the natural gas is treated to meet sales specifications by removing moisture and trace impurities. The Canacol Group's gas is dry and predominantly methane, which generally requires minimal processing and results in a comparatively low emissions footprint.  After treatment and measurement at Jobo, the gas enters third-party pipelines that transport it to end markets.  Natural gas is delivered to customers, primarily for electricity generation, as well as to industrial and distribution clients.

7.      The Canacol Group's Colombian natural gas production[3] is a critical fuel source for Colombia's electrical grid, with a majority of its gas being sold to power generators in Colombia.  The Canacol Group sells gas to Colombian customers pursuant to standard form gas offtake agreements (collectively, the "Offtake Agreements") between a Debtor within the Canacol Group and a customer. Revenues generated from Offtake Agreements are paid (1) directly into the Deposit Accounts (as defined below)[4] operated by the Canacol Group (approximately 36% of revenues in the most recent quarter); and (2) into a trust (the "Promigas Trust") held for Promigas

---

[3]      In addition to its production and sale of natural gas, the Canacol Group also produces oil, although these activities are a lesser part of the overall business.

[4]      As described in further detail below, the bank accounts receiving payments that are not being made to the Promigas Trust are subject to deposit account control agreements in favor of Macquarie (defined below).

S.A. E.S.P. ("Promigas"), as beneficiary (approximately 64% of revenues in the most recent fiscal quarter).

8.       Promigas is an oil and gas infrastructure company that transports a large portion of Colombia's natural gas.  The Debtors have an arrangement with Promigas for the transport of a portion of Canacol's natural gas through Promigas's network of pipelines. The Promigas Trust provides a mechanism by which Promigas is guaranteed payment of its gas transportation fees charged to the Debtors.  Offtake payments for supply transported by Promigas are paid in full to the Promigas Trust.  Promigas then deducts its transport fees and the residual amounts are remitted to the Debtors, specifically into deposit accounts operated by the Canacol Group at Davivienda S.A. And Banco de Occidente, S.A. in Colombia and Citibank, N.A. in New York (collectively, the "Deposit Accounts").[5]

9.       As discussed below, in accordance with the loan documents in effect between Canacol and Macquarie (defined below), these Deposit Accounts are subject to deposit account control agreements (each, a "DACA").  In the ordinary course of business, the Canacol Group uses funds in these Deposit Accounts to fund its operations.

10.      In addition to the Deposit Accounts, the Debtors operate six (6) general operating accounts in New York and Calgary at Citibank, JP Morgan, and Bank of Nova Scotia.  These accounts are used for the general purposes of the Canacol Group's business.  The Debtors also maintain several accounts that are used for local banking needs in Colombia.  By the Initial CCAA Order, the Canadian Court authorized the Debtors to continue their cash management system.

---

[5]       The Deposit Accounts located in the United States are held in the names of Debtors Canacol Columbia, CNE O&G Columbia and CNE Panama.

**B.** **Employees**

11.    In the aggregate, the Debtors employ approximately 381 full-time employees across various jurisdictions.

| Canacol | |
|---|---|
| Location and Number of Employees | |
| Canada: | 29 |
| **CNE Panama (through its Sucursal, CNEOG Colombia)** | |
| Location and Number of Employees | |
| Colombia: | 202 |
| **CNE O&G Colombia** | |
| Location and Number of Employees | |
| Colombia: | 138 |
| **Canacol Colombia** | |
| Location and Number of Employees | |
| Colombia: | 12 |

12.    In addition to full-time employees, the Canacol Group engages the services of professionals on a contract or consultant basis in Canada, Colombia and the United States.

13.    The 29 employees that are employed by Canacol (the Canadian parent of the Canacol Group) are generally comprised of seven (7) senior executives and higher level finance, geological, and technical experts.  Canacol's employees are responsible for working with the Canacol Group's subsidiaries (including Debtors CNE Panama, CNE O&G Colombia, and Canacol Colombia) to implement the Canacol Group's operational and financial goals.  None of the Canadian employees are unionized, and Canacol does not administer any pension plans.

