## EXHIBIT A

*Execution Version*

**CREDIT AND GUARANTEE AGREEMENT**

Dated as of September 3, 2024

among

**CANACOL ENERGY LTD.,**
as Borrower,

the **GUARANTORS** party hereto,

the **LENDERS** party hereto,

the **HEDGE PROVIDERS** from time to time party hereto,

the **ISSUING BANKS** from time to time party hereto,

**MACQUARIE BANK LTD.,**
as Administrative Agent,

and

**MACQUARIE BANK LTD.,**

as Collateral Agent

**MACQUARIE BANK LTD.**
as
Sole Lead Arranger and Bookrunner

# TABLE OF CONTENTS

<u>Section</u>                                                                                      <u>Page</u>

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ..................................................1
    1.01    Defined Terms ...................................................................................1
    1.02    Other Interpretive Provisions.............................................................54
    1.03    Accounting Terms..............................................................................55
    1.04    Rounding...........................................................................................55
    1.05    Times of Day; Rates..........................................................................55
    1.06    Cashless Settlement ...........................................................................56

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS .................................56
    2.01    Loans................................................................................................56
    2.02    Borrowings.......................................................................................56
    2.03    Optional and Mandatory Prepayments.................................................57
    2.04    Termination of Commitments .............................................................59
    2.05    Repayment of Loans ..........................................................................60
    2.06    Interest.............................................................................................60
    2.07    Fees .................................................................................................61
    2.08    Computation of Interest and Fees .......................................................62
    2.09    Evidence of Debt; Notes.....................................................................62
    2.10    Payments Generally; Administrative Agent's Clawback .......................64
    2.11    Sharing of Payments by Lenders ........................................................66
    2.12    Defaulting Lenders............................................................................66
    2.13    Benchmark Replacement Setting.........................................................67
    2.14    Canadian Interest Provisions..............................................................69
    2.15    Increase in Commitments ...................................................................70

ARTICLE III TAXES, YIELD PROTECTION AND ILLEGALITY........................................71
    3.01    Taxes ...............................................................................................71
    3.02    Illegality ..........................................................................................73
    3.03    Inability to Determine Rates ..............................................................74
    3.04    Increased Costs .................................................................................75
    3.05    Compensation for Losses...................................................................76
    3.06    Mitigation Obligations; Replacement of Lenders.................................76
    3.07    Survival ...........................................................................................77

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS .............................77
    4.01    Conditions for Closing and Initial Credit Extension.............................77
    4.02    Conditions to Each Borrowing............................................................83

ARTICLE V REPRESENTATIONS AND WARRANTIES.................................................85
    5.01    Existence, Qualification and Power.....................................................85
    5.02    Authorization; No Contravention .......................................................85
    5.03    Governmental Authorization; Other Consents......................................85

5.04   Binding Effect ........................................................................................ 86
5.05   Financial Statements; No Material Adverse Effect ............................... 86
5.06   Litigation ............................................................................................... 87
5.07   No Default .............................................................................................. 87
5.08   Ownership of Property ........................................................................... 87
5.09   Environmental Compliance .................................................................... 89
5.10   Insurance ................................................................................................ 89
5.11   Taxes ...................................................................................................... 89
5.12   Subsidiaries; Equity Interests ................................................................ 90
5.13   Margin Regulations; Investment Company Act. .................................... 90
5.14   Disclosure .............................................................................................. 91
5.15   Compliance with Laws ........................................................................... 91
5.16   Intellectual Property; Licenses, Etc ....................................................... 91
5.17   Legal Form ............................................................................................. 91
5.18   Labor Matters ........................................................................................ 92
5.19   Solvency ................................................................................................. 92
5.20   Rank of Debt .......................................................................................... 92
5.21   Commercial Activity; Absence of Immunity .......................................... 92
5.22   Use of Proceeds...................................................................................... 92
5.23   Canacol Existing Revolving Credit Agreement ..................................... 93
5.24   Canacol 2028 Notes Indenture ............................................................... 93
5.25   Material Project Documents; Related Parties Agreements. .................... 93
5.26   Permits ................................................................................................... 94
5.27   Collateral Matters; Liens........................................................................ 94
5.28   Sanctions Laws ...................................................................................... 95
5.29   Anti-Corruption Laws ............................................................................ 95
5.30   Anti-Money Laundering Laws................................................................ 95
5.31   Beneficial Ownership Certification ........................................................ 95
5.32   Accounts ................................................................................................. 96
5.33   Existing Offtakers .................................................................................. 96
5.34   Gas Imbalances ...................................................................................... 96
5.35   Reserves Reports .................................................................................... 96
5.36   Sale Production ...................................................................................... 96
5.37   Canadian Pension Plan ........................................................................... 97
5.38   Modern Slavery Laws ............................................................................ 97
5.39   Exchange Controls ................................................................................. 97

ARTICLE VI AFFIRMATIVE COVENANTS ................................................... 98
6.01   Financial Statements .............................................................................. 98
6.02   Certificates; Other Information............................................................... 98
6.03   Notices ................................................................................................. 104
6.04   Payment of Obligations........................................................................ 104
6.05   Preservation of Existence, Etc ............................................................. 104
6.06   Maintenance of Properties .................................................................... 105
6.07   Maintenance of Insurance ..................................................................... 106
6.08   Compliance with Laws ......................................................................... 107

6.09   Compliance with Contractual Obligations ........................................................107
6.10   Books and Records ..........................................................................................107
6.11   Inspection Rights; Audit Matters .....................................................................108
6.12   Use of Proceeds ...............................................................................................108
6.13   Pari Passu Ranking ..........................................................................................108
6.14   Permits .............................................................................................................108
6.15   Corporate Separateness ...................................................................................109
6.16   Maintenance of Accounts; Preservation of Rights Under the Collateral
        Documents ........................................................................................................109
6.17   Environmental and Social Requirements .........................................................110
6.18   Additional Documents ......................................................................................110
6.19   Hydrocarbon Sale Agreements; Other Project Revenues .................................110
6.20   Post-Closing Obligations. .................................................................................111

ARTICLE VII NEGATIVE COVENANTS ..................................................................112
7.01   Liens .................................................................................................................112
7.02   Investments ......................................................................................................112
7.03   Indebtedness .....................................................................................................112
7.04   Fundamental Changes .......................................................................................113
7.05   Dispositions ......................................................................................................115
7.06   Restricted Payments .........................................................................................116
7.07   Change in Nature of Business ...........................................................................116
7.08   Transactions with Affiliates .............................................................................116
7.09   Burdensome Agreements ..................................................................................117
7.10   Use of Proceeds ...............................................................................................119
7.11   Sale or Discount of Receivables ......................................................................119
7.12   Limitation on Prepayments; Amendments of Certain Documents ....................119
7.13   Accounting Changes; Limitations on Changes in Fiscal Year ..........................121
7.14   Accounts; Withdrawals and Transfers from Accounts ......................................121
7.15   Sanctions ..........................................................................................................121
7.16   Anti-Corruption Laws .......................................................................................122
7.17   Anti-Money Laundering Laws ..........................................................................122
7.18   Gas Imbalances, Take or Pay or Other Prepayments ........................................122
7.19   Financial Covenants ..........................................................................................122
7.20   Sale and Leaseback ..........................................................................................122
7.21   Negative Pledge Clauses ..................................................................................122
7.22   Pooling and Utilization .....................................................................................123
7.23   Canadian Pension Plan ......................................................................................123
7.24   E&P Contracts ..................................................................................................123

ARTICLE VIII EVENTS OF DEFAULT AND REMEDIES .........................................123
8.01   Events of Default ..............................................................................................123
8.02   Remedies Upon Event of Default .....................................................................128
8.03   Application of Funds .........................................................................................130
8.04   Power of Attorney .............................................................................................131
8.05   Protective Payments ..........................................................................................131

8.06    Accounts Collection.................................................................132
8.07    Agents' Liability for Collateral....................................................132
8.08    No Obligation to Pursue Others...................................................132
8.09    Demand Waiver ......................................................................132

ARTICLE IX AGENTS..............................................................................133
9.01    Appointment and Authority .......................................................133
9.02    Rights as a Lender, Hedge Provider or Issuing Banks.......................133
9.03    Exculpatory Provisions ............................................................133
9.04    Reliance by Agents..................................................................134
9.05    Delegation of Duties ...............................................................135
9.06    Resignation or Removal of Agents ...............................................135
9.07    Non-Reliance on Agents and Other Lenders ...................................136
9.08    No Other Duties, Etc ...............................................................136
9.09    Agents May File Proofs of Claim ................................................136
9.10    Enforcement...........................................................................137
9.11    Collateral and Guaranty Matters .................................................137
9.12    Survival ................................................................................138

ARTICLE X MISCELLANEOUS .................................................................139
10.01   Amendments, Etc ...................................................................139
10.02   Notices; Effectiveness; Electronic Communication ..........................140
10.03   No Waiver; Cumulative Remedies; Enforcement..............................142
10.04   Expenses; Indemnity; Damage Waiver..........................................143
10.05   Payments Set Aside.................................................................145
10.06   Successors and Assigns.............................................................145
10.07   Treatment of Certain Information; Confidentiality............................149
10.08   Right of Setoff.......................................................................150
10.09   Interest Rate Limitation ...........................................................150
10.10   Counterparts; Integration; Effectiveness.......................................151
10.11   Survival of Representations and Warranties....................................151
10.12   Severability ...........................................................................151
10.13   Replacement of Lenders ...........................................................151
10.14   Governing Law; Jurisdiction; Etc. ...............................................152
10.15   WAIVER OF JURY TRIAL........................................................153
10.16   No Immunity ..........................................................................153
10.17   Special Waiver .......................................................................154
10.18   Judgment Currency ..................................................................154
10.19   Use of English Language ...........................................................155
10.20   Headings ...............................................................................155
10.21   No Advisory or Fiduciary Responsibility ........................................155
10.22   Electronic Execution of Assignments and Certain Other Documents .................155
10.23   USA PATRIOT Act...................................................................156
10.24   Acknowledgment and Consent of Affected Financial Institutions .....................156
10.25   Erroneous Payment ..................................................................157

iv

ARTICLE XI GUARANTY ................................................................................159
   11.01  Guaranty.................................................................................................159
   11.02  Rights of Lenders..................................................................................159
   11.03  Certain Waivers ....................................................................................160
   11.04  Obligations Independent .......................................................................161
   11.05  Subrogation...........................................................................................161
   11.06  Termination; Reinstatement..................................................................161
   11.07  Subordination .......................................................................................162
   11.08  Stay of Acceleration.............................................................................162
   11.09  Condition of Borrower ..........................................................................162
   11.10  Payments ..............................................................................................162
   11.11  Keepwell ..............................................................................................162
   11.12  Acknowledgement Regarding Any Supported QFCs...........................163
   11.13  Additional Guarantors..........................................................................164
   11.14  Swiss Guarantee Limitations ...............................................................164

## ANNEXES

I              Repayment Schedule

## SCHEDULES

1.01-I        Commitments and Applicable Percentages
1.01-II       E&P Contracts
1.01-III      Existing Hydrocarbon Sale Agreements
1.01-IV       Hydrocarbon Contracts
1.01-V        Existing Royalties
1.01-VI       Existing Liens
1.01-VII      Promigas Trust Accounts
1.01-VIII     Related Parties Agreements
5.05(d)       Existing Indebtedness
5.06          Litigation
5.12          Subsidiaries, Colombian Branches, Other Equity Investments; Equity Interests
5.26(a)       Permits
5.33          Existing Offtakers
5.36          Sale of Production
6.02(l)       Acceptable Firms of Engineers
6.07          Insurance Requirements
7.05          Existing Overriding Royalties
10.02         Administrative Agent's Office; Certain Addresses for Notices

## EXHIBITS

*Form of*

A             Assignment and Assumption
B             Colombian Asset Pledge Agreement
C             Colombian Collateral Agency Agreement
D             Colombian Conditional Assignment of Contractual Rights and Economic Rights of the E&P Contracts
E             Colombian Promissory Note
F             Colombian Share Pledge Agreements
G             Compliance Certificate
H             Intercompany Loans Subordination Agreement
I             Loan Notice
J             NY Note
K             Panama Pledge Agreement
L             Process Agent Acceptance
M             Flow of Funds Memorandum
N             Special Canadian Counsel Legal Opinion
O             Special Swiss Counsel Legal Opinion
P             Special New York Counsel Legal Opinion

| | |
|---|---|
| Q | Officer's Certificate |
| R | Solvency Certificate |
| S | Colombian Power of Attorney |
| T | Irrevocable Instruction |
| U | Guarantor Joinder Agreement |

# Index of Defined Terms

Page

ABR ......................................................................................................................... 1
ABR Loan .............................................................................................................. 1
ABR Term SOFR Determination Day ................................................................... 51
Accelerated Amortization Event ............................................................................ 2
Accelerated Amortization Payment Dates ............................................................ 60
Accelerated Amortization Period ........................................................................... 2
Accelerated Amortization Start Date ..................................................................... 2
Account Control Agreements ................................................................................. 2
Act ........................................................................................................................ 156
Additional Guarantor ........................................................................................... 164
Administrative Agent ......................................................................................... 1, 2
Administrative Agent's Office ............................................................................... 2
Administrative Questionnaire ................................................................................ 2
Advisors ................................................................................................................. 2
Affected Financial Institution ................................................................................ 2
Affiliate ................................................................................................................. 2
Agent Parties ...................................................................................................... 142
Agents ................................................................................................................... 3
Aggregate Commitments ....................................................................................... 3
Agreement ............................................................................................................. 1
ANH ...................................................................................................................... 3
ANH Letter of Credit ............................................................................................. 3
Annual Drilling Plan ............................................................................................. 3
Anti-Corruption Laws ............................................................................................ 3
Anti-Money Laundering Laws ............................................................................... 3
Applicable Margin ................................................................................................. 4
Applicable Percentage ........................................................................................... 4
Approved Fund ...................................................................................................... 4
Arranger ................................................................................................................. 4
Asset Coverage Ratio ............................................................................................ 4
Asset Sale .............................................................................................................. 4
Assignment and Assumption ................................................................................. 5
Attributable Indebtedness ...................................................................................... 5
Audited Financial Statements ................................................................................ 5
Auditor ................................................................................................................... 5
Availability Period ................................................................................................. 5
Available Tenor ..................................................................................................... 5
Bail-In Action ........................................................................................................ 5
Bail-In Legislation ................................................................................................. 5
Base Case Model .................................................................................................... 5
Benchmark ............................................................................................................. 6
Benchmark Replacement ........................................................................................ 6
Benchmark Replacement Adjustment ..................................................................... 6

Benchmark Replacement Date ............................................................................................. 6
Benchmark Transition Event ............................................................................................. 7
Benchmark Unavailability Period ...................................................................................... 8
Beneficial Ownership Certificate ...................................................................................... 8
Beneficial Ownership Regulation ..................................................................................... 8
Betania Separation and Compression System ................................................................... 8
BHC Act Affiliate ......................................................................................................... 163
Blocks ............................................................................................................................... 8
Board ................................................................................................................................. 8
Borrower ............................................................................................................................ 1
Borrowing .......................................................................................................................... 8
Borrowing Date ................................................................................................................. 8
Business Day ...................................................................................................................... 9
Canacol 2028 Notes .......................................................................................................... 9
Canacol 2028 Notes Indenture .......................................................................................... 9
Canacol 2028 Notes Permitted Purchase .......................................................................... 9
Canacol 2028 Notes Purchase Conditions ........................................................................ 9
Canacol Energy Colombia ................................................................................................. 9
Canacol Existing Revolving Credit Agreement ................................................................ 9
Capital Expenditure ........................................................................................................ 10
Capital Lease Obligations ............................................................................................... 10
Capital Stock ................................................................................................................... 10
Casanare-Rancho Hermoso Block ................................................................................... 10
Cash Equivalents ............................................................................................................. 10
Casualty Event ................................................................................................................ 11
Change in Law ................................................................................................................ 11
Change of Control ........................................................................................................... 11
Child Labour ................................................................................................................... 12
claim ................................................................................................................................ 49
Clarinete Separation and Compression System .............................................................. 12
Closing Date .................................................................................................................... 12
CNE Energy Colombia .................................................................................................... 12
CNE Oil & Gas Colombia ............................................................................................... 12
Code ................................................................................................................................. 12
Collateral ......................................................................................................................... 12
Collateral Agent ................................................................................................................ 1
Collateral Documents ...................................................................................................... 12
Colombia .......................................................................................................................... 12
Colombian Account Control Agreements ........................................................................ 13
Colombian Accounts ....................................................................................................... 13
Colombian Asset Pledge Agreement ............................................................................... 13
Colombian Branches ....................................................................................................... 14
Colombian Central Bank ................................................................................................. 13
Colombian Collateral Agency Agreement ...................................................................... 13
Colombian Collateral Agent ........................................................................................... 13
Colombian Collateral Documents ................................................................................... 13

Colombian Companies ................................................................................ 14
Colombian Conditional Assignment of Contractual Rights and Economic Rights of the E&P
  Contracts ............................................................................................... 13
Colombian Depositary Banks ..................................................................... 14
Colombian Guarantors ............................................................................... 14
Colombian Promissory Note ...................................................................... 14
Colombian Share Pledge Agreements ......................................................... 14
Commitment .............................................................................................. 14
Commitment Fee ....................................................................................... 62
Compliance Certificate .............................................................................. 14
Conforming Changes ................................................................................. 14
Connection Income Taxes .......................................................................... 15
Consolidated ............................................................................................. 15
Consolidated Current Assets ...................................................................... 15
Consolidated Current Liabilities ................................................................ 15
Consolidated EBITDAX ............................................................................ 15
Consolidated EBITDAX to Consolidated Interest Expense Ratio ............... 16
Consolidated Income Tax Expense ............................................................. 19
Consolidated Interest Expense ................................................................... 19
Consolidated Total Debt ............................................................................ 20
Contest ..................................................................................................... 21
Contested .................................................................................................. 21
Contractual Obligation .............................................................................. 21
Control ..................................................................................................... 21
Controlled ................................................................................................. 21
Controlling ............................................................................................... 21
Corrective Plan ......................................................................................... 21
Covered Entity .......................................................................................... 163
Covered Party ........................................................................................... 163
CRD IV .................................................................................................... 11
Credit Exposure ........................................................................................ 21
CRR .......................................................................................................... 11
Current Ratio ............................................................................................ 21
Daily Simple SOFR ................................................................................... 21
debt ........................................................................................................... 49
Debtor Relief Laws ................................................................................... 22
Default ...................................................................................................... 22
Default Right ............................................................................................ 164
Defaulting Lender ..................................................................................... 22
Dispose ..................................................................................................... 23
Disposition ............................................................................................... 23
Dollar ....................................................................................................... 23
Dollar Equivalent ...................................................................................... 23
E&P Contracts .......................................................................................... 23
EEA Financial Institution .......................................................................... 23
EEA Member Country ............................................................................... 24

x

EEA Resolution Authority ................................................................................................ 24
Entitled Person .............................................................................................................. 154
Environment .................................................................................................................... 24
Environmental and Social Requirements ........................................................................ 24
Environmental Claim ...................................................................................................... 24
Environmental Laws ........................................................................................................ 24
Environmental Liability .................................................................................................. 24
Equity Interests ............................................................................................................... 25
Erroneous Payment ....................................................................................................... 157
Erroneous Payment Subrogation Rights ....................................................................... 158
Esperanza Block .............................................................................................................. 25
EU Bail-In Legislation Schedule .................................................................................... 25
Event of Default .............................................................................................................. 25
Excluded Taxes ............................................................................................................... 25
Executive Order ............................................................................................................... 25
Existing Hydrocarbon Sale Agreements ......................................................................... 25
Existing Offtakers ........................................................................................................... 25
Fair Market Value ........................................................................................................... 26
FATCA ............................................................................................................................ 26
FCLA ............................................................................................................................... 26
FCPA ............................................................................................................................... 26
Federal Funds Rate ......................................................................................................... 26
Fee Letters ....................................................................................................................... 26
Fitch ................................................................................................................................. 26
Floor ................................................................................................................................ 26
Flow of Funds Memorandum .......................................................................................... 57
Forced and Child Labour Laws ....................................................................................... 26
Forced Labour ................................................................................................................. 26
Fund ................................................................................................................................. 26
Gas Imbalance ................................................................................................................. 26
Government Approval ...................................................................................................... 27
Governmental Authority .................................................................................................. 27
Guarantee ......................................................................................................................... 27
Guarantors ....................................................................................................................... 27
Guaranty ........................................................................................................................... 28
Hazardous Materials ........................................................................................................ 28
Hedge Provider ................................................................................................................ 28
Hedge Termination Value ................................................................................................ 28
Hedging Agreement ......................................................................................................... 28
Hydrocarbon Contracts .................................................................................................... 29
Hydrocarbon Interests ..................................................................................................... 29
Hydrocarbon Sale Agreements ........................................................................................ 29
Hydrocarbons ................................................................................................................... 29
IFC ................................................................................................................................... 29
IFC Performance Standards ............................................................................................. 29
IFRS ................................................................................................................................. 29

Illegality Notice ................................................................................................ 73
Increase Effective Date .................................................................................... 71
Incur .................................................................................................................. 29
Incurrence ......................................................................................................... 29
Incurring ........................................................................................................... 29
Indebtedness ..................................................................................................... 29
Indemnified Taxes ............................................................................................ 31
Indemnitee ...................................................................................................... 143
Information ..................................................................................................... 149
Insurance Proceeds ........................................................................................... 31
Intercompany Loans Subordination Agreement .............................................. 31
Interest Payment Date ...................................................................................... 31
Interest Period .................................................................................................. 31
Investment ........................................................................................................ 32
Issuing Bank ..................................................................................................... 32
Jobo 1A/1B Processing Facility ....................................................................... 32
Jobo 2 Processing Facility ............................................................................... 32
Jobo 3 Processing Facility ............................................................................... 32
Joinder Agreement .......................................................................................... 164
Joint Operating Agreements ............................................................................ 32
judgment currency .......................................................................................... 154
Key Operating Assets ....................................................................................... 33
Key-Man Event ................................................................................................ 33
Laws .................................................................................................................. 33
Lender ................................................................................................................. 1
Lenders ............................................................................................................... 1
Lending Office .................................................................................................. 33
Lien ................................................................................................................... 33
Line of Business ............................................................................................... 33
Loan .................................................................................................................. 33
Loan Documents ............................................................................................... 33
Loan Notice ...................................................................................................... 34
Loan Parties ...................................................................................................... 34
Loan Parties' Materials ................................................................................... 103
Loan Party Related Person ............................................................................... 34
Management Group ........................................................................................... 34
Master Agreement ............................................................................................ 29
Material Adverse Effect .................................................................................... 34
Material Project Documents ............................................................................. 34
Maturity Date .................................................................................................... 34
Maximum Amount .......................................................................................... 165
Maximum Rate ................................................................................................ 150
mmcfe/d ............................................................................................................ 34
Moody's ............................................................................................................ 35
Net Cash Proceeds ............................................................................................ 35
NI-51-101 .......................................................................................................... 35

Non-Consenting Lender ........................................................................................ 35
Note .......................................................................................................................... 35
NY Note .................................................................................................................... 35
Obligations ............................................................................................................... 36
OFAC ........................................................................................................................ 36
Official .................................................................................................................... 119
Offtaker .................................................................................................................... 36
Oil and Gas Properties ........................................................................................... 36
Operating Plan and Budget .................................................................................... 36
Organization Documents ........................................................................................ 37
Other Connection Taxes .......................................................................................... 37
Other Taxes .............................................................................................................. 37
Panama Pledge Agreement ..................................................................................... 37
Participant .............................................................................................................. 148
Participant Register ............................................................................................... 148
Payment Recipient ................................................................................................. 157
Periodic Term SOFR Determination Day .............................................................. 50
Permits ...................................................................................................................... 94
Permitted Corporate Reorganization ..................................................................... 37
Permitted Holders ................................................................................................... 37
Permitted Investments ............................................................................................ 38
Permitted Letters of Credit ..................................................................................... 43
Permitted Liens ....................................................................................................... 39
Person ....................................................................................................................... 43
Pesos ......................................................................................................................... 43
Petroleum Engineers ............................................................................................... 43
Platform .................................................................................................................. 103
Prepayment Premium .............................................................................................. 61
primary obligor ....................................................................................................... 27
Prime Rate ............................................................................................................... 43
Principal Payment Date ........................................................................................... 43
Process Agent ......................................................................................................... 153
Process Agent Acceptance ...................................................................................... 44
Project ...................................................................................................................... 44
Promigas Trust ........................................................................................................ 44
Promigas Trust Accounts ........................................................................................ 44
Promigas Trust Receivables ................................................................................... 44
Property .................................................................................................................... 44
Proved Developed Producing Reserves .................................................................. 44
Proved Reserves ...................................................................................................... 44
Prudent Industry Practices ..................................................................................... 44
PUBLIC .................................................................................................................. 103
Public Lender ......................................................................................................... 103
Public Side Information ......................................................................................... 103
PV 10 Value .............................................................................................................. 44
QFC ......................................................................................................................... 164

QFC Credit Support ................................................................................................ 163
Qualified ECP Guarantor ........................................................................................ 45
Receivable ............................................................................................................... 45
Recipient .................................................................................................................. 45
Reference Hedge ...................................................................................................... 45
Reference Letter of Credit ....................................................................................... 45
Reference Letter of Credit Documentation .............................................................. 45
Register .................................................................................................................... 147
Registro de Garantías Mobiliarias .......................................................................... 81
Regulation U ............................................................................................................ 45
Regulation X ............................................................................................................ 45
Related Parties ......................................................................................................... 45
Related Parties Agreements ..................................................................................... 45
Relevant Governmental Body .................................................................................. 45
Removal Effective Date ........................................................................................... 135
Required Lenders ..................................................................................................... 45
Reserves Report ....................................................................................................... 46
Resignation Effective Date ...................................................................................... 135
Resolution Authority ............................................................................................... 46
Responsible Officer ................................................................................................. 46
Restricted Payment .................................................................................................. 46
Rolling Period .......................................................................................................... 46
S&P .......................................................................................................................... 47
Sanction(s) ............................................................................................................... 47
Sanctioned Jurisdiction ........................................................................................... 47
Sanctions Laws ........................................................................................................ 47
Sanctions Target ...................................................................................................... 47
Sangretoro Block ..................................................................................................... 48
SEC .......................................................................................................................... 48
Secured Parties ........................................................................................................ 48
Significant Casualty Event ...................................................................................... 48
SOFR ....................................................................................................................... 48
SOFR Administrator ................................................................................................ 48
SOFR Administrator's Website ............................................................................... 48
SOFR Borrowing ..................................................................................................... 48
SOFR Determination Date ....................................................................................... 21
SOFR Loan .............................................................................................................. 48
SOFR Rate Day ....................................................................................................... 21
Solvency ................................................................................................................... 48
Solvent ..................................................................................................................... 48
Specially Designated National and Blocked Person ................................................ 47
Specified Loan Party ............................................................................................... 49
Specified Permits ..................................................................................................... 49
SSJN-7 Block ........................................................................................................... 49
Strip Price ................................................................................................................ 49
Subsidiaries ............................................................................................................. 49

Subsidiary ........................................................................................................................ 49
Supported QFC ............................................................................................................... 163
Swap Obligation.............................................................................................................. 49
Swiss Guarantors ............................................................................................................ 50
Swiss Withholding Tax ................................................................................................... 50
Synthetic Lease Obligation ............................................................................................ 50
Takeout Indebtedness...................................................................................................... 50
Takeout Indebtedness Refinancing ................................................................................ 50
Taking .............................................................................................................................. 50
Takings Proceeds ............................................................................................................ 50
Taxes ............................................................................................................................... 50
Term SOFR ..................................................................................................................... 50
Term SOFR Administrator .............................................................................................. 51
Term SOFR Reference Rate ............................................................................................ 51
Termination Date ............................................................................................................ 51
Threshold Amount .......................................................................................................... 51
Total Credit Exposure ..................................................................................................... 51
Transactions .................................................................................................................... 51
U.S. .................................................................................................................................. 52
U.S. Government Securities Business Day...................................................................... 52
U.S. Special Resolution Regimes ................................................................................. 163
U.S.$ ............................................................................................................................... 23
UK Financial Institution ................................................................................................. 52
UK Resolution Authority ................................................................................................ 52
Unadjusted Benchmark Replacement ............................................................................. 52
United States ................................................................................................................... 52
Upstream or Cross-Stream Secured Obligations ......................................................... 165
US Account Control Agreements .................................................................................... 52
US Accounts .................................................................................................................... 52
US Collateral Documents ................................................................................................ 52
US Depositary Bank ....................................................................................................... 52
US Security Agreement ................................................................................................... 52
USA Patriot Act .............................................................................................................. 52
VIM-21 Block ................................................................................................................. 53
VIM-33 Block ................................................................................................................. 53
VIM-44 Block ................................................................................................................. 53
VIM-5 Block ................................................................................................................... 53
VMM-10-1 Block ........................................................................................................... 53
VMM-2 Block ................................................................................................................. 53
VMM-3 Block ................................................................................................................. 53
VMM-45 Block ............................................................................................................... 53
VMM-49 Block ............................................................................................................... 53
VMM-53 Block ............................................................................................................... 53
Voting Equity Interest..................................................................................................... 53
Wholly Owned Subsidiary .............................................................................................. 54
Write-Down and Conversion Powers ............................................................................. 54

X%: Porcentaje en la participación (de la producción) ................................................................ 54
X-Factor ................................................................................................................................. 54

## CREDIT AND GUARANTEE AGREEMENT

This CREDIT AND GUARANTEE AGREEMENT (the "Agreement") is entered into as of September 3, 2024, among (i) Canacol Energy Ltd., a corporation organized and existing under the laws of the Province of Alberta, Canada, as borrower (the "Borrower"), (ii) the Guarantors (as defined below) party hereto, as guarantors, (iii) each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), (iv) the Hedge Providers from time to time party hereto, (v) the Issuing Banks from time to time party hereto, (vi) Macquarie Bank Ltd., as administrative agent (in such capacity, the "Administrative Agent") and (vii) Macquarie Bank Ltd., as collateral agent (in such capacity, the "Collateral Agent").

WHEREAS, the Borrower, desires to borrow funds under this Agreement to finance the payment of certain tax liabilities, for other general corporate purposes of the Loan Parties, and to pay the fees and expenses incurred in connection with the transactions contemplated herein;

WHEREAS, each Guarantor will benefit directly from the transactions contemplated herein and under the Loan Documents (as defined below), and each Guarantor is willing to guarantee the obligations of the Borrower contemplated herein and under the Loan Documents; and

WHEREAS, the Lenders are willing to extend credit to the Borrower on the terms and subject to the conditions set forth herein and in the other Loan Documents (as defined below);

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I

## DEFINITIONS AND ACCOUNTING TERMS

**1.01    Defined Terms**.  As used in this Agreement, the following terms shall have the meanings set forth below:

"ABR" means, for any day, a rate *per annum* equal to the highest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Rate in effect on such day *plus* 0.50% and (c) Term SOFR for a one-month tenor in effect on such day *plus* 1.00%.  Any change in the ABR due to a change in the Prime Rate, the Federal Funds Rate or Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Rate or Term SOFR, respectively.  If the ABR is being used as an alternate rate of interest pursuant to Section 2.13 (for the avoidance of doubt, only until the Benchmark Replacement has been determined pursuant to Section 2.13, then the ABR shall be the greater of clauses (a) and (b) above and shall be determined without reference to clause (c) above).  For the avoidance of doubt, if the ABR as determined pursuant to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"ABR Loan" means a Loan that bears interest based on the ABR.

"Accelerated Amortization Event" means any of the following:

(i)                          the Loan Parties having sold a daily average of oil and natural gas, for the account of the Loan Parties, of less than 130 mmcfe/d from the Blocks, during two consecutive calendar months; or

(ii)                          the Loan Parties having failed to deliver a report pursuant to Section 6.02(w).

"Accelerated Amortization Period" means the period beginning on the Accelerated Amortization Start Date and ending on the earlier of (i) the date on which the Obligations shall have been paid and performed indefeasibly in full and (ii) the date on which all the Lenders shall have consented to the termination of the Accelerated Amortization Period.

"Accelerated Amortization Start Date" means (i) in case an Accelerated Amortization Event occurs at any time prior to the 12-month anniversary of the Closing Date, the 12-month anniversary of the Closing Date, and (ii) in case an Accelerated Amortization Event occurs on or following the 12-month anniversary of the Closing Date, the date upon which such Accelerated Amortization Event occurred, in each of the foregoing cases under (i) and (ii) above, unless the Required Lenders shall have determined (in their sole and absolute discretion) that an Accelerated Amortization Start Date should not occur in connection with such Accelerated Amortization Event.

"Account Control Agreements" means the Colombian Account Control Agreements and the US Account Control Agreements.

"Administrative Agent" means Macquarie Bank Ltd., in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify to the Loan Parties and the Lenders.

"Administrative Questionnaire" means, with respect to each Lender, an administrative questionnaire in a form supplied by the Administrative Agent and submitted to the Administrative Agent duly completed by such Lender.

"Advisors" means, the Petroleum Engineer and any other advisor agreed among the Borrower and the Required Lenders.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

2

Notwithstanding the foregoing, none of the Administrative Agent, the Collateral Agent or any Lender shall be deemed to be an Affiliate of the Loan Parties.

"<u>Agents</u>" means, collectively, the Administrative Agent and the Collateral Agent.

"<u>Aggregate Commitments</u>" means the Commitments of all the Lenders.

"<u>ANH</u>" means the National Hydrocarbons Agency (*Agencia Nacional de Hidrocarburos*) of Colombia.

"<u>ANH Letter of Credit</u>" means each irrevocable letter of credit (*garantía bancaria única de cumplimiento*) issued in favor of ANH and which guarantees the obligations of any of the Loan Parties under any E&P Contract.

"<u>Annual Drilling Plan</u>" means a plan for the drilling of wells associated with the Project during a specific fiscal year of the Borrower.

"<u>Anti-Corruption Laws</u>" means all laws, rules, regulations and requirements of any jurisdiction (including the U.S., Colombia, Switzerland, Panama and Canada) applicable to each Loan Party, its Affiliates or any party to the Loan Documents concerning or relating to bribery or corruption, including, without limitation, the FCPA, the title of "crimes against the public administration" (currently included in book II, title XV, chapters I to XII of the Colombian Criminal Code), the article on private corruption (currently included in book II, title VII, chapter V of the Colombian Criminal Code) established in the Colombian Criminal Code, Law 80 of 1993, Law 1474 of 2011, Law 1778 of 2016, and Law 2195 of 2022 of Colombia and their respective implementing decrees, Colombian Law 970 of 2005 ratifying the United Nations Convention against Corruption, and Chapter X of the External Letter 100-000003 of July 26, 2016, issued by the Superintendency of Companies (*Superintendencia de Sociedades*) of Colombia, or any other standard issued at any time by the Superintendency of Companies (*Superintendencia de Sociedades*) of Colombia, the *Corruption of Foreign Public Officials Act* (Canada), Title 19 of the Swiss Criminal Code on bribery and any similar laws currently in force or hereafter enacted (and including any regulations, rules, guidelines or orders thereunder), as any of the foregoing may be amended from time to time.

"<u>Anti-Money Laundering Laws</u>" means all laws of any jurisdiction (including the U.S., Colombia, Switzerland, Panama and Canada) applicable to each Loan Party, its Affiliates or any party to the Loan Documents concerning or relating to anti-money laundering and anti-terrorism financing, including, without limitation, the Currency and Financial Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act, the Money Laundering Control Act of 1986 and other legislation, which legislative framework is commonly referred to as the "Bank Secrecy Act," the chapter on money laundering (currently included in book II, title X, chapter V of the Colombian Criminal Code), the provision regarding the financing of terrorism included in article 345 of the Colombian Criminal Code, Colombian Law 1017 of 2006 ratifying the Convention on Laundering, Search, Seizure and Confiscation of the Proceeds of Crime, Colombian Law 808 of 2003 ratifying the International Convention for the Suppression of the Financing of Terrorism, Colombian Law 1108 of 2006 ratifying the Inter-American Convention

3

against Terrorism, Colombian Law 800 of 2003, ratifying the United Nations Convention against Transnational Organized Crime and Colombian Law 67 of 1993 ratifying the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, Part II.1 of the *Criminal Code* (Canada), the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada), regulations promulgated pursuant to the *Special Economic Measures Act* (Canada) and the *United Nations Act* (Canada), the Swiss Federal Act on Combating Money Laundering and Terrorist Finance of 10 October 1997 and its related ordinances and all rules and regulations implementing these Laws and any similar Laws currently in force or hereafter enacted (and including any regulations, rules, guidelines or orders thereunder), as any of the foregoing may be amended from time to time.

"Applicable Margin" means, for each Loan, a rate *per annum* equal to 8.0%; provided, however, that if on or prior to December 31, 2024 the Administrative Agent shall not have received documentation evidencing that the Permitted Corporate Reorganization has been consummated on or prior to such date, "Applicable Margin" shall mean, during the period commencing on (and including) December 31, 2024 and ending on (and including) the date on which the Administrative Agent shall have received documentation evidencing that the Permitted Corporate Reorganization has been consummated, a rate *per annum* equal to 10.00%.

"Applicable Percentage" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Aggregate Commitments represented by such Lender's Commitment at such time. If the commitment of each Lender to make Loans have been terminated pursuant to Section 8.02 or if the Aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 1.01-I or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arranger" means Macquarie Bank Ltd. or any of its designated Affiliates.

"Asset Coverage Ratio" means, as of any date of determination, the ratio of (a) total PV 10 Value as of such date of determination, to (b) the Indebtedness of the Loan Parties under the Credit Agreement as of such date of determination.

"Asset Sale" means, with respect to any Person, any Disposition or other conveyance (including by way of merger, casualty, condemnation or otherwise), in one transaction or series of related transactions, by any Loan Party or any of its Subsidiaries of any Property of the relevant Loan Party or any of its Subsidiaries.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee, and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with IFRS, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with IFRS if such lease were accounted for as a capital lease.

"Audited Financial Statements" means the audited balance sheet of the Borrower as of December 31, 2021, December 31, 2022, and December 31, 2023, and the related statements of income or operations, shareholders' equity and cash flows for the periods reported thereunder of the Borrower, including the notes thereto.

"Auditor" means PricewaterhouseCoopers LLP or such other firm of internationally recognized independent public accounts reasonably acceptable to the Required Lenders and appointed by the relevant Loan Party to serve as its auditor.

"Availability Period" means the period from (and including) the date on which each of the conditions under Section 4.01 are satisfied (or waived) to (and including) the Termination Date.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.13(d).

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"Bail-In Legislation" means (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"Base Case Model" means the Lenders' approved financial model forecasting the cash flows of the Borrower and its Subsidiaries and a fully amortizing structure with a maturity on the Maturity Date, and such other assumptions and methodology agreed to by the Borrower and the

Lenders as of the Closing Date and as amended from time to time pursuant to this Agreement, as prepared by the Borrower, and which reflects (a) the Proved Developed Producing Reserves and (b) the projected operating expenses (including, without limitation, Hydrocarbon processing costs, compression costs and estimated expenses of direct supervision), production Taxes, royalty payable, transportation costs and capital expenditures (including, without limitation, surface production facilities, pipelines, and the drilling of wells), required to operate the Project.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.13.

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

        (a)      Daily Simple SOFR; or

        (b)      the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

If the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero), that has been selected by the Administrative Agent and the Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means a date and time determined by the Administrative Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) have been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; _provided_ that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, if such Benchmark is a term rate, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"<u>Benchmark Transition Event</u>" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; _provided_ that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) or, if such Benchmark

is a term rate, all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof) or, if such Benchmark is a term rate, any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) or, if such Benchmark is a term rate, all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, if such Benchmark is a term rate, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Unavailability Period" means the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.13 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.13.

"Beneficial Ownership Certificate" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Betania Separation and Compression System" means gathering system, manifold with multiple headers, gas-water separation facilities and compressors located at Betania substation.

"Blocks" means the Esperanza Block, SSJN-7 Block, Sangretoro Block, VIM-5 Block, VIM-21 Block, VMM-45 Block, VMM-49 Block, VIM-33 Block, VIM-44 Block, VMM-53 Block, VMM-10-1 Block, VMM-2 Block, VMM-3 Block and the Casanare-Rancho Hermoso Block.

"Board" means the Board of Governors of the Federal Reserve System, together with any successor.

"Borrowing" means a borrowing of the Loans made or to be made hereunder.

"Borrowing Date" means a Business Day within the Availability Period, specified in a Loan Notice as the date on which, upon the terms and subject to the conditions set forth herein, the Borrower shall make a Borrowing hereunder.

"<u>Business Day</u>" means (a) a day on which banks are generally open for business in New York, New York, Calgary, Alberta, Panama City, Republic of Panama, and Bogotá, Colombia; and (b) with respect to all notices and determinations in connection with SOFR (including the determination of Interest Period), any day which is a Business Day described in clause (a) above and which is also a U.S. Government Securities Business Day.

"<u>Canacol 2028 Notes</u>" means the 5.750% senior notes of the Borrower due 2028, governed by the Canacol 2028 Notes Indenture.

"<u>Canacol 2028 Notes Indenture</u>" means that certain indenture, dated as of November 24, 2021, by and among the Borrower, Canacol Energy Inc., Shona Energy Limited Partnership, Shona Energy Holding Limited Partnership, Shona Energy Holding Ulc, Shona Energy Ulc, the Colombian Companies, Shona Holding Gmbh, Geoproduction Holding Gmbh, CECSA Energy, Inc., and Cantana Energy GmbH (formerly Cantana Energy, S.A.), as note guarantors, and Citibank N.A. as trustee, security registrar and paying agent, providing for the issuance of the 5.750% senior notes due 2028, as amended, amended and restated, supplemented or otherwise modified from time to time.

"<u>Canacol 2028 Notes Permitted Purchase</u>" means a purchase of Canacol 2028 Notes pursuant to Section 3.9 of the Canacol 2028 Notes Indenture, if (and only to the extent that) the Canacol 2028 Notes Purchase Conditions applicable to any such purchase are satisfied.

"<u>Canacol 2028 Notes Purchase Conditions</u>" means, with respect to any purchase of Canacol 2028 Notes pursuant to Section 3.9 of the Canacol 2028 Notes Indenture, the satisfaction of each of the following conditions:

   a. immediately prior to and after giving effect to the making of such purchase, the aggregate amount of cash on hand of the Loan Parties that is not (1) subject to any Lien or control agreement (other than Liens created pursuant to the Colombian Asset Pledge Agreement) or (2) held as deposit or security for contractual obligations of any Loan Party or any of its Subsidiaries or any other Person, shall not be less than U.S.$50,000,000 (or its equivalent in any other currency); and

   b. not later than five Business Days prior to the making of such purchase, the Administrative Agent and the Lenders shall have received a certificate signed by a Responsible Officer of the Borrower (which delivery may be by electronic communication including fax or email and shall be deemed to be an original authentic counterpart thereof for all purposes) certifying the compliance of the condition specified above, and setting forth in reasonable detail the calculations required to establish such compliance.

"<u>Canacol Energy Colombia</u>" means Canacol Energy Colombia S.A.S., a *sociedad por acciones simplificada*, organized and existing under the laws of Colombia.

"<u>Canacol Existing Revolving Credit Agreement</u>" means that certain revolving credit and guaranty agreement, dated as of February 14, 2023, by and among the Borrower, the guarantors

party thereto, the lenders party thereto, and Deutsche Bank Trust Company Americas, as administrative agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Canadian Defined Benefit Plan" means a Canadian Pension Plan which contains a "defined benefit provision", as such term is defined in the *Income Tax Act* (Canada).

"Canadian Pension Plan" means any plan, program or arrangement that is a "registered pension plan" as that term is defined in the *Income Tax Act* (Canada) or a pension plan for the purposes of any applicable Canadian federal or provincial pension standards legislation, which is maintained or contributed by, or to which there is or may be an obligation to contribute by a Loan Party or any Subsidiary thereof or under or in respect of which any Loan Party or any Subsidiary thereof has any liability, actual, contingent or otherwise, other than a Canadian multi-employer pension plan or multiple employer pension plan.

"Capital Expenditure" means, with respect to any Person for any period, any additions to Property, plant or equipment (either for maintenance or expansion works), the value or cost of which under IFRS should be capitalized and appear as a fixed asset on such Person's balance sheet.

"Capital Lease Obligations" of any Person, means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under IFRS, and the amount of such obligations shall be the capitalized amount thereof, determined in accordance with IFRS.

"Capital Stock" means, with respect to any Person, any and all shares, interests, participations or other equivalents (however denominated) of such Person's capital stock whether now outstanding or issued after the date of this Agreement.

"Casanare-Rancho Hermoso Block" means the block known as "Casanare-Rancho Hermoso" located in Casanare, Colombia operated by Canacol Energy Colombia and in which the Borrower, through Canacol Energy Colombia, has a 30% working interest.

"Cash Equivalents" means (a) marketable direct obligations issued by, or unconditionally guaranteed by, the United States government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case maturing within one year from the date of acquisition; (b) certificates of deposit, time deposits, or overnight bank deposits having maturities of twelve months or less from the date of acquisition issued by any Lender or by any commercial bank organized under the laws of the United States of America or any state thereof having combined capital and surplus of not less than U.S.$500,000,000; (c) commercial paper of an issuer rated at least A-1 by S&P or P-1 by Moody's, or carrying an equivalent rating by a "nationally recognized statistical rating organization" (within the meaning of proposed Rule 3b-10 promulgated by the SEC under the Exchange Act), if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and maturing within twelve months from the date of acquisition; (d) repurchase obligations of any Lender or of any

commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than 30 days with respect to securities issued or fully guaranteed or insured by the United States government; (e) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory, the securities of which state, commonwealth, territory, political subdivision or taxing authority (as the case may be) are rated at least AAA by S&P or Aaa by Moody's; (f) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any Lender or any commercial bank satisfying the requirements of clause (b) of this definition; and (g) shares of money market mutual or similar funds which invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Casualty Event" means, with respect to any Person, (a) the destruction of any Property (including any Oil and Gas Property) of such Person, (b) damage beyond economical repair of any Property (including any Oil and Gas Property) of such Person or (c) any Property (including any Oil and Gas Property) of such Person becoming permanently unfit for normal use.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in, or in the interpretation of, any law, rule, regulation or treaty, or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary: (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, CRD IV and/or CRR shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued.  For purposes of this definition, "CRD IV" means Directive 2013/36/EU of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directive 2006/48/EC and 2006/49/EC, and "CRR" means Regulation (EU) No. 575/2013 of 26 June 2013 on prudential requirements for credit institutions and investment firms and amending regulation (EU) No. 648/2012.

"Change of Control" means the consummation of any transaction or series of transactions or the occurrence of any event or series of events, following the Closing Date, as a result of which (a) the Borrower individually or together with one or more Wholly Owned Subsidiaries shall cease to own, directly or indirectly, beneficially and of record, all of the outstanding Equity Interest and Voting Equity Interest of any Guarantor or shall cease to Control any Guarantor; (b) a Person or combination of Persons acting jointly or in concert (within the meaning of the Securities Act (Alberta)) (other than any Wholly Owned Subsidiary of the Borrower or any Permitted Holder) shall become the owner of record or beneficial owner of more than 50% of the Voting Equity Interest of the Borrower; (c) a Person or combination of Persons acting jointly or in concert (within the meaning of the Securities Act (Alberta)) (other than the Borrower, any

11

Wholly Owned Subsidiary of the Borrower or any Permitted Holder) shall have the right to designate, directly or indirectly, (x) with respect to any Loan Party other than the Borrower, one or more individuals to be members of the Board of Directors of such Loan Party, and (y) with respect to the Borrower, the majority of the members of the Board of Directors of the Borrower; or (d) the individuals who at the Closing Date constituted the Board of Directors of the Borrower (together with any new directors whose election by such Board of Directors or whose nomination for election by the shareholders of the Borrower, as the case may be, was approved by a vote of the majority of the directors then still in office who were either directors at the Closing Date or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of the Borrower then in office; provided, however, that the occurrence of any of the foregoing events resulting solely from the exercise by any Lender or the Administrative Agent of any of its rights under the Loan Documents shall not be deemed to constitute a Change of Control.

"Child Labour" means labour or services provided or offered to be provided by persons under the age of 18 years as defined in the FCLA.

"Clarinete Separation and Compression System" means gathering system, manifold with multiple headers, gas-water separation facilities and compressors located at Clarinete substation.

"Closing Date" means the first date falling on or prior to September 16, 2024, on which all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"CNE Energy Colombia" means CNE Energy S.A.S., a *sociedad por acciones simplificada*, organized and existing under the laws of Colombia.

"CNE Oil & Gas Colombia" means CNE Oil & Gas Colombia S.A.S., a *sociedad por acciones simplificada*, organized and existing under the laws of Colombia.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means the property and rights of any Person from time to time subject to the Collateral Documents as security, *inter alia*, for the obligations of the Loan Parties hereunder and under the other Loan Documents.

"Collateral Documents" means, collectively, the Colombian Collateral Documents, the U.S. Collateral Documents, the Panama Pledge Agreement and any other document or instrument executed in connection with the foregoing and any other agreement or instrument that creates or purports to create a Lien in favor of any Agent for the benefit of the Secured Parties.

"Collection Accounts" means, collectively, the US Accounts, the Colombian Accounts and the Promigas Trust Accounts.

"Colombia" means the Republic of Colombia.

12

"Colombian Account Control Agreements" means the Colombian account control agreements (*contrato de control de cuentas*) to be entered into by the applicable Loan Party, the Colombian Collateral Agent and a Colombian Depositary Bank, in form and substance reasonably satisfactory to the Colombian Collateral Agent, by means of which the applicable Loan Party creates a moveable guarantee (*garantía mobiliaria*) over the applicable Colombian Account, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Colombian Accounts" means the accounts maintained with (a) Davivienda S.A. under (i) checking account No. 4828 6999 5316, (ii) savings account No. 4828 0000 5274, (iii) checking account No. 0011 6999 6129, and (iv) checking account No. 0089 6999 2620; and (b) Banco de Occidente, S.A. under (i) savings account No. 291 81961 3, and (ii) checking account No. 291 81962 1.

"Colombian Asset Pledge Agreement" means the assets pledge agreement (*contrato de garantía mobiliaria sobre activos*) governed by the laws of Colombia, over the assets of the Colombian Guarantors, to be entered into by and between the Colombian Guarantors, and the Colombian Collateral Agent, substantially in the form of Exhibit B, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Colombian Central Bank" means the Central Bank of Colombia (*Banco de la República de Colombia*) or any other Governmental Authority charged with the responsibility of issuing, managing and controlling legal currency in Colombia and determining foreign exchange policy.

"Colombian Collateral Agency Agreement" means the Colombian collateral agency agreement (*contrato de encargo fiduciario irrevocable del agente de garantías local*) to be entered into by and between the Borrower, the Administrative Agent and the Colombian Collateral Agent, substantially in the form of Exhibit C, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Colombian Collateral Agent" means Credicorp Capital Fiduciaria S.A. in its capacity as Colombian onshore collateral agent under the Colombian Collateral Documents, or any successor Colombian onshore collateral agent pursuant to the terms of the Colombian Collateral Agency Agreement.

"Colombian Collateral Documents" means, collectively, the Colombian Asset Pledge Agreement, the Colombian Conditional Assignment of Contractual Rights and Economic Rights of the E&P Contracts, the Colombian Share Pledge Agreements and the Colombian Account Control Agreements.

"Colombian Conditional Assignment of Contractual Rights and Economic Rights of the E&P Contracts" means the conditional assignment of economic rights (*contrato de cesión condicionada de derechos contractuales y derechos económicos de los contratos de exploración y producción*) governed by the laws of Colombia, to be entered into by and between the Colombian Companies and the Colombian Branches as assignors, and the Colombian Collateral

Agent, as assignee, substantially in the form of Exhibit D, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Colombian Depositary Banks" means Banco Davivienda S.A. and Banco de Occidente, S.A.

"Colombian Branches" means, collectively, CNEOG Colombia Sucursal Colombia, Cantana Energy Sucursal Colombia, CECSA Energy Inc. Sucursal Colombia, and Canacol Energy Colombia S.A.S Sucursal Bolivia.

"Colombian Companies" means, collectively, CNE Energy Colombia, CNE Oil & Gas Colombia, and Canacol Energy Colombia.

"Colombian Guarantors" means, collectively, the Colombian Companies and the Colombian Branches.

"Colombian Promissory Note" means a promissory note with blank spaces and its corresponding letter of instructions (*pagaré con espacios en blanco y carta de instrucciones*) issued under Colombian Law by the Borrower and executed by the Guarantors as *avalistas* in favor of each Lender, substantially in the form of Exhibit E.

"Colombian Share Pledge Agreements" means each share pledge agreement (*contrato de garantía mobiliaria sobre acciones*) governed by the laws of Colombia, to be entered into by and among Cantana Energy GmbH, CNE Oil & Gas S.R.L., CECSA Energy Inc., CNE Energy S.A.S., CNE Oil & Gas S.A.S., Canacol Energy Colombia and the Colombian Collateral Agent, substantially in the form of Exhibit F, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Commitment" means, as to each Lender, its obligation to make Loans to the Borrower pursuant to Section 2.01, in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Schedule 1.01-I or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Compliance Certificate" means a certificate substantially in the form of Exhibit G.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "ABR," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 3.05 and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with

14

market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated" refers to the consolidation of accounts of a Person and its Subsidiaries in accordance with IFRS.

"Consolidated Current Assets" means, as of any date, the aggregate of all current assets (but excluding non-cash assets under IFRS) reflected in the Consolidated balance sheet of the Borrower and its Consolidated Subsidiaries as of the last day of the fiscal quarter of the Borrower most recently ended, prepared in accordance with IFRS. Additionally, up to U.S.$20,000,000 of materials inventory in warehouse that are recorded under property, plant and equipment shall be included in current assets for the purposes of the calculation of Consolidated Current Assets.

"Consolidated Current Liabilities" means, as of any date, the aggregate of all current liabilities, but excluding the current portion of:

(1) Indebtedness under (i) this Agreement, (ii) the Canacol Existing Revolving Credit Agreement, and (iii) the Canacol 2028 Notes Indenture;

(2) any obligation with respect to any non-cash marked-to-market and non-cash early liquidation charges (or valuation account) under any Hedging Agreements;

(3) non-cash obligations under IFRS and the non-cash effects, if any, of any non-cash stock option re-pricing accrual; and

(4) deferred income in an aggregate amount not to exceed, as of any such date, U.S.$15,000,000;

in each of the foregoing cases, as each such item is reflected in the Consolidated balance sheet of the Borrower as of the last day of the fiscal quarter of the Borrower most recently ended, prepared in accordance with IFRS.

"Consolidated EBITDAX" for any Rolling Period, means with respect to the Borrower and its Subsidiaries, the Consolidated Net Income for such Rolling Period, *plus* the following, without duplication and to the extent deducted (and not added back) in calculating such Consolidated Net Income:

(1) Consolidated Interest Expense;

15

(2) Consolidated Income Tax Expense;

(3) Consolidated depletion, depreciation and accretion expense;

(4) Consolidated amortization expense or asset impairment charges;

(5) other non-cash charges (including, without limitation, any non-cash compensation expenses, non-cash unrealized gains/losses on foreign exchange translation, commodity and foreign currency derivatives and investments, loss on extinguishment of Indebtedness, doubtful account expense, gains/losses on sale or acquisition of Oil and Gas Properties or Equity Interests in Persons holding such properties, but excluding any non-cash charge to the extent it represents an accrual of or reserve for cash charges in any future period or amortization of a prepaid cash expense that was paid in a prior period not included in the calculation); and

(6) Consolidated exploration expense,

if applicable for such Rolling Period; and *less*, to the extent included in calculating such Consolidated Net Income and in excess of any costs or expenses attributable thereto that were deducted (and not added back) in calculating such Consolidated Net Income, non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDAX in any prior period); provided that in determining Consolidated EBITDAX, the components specified in clauses (1) to (6) shall not include the effects of any transactions that are or would have been characterized as an operating lease for purposes of IAS 17–Leases prior to the effective date of IFRS 16, and shall include the effects of Capital Lease Obligations of such Person, notwithstanding the application of IFRS 16 (on a prospective or retroactive basis or otherwise) and regardless of any change in IFRS that would otherwise require such obligation to be recharacterized.

It being understood that, (i) the Consolidated EBITDAX of any Person or line of business acquired by the Borrower or any of its Subsidiaries during such Rolling Period shall be included on a *pro forma* basis for such Rolling Period (assuming that the consummation of such acquisition and the Incurrence of any Indebtedness in connection therewith occurred as of the first day of such Rolling Period); and (ii) the Consolidated EBITDAX of any Person or line of business Disposed of by the Borrower or any of its Subsidiaries during such Rolling Period shall be excluded for such Rolling Period (assuming that the consummation of such Disposition and the repayment of any Indebtedness in connection therewith occurred as of the first day of such Rolling Period).

Notwithstanding the preceding sentence, clauses (1) through (6) relating to amounts of a Subsidiary of the referent Person will be added to Consolidated Net Income to compute Consolidated EBITDAX of such Person only in the same proportion that the net income of such Subsidiary was included in calculating the Consolidated Net Income of such Person.

"Consolidated EBITDAX to Consolidated Interest Expense Ratio" means at any date of determination (x) Consolidated EBITDAX for the Rolling Period ended on such date (or, if such

date is not the last day of a fiscal quarter, ended on the last day of the fiscal quarter most recently ended prior to such date) *divided by* (y) the Consolidated Interest Expense for the Rolling Period ended on such date (or, if such date is not the last day of a fiscal quarter, ended on the last day of the fiscal quarter most recently ended prior to such date); <u>provided</u> that:

(1) if the Borrower or any Subsidiary has

    (a) Incurred any Indebtedness since the beginning of such Rolling Period that remains outstanding on the date of calculation of the Consolidated EBITDAX to Consolidated Interest Expense Ratio (or, if such date is not the last day of a fiscal quarter, ended on the last day of the fiscal quarter most recently ended prior to such date), Consolidated EBITDAX and Consolidated Interest Expense for such Rolling Period shall be calculated on a *pro forma* basis as if such Indebtedness had been Incurred on the first day of such Rolling Period except that in making such computation, the amount of Indebtedness under any revolving credit facility outstanding on the day of such calculation will be deemed to be

        (i) the average daily balance of such Indebtedness during such Rolling Period or such shorter period for which such facility was outstanding, or

        (ii) if such facility was created after the end of such Rolling Period, the average daily balance of such Indebtedness during the period from the date of creation of such facility to the date of such calculation (or, if such date is not the last day of a fiscal quarter, ended on the last day of the fiscal quarter most recently ended prior to such date), or

    (b) repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such Rolling Period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case, other than Indebtedness Incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of calculation of the Consolidated EBITDAX to Consolidated Interest Expense Ratio (or, if such date is not the last day of a fiscal quarter, ended on the last day of the fiscal quarter most recently ended prior to such date), Consolidated EBITDAX and Consolidated Interest Expense for such Rolling Period shall be calculated on a *pro forma* basis as if such discharge had occurred on the first day of such Rolling Period and as if the Borrower or such Subsidiary has not earned the interest income, if any, actually earned during such Rolling Period in respect of cash or Cash Equivalents used to repay, repurchase, defease or otherwise discharge such Indebtedness;

(2) if since the beginning of such Rolling Period, the Borrower or any Subsidiary shall have made any Asset Sale, then giving *pro forma* effect to such disposition during such Rolling Period on Consolidated EBITDAX and Consolidated Interest Expenses for such Rolling Period;

17

(3) if since the beginning of such Rolling Period, the Borrower or any Subsidiary (by merger, amalgamation or otherwise) shall have made an Investment in any Person that is merged or amalgamated with or into the Borrower or any Subsidiary (or any Person that becomes a Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation of Consolidated EBITDAX to Consolidated Interest Expense Ratio to be made hereunder, which constitutes all or substantially all of an operating unit of a business, then giving *pro forma* effect to such Investment or acquisition on the Consolidated EBITDAX and Consolidated Interest Expense for such Rolling Period, any such *pro forma* calculation may include adjustments appropriate to reflect, without duplication,

(a) any such acquisition to the extent such adjustments may be reflected in the preparation of *pro forma* financial information in accordance with the requirements of Article 11 of Regulation S-X under the Exchange Act;

(b) the annualized amount of operating expense reductions reasonably expected to be realized in the six months following any such acquisition made during such Rolling Period; <u>provided</u> that in each case such adjustments are set forth in an officer's certificate that states:

(i) the amount of such adjustment or adjustments;

(ii) that such adjustment or adjustments are based on the reasonable good faith beliefs of the Responsible Officer executing such officer's certificate at the time of such execution; and

(iii) that any related Incurrence of Indebtedness is permitted pursuant to this Agreement.

(4) if since the beginning of such Rolling Period, any Person (that subsequently became a Subsidiary or was merged or amalgamated with or into the Borrower or any Subsidiary since the beginning of such Rolling Period) shall have made any Asset Sale or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (2) or (3) above if made by the Borrower or a Subsidiary during such Rolling Period, Consolidated EBITDAX and Consolidated Interest Expense for such Rolling Period shall be calculated after giving *pro forma* effect thereto as if such Asset Sale, Investment or acquisition of assets occurred on the first day of such Rolling Period.

For purposes of this definition, whenever *pro forma* effect is to be given to an acquisition of assets and the amount of income or earnings related thereto, the *pro forma* calculations shall be determined in good faith by the Responsible Officer of the Borrower. If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Hedging Agreement applicable to

18

such Indebtedness if such Hedging Agreement has a remaining term as at the date of determination in excess of twelve months).

"Consolidated Income Tax Expense" shall mean, with respect to any period, the provision for federal, national, state, local and foreign income taxes (including state franchise taxes accounted for as income taxes in accordance with IFRS) for such period as determined in accordance with IFRS.

"Consolidated Interest Expense" means, for any Rolling Period, the aggregate amount of Consolidated interest expense (net of Consolidated interest income) accrued in respect of Indebtedness (including, but not limited to, any amount thereof capitalized) during such period, as determined in accordance with IFRS.

"Consolidated Leverage Ratio" means, for any date of determination, (a) Consolidated Total Debt as of such date minus the cash and Cash Equivalents of the Borrower and its Subsidiaries as of such date *divided by* (b) Consolidated EBITDAX for the Rolling Period ended such date (or, if such date is not the last day of a fiscal quarter, ended on the last day of the fiscal quarter most recently ended prior to such date); *provided,* that: (1) if the Borrower or any Subsidiary has (x) Incurred any Indebtedness since the beginning of such Rolling Period that remains outstanding on the date of determination (or, if such date is not the last day of a fiscal quarter, ended on the last day of the fiscal quarter most recently ended prior to such date), Consolidated EBITDAX and Consolidated Total Debt for such Rolling Period shall be calculated on a *pro forma* basis as if such Indebtedness had been Incurred on the first day of such Rolling Period (except that in making such computation, the amount of Indebtedness under any revolving credit facility outstanding on the day of such calculation will be deemed to be the average daily balance of such Indebtedness during such Rolling Period or such shorter period for which such facility was outstanding or if such facility was created after the end of such Rolling Period, the average daily balance of such Indebtedness during the period from the date of creation of such facility to the date of such calculation (or, if such date is not the last day of a fiscal quarter, ended on the last day of the fiscal quarter most recently ended prior to such date)); (y) repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such Rolling Period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case, other than Indebtedness Incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of calculation of the Consolidated Leverage Ratio (or, if such date is not the last day of a fiscal quarter, ended on the last day of the fiscal quarter most recently ended prior to such date), Consolidated EBITDAX for such Rolling Period shall be calculated on a *pro forma* basis as if such discharge had occurred on the first day of such Rolling Period and as if the Borrower or such Subsidiary had not earned the interest income actually earned during such Rolling Period in respect of cash or Cash Equivalents used to repay, repurchase, defease or otherwise discharge such Indebtedness; (2) if since the beginning of such Rolling Period the Borrower or any Subsidiary shall have made any Asset Sale, then giving *pro forma* effect to such Asset Sale during such period on the Consolidated EBITDAX; (3) if since the beginning of such Rolling Period, the Borrower or any Subsidiary (by merger, amalgamation or otherwise) shall have made an Investment in any Person that is merged or amalgamated with or into the Borrower or any Subsidiary (or any

19

Person that becomes a Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation of Consolidated Leverage Ratio to be made under this Agreement, which constitutes all or substantially all of an operating unit of a business, then giving *pro forma* effect to such Investment or acquisition on the Consolidated EBITDAX for such Rolling Period, any such *pro forma* calculation may include adjustments appropriate to reflect, without duplication, (x) any such acquisition to the extent such adjustments may be reflected in the preparation of *pro forma* financial information in accordance with the requirements of Article 11 of Regulation S-X under the Exchange Act, and (y) the annualized amount of operating expense reductions reasonably expected to be realized in the six months following any such acquisition made during such Rolling Period; and (4) if since the beginning of such Rolling Period, any Person (that subsequently became a Subsidiary or was merged or amalgamated with or into the Borrower or any Subsidiary since the beginning of such period) shall have made any Asset Sale or any Investment or acquisition of assets that would have required an adjustment pursuant to clauses (2) or (3) above if made by the Borrower or a Subsidiary during such Rolling Period, Consolidated EBITDAX for such Rolling Period shall be calculated after giving *pro forma* effect thereto as if such Asset Sale, Investment or acquisition of assets occurred on the first day of such Rolling Period.

For purposes of this definition, whenever *pro forma* effect is to be given to an acquisition of assets and the amount of income or earnings related thereto, the *pro forma* calculations shall be determined in good faith by a Responsible Officer of the Borrower. If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account Hedging Agreement applicable to such Indebtedness if such Hedging Agreement has a remaining term as at the date of determination in excess of twelve months).

"Consolidated Net Income" means, for any period and with respect to the Borrower, the Consolidated net income of the Borrower and its Subsidiaries for such period as determined in accordance with IFRS, excluding the following:

(1) consolidated deferred income taxes of the Borrower and its Subsidiaries for such period as determined in accordance with IFRS;

(2) impairment of exploration and evaluation assets of the Borrower and its Subsidiaries for such period as determined in accordance with IFRS; and

(3) any amount recognized in the consolidated net income of the Borrower and its Subsidiaries for such period due to the extinguishment or substantial modification of a financial liability in accordance with IFRS 9.

"Consolidated Total Debt" means, with respect to the Loan Parties and their respective Subsidiaries on any date, the aggregate principal amount of all Indebtedness of the Loan Parties and their respective Subsidiaries on such date, determined on a consolidated basis in accordance with IFRS.

"Contest" means, with respect to the payment of Taxes or any other claims or liabilities by any Person, to contest the validity or amount thereof in good faith by appropriate proceedings; provided that such Person has posted a bond or other security in accordance with applicable Law (if required) or has established adequate reserves with respect to the contested items in accordance with, and to the extent required by, IFRS.   "Contested" shall have a meaning correlative thereto.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.   "Controlling" and "Controlled" have meanings correlative thereto.

"Corrective Plan" means a plan prepared by the Loan Parties to correct or remedy the damages or adverse consequences caused by non-compliance with Environmental and Social Requirements, which must include the following:

(a)   a brief description of the damage or adverse consequences, including the extent, magnitude, impact and causes thereof;

(b)   the proposed actions to correct and resolve all damage and adverse consequences caused by the breach;

(c)   an indication of responsibility for the implementation of said corrective actions;

(d)   a timeline for the implementation of the corrective actions, including the initiation date, the completion date and the main milestones;

(e)   the estimated cost of said corrective actions; and

(f)   the proposed actions to prevent the occurrence in the future of such a breach or similar breaches.

"Credit Exposure" means, as to any Lender at any time, the aggregate principal amount at such time of its outstanding Loans.

"Current Ratio" means, as of any date of determination, the ratio of (a) Consolidated Current Assets as of such date of determination to (b) Consolidated Current Liabilities as of such date of determination.

"Daily Simple SOFR" means, for any day (a "SOFR Rate Day"), a rate per annum equal to SOFR for the day (such day, a "SOFR Determination Date") five (5) U.S. Government Securities Business Days prior to (i) if such SOFR Rate Day is a U.S. Government Securities

Business Day, such SOFR Rate Day or (ii) if such SOFR Rate Day is not a U.S. Government Securities Business Day, the U.S. Government Securities Business Day immediately preceding such SOFR Rate Day, in each case, as such SOFR is published by the SOFR Administrator on the SOFR Administrator's Website; provided that if by 5:00 p.m. (New York City time) on the second (2nd) U.S. Government Securities Business Day immediately following any SOFR Determination Date, SOFR in respect of such SOFR Determination Date has not been published on the SOFR Administrator's Website and a Benchmark Replacement Date with respect to the Daily Simple SOFR has not occurred, then SOFR for such SOFR Determination Date will be SOFR as published in respect of the first preceding U.S. Government Securities Business Day for which such SOFR was published on the SOFR Administrator's Website; provided, further, that SOFR as determined pursuant to this proviso shall be utilized for purposes of calculation of Daily Simple SOFR for no more than three (3) consecutive SOFR Rate Days.  Any change in Daily Simple SOFR due to a change in SOFR shall be effective from and including the effective date of such change in SOFR without notice to the Borrower.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, winding-up, reorganization, relief of debtors, takeover by any Governmental Authority or similar debtor relief Laws of Colombia, the United States, Canada, Switzerland, Panama or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Defaulting Lender" means, subject to Section 2.12(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent, the Collateral Agent or any Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower, the Administrative Agent, the Collateral Agent or any other Lender in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation

22

of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity, or (iii) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding, absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.12(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Borrower, the Collateral Agent and each other Lender promptly following such determination.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith or of any contractual rights or Capital Stock of any Subsidiary of such Person.

"Dollar" and "U.S.$" mean lawful money of the United States.

"Dollar Equivalent" means, on any day, the amount of Dollars obtained by converting Pesos at (i) the official exchange rate in Colombia (tasa de cambio representativa del mercado) used to determine the amount of Pesos equivalent to one Dollar, as calculated one day prior to such day by the Colombian Superintendent of Finance (Superintendencia Financiera de Colombia) and published at www.superfinanciera.gov.co (or any successor website), or (ii) if such rate or a substitute rate therefor is not published as described in clause (i) for the relevant date of determination, the "Dollar Equivalent" shall be the amount of Dollars obtained by converting Pesos into Dollars at the spot rate for the purchase of Dollars with Pesos as published on the applicable Reuters screen page (https://www.reuters.com/markets/currencies) (or, if not available on such website, a comparable website reasonably selected by the Administrative Agent) at approximately 11:00 a.m. (New York City time) on the date of such determination.

"E&P Contracts" means, collectively, the contracts for the exploration and production of Hydrocarbons to which any Loan Party is a party, as amended, amended and restated, supplemented or otherwise modified from time to time.  Schedule 1.01-II contains a description of the E&P Contracts in effect as of the date hereof.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established

in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Environment" means flora and fauna, living organisms including humans and the ecological systems of which they form part and the following media: (a) air and climate (including air within natural or man-made structures, whether above or below ground); (b) water (including territorial, coastal and inland waters, water under or within land and water in drains and sewers); and (c) land and soil (including landscape, land under water, flora and fauna).

"Environmental and Social Requirements" means (a) the applicable provisions of the IFC Performance Standards, and (b) all applicable Environmental Laws.

"Environmental Claim" means, with respect to any Person, (i) any notice, claim, administrative, regulatory or judicial or equitable action, suit, Lien, judgment or demand by any other Person or (ii) any other written communication by any Governmental Authority exerting its powers over such Person, in either case, alleging or asserting such Person's liability for investigatory costs, cleanup costs, consultants' fees, governmental response costs, damages to natural resources (including, without limitation, wetlands, wildlife, aquatic and terrestrial species and vegetation) or other property, property damages, personal injuries, fines or penalties arising out of, based on or resulting from (x) the presence, or release into the environment, of any Hazardous Material at any location, whether or not owned by such Person or (y) circumstances forming the basis of any actual or alleged violation, obligation or other liability of any Environmental and Social Requirement or Governmental Approval issued under any Environmental and Social Requirement.

"Environmental Laws" means any international, *supra*-national, Federal, state, provincial, local or foreign statute, law, ordinance, rule, regulation or code of any Governmental Authority now or hereafter in effect and in each case as amended, and any binding judicial or administrative interpretation thereof, including any binding judicial or administrative order, consent decree or judgment, relating to pollution, protection or restoration of the environment or natural resources, social issues or performance, public access to information and participation in decision-making insofar as it relates to the Environment or social impacts, labor and employment conditions, occupational health and safety, industrial hygiene, noise and vibrations, or the effect of the Environment on human health and safety, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the

Loan Parties or any of their Subsidiaries directly or indirectly resulting from or based upon (a) violation of any applicable Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares, shares of Capital Stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of the shares, shares of Capital Stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares, shares of Capital Stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Esperanza Block" means the block known as "Esperanza" located in the Lower Magdalena Valley Basin, Colombia operated by CNE Oil & Gas Colombia and in which the Borrower, through CNE Oil & Gas Colombia, has a 100% working interest.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" means any of the conditions or events set forth in Section 8.01.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to any Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) Taxes attributable to such Recipient's failure to comply with Section 3.01(f), and (c) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Executive Order" means the Executive Order No. 13224 of September 23, 2001, entitled Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism.

"Existing Hydrocarbon Sale Agreements" means the Hydrocarbon Sale Agreements entered into with Existing Offtakers on or prior to the date hereof and identified in Schedule 1.01-III.

"Existing Offtakers" means the offtakers set forth on Schedule 5.33 hereto.

"Fair Market Value" means, with respect to any asset, the price which could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing buyer, neither of which is under compulsion to complete the transaction.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"FCLA" means the *Fighting Against Forced Labour and Child Labour in Supply Chains Act* (Canada).

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended.

"Federal Funds Rate" means, for any day, the greater of (a) the rate calculated by the Federal Reserve Bank of New York based on such day's Federal funds transactions by depositary institutions (as determined in such manner as the Federal Reserve Bank of New York shall set forth on its public website from time to time) and published on the next succeeding Business Day by the Federal Reserve Bank of New York as the Federal funds effective rate and (b) 0%.

"Fee Letters" means the fee letters relating to the transactions entered into by the Loan Parties with any of the Arranger and/or the Agents, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Fitch" means Fitch Ratings Inc.

"Floor" means a rate of interest equal to 2.00%.

"Forced and Child Labour Laws" means all applicable Laws relating to forced, prison and/or compulsory labour and child labour, including the FCLA, section 279.01 (*Trafficking in persons*), section 279.02 (*Material benefit–trafficking*), section 279.04 (*Exploitation*) and section 279.011 (*Trafficking of a person under the age of eighteen years*) of the Criminal Code (Canada) and subparagraph 132(1)(m)(i.1) of the *Customs Tariff* (Canada).

"Forced Labour" means labour or service provided or offered to be provided by a person under circumstances defined in the FCLA.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"Gas Imbalance" means (a) a sale or utilization by the Loan Parties or any of their Subsidiaries of volumes of natural gas in excess of or less than its gross working interest, (b) receipt of volumes of natural gas into a gathering system and redelivery by the Loan Parties or any of their Subsidiaries of a larger or smaller volume of natural gas under the terms of the applicable transportation agreement, or (c) delivery to a gathering system of a volume of natural

gas produced by the Loan Parties or any of their Subsidiaries that is larger or smaller than the volume of natural gas such gathering system redelivers for the account of the Loan Parties or any of their Subsidiaries, as applicable. For the avoidance of doubt, take or pay, prepayments or deferred revenue collected from sales of undelivered natural gas shall not constitute Gas Imbalances.

"Governmental Approval" means (a) any action, approval, consent, waiver, exemption, variance, lease, ruling, claim, franchise, order, judgment, decree, permit, authorization, right, registration, filing, submission, tariff, rate, certification, plan or license of, with or from a Governmental Authority or (b) any required notice to, any declaration of, or with, or any registration by any Governmental Authority, in the case of clauses (a) and (b), relating to the Loan Parties or the Project.

"Governmental Authority" means the government of Colombia, Canada, the United States, Switzerland, Panama or any other nation, or of any political subdivision thereof, whether national, state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, collectively, Canacol Energy Inc., Shona Energy Limited Partnership, Shona Energy Holding Limited Partnership, Canacol Holding GmbH, Shona Energy Holding ULC, Shona Energy ULC, Canacol Energy Colombia, CNE Oil & Gas S.A.S, CNE Energy S.A.S, Shona Holding GmbH, Geoproduction Holding GmbH, Cantana Energy GmbH

27

(formerly Cantana Energy, S.A.), CNE Oil & Gas S.R.L. and each Person that becomes an Additional Guarantor pursuant to Section 11.13.

"Guaranty" means the Guaranty made by the Guarantors under Article XI in favor of the Secured Parties.

"Hazardous Materials" means (a) any substance or waste (whether alone or in combination with any other substances or waste) that is listed, classified or regulated under any applicable Environmental Law, (b) petroleum, petroleum products, petroleum by-products or petroleum breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls, radon gas, lead-containing paint or plumbing, toxic materials, explosives, flammable materials and molds, or (c) any other chemicals, materials or substances designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant, or that could give rise to liability or are capable of causing significant pollution or significant damage to the environment, under any applicable Environmental Law.

"Hedge Provider" means Macquarie Bank Limited or any Affiliate thereof (or any assignee or transferee thereof under the Reference Hedge (which assignee or transferee shall be a Lender or an Affiliate of a Lender) to the extent such assignment or transfer is permitted by the terms of a Reference Hedge) as party to any Reference Hedge.

"Hedge Termination Value" means, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"Hedging Agreement" means (a) any and all interest rate protection agreements, interest rate future agreements, interest rate option agreements, interest rate swap agreements, interest rate cap agreements, interest rate collar agreements, interest rate hedge agreements, foreign exchange contracts, currency swap agreements, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of the foregoing (including any option to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, traded at the over-the-counter or standardized markets and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or are governed by any form of master agreement published by the International Swaps and Derivative Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (such

28

master agreement, together with any related schedules, a "Master Agreement") including any such obligations or liabilities under any Master Agreement.

"Hydrocarbon Contracts" means any contract for the processing, transportation and/or storage of Hydrocarbons produced from or in respect of the E&P Contracts, which imposes (or which could reasonably be expected to impose) annual liabilities on any Loan Party in excess of U.S.$1,000,000.  A complete listing of Hydrocarbon Contracts as of the date hereof is set forth in Schedule 1.01-IV.

"Hydrocarbon Interests" means all presently existing or after-acquired rights, titles and interests in and to oil and gas leases, oil, gas and mineral leases, other Hydrocarbon leases, mineral interests, mineral servitudes, overriding royalty interests, royalty interests, net profits interests, production payment interests and other similar interests.  Unless otherwise qualified, all references to a Hydrocarbon Interest or Hydrocarbon Interests in this Agreement shall refer to a Hydrocarbon Interest or Hydrocarbon Interests of the Loan Parties or their Subsidiaries.

"Hydrocarbon Sale Agreements" means, any purchase or supply agreement entered into between any Loan Party or any of its Subsidiaries and an Offtaker that provides for the purchase by such Offtaker of Hydrocarbon from any Loan Party or any Subsidiary thereof, as each such agreement may be amended, restated, supplemented, replaced or otherwise modified in accordance with this Agreement.

"Hydrocarbons" means collectively, oil, gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate and all other liquid or gaseous hydrocarbons and related minerals and all products therefrom, in each case whether in a natural or a processed state.

"IFC" means the International Finance Corporation, a member of the World Bank Group.

"IFC Performance Standards" means IFC's Performance Standards on Social & Environmental Sustainability dated 1 January 2012, as may be amended by the World Bank Group and/or IFC from time to time.

"IFRS" means the International Financial Reporting Standards, as adopted, and in effect from time to time, by the International Accounting Standards Board, consistently applied throughout the periods involved.

"Incur" means, with respect to any Indebtedness, to incur, create, issue, assume, guarantee or otherwise, contingently or otherwise, become liable, directly or indirectly, for or with respect to, or to extend the maturity of, or become responsible for, the payment of such Indebtedness; provided, however, that neither (i) the accrual of interest, (ii) the accretion of original issue discount nor (iii) an increase in the outstanding amount of Indebtedness caused by fluctuations in the exchange rates of currencies shall be considered an Incurrence of Indebtedness.  The terms "Incurrence" and "Incurring" have corresponding meanings.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with IFRS:

29

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    net obligations of such Person under any Hedging Agreement;

(d)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business not past due for more than 120 days after the date on which such trade account payable became due and payable);

(e)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f)    all Attributable Indebtedness;

(g)    all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference *plus* accrued and unpaid dividends; and

(h)    all Guarantees of such Person in respect of any of the foregoing.

; provided, that the following obligations shall not be deemed to be Indebtedness for any purpose: (i) obligations arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within five Business Days of its Incurrence; (ii) customer deposits and advance payments received from customers in the ordinary course of business; (iii) accrued expenses, royalties and trade accounts payable arising in the ordinary course of business (provided, however, that any Guarantee of production or payment (but not any other contractual obligation) in respect to a royalty will constitute Indebtedness); (iv) any Indebtedness which has been defeased in accordance with IFRS or defeased pursuant to the deposit of cash or Cash Equivalents (in an amount sufficient to satisfy all such Indebtedness obligations at maturity or redemption, as applicable, and all payments of interest and premium, if any) in a trust or account created or pledged for the sole benefit of the holders of such Indebtedness, and subject to no other Liens, and the other applicable terms of the instrument governing such Indebtedness; (v) any obligation arising from any agreement providing for indemnities, guarantees, purchase price adjustments, holdbacks, contingency payment obligations based on the performance of the acquired or disposed assets or similar obligations (other than Guarantees of Indebtedness) incurred by any Person in connection with the acquisition or disposition of assets; (vi) natural gas balancing liabilities incurred in the

30

ordinary course of business and consistent with past practice; (vii) any take-or-pay or ship-or-pay agreements in effect as of the Closing Date, or any Guarantee hereof in connection with the operation of the Borrower's and any Subsidiary's Oil and Gas Properties; and (viii) contingent liabilities or reserves with respect to any litigation or similar proceedings.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any net obligation under any Hedging Agreement on any date shall be deemed to be the Hedge Termination Value thereof as of such date.  The amount of any Indebtedness of any Person that is expressly made non-recourse or limited-recourse (limited solely to the assets securing such Indebtedness) to such Person shall be deemed to be equal to the lesser of (i) the aggregate principal amount of such Indebtedness and (ii) the Fair Market Value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Loan Parties under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Insurance Proceeds" means all amounts paid or payable to or for the account of a Loan Party, any of its Subsidiaries, the Colombian Collateral Agent or the Collateral Agent pursuant to any insurance policy, including any insurance required to be maintained (or caused to be maintained) under this Agreement, or any other compensation, awards, damages or other payments made to such Person in respect of any Casualty Event.

"Intercompany Loans Subordination Agreement" means the subordination and intercreditor agreement, to be entered into among the Borrower, the affiliates of the Borrower identified therein and the Administrative Agent, substantially in the form of Exhibit H, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Interest Payment Date" means, as to any Loan, (i) prior to the occurrence of an Accelerated Amortization Event, (a) the 15 day of each March, June, September and December and (b) the applicable Maturity Date, and (ii) upon the occurrence of an Accelerated Amortization Event, (a) the 15 day of each calendar month, and (b) the applicable Maturity Date.

"Interest Period" means

(i)  prior to the occurrence of an Accelerated Amortization Event, (a) with respect to the first Borrowing of SOFR Loans hereunder, initially, the period commencing on the date such SOFR Loan is disbursed and ending on the earlier of (x) the immediately succeeding Interest Payment Date and (y) the Accelerated Amortization Start Date and, thereafter, each period commencing on the last day of the immediately preceding Interest Period and ending on the earlier of (x) the immediately succeeding Interest Payment Date and (y) the Accelerated Amortization Start Date, and (b) with respect to each additional Borrowing of SOFR Loans hereunder, initially, the period commencing on the date such SOFR Loan is disbursed and ending on the last day of the earlier

of (x) the then current Interest Period pursuant to clause (a) above and (y) the Accelerated Amortization Start Date and, thereafter, each period commencing on the last day of the immediately preceding Interest Period and ending on the earlier of (x) the immediately succeeding Interest Payment Date and (y) the Accelerated Amortization Start Date, and

(ii) upon the occurrence of an Accelerated Amortization Event, with respect to the Loans outstanding as of the Accelerated Amortization Start Date, initially, the period commencing on the Accelerated Amortization Start Date and ending on the immediately succeeding Interest Payment Date and, thereafter, each period commencing on the last day of the immediately preceding Interest Payment Date and ending on the immediately succeeding Interest Payment Date;

provided that, in any of the foregoing cases, no Interest Period shall extend beyond the Maturity Date.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of shares, capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Issuing Bank" means Macquarie Bank Limited or any Affiliate thereof (or any assignee or transferee thereof under the Reference Letter of Credit Documentation (which assignee or transferee shall be a Lender or an Affiliate of a Lender) to the extent such assignment or transfer is permitted by the terms of any Reference Letter of Credit Documentation) as party to any Reference Letter of Credit Documentation.

"Jobo 1A/1B Processing Facility" means mechanical Refrigeration gas processing units and outlet compressors located at Jobo Plant.

"Jobo 2 Processing Facility" means gas processing facility built in 2016 with two trains and JT units and inlet/outlet compressors located at Jobo Plant.

"Jobo 3 Processing Facility" means gas processing facility built in 2018 with two trains and JT units and inlet/outlet compressors located at Jobo Plant.

"Joint Operating Agreements" means, the contracts entered by any Loan Party for the exploration, appraisal and development of shared blocks i) Contrato E&P SSJN-7 with ONGC VIDESH Limited Sucursal Colombiana, ii) Contrato Adicional E&P VMM-2 para YNC with ConocoPhillips Colombia Ventures Limited; and iii) Contrato Adicional E&P VMM-3 with ConocoPhillips Colombia Ventures Limited.

"Key-Man Event" means the consummation of any transaction or series of transactions or the occurrence of any event or series of events, following the Closing Date, as a result of which Mr. Charle Gamba ceases to (a) serve as Chief Executive Officer of the Borrower or (b) devote substantially all of his working time, attention, skills and effort to the business and affairs of the Borrower, whether as a result of resignation, removal or otherwise, but not as a result of death or disability.

"Key Operating Assets" means the equipment and moveable assets owed by the Borrower or any of its Subsidiaries relating to the following key operating facilities: (i) Jobo 1A/1B Processing Facility; (ii) Jobo 2 Processing Facility; (iii) Jobo 3 Processing Facility; (iv) Betania Separation and Compression System; and (iv) Clarinete Separation and Compression System.

"Laws" means, collectively, all international, foreign, federal, national, state, provincial and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Loan Parties and the Administrative Agent, which office may include any Affiliate of such Lender or any domestic or foreign branch of such Lender or such Affiliate.  Unless the context otherwise requires each reference to a Lender shall include its applicable Lending Office.

"Lien" means, with respect to any asset or property, any mortgage, pledge, hypothecation, assignment, *fideicomiso*, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any easement, right-of-way or other encumbrance on title to real property, any financing lease having substantially the same economic effect as any of the foregoing and any preferential arrangement having substantially the same economic effect as any of the foregoing).

"Line of Business" means business activities of the Loan Parties relating primarily to the exploration and production of Hydrocarbon Interests in Colombia or any other jurisdiction where the Borrower or any of its Subsidiaries conduct or plan to conduct such type of business activities, and activities reasonably related, ancillary or complementary thereto.

"Loan" means an extension of credit outstanding hereunder by a Lender to the Borrower.

"Loan Documents" means this Agreement, the Notes, the Fee Letters, the Collateral Documents, the Colombian Collateral Agency Agreement, the Reference Hedges, the Reference Letter of Credit Documentation, the Intercompany Loans Subordination Agreement and each

other agreement, certificate, instrument or document executed and delivered in connection with any of the foregoing.

"Loan Notice" means a notice requesting a Borrowing of SOFR Loans pursuant to Section 2.02(a), substantially in the form of Exhibit I.

"Loan Parties" means, collectively, the Borrower and the Guarantors.

"Loan Party Related Person" means (a) any Person that is a Related Party of any Loan Party, (b) any Person in which any Loan Party or any Related Party of any Loan Party owns any Equity Interests, and (c) any Person in respect of which any Related Party of any Loan Party is a shareholder, equity holder, partner, director, officer, employee, agent, trustee, administrator, manager, advisor or representative.

"Management Group" means one or more members of the Board of Directors, the President, Chief Executive Officer, the Chief Financial Officer, the principal accounting officer, any Treasurer or Controller, or any Vice President, in each case, of the Borrower or any Guarantor.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent), condition (financial or otherwise) of the Loan Parties, taken as a whole; (b) a material impairment of the ability of the Loan Parties taken as a whole to perform their obligations under any Loan Document; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against the Loan Parties of any Loan Document; or (d) a material adverse effect upon the validity or priority of the security interests purported to be granted to the Collateral Agent and the Lenders under the Collateral Documents.

"Material Project Documents" means, collectively:

(a)     each E&P Contract;

(b)     each Hydrocarbon Contract;

(c)     each Joint Operating Agreement; and

(d)     each Specified Permit.

"Maturity Date" means (i) prior to the occurrence of an Accelerated Amortization Event, September 15, 2026 and (ii) upon the occurrence of an Accelerated Amortization Event, the earlier of (a) the last business day of the calendar month that is six months following the Accelerated Amortization Start Date and (b) September 15, 2026; provided, however, that, in any such case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"mmcfe/d" means million cubic feet of natural gas equivalent per day.

34

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Net Cash Proceeds" means, with respect to any Person:

(a)    with respect to any Casualty Event, the excess, if any, of: (i) Insurance Proceeds received by such Person in connection with such Casualty Event over (ii) the reasonable and customary costs and expenses actually incurred by such Person in connection with such Casualty Event;

(b)    with respect to any Taking, the excess, if any, of: (i) Takings Proceeds received by such Person in connection with such Taking over (ii) the reasonable and customary costs and expenses actually incurred by such Person in connection with such Taking;

(c)    with respect to any Asset Sale, the excess, if any, of: (i) the aggregate amount of cash proceeds received by such Person in connection with such Asset Sale (including any cash proceeds received by way of a deferred payment pursuant to a note receivable or from the sale or disposal of non-cash consideration or otherwise, but only as and when so received) over (ii) the reasonable and customary costs and expenses actually incurred by such Person in connection therewith; and

(d)    with respect to the incurrence or issuance of any Indebtedness by such Person, the excess of (i) the aggregate amount of cash proceeds received in connection with such incurrence of Indebtedness over (ii) the underwriting discounts and commissions, and other reasonable and customary costs and expenses, incurred by such Person in connection therewith;

provided that, in the case of the events described in clauses (a) and (b) above, net of any Taxes paid or reasonably estimated to be payable by such Person in connection with any of the foregoing events or circumstances as reasonably determined by such Person; provided that if the amount of any estimated Taxes exceeds the amount of Taxes actually required to be paid in cash in connection with such events, the aggregate amount of such excess shall constitute Net Cash Proceeds with respect to such event.

"NI-51-101" means National Instrument 51-101–*Standards of Disclosure for Oil and Gas Activities*.

"Non-Consenting Lender" means any Lender that does not approve any amendment, waiver or consent that (i) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 10.01 and (ii) has been approved by the Required Lenders.

"Note" means the NY Notes and/or the Colombian Promissory Notes, as context may require.

"NY Note" means a promissory note made by the Borrower in favor of a Lender evidencing Loans made by such Lender, substantially in the form of Exhibit J.

35

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, the Loan Parties arising under any Loan Document or otherwise with respect to any Loan, any Reference Hedge and/or any Reference Letter of Credit, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against the Loan Parties or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury, or any successor thereof.

"Offtaker" means: (a) each Existing Offtaker and (b) each other person that: (i) is not a Sanctions Target, and (ii) has entered into any Hydrocarbon Sale Agreement with any Loan Party or any Subsidiary thereof.

"Oil and Gas Properties" means Hydrocarbon Interests; the properties now or hereafter pooled or unitized with Hydrocarbon Interests; all presently existing or future unitization, pooling agreements and declarations of pooled units and the units created thereby (including all units created under orders, regulations and rules of any Governmental Authority having jurisdiction) which may affect all or any portion of the Hydrocarbon Interests; all operating agreements, contracts and other agreements which relate to any of the Hydrocarbon Interests or the production, sale, purchase, exchange or processing of Hydrocarbons from or attributable to such Hydrocarbon Interests; all Hydrocarbons in and under and which may be produced and saved or attributable to the Hydrocarbon Interests, the lands covered thereby and all oil in tanks and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Hydrocarbon Interests; all tenements, hereditaments, appurtenances and properties in anywise appertaining, belonging, affixed or incidental to the Hydrocarbon Interests, properties, rights, titles, interests and estates described or referred to above, including any and all Property, real or personal, now owned or hereafter acquired and situated upon, used, held for use or useful in connection with the operating, working or development of any of such Hydrocarbon Interests or Property (excluding drilling rigs, automotive equipment or other personal property which may be on such premises for the purpose of drilling a well or for other similar temporary uses) and including any and all oil wells, gas wells, injection wells or other wells, buildings, structures, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.  Unless otherwise qualified, all references to an Oil and Gas Property or to Oil and Gas Properties in this Agreement shall refer to an Oil and Gas Property or Oil and Gas Properties of the Loan Parties or their Subsidiaries.

"Operating Plan and Budget" means the initial operating plan and budget delivered pursuant to Section 4.01(t) and each subsequent operating plan and budget prepared and delivered pursuant to Section 6.02(q).

36

"Organization Documents" means, with respect to any Person, (i) in the case of a corporation organized under the laws of Colombia, its bylaws (*estatutos sociales*) and a certificate of existence and legal representation by the relevant Governmental Authority, (ii) in the case of a corporation organized under the laws of Canada (or any province thereof), its certificate of incorporation, articles of incorporation, notice of articles, bylaws, articles, all as applicable, and any shareholder agreement or declaration in respect of such corporation, (iii) in the case of any other corporation or exempted company, the certificate of incorporation, articles of incorporation, and bylaws or the memorandum and articles of association (or similar documents) of such Person, (iv) in the case of any limited liability company, the certificate of formation and operating agreement (or similar documents) of such Person, (v) in the case of any limited partnership, the certificate of formation and limited partnership agreement (or similar documents) of such Person, (vi) in the case of any general partnership, the partnership agreement (or similar document) of such Person, (vii) in any other case, the functional equivalent of the foregoing and (viii) in the case of a corporation organized under the laws of Switzerland, its articles of association (*Statuten*), its organizational regulations (*Organisationsreglement*) if any, and a certified excerpt from the commercial register.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"Panama Pledge Agreement" means the agreement (*contrato de prenda mercantil*) entered into by Canacol Energy Inc., and Canacol Energy Ltd., as pledgors, CNE Oil & Gas, S.R.L. and the Collateral Agent, as pledgee, over 100% of the issued and outstanding quotas of CNE Oil & Gas, S.R.L., substantially in the form of Exhibit K, as amended, amended and restated, supplemented or otherwise modified from time to time.

"Permitted Corporate Reorganization" means the merger between CNE Oil & Gas Colombia and CNE Oil & Gas, S.R.L with CNE Oil & Gas Colombia being the surviving entity.

"Permitted Holders" means one or more of the following (i) members of the Management Group, (ii) any spouse, descendant, heirs or estate of the individuals referred to in the preceding clause (i), and (iii) any non-natural Person that is an Affiliate of any of the Persons referred to in the preceding clauses (i) and (ii) and with respect to which a Person or Persons listed in the preceding clauses (i) and (ii) owns the majority of the aggregate of the total voting power of the voting stock in such non-natural Person, on a fully diluted basis.

37

"Permitted Investments" means,

(a)  Investments in cash and Cash Equivalents;

(b)  Investments in existence on the date hereof and identified in Schedule 5.12;

(c)  Investments of any Loan Party consisting of extensions of trade credit and advances to non-operators under operating agreements in the ordinary course of business;

(d)  Investments by any Loan Party in another Loan Party; provided, that if the Loan Party making the Investment is a Colombian Guarantor, the other Loan Party in which the Investment is made shall also be a Colombian Guarantor; provided, further nothing herein shall restrict any Investment among the Loan Parties associated with the Permitted Corporate Reorganization;

(e)  Investments of any Loan Party consisting of trade and customer accounts receivable which are for goods furnished or services rendered in the ordinary course of business and are payable in accordance with customary trade terms;

(f)  Investments of any Loan Party consisting of notes payable or equity interests issued by account debtors pursuant to negotiated agreements with respect to settlement of such account debtor's accounts in the ordinary course of business in an aggregate amount not to exceed U.S.$1,000,000.00 outstanding at any time;

(g)  Hedging Agreements permitted by Section 7.03;

(h)  Investments by the Loan Parties consisting of prepaid expenses and lease, utility and workers' compensation, performance and other similar deposits made in the ordinary course of business;

(i)  Investments received by the Loan Parties in connection with workouts with, or bankruptcy, insolvency or other similar proceedings with respect to, customers, working interest owners, other industry partners or any other Person;

(j)  Investments made with (i) the proceeds of contributions in cash to the Borrower in form of subscriptions of newly issued Equity Interests of the Borrower, (ii) newly issued Equity Interests of Borrower, or (iii) a combination of the foregoing;

(k)  Investments in stock, obligations or securities received in settlement of debts arising from accounts receivable and other similar obligations arising in the ordinary course of business, which Investments are obtained by any Loan Party as a result of a bankruptcy or other insolvency proceeding of, or difficulties in collecting from, the obligor in respect of such obligations; provided that the Borrower shall give the Administrative Agent prompt written notice in the event that the aggregate amount of all Investments held at any one time exceeds U.S.$3,000,000 (or the Dollar Equivalent thereof);

(l)    receivables owing to Borrower or any of its Subsidiaries if created or acquired in the ordinary course of business;

(m)    payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(n)    Guaranties of Indebtedness otherwise permitted under this Agreement;

(o)    Guaranties of performance or other obligations (other than Indebtedness) arising in the ordinary course of business, including obligations under oil and natural gas exploration, development, joint operating, and related agreements and licenses, concession or operating leases;

(p)    Investments and expenditures made in the ordinary course of, and of a nature that is or shall have become customary in, the Line of Business, and in each case consistent with past practice, as a means of actively exploiting, exploring for, acquiring, developing, processing, gathering, marketing or transporting Hydrocarbons (including with respect to plugging and abandonment) through agreements, transactions, interests or arrangements that permit one to share risks or costs of such activities or comply with regulatory requirements regarding local ownership, including without limitation, (i) ownership interests in Hydrocarbons properties, liquefied natural gas facilities, processing facilities, gathering systems, pipelines, storage facilities or related systems or ancillary real property interests; (ii) Investments in the form of or pursuant to operating agreements, concession agreements, new exploration and production contracts for the acquisition of new blocks, working interests, royalty interests, mineral leases, processing agreements, farm-in agreements, farm-out agreements, contracts for the sale, transportation or exchange of Hydrocarbons, production sharing agreements, participation agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling agreements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), subscription agreements, stock purchase agreements, stockholder agreements and other similar agreements (including for limited liability companies) with third parties; and (iii) direct or indirect ownership interests in drilling rigs and related equipment, including, without limitation, transportation equipment;

(q)    the portion of any Investment that is made with Equity Interests of Borrower; and

(r)    the Canacol 2028 Notes Permitted Purchase.

"Permitted Liens" means,

(a)    any interest or title of a lessor under any Capital Lease Obligation (to the extent permitted hereunder);

39

(b) Liens securing Taxes, assessments and other governmental charges or levies;

(c) carriers', warehousemen's, mechanics', materialmen's, repairmen's, construction landlords', vendors' salary and social security and other like Liens imposed by law, arising in the ordinary course of business and securing obligations that are not overdue by more than 90 days or are being Contested;

(d) pledges and deposits made in the ordinary course of business in compliance with workers' compensation, disability or unemployment insurance, pensions and employment and other social security laws or regulations or similar legislation (including letters of credit or guarantees issued in respect thereof);

(e) Liens, deposits and pledges to secure the performance of bids, offers, government contracts and trade contracts, leases, statutory obligations, surety and appeal bonds, performance and return-of-money bonds, tenders and other obligations of a like nature or relating to the letters of credit or guarantees issued in respect thereof, in each case in the ordinary course of business or under applicable Law;

(f) Liens arising out of judgments that do not constitute an Event of Default under Section 8.01(h);

(g) minor irregularities in title to real property that do not secure any monetary obligations and which do not materially interfere with the occupation, use or enjoyment by the Loan Parties of any of their properties or assets;

(h) contractual Liens not securing Indebtedness which arise in the ordinary course of business, in a transaction expressly permitted hereunder, under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the business of any Loan Party and are for claims which are not delinquent or which are being Contested; provided that any such Lien referred to in this clause (h) does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by any Loan Party or any of its Subsidiaries or materially impair the value of such Property subject thereto;

(i) encumbrances consisting of easements, rights-of-way, restrictions, servitudes, permits, conditions, covenants, exceptions or reservations or other similar encumbrances, grazing rights, logging rights, ponds, lakes, reservoirs, ditches and waterways, and minor title deficiencies in any Property of the Loan Parties,

40

including those granted for the purpose of roads, pipelines, transmission lines, communication lines, transportation lines, distribution lines for the removal of gas, oil, coal or other minerals and other like purposes, that, do not secure Indebtedness or other monetary obligations and, in the aggregate, do not materially impair the use of such property by any Loan Party in the operation of its business and which do not in any case materially detract from the value of the Property subject thereto;

(j)   Liens of lessors (including sublessors) of Property leased by such lessors to any Loan Party or any Subsidiary thereof, restrictions and prohibitions on encumbrances and transferability with respect to such Property and such Loan Party's or such Subsidiary's interests therein imposed by such leases, and Liens encumbering such lessors' titles and interests in such Property and to which such Loan Party's or such Subsidiary's leasehold interests may be subject or subordinate, in each case, whether or not evidenced by UCC financing statement filings or other documents of record; provided that such Liens do not encumber Property of any Loan Party or any Subsidiary thereof other than the Property that is the subject of such leases and items located thereon;

(k)   Liens, titles and interests of licensors of software and other intangible Property licensed by such licensors to any Loan Party or any Subsidiary thereof, restrictions and prohibitions on encumbrances and transferability with respect to such Property and such Loan Party's or such Subsidiary's interests therein imposed by such licenses, and Liens encumbering such licensors' titles and interests in such Property and to which such Loan Party's or such Subsidiary's license interests may be subject or subordinate, in each case, whether or not evidenced by UCC financing statement filings or other documents of record; provided that such Liens do not encumber Property of any Loan Party or any Subsidiary thereof other than the Property that is the subject of such licenses;

(l)   Liens on any Property acquired from a Person that is merged or amalgamated with or into any Loan Party or any Subsidiary (to the extent such transaction is permitted under this Agreement), or any Liens on the Property, Equity Interests, income or profits of any Person, existing at the time such Person becomes a Subsidiary and, in either such case, is not created as a result of or in connection with or in anticipation of any such transaction (unless such Lien was created to secure or provide for the payment of any part of the purchase price of such Person); provided, however, that such Liens may not extend to any other Property, income or profits of any Loan Party or any Subsidiary (other than improvements, accessions, upgrades, accessories and products and proceeds in respect of the Property subject to such Liens at the time of such merger or amalgamation);

(m)   Liens on any Property existing at the time of acquisition thereof, including any acquisition by means of a merger, amalgamation or consolidation, and that is not created as a result of or in connection with or in anticipation of such acquisition (unless such Lien was created to secure or provide for the payment of any part of

41

the purchase price of such property or assets); <u>provided</u>, <u>however</u>, that such Liens may not extend to any other Property, or profits of such Loan Party or any Subsidiary thereof (other than improvements, accessions, upgrades, accessories and products and proceeds in respect of the property subject to such Liens at the time of such acquisition);

(n) Liens arising out of governmental concessions or licenses (including under contracts with governmental agencies for technical evaluation or exploration and development rights of oil and natural gas fields) held by a Loan Party or any Subsidiary thereof;

(o) Liens reserved in oil and gas mineral leases for bonus or rental payments and for compliance with the terms of such leases;

(p) Liens created pursuant to the Collateral Documents;

(q) Liens securing obligations arising under cash management obligations, cash management services and other netting services, automatic clearing house arrangements, employees' credit or purchase cards, overdraft protections and similar arrangements in each case incurred in the ordinary course of business and consistent with past practice;

(r) banker's liens, rights of setoff or similar rights and remedies as to deposit accounts or other funds maintained with depository institutions;

(s) licenses or sublicenses with respect to the assets or properties of the Loan Parties that do not, individually or in the aggregate, materially impair the ordinary conduct of the business of any Loan Party;

(t) Liens on the insurance policies and the proceeds thereof securing the premiums with respect thereto;

(u) Liens (other than Liens securing Indebtedness) on, or related to, assets to secure all or part of the costs incurred in the ordinary course of business for the exploration, drilling, development, production, processing, transportation, marketing, storage or operation thereof, in each case consistent with past practice;

(v) all lessors' royalties, overriding royalties, net profits interests, carried interests, production payments, reversionary interests, calls on production, preferential purchase rights, and other burdens on or deductions from the proceeds of production with respect to each Oil and Gas Property (in each case) that do not operate to reduce the net revenue interest for such Oil and Gas Property (if any) as reflected in the most recently delivered Reserves Report or increase the working interest for such Oil and Gas Property (if any) as reflected in the most recently delivered Reserves Report without a corresponding increase in the corresponding net revenue interest, in each case under this <u>clause (m)</u>, to the extent existing on the date hereof and described in <u>Schedule 1.1-V</u>;

42

(w) Liens arising from precautionary UCC financing statement filings entered into in the ordinary course of business;

(x) rights reserved to or vested in any Governmental Authority to control or regulate any property of the Loan Parties, or to use such property, whether pursuant to permits or Requirements of Law or otherwise;

(y) Liens created pursuant to the Promigas Trust (as the Promigas Trust is in effect on the date hereof);

(z) Liens on cash in an amount not exceeding the amount of any Permitted Letter of Credit, securing the obligations of the Loan Party thereunder; and

(aa)        other Liens existing on the date hereof and specified on <u>Schedule 1.01-VI</u>.

<u>provided</u>, <u>however</u>, that except as expressly contemplated by clauses  (a), (l), (m), (p), (q), (y) and (z) above, the term "Permitted Liens" shall not include any Lien securing Indebtedness.

"<u>Permitted Letters of Credit</u>" means (i) any ANH Letter of Credit, (ii) any other Reference Letter of Credit, and (iii) any other letter of credit issued to a counterparty of any of the Loan Parties guaranteeing the obligations of the relevant Loan Party to such counterparty, incurred in the ordinary course of business and consistent with past practice.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, *fideicomiso*, joint venture, association, company, exempted company, partnership, Governmental Authority or other entity.

"<u>Pesos</u>" means the lawful currency of Colombia.

"<u>Petroleum Engineers</u>" means (a) Boury Global Energy Consultants Ltd., (b) any of the firms or petroleum engineers listed in <u>Schedule 6.02(l)</u>, or (c) such other independent petroleum engineers of recognized national standing as may be selected by the Borrower with the prior consent of the Required Lenders, provided that each such petroleum engineers constitute qualified reserves evaluators or auditors as contemplated by NI 51-101.

"<u>Prime Rate</u>" means the rate of interest *per annum* last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if The Wall Street Journal ceases to quote such rate, the highest *per annum* interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent).  Any change in the Prime Rate shall take effect at the opening of business on the day such change is publicly announced or quoted as being effective.

"<u>Principal Payment Date</u>" means each Interest Payment Date falling in the months specified in the column below the caption "Months of Principal Repayment Date" on <u>Annex I</u> hereto.

43

"Process Agent Acceptance" means a letter from the Process Agent to the Administrative Agent, substantially in the form of Exhibit L.

"Project" means the exploration and production of Hydrocarbon Interests related to the Blocks.

"Promigas Trust" means that certain Guaranty Trust Agreement (*Contrato de Fiducia Mercantil Irrevocable de Garantía, Administración, Fuente de Pago y Pagos*), dated January 26, 2021, by and among CNE Oil & Gas Colombia and Canacol Energy Colombia, as settlors, Fiduciaria de Occidente S.A., as trustee, and Promigas S.A. E.S.P., as beneficiary, as amended and restated, supplemented or otherwise modified from time to time.

"Promigas Trust Accounts" means the accounts specified on Schedule 1.1-VII.

"Promigas Trust Receivables" means any Receivable required to be paid into a Promigas Trust Account pursuant to the Promigas Trust.

"Property" means any right or interest in or to property of any kind whatsoever, or rights in respect of any thereof, whether real, personal or mixed and whether tangible or intangible.

"Proved Developed Producing Reserves" means those Oil and Gas Properties designated as proved developed producing in the Reserves Report most recently delivered to the Administrative Agent pursuant to this Agreement; provided that no Oil and Gas Property shall constitute Proved Developed Producing Reserves until the associated well(s) have been completed and are flowing for a period of at least 30 days thereafter.

"Proved Reserves" means those Oil and Gas Properties designated as proved (in accordance with NI-51-101) in the Reserves Report most recently delivered to the Administrative Agent pursuant to this Agreement.

"Prudent Industry Practices" means those practices, methods, equipment, specifications and standards of safety and performance, as the same may change from time to time, as are commonly used in Colombia by companies engaged in the Line of Business.

"PV 10 Value" means with respect to any Proved Developed Producing Reserves, the aggregate net present value of such Oil and Gas Properties calculated before income taxes, but after reduction for royalties, operating expenses (considering the payments of the minimum volumes according to the take-or-pay contracts with suppliers), lease operating expenses, severance and *ad valorem* taxes, Capital Expenditures, abandonment costs and after deducting the applicable X-Factor and with no escalation of Capital Expenditures or abandonment costs; then discounted at 10%; using prices set on the Hydrocarbon Sale Agreements up to the contracted volumes and assumptions regarding future prices of Hydrocarbon sales based on the lower of the weighted average price of the existing contracts and the most recent contract on all unhedged and uncontracted volumes (or for volumes of crude oil, (1) Strip Prices for the unhedged volumes or (2) hedged prices for hedged volumes), adjusted for historical price differentials and Btu and quality adjustments.

44

"Qualified ECP Guarantor" means, at any time, each Loan Party with total assets exceeding U.S.$10,000,000 or that qualifies at such time as an "eligible contract participant" under the Commodity Exchange Act and can cause another person to qualify as an "eligible contract participant" at such time under § 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"Receivable" means all rights of any Loan Party or any Subsidiary thereof to payments (whether constituting accounts, chattel paper, instruments, general intangibles or otherwise, and including the right to payment of any interest, finance charges, fee, penalty or any other amount due thereunder) which arise out of the Hydrocarbon Sale Agreements.

"Recipient" means the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder.

"Reference Hedge" means any Hedging Agreement entered into between any Loan Party and the Hedge Provider, relating to the Transactions.

"Reference Letter of Credit" means a standby letter of credit issued by an Issuing Bank (a) in favor of ANH to guarantee obligations of any Loan Party under any E&P Contract or (b) in favor of any contractor of any Loan Party or Colombian Branch as guarantee of any agreement entered into by any Loan Party or any Colombian Branch in connection with the Project.

"Reference Letter of Credit Documentation" means any Reference Letter of Credit and any other agreement entered into by any Loan Party and an Issuing Bank in connection with a Reference Letter of Credit, including, but not limited to, any letter of credit facility agreement and any letter of credit reimbursement agreement.

"Regulation U" means Regulation U (12 C.F.R. Part 221) of the Board, as the same may be modified and supplemented and in effect from time to time.

"Regulation X" means Regulation X (12 C.F.R. Part 224) of the Board, as the same may be modified and supplemented and in effect from time to time.

"Related Parties" means, with respect to any Person, such Person's Affiliates, (b) the shareholders, equity holders, partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Related Parties Agreements" means any agreement between a Loan Party and a Related Party in effect as of the date hereof, and identified in Schedule 1.01-VIII.

"Relevant Governmental Body" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"Required Lenders" means, at any time, Lenders having Total Credit Exposures representing more than 50% of the Total Credit Exposures of all Lenders; provided, that at any time that Macquarie Bank Limited or any of its Affiliates is a Lender hereunder, Required

Lenders must include Macquarie Bank Limited or any such Affiliates acting as Lender hereunder. The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Reserves Report" means a report prepared by the Petroleum Engineer in accordance with the standards contained in the Canadian Oil and Gas Evaluation Handbook and NI 51-101, regarding the Proved Developed Producing Reserves attributable to the Oil and Gas Properties of the Loan Parties and related future net revenue, reasonably satisfactory to the Administrative Agent in both format and content, and otherwise in compliance with Sections 6.02(l), as applicable. Each Reserves Report shall set forth volumes, projections of the future rate of production, Hydrocarbon prices (which shall be based upon the Strip Price), net proceeds of production, operating expenses and capital expenditures, in each case based upon updated economic assumptions reasonably acceptable to the Administrative Agent and the Required Lenders.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means, as to any Loan Party, its chief executive officer, president, chief financial officer, treasurer, director, assistant treasurer or controller. Any document delivered hereunder that is signed by a Responsible Officer of any of the Loan Parties shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of the relevant Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of the relevant Loan Party.

"Restricted Payment" means, as to any Loan Party or any of its Subsidiaries, (i) any dividend or other distribution (whether in cash, securities or other property) with respect to any shares, Capital Stock or other Equity Interest of the Loan Parties or any Subsidiary thereof, (ii) any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such shares, Capital Stock or other Equity Interest, or on account of any return of capital to the Loan Parties' stockholders, partners or members (or the equivalent Person thereof), (iii) any payment of any principal, interest or other amount on or in relation to any Indebtedness owed by any Loan Party to an Affiliate or any Loan Party Related Person, or (iv) any other payment by any Loan Party to an Affiliate or a Loan Party Related Person, including any payment in respect of compensation, management, consulting, advisory or other fees, bonuses or commissions; provided, however, that the following shall not constitute Restricted Payments: (a) dividends, distributions, options and other equity rights granted under any employee stock option plan or other similar incentive plan approved by the Board of Directors of the Borrower, (b) non-cash distributions by the Borrower in the form of Equity Interests in the Borrower, (c) dividends, distributions or other payments solely to a Loan Party, and (d) reimbursements of costs and expenses by a Loan Party or any of its Subsidiaries incurred in the ordinary course of business and consistent with past practice.

"Rolling Period" means with respect to any fiscal quarter, such fiscal quarter and the three immediately preceding fiscal quarters considered as a single accounting period.

46

"S&P" means Standard & Poor's Ratings Services, a division of the McGraw-Hill Companies, Inc., and any successor thereto.

"Sanctioned Jurisdiction" means at any time, a country, territory or geographical region which is itself the subject or target of any Sanctions (including, without limitation, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, the Crimea, Zaporizhzhia and Kherson Regions of Ukraine, Cuba, Sudan, Iran, North Korea and Syria).

"Sanction(s)" means economic or financial sanctions, requirements, regulations, trade embargoes or restrictive measures imposed, administered or enforced from time to time by U.S. Governmental Authorities (including, but not limited to, OFAC, the U.S. Department of State and the U.S. Department of Commerce), the United Nations Security Council, the European Union, the United Kingdom (including, but not limited to, the Office of Financial Sanctions Implementation), His Majesty's Treasury, the Canadian government (including Global Affairs Canada and Public Safety Canada), Australia (including, but not limited to, the Department of Foreign Affairs and Trade), the government of Panama, the government of Switzerland or the respective institutions, departments and agencies of any of the foregoing.

"Sanctions Laws" means all laws, rules, regulations and requirements of any jurisdiction (including the U.S., Canada, Panama, Switzerland and Colombia) applicable to each of the Loan Parties, their Subsidiaries, or any party to the Agreement concerning or relating to Sanctions, terrorism or money laundering, including, without limitation, (a) the Executive Order; (b) the Act; (c) the U.S. International Emergency Economic Powers Act; (d) the U.S. Trading with the Enemy Act; (e) the U.S. United Nations Participation Act; (f) the U.S. Syria Accountability and Lebanese Sovereignty Act; (g) the U.S. Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010; (h) the Iran Sanctions Act, Section 1245 of the National Defense Authorization Act of 2012; (i) the *Special Economic Measures Act (Canada)*; (j) the *United Nations Act (Canada)*; (k) the *Criminal Code* (Canada); (l) the *Freezing of Assets of Corrupt Foreign Officials Act* (Canada); (m) the Federal Act on the Implementation of International Sanctions and related ordinances and (n) any similar laws, rules, regulations and requirements enacted, administered or enforced by the U.S., the Canadian government, the United Nations Security Council, the European Union, the United Kingdom or His Majesty's Treasury, Panama and Switzerland.

"Sanctions Target" means any Person: (a) that is the subject or target of any Sanctions; (b) listed in the annex to, or otherwise subject to the provisions of, the Executive Order; (c) named in any Sanctions-related list maintained by OFAC, the U.S. Department of State, the U.S. Department of Commerce or the U.S. Department of the Treasury, including the "Specially Designated National and Blocked Person" list, named in the Consolidated List of Financial Sanctions Targets and the Investment Ban List maintained by His Majesty's Treasury of the United Kingdom or any substantially similar list maintained by, or public announcement of Sanctions designation made by, any of the U.S. Governmental Authorities (including, but not limited to, OFAC, the U.S. Department of State and the U.S. Department of Commerce), the United Nations Security Council, the European Union, the United Kingdom, His Majesty's Treasury, the Canadian government or the respective institutions, departments and agencies of any of the foregoing; (d) located, organized or resident in a Sanctioned Jurisdiction that is, or

47

whose government is, the subject or target of Sanctions; (e) which otherwise is, by public designation of the United Nations Security Council, the European Union, the United Kingdom, His Majesty's Treasury or the Canadian government, the subject or target of any Sanction; (f) with which any party to the Loan Documents is prohibited from dealing or otherwise engaging in any transaction pursuant to any Sanctions Laws; or (g) owned or Controlled by any such Person or Persons described in the foregoing clauses (a)-(f).

"Sangretoro Block" means the block known as "Sangretoro" located in the Caguán Putumayo Basin, operated by Canacol Energy Colombia and in which the Borrower, through Canacol Energy Colombia, has a 100% working interest.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, the Hedge Providers that are a party hereto, the Issuing Banks that are party hereto, each co-agent or sub-agent appointed by the Administrative Agent or the Collateral Agent from time to time pursuant to Section 9.05, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"Significant Casualty Event" means (a) a Casualty Event in respect of Oil and Gas Properties that results, or that could reasonably be expected to result, in a decrease of the amount of Proved Developed Producing Reserves reported in the most recently delivered Reserves Report, by 10% or more, or (b) any other Casualty Event resulting in Net Cash Proceeds paid or payable exceeding U.S.$25,000,000 (or the Dollar Equivalent thereof).

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Administrator's Website" means the website of the Federal Reserve Bank of New York, currently at http://www.newyorkfed.org, or any successor source for the secured overnight financing rate identified as such by the SOFR Administrator from time to time.

"SOFR Borrowing" means, as to any Borrowing, the Dollar Loans comprising such Borrowing.

"SOFR Loan" means an advance that bears interest at a rate based on Term SOFR, other than pursuant to clause (c) of the definition of "ABR."

"Solvent" and "Solvency" means, when used with respect to any Person, as of any date of determination (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise," as of such date, as such quoted terms (or their comparable terms in the applicable jurisdiction) are determined in accordance with applicable national, federal, provincial, territorial and state laws

48

governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, (d) such Person will be able to pay its debts as they mature, and (e) such Person has not initiated and is not subject to any grounds for admission to an insolvency proceeding under any Debtor Relief Law.  For purposes of this definition, (i) "debt" means liability on a "claim" and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured, or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

"Specified Loan Party" means any Loan Party that is not an "eligible contract participant" under the Commodity Exchange Act (determined prior to giving effect to Section 11.11).

"Specified Permits" means the Permits designated as Specified Permits on Schedule 5.26(a).

"SSJN-7 Block" means the block known as "SSJN-7" located in the Lower Magdalena Valley Basin, operated by CNE Oil & Gas Colombia and in which the Borrower, through CNE Oil & Gas Colombia, has a 100% working interest.

"Strip Price" means, as of any date of determination, the forward month prices as of such date for the most comparable hydrocarbon commodity applicable to such future production month for a five-year period (or such shorter period if forward month prices are not quoted for a reasonably comparable hydrocarbon commodity for the full five-year period), and held constant thereafter based on the price of the average of the contract prices for the last twelve months of such five-year period as such prices are quoted on the New York Mercantile Exchange (or its successor) as of the determination date, adjusted for any basis differential as of the date of determination.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of any of the Loan Parties.

"Swap Obligation" means with respect to the Guarantors any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

49

"<u>Swiss Guarantors</u>" means, collectively, Shona Holding GmbH, Geoproduction Holding GmbH, Cantana Energy GmbH and Canacol Holding GmbH.

"<u>Swiss Withholding Tax</u>" means the tax imposed based on the Swiss Federal Act on Withholding Tax of 13 October 1965.

"<u>Synthetic Lease Obligation</u>" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"<u>Takeout Indebtedness</u>" means any Indebtedness of any Loan Party in respect of which Macquarie Bank Limited or any of its Affiliates, is the sole and exclusive arranger and bookrunner, the use of proceeds of which shall be to repay the Loans in whole.

"<u>Takeout Indebtedness Refinancing</u>" means the repayment of all Loans outstanding and interest thereon, solely with proceeds of Takeout Indebtedness.

"<u>Taking</u>" means, with respect to any Person, any circumstance or event, or series of circumstances or events as a result of which all or any portion of the Property of such Person shall be condemned, nationalized, confiscated, seized, compulsorily acquired or otherwise expropriated by any Governmental Authority under power of eminent domain or otherwise.

"<u>Takings Proceeds</u>" means, with respect to any Person, all condemnation awards or other compensation, awards, damages and other payments or relief with respect to: (a) any condemnation, nationalization, confiscation, seizure or expropriation by a Governmental Authority (including by eminent domain) of all or any portion of the Property of such Person (including any rights under or associated with any Governmental Approval and any Collateral), (b) any assumption by a Governmental Authority of control of all or any portion of the Property or business operations of such Person, (c) any Taking or any action by a Governmental Authority for the dissolution or disestablishment of such Person or (d) any Taking or any action by a Governmental Authority that would prevent such Person from carrying on its business or operations or a substantial part thereof.

"<u>Taxes</u>" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term SOFR</u>" means,

(a)     for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "<u>Periodic Term SOFR Determination Day</u>") that is two U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; <u>provided</u>, <u>however</u>, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR

Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)    for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day;

provided, further, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Termination Date" means the earlier of (i) the date which is 12 months after Closing Date, and (ii) the date on which the Commitments shall have been entirely utilized or terminated in accordance with this Agreement.

"Threshold Amount" means U.S.$15,000,000 (or the Dollar Equivalent thereof).

"Total Credit Exposure" means, as to any Lender at any time, the unused Commitments and Credit Exposure of such Lender at such time.

"Transactions" means, collectively, the execution, delivery and performance by the Loan Parties and other parties thereto, as applicable, of this Agreement and the other Loan Documents

and the transactions contemplated hereby and thereby (including the application of the proceeds of the Loans pursuant to this Agreement).

"UK Financial Institution" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"UK Resolution Authority" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"United States" and "U.S." mean the United States of America.

"US Account Control Agreements" means the Deposit Account Control Agreement to be entered into among the U.S. Depositary Bank, Canacol Energy Colombia, CNE Oil & Gas S.A.S., CNE Oil & Gas S.R.L., CNEOG Colombia Sucursal Colombia and the Collateral Agent, in form and substance reasonably satisfactory to the Borrower and the Collateral Agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

"US Accounts" means the accounts currently maintained by Canacol Energy Colombia, CNE Oil & Gas S.A.S., CNE Oil & Gas S.R.L. and CNEOG Colombia Sucursal Colombia with Citibank, N.A. under (i) account No. 3627 7079, (ii) account No. 3627 9111, (iii) account No. 3645 0329, and (iv) account No. 3645 2463.

"US Collateral Documents" means, the US Security Agreement and the US Account Control Agreements.

"US Depositary Bank" means Citibank, N.A.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"US Security Agreement" means the security agreement to be entered into among the Loan Parties and the Collateral Agent, in form and substance reasonably satisfactory to the Borrower and the Collateral Agent, as amended, amended and restated, supplemented or otherwise modified from time to time.

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. 107-56, signed into law October 26, 2001, as amended from time to time.

"VIM-5 Block" means the block known as "VIM-5" located in the Lower Magdalena Valley Basin, Colombia, operated by CNE Oil & Gas Colombia and in which the Borrower, through CNE Oil & Gas Colombia, has a 100% working interest.

"VIM-21 Block" means the block known as "VIM-21" located in the Lower Magdalena Valley Basin, Colombia, operated by CNE Oil & Gas Colombia and in which the Borrower, through CNE Oil & Gas Colombia, has a 100% working interest.

"VIM-33 Block" means the block known as "VIM-33" located in the Lower Magdalena Valley Basin, operated by CNE Oil & Gas Colombia and in which the Borrower, through CNE Oil & Gas Colombia, has a 100% working interest.

"VIM-44 Block" means the block known as "VIM-44" located in Lower Magdalena Valley Basin, operated by CNE Oil & Gas Colombia and in which the Borrower, through CNE Oil & Gas Colombia, has a 100% working interest.

"VMM-10-1 Block" means the block known as "VMM-10-1" located in the Middle Magdalena Valley Basin, operated by CNE Oil & Gas Colombia and in which the Borrower, through CNE Oil & Gas Colombia, has a 100% working interest.

"VMM-2 Block" means the block known as "VMM-2" located in the Middle Magdalena Valley Basin, operated by ConocoPhillips Colombia Ventures Ltd. and in which the Borrower, through Canacol Energy Colombia, has a 20% working interest.

"VMM-3 Block" means the block known as "VMM-3" located in the Middle Magdalena Valley Basin, operated by ConocoPhillips Colombia Ventures Ltd. and in which the Borrower, through CNE Oil & Gas Colombia, has a 20% working interest.

"VMM-45 Block" means the block known as "VMM-45" located in the Middle Magdalena Valley Basin, operated by Cantana Energy GmbH (formerly Cantana Energy, S.A.) and in which the Borrower, through Cantana Energy GmbH (formerly Cantana Energy, S.A.), has a 100% working interest.

"VMM-49 Block" means the block known as "VMM-49" located in the Middle Magdalena Valley Basin, operated by Cantana Energy GmbH (formerly Cantana Energy, S.A.) and in which the Borrower, through Cantana Energy GmbH (formerly Cantana Energy, S.A.), has a 100% working interest.

"VMM-53 Block" means the block known as "VMM-53" located in the Middle Magdalena Valley Basin, operated by CNE Oil & Gas Colombia and in which the Borrower, through CNE Oil & Gas Colombia, has a 100% working interest.

"Voting Equity Interest" of a Person means the Equity Interest in such Person having power to vote for the election of directors or similar officials of such Person or otherwise voting with respect to actions of such Person (other than such Equity Interests having such power only by reason of the happening of a contingency).

"Wholly Owned Subsidiary" of any Person, means a Subsidiary of such Person, all of the Equity Interest of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to applicable Law) are owned by such Person or another Wholly Owned Subsidiary of such Person or by such Person together with one or more of its other Wholly Owned Subsidiaries.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

"X-Factor" means the compensation (*retribución*) in cash or in kind, at the election of ANH, to be offered by contractors and corresponding to a percentage of the base production, as consideration for the execution of E&P Contracts, which is defined as "X%: Porcentaje en la participación (de la producción)" in the "*Manual de Usuario–Sistema de liquidación de derechos economicos y contractuales*" issued by the ANH on August 23, 2022 (as it may amended, supplemented or otherwise modified from time to time).

**1.02    Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified,

refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "<u>from</u>" means "<u>from and including</u>"; the words "<u>to</u>" and "<u>until</u>" each mean "<u>to but excluding</u>"; and the word "<u>through</u>" means "<u>to and including</u>."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

### 1.03    Accounting Terms.

(a)    <u>Generally</u>.    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, IFRS on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, <u>except</u> as otherwise specifically prescribed herein.

(b)    <u>Changes in IFRS</u>.    If at any time any change in IFRS would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Loan Parties or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Loan Parties shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in IFRS (subject to the approval of the Required Lenders); <u>provided that</u>, until so amended, (A) such ratio or requirement shall continue to be computed in accordance with IFRS prior to such change therein and (B) the Loan Parties shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in IFRS.

### 1.04    Rounding.    Any financial ratios required to be maintained by any Loan Party pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

### 1.05    Times of Day; Rates.    Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).    The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to ABR, the Term SOFR Reference Rate, Term SOFR or any component definition thereof or rates referred to in the definition thereof, or any alternative,

successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, ABR, the Term SOFR Reference Rate, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or  (b) the effect, implementation or composition of any Conforming Changes.   The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of ABR, the Term SOFR Reference Rate, Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Loan Parties.   The Administrative Agent may select information sources or services in its reasonable discretion to ascertain ABR, the Term SOFR Reference Rate, Term SOFR, or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to the Loan Parties, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

   **1.06 Cashless Settlement**.  Notwithstanding anything to the contrary contained in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Loan Parties, the Administrative Agent and such Lender.

## ARTICLE II

## THE COMMITMENTS AND CREDIT EXTENSIONS

   **2.01 Loans**.

   (a) Subject to the terms and conditions set forth herein, each Lender severally and not jointly with any other Lender agrees to make Loans to the Borrower in the form of SOFR Loans during the Availability Period in an aggregate amount not to exceed the amount of such Lender's Commitment; <u>provided</u> that after giving effect to any Borrowing, (i) the aggregate outstanding amount of all Loans shall not exceed the amount of all Commitments, and (ii) the aggregate outstanding amount of the Loans of any Lender shall not exceed such Lender's Commitment.   Amounts borrowed under this <u>Section 2.01</u> and repaid or prepaid may not be reborrowed.

   (b) There shall be no more than four Borrowings hereunder; <u>provided</u> that the first Borrowing hereunder shall be made on the Closing Date.

   **2.02 Borrowings**.

   (a) Each Borrowing of SOFR Loans shall be made upon the Borrower's irrevocable notice to the Administrative Agent, which shall be given by a Loan Notice.   Each

such Loan Notice must be received by the Administrative Agent not later than five (5) U.S. Government Securities Business Days prior to the proposed Borrowing Date (or such shorter period acceptable to the Lenders and the Administrative Agent).  The Loan Notice shall specify:

(i)                                  the proposed Borrowing Date (which shall be a Business Day during the Availability Period);

(ii)                                 the principal amount of Loans to be borrowed (which, with respect to the first Borrowing hereunder, shall be in the amount of U.S.$50,000,000);

(iii)                                with respect to the first Borrowing hereunder, an irrevocable instruction to the Administrative Agent to transfer, on behalf of the Borrower, the aggregate amount of the proceeds of the requested Borrowing pursuant to a funds flow memorandum dated on or about the first Borrowing Date, from the Borrower to the Administrative Agent, substantially in the form of Exhibit M (a "Flow of Funds Memorandum"); and

(iv)                                with respect to the second Borrowing hereunder, the account or accounts of the Borrower into which the proceeds of the requested Borrowing will be disbursed.

(b)     Following receipt of a Loan Notice, the Administrative Agent shall promptly notify each Lender of the amount of its Applicable Percentage of the Loans.  Each Lender shall make the amount of its Loan available to the Administrative Agent in immediately available funds at the Administrative Agent's Office not later than 11:00 a.m. on the relevant Borrowing Date.  Upon satisfaction of the applicable conditions set forth in Section 4.01 and Section 4.02, the Administrative Agent shall make all funds so received available to the Borrower in like funds as received by the Administrative Agent either by wire transfer of such funds, or by crediting the account of the Borrower on the books of the Administrative Agent with the amount of such funds, in any case in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower in the Loan Notice.

(c)     The Administrative Agent shall promptly notify the Borrower and the Lenders of the interest rate applicable to any Interest Period for SOFR Loans upon determination of such interest rate.  At any time that ABR Loans are outstanding, the Administrative Agent shall notify the Borrower and the Lenders of any change in the Prime Rate used in determining the ABR promptly following the public announcement of such change.

(d)     Each Lender at its option may make any Loan by causing any domestic or foreign Lending Office of such Lender or any other Loan Party to make such Loan; provided, however, that the exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

**2.03    Optional and Mandatory Prepayments**.

(a)     Optional Prepayments.  The Borrower may, upon notice to the Administrative Agent, at any time on or after the 12-month anniversary of the first Borrowing

57

Date and from time to time thereafter voluntarily prepay the Loans in whole or in part; <u>provided</u> that (i) such notice must be received by the Administrative Agent not later than 12:00 p.m. three Business Days prior to any date of prepayment of the Loans; and (ii) any prepayment of the Loans shall be in a principal amount of U.S.$2,000,000 or a whole multiple of U.S.$1,000,000 in excess thereof or, if less, the entire principal amount of the Loans then outstanding.  Each such notice shall specify the date and amount of such prepayment.

(b)   <u>Mandatory Prepayments</u>.

(i)                          Within three Business Days after the receipt by any Loan Party or any of its Subsidiaries of any Net Cash Proceeds from any Casualty Event in excess, individually or in the aggregate, of U.S.$1,000,000, such Loan Party shall, or shall cause its applicable Subsidiaries to, prepay the outstanding principal amount of the Loans in an amount equal to 100% of such Net Cash Proceeds; <u>provided</u> that (1) so long as no Default or Event of Default shall have occurred and be continuing and no Accelerated Amortization Event shall have occurred and (2) upon written notice to the Administrative Agent prior to the expiration of such three Business Day period, such Loan Party shall have the option, directly or through one or more of its Subsidiaries, to within 90 days of receipt thereof use such Net Cash Proceeds to repair, replace or restore Property affected by such Casualty Event (provided that such investment shall only be permitted to be made to the extent such investment is made pursuant to a transaction, or series of transactions, for Fair Market Value); <u>provided</u>, <u>further</u>, to the extent that the Liens created by the Collateral Documents do not extend to such assets, as soon as reasonably practicable after the consummation of such investment, such Loan Party or such Subsidiary shall execute and deliver such agreements, instruments and other documents, and shall have taken such actions as the Administrative Agent reasonably requests, so that such assets are subject to a first priority fully perfected Lien securing the repayment and other Obligations of the Loan Parties under the Loan Documents, subject to no other Liens; and any portion of such Net Cash Proceeds not invested by the Loan Parties as provided herein, shall be applied to prepay the Loans as contemplated by this <u>clause (i)</u> no later than on the expiration of the 90 day period mentioned above.

(ii)                          Within three Business Days after the receipt by any Loan Party or any of its Subsidiaries of any Net Cash Proceeds from any Taking, such Loan Party shall, or shall cause its applicable Subsidiaries to, prepay the outstanding principal amount of the Loans in an amount equal to 100% of such Net Cash Proceeds.

(iii)                          Within three Business Days after the receipt by any Loan Party or any of its Subsidiaries of any Net Cash Proceeds from any Asset Sale (other than Asset Sales permitted by <u>Section 7.05</u>), such Loan Party shall, or shall cause its applicable Subsidiaries to, prepay the outstanding principal amount of the Loans in an amount equal to 100% of such Net Cash Proceeds.

(iv)                          Within three Business Days after the receipt by any Loan Party or any Loan Party's Subsidiaries of any Net Cash Proceeds from the incurrence or issuance by any Loan Party, any of its Subsidiaries of any Indebtedness (other than

58

incurrence or issuance of Indebtedness permitted by <u>Section 7.03</u>), such Loan Party shall, or shall cause its applicable Subsidiaries to, prepay the outstanding principal amount of the Loans in an amount equal to 100% of all Net Cash Proceeds received by such Loan Party, such Subsidiary from such incurrence or issuance.

(v)                            Within three Business Days after the receipt by any Loan Party or any of its Subsidiaries of any Net Cash Proceeds from any farmout in respect of any Oil and Gas Property of any Loan Party or any of its Subsidiaries (other than farmouts permitted by <u>Section 7.05(g)</u>), such Loan Party shall, or shall cause its applicable Subsidiaries to, prepay the outstanding principal amount of the Loans in an amount equal to 100% of such Net Cash Proceeds.

(c)    <u>Other Amounts</u>.

(i)                            Each prepayment of the Loans pursuant to this <u>Section 2.03</u> shall be accompanied by all accrued interest on the amount prepaid, together with any additional amounts required pursuant to <u>Section 3.05</u> and, the applicable Prepayment Premium as required pursuant to <u>Section 2.07(b)</u>.

(ii)                            The Loan Parties shall pay any termination or partial termination amounts under (and to the extent required by) any Reference Hedge resulting from any prepayment of the Loans pursuant to this <u>Section 2.03</u>.

(iii)                            Each prepayment of the Loans pursuant to this <u>Section 2.03</u> shall be applied to the unpaid installments of the Loans in inverse order of maturity.

(d)    <u>Notice of Prepayment</u>.    The Loan Parties shall notify the Administrative Agent pursuant to <u>Section 10.02</u> not later than 11:00 a.m. at least three U.S. Government Securities Business Days before the date of any prepayment pursuant to this <u>Section 2.03</u>.  Each such notice shall be irrevocable and shall specify the prepayment date, the principal amount of each Loan to be prepaid and the amount of accrued interest thereon to the date of the prepayment.  Promptly following receipt of any such notice, the Administrative Agent shall advise the Lenders of the contents thereof and of the amount of such Lender's Applicable Percentage of such prepayment.

(e)    <u>Prepayment Dates</u>.  No prepayment of a SOFR Loan hereunder shall be made on any day that is not a U.S. Government Securities Business Day, and if any prepayment to be made by the Borrower shall fall due on a day that is not a U.S. Government Securities Business Day, payment shall be made on the next succeeding U.S. Government Securities Business Day and such extension of time shall be reflected in computing interest or fees, as the case may be.

**2.04    Termination of Commitments**.

(a)    The Commitments shall automatically terminate (i) at 5:00 p.m. on the Termination Date and (ii) upon the occurrence of an Accelerated Amortization Event.

(b)    The Borrower may not reduce or terminate the Commitments.

**2.05    Repayment of Loans**.

(a)    <u>Repayment of the Loans on Interest Payment Dates prior to an Accelerated Amortization Event</u>.  Other than during an Accelerated Amortization Period, the Borrower shall repay to the Administrative Agent for the account of the Lenders, on each Principal Payment Date, the principal amount of Loans in the respective amounts set forth opposite each such date on <u>Annex I</u> hereto (which amounts shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in <u>Section 2.03</u>); <u>provided</u> that the final principal repayment installment of the Loans shall be repaid on the relevant Maturity Date and in any event shall be in an amount equal to the aggregate principal amount of all Loans outstanding on such date.

(b)    <u>Repayment of the Loans on Interest Payment Dates upon an Accelerated Amortization Event</u>.  During an Accelerated Amortization Period, the Borrower shall repay to the Administrative Agent for the account of the Lenders the aggregate principal amount of all Loans outstanding as of the Accelerated Amortization Start Date in a number of installments equal to the number of Interest Payment Dates falling during the period commencing on the first day of such Accelerated Amortization Period and ending on the then Maturity Date (such number of Interest Payment Dates, the "<u>Accelerated Amortization Payment Dates</u>"), each such installment in an amount equal to the lesser of (i) the product of (x) the aggregate outstanding principal amount of the Loans as of the Accelerated Amortization Start Date and (y) a fraction equal to the result of dividing (A) the number one by (B) the number of Accelerated Amortization Payment Dates, and (ii) the aggregate principal outstanding amount of the Loans on such Interest Payment Date (which amounts shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in <u>Section 2.03</u>); <u>provided</u> that the final principal repayment installment of the Loans shall be repaid on the relevant Maturity Date and in any event shall be in an amount equal to the aggregate principal amount of all Loans outstanding on such date.

(c)    <u>General Obligation of the Borrower</u>.  The Borrower's obligations under this Agreement and the other Loan Documents are general obligations of the Borrower, and the recourse of the Lenders and the Administrative Agent in respect thereof is not limited to the Collateral or any portion thereof or to any particular Property of the Loan Parties.

**2.06    Interest.**

(a)    Subject to the provisions of <u>subsection (b)</u> below, (i) each SOFR Loan shall bear interest on the outstanding principal amount thereof from the Closing Date until repaid in full, at a rate *per annum* equal to Term SOFR *plus* the Applicable Margin; and (ii) each ABR Loan shall bear interest on the outstanding principal amount thereof at a rate *per annum* equal to the ABR *plus* the Applicable Margin.  Anything hereunder to the contrary notwithstanding, in case the interest rate determined pursuant to the immediately preceding sentence shall be less than the Floor, the applicable interest rate on the Loans for purposes of this clause(a) shall be a rate *per annum* equal to the Floor.

60

(b)    Upon the occurrence and during the continuance of any Event of Default and until all Obligations shall be paid in full, the Borrower shall pay interest on all outstanding Obligations hereunder, payable in arrears on the dates referred to in Section 2.06(a) above and on demand, for each day until paid at a rate *per annum* equal to the rate that is 2% in excess of the interest rate then applicable to the Loans, and at any time that no Interest Period is then in effect, such rate shall be equal to 2% *plus* the ABR *plus* the Applicable Margin.

(c)    Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein; provided that (i) interest accrued pursuant to clause (b) of this Section shall be payable on demand and (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.  Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d)    The applicable ABR or Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

(e)    In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

**2.07    Fees**.

(a)    The Borrower shall pay to the Arranger, the Agents and the Lenders, as applicable, for their own respective accounts fees in the amounts and at the times specified in the Fee Letters.

(b)    The Borrower shall pay to the Administrative Agent, for ratable distribution among the Lenders, concurrently with (and on the same date of) any prepayment of Loans made at any time pursuant to Section 2.03 (other than Section 2.03(b)(i) or (ii)), a prepayment fee equal to 4.50% of the aggregate principal amount of the Loans being prepaid (the "Prepayment Premium"); provided, however, that no Prepayment Premium shall be payable in connection with a prepayment of the Loans made with proceeds of a Takeout Indebtedness Refinancing.  It is hereby acknowledged and agreed that the Prepayment Premium, upon becoming due and payable pursuant to the terms hereof, shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to the reasonable calculation of each Lender's lost profits as a result thereof.  Any Prepayment Premium payable above shall be presumed to be the liquidated damages sustained by each Lender as the result of the early repayment and the Loan Parties agree that it is reasonable under the circumstances currently existing.  Such Prepayment

61

Premium, shall also be payable in the event the Loans are satisfied or released by foreclosure (whether by power of judicial proceeding), deed in lieu of foreclosure or by any other means. **THE LOAN PARTIES EXPRESSLY WAIVE (TO THE FULLEST EXTENT THEY MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE FOREGOING PREPAYMENT PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION**. Each Loan Party expressly agrees (to the fullest extent it may lawfully do so) that: (A) the Prepayment Premium is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Prepayment Premium shall be payable notwithstanding the then prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Loan Parties giving specific consideration in this transaction for such agreement to pay the Prepayment Premium; and (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. The Loan Parties expressly acknowledge that their agreement to pay the Prepayment Premium to the Lenders as herein described is a material inducement to the Lenders making their Loans hereunder.

(c)     The Borrower agrees to pay to the Administrative Agent for the account of each Lender on each Interest Payment Date and on the Termination Date (or, if such day is not a Business Day, on the immediately preceding Business Day), a commitment fee (the "Commitment Fee"), at a rate *per annum* equal to 30% of the Applicable Margin on the unused portion of the Commitment of such Lender. The Commitment Fee shall be computed on the basis of actual number of days elapsed in a year of 360 days. The Commitment Fee due to each Lender shall commence to accrue on the Closing Date, shall be payable in arrears and shall cease to accrue on the Termination Date.

(d)     All fees payable hereunder or under the Fee Letters, as applicable, shall be paid on the dates due, in the currency specified hereunder or thereunder, in immediately available funds and shall not be subject to reduction by way of setoff or counterclaim. Fees paid hereunder or under the Fee Letters, as applicable, shall not be refundable under any circumstances.

**2.08    Computation of Interest and Fees**.    All interest hereunder shall be computed on the basis of a year of 360 days (or in the case of interest computed by reference to the ABR at times when the ABR is based on the Prime Rate, such interest shall be computed on the basis of a year of 365 days (or 366 days in a leap year)), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). All interest hereunder on any Loan shall be computed on a daily basis based upon the outstanding principal amount of such Loan as of the applicable date of determination. The applicable ABR or Term SOFR shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

**2.09    Evidence of Debt; Notes**.

(a)     The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the

ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(b)    Upon the request of any Lender made through the Administrative Agent, the Borrower shall execute and deliver to such Lender (through the Administrative Agent) a NY Note, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its NY Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

(c)    The Loans made by each Lender shall be evidenced by a Colombian Promissory Note. The Loan Parties shall prepare and deliver to each Lender:

(i)    on the date hereof, a duly executed Colombian Promissory Note payable to each Lender, for the fees and expenses owed to such Lender under the Loan Documents; and

(ii)    on or prior to the Closing Date, a duly executed Colombian Promissory Note payable to each Lender, for the Loans to be made by such Lender. Thereafter the Loan evidenced by such Colombian Promissory Notes and interest thereon shall at all times (including after assignment pursuant to Section 10.06) be represented by one or more Colombian Promissory Notes in such form payable to the payee named therein.

(d)    The payment of any part of the principal of any such Note shall discharge the obligation of the Borrower under this Agreement to pay principal of the Loan evidenced by such Note *pro tanto*, and the payment of any principal of a Loan in accordance with the terms hereof shall discharge the obligations of the Borrower under the Note evidencing such Loan *pro tanto*. Notwithstanding the discharge in full of any Note, (i) if the amount paid or payable under any such Note (whether arising from the enforcement thereof in Colombia or otherwise) is less than the amount due and payable in accordance with this Agreement with respect to the Loan evidenced by such Note, to the fullest extent permitted under applicable Law, the Borrower agrees to pay to the Administrative Agent upon its receipt of written demand such difference, and (ii) if the amount paid or payable under any such Note (whether arising from the enforcement thereof in Colombia or otherwise) exceeds the amount due and payable in accordance with this Agreement with respect to the Loan evidenced by such Note, each Lender that has received any amounts under such Notes in excess of the amounts due to such Lender hereunder agrees, to the fullest extent permitted under applicable Law, to pay such excess to the Borrower upon its receipt of written demand.

(e)        Upon discharge of all obligations of the Borrower under the Loan evidenced by a Note, the Lender holding such Note shall cancel such Note and promptly return it to the Borrower.

(f)        Each Lender shall be entitled to have its Notes substituted, exchanged or subdivided for Notes of lesser denominations in connection with a permitted assignment of all or any portion of such Lender's Loans and Notes pursuant to <u>Section 10.06</u>.

(g)        The mutilation, loss, theft or destruction of a Note shall not imply or be deemed to constitute a cancellation of debt or of any other Obligation under or in respect of this Agreement or any Loan, even if any such event has occurred due to acts attributable to any of the Lenders or any of the Agents.  If a Note is mutilated, the Borrower or the Guarantors, as applicable, shall issue and deliver a new Note promptly upon the written request by the relevant Lender or the Administrative Agent; <u>provided</u> that such mutilated Note shall be returned to the Borrower.  If a Note is lost, stolen or destroyed, the Borrower shall, promptly upon the written request of the relevant Lender or the Administrative Agent, issue and deliver to such Lender a new Note without requiring any further action from such Lender that may be applicable according to the applicable Law.

**2.10    Payments Generally; Administrative Agent's Clawback**.

(a)        <u>General</u>.  All payments to be made by the Loan Parties shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Loan Parties hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 11:00 a.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Loan Parties shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)        (i) <u>Funding by Lenders; Presumption by Administrative Agent</u>.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of SOFR Loans that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with <u>Section 2.02</u> and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the

date such amount is made available to the Borrower to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, *plus* any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrower, the interest rate applicable to ABR Loans.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii)    Payments by the Loan Parties; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Loan Parties prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Loan Parties will not make such payment, the Administrative Agent may assume that the Loan Parties have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Loan Parties have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or the Loan Parties with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

(c)    Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(d)    Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans, and to make payments pursuant to Section 10.04(c), are several and not joint.  The failure of any Lender to make any Loan, or to make any payment under Section 10.04(c), on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, or to make its payment under Section 10.04(c).

65

(e)    <u>Funding Source</u>.   Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

**2.11    Sharing of Payments by Lenders**.   If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of the Loans made by it, resulting in such Lender's receiving payment of a proportion of the aggregate amount of such Loans and accrued interest thereon greater than its *pro rata* share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; <u>provided</u> that:

(i)                              if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)                              the provisions of this Section shall not be construed to apply to (x) any payment made by or on behalf of the Loan Parties pursuant to and in accordance with the express terms of this Agreement, or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to the Loan Parties or any Affiliate thereof (as to which the provisions of this Section shall apply).

The Loan Parties consent to the foregoing and agree, to the extent they may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Loan Parties rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Loan Parties in the amount of such participation.

**2.12    Defaulting Lenders**.

(a)    <u>Adjustments</u>.   Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)    <u>Waivers and Amendments</u>.   Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of "Required Lenders" and <u>Section 10.01</u>.

(ii)    <u>Defaulting Lender Waterfall</u>.   Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Article VIII</u> or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to

Section 10.08 shall be applied at such time or times as may be determined by the Administrative Agent as follows: *first*, to the payment of any amounts owing by such Defaulting Lender to any Agent hereunder; *second*, as the Borrower may request (so long as no Default or Event of Default exists and no Accelerated Amortization Event shall have occurred), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; *third*, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released *pro rata* in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; *fourth*, to the payment of any amounts owing to the Lenders or any Agent as a result of any judgment of a court of competent jurisdiction obtained by any Lender or any Agent against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; *fifth*, so long as no Default or Event of Default exists and no Accelerated Amortization Event shall have occurred, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and *sixth*, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (y) such Loans were made at a time when the conditions set forth in Section 4.01, were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans and funded. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)      Defaulting Lender Cure. If the Loan Parties, the Administrative Agent, the Collateral Agent and the other Lenders agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a *pro rata* basis by the Lenders in accordance with their Applicable Percentages, whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

### 2.13    Benchmark Replacement Setting.

(a)      Benchmark Replacement.

(i)    Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is based upon Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(ii)    No Hedging Agreements shall be deemed to be a "Loan Document" for purposes of this <u>Section 2.13</u>.

(b)    <u>Benchmark Replacement Conforming Changes</u>.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    <u>Notices; Standards for Decisions and Determinations</u>.  The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to <u>Section 2.13(d)</u> and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this <u>Section 2.13</u>, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 2.13</u>.

(d)    <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the

68

implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     <u>Benchmark Unavailability Period</u>.   Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (i) the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans; and (ii) any outstanding affected SOFR Loans will be deemed to have been converted to ABR Loans at the end of the applicable Interest Period.   Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to <u>Section 3.05</u>.   During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of ABR based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of ABR.

## 2.14   Canadian Interest Provisions.

(a)     If any provision of this Agreement or of any of the other Loan Documents would obligate the Borrower or any Loan Party to make any payment of "interest" (as defined in section 347 of the *Criminal Code* (Canada))  or other amount payable to any Secured Party shall exceed the maximum effective annual rate of interest on the "credit advanced" (as defined in section 347 of the *Criminal Code* (Canada))  permitted under such section 347, and if any payment, collection or demand pursuant to this Agreement or any Loan Document in respect of "interest" (as defined in section 347 of the *Criminal Code* (Canada)) is determined to be contrary to the provisions of such section 347, then, notwithstanding such provisions, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by applicable Law or so result in a receipt by such Secured Party of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: firstly, by reducing the amount or rate of interest required to be paid to such Secured Party under the applicable Loan Document, and thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to such Secured Party which would constitute "interest" for purposes of Section 347 of the Criminal Code (Canada). If,

notwithstanding the foregoing provisions of this Section 2.14(a), and after giving effect to all adjustment contemplated hereby, such Secured Party shall have received an amount in excess of the maximum permitted by the *Criminal Code* (Canada), then such excess shall be applied by the Secured Party to the reduction of the outstanding principal balance of the Loan and not to the payment of interest, or if such excessive interest exceeds such principal balance, then such excess shall be refunded to the Borrower or Loan Party, as applicable.

(b)    For purposes of the Interest Act (Canada), (i) whenever any interest or fee under this Agreement or any other Loan Document is calculated using a rate based on a year of 360 days or 365 days (or such other period that is less than a calendar year), as the case may be, the rate determined pursuant to such calculation, when expressed as an annual rate, is equivalent to (x) the applicable rate based on a year of 360 days or 365 days (or such other period that is less than a calendar year), as the case may be, (y) *multiplied by* the actual number of days in the calendar year in which the period for which such interest or fee is payable (or compounded) ends, and (z) *divided by* 360 or 365 (or such other period that is less than a calendar year), as the case may be, (ii) the principle of deemed reinvestment of interest does not apply to any interest calculation under this Agreement or any other Loan Document, and (iii) the rates of interest stipulated in this Agreement and any other Loan Document are intended to be nominal rates and not effective rates or yields.

(c)    To the extent permitted by applicable Laws, any provision of the Judgment Interest Act (Alberta) (or similar legislation in any other province of Canada) and the Interest Act (Canada) which restricts the rate of interest on any judgment debt shall be inapplicable to the Loan Documents and is hereby waived by each Loan Party.

(d)    Each Loan Party confirms that it fully understands and is able to calculate the rate of interest applicable to the Loans based on the methodology for calculating *per annum* rates provided for in this Agreement and the other Loan Documents. Each Loan Party hereby irrevocably agrees not to plead or assert, whether by way of defense or otherwise, in any proceeding relating to this Agreement or any other Loan Document, that the interest payable under this Agreement or any other Loan Document and the calculation thereof has not been adequately disclosed to the Loan Parties as required, whether pursuant to Section 4 of the Interest Act (Canada) or any other applicable law or legal principle.

## 2.15    Increase in Commitments.

(a)    At any time during the period commencing on the Closing Date and ending on the date that is 12 months following the Closing Date; underlined provided that no Default or Event of Default has occurred and is continuing, upon notice by the Borrower to the Lenders (through the Administrative Agent), the Borrower shall have the right to request, on a one time basis, an increase in the Aggregate Commitments, and the Lenders shall have the option (but not the obligation) to accept such request, to the extent that the aggregate amount of the Commitments on the Closing Date and on the Increase Effective Date (in each case, before giving effect to the making of any Loans) does not exceed U.S.$125,000,000; underlined provided that any such request for an increase shall be in a minimum amount of U.S.$5,000,000. At the time of sending such notice, the Borrower shall specify the time period within which the Lenders are

requested to respond (which shall in no event be less than ten Business Days from the date of delivery of such notice to the applicable Lender) and the intended use of the proceeds of the Loans proposed to be made in connection with such increase.

(b)    Each Lender will have the option, but not the obligation, to participate in such proposed increase in the Aggregate Commitments, in accordance with the ratable portion of the Loans owing to such Lender at the time of receipt of the notice referred to in Section 2.15(a).  Each Lender will notify the Administrative Agent and the Borrower within the time period referred to in Section 2.15(a) whether or not it would like to participate in the increase in the Aggregate Commitments and the proposed amount of such Lender's participation in such increase.  If a Lender does not respond within such time period, such Lender will be deemed to have declined to participate in such increase.

(c)    If the Aggregate Commitments are increased in accordance with this Section 2.15, the Administrative Agent and the Borrower shall determine the effective date (the "Increase Effective Date") and the final allocation of such increase.  The Administrative Agent shall promptly notify the Borrower and the Lenders of the final allocation of such increase and the Increase Effective Date.

(d)    Such increase shall be subject to conditions precedent to be agreed among the Administrative Agent, the Lenders accepting such increase in the Aggregate Commitments, and the Borrower, which conditions shall include (but shall not be limited to) that the making of such increase, and the Incurrence of Indebtedness by the Borrower and the other Loan Parties in connection therewith shall not conflict with or result in any breach or contravention of the Canacol Existing Revolving Credit Agreement and/or the Canacol 2028 Notes Indenture.

(e)    This Agreement shall be amended (including Schedule 1.01-I hereto) in order to reflect such increase, pursuant to an amendment agreement entered among the Administrative Agent, the Lenders accepting such increase in the Aggregate Commitments, and the Borrower to reflect such increase.

(f)    Each Lender participating in such increase shall receive a NY Note and a Colombian Promissory Note evidencing the Loans made by it in connection with such increase, in compliance with Section 2.09.

(g)    This Section shall supersede any provisions in Sections 2.11 or 10.01 to the contrary.

## ARTICLE III

## TAXES, YIELD PROTECTION AND ILLEGALITY

### 3.01    Taxes.

(a)    Any and all payments by or on account of any obligation of the Loan Parties under any Loan Document shall be made without deduction or withholding for any

Taxes, except as required by applicable Laws.  If any applicable Laws (as determined in the good faith discretion of the Administrative Agent) require the deduction or withholding of any Tax from any such payment by the Administrative Agent or the Loan Parties, then the Administrative Agent or the Loan Parties shall be entitled to make such deduction or withholding, upon the basis of the information and documentation to be delivered pursuant to clause (f) below.

(b)    If the Loan Parties or the Administrative Agent shall be required by any applicable Laws to withhold or deduct any Taxes from any payment, then (A) the Loan Parties or the Administrative Agent, as required by such Laws, shall withhold or make such deductions as are determined by it to be required based upon the information and documentation it has received pursuant to clause (f) below, (B) the Loan Parties or the Administrative Agent, to the extent required by such Laws, shall timely pay the full amount withheld or deducted to the relevant Governmental Authority in accordance with such Laws, and (C) to the extent that the withholding or deduction is made on account of Indemnified Taxes, the sum payable by the Loan Parties shall be increased as necessary so that after any required withholding or the making of all required deductions (including deductions applicable to additional sums payable under this Section 3.01) the applicable Recipient receives an amount equal to the sum it would have received had no such withholding or deduction been made.

(c)    Without limiting the provisions of clause (a) and (b) above, the Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d)    The Loan Parties shall, and does hereby indemnify each Recipient, and shall make payment in respect thereof within ten days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes asserted on or attributable to amounts payable under this Section 3.01) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Loan Parties by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e)    After any payment of Taxes by the Loan Parties to a Governmental Authority as provided in this Section 3.01, the Loan Parties shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of any return required by Laws to report such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)    Each of the Administrative Agent and each Lender agrees to use its best efforts to comply with any reasonable certification, identification, information, documentation or reporting requirement identified to it by the Loan Parties if such compliance is required by applicable Law, regulation, administrative practice or any applicable treaty as a precondition to exemption from, or reduction in the rate of, withholding or deduction of Tax of

72

any amounts payable by the Loan Parties pursuant to this <u>Section 3.01</u>. Notwithstanding anything to the contrary in the preceding sentence, the completion, execution and submission of any such certification, identification, information, documentation or reporting shall not be required if in the Administrative Agent's or Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would prejudice the legal or commercial position of the Administrative Agent or such Lender. Notwithstanding the foregoing, it is understood and agreed that nothing in this <u>Section 3.01(f)</u> shall interfere with the rights of any Lender or the Administrative Agent to conduct its fiscal or tax affairs in such manner as it deems appropriate.

(g)    If any Recipient determines in its sole discretion that it has received a refund of any Taxes as to which it has been indemnified by the Loan Parties or with respect to which the Loan Parties have paid additional amounts pursuant to this <u>Section 3.01</u>, it shall pay to the Loan Parties an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Loan Parties under this <u>Section 3.01</u> with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) incurred by such Recipient, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); <u>provided</u> that the Loan Parties, upon the request of the Recipient, agrees to repay the amount paid over to the Loan Parties (*plus* any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Recipient in the event the Recipient is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection, in no event will the applicable Recipient be required to pay any amount to the Loan Parties pursuant to this <u>clause (g)</u> the payment of which would place the Recipient in a less favorable net after-Tax position than such Recipient would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any Recipient to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Loan Parties or any other Person.

(h)    Each party's obligations under this <u>Section 3.01</u> shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Loans and the repayment, satisfaction or discharge of all other Obligations.

**3.02    Illegality**. If any Lender determines that any Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate or Term SOFR, or to determine or charge interest based upon SOFR, the Term SOFR Reference Rate or Term SOFR, then, upon notice thereof by such Lender to the Loan Parties (through the Administrative Agent) (an "<u>Illegality Notice</u>"), (a) any obligation of the Lenders to make SOFR Loans, and any right of the Loan Parties to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended, and (b) the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "ABR," in each case until each affected Lender notifies the Administrative Agent and the Loan

Parties that the circumstances giving rise to such determination no longer exist. Upon receipt of an Illegality Notice, the Loan Parties shall, if necessary to avoid such illegality, upon demand from any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans to ABR Loans (the interest rate on which ABR Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "ABR"), on the last day of the Interest Period therefor, if all affected Lenders may lawfully continue to maintain such SOFR Loans to such day, or immediately, if any Lender may not lawfully continue to maintain such SOFR Loans to such day. Upon any such prepayment or conversion, the Loan Parties shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 3.05 (but no other penalty or premium otherwise payable hereunder).

   **3.03 Inability to Determine Rates**. Subject to Section 2.13, if, on or prior to the first day of any Interest Period for any SOFR Loan:

   (a) the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof, or

   (b) The Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent,

then, in each case, the Administrative Agent will promptly so notify the Borrower and each Lender.

Upon notice thereof by the Administrative Agent to the Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Borrower to continue SOFR Loans or to convert ABR Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent (with respect to clause (b), at the instruction of the Required Lenders) revokes such notice. Upon receipt of such notice, (i) the Borrower may revoke any pending request for a Borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans in the amount specified therein and (ii) any outstanding affected SOFR Loans will be deemed to have been converted into ABR Loans at the end of the applicable Interest Period. Upon any such conversion, the Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 3.05. Subject to Section 2.13, if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on ABR Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "ABR" until the Administrative Agent revokes such determination.

### 3.04   Increased Costs.

(a)   <u>Increased Costs Generally</u>.  If any Change in Law shall:

(i)                                  impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii)                                subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) and (c) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)                               impose on any Lender any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to increase the cost to such Lender or such other Recipient of participating in or to reduce the amount of any sum received or receivable by such Lender or other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or other Recipient, the Loan Parties will pay to such Lender or other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b)   <u>Capital Requirements</u>.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Loan Parties will pay to such Lender, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)   <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth (i) the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in <u>subsection (a)</u> or <u>(b)</u> of this Section and (ii) how such amount or amounts were calculated, which description shall in no event contain any disclosure of matters deemed by such Lender in good faith to be confidential or proprietary, and delivered to the Loan Parties shall be conclusive absent manifest error.  The Loan Parties shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

75

(d)    <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u> that the Loan Parties shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Loan Parties of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

**3.05    Compensation for Losses**.  In the event of (a) the payment of any principal of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default or an Accelerated Amortization Event), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of an Event of Default or an Accelerated Amortization Event), (c) the failure to borrow, convert, continue or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 3.06(b), then, in any such event, the Loan Parties shall compensate each Lender for any loss, cost and expense attributable to such event, including any loss, cost or expense arising from the liquidation or redeployment of funds or from any fees payable.  A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Loan Parties shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

**3.06    Mitigation Obligations; Replacement of Lenders**.

(a)    <u>Designation of a Different Lending Office</u>.  If any Lender requests compensation under <u>Section 3.04</u>, or requires the Loan Parties to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 3.01</u>, then such Lender shall (at the request of the Loan Parties) use reasonable efforts to, as applicable, designate a different lending or issuing office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to <u>Sections 3.01</u> or <u>3.04</u>, as the case may be, in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Loan Parties hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    <u>Replacement of Lenders</u>.  If any Lender requests compensation under <u>Section 3.04</u> and such Lender has declined or is unable to designate a different lending office in accordance with <u>Section 3.06(a)</u>, the Loan Parties may replace such Lender in accordance with <u>Section 10.13</u>.

**3.07    Survival**.  All of the Loan Parties' obligations under this <u>Article III</u> shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder and resignation of the Administrative Agent.

## ARTICLE IV

## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

**4.01    Conditions for Closing and Initial Credit Extension**.  The obligation of each Lender to make its initial Loan hereunder shall not become effective until the date on which the Administrative Agent shall have received each of the following documents (each of which, if requested, shall be originals or telecopies (followed promptly by originals)) unless otherwise specified or the following conditions precedent shall have been satisfied, as applicable (but in any event by no later than September 16, 2024), each of which shall be satisfactory to the Administrative Agent (and to the extent specified below, each Lender):

(a)    <u>Loan Documents</u>.  The Administrative Agent shall have received this Agreement, the Fee Letters and the other Loan Documents (other than the Reference Hedges and the Reference Letter of Credit Documentation), duly executed and delivered by each of the parties named as a signatory thereto, and such Loan Documents shall be in full force and effect.

(b)    <u>Organization Documents</u>.  The Administrative Agent shall have received certified copies of the Organization Documents of the Loan Parties and of all corporate authority for the Loan Parties (including, without limitation, all necessary action of the board of directors, shareholders, or other governing body) with respect to the execution, delivery and performance of each Loan Document to which each Loan Party is intended to be a party and each other document to be signed and delivered by the Loan Parties from time to time in connection herewith and with the Loans.

(c)    <u>Financial Statements</u>.  The Administrative Agent shall have received the financial statements described in <u>Section 5.05</u>.  Such financial statements shall not be materially inconsistent with the financial statements or other information previously provided to the Administrative Agent.

(d)    <u>Legal Opinions</u>.  The Administrative Agent shall have received the following legal opinions, each dated as of the Closing Date, in the English language, addressed to the Administrative Agent, the Collateral Agent, each Lender and each Hedge Provider:

(i)    an opinion of Asociados Legales S.A.S., special Colombian counsel to the Loan Parties, in form and substance reasonably satisfactory to the Lenders, with customary qualifications and exceptions reasonably acceptable to the Administrative Agent and its counsel (and the Loan Parties have instructed such counsel to deliver such opinion to the Agents and the Lenders);

(ii)    an opinion of DLA Piper (Canada) LLP, special Canadian counsel to the Loan Parties, in the form of <u>Exhibit N</u>, with customary qualifications and exceptions reasonably acceptable to the Administrative Agent and its counsel (and the

Loan Parties have instructed such counsel to deliver such opinion to the Agents and the Lenders);

(iii)                    an opinion of Bellerive Attorneys at Law, special Swiss counsel to the Loan Parties, in the form of Exhibit O, with customary qualifications and exceptions reasonably acceptable to the Administrative Agent and its counsel (and the Loan Parties have instructed such counsel to deliver such opinion to the Agents and the Lenders);

(iv)                    an opinion of Valles & Asociados, special Panamanian counsel to the Loan Parties, in form and substance reasonably satisfactory to the Lenders, with customary qualifications and exceptions reasonably acceptable to the Administrative Agent and its counsel (and the Loan Parties have instructed such counsel to deliver such opinion to the Agents and the Lenders);

(v)                    an opinion of Nelson Mullins Riley & Scarborough LLP, special New York counsel to the Loan Parties, in the form of Exhibit P, with customary qualifications and exceptions reasonably acceptable to the Administrative Agent and its counsel (and the Loan Parties have instructed such counsel to deliver such opinion to the Agents and the Lenders);

(vi)                    an opinion of Cuatrecasas, Goncalves Pereira S.A.S., special Colombian counsel to the Lenders and the Administrative Agent, in form and substance acceptable to the Administrative Agent;

(vii)                    an opinion of Stikeman Elliott LLP, special Canadian counsel to the Lenders and the Administrative Agent, in form and substance acceptable to the Administrative Agent;

(viii)                    an opinion of Schellenberg Wittmer Ltd, special Swiss counsel to the Lenders and the Administrative Agent, in form and substance acceptable to the Administrative Agent;

(ix)                    an opinion of Aleman, Cordero, Galindo & Lee, special Panamanian counsel t the Lenders and the Administrative Agent, in form and substance acceptable to the Administrative Agent; and

(x)                    an opinion of Skadden, Arps, Slate, Meagher & Flom LLP, special New York counsel to the Lenders and the Administrative Agent, in form and substance acceptable to the Administrative Agent.

(e)    Officer's Certificate.  The Administrative Agent shall have received a certificate of each of the Loan Parties dated as of the Closing Date, substantially in the form of Exhibit Q, with appropriate insertions and attachments, in form and substance reasonably satisfactory to the Administrative Agent and its counsel, executed by a Responsible Officer of each Loan Party.

78

(f)     Solvency Certificate.  The Administrative Agent shall have received a certificate of each of the Loan Parties, substantially in the form of Exhibit R, executed by the chief financial officer, principal accounting officer, treasurer or controller of each Loan Party confirming the Solvency of each Loan Party as of the Closing Date (after giving effect on a *pro forma* basis to the occurrence of the Closing Date and the consummation of the Transactions).

(g)     Payment of Fees.  The Administrative Agent, the Collateral Agent, the Arranger and the Lenders shall have received all costs, fees, expenses (including, without limitation, the fees and expenses of Cuatrecasas, Goncalves Pereira S.A.S., Stikeman Elliott LLP and Skadden, Arps, Slate, Meagher & Flom LLP, special Colombian, Canadian and New York counsel, respectively, to the Lenders and the Administrative Agent) and other consideration presented for payment required to be paid on or before the Closing Date, or, in each case, arrangements satisfactory to the Administrative Agent shall have been made for the payment of such fees or amounts from the proceeds of the Borrowing to be made on the Closing Date.

(h)     2024 Annual Drilling Plan.  The Loan Parties shall have delivered to the Administrative Agent an Annual Drilling Plan for the year 2024, in form and substance satisfactory to the Lenders.

(i)     Material Adverse Effect.   Since December 31, 2023, no event, development or circumstance has occurred that has had or could reasonably be expected to have a Material Adverse Effect, both immediately prior to the occurrence of the Closing Date and also after giving effect thereto.

(j)     Material Adverse Change.  Since September 3, 2024, there shall not have occurred a material adverse change in the political or financial stability of Colombia which would reasonably be expected to materially affect or impair the business, operations, condition (financial or otherwise), assets, liabilities or Properties of the Loan Parties, as determined by the Administrative Agent in its reasonable discretion.

(k)     Representations and Warranties.  Each of the representations and warranties of each Loan Party set out in this Agreement and in each of the Loan Documents shall be, (i) if such representation and warranty is qualified as to materiality or by reference to the existence of a Material Adverse Effect, true and correct (as so qualified) on and as of the Closing Date (or, in the case of any such representation or warranty expressly stated to have been made as of a specific date, as of such specific date), or (ii) if such representation and warranty is not so qualified, true and correct in all material respects on and as of the Closing Date (or, in the case of any such representation or warranty expressly stated to have been made as of a specific date, as of such specific date).

(l)     No Default, Event of Default or Accelerated Amortization Event. No event, act or condition shall have occurred and be continuing or would result from the execution, delivery or performance of this Agreement or the other Loan Documents (including after giving effect to the occurrence of the Closing Date and the funding of the Loans hereunder) which would constitute a Default, an Event of Default or Accelerated Amortization Event (disregarding any cure period therefor).

(m)  <u>No Order</u>.  There shall not (i) be in effect any statute, regulation, order, decree or judgment of any Governmental Authority that makes illegal or enjoins or prevents the consummation of the Transactions, or (ii) have been commenced any action, suit, investigation or proceeding or, to the knowledge of the Loan Parties, threatened in any court or before any Governmental Authority that could reasonably be expected to have a Material Adverse Effect on the ability of each Loan Party to perform its obligations under the Loan Documents.

(n)  <u>Approvals</u>.  The Administrative Agent shall have received all governmental, shareholder and third-party consents and approvals necessary in connection with the Transactions and expiration of all applicable waiting periods without any action being taken by any authority that could restrain, prevent or impose any material adverse conditions on the Loan Parties or the Transactions or that could seek or threaten any of the foregoing, and no law or regulation shall be applicable that in the reasonable judgment of the Administrative Agent could have such effect.

(o)  <u>Process Agent Acceptance</u>.  Each Loan Party shall have appointed the Process Agent as its agent for service of process in New York in respect of any dispute arising from or relating to this Agreement and the other Loan Documents to which it is a party, and shall have furnished evidence of such appointment and a Process Agent Acceptance, duly executed and delivered by the Process Agent, for a period following the Closing Date ending not earlier than one year after the Maturity Date.

(p)  <u>Taxes</u>.  All applicable taxes and stamp duties due and payable, if any, arising in connection with the execution, delivery and performance of this Agreement and the other Loan Documents shall have been paid in full.

(q)  <u>Notes</u>.

(i)  Each Lender that shall have so requested, shall have received its corresponding Note, evidencing the Loans required to be made by such Lender on the Closing Date, duly executed and delivered by the Borrower, as issuer, dated on or prior to the relevant Closing Date complying with the provisions of <u>Section 2.09(b)</u>.

(ii)  Each Lender shall have received a Colombian Promissory Note, duly executed and delivered by the Borrower, as issuer, and each of the Guarantors, as *avalistas*, dated on or prior to the Closing Date complying with the provisions of <u>Section 2.09(c)</u>.

(r)  <u>Collateral</u>.

(i)  A security interest in the Collateral has been duly created and perfected as valid and enforceable first priority Liens or other interests or rights of the kind the relevant Collateral Documents purport to create with respect to the Property.

(ii)  All documents required to be filed, registered, notarized or recorded in order to create a security interest in and perfect the Collateral as valid and

80

enforceable first priority Liens or other interests or rights of the kind the relevant Collateral Documents purport to create over the Collateral (except for such actions required to be taken and such filings required to be made after the Closing Date pursuant to <u>Section 6.20</u>) have been properly filed, registered, notarized or recorded in each office of each jurisdiction in which such filings, registrations, notarizations or recordations are required, including, (1) with respect to the Collateral Documents governed by the laws of Colombia, registered by the Colombian Collateral Agent before the "*Registro de Garantías Mobiliarias*" of Colombia and (2) with respect to the Colombian Share Pledge Agreements, registered in the applicable stock ledger (*libro de registro de acciones*).

(iii)         All notices and acknowledgments have been made and given in accordance with each relevant Collateral Document and the Lenders have received true, complete and correct copy of such notices and acknowledgments, together with a certificate issued by a Responsible Officer of the Borrower certifying the foregoing.

(iv)         Each Lender has received evidence of the searches performed within ten (10) days prior to the Closing Date in connection with the Loan Parties in the "*Registro de Garantías Mobiliarias*" evidencing, in each case, the absence of any Liens (other than Permitted Liens) over any of the Collateral.

(s)    <u>Material Project Documents</u>.  The Administrative Agent shall have received a true, correct and complete copy of each Material Project Document duly executed and delivered by each of the parties named as a proposed signatory thereto, and each such Material Project Document shall be in full force and effect.

(t)    <u>Base Case Model and Operating Plan and Budget</u>.  The Administrative Agent shall have received (i) a copy of the Base Case Model, and (ii) the initial Operating Plan and Budget (which shall cover the period from the Closing Date through the end of the fiscal year of the Borrower ending on December 31, 2024).

(u)    <u>KYC Information</u>.

(i)         Upon the reasonable request of any Lender made at least ten days prior to the Closing Date, the Loan Parties shall have provided to such Lender the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including the Act, in each case at least five days prior to the Closing Date.

(ii)         At least five days prior to the Closing Date, the Lenders and the Administrative Agent shall have received a Beneficial Ownership Certificate in relation to each Loan Party.

(v)    <u>Hydrocarbon Sale Agreements</u>.  The Administrative Agent shall have received a true, correct and complete copy of each Existing Hydrocarbon Sale Agreement, duly executed and delivered by each Existing Offtaker party thereto and each Loan Party party thereto, and all amendments, modifications and supplements thereto, accompanied by a certificate of a Responsible Officer of the relevant Loan Party certifying that: (A) the copy of

81

each such Hydrocarbon Sale Agreement is a true, correct and complete copy thereof, (B) no term or condition of any such Hydrocarbon Sale Agreement has been amended since the date thereof, other than such amendments that have been delivered pursuant to this clause (x), (C) each such Hydrocarbon Sale Agreement is in full force and effect, and enforceable against the applicable Offtaker in accordance with its terms, (D) neither the Loan Party party thereto nor, to the knowledge of such Loan Party, any Offtaker party thereto, is in "default" thereunder, and (E) each such Hydrocarbon Sale Agreement is enforceable against each other party thereto in accordance with its terms.

(w)   Reserves Report.  The Administrative Agent shall have received an updated Reserves Report, evaluating the Oil and Gas Properties of the Loan Parties as of December, 2023, prepared by the Petroleum Engineer.

(x)   Diligence Reports.  The Administrative Agent shall have received final diligence reports dated not earlier than three Business Days prior to the Closing Date, which Lenders have confirmed are satisfactory prior to the Closing Date, from each of the following:

(i)                              Cuatrecasas, Goncalves Pereira S.A.S.

(y)   Insurance.   The Administrative Agent shall have received a certificate from the Loan Parties' insurance broker and an officer's certificate of the Loan Parties, certifying (with respect to the insurance policies of which the ANH or third parties designated by the ANH are beneficiaries, only the items under (i) through (iii) below):

(i)                              that the Loan Parties have obtained the insurance policies required to be obtained and maintained by it pursuant to Section 6.07;

(ii)                             that all such insurance policies are in full force and effect, and all premiums due and payable as of the Closing Date have been paid in full, except where such premiums are permitted to be paid at a later date in accordance with such insurance policies;

(iii)                            that such insurance policies comply with the requirements of Section 6.07;

(iv)                            that the Collateral Agent is named as loss payee under all property-related insurance policies;

(v)                             that the insurance providers have waived subrogation rights under any insurance policies covering third-party liability; and

(vi)                            that the Collateral Agent and the Lenders are named as additional insured under any insurance policies covering third-party liability, with the exception of workers and compensation insurance.

(z)   Related Parties Agreements.  The Administrative Agent shall have received a true, correct and complete copy of each Related Parties Agreement, duly executed and

delivered by each Loan Party Related Person party thereto and the Loan Party party thereto, and all amendments, modifications and supplements thereto.

(aa)    <u>Power of Attorney</u>.  The Administrative Agent shall have received a power of attorney, substantially in the form of <u>Exhibit S</u>, executed by a Responsible Officer of each Colombian Guarantor, in form and substance reasonably satisfactory to the Administrative Agent and its counsel, pursuant to which each Colombian Guarantor constitutes and appoints each Agent as such Colombian Guarantor's attorney-in-fact with full authority in the place and stead of such Colombian Guarantor and in the name of such Colombian Guarantor, from time to time in any Agent's discretion while an Event of Default is continuing, to take any action and to execute any instrument that any Agent may deem reasonably necessary or advisable in connection with the creation, perfection, enforceability, foreclosure, or any other aspect related to the Collateral Documents or as otherwise deemed necessary or advisable to ensure the validity, perfection, priority, or enforceability of the security interests granted therein.

(bb)    <u>Irrevocable Instruction</u>. The Administrative Agent shall have received documentation, in form and substance reasonably satisfactory to the Lenders, evidencing that CNE Oil & Gas Colombia and Canacol Energy Colombia, as settlors, delivered an irrevocable instruction substantially in the form of <u>Exhibit T</u> to Fiduciaria de Occidente S.A., as trustee, accepted by the Onshore Collateral Agent, pursuant to which any amounts to which CNE Oil & Gas Colombia and Canacol Energy Colombia may be entitled to under the Promigas Trust are automatically transferred to Colombian Accounts or the US Accounts without any further instruction.

Without limiting the generality of the provisions of the last paragraph of <u>Section 9.03</u>, for purposes of determining compliance with the conditions specified in this <u>Section 4.01</u>, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

**4.02    Conditions to Each Borrowing**.  The obligation of each Lender to make a Loan on a Borrowing Date is subject to the satisfaction of the further conditions precedent that:

(a)    <u>Closing Date</u>.  The Closing Date shall have occurred.

(b)    <u>Loan Notice</u>.  The Administrative Agent shall have received a Loan Notice as required by <u>Section 2.02</u>, requesting the borrowing of the SOFR Loans to be made on such Borrowing Date, in a principal amount equal to (i) U.S.$50,000,000, with respect to the first Borrowing of the Loans hereunder, and (ii) not less than U.S.$5,000,000 (and integral multiples of U.S.$1,000,000 in excess thereof), with respect to any subsequent Borrowing of the Loans hereunder.

(c)    <u>Material Adverse Effect</u>.    Since December 31, 2023, no event, development or circumstance has occurred that has had or could reasonably be expected to have

a Material Adverse Effect, both immediately prior to the occurrence of such Borrowing Date and also after giving effect thereto, including the making of the Loans on such Borrowing Date and the intended use thereof.

(d)    <u>Representations and Warranties</u>.    Each of the representations and warranties of each Loan Party set out in this Agreement and in each of the Loan Documents shall be, (i) if such representation and warranty is qualified as to materiality or by reference to the existence of a Material Adverse Effect, true and correct (as so qualified) on and as of such Borrowing Date (or, in the case of any such representation or warranty expressly stated to have been made as of a specific date, as of such specific date), or (ii) if such representation and warranty is not so qualified, true and correct in all material respects on and as of such Borrowing Date (or, in the case of any such representation or warranty expressly stated to have been made as of a specific date, as of such specific date).

(e)    <u>No Default, Event of Default or Accelerated Amortization Event</u>. No event, act or condition shall have occurred and be continuing or would result from the Borrowing of Loans on such Borrowing Date, which would constitute a Default, an Event of Default (disregarding any cure period therefor) or Accelerated Amortization Event.

(f)    <u>Minimum Production</u>.  With respect to any Borrowing of the Loans hereunder (other than the Borrowing to be made on the Closing Date), the Borrower shall have delivered evidence to the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent, that during the two calendar months immediately preceding the proposed Borrowing Date, the Blocks shall have been selling a daily average volume of natural gas of at least 180 mmcfe/d from the Blocks.

(g)    <u>Compliance Certificate</u>.    The Administrative Agent shall have received a certificate, signed by a Responsible Officer of the Borrower, certifying that after giving effect on a *pro forma* basis to the Borrowing of the Loans on such Borrowing Date, the Loan Parties shall be in compliance with <u>Section 7.19</u>, and setting forth in reasonable detail the calculations to such effect.

(h)    <u>Release of Liens</u>.  With respect to the Borrowing of the Loans to be made on the Closing Date, the Administrative Agent shall have received all no interest letters, discharges, releases, terminations, subordinations or waivers which, in each case, are desirable or required to ensure the perfection and the first-ranking priority of each of the Collateral Documents and the Liens granted thereunder.

(i)    <u>No Contravention of Existing Debt</u>.    With respect to any Borrowing of the Loans hereunder (other than the first Borrowing), the Administrative Agent and the Lenders shall be satisfied (at their sole discretion) with calculations presented by the Borrower, that the making of such Borrowing, and the Incurrence of Indebtedness by the Borrower and the other Loan Parties in connection therewith shall not conflict with or result in any breach or contravention of the Canacol Existing Revolving Credit Agreement and/or the Canacol 2028 Notes Indenture.

(j)      Payment of Tax Liabilities.  With respect to the first Borrowing of the Loans hereunder, the Borrower shall have made arrangements in substance and form reasonably satisfactory to the Lenders for a portion of the proceeds of such Loans to be applied to the payment of outstanding tax liabilities of the Borrower and its Subsidiaries.

Without limiting the generality of the provisions of the last paragraph of Section 9.03, for purposes of determining compliance with the conditions specified in this Section 4.02, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders to enter into this Agreement and to make the Loans, each Loan Party hereby represents and warrants to the Administrative Agent, the Collateral Agent and the Lenders, as of the date hereof, as of the Closing Date and as of each Borrowing Date, that:

**5.01    Existence, Qualification and Power**.  Each Loan Party and each Colombian Branch (a) is duly organized, incorporated or formed, validly existing and, as applicable, in good standing under the Laws of the jurisdiction of its incorporation or organization, and (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to execute, deliver and perform its obligations under the Loan Documents to which it is a party.

**5.02    Authorization; No Contravention**.    The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any of its Subsidiaries, or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law.

**5.03    Governmental Authorization; Other Consents**.

(a)      No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, each Loan Party of this Agreement or any other Loan Document, other than filings with the Colombian Central Bank.

85

(b)    The Transactions, the performance thereof and the continuing obligations of each Loan Party under or in connection with the Loan Documents and the Transactions do not and will not result in the creation or imposition of any Lien on any property or asset of any Loan Party or any of its Subsidiaries (other than the Liens created pursuant to the Collateral Documents).

**5.04    Binding Effect**.

(a)    This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of each Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(b)    Each of the Colombian Promissory Notes shall entitle the holder thereof to commence an executory proceeding against the signatory thereto in the Colombian courts.  If any Lender enforces any Colombian Promissory Note before the courts of Colombia, it shall not be required to evidence to the Borrower or any other Person that such Colombian Promissory Note represents obligations of the Borrower under this Agreement nor that any condition herein has been satisfied.

**5.05    Financial Statements; No Material Adverse Effect; Existing Indebtedness**.

(a)    The Audited Financial Statements (i) were prepared in accordance with IFRS consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, (ii) fairly present the financial condition of the Borrower, its Subsidiaries and the Colombian Branches as of the date thereof and their results of operations for the period covered thereby in accordance with IFRS consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Borrower, its Subsidiaries and the Colombian Branches as of the date thereof, including liabilities for taxes, material commitments and Indebtedness.

(b)    The unaudited consolidated balance sheet of the Borrower, its Subsidiaries and the Colombian Branches dated June 30, 2024, and the related consolidated statements of income or operations, shareholders' equity and cash flows for the six-month period ended on that date and for the comparable period of the prior fiscal year of the Borrower (i) were prepared in accordance with IFRS consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present the financial condition of the Borrower, its Subsidiaries and the Colombian Branches as of the date thereof and their results of operations for the period covered thereby, subject, in the case of underline clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments.

86

(c)     Since December 31, 2023, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

(d)     The Loan Parties and the Colombian Branches have no Indebtedness outstanding as of the Closing Date, except for Indebtedness disclosed in <u>Schedule 5.05(d)</u>.

(e)     As of the Closing Date, neither the Loan Parties nor any of their Subsidiaries nor any of the Colombian Branches has any material contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments, except as referred to or reflected or provided for in the foregoing financial statements (including the notes thereto).

**5.06     Litigation**.  Except as set forth in <u>Schedule 5.06</u>, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Loan Parties after due and diligent investigation, threatened in writing or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any of their Subsidiaries or against any of the Colombian Branches or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the Transactions, or (b) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

**5.07     No Default; No Accelerated Amortization Event**.

(a)     Neither the Loan Parties nor any Subsidiary thereof nor any of the Colombian Branches is in default under or with respect to any Material Project Document or any other Contractual Obligation, except in each of the foregoing cases where such default could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     No Default, Event of Default or Accelerated Amortization Event has occurred and is continuing or would result from the consummation of the Transactions.

**5.08     Ownership of Property**.

(a)     The Colombian Guarantors and the Colombian Branches have a legally valid and enforceable right to operate, maintain and finance the Project and the Oil and Gas Properties associated therewith.

(b)     The Oil and Gas Properties operated by any Loan Party and by any of the Colombian Branches and, to the Loan Party's knowledge, the Oil and Gas Properties operated by any Person other than any Loan Party, have been maintained, operated and developed by such Loan Party, such Colombian Branche or such other Person in a good and workmanlike manner and in conformity in all material respects with all requirements of Law and in conformity in all material respects with the provisions of all leases, sub-leases or other contracts comprising a part of the Hydrocarbon Interests and other contracts and agreements forming a part of the Oil and Gas Properties.

87

(c)    No mortgage or financing statement or other instrument or recordation (or any conveyance to any trust) covering all or any part of the Collateral has been filed (or effected), except such as has been filed (or conveyed) in favor of the Collateral Agent.

(d)    Each of the Loan Parties and each of their Subsidiaries and each of the Colombian Branches has good and valid title to, or legally binding property right in, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, in each case free and clear of all Liens other than those Liens permitted by Section 7.01 and except for minor defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(e)    Each of the Loan Parties and each of their Subsidiaries and each of the Colombian Branches has good and valid title to, or legally binding property right in, or valid leasehold interests in, all its personal property material to its business, in each case free and clear of all Liens other than those Liens permitted by Section 7.01 and except for minor defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(f)    Each Loan Party's, each of their Subsidiaries' and each of the Colombian Branches' marketing, gathering, transportation, processing and treating facilities and equipment, if any, together with any marketing, gathering, transportation, processing and treating contracts in effect between or among such Loan Party and its Subsidiaries and the Colombian Branches, on the one hand, and any other Person, on the other hand, are sufficient to gather, transport, process or treat the volumes of production of Hydrocarbons from the Oil and Gas Properties reasonably anticipated to be produced during the term of this Agreement, and all related charges are accurately reflected and accounted for in the Base Case Model.

(g)    The Hydrocarbon Interests and operating agreements attributable to the Oil and Gas Properties are in full force and effect in all material respects in accordance with their terms.  Except for royalties held in suspense, all rents, royalties and other payments due and payable by the Loan Parties, any of their Subsidiaries and any of the Colombian Branches under such Hydrocarbon Interests and operating agreements have been properly and timely paid in all material respects.

(h)    The quantum and nature of any interest in and to the Oil and Gas Properties of the Loan Parties, any of their Subsidiaries and any of the Colombian Branches as set forth in the most recent Reserves Report includes the entire interest of such Persons in such Oil and Gas Properties as of the date of such applicable Reserves Report delivered by the Borrower to the Administrative Agent pursuant to Section 4.01(w) and are complete and accurate in all material respects as of the date of such applicable Reserves Report; there are no "back-in" or "reversionary" interests held by third parties which could materially reduce the interest of such Persons in such Oil and Gas Properties as reflected in the most recent Reserves Report.  The ownership of the Oil and Gas Properties by the Loan Parties, their Subsidiaries and the Colombian Branches entitles such Persons to the share of the Hydrocarbons produced therefrom or attributable thereto set forth as the Loan Parties' "net revenue interest" therein in all material respects as set forth in the Reserves Report delivered by Borrower to the Administrative Agent

88

pursuant to <u>Section 4.01(w)</u> and does not in any material respect obligate the Loan Parties or any of their Subsidiaries or any of the Colombian Branches to bear the costs and expenses relating to the maintenance, development or operations of the Oil and Gas Properties of such Persons in an amount in excess of the "working interest" of such Persons in its Oil and Gas Properties set forth in the Reserves Report delivered by the Borrower to the Administrative Agent pursuant to <u>Section 4.01(w)</u>, other than excesses (A) relating to customary provisions of operating agreements requiring parties thereto to pay the operator the share of costs of a defaulting party, (B) resulting from the acquisition of the interest of any non-participating parties pursuant to customary provisions of participation agreements, development agreements, exploration agreements and joint operating agreements, or (C) required in connection with the drilling of an obligation well or pursuant to a carried interest arrangement.

(i)     There is no overriding royalty interest in respect of the Oil and Gas Properties, other than as specified in <u>Schedule 7.05</u>.

**5.09     Environmental Compliance**.

(a)     The Loan Parties and each of their Subsidiaries and each of the Colombian Branches are in compliance in all material respects with the Environment and Social Requirements.

(b)     The Loan Parties and each of their Subsidiaries and each of the Colombian Branches have been issued and are in compliance in all material respects with all Permits required pursuant to the Environmental and Social Requirements, and to the best knowledge of the Loan Parties, there are no facts, circumstances or conditions reasonably likely to give rise to a denial, non-renewal, termination, suspension or revocation of any such Permit.

(c)     Neither the Loan Parties nor any of their Subsidiaries nor any of the Colombian Branches has received written notice of any Environmental Claim against or affecting any of the Loan Parties or any Subsidiary or any Colombian Branch, and to the best knowledge of the Loan Parties, there are no facts, circumstances or conditions that would reasonably be expected to give rise to an Environmental Claim.

**5.10     Insurance**.

(a)     All insurance policies required to be in place as of the Closing Date pursuant to <u>Section 6.07</u> have been obtained and are in full force and effect.

(b)     There is no insurance or reinsurance that has not been disclosed in writing to the Administrative Agent and the Lenders, if any, under which the Loan Parties or the Oil and Gas Properties are insured, reinsured or have any rights.

**5.11     Taxes**.

(a)     The Loan Parties and their Subsidiaries and each of the Colombian Branches have filed all federal, state and other material tax returns and reports required to be filed, and have paid all federal, state and other material taxes, assessments, fees and other

89

governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with IFRS.  There is no proposed tax assessment against the Loan Parties or any Subsidiary thereof that would, if made, have a Material Adverse Effect.  Neither the Loan Parties nor any Subsidiary thereof nor any of the Colombian Branches is party to any tax sharing agreement.

(b)    Under applicable Law, there is no restriction or limitation on the obligation of the Loan Parties to pay any additional amounts payable pursuant to Section 3.01(b).

**5.12    Subsidiaries; Equity Interests**.

(a)    As of the Closing Date, the Loan Parties have no Subsidiaries and no Colombian Branches other than those specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests in such Subsidiaries and such Colombian Branches, as applicable, have been validly issued, are fully paid and nonassessable and are owned by the relevant Loan Party in the amounts specified in Schedule 5.12 free and clear of all Liens (other than Liens created pursuant to the Loan Documents).  None of the Loan Parties, nor any of their Subsidiaries nor any of the Colombian Branches have any equity investments in any other corporation or entity other than those specifically disclosed in Schedule 5.12.  All of the outstanding Equity Interests in each Loan Party, each of their Subsidiaries and each of the Colombian Branches have been validly issued, are fully paid and nonassessable and are owned by the Persons and in the amounts specified in Schedule 5.12 free and clear of all Liens.

(b)    Except as set forth in Schedule 5.12 there are no outstanding rights, plans, options, warrants, calls, conversion rights or any obligations, agreements, arrangements or commitments of any character, either firm or conditional (including, without limitation, pursuant to uncapitalized capital contributions), obligating the Loan Parties, any of their Subsidiaries or any of the Colombian Branches to issue, deliver or sell, or cause to be issued, delivered or sold, any shares, Capital Stock or any securities exchangeable for, or convertible into, shares, Capital Stock or obligating the Loan Parties, any of their Subsidiaries or any of the Colombian Branches to grant, extend or enter into any such agreement, arrangement, requirement or commitment or providing for the right on the part of any shareholder to subscribe for such shares.

(c)    CNEMED S.A.S. does not have any material Property.

(d)    Other than the Colombian Companies and the Colombian Branches, no Loan Party owns any Property in Colombia (other than receivables subject to transactions involving the discount or sale of notes receivable or accounts receivable among Loan Parties).

(e)    Other than the Colombian Companies and CNEMED S.A.S., the Borrower does not have any Subsidiary incorporated, formed or organized, as applicable, and existing under the Laws of Colombia.

**5.13    Margin Regulations; Investment Company Act.**

90

(a)    None of the Loan Parties nor any of their Subsidiaries is engaged nor will it engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), or extending credit for the purpose of purchasing or carrying margin stock.

(b)    None of the Loan Parties nor any of their Subsidiaries is required to be registered as an "investment company" under the Investment Company Act of 1940, as amended.

**5.14    Disclosure**.  Each Loan Party has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or any of the Colombian Branches is subject, and all other matters known to it, that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished in writing by or on behalf of the Loan Parties to the Administrative Agent or any Lender in connection with the Transactions and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, information of a general industry-wide nature or economic nature and other forward looking information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time, it being understood that such projections are not to be viewed as facts and that actual results during the period covered by any such projections may differ significantly from the projected results.

**5.15    Compliance with Laws**.  Each Loan Party and each Subsidiary thereof and each of the Colombian Branches is in compliance with the requirements of (i) all applicable Anti-Money Laundering Laws, Sanctions Laws and Anti-Corruption Laws, and (ii) all other applicable Laws, except, in the case of such other applicable Laws, in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

**5.16    Intellectual Property; Licenses, Etc**.  The Loan Parties and each Subsidiary thereof and each of the Colombian Branches owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights that are reasonably necessary for the operation of its respective businesses, without conflict with the rights of any other Person.  To the best knowledge of the Loan Parties, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by the Loan Parties or any Subsidiary thereof infringes upon any rights held by any other Person.

**5.17    Legal Form**.

91

Each of the Loan Documents to which each Loan Party is a party is in proper legal form under the laws of the jurisdiction of the relevant Loan Party for the enforcement thereof against the Loan Party under such law. To ensure the legality, validity, enforceability or admissibility in evidence of this Agreement and each other Loan Document in the jurisdiction of each Loan Party, it is not necessary that (i) this Agreement or any other Loan Document be filed or recorded with any Governmental Authority in such jurisdiction; or (ii) that any stamp or similar tax be paid on or in respect of this Agreement or any other document to be furnished under this Agreement, unless such stamp or similar taxes have been paid by the Loan Parties.

**5.18    Labor Matters**. There is (i) no unfair labor practice complaint pending or threatened against any Loan Party or any Subsidiary thereof or any of the Colombian Branches or before any other Governmental Authority, and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is so pending or threatened against any Loan Party or any Subsidiary thereof or any of the Colombian Branches, (ii) no strike, labor dispute, slowdown or stoppage pending or threatened against the any Loan Party or any Subsidiary thereof or any of the Colombian Branches, (iii) no representation proceeding pending with any Governmental Authority involving the employees of any Loan Party or of any Subsidiary thereof or any of the Colombian Branches, (iv) no union representation question existing with respect to the employees of any Loan Party or any Subsidiary thereof or any of the Colombian Branches and (v) no union organizing activity taking place, except, in each case, as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.19    Solvency**. Upon giving effect to the execution and delivery of the Loan Documents by the parties thereto and the consummation of the Transactions, each Loan Party will be Solvent as of the Closing Date.

**5.20    Rank of Debt**. The obligations evidenced by each Loan Document to which each Loan Party is a party are and will at all times be direct and unconditional general obligations of the Loan Parties and rank and will at all times rank in right of payment and otherwise at least *pari passu* with all other senior unsecured Indebtedness of the Loan Parties, if any, whether now existing or hereafter outstanding.

**5.21    Commercial Activity; Absence of Immunity**. Each Loan Party is subject to civil and commercial law with respect to its obligations under this Agreement, and each other Loan Document to which it is a party. The execution, delivery and performance by each Loan Party of this Agreement and each other Loan Document to which it is a party constitute private and commercial acts rather than public or governmental acts. Neither the Loan Parties nor any of their properties are entitled to any right of immunity in any jurisdiction from suit, court jurisdiction, judgment, attachment (whether before or after judgment), setoff or execution of a judgment or from any other legal process or remedy relating to its obligations under this Agreement or any of the other Loan Documents to which it is a party.

**5.22    Use of Proceeds**.

(a)    The Borrower will use the proceeds of the Loans to, (i) with respect to the proceeds of the first Borrowing hereunder, to pay tax liabilities of the Borrower and to pay

fees and expenses incurred in connection with the Transactions, and (ii) with respect to the proceeds of any subsequent Borrowing hereunder, to finance general corporate purposes of the Loan Parties.

(b)     No part of the proceeds of the Loans will be used for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter be in effect or for any purpose which violates or is inconsistent with the provisions of Regulation U or Regulation X of the Board.  The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), or extending credit for the purpose of purchasing or carrying margin stock.

**5.23     Canacol Existing Revolving Credit Agreement**.  The Borrower has delivered to the Administrative Agent a true, complete and correct copy of the Canacol Existing Revolving Credit Agreement, including any amendments, supplements or modifications with respect thereto.  The Canacol Existing Revolving Credit Agreement has been validly authorized, executed and delivered by the Borrower and the Loan Parties party thereto and constitutes the valid and binding obligation of the Borrower and the Loan Parties party thereto in accordance with the terms thereof.  No default, event of default or similar event has occurred and is continuing or would occur after giving effect to this Agreement and the first Borrowing under the Canacol Existing Revolving Credit Agreement.

**5.24     Canacol 2028 Notes Indenture**.  The Borrower has delivered to the Administrative Agent a true, complete and correct copy of the Canacol 2028 Notes Indenture, including any amendments, supplements or modifications with respect thereto.  The Canacol 2028 Notes Indenture has been validly authorized, executed and delivered by the Borrower and the Loan Parties party thereto and constitutes the valid and binding obligation of the Borrower and the Loan Parties party thereto in accordance with the terms thereof.  No default, event of default or similar event has occurred and is continuing or would occur after giving effect to this Agreement and the first Borrowing under the Canacol 2028 Notes Indenture.

**5.25     Material Project Documents; Related Parties Agreements.**

(a)     The Loan Parties have made available to the Administrative Agent a true, correct and complete copy of each of the Material Project Documents as in effect on the date hereof.  Each of the Material Project Documents has been validly authorized, executed and delivered by the relevant Loan Party and constitutes the valid and binding obligation of the relevant Loan Party in accordance with the terms thereof.  The Loan Parties are not in default, and, to their knowledge, as of the Closing Date no other party to any Material Project Document is in default (including by reason of a termination by such other party) of any provision under such Material Project Document, except as would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)     The Borrower has made available to the Administrative Agent a true, correct and complete copy of each of the Related Parties Agreements as in effect on the date hereof.

93

### 5.26    **Permits**.

(a)    Set forth in <u>Schedule 5.26(a)</u> is a list of all material public, regulatory or governmental licenses, concessions (other than the E&P Agreements), franchises, certificates, no-objections, permits, consents, orders and approvals relating to the use of Oil and Gas Properties of the Loan Parties, their Subsidiaries and the Colombian Branches, and other authorizations required from time to time under applicable Law for the Loan Parties, their Subsidiaries and the Colombian Branches to execute, deliver and perform its obligations under each of the Material Project Documents and to implement, construct and operate the Project (collectively, the "<u>Permits</u>").  For the avoidance of doubt, the E&P Agreements shall not be deemed to constitute "Permits."

(b)    Each Loan Party, each of its Subsidiaries and each of the Colombian Branches has all Permits necessary for the ownership and, if any Loan Party, any of its Subsidiaries or any of the Colombian Branches is the operator, operation of its Oil and Gas Properties and the conduct of its businesses, and is in compliance in all material respects with the terms and conditions of all such Permits.

(c)    The Loan Parties, their respective Subsidiaries and the Colombian Branches have not received any written notice of proceedings relating to the revocation, cancellation, expropriation or modification of any Specified Permit.

(d)    The Loan Parties have no reason to believe that:

(i)                    any Specified Permit which requires renewal will not be renewed as and when required under applicable Law and without imposing any further restrictions or conditions thereon;

(ii)                    any Specified Permit will be withdrawn, suspended, canceled, varied, surrendered or revoked; or

(iii)                    any Specified Permit required to be obtained following the date hereof will not be obtained in the ordinary course.

(e)    Except for rights that can reasonably be expected to be obtained on commercially reasonable terms at the time required, the Material Project Documents contain all material contractual rights that are necessary for the operation and ownership of the Project.

### 5.27    **Collateral Matters; Liens**.

(a)    Upon the execution of each Collateral Document, the provisions of such Collateral Document shall be effective to create in favor of the Collateral Agent a legal, valid and enforceable fully perfected first priority Lien in the Collateral described therein in accordance with the terms thereof, subject to no other Liens.

(b)    Neither the establishment of the Liens created by the Collateral Documents, nor the exercise of the rights and remedies contemplated by the Collateral

Documents at any time, contravenes any provision of applicable Law or any order, writ, injunction or decree of any Governmental Authority.

(c)    None of the Loan Parties, their Subsidiaries nor any of the Colombian Branches has received any notice of any adverse claims by any Person in respect of its ownership or entitlement to the assets and rights assigned as Collateral, and the Collateral and the distribution of the proceeds resulting from the enforcement of the Collateral Documents shall be governed solely by the terms of the Collateral Documents.

### 5.28    Sanctions Laws.

(a)    None of the Loan Parties, any of their Subsidiaries, any of the Colombian Branches nor, to the knowledge of the Loan Parties, any director, officer, employee, agent, or Affiliate of the Loan Parties or any of their Subsidiaries is a Person that is, or is owned or Controlled by Persons that are: (i) a Sanctions Target; or (ii) located, organized or resident in a Sanctioned Jurisdiction.

(b)    Each of the Loan Parties and their Subsidiaries and the Colombian Branches, and, to the knowledge of the Loan Parties, their respective directors, officers, employees, agents, and Affiliates, are in compliance with Sanctions Laws.

(c)    Each of the Loan Parties and their Subsidiaries and the Colombian Branches have instituted and maintain policies and procedures designed to ensure continued compliance with the Sanctions Laws.

### 5.29    Anti-Corruption Laws.

(a)    None of the Loan Parties, any of their Subsidiaries, any of the Colombian Branches nor, to the knowledge of the Loan Parties, any director, officer, agent, employee or other Person acting on behalf of the Loan Parties or any of their Subsidiaries or any of the Colombian Branches has taken any action, directly or indirectly, that would result in a violation by such Persons of the Anti-Corruption Laws.

(b)    Each of the Loan Parties and their Subsidiaries and the Colombian Branches have instituted and maintain policies and procedures designed to ensure continued compliance with the Anti-Corruption Laws.

### 5.30    Anti-Money Laundering Laws.  None of the Loan Parties, any of their Subsidiaries, any of the Colombian Branches, or, to the knowledge of the Loan Parties, any director, officer, employee, agent, or Affiliate of the Loan Parties or any of their Subsidiaries or any of the Colombian Branches, has violated or is violating any Anti-Money Laundering Laws.

### 5.31    Beneficial Ownership Certification.  As of the Closing Date, the information included in the Beneficial Ownership Certification delivered by each Loan Party is true and correct in all respects.

**5.32    Accounts**.  Other than the accounts constituting Collateral pursuant to the Loan Documents, none of the Loan Parties, any of their Subsidiaries nor any of the Colombian Branches maintains any deposit accounts, investment accounts or other similar account designated as an account into which any Offtaker is required to make any payment or transfer in respect of Receivables that do not constitute Promigas Trust Receivables.

**5.33    Existing Offtakers**.  As of the Closing Date, Schedule 5.33 hereto sets forth a complete and accurate list of all Existing Offtakers.

**5.34    Gas Imbalances**.  On a net basis there are no Gas Imbalances in excess of 0.20 bcf of gas (on a mcf equivalent basis), with respect to any Oil and Gas Properties which would require the Loan Parties to deliver Hydrocarbons produced from such Oil and Gas Properties at some future time without then or thereafter receiving full payment therefor with an aggregate Fair Market Value exceeding U.S.$1,000,000. For the avoidance of doubt, the foregoing does not apply to take or pay, deferred revenue or other prepayments with respect to any Oil and Gas Properties.

**5.35    Reserves Reports**.  (i) The assumptions stated or used in the preparation of each Reserves Report are reasonable (it being understood by the Administrative Agent and the Lenders that assumptions as to future results are subject to significant uncertainty and that no assurance can be given that any particular projections will be realized and that the Loan Parties do not warrant that such assumptions will ultimately prove to have been accurate), (ii) all information furnished by any Loan Party to the Petroleum Engineer for use in the preparation of each Reserves Report was accurate in all material respects at the time furnished, and (iii) at the time furnished, no Reserves Report omitted any statement or information necessary to cause the same not to be misleading to the Administrative Agent and the Lenders in any material respect.

**5.36    Sale Production**.  No Oil and Gas Property is subject to any contractual or other arrangement (i) whereby payment for production is or can be deferred for a substantial period after the month in which such production is delivered (in the case of oil, not in excess of 60 days, and in the case of gas, not in excess of 90 days) or (ii) whereby payments are made to any Loan Party other than by checks, drafts, wire transfer advices or other similar writings, instruments or communications for the immediate payment of money.  Except for production sales contracts, processing agreements, transportation agreements and other agreements relating to the marketing of production that are listed on Schedule 5.36, all contractual or other arrangements for the sale, processing or transportation of Hydrocarbon production (or otherwise related to the marketing of production) are *bona fide* arm's length transactions with third parties not affiliated with any Loan Party.  The Loan Parties are presently receiving a price for all production from (or attributable to) each Oil and Gas Property covered by a Hydrocarbon production sales contract or marketing contract listed on Schedule 5.36 that is computed in all material respects in accordance with the terms of such contract.  All production and sales of Hydrocarbons produced or sold from any Oil and Gas Properties has been accounted for and paid to the Persons entitled thereto, in compliance in all material respects with all applicable requirements of Law, except with respect to (i) unpaid amounts that are the subject of litigation or other judicial proceedings, (ii) amounts held in suspense, (iii) immaterial payment issues arising in the ordinary course of business and (iv) disputes of a *de minimis* nature.  The Loan

96

Parties are the holders of legal title to the Receivables, and the Receivables are free and clear of any Liens (other than any Liens created under the Collateral Documents or the Promigas Trust).

5.37    **Canadian Pension Plan**.  No Loan Party or any Subsidiary thereof sponsors, administers, contributes or is required to contribute to or has any liability under or in respect of any Canadian Defined Benefit Plan.

5.38    **Modern Slavery Laws**.

(a)    The Loan Parties and their Subsidiaries are and have been at all times in compliance with all applicable Forced and Child Labour Laws.

(b)    There are no actions, conditions or circumstances pertaining to the business of the Loan Parties and each of their Subsidiaries that would reasonably be expected to give rise to any future claims or investigations under Forced and Child Labour Laws.

(c)    None of the Loan Parties or any of their Subsidiaries (A) currently uses, employs or engages or has in the last five years used or employed or engaged in Forced Labour or Child Labour; or (B) has in the last five years aided, abetted, counseled or participated in any of the activities prohibited under Forced and Child Labour Laws.  The Loan Parties and each of their Subsidiaries has instituted, maintained and enforced policies and procedures designed with the intention of promoting and ensuring compliance with Forced and Child Labour Laws and preventing the use of Forced Labour or Child Labour by itself and any of its direct or indirect suppliers.

(d)    To the knowledge of the Loan Parties, no direct or indirect supplier of their respective businesses operates in breach or violation of Forced and Child Labour Laws or uses or employs or engages in practices of Forced Labour or Child Labour.

(e)    The Borrower and each of its Subsidiaries, as applicable, has timely filed all reports, notifications, applications, statements, documents, registrations, filings, amendments, supplements and submissions required to be filed under applicable Forced and Child Labour Laws, and each such filing was true and correct as of the date of the submission and any legally necessary or required updates, changes, corrections, amendments, supplements, or modifications to such filings have been submitted to the applicable Governmental Authorities.

5.39    **Exchange Controls**. Under current laws and regulations of Canada and each political subdivision thereof, all interest, principal, premium, if any, and other payments due or to be made pursuant to the Loan Documents may be freely transferred out of Canada, as applicable, and may be paid in, or freely converted into, Dollars.

## ARTICLE VI

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, each of the Loan Parties agrees to, and to cause each of its Subsidiaries and each of the Colombian Branches to:

**6.01    Financial Statements**.  Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent and the Required Lenders:

(a)    as soon as available, but in any event within 90 days after the end of each fiscal year of the Borrower (in any case, commencing with the fiscal year ended December 31, 2024), a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal year, and the related Consolidated statements of income or operations, changes in shareholders' equity, and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with IFRS, audited and accompanied by a report and opinion of the Auditor, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit to the effect that such Consolidated financial statements are fairly stated in all material respects when considered in relation to the Consolidated financial statements of the Borrower and its Subsidiaries; and

(b)    as soon as available, but in any event within 45 days after the end of each fiscal quarter of the Borrower (in any case, commencing with the fiscal quarter ended June 30, 2024), a Consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, the related Consolidated statements of income or operations for such fiscal quarter and for the portion of the Loan Party's fiscal year then ended, and the related Consolidated statements of changes in shareholders' equity, and cash flows for the portion of the Borrower's fiscal year then ended, in each case setting forth in comparative form, as applicable, the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, (i) certified by a Responsible Officer of the Borrower as fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of the relevant Loan Party and its Subsidiaries in accordance with IFRS, subject only to normal year-end audit adjustments and the absence of footnotes and (ii) approved by the Board of Directors of the Borrower.

**6.02    Certificates; Other Information**.  Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent and the Required Lenders:

(a)    concurrently with the delivery of the financial statements referred to in <u>Sections 6.01(a)</u> and <u>(b)</u>, a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower (which delivery may be by electronic communication including fax or email and shall be deemed to be an original authentic counterpart thereof for all purposes)

98

(i) certifying as to whether a Default, Event of Default or Accelerated Amortization Event has occurred and, if a Default, Event of Default or Accelerated Amortization Event has occurred, specifying the details thereof and any action taken or proposed to be taken by the Loan Parties with respect thereto, (ii) certifying the compliance by the Loan Parties with <u>Section 7.19</u> and setting forth in reasonable detail the calculations required to establish the compliance by the Loan Parties with such section, (iii) stating whether any change in IFRS or in the application thereof has occurred since the date of the financial statements referred to in <u>Section 6.01(a)</u> or <u>Section 6.01(b)</u>, as applicable, and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate, (iv) to the extent not previously disclosed to the Administrative Agent, containing an updated listing of any Oil and Gas Properties or Hydrocarbon Interests acquired by any Loan Party since the date of the most recent updated list delivered pursuant to this clause (or, in the case of the first such list so delivered, since the Closing Date), and (v) describing in a schedule, a detail of payments made to a Loan Party Related Person during the period reported in the relevant financial statements;

(b)    concurrently with the delivery of the financial statements referred to in <u>Sections 6.01(a)</u> and <u>(b)</u>, lease operating statements, in form and substance reasonably satisfactory to the Administrative Agent, setting forth a statement of gross and net production, sales proceeds and expense data of all Hydrocarbons produced from the Oil and Gas Properties during the prior fiscal quarter, together with such other related information as the Administrative Agent may reasonably request, and a daily production report for each well;

(c)    concurrently with the delivery of the financial statements referred to in <u>Sections 6.01(a)</u> and <u>(b)</u>, a schedule, certified by a Responsible Officer of the Loan Parties, containing a detail of the Capital Expenditures made by the Loan Parties and their Subsidiaries during the three-month period ended on the last day of the relevant fiscal quarter (including a comparison of actual costs with estimated costs);

(d)    concurrently with the delivery of the financial statements referred to in <u>Sections 6.01(a)</u> and <u>(b)</u>, a certificate signed by a Responsible Officer of the Borrower together with a summary operating statement with respect to the Project in form and substance reasonably satisfactory to the Administrative Agent, which shall include in reasonable detail with respect to the financial year or quarter, as applicable, reported in such financial statements a quarterly and year-to-date numerical and narrative assessment of (1) the Loan Parties' compliance with each material category in the then current Operating Plan and Budget (including a description of the expenditures on operating and maintenance expenses and maintenance capital expenses within such categories), (2) cash balances, (3) maintenance activity, (4) other than in the ordinary course of business, replacement of equipment of value in excess of U.S.$1,000,000 and (5) material unresolved disputes with contractors, materialmen, suppliers or others and any related claims against the Loan Parties;

(e)    concurrently with the delivery of the financial statements referred to in <u>Sections 6.01(a)</u> and <u>(b)</u>, a report, in form and substance reasonably acceptable to the Administrative Agent, setting forth as of the last Business Day of the most recently ended fiscal year or quarter (as applicable), a summary of the hedging positions of each Loan Party under all Hedging Agreements (including any contracts of sale which provide for prepayment for deferred

shipment or delivery of Hydrocarbons or other commodities, and, for the avoidance of doubt, including any new Hedging Agreements, whether physical or otherwise, entered into after the Closing Date) of each Loan Party, including the type, term, effective date, termination date and notional principal amounts or volumes, the hedged price(s), interest rate(s) or exchange rate(s), as applicable, and any new credit support agreements relating thereto;

(f)    a revised Base Case Model within 30 days of any material change that adversely affects the Base Case Model;

(g)    to the extent not previously disclosed to the Administrative Agent, promptly upon the acquisition thereof, a listing of any Hydrocarbon Interests or real property acquired by any Loan Party at a purchase price in excess of U.S.$1,000,000 individually or in the aggregate together with all such other acquisitions in any calendar year, and a listing of any intellectual property acquired by any Loan Party at a purchase price in excess of U.S.$1,000,000 individually or in the aggregate together with all other such acquisition in any calendar year, in each case since the date of the most recent list delivered pursuant to this Section 6.02(g) (or, in the case of the first such list so delivered, since the Closing Date);

(h)    promptly upon delivery to or by a counterparty to a Material Project Document, copies of any material notices or material documents delivered by or to any Loan Party, including any notices of a claim of force majeure, suspension of work, default, termination, material claims or material demands (including any claim for liquidated damages);

(i)    promptly after any request by the Administrative Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any relevant Loan Party by independent accountants in connection with the accounts or books of the relevant Loan Party or any Subsidiary, or any audit of any of them;

(j)    promptly following any request therefor, information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" requirements under the Act, the Beneficial Ownership Regulation or other applicable Anti-Money Laundering Laws;

(k)    prompt (and in any event within five Business Days) notice (i) after receipt by any Loan Party of any written notice of the commencement, or threatened commencement, of proceeding relating to the revocation, cancellation, expropriation or modification of any material permit (including, without limitation, any such permit required for the operation of its business) and (ii) after any Loan Party obtains knowledge of the occurrence of, or reasonably believes that, any permit material to any material part of its business (A) which requires renewal will not be renewed as and when required under applicable Law and without imposing any further material restrictions or conditions thereon, (B) will be withdrawn, suspended, cancelled, varied, surrendered or revoked and not promptly replaced or reinstated, or (C) required to be obtained following the date hereof will not be obtained in the ordinary course or otherwise as and when necessary;

100

(l)    (i) on or before March 31 of each year, a Reserves Report prepared by the Petroleum Engineer dated as of December 31 of the previous year; (ii) on or before August 31 of each fiscal year, a Reserves Report prepared by (A) the Petroleum Engineer or (B) petroleum engineers who are employees of a Loan Party or an Affiliate thereof, in substantially the same form and substance as the Reserves Report referred to in Section 6.02(l)(i), in the case of (ii)(A) and (ii)(B), dated as of June 30 of such year; and (iii) in case the Administrative Agent (acting at the instruction of the Required Lenders) notifies the Borrower in writing that Lenders comprising Required Lenders do not agree with the information contained in a Reserves Report prepared (x) pursuant to clause (i) or (ii) above, or (y) pursuant to Section 6.02(t), then within 60 days after receipt of such notice, an additional Reserves Report prepared by any of the firms of engineers identified in Schedule 6.02(l), at the sole cost and expense of the Loan Parties, dated as of the first day of the month during which the Borrower receives such request.  Any Reserves Reports delivered pursuant to this Section 6.02(l) shall be accompanied by a report containing the PV 10 Value as of the "as of" date of such Reserves Report, together with a description in reasonable detail of the calculation to determine such PV 10 Value, and to the extent requested by the Required Lenders, since the date of the last Reserves Report previously delivered hereunder, (A) information regarding any Oil and Gas Property sales, (B) information regarding any Oil and Gas Property purchases, (C) changes in categories concerning the Oil and Gas Properties owned by the Loan Parties which have attributable to them Proved Reserves and containing information and analysis with respect to the Proved Reserves of the Loan Parties as of the date of such report, (D) updated monthly production history of each category of Reserves as of such date, (E) updated monthly production forecasts for each category of Reserves as of such date, and (F) the lease operating expenses attributable to the Oil and Gas Properties of the Loan Parties for the prior 12-month period;

(m)    promptly (and, in any event within five Business Days) after any Loan Party obtains knowledge of the occurrence of any Default or Event of Default or any "default," "event of default," "termination event," "suspension" or similar event (including, without limitation, the occurrence of any act of God or *force majeure* event) under any Hydrocarbon Sale Agreement or Material Project Document, a certificate of a Responsible Officer of such Loan Party setting forth the details thereof and the action(s) that is/are being taken or is/are proposed to be taken with respect thereto;

(n)    promptly (and, in any event, within five Business Days) after any Loan Party gives or receives any material written notice pursuant to any Hydrocarbon Sale Agreement;

(o)    within ten Business Days of entering into any Hydrocarbon Sale Agreement (or any amendment, modification, supplement or renewal thereof), (i) written notice thereof, together with a copy of such Hydrocarbon Sale Agreement (or amendment, modification, supplement or renewal thereof), and (ii) documentation in substance and form satisfactory to the Administrative Agent evidencing that a first priority fully perfected Lien in favor of the Collateral Agent (for the benefit of the Lenders) as additional collateral for the Obligations of the Loan Parties under the Loan Documents (subject to no other Liens, except to the extent permitted under Section 7.01) has been created in respect of the rights of the Loan Parties or any Subsidiary thereof under such Hydrocarbon Sale Agreement;

(p)    prompt (and in no event, later than five Business Days) notice (i) after receipt by any Loan Party of any written notice of the commencement, or threatened commencement, of proceedings relating to the revocation, cancellation, expropriation or modification of any Specified Permit and (ii) after any Loan Party obtains knowledge of the occurrence of, or reasonably believes that, any Specified Permit necessary to any material part of its business (A) which requires renewal will not be renewed as and when required under applicable Law and without imposing any further material restrictions or conditions thereon; (B) will be withdrawn, suspended, canceled, varied, surrendered or revoked and not promptly replaced or reinstated; or (C) required to be obtained following the date hereof will not be obtained in the ordinary course or otherwise as and when necessary;

(q)    no later than 25 days prior to the beginning of each fiscal year of the Borrower, an Operating Plan and Budget (with shall cover the succeeding fiscal year of the Loan Parties), broken down by line items in a level of detail consistent with the initial Operating Plan and Budget, for each month during the relevant budget period and prepared in accordance with the Borrower's customary accounting policies and based on the Borrower's projections for the upcoming fiscal year;

(r)    promptly after the formation of any pool or unit in accordance herewith, a conformed copy of the recorded pooling agreement, declaration of pooling, or other instrument creating the pool or unit and, in the event any proceeding of any Governmental Authority which seeks the pooling of unitizing of all or any part of the Oil and Gas Properties is commenced, prompt written notice thereof to the Administrative Agent;

(s)    not later than 30 days after the end of each fiscal quarter of the Borrower (commencing with the fiscal quarter ending September 30, 2024), a certificate signed by a Responsible Officer of the Borrower, certifying the (i) daily gas production of the Blocks, (ii) daily water production of the Blocks and (iii) pressure per well in the Blocks, in each case during the fiscal quarter most recently ended;

(t)    concurrently with the delivery of the financial statements referred to in Section 6.01(b) for the fiscal quarters of the Borrower ending on March 31 and September 30 of each fiscal year of the Borrower, a report, in form and substance reasonably acceptable to the Administrative Agent, setting forth if the wells associated with the Blocks, as of the last day of the fiscal quarter most recently ended, are producing oil and gas in amounts at least 85% consistent with the projected production in the Reserves Report most recently delivered pursuant to Section 6.02(l); provided that if the result of such report is that such wells are not producing oil and gas in amounts at least 85% consistent the projected production in such report, then together with such report the Borrower shall deliver an additional report prepared by petroleum engineers who are employees of a Loan Party or an Affiliate thereof, in substantially the same form and substance as the most recent Reserves Report delivered pursuant to Section 6.02(l);

(u)    not later than 30 days after the end of each fiscal year of the Borrower (commencing with the fiscal year ending December 31, 2025), an Annual Drilling Plan for the year in which such plan is delivered; provided that any such Annual Drilling Plan

102

delivered at any time that the Loan Parties are in Default of <u>Section 7.19</u> shall have to be in form and substance satisfactory to the Lenders;

        (v)   a revised Annual Drilling Plan within 30 days of any material change that adversely affects (i) the Borrower or (ii) the interest of the Lenders in any material respects;

        (w)   not later than the fifth Business Day of each calendar month, deliver to the Administrative Agent a detailed report of the oil and natural gas sold from the Blocks during the immediately preceding calendar month, and stating if the average volume of oil and natural gas sold from the Blocks, on account of the Loan Parties, during the immediately preceding two calendar months exceeded 130 mmcfe/d;

        (x)   in case of any Default caused by non-compliance with Environmental and Social Requirements, within 30 days following the occurrence thereof, a Corrective Plan in respect of such breach, which shall be supplemented and/or modified by the Loan Parties with any reasonable request therefor by the Lenders promptly following such request (and in any event not later than 30 days after the receipt of such request from any such Lender);

        (y)   not later than 15 days after the consummation thereof, documentation evidencing the consummation of the Permitted Corporate Reorganization, together with a certificate signed by a Responsible Officer of the Borrower certifying that such documentation is true, complete and correct, and certifying the date on which the Permitted Corporate Reorganization was consummated; and

        (z)   promptly, such additional information regarding the business, financial or corporate affairs of the Loan Parties or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request.

Each Loan Party hereby acknowledges that (a) the Administrative Agent and/or the Arranger may, but shall not be obligated to, make available to the Lenders materials and/or information provided by or on behalf of the Loan Parties hereunder (collectively, "<u>Loan Parties' Materials</u>") by posting the Loan Parties' Materials on Debt Domain, IntraLinks, Syndtrak or another similar electronic system (the "<u>Platform</u>") and (b) certain of the Lenders (each, a "<u>Public Lender</u>") may have personnel who do not wish to receive material non-public information with respect to the Loan Parties or their Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Loan Parties hereby agree that (w) all Loan Parties' Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Loan Parties' Materials "PUBLIC," the Loan Parties shall be deemed to have authorized the Administrative Agent, the Arranger and the Lenders to treat such Loan Parties' Materials as not containing any material non-public information with respect to the Loan Parties or its securities for purposes of United States Federal and state securities laws

(provided, however, that to the extent such Loan Parties' Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Loan Parties' Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent and the Arranger shall be entitled to treat any Loan Parties' Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

Each delivery of a Reserves Report to the Administrative Agent pursuant to this Agreement shall constitute a representation and warranty by the Loan Parties to the Administrative Agent and the Lenders with respect to the matters referenced in Section 5.35.

     **6.03    Notices**.  Promptly notify the Administrative Agent and each Lender of:

     (a)    the occurrence of any Default, Event of Default or Accelerated Amortization Event;

     (b)    any termination or threatened termination of any of the Material Project Documents; and

     (c)    any matter that has resulted or would reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party or any of its Subsidiaries; (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any of its Subsidiaries and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any of its Subsidiaries.

     Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the relevant Loan Party setting forth details of the occurrence referred to therein and stating what action the relevant Loan Party has taken and proposes to take with respect thereto.  Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

     **6.04    Payment of Obligations**.  Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves in accordance with IFRS are being maintained by the Loan Parties or such Subsidiary; and (b) all lawful claims which, if unpaid, would by law become a Lien upon its property; except, in each case, to the extent that such failure to pay or discharge could not reasonably be expected to cause a Material Adverse Effect.

     **6.05    Preservation of Existence, Etc**.  (a) Preserve, renew and maintain in full force and effect its legal existence under the Laws of the jurisdiction of its incorporation or organization, as applicable; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so would not reasonably be expected to have a Material

Adverse Effect; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which would reasonably be expected to have a Material Adverse Effect.

### 6.06    Maintenance of Properties.

(a)    (i) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted; (ii) make all necessary repairs, renewals, replacements, betterments and improvements thereto in accordance with Prudent Industry Practices; and (iii) otherwise ensure the continued operation of all property material to the conduct of its business in a manner consistent with Prudent Industry Practices.

(b)    Operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with Prudent Industry Practices and in compliance with all applicable contracts and agreements and in compliance with all governmental requirements, including applicable proration requirements, and all applicable Laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(c)    Keep and continue all material leases, estates and interests constituting producing Oil and Gas Properties in accordance with the terms thereof and not permit the same to lapse or otherwise become materially impaired for failure to comply with the obligations thereof, whether express or implied; provided that this provision shall not prevent any Loan Party from (i) abandoning and releasing any such leases upon their termination as the result of cessation of production in paying quantities that did not result from the failure of any Loan Party to maintain such production as a reasonably prudent operator or (ii) abandoning and releasing non-productive depths or formations.

(d)    To the extent that the Oil and Gas Properties are operated by any Loan Party, any of its Subsidiaries or any Colombian Branch, act as a prudent operator in an effort to identify and prevent the occurrence of any drainage of Hydrocarbons from the Oil and Gas Properties and carry out all such operations as would a reasonable and prudent operator in accordance with standard industry practices in Colombia; and, to the extent that the Oil and Gas Properties are not operated by any Loan Party, any of its Subsidiaries or any Colombian Branch, reasonably utilize the property and contractual rights of each such Person as a prudent owner in an effort to identify and prevent the occurrence of any drainage of Hydrocarbons from the Oil and Gas Properties and to cause the reasonable and prudent operation thereof in accordance with standard industry practices in Colombia.

(e)    Promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all material rentals, royalties, expenses and indebtedness accruing under the leases or other material agreements affecting or pertaining to its

Oil and Gas Properties or other material Properties and do all other things necessary to keep unimpaired their material rights with respect thereto and prevent any forfeiture thereof or material default thereunder.

(f)     Promptly perform or make reasonable and customary efforts to cause to be performed in all material respects, in accordance with industry standards, the material obligations required by each and all of the assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Properties.

(g)     To the extent any Loan Party is not the operator of any Oil and Gas Properties or other material Properties, use its commercially reasonable efforts to cause the operator to comply with this Section 6.06.

**6.07    Maintenance of Insurance**.

(a)     Unless the Administrative Agent (acting at the instructions of the Required Lenders) otherwise agrees, insure and keep insured all its assets and business that can be insured against all insurable losses as set forth in, and subject to the terms and conditions of, Schedule 6.07; provided, however, that the foregoing shall not apply to D&O insurance policies which shall not be required to be listed in Schedule 6.07 and shall not be subject to the periodic certification requirements contained herein.

(b)     Each insurance policy to be obtained pursuant to Section 6.07(a) shall be issued by an insurance or reinsurance company licensed in Colombia and approved by the Administrative Agent (acting at the instructions of the Required Lenders) and shall comply with all requirements set forth on Schedule 6.07.

(c)     Comply with the terms and conditions of, pay when due any premium or commission under, and otherwise maintain in full force and effect, each insurance policy required to be maintained under Schedule 6.07 and not take any actions that may adversely prejudice in any material respect, the Loan Parties', any of their Subsidiaries', any Colombian Branches' or, where the Collateral Agent is a loss payee or additional insured, such Person's right to claim or recover under any such insurance policy.

(d)     The Loan Parties shall deliver to the Administrative Agent, not later than 60 days after the end of each fiscal year of the Borrower:

(i)                         an annual insurance certification from the Loan Parties' insurance broker certifying the effectiveness of the insurance policies required to be maintained under Section 6.07(a); and

(ii)                        a report from the Loan Parties' insurance broker (which insurance broker shall be acceptable to the Required Lenders) confirming the effectiveness of the insurance policies required to be maintained under Section 6.07(a) and Schedule 6.07 and their conformity with the requirements thereof and attaching the front page of each such insurance policy.

106

(e)    Concurrently with the issuance of each insurance policy described in Section 6.07(a) above (other than insurance policies of which the ANH or third parties designated by the ANH are beneficiaries), cause each issuer of an insurance policy to provide the Administrative Agent an endorsement naming the Administrative Agent, for its benefit and the benefit of the Lenders, as additional insured on any comprehensive and general liability policies and lender loss payee on any casualty loss policy, as applicable, and providing for no less than 30 days (or, if less, the maximum advance notice that the applicable issuer will agree to provide) prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance. The Loan Parties shall promptly deliver to the Administrative Agent the original certificate or other appropriate instruments evidencing compliance with this Section 6.07(e).

## 6.08    Compliance with Laws.

(a)    Comply with all requirements of (i) all applicable Anti-Money Laundering Laws, Sanctions Laws and Anti-Corruption Laws, and (ii) all other applicable Laws (including, without limitation, social security laws, labor laws and tax laws) except in the case of such other applicable Laws identified in subclause (ii) hereof where the failure by any of the Loan Parties or any of their Subsidiaries to comply could not reasonably be expected to have a Material Adverse Effect.

(b)    Maintain policies and procedures designed to promote and achieve continued compliance with the Sanctions Laws and Anti-Corruption Laws.

## 6.09    Compliance with Contractual Obligations.

(a)    Comply in all material respects with all the terms and conditions of all material contracts to which it is a party or by which any of its properties or assets is bound (other than the Material Project Documents), keep each such material contract in full force and effect and enforce all material provisions thereof in accordance with their respective terms; except in such instances in which the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

(b)    Except with respect to (i) terminations as a result of a breach or default thereunder by the applicable counterparty or due to the expiration or non-renewal of the relevant Material Project Document's term or terminations for an occurrence which is being actively contested in good faith and by appropriate proceedings, or (ii) E&P Agreements related to Blocks with no Proved Developed Producing Reserves, (1) perform and observe all of its material covenants and agreements contained in the Material Project Documents and take any and all reasonable and prudent action to prevent the termination of any Material Project Document, and (2) pursue diligently and maintain all material rights granted to it under, pursuant to or in connection with, each Material Project Document, and perform all of its material obligations under each Material Project Document, and take all reasonable steps to enforce and/or exercise and/or preserve such material rights and remedies.

## 6.10    Books and Records.  (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with IFRS consistently applied shall be made of

all financial transactions and matters involving the assets and business of each Loan Party and each of their Subsidiaries and the Colombian Branches, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over each Loan Party and each of their Subsidiaries and the Colombian Branches, as the case may be.

### 6.11    Inspection Rights; Audit Matters.

(a)    Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties (including the Project), to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Loan Parties and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Loan Parties; provided that unless a Default or Event of Default has occurred and is continuing and no Accelerated Amortization Event shall have occurred, there shall be no more than one visit in each fiscal year, which shall be coordinated through the Administrative Agent.

(b)    Cooperate with each Advisor to permit, among other things, such Advisor to deliver all reports, notices and certificates to be delivered by such Advisor and provide each Advisor with all information reasonably available to the Loan Parties or such other applicable party that is reasonably requested by such Advisor.

### 6.12    Use of Proceeds.  The Borrower will use the proceeds of the Loans to finance general corporate purposes of the Loan Parties and pay the fees and expenses incurred in connection with the Transactions.

### 6.13    Pari Passu Ranking.  Take all action which may be or become necessary or appropriate to ensure that the obligations of the Loan Parties under the Loan Documents to which it is a party will continue to constitute its direct and unconditional obligations ranking at least *pari passu* in right of payment with all other senior unsecured Indebtedness of the Loan Parties.

### 6.14    Permits.

(a)    Obtain and maintain in full force and effect, at its own expense, all Permits and comply with the requirements and conditions of the Permits, except, with respect to Permits that do not constitute Specified Permits, where failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(b)    Promptly obtain, maintain and renew or extend (as appropriate) from time to time at its own expense all such Permits as may be required for (i) each Loan Party to comply with its obligations under each Loan Document to which it is a party, and (ii) for each Loan Party and its Subsidiaries and the Colombian Branches, to own their respective properties that are material to their business and conduct their businesses and operations as presently conducted and as proposed to be conducted in all material respects.

**6.15    Corporate Separateness**.    Satisfy customary corporate formalities, including the holding of regular board of directors' and shareholders' meetings or action by directors or shareholders without a meeting and the maintenance of corporate records.  None of the Loan Parties or any of their Subsidiaries shall conduct its or their affairs in a manner which is reasonably likely to result in the corporate or other existence of the Loan Parties or any of their Subsidiaries being ignored, or in the assets and liabilities of the Loan Parties or any of their Subsidiaries being substantively consolidated with those of any other such Person in a bankruptcy, reorganization or other insolvency proceeding.

**6.16    Maintenance of Accounts; Preservation of Rights Under the Collateral Documents**.

(a)    Maintain the Colombian Accounts and the US Accounts pursuant to the Account Control Agreements.

(b)    With respect to any Oil and Gas Property and other Property acquired after the Closing Date by any Colombian Loan Party as to which the Collateral Agent, for the benefit of the Secured Parties, does not have a Lien in favor of the Collateral Agent securing the Obligations, promptly, and in any event within 45 days, execute and deliver to the Collateral Agent such Collateral Documents or amendments to Collateral Documents and take all actions, including, without limitation, the filing of any financing statements, as the Collateral Agent reasonably deems necessary or advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest in such Property; provided that unless the purchase price or consideration for the Property or the Properties acquired during any fiscal quarter by the Loan Parties exceeds U.S.$500,000 individually or in the aggregate, the Loan Parties shall not be required to take the actions specified in this Section 6.16(b) prior to the date that the quarterly financial statements are required to be delivered pursuant to Section 6.01(b) for the fiscal quarter in which the acquisition or acquisitions occur, at which time all such Property or Properties theretofore acquired and not previously made subject to a Lien in favor of the Collateral Agent shall be made so subject.

(c)    Take such actions as may be necessary or advisable in order to preserve the rights of the Collateral Agent, the Colombian Collateral Agent and the Lenders under each of the Collateral Documents, including, but not limited to, at any time that an Event of Default is continuing, providing notices to, and request consents, waivers or approvals from, any counterparty or any Subsidiary or Affiliate thereof, under any Material Project Document or any Hydrocarbon Sale Agreement, in connection with the creation, perfection, enforceability, foreclosure, or any other aspect related to the Collateral Documents associated therewith. Without limiting the generality of the foregoing, the Borrower shall execute any documents, filing statements, agreements and instruments, and take all further action that may be required under applicable Law, or that the Collateral Agent or the Colombian Collateral Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority of the Liens created or intended to be created by the Collateral Documents.  In addition, from time to time, the Borrower shall, at its own cost and expense, promptly secure its obligations under the Loan Documents by pledging or creating, or causing to be pledged or created, perfected Liens with

respect to such of its assets and properties located in Colombia as the Collateral Agent, the Colombian Collateral Agent or the Required Lenders shall designate (it being agreed that it is the intent of the parties that the obligations of the Borrower under the Loan Documents shall be secured by, among other things, substantially all the assets of the Borrower and its Subsidiaries located in Colombia). Such Liens will be created under the Collateral Documents in form and substance reasonably satisfactory to the Collateral Agent, the Colombian Collateral Agent and the Borrower shall deliver, or cause to be delivered, to the Administrative Agent all such instruments and documents (including legal opinions, title insurance policies and lien searches) as the Administrative Agent shall reasonably request to evidence compliance with this Section 6.16(c).

(d)     Perform all actions provided under each Colombian Collateral Document and which are necessary or advisable to maintain the Colombian Collateral Agent's security interest in full force and effect at all times (including the priority thereof), including, but not limited to, delivering all documents that are required to be filed, registered, notarized, legalized, consularized or recorded (including, where applicable, any filings required to be made in the *Registro de Garantías Mobiliarias*) in order to create, perfect and, where applicable register the Colombian Collateral Documents as a valid and enforceable first priority Lien.

### 6.17    Environmental and Social Requirements.

(a)     Comply with all Environmental and Social Requirements in all material respects.

(b)     Maintain all Permits required pursuant to the Environmental and Social Requirements.

### 6.18    Additional Documents.
From time to time execute and deliver or cause to be executed and delivered any and all such further documents and instruments as may reasonably be requested by the Administrative Agent that are necessary for the compliance by the Loan Parties with their obligations under this Agreement and the other Loan Documents.

### 6.19    Hydrocarbon Sale Agreements; Other Project Revenues.

(a)     Sell and supply Hydrocarbons to Offtakers only pursuant to Hydrocarbon Sale Agreements of which the rights of the relevant Loan Party, Subsidiary or Colombian Branch party thereto have been pledged as security for the Obligations pursuant to the Collateral Documents or the Promigas Trust, and to Offtakers that are required to make all payments under such Hydrocarbon Sale Agreements directly for credit to a Collection Account.

(b)     Cause all payments by any Person (including Offtakers) in respect of sale and supply of Hydrocarbons by any Loan Party or any of its Subsidiaries or any of the Colombian Branches (including spot sales) to be made directly for credit to a Collection Account.

(c)     Cause each invoice issued in connection with any Receivables to contain instructions to the Offtaker or other Person obligated thereon to remit all payments for such Receivables to a Collection Account.

(d)    Cause each of the Hydrocarbon Sale Agreements (other than the Hydrocarbon Sale Agreements associated with the Promigas Trust Receivables) to remain, during the term of such Hydrocarbon Sale Agreement, subject to a first priority fully perfected Lien pursuant to the Colombian Asset Pledge Agreement in favor of the Colombian Collateral Agent (for the benefit of the Lenders) as Collateral for the Obligations of the Loan Parties under the Loan Documents (subject to no other Liens), except for any termination of any Hydrocarbon Sale Agreement in accordance with its terms or as a result of a breach or default thereunder by the applicable Offtaker.

(e)    Perform and observe all of its material covenants and obligations contained in each Hydrocarbon Sale Agreement to which it is a party, take all reasonable and necessary action to prevent the termination or cancellation of any Hydrocarbon Sale Agreement (except for the termination in accordance with its terms or as a result of a breach or default thereunder by the applicable Offtaker), and enforce against the relevant Offtakers all of its rights thereunder in accordance with its terms.

(f)    Invoice or make a claim to the counterparty of any Loan Party or any Subsidiary thereof or any of the Colombian Branches under any Hydrocarbon Sale Agreement for liquidated damages payable to such Loan Party or Subsidiary or Colombian Branch pursuant to the terms of the applicable Hydrocarbon Sale Agreement in accordance with the terms of, and within the specified period set forth in, such Hydrocarbon Sale Agreement.

(g)    If any funds are received by any Loan Party (or any Subsidiary of any Loan Party or any Colombian Branch) from time to time in respect of Receivables or in respect of any sale and supply of Hydrocarbons (other than any such funds received in a Collection Account): (i) promptly (and, in any event, within two Business Days) after its receipt thereof, the relevant Loan Party shall remit such funds to a Colombian Account or a US Account or, if not permitted by applicable Law, such other account as the Administrative Agent may designate (and until so remitted, such funds shall be held in trust by such Person for the benefit of the Administrative Agent); and (ii) promptly (and, in any event, by no later than the Business Day after any such remittance) the relevant Loan Party shall: (A) notify the Administrative Agent of its receipt of any such funds and of each such remittance by it (or on its behalf) to a Colombian Account or a US Account (specifying the amount and date of the remittance and the Hydrocarbon Sales Agreement, if any, with respect to which it received such funds in respect of Receivables) and (B) in case such amounts are in respect of Receivables, deliver to the Administrative Agent evidence that it has sent a notice to the applicable Offtaker that all future payments on Receivables are to be deposited to the applicable Collection Account.  For the avoidance of doubt, the Loan Parties may make or cause to be made any withdrawal or transfer of amounts on deposit in a Colombian Account or a US Account pursuant to Section 7.14(b).

**6.20    Post-Closing Obligations.**

(a)    No later than 20 Business Days following the Closing Date, deliver to the Administrative Agent documentation in substance and form reasonably satisfactory to the Administrative Agent, evidencing the apostilling and registration of the Panama Pledge Agreement with the Public Registry of Panama.

## ARTICLE VII

## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder, any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, each Loan Party agrees that it shall not, and shall not permit any of its Subsidiaries or any of the Colombian Branches to, directly or indirectly:

**7.01    Liens**.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, other than Permitted Liens.

Notwithstanding the foregoing, the Loan Parties shall not, and shall not permit any of its Subsidiaries to, create, incur, assume or permit to exist any Lien (other than Liens created pursuant to the Collateral Documents) (i) on any property or asset, income or revenues (including account receivables) or rights in respect of any thereof, whether presently owned or hereafter acquired, of any Person constituting or intended to constitute Collateral or (ii) securing any Indebtedness with a Loan Party Related Person.

**7.02    Investments**.  Create, form or cause or permit any Person to become a Subsidiary of the Loan Parties, or make any other Investment, except (i) with the prior written consent of the Required Lenders, (ii) Permitted Investments and (iii) in the case of any Person becoming a Subsidiary of the Loans Parties, substantially concurrently with such Person becoming a Subsidiary of any Loan Party, such Person becomes a Guarantor hereunder pursuant to Section 11.13.

**7.03    Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness, except any of the following:

(a)    Indebtedness under the Loan Documents;

(b)    Indebtedness outstanding on the date hereof and listed on Schedule 5.05(d);

(c)    Indebtedness of the Loan Parties (including Capital Lease Obligations) secured by Liens of the type set forth in clause (a) of the definition ascribed to the term "Permitted Liens" in an aggregate principal amount not to exceed U.S.$5,000,000 (or the Dollar Equivalent thereof) at any one time outstanding;

(d)    unsecured current accounts payable incurred by the Guarantors in the ordinary course of business which are (i) outstanding for not more than 120 days past the original invoice or billing date thereof or (ii) being contested in good faith by appropriate proceedings, if such reserve as may be required by IFRS shall have been made therefor;

112

(e)   extensions of credit from suppliers or contractors who are not Affiliates of any Loan Party for the performance of labor or services or the provision of supplies or materials under applicable contracts or agreements in connection with the Loan Parties' oil and gas exploration and development activities, which are not more than 90 days overdue or are being contested in good faith by appropriate proceedings, if such reserves as may be required by IFRS shall have been made therefor;

(f)   obligations under Permitted Letters of Credit; provided, that except with respect to obligations under Reference Letters of Credit, such obligations are only secured with cash in an amount not exceeding the amount of such Permitted Letter of Credit;

(g)   obligations (contingent or otherwise) of any Loan Party under a Reference Hedge;

(h)   unsecured Indebtedness among Loan Parties, which for all purposes shall rank at all times junior and subordinated in right of payment to any of the obligations of the Loan Parties hereunder;

(i)   Takeout Indebtedness; and

(j)   unsecured Indebtedness in an aggregate amount not to exceed U.S.$10,000,000 at any time outstanding; provided, that no Default or Event of Default shall have occurred and be continuing or would occur after giving effect on a *pro forma* basis to the Incurrence of such Indebtedness (including, but not limited to, a Default or Event of Default resulting from the failure to comply with Section 7.19, such compliance to be determined on the basis of the financial information most recently delivered to the Administrative Agent and the Lenders pursuant to Section 6.01(a) or (b) as though such Indebtedness had been Incurred as of the first day of the fiscal period covered thereby).

**7.04   Fundamental Changes**.  Merge, dissolve, liquidate, amalgamate, spin-off, consolidate, with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom and no Accelerated Amortization Event exists or would occur as a result thereof,

(a)   the Loan Parties may consummate the Permitted Corporate Reorganization;

(b)   any Subsidiary of the Borrower or any other Loan Party may merge or consolidate with any Loan Party or any Subsidiary of the Borrower that is not a Loan Party; provided, that (i) in any such merger or consolidation involving the Borrower, the Borrower shall be the continuing or surviving Person, (ii) in any such merger or consolidation involving any other Loan Party, such Loan Party shall be the continuing or surviving Person, (iii) in any such merger or consolidation involving a Colombian Guarantor, such merger or consolidation shall only be permitted to the extent consummated solely among Colombian Guarantors and (iv) in any such merger or consolidation involving any entity the Equity Interests of which is subject to any Lien (or required to be subject to any Lien) pursuant to the Collateral Documents, all of the

113

Equity Interests of the continuing or surviving Person shall be subject to a Lien pursuant to the Collateral Documents or pursuant to other definitive documentation in form and substance acceptable to the Lenders;

       (c)    any Loan Party may amalgamate with another Loan Party (other than the Borrower); <u>provided</u>, that (i) the amalgamated entity resulting from such amalgamation shall continue to be liable for all of the obligations of the amalgamated entities under the Loan Documents, and (ii) no amalgamation involving any Colombian Guarantor shall be permitted;

       (d)    any Loan Party may Dispose of all or substantially all of its assets to another Loan Party; <u>provided</u>, that (i) any such Disposition involving the assets of a Colombian Guarantor shall only be permitted to be carried out among Colombian Guarantors, and (ii) in any such Disposition involving any entity the Equity Interests of which is subject to any Lien (or required to be subject to any Lien) pursuant to the Collateral Documents, all of the Equity Interests of the transferee shall be subject to a Lien pursuant to the Collateral Documents or pursuant to other definitive documentation in form and substance acceptable to the Lenders; and

       (e)    any Subsidiary of the Borrower that is not a Loan Party may merge, consolidate or amalgamate with another Subsidiary of the Borrower that is not a Loan party; <u>provided</u>, that the continuing or surviving entity, or the amalgamated entity resulting therefrom, shall be a Subsidiary of the Borrower.

The Borrower shall provide written notice to the Administrative Agent at least ten Business Days prior to the consummation of any transaction permitted under this <u>Section 7.04</u> involving any Loan Party. With respect to any such transaction involving a Loan Party, upon request, the Borrower shall deliver to the Administrative Agent as promptly as practicable thereafter (i) legal opinion(s) in form and substance reasonably satisfactory to the Administrative Agent from counsel reasonably acceptable to the Administrative Agent or Loan Parties, as may be applicable, in each relevant jurisdiction(s), addressed to the Administrative Agent and each Lender and dated as of the date on or about which such transaction becomes effective (but in any event no later than the date of consummation of such transaction), to the effect that all obligations of the Loan Parties involved, if applicable, hereunder or under any other Loan Document, notwithstanding the effectiveness of such transaction, shall by operation of law or express agreement, continue to be legal, valid and enforceable obligations of the surviving Loan Party (or in the case of an amalgamation, the amalgamated entity resulting from such amalgamation) and covering such other matters relating to the transactions contemplated hereby and by any other Loan Documents as the Administrative Agent may reasonably request, and (ii) certified copies of the articles of incorporation, association or amalgamation, shareholder agreements or declarations and by-laws of such surviving entity (or in the case of an amalgamation, the amalgamated entity resulting from such amalgamation) and of all corporate authority for such entity (including, without limitation, all necessary action of the board of directors, shareholders, or other governing body and incumbency certificates) relating to such transaction as well as evidence of compliance with all required formalities under applicable Law.

      **7.05    Dispositions**.  Make any Disposition or enter into any agreement to make any Disposition of any of its Property (including, receivables, leasehold interests or any interest in Hydrocarbons), whether now owned or hereafter acquired, except:

      (a)    Dispositions of (i) obsolete, worn out, depleted or uneconomic property in the ordinary course of business or (ii) equipment that is contemporaneously replaced by equipment or other property of comparable value;

      (b)    the sale of inventory (including Hydrocarbons sold as produced) which is sold in the ordinary course of business; provided that no contract for the sale of Hydrocarbons shall obligate any Loan Party to deliver Hydrocarbons at a future date without receiving full payment therefor within 90 days after delivery;

      (c)    Dispositions of claims against customers, working interest owners, other industry partners or any other Person in connection with workouts or bankruptcy, insolvency or other similar proceedings with respect thereto;

      (d)    Disposition of Properties that the Loan Parties have determined are not capable of producing Hydrocarbons in paying quantities after expiration of their primary terms;

      (e)    an assignment of capacity under any transportation agreement in the ordinary course of business;

      (f)    to the extent constituting a Disposition, Investments permitted under Section 7.02 and Restricted Payments permitted under Section 7.06;

      (g)    the sale, farmouts or other Dispositions of Oil and Gas Properties and/or Blocks (including returns of the applicable Blocks to the ANH) consisting of undeveloped acreage or in respect of undrilled depths to which no Proved Developed Producing Reserves are attributable in the most recently delivered Reserves Report prepared by the Petroleum Engineer, and assignments in connection with such farmouts; provided that (i) no Default or Event of Default (disregarding any cure period thereof) shall have occurred and be continuing or would occur after giving effect on a *pro forma* basis to such Disposition, (ii) no Accelerated Amortization Event shall have occurred or would occur after giving effect on a *pro forma* basis to such Disposition, and (iii) the Loan Parties shall, concurrently with such a transaction, certify to the Administrative Agent, that after giving effect on a *pro forma* basis to such transaction the Loan Parties shall be in compliance with Section 7.19 and the amount of Proved Developed Producing Reserves shall not be reduced;

      (h)    Disposition of all or substantially all of the Property of, or Equity Interests in, CNEMED S.A.S., a Colombian *Sociedad por Acciones Simplificada*, to a Person that is not an Affiliate of the Loan Parties for Fair Market Value;

      (i)    Dispositions among Loan Parties; provided, that (i) any such Disposition involving the assets of a Colombian Guarantor shall only be permitted to be carried out among Colombian Guarantors that are party to the Colombian Asset Pledge Agreement, and

115

(ii) any such Disposition involving any entity the Equity Interests of which is subject to any Lien (or required to be subject to any Lien) pursuant to the Collateral Documents, all of the Equity Interests of the transferee shall be subject to a Lien pursuant to the Collateral Documents or pursuant to other definitive documentation in form and substance acceptable to the Lenders;

(j)      Dispositions permitted by Section 7.04;

(k)      Disposition of Cash Equivalents in the ordinary course of business;

(l)      the lease or sublease of any real or personal property in the ordinary course of business;

(m)      Dispositions of equipment, inventory, products, services, accounts receivable or other assets in the ordinary course of business, including in connection with any compromise, settlement or collection of accounts receivable;

(n)      the licensing or sublicensing of intellectual property, including, without limitation, licenses for seismic data, in the ordinary course of business and which do not materially interfere with the business of Borrower and any of its Subsidiaries;

(o)      surrender or waiver of contract rights or the settlement, release or surrender of contract, tort or other claims of any kind in the ordinary course of business and consistent with past practice; and

(p)      a sale, lease, transfer or other disposition of obsolete, surplus or worn-out equipment or other obsolete assets or other property which is uneconomical and no longer useful for the Borrower or any of its Subsidiaries in the ordinary course of business and consistent with past practice.

Anything herein to the contrary notwithstanding, no Loan Party shall, and shall not permit any of its Subsidiaries to, (i) Dispose, in any way, of any Equity Interests in any Loan Party or any of its Subsidiaries (other than in accordance with clause (h) above or pursuant to a transaction permitted under Section 7.04), (ii) Dispose, in any way, of any Key Operating Asset, and (iii) grant any overriding royalty interest or make any payment in respect of any overriding royalty interest, other than those existing as of the Closing Date and specified in Schedule 7.05.

**7.06    Restricted Payments**.    Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, except that, so long as no Default or Event of Default shall have occurred and be continuing or would result therefrom, the Loan Parties may make payments to Loan Party Related Persons pursuant to the Related Parties Agreements.

**7.07    Change in Nature of Business**.    Engage in any line of business substantially different from the Line of Business.

**7.08    Transactions with Affiliates**.    Enter into any transaction of any kind with any Affiliate or any Loan Party Related Person of the Loan Parties, whether or not in the

116

ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Loan Parties or Subsidiary thereof as would be obtainable by the Loan Parties or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate.  The Borrower shall furnish to the Administrative Agent: (i) a certificate signed by a Responsible Officer of the Borrower, no later than ten Business Days following the end of any calendar quarter, with respect to transactions (or series of related transactions) described in the preceding sentence with a fair market value between U.S.$10,000,000 and U.S.$20,000,000 (or the equivalent thereof in any other currency) in the aggregate occurring during such calendar quarter, and (ii) a report from an Independent Financial Advisor no later than 30 days following the end of any calendar quarter, with respect to any transactions (or series of related transactions) described in the preceding sentence with a fair market value in excess of U.S.$20,000,000 (or the equivalent thereof in any other currency) in the aggregate occurring during such calendar quarter, in each case certifying the Fair Market Value of such transaction and certifying that each such transaction was conducted on arm's-length basis and that all of the material terms thereof could also have been obtained from a third party upon similar circumstances, and describing in reasonable detail each such transaction.  The provisions of this <u>Section 7.08</u> shall not apply to any transaction between or among Loan Parties and not involving any other Person, including, but not limited to, the Permitted Corporate Reorganization.

      **7.09    Burdensome Agreements**.  Enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that limits the ability (i) of any Subsidiary of the Loan Parties to pay, directly or indirectly, dividends or make any other distributions in respect of its Equity Interests to the relevant Loan Party or to otherwise transfer property to the relevant Loan Party, (ii) of any Subsidiary of the Loan Parties to Guarantee the Indebtedness of any Loan Party, (iii) of the Loan Parties or any of their Subsidiaries to create, incur, assume or suffer to exist Liens on the property of such Person, (iv) of any Subsidiary of the Loan Parties to pay any Indebtedness owed to any of the Loan Parties or any of its Subsidiaries, or (v) of any Subsidiary of the Loan Parties to make loans or advances to, or other Investments in, any of the Loan Parties or any of its Subsidiaries, in each case, except for:

         (a)    restrictions or encumbrances under applicable Law;

         (b)    any restrictions or encumbrances regarding licenses or sublicenses by the Loan Parties and their Subsidiaries of intellectual property in the ordinary course of business (in which case such restriction shall relate only to such Intellectual Property);

         (c)    customary provisions in leases and other contracts restricting the assignment thereof;

         (d)    customary restrictions, encumbrances or conditions contained in agreements relating to the sale of assets pending such sale; <u>provided</u> that such restrictions and conditions apply only to assets that are to be sold and such sale is permitted hereunder;

         (e)    customary provisions in joint venture agreements and other similar agreements applicable to joint ventures and applicable solely to such joint venture and/or Equity Interests therein;

117

(f)    restrictions or encumbrances under any document or instrument governing Indebtedness incurred pursuant to any Indebtedness outstanding on the date hereof and listed on Schedule 5.05(d);

(g)    with respect to any Property acquired from a Person which is merged or amalgamated with or into Borrower or any of its Subsidiaries, or by reason of any Liens on any property or assets, or relating to or arising under the Indebtedness, of any Person or other entity existing at the time such Person or other entity becomes a Subsidiary, or any restriction or encumbrance relating to Indebtedness of any such Person and, in any such case, that is not created as a result of or in connection with or in anticipation of any such transaction, and any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any such encumbrance or restriction, so long as the terms are substantially identical to such encumbrance or restriction (other than with respect to the duration thereof); provided, however, that any such Lien created to secure or provide for the payment of any part of the purchase price of such Person shall not be permitted by this clause (i); provided, further, that such Liens may not extend to any other property owned by Borrower or any of its Subsidiaries (other than improvements, accessions, upgrades, accessories and products and proceeds in respect of the property subject to such Liens at the time of such acquisition);

(h)    with respect to any property or assets existing at the time of acquisition thereof and which are not created as a result of or in connection with or in anticipation of such acquisition and any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any such encumbrance or restriction, so long as the terms are substantially identical to such encumbrance or restriction (other than with respect to the duration thereof); provided, however that any such encumbrance or restriction created to secure or provide for the payment of any part of the purchase price of such Person shall not be permitted by this clause; provided further, that such encumbrance or restriction may not extend to any other property owned by Borrower or any of its Subsidiaries;

(i)    in the case of restrictions or encumbrances on the ability of any of Borrower's Subsidiaries to make loans or advances to Borrower or any other Subsidiary or to transfer any of its property or assets to Borrower or any other Subsidiary, restrictions or encumbrances (1) that exist by virtue of any transfer of, agreement to transfer, option or right with respect to, or Lien on, any property or assets of Borrower or any of its Subsidiaries not otherwise prohibited by this Agreement, (2) that restrict in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license or similar contract, or the assignment or transfer of any such lease, license or other contract or contractual right or (3) contained in mortgages, pledges or other security agreements permitted under this Agreement securing Indebtedness of Borrower or any of its Subsidiaries to the extent such encumbrances or restrictions restrict the transfer of the property subject to such mortgages, pledges or other security agreements;

(j)    restrictions or encumbrances arising or agreed to in the ordinary course of business, not relating to Indebtedness, and that do not, individually or in the aggregate, detract from the value of the property or assets of Borrower or any of its Subsidiaries in any manner material to Borrower and its Subsidiaries;

118

(k)    restrictions or encumbrances imposed by purchase money obligations for property acquired in the ordinary course of business or by Capital Lease Obligations permitted under this Agreement on the property so acquired, but only to the extent that such encumbrances or restrictions restrict the transfer of the Property;

(l)    restrictions or encumbrances resulting from restrictions on cash or other deposits or other customary requirements imposed by customers or suppliers under contracts entered into in the ordinary course of business;

(m)    restrictions or encumbrances contained in mortgages, pledges or other security agreements permitted under this Agreement securing Indebtedness of the Borrower or a Subsidiary to the extent such encumbrances or restrictions restrict the transfer of the property subject to such mortgages, pledges or other security agreements; and

(n)    restrictions or encumbrances existing on the Closing Date and any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any such encumbrance or restriction, so long as the terms are substantially identical to such encumbrance or restriction (other than with respect to the duration thereof).

**7.10    Use of Proceeds**.

(a)    Use the proceeds of the Loans, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the Board) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.  Neither the Administrative Agent nor any Lender shall have any responsibility as to the use of any of such proceeds.

(b)    Offer or give, directly or indirectly, any part of the proceeds of the Loans to any governmental official or employee, political party official, political party, candidate for political office, official of any public international organization or anyone else acting in an official capacity (each, an "Official") in order to obtain, retain or direct business by: (i) influencing any act or decision by such Official, (ii) inducing such Official to act in violation of his, her, or its lawful duty, (iii) securing any improper advantage, (iv) persuading such Official to influence any act or decision of a government or party or public international organization or (v) otherwise making a payment in violation of Anti-Corruption Laws.

**7.11    Sale or Discount of Receivables**.  Other than with respect to transactions involving the discount or sale of notes receivable or accounts receivable among Loan Parties, discount or sell (with or without recourse) any of its notes receivable or accounts receivable, except for receivables obtained by each of the Loan Parties or any Subsidiary in the ordinary course of business or the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction.

**7.12    Limitation on Prepayments; Amendments of Certain Documents**.

(a)    (i) Prepay, retire, redeem, purchase, defease or exchange, or make or arrange for any prepayment, retirement, redemption, purchase, defeasance or exchange of any outstanding Indebtedness of the Loan Parties or any of their Subsidiaries that ranks junior and subordinate in right of payment to any of the obligations of the Loan Parties hereunder and under the other Loan Documents (other than, so long as no Event of Default is continuing and no Accelerated Amortization Event shall have occurred, intercompany indebtedness permitted under Section 7.03(h)), or (ii) waive, amend, supplement, modify, terminate or release any of the provisions with respect to any Indebtedness of the Loan Parties or any of their Subsidiaries that ranks junior and subordinate in right of payment to any of the obligations of the Loan Parties hereunder and under the other Loan Documents, without the prior consent of the Required Lenders.

(b)    Enter into or consent to any modification, supplement or waiver to any provision of its Organization Documents, except (i) to the extent such modification, supplement or waiver does not adversely affect the interests of the Lenders hereunder in any material respect; or (ii) otherwise with the prior written consent of the Required Lenders (such consent not to be unreasonably conditioned, withheld or delayed).

(c)    Enter into or consent to any modification, supplement or waiver to any provision of the Promigas Trust or consent to any assignment, sale or transfer of rights or obligations in the Promigas Trust, in each case except with the prior written consent of the Required Lenders.

(d)    Enter into or consent to any modification, supplement or waiver to any provision of the Canacol Existing Revolving Credit Agreement or the Canacol 2028 Notes Indenture or consent to any assignment, sale or transfer of rights or obligations of the Borrower or any of its Affiliates in the Canacol Existing Revolving Credit Agreement or the Canacol 2028 Notes Indenture, in each case except with the prior written consent of the Required Lenders.

(e)    Except with respect to (i) terminations as a result of a breach or default thereunder by the applicable counterparty or due to the expiration or non-renewal of the relevant Material Project Document's or Hydrocarbon Sale Agreement's term, or (ii) E&P Agreements related to Blocks with no Proved Developed Producing Reserves, amend, modify, supplement, grant any waiver in respect of, terminate or take any other action (or accept or agree to amend, grant any waiver in respect of, terminate or take any other action) with respect to any Material Project Document, Specified Permit or Hydrocarbon Sale Agreement in a manner adverse to the interests of the Lenders under the Loan Documents in any material respect.

(f)    Instruct or cause or attempt to instruct or cause any customer that purchases Hydrocarbons from any Loan Party or its Subsidiaries to remit any payments for the purchase of such Hydrocarbons to any account or any Person other than to a Collection Account.

(g)    Enter into or consent to any modification, supplement or waiver to any provision of any Related Parties Agreement, except with the prior written consent of the Required Lenders.

120

### 7.13    Accounting Changes; Limitations on Changes in Fiscal Year.

(a)    Make any change in accounting treatment and reporting practices or tax reporting treatment except as (i) required or permitted by IFRS, consistently applied, or applicable Law and, to the extent material, disclosed to the Administrative Agent and (ii) agreed to by the Auditor.

(b)    Change its current fiscal year end to end on a day other than on December 31.

### 7.14    Accounts; Withdrawals and Transfers from Accounts.

(a)    Open or maintain any deposit account, investment account or other similar account into which any Offtaker is required to make any payment in respect of any Receivable, other than the Promigas Trust Accounts or any account subject to a first priority perfected Lien in favor of the Collateral Agent or the Colombian Collateral Agent, as security for the Obligations pursuant to documentation in substance and form reasonably satisfactory to the Collateral Agent (which documentation shall include, except as expressly set forth herein, an account control agreement).

(b)    Make or cause any withdrawal or transfer of amounts on deposit in a Colombian Account or a US Account, except if (and only to the extent that) immediately prior to and after giving effect to such withdrawal or transfer, no Event of Default shall have occurred and be continuing.

(c)    Permit any payment of any amount or otherwise transfer any amount in respect of any Receivable (other than Promigas Trust Receivables) into any Promigas Trust Account.

(d)    Permit any payment or transfer of any amount from the Promigas Trust to the Borrower or any of its Affiliates, other than any payment or transfer made into a Colombian Account or a U.S. Account.  Any amounts so paid or transferred to a Colombian Account or a U.S. Account may be withdrawn or transferred pursuant to clause (b) above.

### 7.15    Sanctions.

(a)    Use the proceeds of any Loan, or lend, contribute or otherwise make available such proceeds to any Subsidiary of the Loan Parties, joint venture partner or other individual or entity, to fund any activities of or business with any individual or entity, or in any Sanctioned Jurisdiction, that, at the time of such funding, is the subject of Sanctions, or in any other manner that will result in a violation by any individual or entity (including any individual or entity participating in the transaction, whether as Lender, Lead Arranger, Administrative Agent or otherwise) of Sanctions.

(b)    Liaise, contract, enter into arrangements or otherwise establish any form of relationships related to the Loans with any Sanctions Target.

(c)    Directly or indirectly fund all or part of any repayment or prepayment of the Loans or discharge any obligation due or owing to any Lender under any Loan Document with proceeds derived from or otherwise directly or indirectly sourced (i) from any Sanctions Target or Sanctioned Jurisdiction, (ii) from any activity prohibited under Sanctions Laws, or (iii) otherwise in violation of Sanctions Laws.

**7.16    Anti-Corruption Laws**.  Use the proceeds of any Loan for any purpose which would breach any Anti-Corruption Laws.

**7.17    Anti-Money Laundering Laws**.  (i) Use the proceeds of the Loans, or (ii) lend, contribute or otherwise make available proceeds of the Loans to its Subsidiaries, its Affiliates, any director, officer, employee, or agent of the Loan Parties, their Subsidiaries or its Affiliates, joint venture partner or other Person, in any manner that would result in a violation of any Anti-Money Laundering Laws by any Person, including any Person participating in the Loans, whether as underwriter, advisor, investor or otherwise.

**7.18    Gas Imbalances, Take or Pay or Other Prepayments**.  Permit Gas Imbalances, take or pay or other prepayments which would require each Loan Party or any of its Subsidiaries to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time (without then or thereafter receiving full payment thereof) to exceed 12.00% of the aggregate annual production of gas from the Oil and Gas Properties as of the last day of the most recently ended fiscal year.

**7.19    Financial Covenants**.

(a)    <u>Current Ratio</u>.  Permit the Current Ratio to be, as of the last day of each fiscal quarter, less than 1.00 to 1.00.

(b)    <u>Asset Coverage Ratio</u>.  Permit, as of the "as of" date of the most recent Reserves Report delivered pursuant to <u>Section 6.02(l)</u> and <u>Section 6.02(t)</u>, the Asset Coverage Ratio to be less than 2.50 to 1.00.

(c)    <u>Consolidated EBITDAX to Consolidated Interest Expense Ratio</u>. Permit the Consolidated EBITDAX to Consolidated Interest Expense Ratio to be, as of the last day of each fiscal quarter, less than 2.50 to 1.00.

(d)    <u>Consolidated Leverage Ratio</u>.  Permit Consolidated Leverage Ratio to be, as of the last day of each fiscal quarter, greater than 3.50 to 1.00.

**7.20    Sale and Leaseback**.  Enter into any sale and leaseback transaction.

**7.21    Negative Pledge Clauses**.  Enter into or suffer to exist or become effective any agreement that prohibits or limits the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its Property or revenues, whether now owned or hereafter acquired, to secure the Obligations, other than (a) this Agreement and the other Loan Documents, and (b) any agreements governing any purchase money Liens or Capital Lease

Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby).

**7.22    Pooling and Utilization**.  Voluntarily pool or unitize all or any material part of their Oil and Gas Properties where the pooling or unitization would result in the diminution of any Loan Party's net revenue interest in production from the pooled or unitized lands, except where any such pooling or unitization would increase the PV 10 Value of the associated Oil and Gas Property compared to the pre-unitized PV 10 Value unless the failure to pool or unitize such Oil and Gas Properties would not be consistent with prudent industry practices.

**7.23    Canadian Pension Plan**.  No Loan Party or Subsidiary thereof shall (a) sponsor, administer, maintain, participate in, contribute to, or otherwise assume any liability under any Canadian Defined Benefit Plan.

**7.24    E&P Contracts**.  Enter into and maintain any E&P Contract associated with exploration and production activities in Colombia, other than E&P Contracts entered into and maintained by a Colombian Guarantor and which E&P Contract is subject to a first priority Lien in favor of the Collateral Agent or the Colombian Collateral Agent, as security for the Obligations, pursuant to the Colombian Conditional Assignment of Contractual Rights and Economic Rights of the E&P Contacts.

# ARTICLE VIII

# EVENTS OF DEFAULT AND REMEDIES

**8.01    Events of Default**.  Any of the following shall constitute an Event of Default:

(a)    <u>Non-Payment</u>.  The Loan Parties fail to pay (i) any amount of principal of any Loan, (ii) any amount due under any Reference Hedge or any Reference Letter of Credit Documentation, or (iii) within two days after the same becomes due, any interest on any Loan, or any fee or other amount payable hereunder or under any other Loan Document; or

(b)    <u>Specific Covenants</u>.  Any of the Loan Parties fails to perform or observe (i) any term, covenant or agreement contained in any of <u>Section 2.03</u>, <u>Section 6.01</u>, <u>6.02</u>, <u>6.03</u>, <u>6.05(a)</u>, <u>6.08(a)(i)</u>, <u>6.11</u>, <u>6.12</u>, <u>6.13</u>, <u>6.16</u>, <u>6.19</u>, <u>6.20</u> or <u>Article VII</u>, (ii) any term covenant or agreement contained in <u>Article XI</u>, or (iii) any term, covenant or agreement of the Collateral Documents; or

(c)    <u>Other Defaults</u>.  Any of the Loan Parties fails to perform or observe any other covenant or agreement (not specified in, or excluded from, <u>subsection (a)</u> or <u>(b)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days; or

(d)    <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any of the Loan

Parties (or any Subsidiary thereof or any of the Colombian Branches) herein, in any other Loan Document, or in any document delivered in connection herewith or therewith (including any document delivered to any Advisor) shall be incorrect or misleading in any material respect when made or deemed made; or

(e)     Cross-Default.     (i) Any of the Loan Parties or any of their Subsidiaries or any of the Colombian Branches (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness under the Loan Documents and Indebtedness under Hedging Agreements) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, in each case, the effect of which default or other event is to cause, or permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or (ii) there occurs under any Hedging Agreement an Early Termination Date (as defined in such Hedging Agreement) resulting from (A) any event of default under such Hedging Agreement as to which the Loan Parties or any of their Subsidiaries is the Defaulting Party (as defined in such Hedging Agreement) or (B) any Termination Event (as so defined) under such Hedging Agreement as to which the Loan Parties or any of their Subsidiaries or any of the Colombian Branches is an Affected Party (as so defined); provided, however, that no such cross-default shall be deemed to have occurred until the expiration of any applicable cure or grace period under the arrangements described above; or

(f)     Insolvency Proceedings, Etc.     Any of the Loan Parties or any of their Subsidiaries or any of the Colombian Branches institutes, consents to or takes any action to authorize the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for, consents to or takes any action to authorize the appointment of any receiver, receiver-manager, trustee, custodian, monitor, conservator, liquidator, rehabilitator, administrator or similar officer for it or for all or any material part of its property; or any receiver, receiver-manager, trustee, custodian, monitor, conservator, liquidator, rehabilitator, administrator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 30 days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 30 days, or an order for relief is entered in any such proceeding; or

(g)     Inability to Pay Debts; Attachment.     (i) Any of the Loan Parties or any of their Subsidiaries or any of the Colombian Branches becomes insolvent or unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any

124

writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person and is not released, vacated or fully bonded within 30 days after its issue or levy; or

(h)    Judgments.  There is entered against any of the Loan Parties or any of their Subsidiaries or any of the Colombian Branches (i) one or more final, non-appealable judgments or orders for the payment of money in an aggregate amount (as to all such judgments or orders) exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final, non-appealable judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect; or

(i)    Invalidity of Loan Documents.    Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any of the Loan Parties or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any of the Loan Parties denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or

(j)    Condemnation; Nationalization.  Any Governmental Authority shall condemn, seize, nationalize or appropriate any portion of the property of any Loan Party or any of its Subsidiaries or any of the Colombian Branches (either with or without payment of compensation) exercising its power of eminent domain or similar authority (and the same shall continue for 20 or more days, to the extent such action is capable of being appealed or otherwise under the applicable Law); or

(k)    Order.  Any Governmental Authority shall issue any order, decree or resolution that limits, restricts, or prohibits the consummation of any of the Transactions; or

(l)    Moratorium; Adverse Governmental Action.  Any Governmental Authority shall, (i) by moratorium laws or otherwise, cancel, suspend or defer the obligation of any of the Loan Parties to pay any principal, interest or any amount payable by any of them hereunder or under any other Loan Document when the same become due and payable hereunder or under any other Loan Document, and such cancellation, suspension or deferral shall continue for ten or more consecutive days, or (ii) take any other action (including the imposition of restrictions on currency convertibility or transfer) that, in the case of the foregoing in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect or purports to render any of the Loan Documents invalid or unenforceable or to prevent or materially delay the performance or observance by any Loan Party of its obligations thereunder, and such action shall continue for 30 or more consecutive days; or

(m)    Exchange Controls.  The imposition of any exchange controls, currency convertibility controls or currency transferability controls by any competent Governmental Authority, or any other action of a Governmental Authority, in each case that

125

adversely affects the ability of the Loan Parties, taken as a whole, to comply with its obligations hereunder or under any other Loan Document; or

(n)   <u>Collateral</u>.  The Administrative Agent, the Collateral Agent or any Lender, as applicable, shall cease at any time to have a perfected first priority Lien on all or any portion of the Collateral purported to be encumbered, as applicable, pursuant to the Collateral Documents; or

(o)   <u>Significant Casualty Event</u>.  A Significant Casualty Event shall occur in respect of any Loan Party; or

(p)   <u>Termination, Repudiation or Invalidity of Project Documents</u>.  Any Material Project Document,

(i)          is canceled, suspended, repudiated or revoked by any Loan Party;

(ii)          becomes illegal or invalid; or

(iii)          is terminated or otherwise ceases to be in full force and effect;

and in any of the foregoing cases under (i) through (iii) above, (1) a Material Adverse Effect shall have occurred, or could reasonably be expected to occur, as a result thereof and (2) the applicable Loan Party is not actively contesting the relevant event in good faith and by appropriate proceedings; or

(q)   <u>Breach of Material Project Document</u>.  Any Loan Party shall breach or be in default under any term, condition, provision, covenant, representation or warranty contained in any Material Project Document, and any applicable cure period for such breach or default shall have expired, and the effect of such breach or default is to permit the counterparty to suspend its performance, notify any Loan Party of, or declare, an event of default thereunder, or terminate such Material Project Document, in each case, only to the extent that (i) any such action has had or could reasonably be expected to have a Material Adverse Effect and (ii) the relevant Loan Party is not actively contesting the relevant breach or default under the relevant Material Project Document in good faith and by appropriate proceedings; or

(r)   <u>Abandonment</u>.  Any of the Loan Parties, its Subsidiaries or any of the Colombian Branches abandons all or substantially all of the Project or ceases its activities to operate or maintain the Project for a period of 30 consecutive days (other than as a result of force majeure); or

(s)   <u>Negative Pledge on Equity Interests of the Borrower</u>.  Any Lien on any Equity Interests in the Borrower shall be created or exist, other than any Lien in favor of the Collateral Agent created or existing solely for the purpose of securing the Obligations; or

(t)   <u>Canacol Existing Revolving Credit Agreement and 2028 Notes</u>.  (i) There shall be any payment or prepayment of any type in respect of principal of any

126

Indebtedness in respect of the Canacol Existing Revolving Credit Agreement and/or any Canacol 2028 Note, and/or there shall be any repurchase, prepayment or redemption by any Loan Party or any of its Affiliates of any loans under the Canacol Existing Revolving Credit Agreement and/or any Canacol 2028 Note (other than a Canacol 2028 Notes Permitted Purchase); or (ii) there shall be any payment or prepayment of any type in respect of principal of any Indebtedness with a maturity falling on a date after the Maturity Date;  or

(u)    <u>Change of Control</u>.  The occurrence of a Change of Control; or

(v)    <u>Key-Man Event</u>.  The occurrence of a Key-Man Event; or

(w)    <u>Sanctions and Compliance Matters</u>. Any of the Loan Parties, their Subsidiaries, any of the Colombian Branches, directors, senior executives (including *administradores* as such term is defined pursuant to Colombian Law No. 222 of 1995, as amended form time to time), any of the shareholders of the Loan Parties (or with respect to the Borrower, any of the Persons that Control the Borrower): (i) becomes a Sanctioned Target; or (ii) (w) is prosecuted for, (x) confesses to, (y) is indicted for, or (z) is convicted for, any violation of Anti-Money Laundering Laws, Anti-Corruption Laws, Laws relating to Sanctions, drug trafficking, terrorist activities, corruption or crimes against the public administration; <u>provided</u>, that no Event of Default pursuant to <u>Section 8.01(w)(i)</u> with respect to the directors or senior executives of the Loan Parties shall be deemed to have occurred if, within 20 Business Days after any such Loan Party obtains knowledge thereof, the Loan Parties shall remove the applicable director or senior executive from all its positions within the Loan Parties; <u>provided</u>, further that no Event of Default pursuant to <u>Section 8.01(w)(ii)</u> shall be deemed to have occurred if, within 30 Business Days after any such Loan Party obtains knowledge thereof, (A) the Loan Parties shall remove the applicable director or senior executive from all its positions within the Loan Parties, or (B) as applicable to Persons that Control the Borrower, such Person ceases to Control the Borrower; or

(x)    <u>Structural Subordination</u>.  Any Subsidiary or any of the Colombian Branches that is not a Guarantor hereunder, shall Guarantee any Indebtedness of any Loan Party; or

(y)    <u>Governmental Approvals.</u> Any Governmental Approval then-required for the development of the Project becomes unenforceable or otherwise ceases to be valid and binding or in full force and effect or is repudiated, revoked, declared void or terminated and as a result thereof a Material Adverse Effect shall have occurred or could reasonably be expected to occur; <u>provided</u> that, no Event of Default shall occur pursuant to this <u>clause (y)</u> (i) if any Loan Party, within twenty (20) Business Days, obtains a new Governmental Approval in replacement of any such repudiated, revoked, void or terminated Governmental Approval or is otherwise able to remediate any such circumstance, or (ii) the occurrence is being actively contested by the relevant Loan Party in good faith and by appropriate proceedings; or

(z)    <u>Non-Payment under Take-or-Pay or Ship-or-Pay Agreements.</u> Any of the Loan Parties or any of their Subsidiaries or any of the Colombian Branches fails to make payment in respect of any obligation to pay the deferred purchase price of property or services

under any take-or-pay or ship-or-pay agreements associated with the operation of the Borrower's or any Subsidiary's Oil and Gas Properties, if (and only to the extent that), (i) the amount of such payment is in excess of the Threshold Amount, and (ii) such obligation is past due for more than 120 days; provided, that no Event of Default under this clause (z) shall occur if within such 120-day period, the Borrower evidences to the Required Lenders (to their reasonable satisfaction) that (1) the reason for the relevant counterparty claiming payment of such obligation in an amount in excess of the Threshold Amount results from such counterparty acting in bad faith, and not acting pursuant to the terms and conditions of the relevant take-or-pay or ship-or-pay agreement and (2) such claim is being actively contested in good faith and by appropriate proceedings on such basis.

       8.02    **Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, any Agent shall, at the request of, or may, with the consent of, the Required Lenders, without notice or demand, do any or all of the following, in addition to and not in limitation of any other rights or remedies available to any Secured Party at Law or in equity:

       (a)    declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

       (b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all Obligations to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each of the Loan Parties;

       (c)    set off and apply to the Obligations any and all (i) balances and deposits of any Loan Party it (or any Lender) holds, or (ii) any amount held by it (or any Lender) owing to or for the credit or the account of any Loan Party;

       (d)    demand and receive possession of the Loan Parties' books and records including ledgers, federal and state tax returns, records regarding the Loan Parties' assets or liabilities, business operations or financial condition, and all computer programs or storage or any equipment containing such information;

       (e)    settle or adjust disputes and claims directly with account debtors for amounts, upon terms and in whatever order that any Agent reasonably considers advisable;

       (f)    credit bid and purchase at any public sale;

       (g)    apply for the appointment of a receiver, trustee, liquidator or conservator of the Collateral, without notice and without regard to the adequacy of the security for the Obligations and without regard to the solvency of the Loan Parties and their Subsidiaries or any other Person liable for any of the Obligations;

       (h)    make any payments and do any acts it considers necessary or reasonable to protect the Collateral and/or its security interest in the Collateral, and in connection therewith: (i) the Loan Parties will assemble the Collateral if any Agent requests and make it available as any Agent designates, (ii) any Agent may enter premises where the Collateral is

128

located, take and maintain possession of any part of the Collateral, and pay, purchase, contest, or compromise any Lien which appears to be prior or superior to its security interest and pay all expenses incurred and (iii) each Loan Party grants each Agent a license to enter and occupy any of its premises, without charge, to exercise any of each Agent's rights or remedies;

(i)     ship, reclaim, recover, store, finish, maintain, repair, prepare for sale, advertise for sale, and sell the Collateral, and, in furtherance of its rights hereunder, any Agent (and its successors, assigns and transferees, whether by voluntary conveyance, operation of law, assignment, transfer, foreclosure, deed in lieu of foreclosure or otherwise) is hereby granted an irrevocable non-exclusive, royalty-free license or other right to use, without charge and without consent of any other Person, each Loan Party's labels, patents, copyrights, mask works, rights of use of any name, trade secrets, trade names, trademarks, and advertising matter, or any other intellectual property or similar property as it pertains to the Collateral, in completing production of, advertising for sale, and selling any Collateral and, in connection with any Agent's exercise of its rights under this Section, each Loan Party's rights under all licenses and all franchise agreements inure to each Agent's benefit;

(j)     sell the Collateral at either a public or private sale, or both, by way of one or more contracts or transactions, for cash or on terms, in such manner and at such places (including any Loan Party's premises) as any Agent determines is commercially reasonable, and apply any proceeds to the Obligations in whatever manner or order any Agent deems appropriate, and in connection therewith: (i) any Agent may sell the Collateral without giving any warranties as to the Collateral, (ii) any Agent may specifically disclaim any warranties of title or the like, (iii) the Loan Parties acknowledge and agree that this procedure will not be deemed or considered to adversely affect the commercial reasonableness of any sale of the Collateral, (iv) if any Agent sells any of the Collateral upon credit, the Borrower will be credited only with payments actually made by the purchaser, received by any Agent, and applied to the indebtedness of the purchaser, (v) such sales may be adjourned and continued from time to time with or without notice (except for any notice required by applicable Law), (vi) each Agent shall have the right to conduct such sales on any Agent's premises or elsewhere and shall have the right to use any Agent's premises without charge for such time or times as any Agent deems necessary, and (vii) if the purchaser fails to pay for the Collateral, any Agent may resell the Collateral and the Borrower will be credited with the proceeds of the sale;

(k)     place a "hold" on any account maintained with any Lender or any Agent and/or deliver a notice of exclusive control, any entitlement order, or other directions or instructions pursuant to any Control Agreement or similar agreements providing control of any Collateral;

(l)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or at Law or equity; and/or

(m)    take all or any of the foregoing actions (and/or instruct the Collateral Agent to take all or any of the foregoing actions), and/or to liquidate the Collateral in whole or in part and transfer the proceeds to the Administrative Agent for application to the payment of amounts owing under the Loan Documents;

129

provided, however, that upon the occurrence of an Event of Default specified in Section 8.01(f) or 8.01(g), the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender; provided, further, that, notwithstanding anything herein to the contrary, this Section 8.02 shall not (A) prevent the commencement of a proceeding under Debtor Relief Laws or the filing of a petition in Colombia, Canada, Panama or Switzerland to commence a proceeding under Debtor Relief Laws with respect to any of the Loan Parties or any of their Subsidiaries, whether voluntary or involuntary, (B) be construed to mean that the purpose of any such provision is to prevent or create obstacles to prevent, directly or indirectly, that proceedings be commenced in Colombia, Canada, Panama or Switzerland under any Debtor Relief Laws with respect to any of the Loan Parties or any of their Subsidiaries, (C) prohibit any of the Loan Parties or any of their Subsidiaries from negotiating or entering into a restructuring agreement under any Debtor Relief Laws or (D) impose any restrictions, prohibitions or unfavorable effects (*efectos desfavorables*) upon the Loan Parties or any of their Subsidiaries for the negotiation or execution of a restructuring agreement under any Debtor Relief Law.

    **8.03    Application of Funds**.  After the exercise of remedies provided for in Section 8.02 (or after the Loans have automatically become immediately due and payable pursuant to Section 8.02), any amounts received on account of the Obligations shall, subject to the provisions of Section 2.11, be applied by the Administrative Agent or the Collateral Agent in the following order:

    First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Agents and amounts payable under Article III) payable to the Agents in their capacity as such;

    Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal, interest or net payments) payable to the Lenders, the Hedge Providers and the Issuing Banks (including fees, charges and disbursements of counsel to the respective Lenders, Hedge Providers and Issuing Banks and amounts payable under Article III), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

    Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, net payments and other Obligations, ratably among the Lenders, the Hedge Providers and the Issuing Banks in proportion to the respective amounts described in this clause Third payable to them;

    Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, net payments and reimbursement obligations and any other amounts constituting Obligations to the extent not described in clauses First through Third above, ratably among the Lenders, the Hedge Providers and the Issuing Banks in proportion to the respective amounts described in this clause Fourth held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Loan Parties or as otherwise required by Law.

**8.04    Power of Attorney**.  Each Loan Party hereby constitutes and appoints each Agent as such Loan Party's attorney-in-fact with full authority in the place and stead of such Loan Party and in the name of such Loan Party, any Agent or otherwise, from time to time in any Agent's discretion while an Event of Default is continuing to take any action and to execute any instrument that any Agent may deem reasonably necessary or advisable to accomplish the purposes of this Agreement, including: (a) endorse such Loan Party's name on any checks or other forms of payment or security; (b) sign such Loan Party's name on any invoice or bill of lading for any Receivable or drafts against Offtakers; (c) settle and adjust disputes and claims about the Receivables directly with Offtakers, for amounts and on terms any Agent determines reasonable; (d) make, settle, and adjust all claims under such Loan Party's insurance policies; (e) pay, contest or settle any Lien, charge, encumbrance, security interest, and adverse claim in or to the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (f) transfer the Collateral into the name of any Agent or a third party as applicable Law permits; (g) exercise voting rights with respect to Equity Interests, which rights may be exercised, if any Agent so elects, with a view to causing the liquidation of assets of the issuer of any such Equity Interests; (h) provide notices to, and request consents, waivers or approvals from, any counterparty or any Subsidiary or Affiliate thereof, under any Material Project Document or any Hydrocarbon Sale Agreement, in connection with the creation, perfection, enforceability, foreclosure, or any other aspect related to the Collateral Documents or as otherwise deemed necessary or advisable to ensure the validity, perfection, priority, or enforceability of the security interests granted therein; and (i) generally to take any act required of such Loan Party under any Loan Document and/or applicable Law, and to sell, transfer, pledge, make any agreement with respect to or otherwise deal with any of the Collateral as fully and completely as though the relevant Agent were the absolute owner thereof for all purposes, and to do, at any Agent's option and Loan Parties' expense, at any time or from time to time, all acts and things that any Agent deems necessary to protect, preserve or realize upon the Collateral. Each Loan Party hereby appoints each Agent as its lawful attorney-in-fact to sign such Loan Party's name on any documents necessary to perfect or continue the perfection of the Agents' security interest in the Collateral regardless of whether an Event of Default has occurred until the indefeasible payment in full of the Obligations.  Each Agent's foregoing appointment as such Loan Party's attorney in fact, and all of each Agent's rights and powers, are coupled with an interest and are irrevocable until the indefeasible payment in full of the Obligations.

**8.05    Protective Payments**.  If any Loan Party fails to pay any amounts or furnish any required proof of payment due to third persons or entities, as required under the terms of this Agreement, then any Agent may do any or all of the following after reasonable notice to Borrower: (a) make payment of the same or any part thereof; or (b) obtain and maintain insurance policies of the type discussed in Section 6.07 of this Agreement, and take any action with respect to such policies as any Agent deems reasonable and prudent in accordance with this Section 8.05.  Any amounts so paid or deposited by any Agent shall constitute expenses, shall constitute part of the Obligations, shall be immediately due and payable, and shall bear interest at the then applicable rate hereinabove provided for the Loans, and, for the avoidance of doubt, shall be secured by the Collateral.  Any payments made by any Secured Party shall not constitute

an agreement by such Secured Party to make similar payments in the future or a waiver by such Secured Party of any Default or Event of Default under this Agreement.

**8.06    Accounts Collection**.  At any time after the occurrence and during the continuation of an Event of Default: (a) any Agent may notify any Person owing funds to any Loan Party of the Secured Parties' security interest in such funds and verify the amount of such Receivables, (b) other than as required, or otherwise with respect to the Promigas Trust Receivables, each Loan Party shall collect all amounts owing to such Loan Party for the Agents, receive in trust all payments as each Agent's trustee, and immediately deliver such payments to the Administrative Agent in their original form as received from the Offtaker, with proper endorsements for deposit, (c) at any Agent's reasonable written request, each Loan Party shall deliver to the Administrative Agent all original and other documents evidencing, and relating to, the agreements and transactions which gave rise to the Receivables, including all original orders, invoices and shipping receipts or, to the extent originals are not available, copies of such documents, and (d) upon any Agent's written request and at the expense of the relevant Loan Party, such Loan Party shall cause independent public accountants or others reasonably satisfactory to the Administrative Agent to furnish to the Administrative Agent reports showing reconciliations, agings and test verifications of, and trial balances for, the Receivables.

**8.07    Agents' Liability for Collateral**.  No Agent has any obligation to clean up or otherwise prepare the Collateral for sale.  Beyond the safe custody thereof and the accounting of moneys, no Agent shall have any duty with respect to any Collateral in its possession (or in the possession of any agent or bailee) or with respect to any income thereon or the preservation of rights against prior parties or any other rights pertaining thereto other than as may be required by applicable Law.  Each Agent shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which such Agent accords its own property.  Each Agent (and any Secured Party) shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehouse, carrier, forwarding agency, consignee, broker or other agent or bailee selected by Loan Parties or selected by any Agent in good faith.  In furtherance therefor, each Loan Party acknowledges and agrees that all risk of loss, damage or destruction of the Collateral shall be borne by the Loan Parties.

**8.08    No Obligation to Pursue Others**.  No Agent has any obligation to attempt to satisfy the Obligations by collecting them from any other person liable for them and any Agent may release, modify or waive any collateral provided by any other Person to secure any of the Obligations, all without affecting any Secured Party's rights against the Loan Parties. Each Loan Party waives any right it may have (including with respect to the Guaranty) to require any Agent to pursue any other Person for any of the Obligations or otherwise to enforce its payment against any collateral securing all or any part of the Obligations.

**8.09    Demand Waiver**.  Except as required by applicable Law, each Loan Party waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment and any other notices relating to the Obligations.

# ARTICLE IX

# AGENTS

**9.01    Appointment and Authority**.  Each of the Lenders, the Hedge Providers and the Issuing Banks hereby irrevocably appoints each of the Administrative Agent and the Collateral Agent as its agents hereunder and under the other Loan Documents and authorizes such Agents to take such actions on its behalf and to exercise such powers as are delegated to such Agents by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Furthermore, each Lender hereby authorizes and appoints the Agents as agents to execute, deliver and perform any of the Loan Documents, and any other document or agreement derived, related or ancillary thereto to which any of the Agents is a party, as well as any other document, agreement or instrument necessary or convenient for the delivery, perfection, execution and foreclosure of the referred agreements and any other Collateral that may be granted in connection with any of the Loan Documents or any of the Loans.  The provisions of this Article are solely for the benefit of the Administrative Agent, the Collateral Agent, the Hedge Providers, the Issuing Banks and the Lenders, and the Loan Parties shall not have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent and the Collateral Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

**9.02    Rights as a Lender, Hedge Provider or Issuing Banks**.  The Person serving as Agent hereunder shall have the same rights and powers in its capacity as a Lender or a Hedge Provider or an Issuing Bank, as any other Lender or Hedge Provider or Issuing Bank, and may exercise the same as though it were not the Administrative Agent or the Collateral Agent, and the term "Lender," "Lenders," "Hedge Provider," "Hedge Providers," "Issuing Bank" or "Issuing Banks" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not the Agent hereunder and without any duty to account therefor to the Lenders or the Hedge Providers or the Issuing Banks.

**9.03    Exculpatory Provisions**.  The Agents shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature.  Without limiting the generality of the foregoing, the Agents:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)      shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that an Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) or the Hedge Providers or the Issuing Banks; provided that an Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose an Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(c)      shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Loan Parties or any of their Affiliates that is communicated to or obtained by the Person serving as an Agent or any of its Affiliates in any capacity.

The Agents shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as each Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.01 and 8.02) or the Hedge Providers or the Issuing Banks, or (ii) in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment.  No Agent shall be deemed to have knowledge of any Default or Event of Default or Accelerated Amortization Event unless and until notice describing such Default or Event of Default or Accelerated Amortization Event is given in writing to such Agent by the Loan Parties, a Hedge Provider, an Issuing Bank or a Lender.

The Agents shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Agents.

**9.04      Reliance by Agents**.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender

unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. Each Agent may consult with legal counsel (who may be counsel for the Loan Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.05    **Delegation of Duties**. Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by such Agent. Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent. No Agent shall be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

### 9.06    Resignation or Removal of Agents.

(a)    Any Agent may at any time give notice of its resignation to the Lenders, the Hedge Providers, the Issuing Banks and the Loan Parties. Upon receipt of any such notice of resignation, the Required Lenders, the Hedge Providers and the Issuing Banks shall have the right to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders, the Hedge Providers and the Issuing Banks and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders and the Hedge Providers) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to) on behalf of the Lenders, the Hedge Providers and the Issuing Banks, appoint a successor Agent meeting the qualifications set forth above; provided that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)    If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable law, by notice in writing to the Loan Parties and such Person remove such Person as Administrative Agent and, in consultation with the Loan Parties, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c)    With effect from the Resignation Effective Date (1) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other

135

Loan Documents (except that in the case of any collateral security held by such Agent on behalf of the Lenders, the Hedge Providers and the Issuing Banks under any of the Loan Documents, the retiring or removed Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (2) except for any indemnity payments or other amounts then owed to the retiring or removed Agent, all payments, communications and determinations provided to be made by, to or through such Agent shall instead be made by or to each Lender, Hedge Provider and Issuing Bank directly, until such time, if any, as the Required Lenders, the Hedge Providers and the Issuing Banks appoint a successor Agent as provided for above.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Agent (other than as provided in <u>Section 3.01(h)</u> and other than any rights to indemnity payments or other amounts owed to the retiring or removed Agent as of the Resignation Effective Date), and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section).  The fees payable by the Loan Parties to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Loan Parties and such successor.  After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and <u>Section 10.04</u> shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

**9.07    Non-Reliance on Agents and Other Lenders**.  Each Lender, each Hedge Provider and each Issuing Bank acknowledges that it has, independently and without reliance upon any Agent or any other Lender, Hedge Provider, Issuing Bank or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender, each Hedge Provider and each Issuing Bank also acknowledges that it will, independently and without reliance upon any Agent or any other Lender, Hedge Provider, Issuing Bank or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**9.08    No Other Duties, Etc**.  Anything herein to the contrary notwithstanding, the Arranger listed on the cover page hereof shall not have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as an Agent or a Lender or Hedge Provider or Issuing Bank hereunder.

**9.09    Agents May File Proofs of Claim**.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to the Loan Parties, any Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether such Agent shall have made any demand on the Loan Parties) shall be entitled and empowered, by intervention in such proceeding or otherwise:

136

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders, the Hedge Providers, the Issuing Banks and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders, the Hedge Providers, the Issuing Banks and the Agents and their respective agents and counsel and all other amounts due the Lenders, the Hedge Providers, the Issuing Banks and the Agents under Sections 2.07 and 10.04) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender, each Hedge Provider and each Issuing Bank to make such payments to any Agent and, in the event that such Agent shall consent to the making of such payments directly to the Lenders, the Hedge Providers and the Issuing Banks, to pay to such Agent any amount due for the reasonable compensation, expenses, disbursements and advances of such Agent and its agents and counsel, and any other amounts due such Agent under Sections 2.07 and 10.04.

Nothing contained herein shall be deemed to authorize any Agent to authorize or consent to or accept or adopt on behalf of any Lender, any Hedge Provider or any Issuing Bank any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender, any Hedge Provider or any Issuing Bank to authorize any Agent to vote in respect of the claim of any Lender or any Hedge Provider or any Issuing Bank in any such proceeding.

**9.10    Enforcement**.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the the other Loan Documents against the Loan Parties shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, in accordance with Article VIII for the benefit of all the Secured Parties; provided that the foregoing shall not prohibit (i) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (ii) each other Secured Party from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Lender, Hedge Provide or Issuing Bank) hereunder and under the other Loan Documents, (iii) any Lender from exercising setoff rights in accordance with Section 10.08 or (iv) any Secured Party from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; provided further that if at any time there is no Person acting as Agent hereunder and under the other Loan Documents, then (x) the Required Lenders shall have the rights otherwise provided to the Agents pursuant to Article VIII and (y) in addition to the matters set forth in clauses (ii), (iii) and (iv) of the preceding proviso, any Secured Party may, with the consent of the Required Lenders, enforce any rights or remedies available to it and as authorized by the Required Lenders.

**9.11    Collateral and Guaranty Matters**.

137

(a)    The Lenders irrevocably authorize each Agent, at its option and in its discretion,to release any Lien on any Collateral or other property granted to or held by any Agent under any Loan Document (i) upon the indefeasible payment in full of the Obligations, (ii) that is sold or otherwise disposed of or to be sold or otherwise disposed of as part of or in connection with any sale or other disposition permitted hereunder or under any other Loan Document, or (iii) if approved, authorized or ratified in writing by the Lenders.

(b)    Upon request by any Agent at any time, the Lenders will confirm in writing such Agent's authority to release or subordinate its interest in particular types or items of property.

(c)    No Agent shall be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of any Agent's Lien thereon, or any certificate prepared by any Loan party or any Subsidiary in connection therewith, nor shall any Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

(d)    Notwithstanding anything contained in any Loan Document, no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce any guaranty of the Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by an Agent on behalf of the Secured Parties in accordance with the terms thereof; provided that, for the avoidance of doubt, in no event shall a Secured Party be restricted hereunder from filing a proof of claim on its own behalf during the pendency of a proceeding relative to any Loan Party or any Subsidiary under any Debtor Relief Law or any other judicial proceeding.  In the event of a foreclosure by any Agent on any of the Collateral pursuant to a public or private sale or other disposition, any Agent or any Secured Party may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and any Agent, as agent for and representative of such Secured Party (but not any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any Collateral payable by any Agent on behalf of the Secured Parties at such sale or other disposition.  Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral, to have agreed to the foregoing provisions.

9.12    **Survival**.  Each party's obligations under this Article IX shall survive the resignation or replacement of any Agent or any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement, and the payment in full in cash of the Obligations.

138

## ARTICLE X

## MISCELLANEOUS

**10.01  Amendments, Etc**.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Loan Parties therefrom, shall be effective unless in writing signed by the Required Lenders and the Loan Parties, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no such amendment, waiver or consent shall:

(a)    waive or amend any condition set forth in <u>Article IV</u> without the written consent of each Lender (or waive or amend any other provision of the Agreement which would have the effect of waiving or amending any condition set forth in such <u>Section 4.01</u>);

(b)    extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to <u>Section 8.02</u>) without the written consent of such Lender;

(c)    postpone any date fixed by this Agreement or any other Loan Document for any payment or mandatory prepayment of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby;

(d)    reduce the principal of, or the rate of interest specified herein on any Loan, or any fees or other amounts payable hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby; <u>provided</u>, <u>however</u>, that only the consent of the Required Lenders shall be necessary to waive any obligation of the Loan Parties to pay interest pursuant to <u>Section 2.06(b)</u>;

(e)    change <u>Section 2.10</u> or <u>Section 8.03</u> in a manner that would alter the *pro rata* sharing of payments required thereby without the written consent of each Lender;

(f)    change any provision of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(g)    change the currency or place of payment in which amounts are payable hereunder or under any other Loan Document without the written consent of each Lender;

(h)    release any of the Collateral from the Liens created pursuant to the Collateral Documents, except as expressly contemplated by the Loan Documents, without the written consent of each Lender;

(i)    impose any obligation on any Lender without the written consent of such Lender; or

139

(j)     change in any manner any provision of this Agreement that, by its terms, expressly requires the approval or concurrence of all Lenders, without the written consent of all Lenders; or

(k)     change in any matter the definition of "Accelerated Amortization Event," "Accelerated Amortization Period" or "Accelerated Amortization Start Date," without the written consent of all Lenders; or

(l)     waive, amend or terminate any Accelerated Amortization Event or any Accelerated Amortization Period without the written consent of all Lenders;

provided, further, that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document; (ii) no such agreement shall amend, modify or otherwise affect the rights, benefits or duties of the Hedge Providers hereunder without the prior written consent of each Hedge Provider; (iii) no such agreement shall amend, modify or otherwise affect the rights, benefits or duties of the Issuing Banks hereunder without the prior written consent of each Issuing Bank; (iv) the Fee Letters may be amended, or rights or privileges thereunder waived, in a writing executed only by the respective parties thereto; (v) a Reference Hedge may be amended, or rights or privileges thereunder waived, in a writing executed only by the respective parties thereto; and (vi) the Reference Letter of Credit Documentation may be amended, or rights or privileges thereunder waived, in a writing executed only by the respective parties thereto.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender disproportionately adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

## 10.02   Notices; Effectiveness; Electronic Communication.

(a)     <u>Notices Generally</u>.   Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in <u>subsection (b)</u> below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by electronic mail as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)                         if to any of the Loan Parties or any Agent, to the address, electronic mail address or telephone number specified for such Person on <u>Schedule 10.02</u>; and

140

(ii)                                    if to any other Lender, to the address, electronic mail address or telephone number specified in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Loan Parties).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient).   Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    Electronic Communications.  Notices and other communications to the Administrative Agent and the Lenders hereunder may be delivered or furnished by electronic communication (including email and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.   The Administrative Agent or the Loan Parties may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(c)    Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its email address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (i) and (ii), if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice, email or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(d)    The Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE."  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE LOAN PARTIES' MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE LOAN PARTIES' MATERIALS.   NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH

141

THE LOAN PARTIES' MATERIALS OR THE PLATFORM.   In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any of the Loan Parties, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of any of the Loan Parties' or the Administrative Agent's transmission of Loan Parties' Materials through the Internet.

(e)    Change of Address, Etc.    Each of the Loan Parties and the Administrative Agent may change their address, electronic mail or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, electronic mail or telephone number for notices and other communications hereunder by notice to the Loan Parties and the Administrative Agent.   In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.  Furthermore, each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States Federal and state securities Laws, to make reference to Loan Parties' Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Loan Parties or their securities for purposes of United States Federal or state securities laws.

(f)    Reliance by Administrative Agent and Lenders.   The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices (including telephonic or electronic Loan Notices) purportedly given by or on behalf of the Loan Parties even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  Each Loan Party agrees to indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Loan Parties.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

**10.03  No Waiver; Cumulative Remedies; Enforcement**.  No failure by any Lender or any Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Agents in accordance with Section 8.02 for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) any Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 10.08 (subject to the terms of Section 2.11), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent or Collateral Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to such Agent pursuant to Section 8.02 and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

**10.04   Expenses; Indemnity; Damage Waiver**.

(a)   <u>Costs and Expenses</u>.  The Loan Parties, jointly and severally, agree to pay (i) all reasonable and documented out-of-pocket expenses incurred by any Agent, the Colombian Collateral Agent and their respective Affiliates (including the reasonable and documented fees, charges and disbursements of counsel for such Agent and the Colombian Collateral Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); and (ii) all out-of-pocket expenses incurred by any Agent, the Colombian Collateral Agent or any Lender (including the fees, charges and disbursements of any counsel for the Agents or any Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)   <u>Indemnification by the Loan Parties</u>.  The Loan Parties, jointly and severally, agree to indemnify each Agent (and any sub-agent thereof), each Lender and the Colombian Collateral Agent, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the documented fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person other than such Indemnitee and its Related Parties arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of each Agent

143

(and any sub-agent thereof) and its Related Parties only, the administration of this Agreement and the other Loan Documents (including in respect of any matters addressed in Section 3.01), (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by any of the Loan Parties or their Subsidiaries, or any Environmental Liability related in any way to any of the Loan Parties or their Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses: (a) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (b) result from a claim brought by any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or any other Loan Document, if such Loan Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction.  Without limiting the provisions of Section 3.01(d), this Section 10.04(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    Reimbursement by Lenders.  To the extent that the Loan Parties for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to any Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to such Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's *pro rata* share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender), such payment to be made severally among them based on such Lenders' Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought); provided, further, that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against each Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for such Agent (or any such sub-agent) in connection with such capacity.  The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.10(d).

(d)    Waiver of Consequential Damages, Etc.  To the fullest extent permitted by applicable law, the Loan Parties shall not assert, and the Loan Parties hereby waive, and acknowledge that no other Person shall have, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting

144

from the gross negligence or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(e)    <u>Payments</u>.  All amounts due under this Section shall be payable not later than 20 Business Days after demand therefor.

(f)    <u>Survival</u>.    The agreements in this Section and the indemnity provisions of <u>Section 10.02(f)</u> shall survive the resignation of any Agent, the replacement of any Lender, the termination of the Aggregate Commitments and the repayment, satisfaction or discharge of all the other Obligations.

**10.05    Payments Set Aside**.  To the extent that any payment by or on behalf of the Loan Parties is made to any Agent or any Lender, or any Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to each Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by such Agent, *plus* interest thereon from the date of such demand to the date such payment is made at a rate *per annum* equal to the Federal Funds Rate from time to time in effect.  The obligations of the Lenders under <u>clause (b)</u> of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

**10.06    Successors and Assigns**.

(a)    <u>Successors and Assigns Generally</u>.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Loan Parties may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of <u>subsection (b)</u> of this Section, (ii) by way of participation in accordance with the provisions of <u>subsection (d)</u> of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of <u>subsection (e)</u> of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in <u>subsection (d)</u> of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Agents and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

145

(b)     Assignments by Lenders.  Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(i)                    Minimum Amounts.

(1)    in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment and/or the Loans at the time owing to it or contemporaneous assignments to related Approved Funds that equal at least the amount specified in paragraph (b)(i)(2) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(2)    in any case not described in subsection (b)(i)(1) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than U.S.$5,000,000 unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed).

(ii)                    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned.

(iii)                    Required Consents.  The consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for any assignment, unless such assignment is to a Lender, and Affiliate of a Lender of an Approved Fund.

(iv)                    Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of U.S.$3,500; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.  The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)                    No Assignment to Certain Persons.  No such assignment shall be made (A) to the Loan Parties or any of the Loan Parties' Affiliates or Subsidiaries, (B) to any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B), or (C) to a natural Person.

146

(vi)                     Certain Additional Payments.    In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or sub participations, or other compensating actions, including funding, with the consent of the Loan Parties and the Administrative Agent, the applicable *pro rata* share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent, Collateral Agent, the Hedge Providers, the Issuing Banks or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full *pro rata* share of all Loans.    Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, 3.05, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.    Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.    Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)     Register.    The Administrative Agent, acting solely for this purpose as an agent of the Loan Parties (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Loan Parties, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the

147

Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Loan Parties and any Lender, at any reasonable time and from time to time upon reasonable prior notice. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(d)    <u>Participations</u>. Any Lender may at any time, without the consent of, or notice to, the Loan Parties or the Administrative Agent, sell participations to any Person (other than a natural Person, a Defaulting Lender or any Loan Party or any of the Loan Parties' Affiliates or Subsidiaries) (each, a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); <u>provided</u> that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Loan Parties, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under <u>Section 10.04(c)</u> without regard to the existence of any participation.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; <u>provided</u> that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to <u>Section 10.01</u> that affects such Participant. Each of the Loan Parties agrees that each Participant shall be entitled to the benefits of <u>Sections 3.01</u>, <u>3.04</u> and <u>3.05</u> to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to <u>subsection (b)</u> of this Section (it being understood that the documentation required under <u>Section 3.01(f)</u> shall be delivered to the Lender who sells the participation) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section; <u>provided</u> that such Participant (A) agrees to be subject to the provisions of <u>Section 3.06</u> as if it were an assignee under paragraph (b) of this Section and (B) shall not be entitled to receive any greater payment under <u>Sections 3.01</u> or <u>3.04</u>, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Loan Parties' request and expense, to use reasonable efforts to cooperate with the Loan Parties to effectuate the provisions of <u>Section 3.06</u> with respect to any Participant. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 10.08</u> as though it were a Lender; <u>provided</u> that such Participant agrees to be subject to <u>Section 2.11</u> as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Loan Parties, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "<u>Participant Register</u>"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's

interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(e)    Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

**10.07 Treatment of Certain Information; Confidentiality**.  Each of the Agents and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (x) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement or (y) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Loan Parties and their obligations, this Agreement or payments hereunder, (g) on a confidential basis to (x) any rating agency in connection with rating the Loan Parties or their Subsidiaries or the credit facilities provided hereunder or (y) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder, (h) with the consent of the Loan Parties or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to any Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Loan Parties.  For purposes of this Section, "Information" means all information received from the Loan Parties or any Subsidiary relating to any of the Loan Parties or any Subsidiary or any of their respective businesses, other than any such information that is (i) clearly identified at the time of delivery as nonconfidential or (ii) available to any Agent or any Lender on a nonconfidential basis prior to disclosure by the Loan Parties or any Subsidiary.  Any Person required to maintain the confidentiality of

149

Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Agents and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Loan Parties or any of their Subsidiaries, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including United States Federal and state securities Laws.

**10.08  Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Loan Parties against any and all of the obligations of the Loan Parties now or hereafter existing under this Agreement or any other Loan Document to such Lender or its Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Loan Parties may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; <u>provided</u> that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 2.12</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent, the Collateral Agent, the Hedge Providers, the Issuing Banks and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Loan Parties and the Administrative Agent promptly after any such setoff and application; <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

**10.09  Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Loan Parties.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate,

allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

**10.10  Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by email in portable document format (.pdf) or electronic mail will be effective as delivery of a manually executed counterpart of this Agreement.

**10.11  Survival of Representations and Warranties**.  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or an Accelerated Amortization Event at the time of the Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

**10.12  Severability**.  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.  The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  Without limiting the foregoing provisions of this Section 10.12, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, the Collateral Agent, the Hedge Providers, the Issuing Banks or the other Lenders, as applicable, then such provisions shall be deemed to be in effect only to the extent not so limited.

**10.13  Replacement of Lenders**.  If the Loan Parties are entitled to replace a Lender pursuant to the provisions of Section 3.06, or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Loan Parties may, at their sole expense and effort (but with the cooperation of the Administrative Agent), upon notice to such Lender and the Agents, require

such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of such Lender's interests, rights (other than its existing rights to payments pursuant to Sections 3.01 and 3.04) and obligations under this Agreement and the related Loan Documents to an assignee Lender that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(a)    the Loan Parties shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.06(b);

(b)    such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under Section 3.05) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Loan Parties (in the case of all other amounts);

(c)    in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter;

(d)    such assignment does not conflict with applicable Laws;

(e)    in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent; and

(f)    the relevant assignee shall deliver to the Administrative Agent such documentation and evidence as is reasonably requested by the Administrative Agent (for itself or on behalf of any Lender) or any Lender in order for the Administrative Agent or such Lender to carry out all necessary "know your customer" or other checks in relation to the identity of the assignee that it is required to carry out in relation to the transactions contemplated in the Loan Documents.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Loan Parties to require such assignment and delegation cease to apply.

**10.14  Governing Law; Jurisdiction; Etc**.

(a)    Governing Law.  This Agreement shall be construed in accordance with and governed by the law of the State of New York.

(b)    Submission to Jurisdiction.  Each party hereto hereby agrees that any suit, action or proceeding with respect to this Agreement, the other Loan Documents (other than any Loan Document expressly governed by the laws of any other jurisdiction) or any judgment entered by any court in respect thereof may be brought in the United States District Court for the Southern District of New York, in the Supreme Court` of the State of New York

sitting in New York County (including its Appellate Division), or in any other appellate court in the State of New York, and each of the Loan Parties hereby expressly and irrevocably submits to the non-exclusive jurisdiction of such courts for the purpose of any such suit, action, proceeding or judgment.

(c)    Waiver of Venue.  Each party hereto hereby irrevocably waives any objection that it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document brought in the Supreme Court of the State of New York, County of New York or in the United States District Court for the Southern District of New York, and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(d)    Service of Process.  Each of the Loan Parties hereby agrees that service of all writs, process and summonses in any such suit, action or proceeding brought in the State of New York relating to this Agreement or any other Loan Document may be made upon C T Corporation System, presently located at 28 Liberty St, New York, NY 10005, United States (the "Process Agent"), and each of the Loan Parties hereby confirms and agrees that the Process Agent has been duly and irrevocably appointed as its agent and true and lawful attorney-in-fact in its name, place and stead to accept such service of any and all such writs, process and summonses, and agrees that the failure of the Process Agent to give any notice of any such service of process to such Loan Party shall not impair or affect the validity of such service or of any judgment based thereon.  If the Process Agent shall cease to serve as agent for the any of the Loan Parties to receive service of process hereunder, the relevant Loan Party shall promptly appoint a successor agent reasonably satisfactory to the Administrative Agent.  Each of the Loan Parties hereby further irrevocably consents to the service of process in any suit, action or proceeding in such courts by the mailing thereof by the Administrative Agent or any Lender by registered or certified mail, postage prepaid, at its address set forth in Section 10.02.

**10.15  WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 10.15.**

**10.16  No Immunity**.  To the extent that any of the Loan Parties may be or become entitled, in any jurisdiction in which judicial proceedings may at any time be

commenced with respect to this Agreement or any other Loan Document, to claim for itself or its properties, assets or revenues any immunity from suit, court jurisdiction, attachment prior to judgment, attachment in aid of execution of a judgment, execution of a judgment or from any other legal process or remedy relating to its obligations under this Agreement or any other Loan Document, and to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), each of the Loan Parties hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity to the fullest extent permitted by the laws of such jurisdiction.

**10.17  Special Waiver**.  To the extent that any of the Loan Parties may be entitled to the benefit of any provision of law requiring the Administrative Agent or any Lender in any suit, action or proceeding brought in a court of Colombia, Canada or other jurisdiction arising out of or in connection with any of this Agreement, any other Loan Documents and the Transactions, to post security for litigation costs or otherwise post a performance bond or guaranty, or to take any similar action, each of the Loan Parties hereby irrevocably waives such benefit, in each case to the fullest extent now or hereafter permitted under the laws of the applicable jurisdiction.

**10.18  Judgment Currency**.  This is an international loan transaction in which the specification of Dollars and payment in New York is of the essence, and the obligations of the Loan Parties under this Agreement to make payment to (or for account of) the Administrative Agent or a Lender in Dollars shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any other currency or in another place except to the extent that such tender or recovery results in the effective receipt by such Person in New York of the full amount of Dollars payable to such Person under this Agreement.  If for the purpose of obtaining judgment in any court it is necessary to convert a sum due hereunder in Dollars into another currency (in this Section 10.18 called the "judgment currency"), the rate of exchange that shall be applied shall be that at which in accordance with normal banking procedures the Administrative Agent could purchase such Dollars at the principal office of the Administrative Agent in New York with the judgment currency on the Business Day next preceding the day on which such judgment is rendered.  The obligation of the Loan Parties in respect of any such sum due from it to the Administrative Agent or any Lender hereunder or under any other Loan Document (in this Section 10.18 called an "Entitled Person") shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by such Entitled Person of any sum adjudged to be due hereunder in the judgment currency such Entitled Person may in accordance with normal banking procedures purchase and transfer Dollars to New York with the amount of the judgment currency so adjudged to be due, and each of the Loan Parties hereby, as a separate obligation and notwithstanding any such judgment, agrees to indemnify such Entitled Person against, and to pay such Entitled Person on demand, in Dollars, the amount (if any) by which the sum originally due to such Entitled Person in Dollars hereunder exceeds the amount of the Dollars so purchased and transferred.  If any Entitled Person reasonably determines that the amount of the Dollars so purchased and transferred to such Entitled Person exceeds the sum originally due to such Entitled Person, then such Entitled Person shall as promptly as reasonably practicable, reimburse such excess to the Loan Parties.

**10.19   Use of English Language**.   This Agreement has been negotiated and executed in the English language.   All certificates, reports, notices and other documents and communications given or delivered pursuant to this Agreement (including any modifications or supplements hereto) shall be in the English language, or accompanied by a certified English translation thereof.   Except in the case of (i) laws or official communications of Colombia or (ii) documents filed with any Governmental Authority in Colombia, with respect to any document originally issued in a language other than English, the English language version of any such document shall for purposes of this Agreement, and absent manifest error, control the meaning of the matters set out therein.

**10.20   Headings**.   Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**10.21   No Advisory or Fiduciary Responsibility**.   In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arranger, and the Lenders are arm's-length commercial transactions between the Loan Parties and their Affiliates, on the one hand, and the Administrative Agent, the Arranger, and the Lenders, on the other hand, (B) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) the Administrative Agent, the Arranger and each Lender is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for each Loan Party or any of its Affiliates, or any other Person and (B) neither the Administrative Agent, the Arranger nor any Lender has any obligation to the Loan Parties or any of their Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Arranger and the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their Affiliates, and neither the Administrative Agent, the Arranger, nor any Lender has any obligation to disclose any of such interests to the Loan Parties or any of their Affiliates.   To the fullest extent permitted by law, the Loan Parties hereby waive and release any claims that they may have against the Administrative Agent, the Arranger or any Lender with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**10.22   Electronic Execution of Assignments and Certain Other Documents**. The words "execute," "execution," "signed," "signature," and words of like import in any Assignment and Assumption or in any amendment or other modification hereof (including waivers and consents) shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the

same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

**10.23  USA PATRIOT Act**.   Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of the Loan Parties and other information that will allow such Lender or the Administrative Agent, as applicable, to identify the Loan Parties in accordance with the Act and to provide notice of these requirements, and this notice shall satisfy such notice requirements of the Act.  The Loan Parties shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the Act.

**10.24  Acknowledgment and Consent of Affected Financial Institutions**. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)                          a reduction in full or in part or cancellation of any such liability;

(ii)                         a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)                    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

### 10.25  Erroneous Payment

(a)    If the Administrative Agent (x) notifies a Lender, or any Person who has received funds on behalf of a Lender (any such Lender or other recipient (and each of their respective successors and assigns), a "Payment Recipient") that the Administrative Agent has determined in its reasonable discretion (whether or not after receipt of any notice under immediately succeeding clause (b)) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "Erroneous Payment") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), (*provided*, that, without limiting any other rights or remedies (whether at law or in equity), the Administrative Agent may not make any such demand under this clause (a) with respect to an Erroneous Payment unless such demand is made within 5 Business Days of the date of receipt of such Erroneous Payment by the applicable Payment Recipient), such Erroneous Payment shall at all times remain the property of the Administrative Agent pending its return or repayment as contemplated below in this Section 10.25 and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received).   A notice of the Administrative Agent to any Payment Recipient under this clause (a) shall be conclusive, absent manifest error.

(b)    Without limiting the immediately preceding clause (a), each Lender or any Person who has received funds on behalf of a Lender (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)     it acknowledges and agrees that (A) in the case of immediately preceding <u>clause (x)</u> or <u>(y)</u>, an error and mistake shall be presumed to have been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding <u>clause (z)</u>), in each case, with respect to such payment, prepayment or repayment; and

(ii)     such Lender shall use commercially reasonable efforts to (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding <u>clauses (x)</u>, <u>(y)</u> and <u>(z)</u>) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this <u>Section 10.25(b)</u>.

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this <u>Section 10.25(b)</u> shall not have any effect on a Payment Recipient's obligations pursuant to <u>Section 10.25(a)</u> or on whether or not an Erroneous Payment has been made.

(c)     Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent has demanded to be returned under immediately preceding <u>clause (a)</u>.

(d)     The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender, to the rights and interests of such Lender, as the case may be) under the Loan Documents with respect to such amount (the "<u>Erroneous Payment Subrogation Rights</u>") (provided that the Loan Parties' Obligations under the Loan Documents in respect of the Erroneous Payment Subrogation Rights shall not be duplicative of such Obligations in respect of Loans that have been assigned to the Administrative Agent under an Erroneous Payment Deficiency Assignment) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any Obligations owed by the Loan Parties; <u>provided</u> that this <u>Section 10.25</u> shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the Obligations of the Loan Parties relative to the amount (and/or timing for payment) of the Obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; <u>provided</u>, <u>further</u>, that for the avoidance of doubt, immediately preceding <u>clauses (x)</u> and <u>(y)</u> shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from any Loan Party for the purpose of making such Erroneous Payment.

(e)    To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of setoff or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, any defense based on "discharge for value" or any similar doctrine.

(f)    Each party's obligations, agreements and waivers under this Section 10.25 shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

## ARTICLE XI

## GUARANTY

### 11.01  Guaranty.

Each Guarantor, jointly and severally, hereby absolutely, unconditionally and irrevocably guarantees to the Secured Parties and their respective successors, endorsees, transferees and assigns, as a guaranty of payment and not merely as a guaranty of collection, prompt and complete payment when due, whether at stated maturity, by required prepayment, upon acceleration, demand or otherwise, and at all times thereafter, of any and all of the Obligations, whether for principal, interest, premiums, fees, indemnities, damages, costs, expenses or otherwise, of the Borrower or the other Loan Parties to the Secured Parties, and whether arising hereunder or under any other Loan Document (including all renewals, extensions, amendments, refinancings and other modifications thereof and all costs, attorneys' fees and expenses incurred by the Secured Parties in connection with the collection or enforcement thereof). The Administrative Agent's books and records showing the amount of the Obligations shall be admissible in evidence in any action or proceeding, and shall be binding upon the Guarantors, and conclusive absent manifest error for the purpose of establishing the amount of the Obligations. This Guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or any instrument or agreement evidencing any Obligations, or by the existence, validity, enforceability, perfection, non-perfection or extent of any collateral therefor, or by any fact or circumstance relating to the Obligations which might otherwise constitute a defense to the obligations of any Guarantor under this Guaranty, and each Guarantor hereby irrevocably waives any defenses it may now have or hereafter acquire in any way relating to any or all of the foregoing.

### 11.02  Rights of Lenders. Each Guarantor consents and agrees that the Secured Parties may, at any time and from time to time, without notice or demand, and without affecting the enforceability or continuing effectiveness hereof in accordance with this Agreement and the other Loan Documents: (a) amend, extend, renew, compromise, discharge, accelerate or otherwise change the time for payment or the terms of the Obligations or any part thereof; (b) take, hold, exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any

security for the payment of this Guaranty or any Obligations; (c) apply such security and direct the order or manner of sale thereof as the Administrative Agent and the Lenders in their sole discretion may determine; and (d) release or substitute one or more of any endorsers or other guarantors of any of the Obligations.  Without limiting the generality of the foregoing, each Guarantor consents to the taking of, or failure to take, any action which might in any manner or to any extent vary the risks of such Guarantor under this Guaranty or which, but for this provision, might operate as a discharge of such Guarantor.

**11.03  Certain Waivers**.  Each Guarantor waives (a) any defense arising by reason of any disability or other defense of the Borrower or any other guarantor, or the cessation from any cause whatsoever (including any act or omission of any Secured Party) of the liability of the Borrower or any other Loan Party; (b) any defense based on any claim that any Guarantor's obligations exceed or are more burdensome than those of the Borrower or any other Loan Party; (c) the benefit of any statute of limitations affecting any Guarantor's liability hereunder; (d) any right to proceed against the Borrower or any other Loan Party, proceed against or exhaust any security for the Obligations, or pursue any other remedy in the power of any Secured Party whatsoever; (e) any benefit of and any right to participate in any security now or hereafter held by any Secured Party; and (f) to the fullest extent permitted by Law, any and all other defenses or benefits that may be derived from or afforded by applicable Law limiting the liability of or exonerating guarantors or sureties.  Notwithstanding the foregoing, each Guarantor agrees that its obligations under and in respect of this guarantee shall not be affected by, and shall remain in full force and effect without regard to, and hereby waives all rights, claims or defenses that it might otherwise have (now or in the future) with respect to each of the following (whether or not such Guarantor has knowledge thereof): (i) the validity or enforceability of this Agreement or any other Loan Document, any of the Obligations or any guarantee or right of offset with respect thereto at any time or from time to time held by any Secured Party; (ii) any renewal, extension or acceleration of, or any increase in the amount of the Obligations, or any amendment, supplement, modification or waiver of, or any consent to departure from, the Loan Documents; (iii) any failure or omission to assert or enforce or agreement or election not to assert or enforce, delay in enforcement, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under any Loan Document, at law, in equity or otherwise) with respect to the Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Obligations; (iv) any change, reorganization or termination of the corporate structure or existence of the Borrower or any other Loan Party or any of their Subsidiaries and any corresponding restructuring of the Obligations; (v) any settlement, compromise, release, or discharge of, or acceptance or refusal of any offer of payment or performance with respect to, or any substitution for, the Obligations, or any subordination of the Obligations to any other obligations; (vi) the validity, perfection, non-perfection or lapse in perfection, priority or avoidance of any security interest or lien, the release of any or all collateral securing, or purporting to secure, the Obligations or any other impairment of such collateral; and (vii) any exercise of remedies with respect to any security for the Obligations (including, without limitation, any collateral, including the Collateral, securing or purporting to secure any of the Obligations) at such time and in such order and in such manner as the Administrative Agent and the Secured Parties may decide and whether or not every aspect thereof is commercially reasonable and whether or not such action constitutes an election of remedies and even if such

action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy that any Guarantor would otherwise have. Without limiting the generality of the foregoing or any other provisions hereof, each Guarantor hereby expressly waives any and all benefits which might otherwise be available to such Guarantor under applicable Law; and any other circumstance whatsoever which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Obligations or which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower or any Guarantor for the Obligations, or of any Guarantor under the guarantee contained in this Article XI or of any security interest granted by any Guarantor, whether in a proceeding under any Debtor Relief Law or in any other instance (other than the indefeasible payment in full of the Obligations). Each Guarantor expressly waives all setoffs and counterclaims and all presentments, demands for payment or performance, notices of non-payment or non-performance, protests, notices of protest, notices of dishonor and all other notices or demands of any kind or nature whatsoever with respect to the Obligations, and all notices of acceptance of this Guaranty or of the existence, creation or Incurrence of new or additional Obligations.

       **11.04   Obligations Independent**.  The obligations of the Guarantors hereunder are those of primary obligor, and not merely as surety, and are independent of the Obligations and the obligations of any other guarantor, and a separate action may be brought against the Guarantors to enforce this Guaranty whether or not the Borrower, any other Loan Party or any other person or entity is joined as a party.

       **11.05   Subrogation**.   No Guarantor shall exercise any right of subrogation, contribution, indemnity, reimbursement or similar rights with respect to any payments it makes under this Guaranty until all of the Obligations and any amounts payable under this Guaranty have been indefeasibly paid and performed in full and the Commitments are terminated.  If any amounts are paid to any Guarantor in violation of the foregoing limitation, then such amounts shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to reduce the amount of the Obligations, whether matured or unmatured.

       **11.06   Termination; Reinstatement**.   This Guaranty is a continuing and irrevocable guaranty of all Obligations now or hereafter existing and shall remain in full force and effect until all Obligations and any other amounts payable under this Guaranty are indefeasibly paid in full in cash and the Commitments with respect to the Obligations are terminated.  Notwithstanding the foregoing, this Guaranty shall continue in full force and effect or be revived, as the case may be, if any payment by or on behalf of the Borrower or any other Loan Party is made, or any of the Secured Parties exercises its right of setoff, in respect of the Obligations and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by any of the Secured Parties in their discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Laws or otherwise, all as if such payment had not been made or such setoff had not occurred and whether or not the Secured Parties are in possession of or have released this Guaranty and regardless of any prior revocation, rescission, termination or reduction.  The obligations of the Guarantors under this paragraph shall survive termination of this Guaranty.

**11.07  Subordination**.  Each Guarantor hereby subordinates the payment of all obligations and indebtedness of the Borrower or any other Loan Party owing to such Guarantor, whether now existing or hereafter arising, including any obligation of the Borrower or any other Loan Party to any Guarantor as subrogee of the Secured Parties or resulting from such Guarantor's performance under this Guaranty, to the indefeasible payment in full in cash of all Obligations.  If the Secured Parties so request, any such obligation or indebtedness of the Borrower or any other Loan Party to the relevant Guarantor shall be enforced and performance received by the relevant Guarantor as trustee for the Secured Parties and the proceeds thereof shall be paid over to the Secured Parties on account of the Obligations, but without reducing or affecting in any manner the liability of any Guarantor under this Guaranty.

**11.08  Stay of Acceleration**.  If acceleration of the time for payment of any of the Obligations is stayed, in connection with any case commenced by or against the Borrower or any other Loan Party (other than a Guarantor) under any Debtor Relief Laws, or otherwise, all such amounts shall nonetheless be payable by such Guarantor immediately upon demand by the Secured Parties.

**11.09  Condition of Borrower**.  Each Guarantor acknowledges and agrees that it has the sole responsibility for, and has adequate means of, obtaining from the Borrower, the other Loan Parties and any other guarantor such information concerning the financial condition, business and operations of the Borrower, the other Loan Parties and any such other guarantor as each Guarantor requires, and that none of the Secured Parties has any duty, and no Guarantor is relying on the Secured Parties at any time, to disclose to any Guarantor any information relating to the business, operations or financial condition of the Borrower, the other Loan Parties or any other guarantor (each Guarantor waiving any duty on the part of the Secured Parties to disclose such information and any defense relating to the failure to provide the same).

**11.10  Payments**.  Any and all payments by or on account of any obligation of any Guarantor hereunder or under any other Loan Document shall be made in Dollars and in immediately available funds, on the same terms and to the same extent that payments by the Borrower are required to be made pursuant to the terms hereof.

**11.11  Keepwell**.  Each Guarantor that is a Qualified ECP Guarantor at the time the Guaranty or the grant of the security interest under the Loan Documents, in each case, by any Specified Loan Party, becomes effective with respect to any Swap Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support to each Specified Loan Party with respect to such Swap Obligation as may be needed by such Specified Loan Party from time to time to honor all of its obligations under this Guaranty and the other Loan Documents in respect of such Swap Obligation (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Guarantor's obligations and undertakings under this Article XI voidable under applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations and undertakings of each Qualified ECP Guarantor under this Section 11.11 shall remain in full force and effect until the Obligations have been indefeasibly paid and performed in full.  Each Qualified ECP Guarantor intends this Section 11.11 to constitute, and this Section 11.11 shall be deemed to constitute, a guarantee of the obligations of,

and a "keepwell, support, or other agreement" for the benefit of, each Specified Loan Party for all purposes of the Commodity Exchange Act.

**11.12    Acknowledgement Regarding Any Supported QFCs**.  To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Hedging Agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York or of the United States or any other state of the United States):

(a)    In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States or a state of the United States.

(b)    As used in this Section 11.12, the following terms have the following meanings:

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Covered Entity" means any of the following:

(i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b)

(ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

163

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

**11.13  Additional Guarantors**.  From time to time any one or more Subsidiaries of the Borrower (other than the then Loan Parties) (each, an "Additional Guarantor") may, upon written notice to the Administrative Agent, become a Guarantor hereunder by delivering to the Administrative Agent a Joinder Agreement, substantially in the form of Exhibit U (except for usual and customary provisions to the extent required under applicable Law and reasonably acceptable to the Administrative Agent) (a "Joinder Agreement"), duly executed by such Additional Guarantor or Additional Guarantors, as applicable; provided that in the case of each Additional Guarantor or Additional Guarantors, as applicable, that become a Guarantor pursuant to this Section 11.13, each such Additional Guarantor or Additional Guarantors, as applicable, shall deliver (i) to the Administrative Agent simultaneously with the Joinder Agreement a legal opinion addressed to the Administrative Agent and each Lender and issued by a counsel to such Additional Guarantor or Additional Guarantors, as applicable, reasonably acceptable to the Administrative Agent, covering such matters relating to the applicable Joinder Agreement and the transactions contemplated hereby and thereby as the Administrative Agent may reasonably request, (ii) to each Lender, substitute Colombian Promissory Notes by the Borrower and each Guarantor (including the Additional Guarantor) and (iii) to the Administrative Agent documents of the types referred to in Section 4.01(b), (e), (f), (o) and (u), in each case, in form, content and scope reasonably satisfactory to the Administrative Agent.  The execution and delivery of any Joinder Agreement shall not require the consent of any party hereunder.  Upon the execution and delivery by any Additional Guarantor of a Joinder Agreement, (i) such Additional Guarantor shall become and be a Guarantor hereunder, and each reference in this Agreement to a "Guarantor" shall also mean and be a reference to such Additional Guarantor, and each reference in any other Loan Document to a "Guarantor" shall also mean and be a reference to such Additional Guarantor, and (ii) each reference herein to the "Guaranty" or words of like import referring to the Guaranty, and each reference in any other Loan Document to the "Guaranty" or words of like import referring to the Guaranty, shall mean and be a reference to the Guaranty as supplemented by such Joinder Agreement.  The rights and obligations of each Loan Party hereunder shall remain in full force and effect notwithstanding any Additional Guarantor becoming a party to this Agreement.   The rights and obligations of each Loan Party hereunder shall remain in full force and effect notwithstanding any Additional Guarantor becoming a party to this Agreement.

**11.14  Swiss Guarantee Limitations**.  Notwithstanding anything to the contrary in this Agreement, the obligations of any Swiss Guarantor under this Agreement and any other Loan Document are subject to the following limitations:

164

(a)    If and to the extent the obligations assumed or the security interest granted by any Swiss Guarantor under this Agreement or any other Loan Document guarantees or secures obligations of its (direct or indirect) parent company (upstream guarantee/security) or its sister companies (cross-stream guarantee/security) (the "Upstream or Cross-Stream Secured Obligations") and if and to the extent payments under this Agreement or any other Loan Document or using the proceeds from the enforcement of such security interest to discharge the Upstream or Cross-Stream Secured Obligations would constitute a repayment of capital (*Einlagerückgewähr/Kapitalrückzahlung*), a violation of the legally protected reserves (*gesetzlich geschützte Reserven*) or the payment of a (constructive) dividend (*Gewinnausschüttung*) by the relevant Swiss Guarantor or would otherwise be restricted under Swiss law and practice then applicable, the payments under this Agreement or any other Loan Document or the use of proceeds of such enforcement shall be limited to the maximum amount of the relevant Swiss Guarantor's freely disposable shareholder equity at the time it becomes liable or at the time of enforcement, including, without limitation, any statutory reserves which can be transferred into unrestricted, distributable reserves, in accordance with Swiss law (the "Maximum Amount"); provided that such limitation is required under the applicable Law at that time; provided, further, that such limitation shall not free the relevant Swiss Guarantor from its obligations in excess of the Maximum Amount, but merely postpone the performance date of those obligations or the discharge date out of enforcement proceeds until such time or times as performance or discharge is again permitted under then applicable law.  This Maximum Amount of freely disposable shareholder equity shall be determined in accordance with Swiss law and applicable Swiss accounting principles, and, if and to the extent required by applicable Swiss law, shall be confirmed by the auditors of the relevant Swiss Guarantor on the basis of an interim audited balance sheet as of that time.

(b)    In respect of Upstream or Cross-Stream Secured Obligations, at the time it is required to make a payment under this Agreement or any other Loan Document or at the time of enforcement, each Swiss Guarantor shall, if and to the extent required by applicable law (including tax treaties) in force at the relevant time:

(i)    procure that such payments or enforcement proceeds can be used to discharge Upstream or Cross-Stream Secured Obligations without deduction of Swiss Withholding Tax by discharging the liability to such tax by notification pursuant to applicable law rather than payment of the tax;

(ii)    if the notification procedure pursuant to sub-paragraph (i) above does not apply, deduct the Swiss Withholding Tax at such rate (currently 35% at the date of this Agreement) as is in force from time to time from any such payment or enforcement proceeds used to discharge Upstream or Cross-Stream Secured Obligations; or deduct Swiss Withholding Tax at the reduced rate resulting after discharge of part of such tax by notification if the notification procedure pursuant to sub-paragraph (i) above applies for a part of Swiss Withholding Tax only, and pay, without delay, any such tax deducted to the Swiss Federal Tax Administration;

(iii)    promptly notify the Administrative Agent in writing that such notification or, as the case may be, deduction has been made, and provide the

165

Administrative Agent with evidence that such notification to the Swiss Federal Tax Administration has been made or, as the case may be, such tax deducted have been paid to the Swiss Federal Tax Administration; and

(iv)   in the case of a deduction of Swiss Withholding Tax, use its best efforts to ensure that any person, which is entitled to a full or partial refund of the Swiss Withholding Tax deducted from such payment or enforcement proceeds, will, as soon as possible after such deduction,

(1)   request a refund of the Swiss Withholding Tax under applicable law (including tax treaties), and

(2)   pay to the Administrative Agent upon receipt any amount so refunded.

(c)   To the extent any Swiss Guarantor is required to deduct Swiss Withholding Tax pursuant to this Agreement or any other Loan Document, and if the Maximum Amount is not fully utilized, the Swiss Guarantor will be required to pay, directly or by way of use of the proceeds of enforcement, an additional amount so that after making any required deduction of Swiss Withholding Tax the aggregate net amount paid to the Administrative Agent, directly or by way of use of the proceeds of enforcement, is equal to the amount which would have been paid if no deduction of Swiss Withholding Tax had been required, provided that the aggregate amount paid (including the additional amount) shall in any event be limited to the Maximum Amount. If a refund is made to a Lender, such Lender shall transfer the refund so received to the relevant Swiss Guarantor, subject to any right of set-off of such Lender pursuant to the Loan Documents.

(d)   Each Swiss Guarantor and any parent company of the Swiss Guarantor which is a party to a Loan Document shall procure that the Swiss Guarantor will promptly take and promptly cause to be taken all and any action as soon as reasonably practicable but in any event within 30 Business Days from the request of the Administrative Agent, including, without limitation, the following:

(i)   the passing of any shareholders' resolutions to approve the payment or other performance under this Agreement or any other Loan Document or the use of the enforcement proceeds, which may be required as a matter of Swiss mandatory law in force at the time of the enforcement of this Agreement or any other Loan Document or the security interest in order to allow a prompt use of the enforcement proceeds;

(ii)   preparation of up-to-date audited balance sheet of the Swiss Guarantor;

(iii)   confirmation of the auditors of the Swiss Guarantor that the relevant amount represents the Maximum Amount;

(iv)  conversion of restricted reserves into profits and reserves freely available for the distribution as dividends (to the extent permitted by mandatory Swiss law);

(v)  revaluation of hidden reserves (to the extent permitted by mandatory Swiss law);

(vi)  to the extent permitted by applicable law, Swiss accounting standards and the Loan Documents, (i) write-up or realize any of its assets that are shown in its balance sheet with a book value that is significantly lower than the market value of the assets, in case of realization, however, only if such assets are not necessary for the Swiss Guarantor's business (*nicht betriebsnotwendig*), and (ii) reduce its share capital to the minimum allowed under then applicable law, provided that such steps are permitted under the Loan Documents; and

(vii)  all such other measures necessary or useful to allow the Administrative Agent to use payments by the Swiss Guarantor or enforcement proceeds as agreed under this Agreement or the other Loan Documents with a minimum of limitations.

(e)     The limitations and procedures of this Section 11.14 shall also apply to any other obligation of a Swiss Guarantor under this Agreement or any other Loan Document to grant economic benefits to its (direct or indirect) parent company or its sister companies, including, for the avoidance of doubt, any joint liability, any indemnity, any waiver of set-off or subrogation rights or any subordination or waiver of intra-group claims.

[*Remainder of this page intentionally left blank*]

167

_IN WITNESS WHEREOF,_ the parties hereto have caused this Agreement to be duly executed as of the date first above written.


**CANACOL ENERGY LTD.**
as Borrower

By: _____
Name: Jason Bednar
Title:   Chief Financial Officer

**CANACOL ENERGY INC.,**
as Guarantor

By: _____
Name: Jason Bednar
Title:   Director

**SHONA ENERGY LIMITED
PARTNERSHIP**,
as Guarantor

By: _____

Name: Jason Bednar

Title:  Director of the General Partner

[Signature Page – Credit and Guarantee Agreement]

**SHONA ENERGY HOLDING LIMITED PARTNERSHIP**, as Guarantor

By: _____

Name: Jason Bednar

Title:   Director of the General Partner

**CANACOL HOLDING GMBH**,
as Guarantor

By: _____
Name: Tracy Whitmore
Title:   Director

**SHONA ENERGY HOLDING ULC**,
as Guarantor

By: _____

Name: Jason Bednar
Title:  Director

**SHONA ENERGY ULC**,
as Guarantor

By: _____

Signed by:

*Jason Bednar*

4G90F2233E48441

Name: Jason Bednar
Title:  Director

[Signature Page – Credit and Guarantee Agreement]

**CANACOL ENERGY COLOMBIA S.A.S.**,
as Guarantor

By: _____

ANDRES VALENZUELA PACHON

Name: Andres Valenzuela Pachon
Title:   Legal Representative

**CNE OIL & GAS S.A.S.,**
as Guarantor

By: _____
Name: Andres Valenzuela Pachon
Title:   Legal Representative

**CNE ENERGY S.A.S.,**
as Guarantor

By: _____

Name: Andres Valenzuela Pachon
Title:   Legal Representative

**SHONA HOLDING GMBH**,
as Guarantor

By: _____

Name: Jason Bednar
Title:   Director

[Signature Page – Credit and Guarantee Agreement]

**GEOPRODUCTION HOLDING GMBH**,
as Guarantor

By: _____

Name: Jason Bednar
Title:   Director

**CANTANA ENERGY GMBH (FORMERLY CANTANA ENERGY, S.A.),**
as Guarantor

By: _____

*Signed by:*
*Jason Bednar*
4C60F2233E48441...

Name: Jason Bednar
Title:   Director

**CNE OIL & GAS S.R.L.**,
as Guarantor

By: _____

Name: Abraham Valles
Title:   Director

[Signature Page – Credit and Guarantee Agreement]

**MACQUARIE    BANK    LTD.,**    as
Administrative Agent

By: _____
      Robert Trevena
      3DB437B422D4436...

Name: _____
      Robert Trevena

Title: _____
      Division Director


By: _____
      Chris Horne
      AFB69A9AD7BF4DD...

Name: _____
      Chris Horne

Title: _____
      Division Director

**MACQUARIE    BANK    LTD.,**    as
Collateral Agent

By: _Robert Trevena_ _____
Name: ~~Robert Trevena~~ _____
Title: _Division Director_ _____


By: _Chris Horne_ _____
Name: ~~Chris Horne~~ _____
Title: _Division Director_ _____

[Signature Page – Credit Agreement]

**MACQUARIE    BANK    LTD.,**    as Lender

By: _____

Name: _____
Robert Trevena

Title: _____
Division Director

By: _____

Name: _____
Chris Horne

Title: _____
Division Director

[Signature Page – Credit Agreement]

**MACQUARIE       BANK       LTD.,**       as
Hedge Provider

By: _____

Name: Robert Trevena

Title: Division Director


By: _____

Name: Chris Horne

Title: Division Director

[Signature Page – Credit Agreement]

**MACQUARIE    BANK    LTD.,    as** Issuing Bank

By: _Robert Trevena_____

Name: _Robert C. Trevena_____

Title: _Division Director_____


By: _Chris Horne_____

Name: _____

Title: _Division Director_____

[Signature Page – Credit Agreement]

**Annex I**

**Repayment Schedule**

| Months of Principal Repayment Date | Amount equal to the following percentage of the Loans made as of the last day of the Termination Date |
|---|---|
| December, 2025 | 25% |
| March, 2026 | 25% |
| June, 2026 | 25% |
| September, 2026 | 25% |
| **Maturity Date** | 100% |

**SCHEDULE 1.01-I**
to Credit and Guaranty Agreement

**COMMITMENTS AND APPLICABLE PERCENTAGES**

| Lender | Commitment | Applicable Percentage |
|---|---|---|
| Macquarie Bank Ltd. | U.S.$75,000,000 | 100% |