14.    Employees that are employed by CNE Panama (through its Sucursal, as defined and discussed below), CNE O&G Colombia, and Canacol Colombia in respect to field operations

in Colombia are members of either the People First Worldwide (PFW) or Union Syndicato Obrera (USO) trade unions.

### C.   Corporate Structure

15.   As shown in the below organizational structure chart, Canacol is the parent company of each of the other Debtors within the Canacol Group.  Each other corporate member of the Canacol Group is a direct or indirect subsidiary of Canacol, with ownership percentages and jurisdictions of formation as noted below:



16.   In 2024, the Canacol Group completed a normal-course corporate restructuring, on notice to and with the consent of its lenders (as applicable). As a result of this restructuring, certain guarantors under Canacol's then-existing financing arrangements changed through various mergers, amalgamations, and transactions, such that the remaining successor entities providing guarantees are now as follows:[6]

---

[6]   In addition, each of "Shona Energy Holding ULC" and "Shona Energy ULC" were dissolved and and "CECSA Energy, Inc." changed its name to VMM Holdco Inc..

| Guarantor (Predecessor) | Guarantor (Current) |
|---|---|
| "Canacol Energy Inc." | Canacol ULC |
| "Geoproduction Holding GmbH" and "Canacol Holding GmbH" | Shona Switzerland |
| "Shona Energy Limited Partnership" and "Shona Energy Holdings Limited Partnership", Shona Energy Holding ULC" and Shona Energy ULC" | 249 Alberta and 265 Alberta |
| "Cantana Energy S.A." | Cantana Switzerland |

### D. Management of the Canacol Group

17.     The names, titles, and residence of each of the directors and officers of Canacol are summarized in the following table:

| Name | Title | Location of Residence |
|---|---|---|
| Charle Gamba | Director, President, Chief Executive Officer | Toronto, Ontario |
| Michael Hibberd | Director, Chairman | Calgary, Alberta |
| David Winter | Director | Calgary, Alberta |
| Francisco Diaz | Director | Bogotá, Colombia |
| Gustavo Gattass | Director | Rio de Janeiro, Brazil |
| Valentina Garbarini | Director | Madrid, Spain |
| Silvestre Tovar Leopardi | Director | Maranda State, Venezuela |
| Jason Bednar | Chief Financial Officer | Calgary, Alberta |
| Ravi Sharma | Chief Operating Officer | Houston, Texas |
| Anthony Zaidi | Vice President of Business Development, General Counsel and Corporate Secretary | Panama City, Panama |
| Tracy Whitmore | Vice President of Tax and Corporate Affairs | Calgary, Alberta |
| Carolina Orozco | Vice President Investor Relations and Communications | London, United Kingdom |
| Aurora Juan | Vice President of Development | Calgary, Alberta |

18.     The directors of Canacol ULC, 265 Alberta, and 249 Alberta (the "Canadian Subsidiaries") are (1) Jason Bednar, (2) Tracy Whitmore, and (3) Anthony Zaidi.

19.    The directors and officers of Cantana Switzerland and Shona Switzerland (collectively, the "Swiss Subsidiaries") are (1) Andres Valenzuela Pachon (director and president of the management), (2) Jason Bednar (director and manager), (3) Gerry McEvoy (director and manager), (4) Stefan Smith (director and manager), and (5) Tracy Whitmore (director and manager).

20.    Canacol Colombia, CNE Energy Colombia, and CNE O&G Colombia (collectively, the "Colombian Subsidiaries") do not have directors and officers in the typical sense; rather they employ lawyers who act as "legal representatives." The Colombian Subsidiaries' legal representatives do not have executive decision making powers but are directed by the executive management of Canacol.

21.    All ultimate decisions regarding exploration and related operations are made out of Canada, primarily by and through Canacol's Chief Executive Officer who resides in Toronto, Ontario, Canada. The Canacol Group conducts its "on-the ground" operations through Canacol's direct and indirect Debtor subsidiaries and branches (known as "Sucursals"),[7] but such Debtors and Sucursals are merely executing the business and operational decisions made by the executive team domiciled primarily in Canada.

22.    Treasury functions, including financial reporting for the Canacol Group, are similarly concentrated in the Head Office in Calgary, Alberta, Canada. The Debtors file consolidated financial statements for the entire enterprise, including reports issued in accordance with applicable law as a result of Canacol's common stock trading on the Toronto Stock Exchange

---

[7]    Sucursals are registered with the Colombian Chamber of Commerce. I have been advised by counsel and believe that Sucursales do not have independent legal existence separate and apart from their parent company, and all assets and property of each Sucursal are held for the account of the parent company.

(TSX: CNE). All reporting is done out of Canada. The staff in charge of operational finances are located in the Head Office in Calgary, Alberta, Canada.

## II.   DEBTORS' CAPITAL STRUCTURE

### A.   Macquarie Bank Ltd. Credit Facility (Secured)

23.   Canacol is the borrower under a Credit and Guarantee Agreement dated September 3, 2024 with Macquarie Bank Ltd ("Macquarie") as Administrative Agent, Collateral Agent, and Sole Lead Arranger and Bookrunner (the "Macquarie Credit Agreement" and the facility thereunder, the "Macquarie Credit Facility"). A true and correct copy of the Macquarie Credit Agreement (without schedules) is attached hereto as **Exhibit "A".**

24.   The Macquarie Credit Facility is a secured term loan facility for an aggregate commitment of US$75,000,000. As of November 17, 2025, the indebtedness owing to Macquarie under this facility is US$37,500,000.

25.   The maturity date of the Macquarie Credit Facility is September 15, 2026, subject to earlier maturity, which may be triggered by failure by the Canacol Group to meet certain specified production metrics, or failure to provide required reporting. The Canacol Group's average total realized contractual sales volume for the last two consecutive months as at June 30, 2025, was below the requisite production metric, thereby triggering the accelerated amortization event clause under the Macquarie Credit Agreement. As a result, the Macquarie Credit Facility began to amortize over eight equal monthly installments starting on September 15, 2025.

26.   Following the corporate restructuring described above, the Macquarie Credit Facility is guaranteed by each of the Debtors other than Canacol (collectively, the "Macquarie Guarantors").

27.     As security for the Macquarie Credit Facility, the Macquarie Credit Agreement contemplates U.S., Colombian and Panamanian collateral documents that are intended to give Macquarie (i) a first-priority security interest against the Canacol Group's assets in Colombia and the United States, (ii) springing control over the Deposit Accounts pursuant to the DACAs, and (iii) pledges of the shares of key subsidiaries.

28.     Pursuant to Section 10.4 of the Macquarie Credit Agreement, the Macquarie Credit Facility is governed by the laws of the State of New York.  Section 10.4 of the Macquarie Credit Agreement also contains a forum selection clause that provides the parties have consented to the jurisdiction of state courts in New York and federal courts in the Southern District of New York with respect to any action related to the Macquarie Credit Facility.

**B.      Revolving Syndicated Credit Facility (Unsecured)**

29.     Canacol, as borrower, is party to a Revolving Credit and Guarantee Agreement dated February 14, 2023 (the "Revolving Credit Agreement" and the facility thereunder, the "Revolving Credit Facility") with Deutsche Bank Trust Company Americas, as Administrative Agent, and CitiGroup Global Markets Inc. Deutsche Bank, AG and JP Morgan Chase Bank, N.A., as joint lead arrangers and joint bookrunners, and a syndicate of lenders.  A true and correct copy of the Revolving Credit Agreement (without schedules and exhibits) is attached as **Exhibit "B".**

30.     The facility is an unsecured revolving credit facility with an aggregate commitment of US$200,000,000, available for multiple draws during the availability period.

31.     The facility under the Revolving Credit Agreement matures on February 14, 2027. As at November 17, 2025, the indebtedness owing to the lenders under this facility is US$200,000,000.

32.     Following the corporate restructuring previously described above, the facility is guaranteed by the following subsidiaries of Canacol: Canacol ULC, Canacol Colombia, CNE O&G Colombia, CNE Energy Colombia, CNE Panama, Shona Switzerland, Cantana Switzerland, 249 Alberta, and 265 Alberta (collectively, the "RCF Guarantors").

33.     Pursuant to Section 11.11 of the Revolving Credit Agreement, the Revolving Credit Facility is governed by the laws of the State of New York.  Section 11.12 of the Revolving Credit Agreement also contains a forum selection clause that the parties have consented to the jurisdiction of state courts in New York and federal courts in the Southern District of New York (in each case sitting in the Borough of Manhattan) with respect to any action related to the Revolving Credit Facility.

**C.      Indenture (Unsecured)**

34.     Canacol, as issuer, is party to an indenture dated November 24, 2021 (the "Indenture") with Citibank, N.A., as Trustee, Security Registrar and Paying Agent, providing for the issuance of Canacol's 5.75% Senior Notes due 2028.  A true and correct copy of the Indenture is attached as **Exhibit "C"**.

35.     The Indenture governs the issuance of senior unsecured notes by Canacol in an aggregate principal amount of US$500,000,000.

36.     The notes bear interest at a fixed rate of 5.75% per annum, payable semi-annually in arrears on May 24 and November 24 of each year. On March 26, 2025, Canacol repurchased US$5,000,000 of unsecured notes on the open market for US$2,750,000.00, such that the aggregate principal amount of the notes outstanding is now US$495,000,000. The notes mature on November 24, 2028.

37.     The notes are guaranteed on a senior unsecured basis by the following subsidiaries of Canacol (following the corporate restructuring previously described above): Canacol ULC, Canacol Colombia, CNE O&G Colombia, CNE Energy Colombia, CNE Panama, Shona Switzerland, Cantana Switzerland, 249 Alberta, and 265 Alberta (collectively, the "Note Guarantors").

38.     Pursuant to Section 10.2 of the Indenture, the notes are governed by the laws of the State of New York.  Section 10.9 of the Indenture also contains a forum selection clause that provides the parties to the Indenture or the Notes have consented to the jurisdiction of state courts in New York and federal courts in the Southern District of New York (in each case sitting in Manhattan) with respect to any action related to the Indenture or the notes or the transactions contemplated thereby.

**D.     Letters of Credit**

39.     As of October 31, 2025, the Canacol Group had letters of credit outstanding totaling US$61,272,727. Certain of these letters of credit expire in November, 2025 or December, 2025 and will need to be renewed or replaced at that time.

**E.     Trade Payables**

40.     As of September 30, 2025, the Debtors estimate that they owe approximately $107.607 million to trade creditors in the aggregate. Most, but not all, of the Debtors' trade creditors are located in Colombia.

**III.    CIRCUMSTANCES LEADING TO THE INSOLVENCY PROCEEDINGS**

**A.     The Arbitral Award**

41.     Earlier this year, the Colombian Arbitration and Conciliation Center of the Bogotá Chamber of Commerce ordered CNE O&G Colombia and CNE Panama to pay approximately

US$22,000,000 to a customer following a contractual dispute (the "Arbitral Award"). The Arbitral Award becomes binding on November 20, 2025.

42.      Canacol is reviewing the award and it is separately pursuing an international arbitration claiming sums exceeding US$76 million.

**B.      Diminished Production and Unsuccessful Exploration Efforts**

43.      The Canacol Group's ability to produce consistent volumes of natural gas from specific fields naturally declines over time as reserves are depleted. Absent new reserves being discovered through exploration, overall production diminishes over time.  The exploration of new fields involves a high degree of geological risk and may not yield commercially viable results. Where exploration efforts are unsuccessful, the Debtors' ability to replace produced volumes becomes limited.

44.      Despite the Canacol Group's extensive onshore position, recent exploration efforts (requiring significant capital expenditure) failed to establish commercially recoverable reserves. Specifically, as of December 31, 2024 Canacol's proven reserves replacement ratio had decreased to 30%, from 32% in 2023, and 56% in 2022.  The lack of success in replacing 100% of produced reserves, along with limited exploration success and diminishing production from established wells, have directly impacted the Debtors' revenue generation while fixed operating costs have increased. The financial strain that has resulted from these operational challenges has also precluded the Canacol Group from pursuing further exploration, leaving it unable to source new revenues from new producing reservoirs.  In this regard, the Debtors have not had access to the capital required to begin exploration activities on over 180 fields.

**C.      Impending Payment Defaults Under Canacol's Debt Facilities**

45.      Based on their current cash flow position, the Debtors will not be able to remit significant scheduled payments that are due to its lenders this month.

46.      Under the terms of the Macquarie Credit Agreement, where an "Accelerated Amortization Event" has occurred (as is the case), installments of principal, in addition to interest, are due on the 15th day of each calendar month until maturity (each a "Macquarie Amortization Payment").

47.      Under the Revolving Credit Facility, payments of interest (each a "RCF Interest Payment") are payable in arrears on each "Payment Date", meaning the last day of each 3-month interest period.

48.      Finally, pursuant to the Indenture, semi-annual interest payments (each an "Indenture Interest Payment") are due on the 24th day of May and November of each calendar year until maturity.

49.      In light of the foregoing, the following payments are due by Canacol to its secured and unsecured lenders in November:

> (a) Macquarie Amortization Payment: due on November 18, 2025 in the amount of US$6,746,972.69;
>
> (b) RCF Payment: due on November 21, 2025 in the approximate amount of US$4,454,312.89; and
>
> (c) Indenture Interest Payment: due on November 24, 2025 in the amount of US$14,231,250.00.

(collectively, the "November Payments").

50.      The Debtors do not have sufficient liquidity to make the November Payments when due.  As a result, I understand that the Debtors are at immediate risk of defaulting under the Macquarie Credit Agreement, and subsequently, the Revolving Credit Agreement and Indenture

(the "Impending Payment Defaults"). I further understand that a payment default under the Macquarie Credit Agreement would result in cross defaults under the Revolving Credit Agreement and Indenture (the "Cross Defaults", and together with the Impending Payment Defaults, the "Impending Defaults"). I have been advised by counsel that the Impending Defaults may entitle such creditors to enforce their remedies against the Debtors.

### D.      Prior Efforts to Raise Capital

51.      Since 2024, the Canacol Group has made significant and focused efforts to obtain additional liquidity from both current and outside lenders. In connection with these efforts, Canacol engaged Plexus Capital ("Plexus") to assist in sourcing, negotiating, and consulting as to the terms of potential financing opportunities. Plexus has, since 2010, worked closely with the Canacol Group in securing new financing opportunities, and has successfully assisted the Debtors in obtaining reserve based lending, term loan facilities, acquisition financings, private and public bond placements, and bridge facilities.

52.      Over the past year, and with the assistance of Plexus, the Canacol Group has attempted to negotiate several financing arrangements but, as of the date hereof, none have closed.

## IV.      THE CANADIAN PROCEEDING

53.      Given the significant liquidity constraints and impending defaults under its loan agreements, the Debtors commenced insolvency proceedings pursuant to the *Companies' Creditors Arrangement Act*, RSC 1985, c C-36, as amended before the Court of King's Bench of Alberta (the "Canadian Court") on November 17, 2025 (such proceeding, the "Canadian Proceeding").

54.      On November 18, 2025, the Canadian Court entered an interim order (the "Initial CCAA Order"). Among other things, the Initial CCAA Order (a) appointed KPMG. as the

"monitor" (in such capacity, the "Monitor") to oversee the Canadian Proceeding by monitoring the business and financial affairs of the Debtors; (b) implemented a stay of proceedings and remedies against the Debtors or their assets in Canada (the "Canadian Stay"); (c) permitted the continued implementation of the Canadian Debtors' cash management system; and (d) authorized and empowered the Monitor, or any officer, employee, or representative thereof, to act as a representative of the Debtors in any foreign proceedings, including for purposes of prosecuting chapter 15 petitions for relief in the United States.

## V.   THE CHAPTER 15 CASES

### A.   The Debtors Are Eligible for Chapter 15 Relief

55.     It is my understanding, based on discussions with the Foreign Representative's U.S. counsel, that in order to be eligible for chapter 15 relief in the Second Circuit, the Debtors must satisfy section 109(a) of the Bankruptcy Code, which requires that the Debtors have either (a) a domicile, (b) a place of business, or (c) property in the United States.  I have been further advised that courts in the Second Circuit have held that contracts governed by United States law, a retainer held by United States counsel, or claims or causes of action against United States entities are each sufficient to allow a foreign entity to be a chapter 15 debtor

56.     I believe that the Debtors satisfy this requirement because each of the Debtors has property in the United States, including cash held in certain accounts and contractual rights.  Each of the Debtors (except for Canacol ULC, 265 Alberta, and 249 Alberta) holds cash in bank accounts with Citibank in New York.  Additionally, as discussed above, each Debtor is either a borrower or guarantor under one or more of the Macquarie Credit Agreement, the Revolving Credit Agreement and the Indenture.  Canacol and the Macquarie Guarantors each have rights under the Macquarie Credit Agreement that contains New York choice of law and forum selection clauses.

Similarly, Canacol and the RCF Guarantors each have rights under the Revolving Credit Agreement that contains New York choice of law and forum selection clauses.  Lastly, Canacol and the Notes Guarantors each have rights under the U.S. dollar-denominated notes and Indenture that contain New York choice of law and forum selection clauses.

### B.      Recognition of the Canadian Proceedings

57.     I am advised that the Foreign Representative must establish that the Canadian Proceeding is either a "foreign main proceeding" or a "foreign nonmain proceeding" as such terms are defined in section 1502 of the Bankruptcy Code in order for the Canadian Proceeding to be "recognized" under section 1517(a) of the Bankruptcy Code.

58.     I understand that under section 1517(a) of the Bankruptcy Code, a "foreign main proceeding" means a foreign proceeding pending in the country where the debtor has its "center of main interests," also referred to as "COMI."  I am advised that a debtor's registered office is presumed to be the COMI.  I further understand that in assessing whether the registered office presumption has been overcome, a court in the Second Circuit will consider various factors when determining COMI (with no one factor being dispositive), including: (a) the location of the debtor's headquarters, (b) the location of those persons or entities that actually manage the debtor (which, in certain instances, could be the headquarters of a holding company), (c) the location of the debtor's primary assets, and (d) the location of the majority of the debtor's creditors or of a majority of the creditors that would be affected by the case.

59.     I submit that the facts set forth herein support the conclusion that each of the Debtors' COMI is in Canada.  As an initial matter, Canacol is the guiding force of the Debtors' drilling operations. It makes the ultimate determinations (both through the executive team and the senior geoscience and petrophysical Canacol employees that work from the Head Office) of where

and how the Canacol Group (through its Debtor subsidiaries) will focus its exploration, development, and production of natural gas. Canacol also determines how cash is used and distributed to its subsidiaries. Without access to cash from Canacol, and the centralized treasury functions Canacol provides to all entities within the Canacol Group, the other Debtors would be unable to operate.

### 1.   The COMI for Canacol and the Canadian Subsidiaries is Canada

60.     With respect to Canacol, Canacol ULC, 265 Alberta, and 249 Alberta, I understand that their COMI is presumed to be in Canada. I am not aware of any information that would rebut that presumption.

61.     Canacol was incorporated and continues under Canadian law. Canacol's registered office is located in Calgary, Alberta, Canada (the "Registered Office"). Canacol operates out of the Head Office in Calgary. Canacol is a publicly traded company. Its common shares are listed on (a) the Toronto Stock Exchange (the "TSX") under trading symbol "CNE", (b) the OTCQX International Premier under the trading symbol "CNNEF", and (c) the Bolsa de Valores de Colombia (the "BVC"), the principal stock exchange of Colombia, under trading symbol "CNEC". Canacol is a reporting issuer in each Province in Canada, with the exception of Quebec. Further, the majority of Canacol's directors, officers, senior and middle-management employees are based in Canada. Canacol's books and records are maintained in Canada.

62.     Canacol ULC, 265 Alberta, and 249 Alberta (the "Canadian Subsidiaries") are each holding companies incorporated in Alberta and the registered office of each of the Canadian Subsidiaries is Canacol's Registered Office. The Canadian Subsidiaries have no employees. Their only debt is as guarantors under the debt facilities described above. The Canadian Subsidiaries' books and records for are also maintained in Canada.

### 2.    *The COMI for the Non-Canadian Subsidiaries Is Canada*

63.    Notwithstanding the fact that Cantana Switzerland, Shona Switzerland, CNE Panama, Canacol Colombia, CNE Energy Colombia, and CNE O&G Colombia (the "Non-Canadian Subsidiaries") have registered offices in Switzerland, Panama, or Colombia (as applicable), I believe the COMI of each is Canada. As described throughout herein, the Canacol Group is a highly integrated enterprise. The Non-Canadian Subsidiaries' operations are coordinated by senior management in Canada to implement the Canacol Group's exploration, development and production goals. Financial results for the Non-Canadian Subsidiaries are reported on a consolidated basis with the other members of the Canacol Group. Such reporting is prepared in Canada.

64.    If the Court were to determine that any Debtor's COMI is not Canada, I understand the Foreign Representative has requested in the alternative that the Court grant recognition as a foreign nonmain proceeding as to that Debtor and grant discretionary provisional relief. It is my understanding, based on conversations with counsel, my understanding of the interrelated nature of the Canacol Group's operations, and for the reasons set forth above, that such recognition is appropriate.

### C.    **Need for Provisional Relief**

65.    The Debtors urgently require provisional stay relief from this Court to preserve value for the benefit of the Debtors' stakeholders. As I discussed above, Canacol does not have sufficient liquidity to make the November Payments when due and, as such, the Debtors are at immediate risk of defaulting under the Macquarie Credit Agreement, and subsequently, the Revolving Credit Agreement and Indenture. Without provisional relief, the Impending Defaults would entitle Canacol's creditors to enforce their remedies against the Debtors. Notably, the

Impending Defaults would trigger the DACAs, thereby allowing Macquarie to sweep all of the Debtors' funds from the Deposit Accounts. The effect of such actions by Canacol's creditors would irreparably harm the entire Canacol Group and would not only significantly erode the value of the Debtors' business, but would threaten an interruption or shut down of the Debtors' operations and have material consequences on Colombia's grid reliability and generation output. Further, certain of the Debtors' executory contracts contain provisions permitting termination upon the Debtors' filing of a case under any section or chapter of the Bankruptcy Code and parties to such agreements could attempt to assert rights in the Debtors' property. The relief requested by the Foreign Representative is required to prevent individual creditors or contract counterparties acting to frustrate the purpose of the Canadian Proceeding by disregarding the Canadian Stay, the foremost of which is the fair and efficient administration of the Canadian Proceeding to maximize the value for all creditors.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 18th day of November 2025
Calgary, Alberta
Canada

_____

Jason Bednar