**<u>EXHIBIT B</u>**

*Execution Version*

# US$200,000,000
# REVOLVING CREDIT AND GUARANTY AGREEMENT

**dated as of February 14, 2023**

**by and among**

**CANACOL ENERGY LTD.,**
**as the Borrower,**

**EACH GUARANTOR PARTY HERETO,**

**CERTAIN LENDERS,**

**DEUTSCHE BANK TRUST COMPANY AMERICAS,**
**as the Administrative Agent**

_____

**CITIGROUP GLOBAL MARKETS INC.,**

**DEUTSCHE BANK, AG and**

**JPMORGAN CHASE BANK, N.A.**

**as Joint Lead Arrangers and Joint Bookrunners**
_____

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS ...............................................................................................1

    Section 1.01    Certain Defined Terms ................................................................1
    Section 1.02    Other Interpretive Provisions ..................................................49
    Section 1.03    Accounting Terms ......................................................................50
    Section 1.04    Currency Equivalents ................................................................50

ARTICLE II THE COMMITMENTS AND LOANS ....................................................51

    Section 2.01    The Loans ....................................................................................51
    Section 2.02    Borrowings of Loans ................................................................51
    Section 2.03    Optional Prepayments ..............................................................52
    Section 2.04    Mandatory Prepayments ..........................................................53
    Section 2.05    Termination or Reduction of Commitments ..........................55
    Section 2.06    Repayment of Loans ..................................................................55
    Section 2.07    Interest ........................................................................................56
    Section 2.08    Fees ..............................................................................................57
    Section 2.09    Computation of Interest and Fees ............................................57
    Section 2.10    Evidence of Debt; Notes ............................................................58
    Section 2.11    Payments Generally; Administrative Agent's Clawback ......59
    Section 2.12    Sharing of Payments by Lenders ..............................................61
    Section 2.13    Rights of Set-off ........................................................................62

ARTICLE III YIELD PROTECTION, ILLEGALITY AND TAXES .......................62

    Section 3.01    Increased Costs ..........................................................................62
    Section 3.02    Illegality ......................................................................................63
    Section 3.03    Funding Losses ..........................................................................64
    Section 3.04    Taxes ............................................................................................65
    Section 3.05    Mitigation ....................................................................................67
    Section 3.06    Alternate Rate of Interest ..........................................................67
    Section 3.07    Benchmark Replacement Setting. ............................................68
    Section 3.08    Survival ......................................................................................69

ARTICLE IV CONDITIONS PRECEDENT ................................................................69

    Section 4.01    Conditions Precedent to Closing ............................................69
    Section 4.02    Conditions Precedent to Borrowing ......................................74
    Section 4.03    Satisfaction of Conditions Precedent ....................................76

ARTICLE V REPRESENTATIONS AND WARRANTIES ......................................77

    Section 5.01    Power and Authority ................................................................77

Section 5.02    Equity Interests; Subsidiaries...........................................................77
Section 5.03    Due Authorization, Etc.; No Conflicts ...........................................77
Section 5.04    No Additional Authorization Required; Approvals ...............................78
Section 5.05    Compliance with Applicable Laws and Agreements ..............................78
Section 5.06    Legal Effect...............................................................................79
Section 5.07    Financial Statements...................................................................80
Section 5.08    No Material Adverse Change..........................................................80
Section 5.09    Ranking; Priority .......................................................................80
Section 5.10    Existing Debt............................................................................80
Section 5.11    No Actions or Proceedings ...........................................................80
Section 5.12    Commercial Activity; Absence of Immunity........................................81
Section 5.13    Taxes.....................................................................................81
Section 5.14    Disclosure ..............................................................................81
Section 5.15    Insurance ...............................................................................82
Section 5.16    Title to Property; Liens................................................................82
Section 5.17    Use of Proceeds........................................................................82
Section 5.18    No Default...............................................................................83
Section 5.19    Solvency.................................................................................83
Section 5.20    Investment Company Act ..............................................................83
Section 5.21    Sanctioned Person .....................................................................83
Section 5.22    Labor Matters ..........................................................................83
Section 5.23    Environmental Matters ................................................................83
Section 5.24    No Set-off................................................................................84
Section 5.25    Exchange Controls .....................................................................84
Section 5.26    Anti-Corruption Laws..................................................................84
Section 5.27    Development, Operation and Maintenance ..........................................85
Section 5.28    Intellectual Property ..................................................................85
Section 5.29    Pension, Welfare and Other Similar Plans..........................................85
Section 5.30    International Banking Facility ........................................................86
Section 5.31    Beneficial Ownership ..................................................................86
Section 5.32    Not an EEA Financial Institution ....................................................86
Section 5.33    Business Activity in Panama...........................................................86

ARTICLE VI AFFIRMATIVE COVENANTS .........................................................87

Section 6.01    Financial Statements...................................................................87
Section 6.02    Certificates; Other Information.......................................................88
Section 6.03    Corporate Existence; Conduct of Business; Inspection; Books and
                Records ..................................................................................91
Section 6.04    Compliance with Applicable Laws and Contracts. ................................92
Section 6.05    Governmental Approvals...............................................................93
Section 6.06    Property...................................................................................93
Section 6.07    Insurance ...............................................................................93
Section 6.08    Ranking; Priority .......................................................................94
Section 6.09    Use of Proceeds ........................................................................94
Section 6.10    Environmental Matters ................................................................94
Section 6.11    Maintenance of Corporate Separateness............................................95

Section 6.12    Beneficial Ownership ...................................................................95
Section 6.13    Colombian Central Bank Requirements ................................95
Section 6.14    Payment of Obligations ..............................................................95
Section 6.15    ESG Reporting ...........................................................................95

ARTICLE VII NEGATIVE COVENANTS .......................................................96

Section 7.01    Debt ............................................................................................96
Section 7.02    Limitations on Liens ..................................................................96
Section 7.03    Limitations on Investments.......................................................97
Section 7.04    Fundamental Changes.................................................................99
Section 7.05    Asset Sales ...............................................................................100
Section 7.06    Restricted Payments .................................................................102
Section 7.07    Change in Line of Business; Etc. .............................................103
Section 7.08    Transactions with Affiliates .....................................................104
Section 7.09    Organizational Documents; Separateness.................................104
Section 7.10    Use of Proceeds........................................................................105
Section 7.11    Financial Covenants ..................................................................105
Section 7.12    Sale or Discount of Receivables...............................................105
Section 7.13    Gas Imbalances, Take or Pay or Other Prepayments ..............106
Section 7.14    Burdensome Agreements...........................................................106
Section 7.15    Optional Payments ....................................................................108
Section 7.16    Canadian Pension Plans ............................................................108
Section 7.17    Funds to Repay Loans ...............................................................108
Section 7.18    Sanctioned Person .....................................................................108
Section 7.19    Repayment of Loans ..................................................................108
Section 7.20    Investment Company Act ..........................................................109
Section 7.21    Anti-Corruption Laws ...............................................................109
Section 7.22    Business Activity in Panama......................................................109

ARTICLE VIII EVENTS OF DEFAULT............................................................109

Section 8.01    Events of Default.......................................................................109
Section 8.02    Remedies upon Event of Default ..............................................112

ARTICLE IX AGENCY .......................................................................................113

Section 9.01    Appointment and Authority ......................................................113
Section 9.02    Rights as a Lender .....................................................................113
Section 9.03    Exculpatory Provisions..............................................................113
Section 9.04    Reliance by the Administrative Agent.......................................116
Section 9.05    Delegation of Duties..................................................................117
Section 9.06    Resignation or Removal of the Administrative Agent ..............117
Section 9.07    Non-Reliance on Administrative Agent and Other Lenders..................118
Section 9.08    Arrangers ...................................................................................118
Section 9.09    Administrative Agent may File Proofs of Claim ......................119
Section 9.10    Indemnification .........................................................................119

Section 9.11    Erroneous Payment.................................................................120

ARTICLE X GUARANTY ............................................................................123

Section 10.01  Guaranty.............................................................................123
Section 10.02  Guaranty Unconditional......................................................123
Section 10.03  Discharge Only Upon Payment in Full; Reinstatement in Certain
               Circumstances ......................................................................124
Section 10.04  Waiver by Each Guarantor...................................................124
Section 10.05  Subrogation.........................................................................125
Section 10.06  Stay of Acceleration ...........................................................125
Section 10.07  Additional Guarantors ........................................................125
Section 10.08  Termination.........................................................................127
Section 10.09  Swiss Guaranty Limitations ................................................127

ARTICLE XI MISCELLANEOUS .................................................................128

Section 11.01  Delay or Omission...............................................................128
Section 11.02  Notices; Effectiveness; Electronic Communications ...........128
Section 11.03  Expenses; Indemnity; Damage Waiver ................................130
Section 11.04  Amendments; Waivers; Etc. ................................................132
Section 11.05  Successors and Assigns .......................................................132
Section 11.06  Third-Party Beneficiaries....................................................133
Section 11.07  Assignments and Participations ..........................................133
Section 11.08  Survival...............................................................................136
Section 11.09  Captions..............................................................................136
Section 11.10  Counterparts; Effectiveness ................................................136
Section 11.11  Governing Law....................................................................137
Section 11.12  Jurisdiction, Service of Process and Venue .........................137
Section 11.13  Waiver of Jury Trial ............................................................139
Section 11.14  Waiver of Immunity ............................................................139
Section 11.15  Judgment Currency..............................................................139
Section 11.16  Interest Rate Limitation .......................................................140
Section 11.17  Use of English Language .....................................................140
Section 11.18  Entire Agreement ................................................................141
Section 11.19  Severability .........................................................................141
Section 11.20  No Fiduciary Relationship or Partnership ...........................141
Section 11.21  Payments Set Aside .............................................................141
Section 11.22  USA Patriot Act ..................................................................141
Section 11.23  Treatment of Certain Information; Confidentiality...............142
Section 11.24  Acknowledgment and Consent to Bail-In of Affected Financial
               Institutions............................................................................143

**ANNEXES, SCHEDULES AND EXHIBITS**

| | |
|---|---|
| ANNEX I | Commitments and Applicable Percentages |
| ANNEX II | Notices |
| SCHEDULE 5.02(a) | Equity Interests |
| SCHEDULE 5.02(b) | Subsidiaries |
| SCHEDULE 5.10 | Existing Debt |
| SCHEDULE 5.11 | Litigation |
| SCHEDULE 5.15 | Insurance |
| SCHEDULE 5.16 | Existing Liens |
| SCHEDULE 5.22(c) | Collective Bargaining Agreements |
| SCHEDULE 7.03 | Existing Investments |
| EXHIBIT A | Form of Assignment and Assumption |
| EXHIBIT B | Form of Compliance Certificate |
| EXHIBIT C | Form of Note |
| EXHIBIT D | Form of Notice of Borrowing |
| EXHIBIT E | Form of Officer's Certificate |
| EXHIBIT F-I | Form of Opinion of DLA Piper (Canada) LLP, special Canadian counsel to the Loan Parties (Closing Date) |
| EXHIBIT F-II | Form of Opinion of DLA Piper (Canada) LLP, special Canadian counsel to the Loan Parties (Initial Borrowing Date) |
| EXHIBIT G | Form of Opinion of Asociados Legales − Pinzón, Mendez, Sanclemente & Bernal S.A.S., special Colombian counsel to the Loan Parties |
| EXHIBIT H | Form of Opinion of Nelson Mullins Riley & Scarborough LLP, special New York counsel to the Loan Parties |
| EXHIBIT I | Form of Opinion of Bellerive Attorneys at Law, special Swiss counsel to the Loan Parties |
| EXHIBIT J | Form of Opinion of Valles & Asociados, special Panamanian counsel to the Loan Parties |
| EXHIBIT K | Form of Joinder Agreement |
| EXHIBIT L | Permitted Reorganization Diagram |
| EXHIBIT M | Existing Bridge Loan Pay-Off Letter |
| EXHIBIT N | Existing RCF Loan Pay-Off Letter |

**THIS REVOLVING CREDIT AND GUARANTY AGREEMENT**, dated as of February 14, 2023 (this "*Agreement*"), is entered into by and among CANACOL ENERGY LTD., a corporation organized and existing under the laws of the Province of Alberta ("*Canacol Energy*" or the "*Borrower*"); each of the Persons that is a signatory hereto under the caption "GUARANTORS" on the signature pages hereto and each other Person that becomes a "*Guarantor*" after the date hereof pursuant to Section 10.07 (each, a "*Guarantor*" and together, the "*Guarantors*"); each of the lenders that is a signatory hereto under the caption "LENDERS" on the signature pages hereto and each other Person that becomes a "Lender" after the date hereof pursuant to Section 11.07 (each, a "*Lender*"); and Deutsche Bank Trust Company Americas, a New York banking corporation, as the administrative agent for the Lenders (the "*Administrative Agent*").

## RECITALS

**WHEREAS,** the Borrower has requested that the Lenders establish the credit facility set forth herein and extend credit in the form of revolving loans on and after the Closing Date and from time to time prior to the Maturity Date, in an aggregate principal amount at any time outstanding not to exceed U.S.$200,000,000;

**WHEREAS,** the proceeds of the Loans are to be used solely for Permitted Uses (as defined below); and

**WHEREAS,** the Lenders are willing to extend credit to the Borrower on the terms and subject to the conditions set forth herein and in the other Loan Documents.

**NOW, THEREFORE,** in consideration of the premises and of the mutual covenants herein contained, the parties hereto agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Certain Defined Terms.  As used herein, the following terms shall have the following meanings:

"*ABR Borrowing*" means, as to any Borrowing, the ABR Loans comprising such Borrowing.

"*ABR Loan*" means a Loan that bears interest based on the Alternate Base Rate.

"*ABR Term SOFR Determination Day*" has the meaning specified in the definition of "Term SOFR".

"*Additional Guarantor*" has the meaning assigned to such term in Section 10.07(a).

"*Administrative Agent*" has the meaning assigned to such term in the <u>preamble</u> hereto.

"*Administrative Agent's Account*" means the bank account maintained by the Administrative Agent, as provided in a separate notice, or such other account as from time to time may be notified in writing by the Administrative Agent to the Borrower.

"*Administrative Questionnaire*" means, with respect to each Lender, an administrative questionnaire in a form supplied by the Administrative Agent and submitted to the Administrative Agent duly completed by such Lender.

"*Affected Interest Period*" has the meaning assigned to such term in <u>Section 3.06</u>.

"*Affected Financial Institution*" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"*Affiliate*" means, with respect to a specified Person at any time, another Person that directly or indirectly through one or more intermediaries, Controls or is Controlled by, or is under common Control with, the Person specified; *provided* that, for purposes of <u>Section 7.08</u>, the term "Affiliate" shall include, (A) with respect to any specified Person (including any Loan Party) at any time, any corporation or other entity (a) at least 10% of the Equity Interests in which is owned or Controlled by such Person and/or by any Subsidiary of such Person and (b) in which such Person has the right to appoint and/or remove all or a majority of such Person's Board of Directors or other governing body, in each case, whether obtained directly or indirectly, and whether obtained by ownership of share capital, the possession of Equity Interest, contract or otherwise; and (B) with respect to any Loan Party at any time, (i) a Significant Shareholder and (ii) any corporation or other entity (a) that is an Affiliate of a Significant Shareholder and (b) in which a Significant Shareholder has the right to appoint and/or remove any member of such Person's Board of Directors or other governing body, in each case, whether obtained directly or indirectly, and whether obtained by ownership of share capital, the possession of Equity Interest, contract or otherwise.

"*Agreement*" has the meaning assigned to such term in the <u>preamble</u> hereto.

"*Alternate Base Rate*" means, for any day, a rate *per annum* equal to the greatest of: (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day *plus* 0.50%, and (c) the Term SOFR for a one month tenor in effect on such day *plus* 1.00%. If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to <u>clause (b)</u> of the preceding sentence until the circumstances giving rise to such inability no longer exist. Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Term SOFR shall be effective from and including the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Term SOFR, respectively.  For the avoidance of doubt, if the Alternate Base Rate as determined pursuant

to the foregoing would be less than 1.00%, such rate shall be deemed to be 1.00% for purposes of this Agreement.

"*Anti-Money Laundering Laws and Anti-Terrorism Laws*" means laws, regulations, rules or guidelines relating to money laundering, drug trafficking, terrorist-related activities or other money laundering predicate crimes, including, without limitation, financial recordkeeping and reporting requirements, which apply to the business and dealings of any Loan Party and its respective Subsidiaries or Affiliates, including without limitation such relevant laws in the United States, Canada, the Republic of Panama, Colombia and Switzerland; such as the U.S. Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (Title III of Pub. L. 107-56 signed into law on October 26, 2001), Public Law 107-56, the U.S. Currency and Foreign Transaction Reporting Act of 1970, as amended, the U.S. Money Laundering Control Act of 1986, as amended, the UK Proceeds of Crime Act 2002, the UK Terrorism Act 2000, as amended, the Canadian Anti-Money Laundering & Anti-Terrorism Legislation, the United Nations Convention against Transnational Organized Crime, the United Nations Convention against Illicit Traffic in Narcotic Drugs and Psychotropic Substances (1988), the Council of Europe Convention on Laundering, Search, Seizure and Confiscation of the Proceeds from Crime, the International Convention for the Suppression of the Financing of Terrorism (1999), the Inter-American Convention against Terrorism, the applicable anti-money Laundering and anti-corruption laws in the Republic of Panama, including Panamanian Law 23 of April 27, 2015, which adopts measures to prevent money laundering, terrorist financing, proliferation of weapons of mass destruction financing, among others (*Ley 23 de 27 de abril de 2015, que adopta medidas para prevenir el blanqueo de capitales, el financiamiento del terrorismo y el financiamiento de la proliferación de armas de destrucción masiva, y dicta otras disposiciones*), as amended from time to time and provisions of the Panama's Criminal Code (*Código Penal de Panamá*) relating to money laundering crimes, the applicable anti-money laundering and anti-corruption laws in Colombia, including, but not limited to, the provisions of the Colombian Criminal Code (*Código Penal*) relating to anti-corruption, anti-money laundering and related matters, and any circular or regulation issued by the Colombian Superintendence of Finance (*Superintendencia Financiera de Colombia*) relating to anti-corruption practices, and any other related or similar Applicable Law issued, administered or enforced by any Governmental Authority.

"*Applicable Law*" means any applicable international, foreign, U.S. Federal, state, local or foreign jurisdiction (including Canada, Colombia, the Republic of Panama and Switzerland) statute, treaty, convention, law, regulation, ordinance, rule, judgment, code, rule of common law, order (including consent order), decree, approval (including any Governmental Approval), concession, grant, franchise, license, agreement, directive, guideline, policy, requirement or other governmental restriction or any similar form of decision of, or determination by (or any interpretation or administration of any of the foregoing by) any Governmental Authority, in each case whether or not having the force of law and as amended or otherwise modified from time to time.

"*Applicable AML Law*" has the meaning assigned to such term in Section 11.22.

"*Applicable Lending Office*" means, for each Lender, the office notified by such Lender to the Administrative Agent in writing as the office through which it will perform its

3

obligations under this Agreement: (a) on or before the date it becomes a Lender or (b) following that date by not less than five Business Days' written notice.

"*Applicable Margin*" means (a) with respect to any Loan which is a SOFR Loan, 4.5% per annum, and (b) with respect to any Loan which is an ABR Loan, 3.5% per annum.

"*Applicable Percentage*" means, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) which: (a) such Lender's Commitment (or, after the Availability Period, the Outstanding Amount of such Lender's Loans) is of (b) the aggregate Commitments (or, after the Availability Period, the Outstanding Amount of all Loans). The initial Applicable Percentage of each Lender is set forth opposite the name of such Lender on Annex I hereto or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable. If the Commitment of each Lender to make Loans has been terminated pursuant to Section 8.02 or if the aggregate Commitments have expired, then the Applicable Percentage of each Lender shall be determined based on the Applicable Percentage of such Lender most recently in effect, giving effect to any subsequent assignments.

"*Arrangers*" means, collectively, Citigroup Global Markets Inc, Deutsche Bank AG and JPMorgan Chase Bank, N.A, in their capacity as joint lead arrangers and joint bookrunners.

"*Asset Sale*" means any Disposition or other conveyance (including by way of merger, amalgamation or otherwise but excluding any Casualty Event or Taking), in one transaction or series of transactions, of all or any part of the Property of any Loan Party or any of their respective Restricted Subsidiaries.

"*Assignment and Assumption*" means an assignment and assumption substantially in the form of Exhibit A.

"*Availability Commencement Date*" has the meaning established in the Capacity Availability Agreement.

"*Availability Period*" means the period from and including the Closing Date to the earliest of: (i) the numerically corresponding day one month prior to the Maturity Date, (ii) the date of termination of the Commitments pursuant to Section 2.05(a) and (iii) the date of termination of the Commitments of the Lenders to make SOFR Loans pursuant to Section 8.02.

"*Available Tenor*" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (x) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an Interest Period or (y) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 3.07(d).

"*Bail-In Action*" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"*Bail-In Legislation*" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"*Beneficial Ownership Certification*" means a certification regarding beneficial ownership as required by the Beneficial Ownership Regulation.

"*Beneficial Ownership Regulation*" means 31 C.F.R. § 1010.230.

"*Benchmark*" means, initially, the Term SOFR Reference Rate; *provided* that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 3.07(a).

"*Benchmark Replacement*" means, with respect to any Benchmark Transition Event, the first alternative set forth in the order below that can be determined by the Administrative Agent for the applicable Benchmark Replacement Date:

    (a)    the sum of (i) Daily Simple SOFR and (ii) 0.26161% (26.161 basis points); or

    (b)    the sum of: (i) the alternate benchmark rate that has been selected by the Administrative Agent and the Borrower giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (B) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities and (ii) the related Benchmark Replacement Adjustment.

provided that, if the Benchmark Replacement as determined pursuant to clause (a) or (b) above would be less than the Floor, the Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"*Benchmark Replacement Adjustment*" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Borrower giving

due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"*Benchmark Replacement Date*" means a date and time determined by the Administrative Agent, which date shall be no later than the earliest to occur of the following events with respect to the then-current Benchmark:

(a)    in the case of clause (a) or (b) of the definition of "*Benchmark Transition Event*," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)    in the case of clause (c) of the definition of "*Benchmark Transition Event*," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; *provided* that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "*Benchmark Replacement Date*" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Transition Event*" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component

used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; *provided* that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)      a public statement or publication of information by or on behalf of the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative of the underlying market and economic reality that such Benchmark is intended to measure and that representativeness will not be restored.

For the avoidance of doubt, a "*Benchmark Transition Event*" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"*Benchmark Unavailability Period*" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.07 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 3.07.

"*Board of Directors*" shall mean, with respect to any Person, the Board of Directors of such Person or any committee thereof duly authorized to act on behalf of the Board of Directors of such Person or similar governing body in the case of a non-incorporated Person.

"*Borrower*" has the meaning assigned to such term in the preamble hereto.

"*Borrowing*" means a borrowing consisting of simultaneous Loans of the same Type and, in the case of a SOFR Borrowing, having the same Interest Period made by the Lenders.

"*Borrower Account*" means the segregated non-interest bearing Dollar-denominated account (Account #01419647 entitled "NYLTD Funds Control - NY") established and maintained in the City of New York by the Administrative Agent in the name of the Borrower.

"*Borrower Account Termination Date*" has the meaning assigned to such term in Section 4.01(a) .

"*Borrowing Date*" means a Business Day within the Availability Period, specified in a Notice of Borrowing as the date on which, upon the terms and subject to the conditions set forth herein, a disbursement of a Loan is made to the Borrower.

"*Business Day*" means any day other than a Saturday, Sunday or other day that is a legal holiday under the laws of Calgary, Alberta, Republic of Panama, Colombia or the State of New York or is a day on which banking institutions in such state or jurisdictions are authorized or required by Applicable Law to close.

"*Canacol Energy*" has the meaning assigned to such term in the preamble hereto.

"*Canacol Energy Public Filings*" has the meaning assigned to such term in Section 5.05(b).

"*Canadian Anti-Money Laundering & Anti-Terrorism Legislation*" means any law, judgment, order, executive order, decree, ordinance, rule or regulation related to terrorism financing, money laundering or Sanctions including Part II.1 of the *Criminal Code*, R.S.C. 1985, c. C-46, the *Proceeds of Crime (Money Laundering) and Terrorist Financing Act*, S.C. 2000, c. 17, the *Corruption of Foreign Public Officials Act*, S.C. 1998, c.34, the *Freezing Assets of Corrupt Foreign Officials Act*, S.C. 2011, c. 10, the *Special Economic Measures Act*, S.C. 1992, C. 17,*the United Nations Act*, R.S.C. 1985, c. U-2, and the *Justice for Victims of Corrupt Foreign Officials Act*, S.C. 2017, c.21 or any similar Canadian legislation, together with all rules and regulations thereunder or related thereto including, without limitation, the *Regulations Implementing the United Nations Resolutions on the Suppression of Terrorism* SOR/2001-360 and the *United Nations Al-Qaida and Taliban Regulations,* SOR/99-444 promulgated under the *United Nations Act*, R.S.C. 1985, c. U-2.

"*Canadian Pension Plan*" means any "registered pension plan" as defined in subsection 248(1) of the *Income Tax Act* (Canada), R.S.C. 1985, c. 1 (5th Supp.) maintained, sponsored, funded or contributed to by Canacol Energy or any of its Subsidiaries or Affiliates or under which such Persons have any liability, contingent or otherwise.

"*Canadian Pension Plan Event*" means any of the following events: (a) the failure of Canacol Energy or any of its Affiliates to make any required contributions in respect of any Canadian Pension Plan, (b) the failure of Canacol Energy or any of its Affiliates to administer any Canadian Pension Plan in accordance with its terms and all Applicable Laws, (c) the occurrence of an act or omission in respect of any Canadian Pension Plan which could give rise to the imposition on Canacol Energy or any of its Affiliates of fines, penalties or related charges under Applicable Law, (d) the assertion of a material claim against Canacol Energy or any of its Affiliates in respect of a Canadian Pension Plan, (e) the imposition of a Lien in respect of any Canadian Pension Plan or (f) any Canadian Pension Plan Wind Up Event.

"*Canadian Pension Wind Up Event*" means (i) the wind up or termination (in whole or in part) of any Canadian Pension Plan by an employer, or the taking of any actions by an employer with respect to, or in contemplation or anticipation of, such wind up or termination; (ii) the institution of proceedings by, or the receipt of a notice or any other communication from, any Governmental Authority, the ultimate result of which could reasonably be expected to be the wind

up or termination (in whole or in part) of, or the appointment of an administrator to administer, a Canadian Pension Plan; or (iii) the occurrence of any other event or circumstance provided for in, or prescribed pursuant to, applicable pension benefits legislation that would entitle any Governmental Authority to require the wind up or termination (in whole or in part) of, or the appointment of a trustee to administer, a Canadian Pension Plan.

"*Canadian Securities Laws*" has the meaning assigned to such term in Section 5.05(b).

"*Capacity Availability Agreement*" means the agreement entered into as of October 24, 2022 by and between CNEMED S.A.S. and CNE Oil & Gas S.A.S., attached hereto as Exhibit O.

"*Capital Lease Obligations*" means, as to any Person, the obligations of such Person to pay rent or other amounts under a lease of (or other agreement conveying the right to use) real and/or personal property, which obligations are required to be classified and accounted for as a capital lease, and for purposes of this Agreement, the amount of such obligations shall be the capitalized. Notwithstanding any other provision in this Agreement, all obligations of any Person that are or would have been characterized as an operating lease for purposes of IAS 17 – Leases prior to the effective date of accounting pronouncement IFRS 16 – Leases as of January 1, 2019 ("IFRS 16"), shall continue to be accounted for as an operating lease (and shall not be recognized as a Capital Lease Obligation) (whether or not such lease obligations were in effect on such date), and thereby do not constitute Debt of that Person, notwithstanding the application of IFRS 16 (on a prospective or retroactive basis or otherwise) and regardless of any change in IFRS that would otherwise require such obligation to be recharacterized as a Capital Lease Obligation.

"*Cash Equivalents*" means: (1) Investments in direct obligations of the United States, Canada or any agency thereof or obligations Guaranteed by the United States, Canada or any agency thereof, or obligations of or Guaranteed by any foreign country (other than Colombia) recognized by the United States or Canada whose long-term debt rating is "A-" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act); (2) Investments in time deposit accounts, certificates of deposit and money market deposits maturing within 365 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States or Canada, any state, province or territory thereof or any foreign country recognized by the United States or Canada having capital, surplus and undivided profits aggregating in excess of US$50,000,000 (or the Dollar Equivalent thereof) and a long-term debt is rated "A" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act); (3) Investments in repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (1) above entered into with a bank meeting the qualifications described in clause (2) above; (4) Investments in commercial paper, maturing not more than 365 days after the date of acquisition, issued by a corporation (other than an Affiliate of Canacol Energy) organized and in existence under the laws of the United States, Canada, any state, province or territory or any foreign country recognized by the United States or Canada, in all events not excluding Colombia, with a rating at the time as of which any Investment therein is made of "P2" (or higher) according to Moody's; "A2" (or higher) according to S&P; F1 (or higher) according to Fitch; or, in the case of investments made in Canada, "A2" or

"P2" (or higher) according to Dominion Bond Rating Service Limited or Canada Bond Rating Service; or, in the case of Investments made in Colombia, rated at least "A" by Fitch Ratings Colombia S.A. Sociedad Calificadora de Valores; (5) Investments in securities with maturities of six months or less from the date of acquisition issued or fully Guaranteed by any state, province, commonwealth or territory of the United States or Canada, or by any political subdivision or taxing authority thereof, and rated at least "A" by S&P or "A" by Moody's, or F3 (or higher) according to Fitch, in the case of Investments made in Colombia, rated at least "A" by Fitch Ratings Colombia S.A. Sociedad Calificadora de Valores and "A" by S&P Global S.A. Sociedad Calificadora de Valores; and (6) (a) Investments in marketable direct obligations issued or unconditionally Guaranteed by Colombia, any agency or political subdivision thereof, or rated "BB+" or higher by a Colombian rating organization licensed by the SFC, (b) Investments in time deposits or certificates of deposit of a Colombian bank or financial institution, the commercial paper or other short-term unsecured debt obligations of which (or in the case of a bank or financial institution that is the principal subsidiary of a holding company, the holding company) are rated "A" or higher by a Colombian rating organization licensed by SFC, and maturing within one year from the date of acquisition thereof by Canacol Energy or a Restricted Subsidiary, (c) Investments in repurchase obligations with a term of not more than 60 days for underlying securities of the types described in <u>subclause (a)</u> above entered into with a bank meeting the qualifications described in <u>subclause (b)</u> above, (d) Investments in securities issued by (or representing shares of) Colombian companies rated "A" or higher by a Colombian rating organization licensed by the SFC, or (e) Investments in certificates of deposit, time deposit accounts and money market accounts maturing not more than one year after the deposit of cash or acquisition thereof issued by (i) any of the largest ten banks (based on assets of the last December 31) organized under the laws of Colombia or (ii) any other bank organized under the laws of Colombia, so long as the outstanding amount of such Investments in any such bank does not exceed at any one time US$5,000,000 (or the Dollar Equivalent thereof).

"*Casualty Event*" means, with respect to any Person, the destruction of the Property of such Person, damage beyond economical repair of any Property of such Person or any Property of such Person becoming permanently unfit for normal use.

"*Change in Control*" means the consummation of any transaction or series of transactions or the occurrence of any event or series of events, following the Closing Date, as a result of which (a) Canacol Energy individually or together with one or more Wholly Owned Subsidiaries shall cease to own, directly or indirectly, beneficially and of record, all of the outstanding Equity Interest and Voting Equity Interest of any Guarantor or shall cease to Control any Guarantor; (b) a Person or combination of Persons acting jointly or in concert (within the meaning of the Securities Act (Alberta)) (other than any Wholly Owned Subsidiary of Canacol Energy or any Permitted Holder) shall become the owner of record or beneficial owner of more than 50% of the Voting Equity Interest of Canacol Energy; (c) a Person or combination of Persons acting jointly or in concert (within the meaning of the Securities Act (Alberta)) (other than Canacol Energy, any Wholly Owned Subsidiary of Canacol Energy or any Permitted Holder) shall have the right to designate, directly or indirectly, (x) with respect to any Loan Party other than Canacol Energy, one or more individuals to be members of the Board of Directors of such Loan Party, and (y) with respect to Canacol Energy, the majority of the members of the Board of Directors of Canacol Energy; or (d) the individuals who at the Closing Date constituted the Board of Directors of Canacol Energy (together with any new directors whose election by such Board of Directors or

whose nomination for election by the shareholders of Canacol Energy, as the case may be, was approved by a vote of the majority of the directors then still in office who were either directors at the Closing Date or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of Canacol Energy then in office; *provided*, *however*, that the occurrence of any of the foregoing events resulting solely from the exercise by any Lender or the Administrative Agent of any of its rights under the Loan Documents shall not be deemed to constitute a Change in Control.

"*Change in Law*" means the occurrence, on or after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty, or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; *provided* that, notwithstanding anything herein to the contrary: (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the U.S. or foreign regulatory authorities, in each case pursuant to Basel III, CRD IV and/or CRR shall in each case be deemed to be a "Change in Law," regardless of the date enacted, adopted or issued. For purposes of this definition, "*CRD IV*" means Directive 2013/36/EU of 26 June 2013 on access to the activity of credit institutions and the prudential supervision of credit institutions and investment firms, amending Directive 2002/87/EC and repealing Directive 2006/48/EC and 2006/49/EC, and "*CRR*" means Regulation (EU) No. 575/2013 of 26 June 2013 on prudential requirements for credit institutions and investment firms and amending Regulation (EU) No. 648/2012.

"*Charges*" has the meaning assigned to such term in <u>Section 11.16(a)</u>.

"*Closing Date*" means the first date upon which the conditions precedent set forth in <u>Section 4.01</u> shall have been satisfied, which date shall fall on or prior to the date falling 5 Business Days after the date of this Agreement.

"*CNEMED Intercompany Loan*" means the intercompany loan agreement to be entered into by Canacol Energy, as lender, and CNEMED S.A.S., as borrower, in form and substance satisfactory to the Administrative Agent, which proceeds shall be used to prepay in full, on behalf of CNEMED S.A.S., the amount outstanding under the Reference Indebtedness.

"*Code*" means the U.S. Internal Revenue Code of 1986, as amended.

"*Colombia*" means the Republic of Colombia.

"*Combined*" means the combination of accounts of two or more Persons in accordance with IFRS.

"*Commission*" means the Alberta Securities Commission and any successor thereof.

"*Commitment*" means, as to each Lender, its obligation to make Loans to the Borrower pursuant to Section 2.01 in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Annex I hereto under the caption "Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"*Communications*" has the meaning assigned to such term in Section 11.02(b)(iii).

"*Compliance Certificate*" means a certificate substantially in the form of Exhibit B hereto.

"*Concession Agreement*" means each Hydrocarbon concession, license, participation, exploration and production contract, contract of association, production sharing agreement or other similar agreement entered into between any Loan Party and any Governmental Authority or other Person, in each case, as each such agreement may be amended, restated, supplemented, replaced or otherwise modified in accordance with this Agreement.

"*Conforming Changes*" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "*Alternate Base Rate,*" the definition of "*Business Day,*" the definition of "*U.S. Government Securities Business Day,*" the definition of "*Interest Period*" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 3.03 and other technical, administrative or operational matters) that the Administrative Agent reasonably determines is appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice and the terms of this Agreement (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"*Consolidated*" refers to the consolidation of accounts of a Person and its Subsidiaries in accordance with IFRS; *provided* that, with respect to Canacol Energy, it shall mean the consolidation of the accounts of Canacol Energy with those of its Restricted Subsidiaries in accordance with IFRS consistently applied; *provided*, *further*, that "Consolidated" will not include consolidation of the accounts of any Unrestricted Subsidiary, but the interest of Canacol Energy or any Restricted Subsidiary in an Unrestricted Subsidiary will be accounted for as an Investment.

"*Consolidated EBITDAX*" for any Rolling Period, means with respect to Canacol Energy and its Restricted Subsidiaries, the Consolidated Net Income for such Rolling Period, plus the following, without duplication and to the extent deducted (and not added back) in calculating such Consolidated Net Income:

(1)     Consolidated Interest Expense;

(2)     Consolidated Income Tax Expense;

(3)     Consolidated depletion, depreciation and accretion expense of Canacol Energy and its Restricted Subsidiaries;

(4)     Consolidated amortization expense or asset impairment charges of Canacol Energy and its Restricted Subsidiaries;

(5)     other non-cash charges of Canacol Energy and its Restricted Subsidiaries (including, without limitation, any non-cash compensation expenses, non-cash unrealized gains/losses on foreign exchange translation, commodity and foreign currency derivatives and investments, loss on extinguishment of Debt, doubtful account expense, gains/losses on sale or acquisition of Oil and Gas Properties or Equity Interests in Persons holding such properties, but excluding any non-cash charge to the extent it represents an accrual of or reserve for cash charges in any future period or amortization of a prepaid cash expense that was paid in a prior period not included in the calculation); and

(6)     Consolidated exploration expense of Canacol Energy and its Restricted Subsidiaries,

if applicable for such Rolling Period; and less, to the extent included in calculating such Consolidated Net Income and in excess of any costs or expenses attributable thereto that were deducted (and not added back) in calculating such Consolidated Net Income, non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated EBITDAX in any prior period); *provided* that in determining Consolidated EBITDA, the components specified in clauses (1) to (6) shall not include the effects of any transactions that are or would have been characterized as an operating lease for purposes of IAS 17 – Leases prior to the effective date of IFRS 16, and shall include the effects of Capital Lease Obligations of such Person, notwithstanding the application of IFRS 16 (on a prospective or retroactive basis or otherwise) and regardless of any change in IFRS that would otherwise require such obligation to be recharacterized.

*It being understood* that, (i) the Consolidated EBITDAX of any Person or line of business acquired by Canacol Energy or any of its Restricted Subsidiaries during such Rolling Period shall be included on a *pro forma* basis for such Rolling Period (assuming that the consummation of such acquisition and the Incurrence of any Debt in connection therewith occurred as of the first day of such Rolling Period); and (ii) the Consolidated EBITDAX of any Person or line of business Disposed of by Canacol Energy or any of its Restricted Subsidiaries during such Rolling Period shall be excluded for such Rolling Period (assuming that the consummation of such Disposition and the repayment of any Debt in connection therewith occurred as of the first day of such Rolling Period).

Notwithstanding the preceding sentence, clauses (1) through (6) relating to amounts of a Restricted Subsidiary of the referent Person will be added to Consolidated Net Income to compute Consolidated EBITDAX of such Person only in the same proportion that the

net income of such Restricted Subsidiary was included in calculating the Consolidated Net Income of such Person.

"*Consolidated EBITDAX to Consolidated Interest Expense Ratio*" means at any date of determination (x) Consolidated EBITDAX for the Rolling Period ended on such date (or, if such date is not the last day of a Fiscal Quarter, ended on the last day of the Fiscal Quarter most recently ended prior to such date) divided by (y) the Consolidated Interest Expense for the Rolling Period ended on such date (or, if such date is not the last day of a Fiscal Quarter, ended on the last day of the Fiscal Quarter most recently ended prior to such date); *provided* that:

(1)    if Canacol Energy or any Restricted Subsidiary has

(a)    Incurred any Debt since the beginning of such Rolling Period that remains outstanding on the date of calculation of the Consolidated EBITDAX to Consolidated Interest Expense Ratio (or, if such date is not the last day of a Fiscal Quarter, ended on the last day of the Fiscal Quarter most recently ended prior to such date), Consolidated EBITDAX and Consolidated Interest Expense for such Rolling Period shall be calculated on a *pro forma* basis as if such Debt had been Incurred on the first day of such Rolling Period except that in making such computation, the amount of Debt under any revolving credit facility outstanding on the day of such calculation will be deemed to be

(i)    the average daily balance of such Debt during such Rolling Period or such shorter period for which such facility was outstanding, or

(ii)    if such facility was created after the end of such Rolling Period, the average daily balance of such Debt during the period from the date of creation of such facility to the date of such calculation (or, if such date is not the last day of a Fiscal Quarter, ended on the last day of the Fiscal Quarter most recently ended prior to such date), or

(b)    repaid, repurchased, defeased or otherwise discharged any Debt since the beginning of such Rolling Period or if any Debt is to be repaid, repurchased, defeased or otherwise discharged (in each case, other than Debt Incurred under any revolving credit facility unless such Debt has been permanently repaid and has not been replaced) on the date of calculation of the Consolidated EBITDAX to Consolidated Interest Expense Ratio (or, if such date is not the last day of a Fiscal Quarter, ended on the last day of the Fiscal Quarter most recently ended prior to such date), Consolidated EBITDAX and Consolidated Interest Expense for such Rolling Period shall be calculated on a *pro forma* basis as if such discharge had occurred on the first day of such Rolling Period and as if Canacol Energy or such Restricted Subsidiary has not earned the interest income, if any, actually earned during such Rolling Period in respect of cash or Cash Equivalents used to repay, repurchase, defease or otherwise discharge such Debt;

(2)    if since the beginning of such Rolling Period, Canacol Energy or any Restricted Subsidiary shall have made any Asset Sale, then giving *pro forma* effect to such

14

disposition during such Rolling Period on Consolidated EBITDAX and Consolidated Interest Expenses for such Rolling Period;

(3)     if since the beginning of such Rolling Period, Canacol Energy or any Restricted Subsidiary (by merger, amalgamation or otherwise) shall have made an Investment in any Person that is merged or amalgamated with or into Canacol Energy or any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation of Consolidated EBITDAX to Consolidated Interest Expense Ratio to be made hereunder, which constitutes all or substantially all of an operating unit of a business, then giving *pro forma* effect to such Investment or acquisition on the Consolidated EBITDAX and Consolidated Interest Expense for such Rolling Period, any such *pro forma* calculation may include adjustments appropriate to reflect, without duplication,

(a)     any such acquisition to the extent such adjustments may be reflected in the preparation of *pro forma* financial information in accordance with the requirements of Article 11 of Regulation S-X under the Exchange Act;

(b)     the annualized amount of operating expense reductions reasonably expected to be realized in the six months following any such acquisition made during such Rolling Period; *provided* that in each case such adjustments are set forth in an Officer's Certificate that states:

(i)     the amount of such adjustment or adjustments;

(ii)     that such adjustment or adjustments are based on the reasonable good faith beliefs of the Responsible Officer executing such Officer's Certificate at the time of such execution; and

(iii)     that any related Incurrence of Debt is permitted pursuant to this Agreement.

(4)     if since the beginning of such Rolling Period, any Person (that subsequently became a Restricted Subsidiary or was merged or amalgamated with or into Canacol Energy or any Restricted Subsidiary since the beginning of such Rolling Period) shall have made any Asset Sale or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (2) or (3) above if made by Canacol Energy or a Restricted Subsidiary during such Rolling Period, Consolidated EBITDAX and Consolidated Interest Expense for such Rolling Period shall be calculated after giving *pro forma* effect thereto as if such Asset Sale, Investment or acquisition of assets occurred on the first day of such Rolling Period.

For purposes of this definition, whenever *pro forma* effect is to be given to an acquisition of assets and the amount of income or earnings related thereto, the *pro forma* calculations shall be determined in good faith by the Responsible Officer of Canacol Energy. If any Debt bears a floating rate of interest and is being given *pro forma* effect, the interest expense on such Debt shall be calculated as if the rate in effect on the date of determination had been the

applicable rate for the entire period (taking into account any Hedging Agreement applicable to such Debt if such Hedging Agreement has a remaining term as at the date of determination in excess of twelve months).

"*Consolidated Income Tax Expense*" shall mean, with respect to any period, the provision for federal, national, state, local and foreign income taxes (including state franchise taxes accounted for as income taxes in accordance with IFRS) of the Borrower and its Restricted Subsidiaries for such period as determined in accordance with IFRS.

"*Consolidated Interest Expense*" means, for any Rolling Period and with respect to Canacol Energy and its Restricted Subsidiaries, the aggregate amount of Consolidated interest expense (net of Consolidated interest income) accrued in respect of Debt (including, but not limited to, any amount thereof capitalized) of Canacol Energy and its Restricted Subsidiaries during such period, as determined in accordance with IFRS.

"*Consolidated Leverage Ratio*" means, for any date of determination, (a) Consolidated Total Debt as of such date minus the cash and Cash Equivalents of Canacol Energy and its Restricted Subsidiaries as of such date *divided by* (b) Consolidated EBITDAX for the Rolling Period ended such date (or, if such date is not the last day of a Fiscal Quarter, ended on the last day of the Fiscal Quarter most recently ended prior to such date); *provided*, that: (1) if Canacol Energy or any Restricted Subsidiary has (x) Incurred any Debt since the beginning of such Rolling Period that remains outstanding on the date of determination (or, if such date is not the last day of a Fiscal Quarter, ended on the last day of the Fiscal Quarter most recently ended prior to such date), Consolidated EBITDAX and Consolidated Total Debt for such Rolling Period shall be calculated on a *pro forma* basis as if such Debt had been Incurred on the first day of such Rolling Period (except that in making such computation, the amount of Debt under any revolving credit facility outstanding on the day of such calculation will be deemed to be the average daily balance of such Debt during such Rolling Period or such shorter period for which such facility was outstanding or if such facility was created after the end of such Rolling Period, the average daily balance of such Debt during the period from the date of creation of such facility to the date of such calculation (or, if such date is not the last day of a Fiscal Quarter, ended on the last day of the Fiscal Quarter most recently ended prior to such date)); (y) repaid, repurchased, defeased or otherwise discharged any Debt since the beginning of such Rolling Period or if any Debt is to be repaid, repurchased, defeased or otherwise discharged (in each case, other than Debt Incurred under any revolving credit facility unless such Debt has been permanently repaid and has not been replaced) on the date of calculation of the Consolidated Leverage Ratio (or, if such date is not the last day of a Fiscal Quarter, ended on the last day of the Fiscal Quarter most recently ended prior to such date), Consolidated EBITDAX for such Rolling Period shall be calculated on a *pro forma* basis as if such discharge had occurred on the first day of such Rolling Period and as if Canacol Energy or such Restricted Subsidiary had not earned the interest income actually earned during such Rolling Period in respect of cash or Cash Equivalents used to repay, repurchase, defease or otherwise discharge such Debt; (2) if since the beginning of such period Canacol Energy or any Restricted Subsidiary shall have made any Asset Sale, then giving *pro forma* effect to such Asset Sale during such period on the Consolidated EBITDAX; (3) if since the beginning of such Rolling Period, Canacol Energy or any Restricted Subsidiary (by merger, amalgamation or otherwise) shall have made an Investment in any Person that is merged or amalgamated with or into Canacol Energy or any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary) or an

acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation of Consolidated Leverage Ratio to be made under this Agreement, which constitutes all or substantially all of an operating unit of a business, then giving *pro forma* effect to such Investment or acquisition on the Consolidated EBITDAX for such Rolling Period, any such *pro forma* calculation may include adjustments appropriate to reflect, without duplication, (x) any such acquisition to the extent such adjustments may be reflected in the preparation of *pro forma* financial information in accordance with the requirements of Article 11 of Regulation S-X under the Exchange Act, and (y) the annualized amount of operating expense reductions reasonably expected to be realized in the six months following any such acquisition made during such Rolling Period; and (4) if since the beginning of such Rolling Period, any Person (that subsequently became a Restricted Subsidiary or was merged or amalgamated with or into Canacol Energy or any Restricted Subsidiary since the beginning of such period) shall have made any Asset Sale or any Investment or acquisition of assets that would have required an adjustment pursuant to clauses (2) or (3) above if made by Canacol Energy or a Restricted Subsidiary during such Rolling Period, Consolidated EBITDAX for such Rolling Period shall be calculated after giving *pro forma* effect thereto as if such Asset Sale, Investment or acquisition of assets occurred on the first day of such Rolling Period.

For purposes of this definition, whenever *pro forma* effect is to be given to an acquisition of assets and the amount of income or earnings related thereto, the *pro forma* calculations shall be determined in good faith by a Responsible Officer of Canacol Energy. If any Debt bears a floating rate of interest and is being given *pro forma* effect, the interest expense on such Debt shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account Hedging Agreement applicable to such Debt if such Hedging Agreement has a remaining term as at the date of determination in excess of twelve months).

"*Consolidated Net Income*" means, for any period and with respect to Canacol Energy, the Consolidated net income of Canacol Energy and its Restricted Subsidiaries for such period as determined in accordance with IFRS, excluding the following:

(1)    consolidated deferred income taxes of the Borrower and its Restricted Subsidiaries for such period as determined in accordance with IFRS;

(2)    impairment of exploration and evaluation assets of Canacol Energy and its Restricted Subsidiaries for such period as determined in accordance with IFRS, which may or may not be recognized until the Maturity Date, and may include the following assets and corresponding costs as of the Closing Date:

(a)    VMM-3 exploration block costs of US$13.8 million,

(b)    VMM-2 exploration block costs of US$1.6 million, and

(c)    Sangretoro exploration block costs of US$4.1 million,

(3)    any amount recognized in the consolidated net income of Canacol Energy and its Restricted Subsidiaries for such period due to the extinguishment or substantial modification of a financial liability in accordance with IFRS 9.

"*Consolidated Net Tangible Assets*" means, of any Person, the aggregate amount of assets of such Person and its Subsidiaries (Restricted Subsidiaries in the case of Canacol Energy) after deducting therefrom (to the extent otherwise included therein) all goodwill, trade names, trademarks, patents, unamortized debt discount and expense and other like intangibles, all as set forth on the most recent quarterly or annual (as the case may be) Consolidated balance sheet (prior to the relevant date of determination for which internal financial statements are available) of such Person and its Subsidiaries (Restricted Subsidiaries in the case of Canacol Energy) in accordance with IFRS.

"*Consolidated Total Assets*" means the aggregate of all assets reflected in the Consolidated balance sheet of Canacol Energy as of the last day of the Fiscal Quarter most recently ended prior to the relevant date of determination, prepared in accordance with IFRS.

"*Consolidated Total Debt*" means, as of any date and with respect to Canacol Energy, the Consolidated Debt as of such date of Canacol Energy and its Restricted Subsidiaries.

"*Contest*" means, with respect to the payment of Taxes or any other claims or liabilities by any Person, to contest the validity or amount thereof in good faith by appropriate proceedings promptly initiated and diligently conducted; *provided* that such Person has posted a bond or other security in accordance with Applicable Law or has established adequate reserves or other appropriate provisions with respect to the contested items in accordance with IFRS. "*Contested*" shall have a meaning correlative thereto.

"*Control*" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. With respect to a Fund, any Person that acts as manager or administrator, or which is otherwise authorized to represent or validly act on behalf of such Fund shall be deemed to Control such Fund. "*Controlling*" and "*Controlled*" have meanings correlative thereto.

"*CSE*" has the meaning assigned to such term in Section 5.05(b).

"*Cuban Assets Control Regulations*" has the meaning assigned to such term in Part 515 of Title 31 of the Code of Federal Regulations, as amended or otherwise modified from time to time.

"*Daily Simple SOFR*" means, for any day, SOFR, with the conventions for this rate (which will include a lookback) being established by the Administrative Agent in accordance with the conventions for this rate selected or recommended by the Relevant Governmental Body for determining "*Daily Simple SOFR*" for syndicated business loans; *provided* that if the Administrative Agent decides that any such convention is not administratively feasible for the Administrative Agent, then the Administrative Agent may establish another convention.

"*Debt*" shall mean, with respect to any Person on any date of determination (without duplication): (a) the principal in respect of indebtedness of such Person for borrowed money; (b) the principal in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments; (c) all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments, excluding obligations in respect of trade letters

of credit or bankers' acceptances issued in respect of trade payables to the extent not drawn upon or presented, or, if drawn upon or presented, the resulting obligation of the Person is paid in ten Business Days; (d) all obligations of such Person to pay the deferred and unpaid purchase price of Property or services (except trade payables and contingent obligations to pay earn-outs), which purchase price is due more than six months after the date of placing such Property in service or taking delivery and title thereto or the completion of such services; (e) all Capital Lease Obligations of such Person; (f) the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock or, with respect to any Subsidiary of such Person, any Preferred Stock (but excluding, in each case, any accrued dividends or obligations payable to the Borrower or any Restricted Subsidiary); (g) all Debt of other Persons secured by a Lien on any asset of such Person, whether or not such Debt is assumed by such Person; *provided*, *however*, that the amount of Debt of such Person shall be the lesser of (x) the Fair Market Value of such asset at such date of determination and (y) the amount of such Debt of such other Persons; (h) to the extent not otherwise included in this definition, the aggregate net termination value of all obligations under any Hedging Agreement of such Person; and (i) all obligations of the type referred to in clauses (a) through (h) above of other Persons Guaranteed by such Person or for which such Person is otherwise liable as obligor, guarantor or otherwise; *provided that*, the amount of Debt of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; *provided, further*, the following obligations shall not be deemed to be Debt for any purpose: (a) obligations arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Debt is extinguished within five Business Days of its Incurrence; (b) customer deposits and advance payments received from customers in the ordinary course of business; (c) accrued expenses, royalties and trade accounts payable arising in the ordinary course of business (*provided*, *however*, that any Guarantee of production or payment (but not any other contractual obligation) in respect to a royalty will constitute Debt); (d) any indebtedness which has been defeased in accordance with IFRS or defeased pursuant to the deposit of cash or Cash Equivalents (in an amount sufficient to satisfy all such indebtedness obligations at maturity or redemption, as applicable, and all payments of interest and premium, if any) in a trust or account created or pledged for the sole benefit of the holders of such indebtedness, and subject to no other Liens, and the other applicable terms of the instrument governing such indebtedness; (e) any obligation arising from any agreement providing for indemnities, guarantees, purchase price adjustments, holdbacks, contingency payment obligations based on the performance of the acquired or disposed assets or similar obligations (other than Guarantees of Debt) incurred by any Person in connection with the acquisition or disposition of assets; (f) natural gas balancing liabilities incurred in the ordinary course of business and consistent with past practice; and (g) any take-or-pay or ship-or-pay agreements in effect as of the Closing Date, or any Guarantee thereof in connection with the operation of the Borrower's and Restricted Subsidiary's Oil and Gas Properties.

"*Debtor Relief Laws*" means the Bankruptcy Code of the United States, Bankruptcy and Insolvency Act (Canada), R.S.C. 1985, c. B-3, the *Companies Creditors' Arrangement Act (Canada)*, R.S.C. 1985, c. C-36, *Winding up and Restructuring Act (Canada)*, R.S.C. 1985, c. W-11, *Business Corporations Act* (Alberta) RSA 2000, c B-9, Law 1116 (Colombia) and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the United

States, Canada (including the arrangement provisions of Canadian and provincial corporate statutes), Colombia, Switzerland (in particular the Swiss Federal Debt Enforcement and Bankruptcy Act (*Bundesgesetz über Schuldbetreibung und Konkurs, SchKG*) of April 11, 1889, as each may be amended from time to time), or other applicable jurisdictions from time to time in effect.

"*Default*" means an Event of Default or an event that, with notice, lapse of time, or both, would become an Event of Default.

"*Default Rate*" means, at any time of determination, a rate per annum equal to the sum of 2.0% per annum plus the rate of interest otherwise applicable to the Loans.

"*Designation*" shall have the meaning given to it under the definition of the term "Unrestricted Subsidiary."

"*Disposition*" or "*Dispose*" means the sale, transfer, license, lease or other disposition (including any Sale and Leaseback Transaction) of any Property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"*Disqualified Stock*" shall mean, with respect to any Person, any capital stock that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event: (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than as a result of a change of control or asset sale so long as any rights of holders thereof upon the occurrence of such change of control or asset sale are subject to the prior payment and satisfaction in full of the Obligations) pursuant to a sinking fund obligation or otherwise; (b) is convertible or exchangeable for Debt or Disqualified Stock; or (c) is redeemable at the option of the holder thereof.

"*Dividend Step-Up Condition*" means, as of any date of determination (x) at any time, that the Consolidated Leverage Ratio is less than 1.50 to 1.00 or (y) following the Availability Commencement Date, that the Consolidated Leverage Ratio is less than 2.00 to 1.00.

"*Dollar Equivalent*" means, with respect to any monetary amount in a currency other than Dollars, at any time for the determination thereof, the amount of Dollars obtained by converting such foreign currency involved in such computation into Dollars at the spot rate for the purchase of Dollars with the applicable foreign currency as quoted by the Administrative Agent or any Affiliate thereof at approximately 11:00 a.m. (New York City time) on the date of such determination.

"*Dollars*" and "*US$*" mean the lawful currency for the time being of the U.S.

"*EEA Financial Institution*" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition or (c) any financial institution established in an EEA

Member Country which is a subsidiary of an institution described in <u>clauses (a)</u> or <u>(b)</u> of this definition and is subject to consolidated supervision with its parent.

"*EEA Member Country*" means any of the member states of the European Union, Iceland, Liechtenstein and Norway.

"*EEA Resolution Authority*" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"*Eligible Assignee*" means: (a) a Lender, (b) an Affiliate of a Lender, (c) a Reference Participant or (d) a commercial bank, a finance company, an insurance company or another financial institution or fund (whether a corporation, partnership, trust or other entity) that is engaged in making, purchasing or otherwise investing in commercial loans in the Oil and Gas Business and/or other industries.

"*Entitled Person*" has the meaning assigned to such term in <u>Section 11.15(a)</u>.

"*Environmental Laws*" means any and all Applicable Laws relating in any way to (a) the protection of the environment, natural resources, wildlife, human or animal health and safety, (b) the presence of, Release of, or exposure to, Hazardous Materials, (c) the generation, manufacture, processing, distribution, use, treatment, storage, transport, recycling or handling of, or the arrangement for such activities with respect to, Hazardous Materials, (d) vibration, noise, odor or mold or (e) social issues or performance, public access to information and participation in decision-making insofar as it relates to the Environment or social impacts, labor and employment conditions, occupational health and safety, industrial hygiene.

"*Environmental Liability*" means any liability or obligation, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party or any of their respective Subsidiaries directly or indirectly resulting from or based upon: (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the presence, release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"*Environmental Permits*" means any and all permits, licenses, registrations, notifications, exemptions and any other authorizations required under any Environmental Law.

"*Equity Interests*" means any and all shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust, participations, quotas or other ownership interests in a Person, any and all warrants, options or other rights entitling the holder thereof to acquire any of the foregoing, or any securities convertible into or exchangeable or exercisable for any of the foregoing.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder.

"*ERISA Affiliate*" means any trade or business (whether or not incorporated) that, together with Canacol Energy or any of its Subsidiaries, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"*ERISA Event*" means (a) the occurrence of any "reportable event," as defined in Section 4043 of ERISA, with respect to a Plan (except an event for which the 30-day notice period is waived); (b) the failure by Canacol Energy or any of its Subsidiaries to satisfy the minimum funding standard with respect to a Plan or to make the required contributions to a Multiemployer Plan within the meaning of Section 412 of the Code or Section 303 or 304 of ERISA, whether or not waived; (c) the filing pursuant to Section 412(c) of the Code by Canacol Energy or any of its Subsidiaries of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by Canacol Energy or any of its Subsidiaries or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by Canacol Energy or any of its Subsidiaries or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by Canacol Energy or any of its Subsidiaries or any ERISA Affiliate of any liability with respect to withdrawal or partial withdrawal from any Plan or Multiemployer Plan; (g) the receipt by Canacol Energy or any of its Subsidiaries or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan to which Canacol Energy or its Subsidiaries or any ERISA Affiliate is obligated to contribute of any notice, concerning the imposition of withdrawal liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA; (h) a determination that a Plan is, or is expected to be, in "at risk" status (as described in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (i) the occurrence of a non-exempt "prohibited transaction" with respect to which Canacol Energy or any of its Subsidiaries is a "disqualified person" (within the meaning of Section 4975 of the Code) or with respect to which Canacol Energy or any of its Subsidiaries would reasonably have knowledge and be likely to otherwise be liable; (j) a determination that a Multiemployer Plan is, or is expected to be, in "endangered status" or "critical status" (as defined in Section 305(b) of ERISA) of which Canacol Energy or any of its Subsidiaries has knowledge; or (k) with respect to any non-U.S. pension Plan, any event under Applicable Law that is substantially similar to any event set forth in the foregoing clauses (a) through (j).

"*Erroneous Payment Deficiency Assignment*" has the meaning assigned to such term in Section 9.11(d).

"*Erroneous Payment Impacted Class*" has the meaning assigned to such term in Section 9.11(d).

"*Erroneous Payment Return Deficiency*" has the meaning assigned to such term in Section 9.11(d).

"*Erroneous Payment Subrogation Rights*" has the meaning assigned to such term in Section 9.11(d).

"*ESG*" has the meaning assigned to such term in Section 6.15.

"*Esperanza*" shall mean the exploration and exploitation contract, which is currently only in exploitation phase. The Esperanza block is located in the Lower Magdalena Basin, Colombia, where the Borrower has a 100% working interest.

"*EU Bail-In Legislation Schedule*" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Event of Default*" has the meaning assigned to such term in Section 8.01.

"*Exchange Act*" means the United States Securities Exchange Act of 1934, as amended.

"*Excluded Taxes*" means, any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient: (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profit Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Applicable Lending Office located in the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender who acquires its Loans after the Closing Date other than from an Initial Lender or a Reference Participant, withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its Applicable Lending Office, except in each case to the extent that, pursuant to Section 3.04, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changes its Applicable Lending Office, (c) Taxes attributable to such Recipient's failure to provide the documentation described in Section 3.04(f) and (d) any withholding Taxes imposed under FATCA.

"*Executed Documentation*" has the meaning assigned to such term in Section 11.10.

"*Executive Order*" means the Executive Order No. 13224 of September 23, 2001, entitled Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism.

"*Existing Bridge Loan*" means that certain Credit and Guaranty Agreement dated as of July 31, 2020 (as amended) by and between CNEMED S.A.S., Credit Suisse AG, Cayman Islands Branch, Credit Suisse Securities (USA) LLC, Banco Davivienda S.A., Citigroup Global Markets Inc. and Itaú (Panama) S.A., and other lenders party thereto, from time to time.

"*Existing Bridge Loan Fee Letter*" means the fee letter dated July 28, 2020, executed by the Borrower in favor of Credit Suisse Securities (USA) LLC, as Arranger, with regards to the Existing Bridge Loan.

"*Existing Bridge Loan Note*" means a promissory note governed by Colombian law with blank spaces and its corresponding letter of instructions (*pagaré con espacios en blanco y carta de instrucciones*) substantially in the form of Exhibit C to the Existing Bridge Loan, with

appropriate insertions as to date, principal amount and applicable rate of interest, duly executed and delivered by the Borrower and duly executed and delivered by each Guarantor por aval, pursuant to the provisions of the Existing Bridge Loan.

"*Existing Bridge Loan Pay-Off Amount*" means the amount set forth in the Existing Bridge Loan Pay-Off Letter.

"*Existing Bridge Loan Pay-Off Letter*" means the pay-off letter to be executed by each of the Lenders under the Existing Bridge Loan, substantially in the form of <u>Exhibit M</u>, or otherwise in form and substance reasonably acceptable to the Administrative Agent and the Lenders.

"*Existing Bridge Loan Documents*" means the Existing Bridge Loan, the Existing Bridge Loan Note, the Existing Bridge Loan Fee Letter and any other document or instrument executed in connection with the foregoing designated as such by the Borrower and the administrative agent under the Existing Bridge Loan.

"*Existing RCF Loan*" means that certain Revolving Credit and Guaranty Agreement dated as of July 31, 2020 (as amended) between the Borrower, the lenders party thereto and Credit Suisse AG, Cayman Islands Branch, as administrative agent.

"*Existing RCF Loan Fee Letter*" means the fee letter dated July 28, 2020, executed by the Borrower in favor of Credit Suisse Securities (USA) LLC, as Arranger, with regards to the Existing RCF Loan.

"*Existing RCF Loan Note*" means a promissory note governed by Colombian law with blank spaces and its corresponding letter of instructions (*pagaré con espacios en blanco y carta de instrucciones*) substantially in the form of Exhibit C to the Existing RCF Loan, with appropriate insertions as to date, principal amount and applicable rate of interest, duly executed and delivered by the Borrower and duly executed and delivered by each Guarantor por aval, pursuant to the provisions of the Existing RCF Loan.

"*Existing RCF Loan Pay-Off Amount*" means the amount set forth in the Existing RCF Loan Pay-Off Letter.

"*Existing RCF Loan Pay-Off Letter*" means the pay-off letter to be executed by Credit Suisse AG, Cayman Islands Branch, as administrative agent under the Existing Bridge Loan, substantially in the form of <u>Exhibit N</u>, or otherwise in form and substance reasonably acceptable to the Administrative Agent and the Lenders.

"*Existing Bridge Loan Documents*" means the Existing RCF Loan, the Existing RCF Loan Note, the Existing RCF Loan Fee Letter and any other document or instrument executed in connection with the foregoing designated as such by the Borrower and the administrative agent under the Existing RCF Loan.

"*Facility*" means the loan facility made available to the Borrower pursuant to <u>Section 2.01</u>.

"*Fair Market Value*" means, with respect to any asset, the price which could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing buyer, neither of which is under compulsion to complete the transaction.

"*FATCA*" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreement entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation or official rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"*Federal Funds Effective Rate*" means, for any day, the weighted average (rounded upwards, if necessary, to the next one-one hundredth (1/100) of one percent (1%)) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next one-one hundredth (1/100) of one percent (1%)) of the quotations for such day for such transactions received by the Administrative Agent from three (3) Federal funds brokers of recognized standing selected by the Required Lenders; *provided* that, if such rate is below zero, the "*Federal Funds Effective Rate*" for such day shall be deemed to be zero. The Federal Funds Effective Rate applies only to Obligations denominated in Dollars.

"*Fee Letters*" means the fee letter dated November 30, 2022, executed by the Borrower in favor of Citigroup Global Markets Inc., Deutsche Bank AG and JPMorgan Chase Bank, N.A., as Arrangers, and/or Deutsche Bank Trust Company Americas as Administrative Agent, and in any other fee letter entered into by any Loan Parties for the benefit of the Arrangers or the Administrative Agent or in connection with this Agreement or the Facility.

"*Fiscal Quarter*" means a fiscal quarter of a Fiscal Year.

"*Fiscal Year*" means the fiscal year of Canacol Energy and its Subsidiaries, which period shall be the 12-month period ending on December 31 of each year. References to a Fiscal Year with a number corresponding to any calendar year (e.g., "*Fiscal Year 2021*") refer to the Fiscal Year ending on December 31 of such calendar year.

"*Fitch*" means Fitch Ratings Ltd. and its Affiliates or any successors thereof.

"*Floor*" means a rate of interest equal to 0.0% (zero).

"*Foreign Corrupt Practices Laws*" means (a) the United States Foreign Corrupt Practices Act of 1977 and the rules and regulations promulgated thereunder, as amended, (b) the United Kingdom Bribery Act 2010 and the rules and regulations promulgated thereunder, (c) Colombian Laws 67 of 1993, 80 of 1993, 970 of 2005, 1017 of 2006, 1150 of 2007, 1474 of 2011, 1712 of 2012, 1778 of 2016, 1952 of 2019, 2094 of 2021 and 2195 of 2022, and its implementing decrees, (d) the United Nations Convention against Corruption, (e) Circulars 100-000016 of December 24, 2020 and 100-00004 of April 9, 2021, issued by the Colombian Superintendence of

Companies (*Superintendencia de Sociedades de Colombia*) and the rules and regulations promulgated thereunder, (f) Panama's Law 33 of April 25, 2013, as amended from time to time, that creates the Transparency National Authority and of Access to Information (*Autoridad Nacional de Transparencia y Acceso a la Información*), any regulations issued by such entity and provisions of the Panama's Criminal Code (*Código Penal de Panamá*) relating to corruption crimes, and (g) any other Applicable Law of any jurisdiction (including, without limitation, the United States, Canada, the Republic of Panama, Colombia and Switzerland) concerning or relating to bribery or corruption, in each case, as amended or supplemented from time to time.

"*Foreign Official*" means any "foreign official" as defined in the United States Foreign Corrupt Practices Act, as amended, and any foreign political party or official thereof or any candidate for foreign political office.

"*Fund*" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities.

"*Gas Business*" shall mean:

(a)     the business of acquiring, exploring, exploiting, developing, producing, operating, marketing, transporting and disposing of interests in natural gas, liquefied natural gas and other Gas Properties or products produced in association with any of the foregoing;

(b)     any business relating to gas field sales and services;

(c)     any business relating to processing of natural gas;

(d)     any midstream gas services, including gas processing, water treatment, pipelines and flowlines; and

(e)     any business or activity relating to, arising from, or necessary, appropriate or incidental to the activities described in the foregoing clauses (a) through (d) of this definition.

"*Gas Properties*" means rights, titles, interests and estates in and to gas leases, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature and including any interests acquired pursuant to unit agreements, pooling agreements and declarations of pooled units. Unless otherwise indicated herein, each reference to the term "Gas Properties" means any and all Gas Properties that are the subject of the Concession Agreements of Canacol Energy and its Subsidiaries. Notwithstanding anything to the contrary, farmouts and other similar transfers of interests in undeveloped acreage to which no proved or probable reserves are attributable (and assignments in connection therewith) shall not constitute "Gas Properties."

"*G-7 Country*" means the U.S., France, the United Kingdom, Canada, Italy, Germany and Japan.

"*GAAP*" means general accepted accounting principles pursuant to the specific accounting legislation and regulations applicable to a Loan Party, as in effect from time to time, applied on a basis consistent with the most recent audited individual financial statements of the relevant Loan Party.

"*Governmental Approval*" means any action, order, authorization, consent, approval, license, lease, ruling, concession, permit, privilege, franchise, tariff, rate, certification, exemption, filing, registration or concession from, by or with any Governmental Authority.

"*Governmental Authority*" means any nation or government, any state, province, territory or municipality, international governmental or quasi-governmental agency or authority or any other agency, instrumentality or political subdivision thereof and any entity exercising executive, legislative, judicial, monetary, taxing, regulatory, administrative or police and law enforcement functions of or pertaining to government, including, without limitation, OFAC.

"*Guarantors*" has the meaning assigned to such term in the preamble.

"*Guaranty*" and "*Guarantee*", indistinctly mean, as to any Person: (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Debt or other obligation payable or performable by another Person (the "*primary obligor*") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect: (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Debt or other obligation of the payment or performance of such Debt or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Debt or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Debt or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Debt or other obligation of any other Person, whether or not such Debt or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Debt to obtain any such Lien); *provided* that the term Guaranty shall not include endorsements for collection or deposit in the ordinary course of business.  The amount of any Guaranty shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guaranty is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "*Guaranty*" as a verb has a corresponding meaning.

"*Hazardous Materials*" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, chemicals, wastes or other pollutants or other materials or substances prohibited, limited or regulated under or to which liability may arise under Environmental Laws, including any petroleum products or byproducts and all other Hydrocarbons, coal ash, radon gas, asbestos, urea formaldehyde foam insulation, polychlorinated biphenyls, chlorofluorocarbons and all other ozone-depleting substances.

"*Hedging Agreement*" means (a) any and all interest rate protection agreements, interest rate future agreements, interest rate option agreements, interest rate swap agreements, interest rate cap agreements, interest rate collar agreements, interest rate hedge agreements, foreign exchange contracts, currency swap agreements, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of the foregoing (including any option to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, traded at the over-the-counter or standardized markets and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or are governed by any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (including such master agreement, together with any related schedules, a "*Master Agreement*") including any such obligations or liabilities under any Master Agreement in each of the foregoing (a) and (b), not for speculative purposes.

"*Hydrocarbons*" means oil, gas, casing head gas, drip gasoline, coal seam gas, natural gasoline, condensate, distillate, liquid hydrocarbons, gaseous hydrocarbons and all products, by-products and other substances derived, refined or separated therefrom and all other minerals and substances produced in conjunction with such substances.

"*IFRS*" means accounting principles in accordance with International Financial Reporting Standards as issued by the International Accounting Standards Board, as in effect from time to time, applied on a basis consistent with the most recent audited consolidated financial statements delivered to the Lenders.

"*Incur*" means, with respect to any Debt, to incur, create, issue, assume, guarantee or otherwise, contingently or otherwise, become liable, directly or indirectly, for or with respect to, or to extend the maturity of, or become responsible for, the payment of such Debt; *provided, however,* that neither (a) the accrual of interest, (b) the accretion of original issue discount nor (c) an increase in the outstanding amount of Debt caused by fluctuations in the exchange rates of currencies shall be considered an Incurrence of Debt.  The terms "*Incurrence,*" "*Incurred*" and "*Incurring*" have corresponding meanings.

"*Indemnified Taxes*" means (a) Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party, and (b) to the extent not otherwise described in <u>clause (a)</u>, Other Taxes.

"*Indemnitee*" has the meaning assigned to such term in <u>Section 11.03(b)</u>.

"*Indenture*" means that certain Indenture, dated as of November 24, 2021, among the Borrower, the note guarantors from time to time party thereto, and Citibank, N.A., as trustee, security registrar and paying agent as amended, supplemented or otherwise modified from time to time.

"*Independent Financial Advisor*" means an accounting firm, appraisal firm, investment banking firm or consultant reasonably acceptable to the Administrative Agent, qualified to perform the task for which it has been engaged and which is independent in connection with the relevant transaction.

"*Information*" has the meaning assigned to such term in <u>Section 11.23</u>.

"*Initial Borrowing*" means the first Borrowing made pursuant to this Agreement.

"*Initial Lender*" means a Lender party to this Agreement on the date hereof and any Affiliate thereof.

"*Insurance Proceeds*" means all amounts paid or payable to or for the account of a Loan Party or any of its Restricted Subsidiaries pursuant to any insurance policy, including any insurance required to be maintained (or caused to be maintained) under this Agreement, or any other compensation, awards, damages or other payments made to such Person in respect of any Casualty Event.

"*Intellectual Property*" has the meaning assigned to such term in <u>Section 5.28</u>.

"*Interest Period*" means with respect to any Loan: (a) initially, the period commencing on and including the Borrowing Date for such Loan and ending on but excluding the numerically corresponding day in the calendar month that is three months thereafter (or, with respect to any Loan made while any other Loan is outstanding, the period commencing on and including the Borrowing Date for such Loan and ending on but excluding the last day of the Interest Period then in effect applicable to all other Loans); and (b) thereafter, each period commencing on and including the last day of the immediately preceding Interest Period and ending on but excluding the numerically corresponding day in the calendar month that is three months thereafter provided that (i) any Interest Period that would otherwise extend beyond the Maturity Date shall end on the Maturity Date, (ii) if an Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, and (iii) any Interest Period that begins on the last day of a calendar month (or a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"*Investment*" means, as to any Person, any direct or indirect acquisition or investment by such Person in another Person, whether by means of: (a) the purchase or other acquisition of any Equity Interest, notes, bonds, debentures or other securities of another Person, (b) a loan, advance or other extension of credit, or capital contribution to, Guaranty or assumption of Debt of, or purchase or other acquisition of any other Debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

For purposes of the definition of "*Unrestricted Subsidiary*", Investment shall include the portion (proportionate to Canacol Energy's equity interest in such Subsidiary) of the Fair Market Value of the net assets of any Subsidiary of Canacol Energy at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that, upon a redesignation of such Subsidiary as a Restricted Subsidiary, Canacol Energy shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to: (1) Canacol Energy's Investment in such Subsidiary at the time of such redesignation less (2) the portion (proportionate to Canacol Energy's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation. Any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case, as determined in good faith by the Board of Directors of Canacol Energy. Except as otherwise provided herein, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value. For the avoidance of doubt, Investments shall not include deposits of money in the bank accounts of Canacol Energy or the Restricted Subsidiaries in the ordinary course of business and not for the benefit of persons other than Canacol Energy and the Restricted Subsidiaries in jurisdictions where they do business.

"*Investor*" has the meaning assigned to such term in Section 11.07(f).

"*Joinder Agreement*" has the meaning assigned to such term in Section 10.07(a).

"*Judgment Currency*" has the meaning assigned to such term in Section 11.15(a).

"*Key-Man Event*" means the consummation of any transaction or series of transactions or the occurrence of any event or series of events, following the Closing Date, as a result of which Mr. Charle Gamba ceases to (a) serve as Chief Executive Officer of Canacol Energy or (b) devote substantially all of his working time, attention, skills and effort to the business and affairs of Canacol Energy, whether as a result of resignation, removal or otherwise, but not as a result of death or disability.

"*Law 1116*" has the meaning assigned to such term in the last paragraph of Section 8.02. "*Lender*" has the meaning assigned to such term in the preamble hereto.

"*Lender Parties*" means, collectively, the Lenders and the Administrative Agent.

"*Lien*" shall mean any mortgage, deed of trust, lien, security interest, pledge, hypothecation, assignment, deposit arrangement (other than deposits of money in the bank accounts of the Borrower or the Restricted Subsidiaries in the ordinary course of business) or other charge or encumbrance of any kind, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property, any right of set off or any similar arrangement under or with respect to any insurance policy or anything analogous to any of the foregoing under the laws of any jurisdiction. For the avoidance of doubt any preference of one creditor in the ordinary course over another arising by operation of law shall not be considered as a Lien; *provided* that in no event shall a lease that would have been characterized as an operating lease for purposes of IFRS prior to the effective

date of IFRS 16 (whether or not such lease was in effect on such date) be deemed to constitute a Lien.

"*Line of Business*" means business activities of the Loan Parties, relating primarily to the oil and natural gas exploration, development and production and business activities reasonably ancillary or related thereto (including the operation and maintenance of gas liquefaction and processing plants and Hydrocarbon transportation).

"*Loan*" means an advance made by any Lender under the Facility pursuant to Section 2.01.

"*Loan Documents*" means, collectively, this Agreement, the Note, the Fee Letters and any other document or instrument executed in connection with the foregoing (including all schedules, exhibits, annexes and other attachments thereto) designated as such by the Borrower and the Lenders.

"*Loan Parties*" means, collectively, the Borrower and each Guarantor.

"*Management Group*" means one or more members of the Board of Directors, the President, Chief Executive Officer, the Chief Financial Officer, the principal accounting officer, any Treasurer or Controller, or any Vice President, in each case, of the Borrower or any Guarantor.

"*Material Adverse Effect*" means a material adverse effect on, or a material adverse change in: (a) the business, assets, liabilities, operations, operating results, financial or other condition of the Loan Parties as a whole, (b) the ability of any Loan Party to perform its respective obligations under the Loan Documents to which it is a party, (c) the rights and/or remedies any of the Lender Parties are purported to have under any Loan Document, or (d) the validity and enforceability of any Loan Document.

"*Maturity Date*" means the earlier of (a) February 14, 2027, and (b) the date on which all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise; provided that, if any such day is not a Business Day, Maturity Date shall be the Business Day immediately preceding such day.

"*Maximum Rate*" has the meaning assigned to such term in Section 11.16(a).

"*Medellín Pipeline*" means a newly built, approximately 20 inch natural gas pipeline in the Lower Magdalena Basin (Colombia), with an expected length of approximately 300kms and an expected capacity of 100mm cfpd.

"*Minor Title Defects*" means, with respect to real property, any minor defect or irregularity in title, including terms, conditions, exceptions, limitations, easements, rights-of-way, servitudes, permits, surface leases and other similar rights in respect of surface operations, and easements for pipelines, streets, roads, alleys, highways, telephone lines, power lines, transmission lines, transportation lines, distribution lines, railways, removal of timber, grazing, logging operations, canals, ditches, reservoirs and other like purposes, or for the joint or common use of real estate, rights-of-way, facilities and equipment and other easements and rights-of-way, on, over

31

or in respect of such property that are customarily granted in the Oil and Gas Business. "*Moody's*" means Moody's Investors Service, Inc. and its Affiliates or any successor thereto.

"*Multiemployer Plan*" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"*Natural Gas Products*" means gas, casing head gas, coal seam gas, gaseous hydrocarbons and all products, by-products and other substances derived, refined or separated therefrom and all other minerals and substances produced in conjunction with such substances.

"*Net Cash Proceeds*" means, with respect to any Person:

(a)     with respect to any Casualty Event, the excess, if any, of (i) Insurance Proceeds received by such Person in connection with such Casualty Event over (ii) (x) the principal amount, premium or penalty, if any, interest and other amounts on any Debt that is secured by the Property subject to such Casualty Event (or Incurred solely for the purpose of financing the acquisition, construction or improvement of the Property subject to such Casualty Event) and required to be repaid with the Insurance Proceeds of (or in an amount equal to the Insurance Proceeds of) such Casualty Event (other than Debt under the Loan Documents), in accordance with the terms of any instrument evidencing such Debt or security or other agreement of any kind with respect to such assets and (y) the reasonable and customary costs and expenses actually incurred by such Person in connection with such Casualty Event;

(b)     with respect to any Taking, the excess, if any, of (i) Takings Proceeds received by such Person in connection with such Taking over (ii) (x) the principal amount, premium or penalty, if any, interest and other amounts on any Debt that is secured by the Property subject to such Taking (or Incurred solely for the purpose of financing the acquisition, construction or improvement of the Property subject to such Taking) and required to be repaid with the Takings Proceeds of (or in an amount equal to the Takings Proceeds of) such Taking (other than Debt under the Loan Documents), in accordance with the terms of any instrument evidencing such Debt or security or other agreement of any kind with respect to such assets and (y) the reasonable and customary costs and expenses actually incurred by such Person in connection with such Taking; and

(c)     with respect to any Asset Sale, the aggregate amount of cash proceeds received by such Person in connection with such Asset Sale (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and proceeds from the sale or other Disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Debt or other obligations relating to the Properties that are the subject of such Disposition or received in any other non-cash form) net of (1) all legal fees and expenses, title and recording tax expenses, commissions and other fees and expenses incurred, and all federal, state, provincial, foreign and local

taxes required to be paid or accrued as a liability under IFRS, as a consequence of such Disposition; (2) all payments, including any prepayment premiums or penalties, made on any Debt that is secured by any assets subject to such Disposition (or Incurred solely for the purpose of financing the acquisition, construction or improvement of the Property subject to such Disposition, or that shall by its terms, or in order to obtain a necessary consent to such Disposition, or by Applicable Law be repaid out of the proceeds from such Disposition), in accordance with the terms of any instrument evidencing such Debt or security or other agreement of any kind with respect to such assets; (3) all distributions and other payments required to be made to minority interest holders in Subsidiaries or joint ventures as a result of such Disposition; and (4) appropriate amounts to be provided by the seller as a reserve, in accordance with IFRS, against any liabilities associated with the property or other assets disposed of in such Disposition and retained by Canacol Energy or any Restricted Subsidiary after such Disposition;

(d)     with respect to the incurrence or issuance of any Debt by such Person, the excess of: (i) the aggregate amount of cash proceeds received in connection with such incurrence of Debt over (ii) the underwriting discounts and commissions, and other reasonable and customary costs and expenses, incurred by such Person in connection therewith;

in each case of clauses (a) and (b), net of any Taxes paid or reasonably estimated to be payable by such Person in connection with any of the foregoing events or circumstances as reasonably determined by such Person; *provided* that if the amount of any estimated Taxes exceeds the amount of Taxes actually required to be paid in cash in connection with such events, the aggregate amount of such excess shall constitute Net Cash Proceeds with respect to such event.

"*Note*" means a promissory note governed by Colombian law with blank spaces and its corresponding letter of instructions (*pagaré con espacios en blanco y carta de instrucciones*) substantially in the form of Exhibit C, with appropriate insertions as to date, principal amount and applicable rate of interest, duly executed and delivered by the Borrower and duly executed and delivered by each Guarantor *por aval*.

"*Notice of Borrowing*" has the meaning assigned to such term in Section 2.02(a).

"*Obligations*" means, collectively, at any time, (a) the due and punctual payment (whether at maturity, by acceleration, upon any Prepayment Date, or otherwise) by each Loan Party of (i) all advances and Loans to the Borrower (whether or not evidenced by any note or instrument and whether or not for the payment of money), including, but not limited to, principal, interest, fees, costs and expenses (in each case including any amounts that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Law naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding) owing under any Loan Document and (ii) all other monetary obligations, whether direct or indirect, of each Loan Party under the Loan Documents (including any obligation or liability to pay fees, expense reimbursements, indemnification obligations, make-whole amounts, premiums, breakage costs with respect to any such Loan Document), in each case including any amounts that accrue after the commencement

33

by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Law naming such Person as the debtor in such proceeding, regardless of whether such obligations or liabilities are allowed claims in such proceeding, and (b) the due and punctual performance of all other obligations, duties, covenants of any Loan Party, whether direct or indirect, arising under any Loan Document, or otherwise with respect to any Loan.  To the extent that any payment with respect to the Obligations (whether by or on behalf of any Loan Party, as proceeds of security, enforcement of any right of set-off or otherwise) is declared to be fraudulent or preferential in any respect, set aside or required to be paid to a debtor in possession, trustee, receiver or similar Person, then the obligation or part thereof originally intended to be satisfied will be deemed to be reinstated and outstanding as if such payment had not occurred.

"*OFAC*" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"*Officer's Certificate*" means a certificate signed by a Responsible Officer of a Loan Party or any of its Restricted Subsidiaries, as the case may be, and delivered to the Administrative Agent.

"*Official*" has the meaning assigned to such term in Section 7.10(c).

"*Oil Business*" shall mean:

(a)     the business of acquiring, exploring, exploiting, developing, producing, operating, marketing, transporting and disposing of interests in oil and other Oil Properties or products produced in association with any of the foregoing;

(b)     any business relating to oil field sales and services;

(c)     any midstream oil services, including water treatment, pipelines and flowlines; and

(d)     any business or activity relating to, arising from, or necessary, appropriate or incidental to the activities described in the foregoing clauses (a) through (d) of this definition.

"*Oil Properties*" means rights, titles, interests and estates in and to oil leases, oil and mineral leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature and including any interests acquired pursuant to unit agreements, pooling agreements and declarations of pooled units.  Unless otherwise indicated herein, each reference to the term "Oil Properties" means any and all Oil Properties that are the subject of the Concession Agreements of Canacol Energy and its Subsidiaries.  Notwithstanding anything to the contrary, farmouts and other similar transfers of interests in undeveloped acreage to which no proved or probable reserves are attributable (and assignments in connection therewith) shall not constitute "Oil Properties."

"*Oil and Gas Business*" shall mean:

(a)    the business of acquiring, exploring, exploiting, developing, producing, operating, marketing, transporting and disposing of interests in oil, natural gas, liquefied natural gas and other Hydrocarbon properties or products produced in association with any of the foregoing;

(b)    any business relating to oil and gas field sales and services;

(c)    any business relating to processing of natural gas;

(d)    any midstream oil and gas services, including gas processing, water treatment, pipelines and flowlines; and

(e)    any business or activity relating to, arising from, or necessary, appropriate or incidental to the activities described in the foregoing clauses (a) through (d) of this definition.

"*Oil and Gas Properties*" means rights, titles, interests and estates in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature and including any interests acquired pursuant to unit agreements, pooling agreements and declarations of pooled units. Unless otherwise indicated herein, each reference to the term "Oil and Gas Properties" means any and all Oil and Gas Properties that are the subject of the Concession Agreements of Canacol Energy and its Subsidiaries. Notwithstanding anything to the contrary, farmouts and other similar transfers of interests in undeveloped acreage to which no proved or probable reserves are attributable (and assignments in connection therewith) shall not constitute "Oil and Gas Properties."

"*Organizational Documents*" means, with regard to any Person, its by-laws, articles of association, incorporation or amalgamation, *estatutos sociales*, deed of incorporation (*escritura de constitución*), limited liability company agreement, shareholders agreement or other similar document, all of them as amended and in effect from time to time.

"*Other Connection Taxes*" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax, other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document.

"*Other Taxes*" means all present or future transfer tax, stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery or enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"*Outstanding Amount*" means, with respect to the Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any Borrowings and prepayments or repayments of Loans, as the case may be, occurring on such date.

"*Panama*" means the Republic of Panama.

"*Participant*" has the meaning assigned to such term in Section 11.07(d).

"*Participant Register*" has the meaning assigned to such term in Section 11.07(e).

"*Payment Recipient*" has the meaning assigned to such term in Section 9.11.

"*Payment Date*" means (a) the last day of each Interest Period and (b) the Maturity Date.

"*Periodic Term SOFR Determination Day*" has the meaning specified in the definition of "Term SOFR".

"*Permitted Holders*" means one or more of the following (i) members of the Management Group, (ii) any spouse, descendant, heirs or estate of the individuals referred to in the preceding clause (i), and (iii) any non-natural Person that is an Affiliate of any of the Persons referred to in the preceding clauses (i) and (ii) and with respect to which a Person or Persons listed in the preceding clauses (i) and (ii) owns the majority of the aggregate of the total voting power of the Voting Stock in such non-natural Person, on a fully diluted basis.

"*Permitted Liens*" means:

(a)    Liens imposed by Applicable Law that were incurred in the ordinary course of business, including carriers', warehousemen's, mechanics', operators', vendors', repairmen's, materialmen's, construction or other similar Liens arising in the ordinary course of business, in each case that: (i) do not in the aggregate materially detract from the value of the Property subject thereto or materially impair the use thereof in the operations of the business of the Person owning such Property, (ii) are being Contested to prevent the forfeiture or sale of the Property subject to such Liens or (iii) secure obligations that are not overdue for more than 90 days;

(b)    Liens securing Taxes, assessments and other governmental charges or levies;

(c)    pledges or deposits made in the ordinary course of business in connection with worker's compensation, unemployment insurance, pensions or other similar social security legislation (including letters of credit or guarantees issued in respect thereof);

(d)    pledges and deposits to secure the performance of tenders, government contracts and trade contracts, statutory obligations, leases, surety and appeal bonds, performance and return-of-money bonds, and other obligations of a like nature or relating to the letters of credit or guarantees issued in respect thereof,

in each case, incurred in the ordinary course of business consistent with past practice or otherwise incidental to the exploration, development, operation and maintenance of Oil Property or Gas Property, in each case which are (x) not Incurred in connection with the borrowing of money, the obtaining of advances or credit or the payment of the deferred purchase price of property or assets in the operation of the business of the Borrower and the Restricted Subsidiaries, and (y) not obligations consisting of letters of credit, bonds or surety obligations required by governmental authorities (including without limitation for the benefit of the *Agencia Nacional de Hidrocarburos of Colombia*) in connection with the operation of the Borrower's and Restricted Subsidiaries' Oil and Gas Properties in the ordinary course of business;

(e)    judgment Liens in respect of judgments that do not constitute an Event of Default under Section 8.01(i);

(f)    minor irregularities in title to real property that do not secure any monetary obligations and which do not interfere in any material respect with the occupation, use or enjoyment by any Loan Party of any of its Properties;

(g)    contractual Liens not securing Debt which arise in the ordinary course of business, in a transaction expressly permitted hereunder, under operating agreements, joint venture agreements, oil and gas partnership agreements, oil and gas leases, farm-out agreements, division orders, contracts for the sale, transportation or exchange of oil and natural gas, unitization and pooling declarations and agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, processing agreements, net profits agreements, development agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, and other agreements which are usual and customary in the Oil and Gas Business and are for claims which are not delinquent or which are being Contested; *provided* that any such Lien referred to in this clause (g) does not materially impair the use of the Property covered by such Lien for the purposes for which such Property is held by any Loan Party or any of its Subsidiaries or materially impair the value of such Property subject thereto;

(h)    easements, servitudes, permits, conditions, covenants, exceptions, reservations, zoning restrictions, rights-of-way and similar Liens on real Property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected Property or interfere in any material respect with the ordinary conduct of business of the Loan Parties or any of their respective Subsidiaries;

(i)    Liens of lessors (including sublessors) of Property leased by such lessors to any Loan Party or any Subsidiary thereof, restrictions and prohibitions on encumbrances and transferability with respect to such Property and such Loan Party's or such Subsidiary's interests therein imposed by such leases, and Liens

encumbering such lessors' titles and interests in such Property and to which such Loan Party's or such Subsidiary's leasehold interests may be subject or subordinate, in each case, whether or not evidenced by UCC financing statement filings or other documents of record; *provided* that such Liens do not encumber Property of any Loan Party or any Subsidiary thereof other than the Property that is the subject of such leases and items located thereon;

(j)    Liens, titles and interests of licensors of software and other intangible Property licensed by such licensors to any Loan Party or any Subsidiary thereof, restrictions and prohibitions on encumbrances and transferability with respect to such Property and such Loan Party's or such Subsidiary's interests therein imposed by such licenses, and Liens encumbering such licensors' titles and interests in such Property and to which such Loan Party's or such Subsidiary's license interests may be subject or subordinate, in each case, whether or not evidenced by UCC financing statement filings or other documents of record; *provided* that such Liens do not encumber Property of any Loan Party or any Subsidiary thereof other than the Property that is the subject of such licenses;

(k)    Liens on any Property acquired from a Person that is merged or amalgamated with or into any Loan Party or any Subsidiary (to the extent such transaction is permitted under Section 7.04), or any Liens on the Property, Equity Interests, income or profits of any Person, existing at the time such Person becomes a Subsidiary and, in either such case, is not created as a result of or in connection with or in anticipation of any such transaction (unless such Lien was created to secure or provide for the payment of any part of the purchase price of such Person); *provided*, *however*, that such Liens may not extend to any other Property, income or profits of any Loan Party or any Subsidiary (other than improvements, accessions, upgrades, accessories and products and proceeds in respect of the Property subject to such Liens at the time of such merger or amalgamation);

(l)    Liens on any Property existing at the time of acquisition thereof, including any acquisition by means of a merger, amalgamation or consolidation, and that is not created as a result of or in connection with or in anticipation of such acquisition (unless such Lien was created to secure or provide for the payment of any part of the purchase price of such property or assets); *provided*, *however*, that such Liens may not extend to any other Property, or profits of such Loan Party or any Subsidiary thereof (other than improvements, accessions, upgrades, accessories and products and proceeds in respect of the property subject to such Liens at the time of such acquisition);

(m)    Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights or remedies as to deposit accounts or other funds maintained with a creditor depository institution; *provided*, *however*, that (i) such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the applicable Loan Party or any Subsidiary thereof in excess of those set forth by regulations promulgated by the Board of Governors of the Federal Reserve System of the United States or

analogous Canadian, Colombian, Panamanian and Swiss governmental authorities and (ii) such deposit account is not intended by the applicable Loan Party or any Subsidiary thereof to provide collateral to such depository institution;

(n)     Liens arising out of governmental concessions or licenses (including under contracts with governmental agencies for technical evaluation or exploration and development rights of oil and natural gas fields) held by a Loan Party or any Subsidiary thereof;

(o)     Liens on pipelines or pipeline facilities that arise by operation of law;

(p)     Liens reserved in oil and gas mineral leases for bonus or rental payments and for compliance with the terms of such leases;

(q)     Liens securing obligations arising under cash management obligations, cash management services and other Debt in respect of netting services, automatic clearing house arrangements, employees' credit or purchase cards, overdraft protections and similar arrangements in each case incurred in the ordinary course of business;

(r)     Liens (other than Liens securing Debt) on, or related to, assets to secure all or part of the costs incurred in the ordinary course of the Oil and Gas Business for the exploration, drilling, development, production, processing, transportation, marketing, storage or operation thereof;

(s)     any Lien securing Hedging Agreements of the Borrower or any Restricted Subsidiary Incurred for the purpose of (i) fixing or hedging interest rate risk or currency and commodity prices fluctuations in the ordinary course of business or (ii) with respect to Debt permitted to be Incurred by the Borrower or any Restricted Subsidiary pursuant to this Agreement, and in each case not for speculative purposes; *provided*, *however*, that increases in any obligation under any Hedging Agreement as a result of fluctuations in foreign currency, commodity prices, exchange rates or interest rates shall not be deemed an Incurrence of Debt; and

(t)     any Lien on the Equity Interests in an Unrestricted Subsidiary;

*provided*, *however*, that the term "Permitted Liens" shall be construed to allow such Permitted Liens also to cover any improvements, fixtures or accessions to the Property encumbered by the applicable Permitted Lien.

"*Permitted Reorganization*" means the transfer of the VIM-21 and Esperanza assets and liabilities solely between Loan Parties, substantially as described in <u>Exhibit L</u>.

"*Permitted Uses*" means, the use of the proceeds of the Loans for (a) general corporate purposes, (b) finance capital expenditures, (c) payments for or in respect of working

capital, (d) repayment in full of the Reference Indebtedness, and (e) investments in (i) Gas Business and (ii) Oil Business, subject to the restrictions set forth in <u>Section 7.03</u>.

"*Person*" means any individual, corporation, company, voluntary association, partnership, limited liability company, joint venture, trust, unincorporated organization, Governmental Authority or other entity of whatever nature.

"*Plan*" means a pension plan as defined in Section 3(2) of ERISA.

"*Preferred Stock*" means, with respect to the Equity Interests in any Person, any class or classes (however designated) that is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of common Equity Interests in such Person.

"*Prepayment Date*" means, with respect to the principal amount of any Loan being prepaid, the date on which such principal amount is actually prepaid, which shall be a Business Day.

"*Prime Rate*" means the rate of interest per annum publicly announced from time to time by the Administrative Agent or an affiliate as its prime rate last quoted by The Wall Street Journal as the "Prime Rate" in the U.S. or, if the Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent (acting at the written direction of the Required Lenders)) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent (acting at the written direction of the Required Lenders)). Any change in the Prime Rate shall take effect at the opening of business on the day such change is publicly announced or quoted as being effective.

"*Process Agent*" has the meaning assigned to such term in <u>Section 11.12(b)</u>.

"*Prohibited Nations Acts*" means the Trading with the Enemy Act, 50 U.S.C. app. §§ 1-44 (2006), the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1707 (2006), the USA Patriot Act, the Cuban Liberty and Democratic Solidarity Act (Helms-Burton Act), Pub. L. No. 104-114, 110 Stat. 785 (1996), related regulations issued by OFAC, including the Cuban Assets Control Regulations, and any similar acts or governmental actions of the U.S., Canada, Colombia, the Republic of Panama or Switzerland to the extent applicable.

"*Prohibited Payments*" has the meaning assigned to such term in <u>Section 5.26(b)</u>.

"*Property*" means any right or interest in or to property or asset of any kind whatsoever, or rights in respect of any thereof, whether real, personal or mixed and whether tangible or intangible.

"*Prudent Industry Practices*" means those practices, methods, equipment, specifications and standards of safety and performance, as the same may change from time to time, as are commonly used in the jurisdictions in which any Loan Party or any of its Subsidiaries operates by companies engaged in the Line of Business in such jurisdiction.

"*Purchase Money Debt*" means Debt in respect of Capital Lease Obligations and to finance the acquisition, construction or improvement of any fixed or capital assets of the Borrower and its Restricted Subsidiaries; *provided* that: (i) such Debt was Incurred in the ordinary course of business of such Loan Party or any of its Restricted Subsidiaries, (ii) the aggregate amount of all such Debt at any one time outstanding shall not exceed, individually or in the aggregate, the greater of (x) US$35,000,000 (or the Dollar Equivalent thereof) and (y) 4.0% of Consolidated Net Tangible Assets, (iii) immediately before and after the Incurrence of such Debt, no Default shall exist or would result therefrom and (iv) such Debt is initially Incurred prior to or within 90 days after such acquisition or the completion of such construction or improvement.

"*Recipient*" means (a) the Administrative Agent, (b) any Lender and (c) any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder.

"*Refinancing*" means, in respect of any Debt, to refinance, extend, renew, refund, repay, replace, prepay, redeem, defease or retire, in whole or in part, or to issue other Debt in exchange or replacement for, in whole or in part, such Debt.  "*Refinanced*" and "*Refinancing*" shall have correlative meanings.

"*Reference Indebtedness*" means Debt of Canacol Energy and CNEMED S.A.S. outstanding as of the Closing Date under the Existing RCF Loan and the Existing Bridge Loan, respectively.

"*Reference Participant*" means any Participant or prospective Participant identified in writing by any Lender to the Borrower on or prior to the date hereof.

"*Register*" has the meaning assigned to such term in Section 11.07(c).

"*Related Parties*" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, counsel and advisors of such Person and of such Person's Affiliates.

"*Release*" means any release, spill, emission, leaking, dumping, injection, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment or within or upon any building, structure, facility or fixture.

"*Relevant Governmental Body*" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"*Relevant Lenders*" has the meaning assigned to such term in Section 9.03(m).

"*Required Lenders*" means, as of any date of determination, Lenders having an aggregate Applicable Percentage of at least 50.01%; provided that at any time there are two or more Lenders, "Required Lenders" shall include at least two Lenders that are not Affiliates of one another.

"*Resignation Effective Date*" has the meaning assigned to such term in Section 9.06(a).

"*Resolution Authority*" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"*Responsible Officer*" means, with respect to any Loan Party, the chief executive officer, president, chief financial officer, treasurer, assistant treasurer, controller or legal representative of such Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of the Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"*Restricted Payment*" means (a) any declaration or payment of any dividend or other distribution (whether in cash, securities or other Property) with respect to any Equity Interests of any Loan Party or any Restricted Subsidiary thereof, (b) any payment (whether in cash, securities or other Property), including any sinking fund or similar deposit, on account of the purchase, redemption, defeasance, retirement, acquisition, cancellation or termination of any Equity Interest of any Loan Party or any Restricted Subsidiary thereof, (c) any payment of any principal, interest or other amount on or in relation to any Debt owed by any Loan Party to an Affiliate, including the payment by CNEMED S.A.S. of any Debt under the CNEMED Intercompany Loan or (d) any other payment by any Loan Party to an Affiliate, including any payment in respect of compensation, management, advisory or other fees, bonuses or commissions; *provided*, *however*, that (i) dividends, distributions, options and other equity rights granted under an employee stock option plan or other similar incentive plan or payments to such Person approved by the Board of Directors of such Person and (ii) non-cash distributions by Canacol Energy in the form of Equity Interests in Canacol Energy shall not constitute Restricted Payments; *provided*, *further*, that (x) dividends, distributions or other payments solely to a Loan Party shall not constitute Restricted Payments and (y) reimbursements of costs and expenses by a Loan Party or any Restricted Subsidiary thereof incurred in the ordinary course of business by other Loan Party or Restricted Subsidiary on behalf of the reimbursing Loan Party or Restricted Subsidiary in respect of costs and expenses shall not constitute Restricted Payments.

"*Restricted Subsidiary*" means any Subsidiary of Canacol Energy that is not an Unrestricted Subsidiary.

"*Revocation*" shall have the meaning given to it under the definition of the term "Unrestricted Subsidiary."

"*Rolling Period*" means with respect to any Fiscal Quarter, such Fiscal Quarter and the three immediately preceding Fiscal Quarters considered as a single accounting period.

"*Sale and Leaseback Transaction*" means, with respect to any Person, an arrangement with any bank, insurance company or other lender or investor providing for the leasing by such Person or any of its Subsidiaries of any Property which has been or is being sold or transferred in connection with such lease by such Person or such Subsidiary to such lender or

investor or to any person to whom funds have been or are to be advanced by such lender or investor on the security of such Property.

"*Sanctioned Country*" means, at any time, a country, region or territory which is itself the subject or target of any Sanctions (at the time of this Agreement, Cuba, Syria, Venezuela, Iran, North Korea, Russia, the non-government controlled regions of Ukraine -currently, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, Zaporizhzhia, Kherson, and the Crimea Region).

"*Sanctioned Person*" means, at any time, any Person (a) that is the subject or target of any Sanctions; (b) listed in the annex to, or otherwise subject to the provisions of, the Executive Order or listed in any other Sanctions-related list of designated Persons (including, without limitation, a "designated person", a "politically exposed foreign person" or a "terrorist group" as defined in any Sanctions) maintained by the Office of Foreign Assets Control (OFAC) or the Financial Crimes Enforcement Network (FINCEN) of the U.S. Department of the Treasury, the United Nations Security Council, the European Union or any European Union member state, His Majesty's Treasury (UK HMT), the Swiss Secretariat for Economic Affairs (SECO), the Hong Kong Monetary Authority (HKMT), Global Affairs Canada, Public Safety Canada, the Monetary Authority of Singapore (MAS) or any other Governmental Authority or relevant sanctions authority; (c) with which any party to the Loan Documents is prohibited from dealing or otherwise engaging in any transaction pursuant to any Applicable Laws relating to Sanctions; or (d) majority-owned or controlled by any such Person or Persons described in the foregoing clauses (a) through (d).

"*Sanctions*" means all economic or financial sanctions or trade embargoes or sanctions or other restrictive measures imposed, administered or enforced from time to time by the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury (OFAC), the United Nations Security Council, the European Union, His Majesty's Treasury (UK HMT), the Swiss Secretariat for Economic Affairs (SECO), the Hong Kong Monetary Authority (HKMT), Global Affairs Canada, Public Safety Canada, the Monetary Authority of Singapore (MAS) or any other Governmental Authority or relevant sanctions authority.

"*Sangretoro*" shall mean the exploration and production contract located in the Caguán Putumayo Basin, operated by the Borrower, with a 100% working interest.

"*Securities Act*" means the United States Securities Act of 1933, or any similar United States Federal statute then in effect, and all regulations related thereto.

"*Security*" has the meaning assigned to such term in Section 10.09(a).

"*SFC*" means Colombian Financial Superintendency (*Superintendencia Financiera de Colombia*).

"*Significant Shareholder*" means, with respect to any Loan Party at any time, any Person or combination of Persons acting jointly or in concert (within the meaning of the Securities Act (Alberta)), holding at least 10% of the Equity Interests in such Loan Party at such time.

"*SOFR*" means a rate per annum equal to the secured overnight financing rate for such Business Day as administered and published by the SOFR Administrator on its website.

"*SOFR Administrator*" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"*SOFR Borrowing*" means, as to any Borrowing, the SOFR Loans comprising such Borrowing.

"*SOFR Loan*" means a Loan that bears interest at a rate based on Term SOFR, other than pursuant to clause (c) of the definition of "*Alternate Base Rate*".

"*Solvent*" means, (i) with respect to any Person (other than any Person organized under the laws of Colombia) on any date of determination, that on such date (a) the fair value of the Property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair saleable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur indebtedness or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction for which such Person's Property would constitute an unreasonably small capital, and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability; (ii) with respect to any Person organized under the laws of Colombia on any date of determination, that on such date (a) such Person has not filed, or consented to the filing of, a petition to initiate a reorganization or liquidation proceeding pursuant to Law 1116, (b) such Colombian Person has not accrued losses that have diminished its net worth below 50% of its paid-in capital, (c) such Colombian Person has not declared its inability to pay its debts as they become due, and/or (d) such Colombian Person has not renegotiated or restructured, and is not in the process of renegotiating or restructuring, Debt in an aggregate amount of more than 10% of the total liabilities of such Colombian Person, through a private negotiation process with its creditors; *provided*, *however*, that (x) renegotiations or restructurings of unsecured trade accounts payable incurred in the ordinary course of business of such Colombian Person that occur within any fiscal quarter of any calendar year shall not be included in the foregoing clause (ii)(d) of the definition of "Solvent" in any subsequent fiscal quarter of such calendar year, and shall not be aggregated with any other such trade accounts payable for any subsequent fiscal quarter of such calendar year and (y) that for purposes of the determination of the total liabilities of such Colombian Person, the Loans shall be taken into consideration; or (iii) with respect to any Person organized under the laws of Canada on any date of determination, that on such date (a) such Person is unable to pay its debts or liabilities as they become due or (b) the realizable value of such Person's assets is less than the aggregate of its liabilities and stated capital of all share classes.

"*S&P*" means Standard & Poor's Ratings Group, Inc. and its Affiliates or any successor thereto.

"*Subsidiary*" means, with respect to any Person at any time, any corporation or other entity: (a) more than 50% of the Voting Equity Interests in which is owned or Controlled by such Person and/or by any Subsidiary of such Person or (b) which is otherwise Controlled by such Person and/or by any Subsidiary of such Person in accordance with the Applicable Law of such Controlled Person's jurisdiction. Unless otherwise specified, all references herein to a "Subsidiary" or to "*Subsidiaries*" shall refer to a Subsidiary or Subsidiaries of Canacol Energy.

"*Swiss Guarantor*" means, any Person organized and existing under the laws of Switzerland that is or becomes a Guarantor pursuant to Section 10.07.

"*Switzerland*" means the Swiss Confederation.

"*Taking*" means, with respect to any Person, any circumstance or event, or series of circumstances or events as a result of which (a) all or any portion of the Property (including any rights under or associated with any Governmental Approval) of such Person shall be condemned, nationalized, confiscated, seized, compulsorily acquired or otherwise expropriated by any Governmental Authority under power of eminent domain or otherwise, (b) any Governmental Authority shall assume control of all or a portion of the Property (including any rights under or associated with any Governmental Approval) or business operations of such Person, (c) any Governmental Authority shall take any action for the dissolution or disestablishment of such Person, or (d) any Governmental Authority shall take any action that would prevent such Person from carrying on its business or operations or a substantial part thereof.

"*Takings Proceeds*" means, with respect to any Person, all condemnation awards or other compensation, awards, damages and other payments or relief with respect to any Taking.

"*Taxes*" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding and value-added tax), assessments, fees or other charges imposed by any Governmental Authority, irrespective of the manner in which they are collected or assessed (either as tax obligor, as liable Person or otherwise), including any interest, surcharges, additions to tax or penalties applicable thereto.

"*Term SOFR*" means,

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "*Periodic Term SOFR Determination Day*") that is two U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; *provided*, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities

Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b) for any calculation with respect to an ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "*ABR Term SOFR Determination Day*") that is two U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; *provided*, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR SOFR Determination Day;

*provided*, *further*, that if Term SOFR determined as provided above (including pursuant to the proviso under clause (a) or clause (b) above) shall ever be less than the Floor, then Term SOFR shall be deemed to be the Floor.

"*Term SOFR Administrator*" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent (acting at the written direction of the Required Lenders)).

"*Term SOFR Reference Rate*" means the forward-looking term rate based on SOFR.

"*TSX*" means the Toronto Stock Exchange or any successor stock exchange.

"*Type*", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Term SOFR or Alternate Base Rate.

"*Unadjusted Benchmark Replacement*" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"*Uniform Commercial Code*" means the Uniform Commercial Code in effect in the State of New York; *provided* that if by reason of mandatory provisions of Applicable Law, the perfection or priority of a security interest is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of New York, the term "Uniform Commercial Code" means the Uniform Commercial Code in effect in such other jurisdiction for the purposes of the provisions in the Loan Documents relating to such perfection or priority.

"*Unrestricted Subsidiary*" means each Subsidiary of Canacol Energy that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of

Canacol Energy, and any Subsidiary of an Unrestricted Subsidiary.  The Board of Directors of Canacol Energy may designate any Subsidiary of Canacol Energy (including any newly acquired or newly formed Subsidiary) as an "Unrestricted Subsidiary" under this Agreement (a "*Designation*") only if:

(1)    neither Canacol Energy nor any Restricted Subsidiary thereof will at any time provide credit support for, subject any of its property or assets (other than the Equity Interests in any such Subsidiary to be Designated as an Unrestricted Subsidiary) to the satisfaction of, or Guaranty, any Debt of any Unrestricted Subsidiary (including any undertaking, agreement or instrument evidencing such Debt) or be directly or indirectly liable for any Debt of any Unrestricted Subsidiary unless such credit support or Debt was permitted to be incurred as Debt under Section 7.01;

(2)    no Default or Event of Default shall have occurred and be continuing at the time of or immediately after giving effect to such Designation, and any transactions between Canacol Energy or any other Restricted Subsidiary thereof and such Subsidiary, as applicable, are in compliance with Section 7.08;

(3)    such Subsidiary and its Subsidiaries own no Equity Interests in or Debt of, and hold no Lien on any Property of, Canacol Energy or any other Restricted Subsidiary of Canacol Energy; and

(4)    at the time of Designation, (i) the Subsidiary to be so Designated has Consolidated Total Assets of US$1,000 or less or (ii) Canacol Energy would be permitted to make an Investment under Section 7.03 at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment at the time of Designation) in an amount equal to the Fair Market Value of Canacol Energy's Investment in such Subsidiary on such date (as determined in accordance with the second paragraph of the definition of "Investment").

In addition, Canacol Energy may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "*Revocation*") if:

(a)    no Default or Event of Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(b)    all Liens and Debt of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of this Agreement.

Any such Designation or Revocation shall be evidenced by prompt delivery to the Administrative Agent of a copy of the resolution of the Board of Directors of Canacol Energy giving effect thereto accompanied by an Officer's Certificate as to compliance with the foregoing provisions.

"*U.S.*" and "*United States*" mean the United States of America.

47

"*U.S. Government Securities Business Day*" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"*U.S. Person*" means: (a) a U.S. citizen, (b) a U.S. resident, (c) an individual or entity located in the U.S., (d) an entity organized under U.S. law or (e) an entity owned or controlled by any of the above.

"*UK Financial Institution*" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*USA Patriot Act*" has the meaning assigned to such term in <u>Section 11.22</u>.

"*VIM-5*" shall mean the exploration and production contract located in the Lower Magdalena Basin, Colombia, operated by the Borrower, where the Borrower has a 100% working interest.

"*VIM-21*" shall mean the exploration and production contract, in the VIM-21 block located in the Lower Magdalena Basin, Colombia, which was operated by the Borrower where the Borrower has a 100% working interest.

"*VMM-2*" shall mean the exploration and production contract for unconventional reservoirs, located in the Middle Magdalena Valley Basin, operated ConocoPhillips Colombia Ventures Ltd. and in which the Borrower has a 20% working interest.

"*VMM-3*" shall mean the exploration and production contract, located in the Middle Magdalena Valley Basin, operated ConocoPhillips Colombia Ventures Ltd. and in which the Borrower has a 20% working interest.

"*Voting Equity Interest*" of a Person means the Equity Interest in such Person having power to vote for the election of directors or similar officials of such Person or otherwise voting with respect to actions of such Person (other than such Equity Interests having such power only by reason of the happening of a contingency).

"*Wholly Owned Subsidiary*" of any Person, means a Subsidiary of such Person, all of the Equity Interest of which (other than directors' qualifying shares or nominee or other similar shares required pursuant to Applicable Law) are owned by such Person or another Wholly Owned Subsidiary of such Person or by such Person together with one or more of its other Wholly Owned Subsidiaries.

"*Withholding Agent*" means any Loan Party and the Administrative Agent.

"*Write-Down and Conversion Powers*" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    Other Interpretive Provisions.

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement, and any subsection, Section, Article, Annex, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(c)    The term "*documents*" includes any and all documents, instruments, written agreements, certificates, indentures, notices and other writings, however evidenced (including electronically).

(d)    The term "including" is not limiting and (except to the extent specifically provided otherwise) means "including without limitation."

(e)    Unless otherwise specified, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each means "to but excluding," and the word "through" means "to and including."

(f)    The terms "may" and "might" and similar terms used with respect to the taking of an action by any Person shall reflect that such action is optional and not required to be taken by such Person.

(g)    Unless otherwise expressly provided herein: (i) references to agreements (including this Agreement) and other documents shall be deemed to include all subsequent amendments, amendments and restatements, supplements and other modifications thereto, but only to the extent that such amendments, amendments and restatements, supplements and other modifications are not prohibited by any Loan Document and (ii) references to any Applicable Law are to be construed as including all statutory and regulatory provisions or rules consolidating, amending, replacing, supplementing, interpreting or implementing such Applicable Law.

49

(h)     References to any Person shall include such Person's successors and permitted assigns (and in the case of any Governmental Authority, any Person succeeding to such Governmental Authority's functions and capacities).

(i)     Unless otherwise expressly provided herein, any reference to a Person's knowledge means such Person's actual knowledge and knowledge that each such Person would reasonably be expected to have as a result of its position or would have reasonably obtained in the performance of each such Person's duties.

(j)     The Loan Documents may use several different limitations, tests or measurements to regulate the same or similar matters.  All such limitations, tests and measurements are cumulative and shall be performed in accordance with their terms.

(k)     The Loan Documents are the result of negotiations among, and have been reviewed by, counsel to the Administrative Agent, the Arrangers, the Loan Parties and the Lenders, and are the products of all such Persons.  Accordingly, they shall not be construed against any Person merely because of any such Person's involvement in their preparation.

(l)     Unless otherwise specified, all references herein to times of day shall be references to such time in New York, New York.

Section 1.03   Accounting Terms.

(a)     Generally.  Unless otherwise specified, all accounting terms used in each Loan Document shall be interpreted, and all accounting determinations and computations thereunder (including under Section 7.11 and the definitions used in such calculations) shall be made in accordance with IFRS.

(b)     Changes in IFRS.  If at any time any change in IFRS would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in IFRS (subject to the approval of the Required Lenders); *provided* that, until so amended: (i) such ratio or requirement shall continue to be computed in accordance with IFRS prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in IFRS.

Section 1.04   Currency Equivalents.  In this Agreement, whenever the equivalent amount in any currency of an amount in another currency is to be determined, such equivalent amount shall be determined: (a) if the equivalent amount of any non-U.S. currency is to be expressed in Dollars, as the amount of Dollars that could be purchased with such amount at the Administrative Agent's foreign exchange spot rate at the time of determination and (b) if the equivalent amount of any currency is to be expressed in a currency other than Dollars, as the amount of such second currency that could be purchased with such amount of the first currency at the prevailing foreign exchange spot rate at the time of determination.  All amounts herein expressed as Dollar amounts shall be calculated at the Dollar Equivalent thereof, which for the

avoidance of doubt shall include, after conversion, any stamp duty charges and other costs needed to yield the equivalent Dollar amount.

## ARTICLE II

## THE COMMITMENTS AND LOANS

Section 2.01    The Loans.  Subject to the terms and conditions set forth herein, each Lender severally agrees to make SOFR Loans to the Borrower from time to time, on a Borrowing Date during the Availability Period of the Facility, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Commitment; *provided* that after giving effect to any Borrowing: (i) the aggregate Outstanding Amount of Loans shall not exceed the aggregate Commitments of all Lenders and (ii) the aggregate Outstanding Amount of the Loans of any Lender shall not exceed such Lender's Commitment. Within the limits of each Lender's Commitment, and subject to the other terms and conditions hereof, the Borrower may borrow under this Section 2.01, prepay under Section 2.03, and reborrow under this Section 2.01.

Section 2.02    Borrowings of Loans.

(a)    Each Borrowing of Loans shall be made upon the irrevocable notice by the Borrower to the Lenders, which shall be given by a written notice (each, a "*Notice of Borrowing*") substantially in the form of Exhibit D (appropriately completed and signed by the Borrower), to the Administrative Agent not later than 11:00 am (New York City time) five (5) U.S. Government Securities Business Days prior to the requested Borrowing Date, and solely in the case of  the Initial Borrowing, not later than 11:00 am (New York City time) two (2) U.S. Government Securities Business Days prior to the requested Borrowing Date. Each Borrowing shall be in a minimum principal amount of U.S.$10,000,000 or a whole multiple of U.S.$1,000,000 in excess thereof.

(b)    Each Notice of Borrowing shall specify:

(i)    the aggregate amount of the requested Borrowing of Loans to be made on the proposed Borrowing Date, which shall not exceed the aggregate amount of the Commitments on the proposed Borrowing Date (prior to giving effect to any Borrowing on such Borrowing Date);

(ii)    the proposed Borrowing Date, which shall be a Business Day;

(iii)    an irrevocable instruction to the Administrative Agent to transfer the proceeds of the Borrowing of the Loans to the account or accounts of the Borrower into which the funding of the proceeds of the Loans should be made;

(iv)    in the case of the Initial Borrowing, an irrevocable instruction to the Administrative Agent to transfer the proceeds of the Borrowing of the Loans, to the Borrower Account, and from the Borrower Account: (1) on behalf of Canacol Energy to a Dollar denominated account of each of the lenders under the Existing Bridge Loan, as specified in the Notice of Borrowing in an amount equal to the principal amount

51

outstanding under the Existing Bridge Loan Pay-Off Amount, on account of repayment in full by Canacol Energy of all outstanding principal amounts payable by CNEMED S.A.S. under the Existing Bridge Loan Documents, (2) on behalf of Canacol Energy, to a Dollar denominated account of Credit Suisse AG, Cayman Islands Branch as administrative agent under the Existing RCF Loan (for distribution to the relevant lenders under the Existing RCF Loan), as specified in the Notice of Borrowing in an amount equal to the Existing RCF Loan Pay-Off Amount, on account of repayment in full by Canacol Energy of all outstanding amounts payable by Canacol Energy under the Existing RCF Loan Documents, and (3) on behalf of Canacol Energy, such other amounts set forth in the Funds Flow Memorandum attached to the Notice of       Borrowing delivered by Canacol Energy in connection with the Initial Borrowing; and

(v)    the location and number of the Borrower's account to which funds are to be disbursed, which in the case of the Initial Borrowing shall be the Borrower Account, to be disbursed pursuant to the Flow of Funds Memorandum attached to such Notice of Borrowing.

(c)    Each Notice of Borrowing shall be effective upon receipt by the Administrative Agent and shall be irrevocable and binding on the Borrower.

(d)    Following receipt of a Notice of Borrowing, the Administrative Agent shall promptly notify each applicable Lender of the amount of the Loans of such Lender to be made as part of the requested Borrowing.  Each applicable Lender shall make the amount of its applicable Loan available to the Administrative Agent by wire transfer of immediately available funds at the office specified by the Administrative Agent not later than 11:00 a.m. (New York City Time) on the Borrowing Date.  Upon satisfaction of the applicable conditions set forth in Section 4.01, the Administrative Agent shall remit all funds so received in like funds as received by the Administrative Agent by wire transfer of such funds, in the case of the Initial Borrowing, to the Borrower Account, and in the case of other Borrowings hereunder, to the account of the Borrower in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Borrower in the applicable Notice of Borrowing.

(e)    Each Lender may, at its option, make any Loan available to the Borrower by causing any foreign or domestic branch or Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement; *provided*, *further*, that no Lender shall exercise such option if it would result, at the time of exercising such option, in an increase on the amount that the Borrower will be obligated to pay to such Lender pursuant to Section 3.04 after giving effect thereto.

(f)    Promptly (and in any event within five Business Days) after the determination of any interest rate provided for herein or any change therein, the Administrative Agent shall give notice thereof to the Lenders and to the Borrower (*it being understood* that the Administrative Agent's failure to do so shall not affect any interest rate applicable hereunder).

Section 2.03    Optional Prepayments. The Borrower may, upon irrevocable written notice to the Administrative Agent, at any time prepay Loans, in whole or in part without penalty;

*provided* that: (a) concurrently with, and on the same date of, such prepayment the Borrower shall pay all accrued interest on the principal amount of the Loans prepaid to the Prepayment Date and all other amounts in respect therewith then due and payable hereunder (including, without limitation, the payment of any amounts due and payable to the Administrative Agent), and any additional amounts required pursuant to Section 3.03, (b) such notice must be received by the Administrative Agent not later than 11:00 a.m. (New York City Time) ten days prior to any Prepayment Date, and (c) any prepayment of the Loans shall be in a minimum principal amount of U.S.$5,000,000 or a whole multiple of U.S.$1,000,000 in excess thereof or if less, the entire principal amount thereof then outstanding.  Each such notice shall be irrevocable and binding on the Borrower and shall specify the applicable Prepayment Date, the Loans to be prepaid and principal amount thereof, the amount of accrued interest thereon and all other amounts in respect therewith then due and payable.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage in respect of the Loans).  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the Prepayment Date specified therein.  Each prepayment of the outstanding Loans pursuant to this Section 2.03 shall be applied in accordance with Section 2.11(g).

Section 2.04    Mandatory Prepayments.

(a)    Within ten Business Days after the receipt by any Loan Party or any of its Restricted Subsidiaries of any Net Cash Proceeds in excess of US$5,000,000 (individually or in the aggregate) in any Fiscal Year from any Casualty Event or series of Casualty Events (or, with respect to any portion of such Net Cash Proceeds not reinvested pursuant to subclause (A) of this clause (a), on the third Business Day following the expiration of the period contemplated in such proviso), such Loan Party shall, or shall cause its applicable Restricted Subsidiaries to prepay, on behalf of the Borrower, the outstanding principal amount of the Loans in an amount equal to the lesser of (x) 100% of such Net Cash Proceeds (or the Dollar Equivalent thereof) and (y) the then aggregate principal amount outstanding of the Loans; *provided* that (A) (i) so long as no Default or Event of Default shall have occurred and be continuing and (ii) upon written notice to the Administrative Agent prior to the expiration of such ten-Business Day period, such Loan Party shall have the option to, directly or through one or more of its Restricted Subsidiaries, within 180 days of receipt thereof, invest or commit to invest (pursuant to a binding agreement with a non-affiliated third party) such Net Cash Proceeds in assets of the general type used by such Loan Party or such Restricted Subsidiary in the Line of Business, which investment may include the repair, restoration or replacement of the applicable assets thereof; *provided*, *further*, that such investment shall only be permitted to be made to the extent such investment is made pursuant to a transaction, or series of transactions, for Fair Market Value and (B) any portion of such Net Cash Proceeds not invested (or committed to be invested) by such Loan Party or such Restricted Subsidiary as provided herein, shall be applied to prepay the Loans as contemplated by this clause (a) no later than the third Business Day following the expiration of the 180-day period mentioned above.

(b)    Within ten Business Days after the receipt by any Loan Party or any of its Restricted Subsidiaries of any Net Cash Proceeds in excess of US$5,000,000 (individually or in the aggregate) in any Fiscal Year from any Taking or series of Takings (or, with respect to any portion of such Net Cash Proceeds not reinvested pursuant to subclause (A) of this clause (b),

on the third Business Day following the expiration of the period contemplated in such proviso), such Loan Party shall, or shall cause its applicable Restricted Subsidiaries to prepay, on behalf of the Borrower, the outstanding principal amount of the Loans in an amount equal to the lesser of (x) 100% of such Net Cash Proceeds (or the Dollar Equivalent thereof) and (y) the then aggregate principal amount outstanding of the Loans; *provided* that (A) (i) so long as no Default or Event of Default shall have occurred and be continuing and (ii) upon written notice to the Administrative Agent prior to the expiration of such ten-Business Day period, such Loan Party shall have the option to, directly or through one or more of its Restricted Subsidiaries, within 180 days of receipt thereof, invest or commit to invest (pursuant to a binding agreement with a non-affiliated third party) such Net Cash Proceeds in assets of the general type used by such Loan Party or such Restricted Subsidiary in the Line of Business; *provided*, *further*, that such investment shall only be permitted to be made to the extent such investment is made pursuant to a transaction, or series of transactions, for Fair Market Value and (B) any portion of such Net Cash Proceeds not invested (or committed to be invested) by such Loan Party or such Restricted Subsidiary as provided herein, shall be applied to prepay the Loans as contemplated by this clause (b) no later than the third Business Day following the expiration of the 180-day period mentioned above.

(c)    Within three Business Days after the receipt by any Loan Party or any of its Restricted Subsidiaries of any Net Cash Proceeds in excess of US$5,000,000 (individually or in the aggregate) in any Fiscal Year from any Asset Sale (other than Asset Sales permitted by Section 7.05) (or, with respect to any portion of such Net Cash Proceeds not reinvested pursuant to subclause (A) of this clause (c), on the third Business Day following the expiration of the period contemplated in such proviso), such Loan Party shall, or shall cause its applicable Restricted Subsidiaries to prepay, on behalf of the Borrower, the outstanding principal amount of the Loans, in an amount equal to the lesser of (x) 100% of such Net Cash Proceeds (or the Dollar Equivalent thereof) and (y) the then aggregate principal amount outstanding of the Loans; *provided* that (A) (i) so long as no Default or Event of Default shall have occurred and be continuing and (ii) upon written notice to the Administrative Agent prior to the expiration of such three-Business Day period, such Loan Party shall have the option to, directly or through one or more of its Restricted Subsidiaries, within 180 days of receipt thereof, invest or commit to invest (pursuant to a binding agreement with a non-affiliated third party) such Net Cash Proceeds in assets of the general type used by such Loan Party or such Restricted Subsidiary in the Line of Business; *provided*, *further*, that such investment shall only be permitted to be made to the extent such investment is made pursuant to a transaction, or series of transactions, for Fair Market Value and (B) any portion of such Net Cash Proceeds not invested (or committed to be invested) by such Loan Party or such Restricted Subsidiary as provided herein, shall be applied to prepay the Loans as contemplated by this clause (c) no later than the third Business Day following the expiration of the 180-day period mentioned above.

(d)    Within three Business Days after the receipt by any Loan Party or any of its Restricted Subsidiaries of any Net Cash Proceeds from the Incurrence or issuance by any Loan Party or any of its Restricted Subsidiaries of any Debt (other than Debt expressly permitted to be Incurred or issued pursuant to Section 7.01), such Loan Party shall, or shall cause its applicable Restricted Subsidiaries to prepay, on behalf of the Borrower, the outstanding principal amount of the Loans, in an amount equal to the lesser of (x) 100% of such Net Cash Proceeds (or the Dollar Equivalent thereof) and (y) the then aggregate principal outstanding amount of the Loans.

(e)     The Borrower shall give the Administrative Agent prompt notice of the occurrence of any event requiring mandatory prepayment under this <u>Section 2.04</u>.  Except as set forth in <u>Section 6.02</u>, such notice must be received by the Administrative Agent not later than 11:00 a.m. (New York City Time) at least five Business Days prior to the applicable Prepayment Date.  Concurrently with, and on the same date of, such prepayment, the Borrower shall pay all accrued interest on the principal amount of the Loans prepaid to the Prepayment Date and all other amounts in respect therewith then due and payable hereunder (including, without limitation, the payment of any amounts due and payable to the Administrative Agent) and any additional amounts required pursuant to <u>Section 3.03</u>.  Each such notice shall be irrevocable and binding on the Borrower and shall specify the applicable Prepayment Date, the amount of the Loans or portion thereof to be prepaid, the amount of accrued interest thereon and all other amounts in respect therewith then due and payable.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage with respect to the Facility).  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the Prepayment Date specified therein.  Each prepayment of the outstanding Loans pursuant to this <u>Section 2.04</u> shall be applied in accordance with <u>Section 2.11(g)</u>.

Section 2.05   <u>Termination or Reduction of Commitments</u>.

(a)     The Borrower may, upon notice to the Administrative Agent during the Availability Period, terminate or permanently reduce (in whole or in part) the unused portion of the aggregate Commitments; *provided* that: (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. (New York City Time) five Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of US$10,000,000 or any whole multiple of US$1,000,000 in excess thereof and (iii) no such reduction of the Commitments may occur if, after giving effect thereto and to any concurrent prepayment hereunder, the Outstanding Amount of Loans would exceed the aggregate amount of the Commitments.

(b)     Commitments shall also be automatically and permanently reduced on each date on which the prepayment of Loans outstanding hereunder is required to be made pursuant to <u>Section 2.04</u> by an amount equal to the principal amount of the Loans so prepaid.

(c)     The Administrative Agent will promptly notify the Lenders of any termination or reduction of the unused portion of the Commitments under <u>Section 2.05(a)</u>.  Upon any reduction of the unused portion of the Commitments, the Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount.  All accrued and unpaid fees under the Loan Documents through the effective date of any termination or reduction of the Commitments shall be paid on the effective date of such termination or reduction.

Section 2.06   <u>Repayment of Loans</u>.

(a)     The Borrower hereby unconditionally promises to repay to the Administrative Agent for the account of the Lenders the aggregate principal amount of all Loans outstanding in a single installment on the Maturity Date.

(b)    The Borrower's obligations under this Agreement and the other Loan Documents are general obligations of the Borrower, and the recourse of the Lenders and the Administrative Agent in respect thereof is not limited to any particular Property of the Borrower.

Section 2.07    Interest.

(a)    Subject to the provisions of <u>clause (b)</u> below, (i) each SOFR Loan shall bear interest on the outstanding principal amount thereof for the period from, and including, the date such Loan is made, to, but excluding, the date such Loan shall be repaid in full, for each Interest Period, at a rate per annum equal to Term SOFR for the Interest Period therefor *plus* the Applicable Margin and (ii) each ABR Loan shall bear interest on the outstanding principal amount thereof from, and including, the date such Loan is converted into an ABR Loan, to, but excluding, the date such Loan shall be repaid in full, at a rate *per annum* equal to the Alternate Base Rate from time to time in effect for such Loan *plus* the Applicable Margin.

(b)    Upon the occurrence and during the continuance of any Event of Default and until all Obligations shall be paid in full, the Borrower shall pay interest on all outstanding Obligations hereunder at an interest rate *per annum* at all times equal to the Default Rate to the fullest extent permitted by Applicable Law.

(c)    Accrued and unpaid interest on past due amounts (including, to the fullest extent permitted by Applicable Law, interest on past due interest) shall be due and payable upon demand.

(d)    Accrued interest on each Loan shall be due and payable in arrears on each Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(e)    In connection with the use or administration of Term SOFR, the Administrative Agent will have the right (but not the obligation) to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

(f)    The principle of deemed reinvestment of interest shall not apply to any interest calculation under this Agreement, in any Note or other evidence of Debt or in any document now or hereafter taken by the Lenders or the Administrative Agent for the Obligations of any Loan Party under this Agreement, or any other Loan Document. All interest payments to be made hereunder shall be paid without allowance or deduction for deemed reinvestment or otherwise, before and after maturity, default and judgment. The rates of interest specified in this Agreement are intended to be nominal rates and not effective rates. Interest calculated hereunder shall be calculated using the nominal rate method and not the effective rate method of calculation.

(g)    If a tax deduction is required by Swiss law to be made by a Swiss Guarantor in respect of any interest payable by it under this Agreement and should Section 3.04(a) be unenforceable for any reason, the applicable interest rate in relation to that interest payment shall be (i) the interest rate which would have applied to that interest payment (as provided for in Section 3.04 in the absence of this Section 2.07(g)) divided by (ii) one *minus* the rate at which the relevant tax deduction is required to be made (where the rate at which the relevant tax deduction is required to be made is for this purpose expressed as a fraction of one rather than as a percentage) and all references to a rate of interest in this Section 2.07 shall be construed accordingly.

Section 2.08    Fees.

(a)    The Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its Applicable Percentage, a commitment fee equal to 1.35% *per annum* times the actual daily amount of the unused portion of such Lender's Commitment (the "Commitment Fee").  The Commitment Fee shall accrue at all times during the relevant Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on each Payment Date, commencing with the first such date to occur after the Closing Date, and on the last day of the Availability Period.

(b)    The Borrower agrees to pay to the Administrative Agent, for its own account or the account of the Arrangers or the Lenders, as applicable, any and all fees payable in the amounts and at the times set forth in this Agreement and in the Fee Letters and in any other fee letter entered into by any Loan Parties for the benefit of the Administrative Agent or the Arrangers in connection with this Agreement or the Facility.

(c)    All fees payable under the Loan Documents shall be paid on the dates due, in Dollars, in immediately available funds and shall not be subject to reduction by way of set-off or counterclaim.  Fees paid under any Loan Document shall not be refundable under any circumstances.

Section 2.09    Computation of Interest and Fees.

(a)    All interest and any fees calculated by reference to a rate per annum hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed. Whenever a rate of interest or other rate *per annum* hereunder is calculated on the basis of a year (the "*deemed year*") which contains fewer days than the actual number of days in the calendar year of calculation, such rate of interest or other rate *per annum* shall be expressed as a yearly rate for purposes of the Interest Act (Canada) R.S.C. 1985, c. I-15 by multiplying such rate of interest or other rate by the actual number of days in the calendar year of calculation and dividing it by the number of days in the deemed year.

(b)    The Term SOFR or Alternate Base Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.  Interest shall accrue on each Loan for the day on which such Loan is made, and shall not accrue on a Loan,

or any portion thereof, for the day on which such Loan or such portion is paid; *provided* that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.11(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.10    Evidence of Debt; Notes.

(a)    The Loans made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The Administrative Agent shall maintain records including (i) the amount of the Loans made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder, for account of the Lenders and each Lender's share thereof. The accounts or records maintained by the Administrative Agent and each Lender (including the Register and the Participant Register) shall be conclusive absent manifest error of the amount of the Loans made by the Lenders to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent with respect to such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

(b)    In addition to such accounts or records, the Borrower shall execute and deliver to each Lender a Note, which shall evidence the Borrower's obligation to repay the Loans with interest and all other amounts due under this Agreement. The mutilation, loss, theft or destruction of a Note shall not imply or be deemed to constitute a cancellation of debt or a cancellation of any other Obligation under or in respect of this Agreement or any Loan, even if any such event has occurred due to acts attributable to any of the Lenders or the Administrative Agent. If a Note is mutilated, promptly upon the written request of the applicable Lender (through the Administrative Agent), the Borrower shall issue and deliver a new Note of the same principal amount and maturity as the mutilated Note; *provided* that such mutilated Note shall be returned to the Borrower. If a Note is lost, stolen or destroyed, the Borrower shall, promptly upon the written request of the applicable Lender (through the Administrative Agent), issue and deliver to the applicable Lender a new Note of the same principal amount and maturity as the lost, stolen or destroyed Note without requiring any further action from the Lender that may be applicable according to the Applicable Law. Upon discharge of all Obligations of the Borrower evidenced by a Note, the Lender holding such Note shall cancel such Note and promptly return it to the Borrower.

(c)    Each Lender shall be entitled to have its Notes substituted, exchanged or subdivided for Notes of lesser denominations in connection with a permitted assignment of all or any portion of such Lender's Loans and Notes pursuant to Section 11.05.

(d)    The payment of any part of the principal of any such Note shall discharge the obligation of the Borrower under this Agreement to pay principal of the Loan evidenced by such Note *pro tanto*, and the payment of any principal of a Loan in accordance with the terms hereof shall discharge the Obligations of the Borrower under the Note evidencing such

Loan *pro tanto*.  Notwithstanding the discharge in full of any Note, if the amount paid or payable under any such Note (whether arising from the enforcement thereof in any jurisdiction or otherwise) is less than the amount due and payable in accordance with this Agreement with respect to the Loan evidenced by such Note, to the fullest extent permitted under Applicable Law, the Borrower agrees to pay to the Administrative Agent upon its receipt of written demand such difference.

Section 2.11    Payments Generally; Administrative Agent's Clawback.

(a)    General.  All payments to be made by each Loan Party shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff, except for the extent prohibited by Applicable Law.  Except as otherwise expressly provided herein, all payments by such Loan Party hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed.  All payments shall be made in immediately available funds in Dollars not later than 12:00 p.m. (New York City time) on the date specified herein to the Administrative Agent's Account.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Applicable Lending Office.  All payments received by the Administrative Agent after 12:00 p.m. (New York City time) shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment under this Agreement is stated to be due on a day that is not a Business Day, then such date shall be extended to the next Business Day and such extension of time shall in such case be included in the computation of payment of interest and fees (as applicable); *provided* that, if such extension would cause payment of interest, fees or principal to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(b)    Funding by Lenders; Presumption by Administrative Agent.  Unless the Administrative Agent shall have received notice from a Lender prior to the proposed Borrowing Date that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such Borrowing Date in accordance with Section 2.02 and may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrower, severally agree, to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrower through, but excluding the date of payment to the Administrative Agent, at: (i) in the case of a payment to be made by such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing and (ii) in the case of a payment to be made by the Borrower, the interest rate applicable to the Loans.  If the Borrower and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrower the amount of such interest paid by the Borrower for such period.  If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in

such Borrowing.  Any payment by the Borrower shall be without prejudice to any claim the Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(c)     Payments by Borrower; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Borrower prior to the time at which any payment is due to the Administrative Agent for the account of the applicable Lenders that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to such Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the applicable Lenders, severally agrees, to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds, but in any event within two (2) Business Days thereafter, without interest.  A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this clause (c) shall be conclusive, absent manifest error.

(d)     Failure to Satisfy Conditions Precedent.  If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the Borrower by the Administrative Agent because the conditions to the applicable Borrowing set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(e)     Obligations of Lenders Several.  The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 11.03(c) are several and not joint.  The failure of any Lender to make any Loan or to make any payment under Section 11.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its payment under Section 11.03(c).

(f)     Funding Source.  Nothing herein shall be deemed to obligate any Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

(g)     Insufficient Funds.

(i)     Whenever any prepayment received by the Administrative Agent under Section 2.04 of this Agreement is insufficient to pay in full all amounts then due and payable to the Administrative Agent and the Lenders under this Agreement and the other Loan Documents, such payment shall be distributed and applied in the following order: *first*, to the payment of fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent) due and payable to the Administrative Agent under or in connection with this Agreement and the other Loan Documents; *second*, to the payment of interest then due and payable on the Loans being prepaid ratably in accordance with the aggregate amount of interest owed to each such

60

Lender; *third*, to the payment of the unpaid principal amount of the Loans ratably in accordance with the amount owed to each such Lender; and *fourth*, to the payment of all fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Lenders) due and payable to the Lenders under or in connection with this Agreement and the other Loan Documents, ratably among the Lenders in accordance with the aggregate amount of such payments owed to each such Lender.

(ii)     Whenever any other payment received by the Administrative Agent under this Agreement or any other Loan Document is insufficient to pay in full all amounts then due and payable to the Administrative Agent and the Lenders under this Agreement and the other Loan Documents, such payment shall be distributed and applied in the following order: *first*, to the payment of fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent) due and payable to the Administrative Agent under or in connection with this Agreement and the other Loan Documents; *second*, to the payment of all fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Lenders) due and payable to the Lenders under or in connection with this Agreement and the other Loan Documents, ratably among the Lenders in accordance with the aggregate amount of such payments owed to each such Lender; and *third*, to the payment of interest then due and payable on the Loans ratably in accordance with the aggregate amount of interest owed to each such Lender.

Section 2.12   <u>Sharing of Payments by Lenders</u>.  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal or interest on any of its Loans or other Obligations in respect of the Facility resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon greater than its ratable share thereof (according to its Applicable Percentage of the Facility), then the Lender receiving such greater proportion shall: (a) notify the Administrative Agent of such fact and (b) purchase (for cash at face value) participations in the Loans of the other applicable Lenders under the Facility, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other Obligations owing to them under the Facility; *provided* that:

(a)     if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(b)     the provisions of this Section shall not be construed to apply to: (A) any payment made by or on behalf of the Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to Canacol Energy or any Subsidiary thereof.

Each Loan Party consents to the foregoing and agrees, to the extent it may effectively do so under Applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Loan Party rights of set-off and counterclaim

with respect to such participation as fully as if such Lender were a direct creditor of such Loan Party in the amount of such participation.

Section 2.13    Rights of Set-off.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by Applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held, and other obligations (in whatever currency) at any time owing, by such Lender or any such Affiliate, to or for the credit or the account of any Loan Party against any and all of the obligations of such Loan Party now or hereafter existing under this Agreement or any other Loan Document to such Lender or its Affiliates, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Loan Party may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness.  The rights of each Lender and its Affiliates under this Section are in addition to other rights and remedies (including other rights of set-off) that such Lender or its Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such set-off and application; *provided* that the failure to give such notice shall not affect the validity of such set-off and application.

## ARTICLE III

## YIELD PROTECTION, ILLEGALITY AND TAXES

Section 3.01    Increased Costs.

(a)    Increased Costs Generally.  If any Change in Law shall:

(i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (or its Applicable Lending Office); or

(ii)    subject any Lender to any Tax of any kind whatsoever with respect to this Agreement or any Loan made by it (or on its loans, loan principal, letters of credit, commitments or other obligations, deposits, reserves, other liabilities or capital attributable thereto), or change the basis of taxation in respect thereof (except for Indemnified Taxes covered by Section 3.04 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(iii)    impose on any Lender, its Applicable Lending Office or the London interbank market any other condition, cost or expense affecting this Agreement or the Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or its Applicable Lending Office of making, converting, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or its Applicable Lending Office hereunder (whether of principal, interest or any other

amount) then, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or its Applicable Lending Office for such additional costs incurred or reduction suffered.

(b)    <u>Capital Requirements</u>.  If any Lender determines that any Change in Law affecting such Lender, its Applicable Lending Office or such Lender's holding company, if any, regarding capital requirements, has or would have the effect of reducing the rate of return on the capital of such Lender, its Applicable Lending Office or such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender, its Applicable Lending Office or such Lender's holding company could have achieved but for such Change in Law (taking into consideration the policies of such Lender, its Applicable Lending Office or such Lender's holding company with respect to capital adequacy or liquidity), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender, its Applicable Lending Office or such Lender's holding company for any such reduction suffered.

(c)    <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender, its Applicable Lending Office or its holding company, as the case may be, as specified in <u>clause (a)</u> or <u>(b)</u> of this <u>Section 3.01</u> and delivered to the Borrower, shall be conclusive and binding upon the Borrower absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within ten days after receipt thereof.

(d)    <u>Delay in Requests</u>.  Failure or delay on the part of any Lender to demand compensation pursuant to this <u>Section 3.01</u> shall not constitute a waiver of such Lender's right to demand such compensation; *provided* that the Borrower shall not be required to compensate a Lender pursuant to this <u>Section 3.01</u> for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions, and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

Section 3.02    <u>Illegality</u>.  Notwithstanding any other provision of this Agreement, if any Change in Law shall make it, or otherwise becomes, unlawful for any Lender or its Applicable Lending Office to honor its obligation to make or maintain its SOFR Loans hereunder (and, in the opinion of such Lender, the designation of a different Applicable Lending Office would either not avoid such unlawfulness or would be disadvantageous to such Lender), then such Lender shall promptly notify the Borrower thereof (with a copy to the Administrative Agent) and, following which notice: (a) such Lender's Commitments (if still available) to make SOFR Loans, shall be suspended until such time as such Lender notifies the Borrower (with a copy to the Administrative Agent) that the circumstances giving rise to such suspension to make and maintain its SOFR Loans no longer exist or (b) notwithstanding <u>Section 2.03</u> and <u>2.04</u> and to the extent necessary to comply with such Change in Law such Lender's SOFR Loans shall be prepaid by the Borrower, together with accrued and unpaid interest thereon, any amounts due under <u>Section 3.03</u> and all other amounts payable to such Lender by the Borrower under the Loan Documents, on or

before such date as shall be mandated by such Change in Law (such prepayment not being shared as described in <u>Section 2.12</u> with any Lenders not so affected).

Section 3.03    <u>Funding Losses</u>.

(a)    The Borrower agrees to pay to the Administrative Agent for the account of each Lender, upon the request of such Lender through the Administrative Agent, such amount as shall be sufficient (in the reasonable opinion of such Lender) to compensate it for, and hold it harmless from, any loss, cost or expense including any such actual loss, cost, premium, penalty or expense arising from fees payable to terminate the deposits from which such funds were obtained or, without duplication, from amounts incurred to terminate, settle or re-establish hedging arrangements or related trading position (irrespective of the currency thereof) arising from, without duplication,

(i)    the liquidation or reemployment of funds obtained by such Lender to fund its SOFR Loan (and for purposes of calculating the foregoing, each SOFR Loan shall be conclusively deemed to have been funded at the Term SOFR applicable to such SOFR Loan by a matching deposit for a comparable amount and for a comparable period, whether or not such SOFR Loan was in fact so funded); or

(ii)    "broken funding"; or

(iii)    fees payable to terminate the deposits from which such funds were obtained, or

(iv)    amounts incurred to terminate, settle or re-establish hedging arrangements or related trading positions (irrespective of the currency thereof), together with customary administrative fees charged by such Lender in connection with the foregoing, that such Lender determines are attributable to:

(A)    the payment of any principal of any Loan (whether voluntary, mandatory, automatic, by reason of acceleration or otherwise), other than on a Payment Date, or prepayment of principal of any Loan, including as a result of an Event of Default; or

(B)    any failure by the Borrower for any reason (including the failure of any of the conditions precedent specified in <u>Article IV</u> to be satisfied) to make a requested Borrowing of Loans hereunder on the Borrowing Date specified in the Notice of Borrowing given pursuant to <u>Section 2.02(a)</u>; or

(C)    the failure to prepay any Loans on the Prepayment Date specified in any notice delivered pursuant hereto; or

(v)    the assignment of any Term SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to <u>Section 3.05</u>.

(b)    Each Lender shall furnish a notice to the Borrower setting forth the basis and amount of each request by such Lender for compensation under this Section 3.03, which notice shall provide reasonable detail as to the calculation of such loss, cost or expense (which description shall in no event contain disclosure of matters deemed by such Lender in good faith to be confidential or proprietary), and shall be conclusive and binding upon the Borrower in the absence of manifest error.  The Borrower shall pay such Lender the amounts shown as due on any such certificate promptly upon receipt thereof, but in no event later than ten days after receipt thereof.

Section 3.04    Taxes.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of a Loan Party hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Taxes from any such payment by any Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Taxes deducted or withheld are Indemnified Taxes, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including deductions or withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    Payment of Other Taxes.  Without limiting clause (a) above, each Loan Party shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or, at the option of the Administrative Agent, timely reimburse the Administrative Agent for the payment of any Other Taxes.

(c)    Indemnification by the Loan Parties.  Each Loan Party shall jointly and severally indemnify each Recipient, within ten days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes (including any penalties and interest applicable thereto) were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to such Loan Party by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, which such certificate shall set forth the basis for and calculation of such payment or liability, shall be conclusive absent manifest error.

(d)    Indemnification by the Lenders.  Each Lender shall severally indemnify the Administrative Agent, within ten days after demand therefor, against (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to

comply with Section 11.07(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this clause (d).

(e)      Evidence of Payments. As soon as practicable after any payment of Indemnified Taxes by any Loan Party to a Governmental Authority pursuant to this Section, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent and the Lenders.

(f)      Status of Lenders. Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made hereunder or under any other Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times prescribed by Applicable Law and at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation either prescribed by Applicable Law or reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation shall not be required if in the Lender's or the Administrative Agent's reasonable judgment such completion, execution or submission would subject such Lender or the Administrative Agent to any material unreimbursed cost or expenses or would materially prejudice the legal or commercial position of such Lender or the Administrative Agent. Each Lender agrees that if any such documentation it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall properly complete or update (and duly execute, as applicable) such form or certification (or replacement form or certification) or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)      Treatment of Certain Refunds. If a Recipient determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section (including by the payment of additional amounts pursuant to this Section), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of the indemnified party, shall repay

to such indemnified party the amount paid over pursuant to this clause (g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this clause (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes) to the indemnifying party or any other Person.

Section 3.05    Mitigation.

(a)    If any Lender requests compensation under Section 3.01, or requires the Borrower to pay additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.04, then such Lender shall (at the request of the Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment: (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable and documented out-of-pocket costs and expenses incurred by any Lenders in connection with any such designation or assignment.

Section 3.06    Alternate Rate of Interest. Subject to Section 3.07, if, on or prior to the first day of any Interest Period for any SOFR Loan (an "*Affected Interest Period*"):

(a)    the Administrative Agent reasonably determines (which determination shall be conclusive absent manifest error) that Term SOFR cannot be determined pursuant to the definition thereof; or

(b)    the Required Lenders determine and notify the Administrative Agent that the Term SOFR for such Affected Interest Period will not adequately and fairly reflect the cost to such Lenders of making or maintaining their Loans for such Affected Interest Period,

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by email as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist: (i) the obligation of the Lenders to make or maintain SOFR Loans shall be suspended and the Borrower may revoke any pending Notice of Borrowing of SOFR Loans (or, failing that, will be deemed to have converted such request into a request for an ABR Loan), (ii) in the event of a determination described in this Section 3.06 with respect to the Term SOFR component of the Alternate Base Rate, the utilization of the Term SOFR component in determining the Alternate Base Rate shall be suspended, and (iii) the Loans then outstanding shall accrue interest at a rate per annum equal to the Alternate Base Rate *plus* the Applicable Margin.

Section 3.07    <u>Benchmark Replacement Setting</u>.

(a)    <u>Benchmark Replacement</u>.  Notwithstanding anything to the contrary herein or in any other Loan Document, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred prior any setting of the then-current Benchmark, then (x) if a Benchmark Replacement is determined in accordance with clause (a) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of such Benchmark setting and subsequent Benchmark settings without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document and (y) if a Benchmark Replacement is determined in accordance with clause (b) of the definition of "Benchmark Replacement" for such Benchmark Replacement Date, such Benchmark Replacement will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting at or after 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the date notice of such Benchmark Replacement is provided to the Lenders without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document so long as the Administrative Agent has not received, by such time, written notice of objection to such Benchmark Replacement from Lenders comprising the Required Lenders.  If the Benchmark Replacement is Daily Simple SOFR, all interest payments will be payable on a quarterly basis.

(b)    <u>Benchmark Replacement Conforming Changes</u>.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(c)    <u>Notices; Standards for Decisions and Determinations</u>.    The Administrative Agent will promptly notify the Borrower and the Lenders of (i) the implementation of any Benchmark Replacement and (ii) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.    The Administrative Agent will notify the Borrower of (x) the removal or reinstatement of any tenor of a Benchmark pursuant to <u>Section 3.07(d)</u> and (y) the commencement of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this <u>Section 3.07</u>, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this <u>Section 3.07</u>.

(d)    <u>Unavailability of Tenor of Benchmark</u>.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (A) any tenor for such Benchmark is not

displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent (acting at the direction of the Required Lenders) or (B) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent (acting at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent (acting at the direction of the Required Lenders) may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(e)     Benchmark Unavailability Period.  Upon the Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to ABR Loans.  During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Alternate Base Rate.

Section 3.08     Survival.     Each party's obligations under this Article III shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of the Obligations.

# ARTICLE IV

## CONDITIONS PRECEDENT

Section 4.01     Conditions Precedent to Closing.  The obligations of the Lenders to make Loans hereunder shall become effective on the date on which the Administrative Agent shall have received each of the following documents or each of the following conditions shall have been satisfied, as applicable, each of which shall be reasonably satisfactory to the Lenders in form and substance (or such condition shall have been waived in accordance with Section 11.04):

(a)     The Administrative Agent shall have received the following documents, together with English translations of documents not in English (other than the Organizational Documents listed in Section 4.01(a)(ii)), each of which shall be originals or ".pdf" copies (followed promptly by originals) unless otherwise specified, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date):

(i)     <u>Loan Documents</u>.  Each Loan Document (other than the Note to be delivered pursuant to <u>Section 4.02(h)</u>) duly executed and delivered by each of the parties named as a proposed signatory thereto, and each such Loan Document shall be in full force and effect.

(ii)     <u>Organizational Documents</u>.   Certified copies of the Organizational Documents of each Loan Party and of documents (including appropriate resolutions of the Board of Directors or similar body of each Loan Party and, if necessary, shareholder or similar approval) evidencing the due authorization by it of the execution and performance by it of the Loan Documents to which it is a party and the authority of the persons signing the Loan Documents on its behalf.

(iii)     <u>Officer's Certificates</u>.   A certificate of each Loan Party executed by a Responsible Officer of each such Loan Party, substantially in the form of <u>Exhibit E</u>, with appropriate insertions and attachments.

(iv)     <u>Good Standing Certificate</u>.  A certificate or certificates of good standing (or equivalent) (in long-form, if available), including verification of tax status, if applicable, of each Loan Party from each relevant Governmental Authority of the jurisdiction of organization of such Loan Party, dated as of a date no earlier than ten days prior to the Closing Date.

(v)     <u>Legal Opinions</u>.

(A)     an opinion of DLA Piper (Canada) LLP, special Canadian counsel to the Loan Parties addressed to the Administrative Agent and the Lenders, substantially in the form of <u>Exhibit F-I</u> hereto;

(B)     an opinion of Asociados Legales Pinzón, Mendez, Sanclemente & Bernal S.A.S. - Asociados Legales S.A.S., special Colombian counsel to the Loan Parties addressed to the Administrative Agent and the Lenders, substantially in the form of <u>Exhibit G</u> hereto;

(C)     an opinion of Nelson Mullins Riley & Scarborough LLP (US), special New York counsel to the Loan Parties addressed to the Administrative Agent and the Lenders, substantially in the form of <u>Exhibit H</u> hereto;

(D)     an opinion of Bellerive Attorneys at Law, special Swiss counsel to the Loan Parties addressed to the Administrative Agent and the Lenders, substantially in the form of <u>Exhibit I</u> hereto;

(E)     an opinion of Valles & Asociados, special Panamanian counsel  to the Loan Parties addressed to the Administrative Agent and the Lenders, substantially in the form of <u>Exhibit J</u> hereto;

(F)     an opinion of Stikeman Elliot LLP, special Canadian counsel addressed to the Administrative Agent and the Lenders, covering such

matters relating to the transactions contemplated hereby as the Administrative Agent and the Lenders may reasonably request;

(G)    an opinion of Brigard & Urrutia, special Colombian counsel addressed to the Administrative Agent and the Lenders, covering such matters relating to the transactions contemplated hereby as the Administrative Agent and the Lenders may reasonably request;

(H)    an opinion of Skadden, Arps, Slate, Meagher & Flom LLP, special New York counsel addressed to the Administrative Agent and the Lenders, covering such matters relating to the transactions contemplated hereby as the Administrative Agent and the Lenders may reasonably request;

(I)    an opinion of Homburger AG, special Swiss counsel addressed to the Administrative Agent and the Lenders, covering such matters relating to the transactions contemplated hereby as the Administrative Agent and the Lenders may reasonably request; and

(J)    an opinion of Aleman, Cordero, Galindo & Lee, special Panamanian counsel addressed to the Administrative Agent and the Lenders, covering such matters relating to the transactions contemplated hereby as the Administrative Agent and the Lenders may reasonably request.

(vi)    <u>Financial Statements</u>.  (i) Audited Consolidated financial statements of Canacol Energy and its Subsidiaries for the Fiscal Year 2021, together with the auditor's opinion in respect of such financial statements and (ii) unaudited interim Consolidated financial statements of Canacol Energy and its Subsidiaries for the Fiscal Quarter ended September 30, 2022, and each such financial statements shall not be materially inconsistent with the financial statements or other information previously provided to the Administrative Agent and the Lenders.

(vii)    <u>Approvals</u>.

(A)    Evidence reasonably satisfactory to the Administrative Agent in respect of each Governmental Approval and other third-party approval required to be obtained by each Loan Party as of the Closing Date in respect of the transactions contemplated by the Loan Documents, accompanied by a certificate of a Responsible Officer of such Loan Party certifying that: (x) the copies of each such Governmental Approval and other third-party approval are true, correct and complete copies of such Governmental Approval or other third-party approval, as the case may be, (y) each such Governmental Approval and other third-party approval is in full force and effect, and is not subject to any pending appeal, intervention or similar proceeding or any unsatisfied condition that may result in modification or revocation thereof and (z) to the knowledge of such Loan Party, no event has occurred that could reasonably be expected to result in the modification, cancellation or revocation of any such Governmental Approval or other third-party approval, as the case may be.

(B)    <u>Representations and Warranties</u>. Each of the representations and warranties of each of the Loan Parties set out in this Agreement and in each of the Loan Documents to which each such Loan Party is a party shall be true and correct in all material respects (or in all respects if qualified by materiality or a Material Adverse Effect) on and as of the Closing Date, except to the extent such representations and warranties specifically refer to an earlier date, in which case, they are true and correct in all material respects (or in all respects if qualified by materiality or a Material Adverse Effect) as of such earlier date.

(C)    <u>Insurance</u>. The Administrative Agent shall have received evidence: (x) of insurance coverage in form, scope and substance reasonably satisfactory to the Administrative Agent and otherwise in compliance with the terms of <u>Section 6.07</u> and (y) that all premiums and other amounts theretofore due and payable thereon have been paid.

(D)    <u>No Default</u>. There shall not have occurred any event, change, condition or circumstance since December 31, 2021 that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect (including after giving effect to the occurrence of the Closing Date). No event, act or condition shall have occurred and be continuing or would result from the execution, delivery or performance of this Agreement or the other Loan Documents which would constitute a Default or Event of Default (disregarding any cure period therefor), both immediately prior to the occurrence of the Closing Date and also after giving effect thereto.

(E)    <u>No Contravention</u>. On or prior to the Closing Date, there shall not have been declared a national or a general banking moratorium by any U.S. federal, New York, Canadian, Panamanian, Swiss or Colombian Governmental Authorities, which shall be continuing on the Closing Date. There shall have not occurred any outbreak or escalation of national or international hostilities or any crisis or calamity, or any change in the United States, Canada, the Republic of Panama, Switzerland or Colombia, or any substantial change or development involving a prospective substantial change in Canada, Colombia, the Republic of Panama, Switzerland or the United States or international political, financial or economic conditions affecting Canada, Colombia, the Republic of Panama, Switzerland or the United States, as in the judgment of the Lenders is material and adverse and makes it impracticable or inadvisable to proceed with the consummation of the transactions hereunder and under the other Loan Documents on the Closing Date.

(F)    <u>Compliance with Laws</u>. No Applicable Law shall, in the reasonable judgment of any Lender, restrain, prevent or impose materially adverse conditions upon, the transactions contemplated by the Loan Documents.

(G)    <u>KYC Information</u>. The Administrative Agent and each Lender shall have received, to the extent requested at least ten Business Days prior to the Closing Date, all documentation and other information required by any

Governmental Authority under applicable "know your customer" and Anti-Money Laundering Laws and Anti-Terrorism Laws, including the USA Patriot Act and Canadian Anti-Money Laundering & Anti-Terrorism Legislation, and the Lenders shall have otherwise completed their due diligence investigation of each Loan Party and its respective Subsidiaries on terms satisfactory to the Lenders.

(H)    Beneficial Ownership Information. At least three days prior to the Closing Date, any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Loan Party, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association.

(I)    Process Agent. The Administrative Agent shall have received evidence, in form and substance satisfactory to the Administrative Agent, that: (x) each Loan Party has irrevocably appointed the Process Agent for a period ending six months after the Maturity Date, (y) the Process Agent has accepted such appointment, and (z) all fees in connection therewith have been paid for the entire term of the appointment.

(J)    Other Documents. The Administrative Agent shall have received such other documents as the Administrative Agent or its counsel may have reasonably requested.

(K)    Payment of Fees and Expenses. The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Closing Date, including reimbursement or payment of all reasonable and documented out-of-pocket expenses (including reasonable, documented fees, charges and disbursements of each of Stikeman Elliot LLP, Brigard & Urrutia, Skadden, Arps, Slate, Meagher & Flom LLP, Homburger AG, Aleman, Cordero, Galindo & Lee and Allen & Overy LLP but only to the extent invoices for such amounts have been received by the Borrower at least two Business Days prior to the Closing Date) required to be reimbursed or paid by the Borrower hereunder or under any other Loan Document.

(L)    No Legal Bar. There shall not (x) be in effect any statute, regulation, order, decree or judgment of any Governmental Authority that makes illegal or enjoins or prevents the consummation of the transactions hereunder or under any other Loan Document or (y) have been commenced any action or proceeding that seeks to prevent or enjoin any transactions hereunder or under any other Loan Document.

(M)    Taxes. All applicable Taxes and stamp duties, if any, arising and due and payable on or before the Closing Date in connection with the

execution, delivery and performance of this Agreement and the other Loan Documents shall have been paid in full.

(viii)    <u>Termination of Commitments under Reference Indebtedness</u>. The Borrower shall have provided to the Lenders and the Administrative Agent (x) that certain prepayment and termination notice dated February 6, 2023, issued by CNEMED S.A.S., and acknowledged by Credit Suisse AG, Cayman Islands Branch as administrative agent under the Existing Bridge Loan and (y) that certain termination notice dated February 6, 2023, issued by the Borrower, and acknowledged by Credit Suisse AG, Cayman Islands Branch as administrative agent under the Existing RCF Loan, which evidence that as of the execution and delivery of the Loan Documents, the unused portion of existing commitments under the Reference Indebtedness has been terminated in full.

(b)    Prior to the Closing Date, the Borrower shall cause the Administrative Agent to establish the Borrower Account which shall be maintained until the Borrower Account Termination Date (as defined below), and operate as follows:

(i)    The Borrower agrees that any instructions directing disposition of funds in the Borrower Account shall be made through the Notice of Borrowing (in accordance with the Funds Flow Memorandum attached thereto) made by the Borrower in connection to the Initial Borrowing, and the Administrative Agent shall honor such requests, only to the extent that the Administrative Agent has not received an objection to such request from the Required Lenders prior to one Business Day prior to the date of the requested Initial Borrowing. For the avoidance of doubt, the Administrative Agent shall act on no instruction of the Borrower other than those set forth in the Notice of Borrowing made by the Borrower in connection to the Initial Borrowing.

(ii)    The Borrower hereby irrevocably instructs the Administrative Agent to close the Borrower Account on the earlier of (x) the date that is three (3) Business Days following the Initial Borrowing Date and (y) the next Business Day following the third consecutive Business Day on which the Borrower Account has reported a zero-dollar balance at the end of the relevant Business Day (such date, the "<u>Borrower Account Termination Date</u>").

(iii)    Neither the Administrative Agent nor the Borrower shall change the customer, account number or location of the Borrower Account without the prior written consent of the Administrative Agent (acting at the written direction of the Required Lenders) (other than due to internal system changes, in which case the Administrative Agent will give prompt notice to Borrower and the Lenders following any change thereof).

Section 4.02    <u>Conditions Precedent to Borrowing</u>.  The obligation of each Lender to honor any Notice of Borrowing on a Borrowing Date falling after the Closing Date, is subject to satisfaction or waiver of the following conditions precedent, each in form and substance satisfactory to each Lender:

(a)    <u>Closing Date</u>. The Closing Date shall have occurred.

(b)    <u>Legal Opinion</u>. With respect to the Initial Borrowing hereunder, the Administrative Agent shall have received an opinion of DLA Piper (Canada) LLP, special Canadian counsel to the Loan Parties, substantially in the form of <u>Exhibit F-II</u> hereto.

(c)    <u>Representations and Warranties</u>. The representations and warranties of the Borrower and each other Loan Party contained in <u>Article V</u> or any other provision of any Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects on and as of the applicable Borrowing Date, except to the extent such representations and warranties specifically refer to an earlier date, in which case, they are true and correct in all material respects (or in all respects if qualified by materiality or a Material Adverse Effect) as of such earlier date.

(d)    <u>No Default</u>. No event, act or condition shall have occurred and be continuing or would result from the execution, delivery or performance of this Agreement or the other Loan Documents which would constitute a Default or Event of Default (disregarding any cure period therefor), both immediately prior to the making of the Loans and also after giving effect thereto and the intended use thereof.

(e)    <u>No Material Adverse Effect</u>. Since the Closing Date, no event, change, condition or circumstance shall have occurred that, individually or in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect both immediately prior to the making of the Loans and also after giving effect thereto and the intended use thereof.

(f)    <u>Financial Statements</u>. The Administrative Agent shall have received all financial statements required to be delivered pursuant to <u>Section 6.01</u>.

(g)    <u>Notice of Borrowing</u>. The Administrative Agent shall have received the Notice of Borrowing in accordance with the requirements hereof.

(h)    <u>Notes</u>.  Solely with respect to the Initial Borrowing hereunder, the Administrative Agent (directly or through its counsel) shall have received its corresponding Note(s), duly executed and delivered by the Borrower, as issuer, and the Guarantors, *por aval*, dated as of the Borrowing Date corresponding to such Initial Borrowing, complying with the provisions of <u>Section 2.10</u>.

(i)    <u>Payment of Fees and Expenses</u>. The Administrative Agent shall have received evidence (or evidence that any such payment will be made out of the Loan proceeds) of payment of the fees and expenses then due and payable under <u>Section 2.08</u> (including any fees and other amounts due under the Fee Letters) and <u>Section 11.03</u>, and of any and all stamp taxes or similar taxes payable in connection with the transactions contemplated hereby or by any other Loan Document; *provided* that the Borrower hereby irrevocably instructs and directs the Administrative Agent to withhold and deduct from the proceeds of the Borrowing of the Loans to occur on the applicable Borrowing Date the aggregate amount of fees and expenses and other amounts payable hereunder and under the other Loan Documents as a condition to such Borrowing of the Loans, and apply, on behalf of the Borrower, the aggregate amount so deducted to the payment of such fees, expenses and amounts payable by the Borrower on the applicable Borrowing

Date and the amount of such Borrowing shall be the aggregate of the amount actually disbursed to the Borrower and the amounts so withheld and deducted.[1]

(j)     No Legal Bar. There shall not (x) be in effect any statute, regulation, order, decree or judgment of any Governmental Authority that makes illegal or enjoins or prevents the consummation of the transactions hereunder or under any other Loan Document or (y) have been commenced any action or proceeding that seeks to prevent or enjoin any transactions hereunder or under any other Loan Document.

(k)     Termination of Existing Credit Agreements. Solely with respect to the Initial Borrowing hereunder, the Borrower shall have delivered to the Administrative Agent and the Lenders a true, correct and complete copy of (i) the Existing Bridge Loan Pay-Off Letter duly executed and delivered by each lender under the Existing Bridge Loan, and (ii) the Existing RCF Loan Pay-Off Letter duly executed and delivered by Credit Suisse AG, Cayman Islands Branch as administrative agent under the Existing RCF Loan, and the Borrower shall have made arrangements in substance and form satisfactory to the Lenders, so that substantially concurrently with the Borrowing of the Loans hereunder, (1) each and all obligations of Canacol Energy and CNEMED S.A.S. arising out of or in connection with the Reference Indebtedness, respectively, shall have been paid in full in accordance with the terms thereof, and the Existing Bridge Loan Documents and the Existing RCF Loan Documents shall have been terminated, and (2) all Liens in respect of any asset or property of any Loan Party or any of their respective Subsidiaries created pursuant to or in connection with the Reference Indebtedness, shall have been released and discharged in full (or the filing for an application with any Governmental Authority required to effectuate or evidence such release and discharge shall have been duly completed with evidence thereof reasonably satisfactory to the Lenders delivered thereto).

(l)     Post Availability Commencement Date Borrowing: In the case of any Borrowings on which a Borrowing Date is set to occur on or after December 1, 2024, the Administrative Agent shall have received evidence in form and substance satisfactory to the Administrative Agent that the Availability Commencement Date has occurred.

(m)     Intercompany Loan: Solely with respect to the Initial Borrowing hereunder, the Borrower shall have delivered to the Administrative Agent a true, correct and complete copy of the CNEMED Intercompany Loan.

Section 4.03   Satisfaction of Conditions Precedent. Each Lender shall be deemed to have agreed to and accepted each document, and to have approved or accepted each other matter delivered or occurring pursuant to Section 4.01 or Section 4.02, unless such Lender (before making the amount of its Loans available to the Administrative Agent) notifies the Administrative Agent in writing that it does not so agree with or accept such document or other matters.

---

[1] Note to Draft: Under review by Administrative Agent.

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES

As of the Closing Date and as of each Borrowing Date each Loan Party represents and warrants to the Administrative Agent and the Lenders that:

Section 5.01    Power and Authority.  Each Loan Party and each of its Subsidiaries: (a) is duly organized, validly existing and in good standing (where applicable) under the laws of its jurisdiction of organization, (b) has all requisite corporate power and has all third-party approvals and Governmental Approvals, necessary to own or lease its Properties and carry on its business as now being or as proposed to be conducted, except where failure to have such Governmental Approvals or third-party approvals could not reasonably be expected to have a Material Adverse Effect, (c) is qualified to do business and is in good standing in all jurisdictions in which the nature of the business conducted by it makes such qualification necessary, except where failure so to qualify could not reasonably be expected to have a Material Adverse Effect, (d) has full power, authority and legal right to make and perform its obligations under each Loan Document to which it is a party and to borrow the Loans hereunder, (e) is in full compliance with its Organizational Documents, (f) is in compliance with any shareholder or voting agreement and all Applicable Laws, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect (*provided* that such qualifier shall not apply in respect of any Sanctions, Prohibited Nations Act, Anti-Money Laundering Laws and Anti-Terrorism Laws, and Foreign Corrupt Practices Laws), and (g) is in compliance with all Governmental Approvals and contractual obligations, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect.

Section 5.02    Equity Interests; Subsidiaries.  As of the Closing Date, the beneficial and record holders of all of the Equity Interests of each Subsidiary of Canacol Energy are indicated in Schedule 5.02(a).  Schedule 5.02(b) hereto sets forth as of the Closing Date a list of all Subsidiaries of each Loan Party and the percentage ownership interest of each Loan Party therein. The Equity Interests so indicated on Schedule 5.02(a) are fully paid and non-assessable and are owned by the Loan Parties, directly or indirectly, free and clear of all Liens (other than Liens permitted under Section 7.02).

Section 5.03    Due Authorization, Etc.; No Conflicts.  The execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party and of all other documents to be executed and delivered thereunder by it (a) have been duly authorized by all necessary corporate action (including any necessary shareholder action), and do not contravene (i) its Organizational Documents, (ii) any Applicable Law (including any Sanctions, Prohibited Nations Act, Anti-Money Laundering Laws and Anti-Terrorism Laws, and Foreign Corrupt Practices Laws), decree, judgment, award, injunction or similar legal restriction in effect or (iii) any document or other contractual restriction binding upon or affecting it or any of its Properties including the Indenture, except in the case of clauses (ii) (other than in respect of Sanctions, the Prohibited Nations Act, Anti-Money Laundering Laws and Anti-Terrorism Laws, and Foreign Corrupt Practices Laws) and (iii), as could not reasonably be expected to have a Material Adverse Effect, and (b) will not result in the creation or imposition of any Lien on any Property of such Loan Party (other than any Lien permitted under Section 7.02). Each Loan Party is in compliance

77

with all of its payment and other obligations under all of its Debt, except in respect of such other obligations as could not reasonably be expected to have a Material Adverse Effect.

Section 5.04    No Additional Authorization Required; Approvals.

(a)    All notices to and filings and registrations with any Governmental Authority, and all Governmental Approvals and all other third-party approvals required for the due execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party, and for the legality, validity or enforceability of the Loan Documents, have been obtained and are in full force and effect except as could not reasonably be expected to have a Material Adverse Effect.

(b)    No Governmental Approvals or other third-party approvals required to be obtained by each Loan Party or any of its Subsidiaries for the due execution, delivery and performance by each Loan Party of the Loan Documents to which it is a party are subject to any pending appeal, intervention or similar condition that may result in the modification or revocation thereof and to such Loan Party's knowledge, no event has occurred that could reasonably be expected to result in the modification, cancellation or revocation of any such Governmental Approval or other third-party approval, except, in each case, as could not reasonably be expected to have a Material Adverse Effect.

Section 5.05    Compliance with Applicable Laws and Agreements.

(a)    Each Loan Party and each of its Subsidiaries is in compliance with all Applicable Laws (including any Sanctions, Prohibited Nations Act, Anti-Money Laundering Laws and Anti-Terrorism Laws, Foreign Corrupt Practices Laws, Environmental Laws, labor and social security laws), regulations and orders of any Governmental Authority applicable to the Loan Parties, their Subsidiaries or their businesses or Properties, except where the failure to so comply (other than in respect of the Sanctions, Prohibited Nations Act, Anti-Money Laundering Laws and Anti-Terrorism Laws, and Foreign Corrupt Practices Laws) could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)    Canacol Energy has timely filed all required registration statements, prospectuses, reports, schedules, forms, statements and other documents (including exhibits and all other information incorporated by reference) required to be filed by it on or before the Closing Date with the Commission, the Colombian *Registro Nacional de Valores y Emisores* and the Colombian Stock Exchange ("*CSE*"), or any other applicable securities commission, in each case, since January 1, 2012 (the "*Canacol Energy Public Filings*").  As of their respective dates, Canacol Energy Public Filings complied as to form in all material respects with the requirements of all applicable Canadian securities laws and legislation, including all regulations, rules, policies and instruments (the "*Canadian Securities Laws*") and Colombian securities regulations, as amended, and the rules and regulations promulgated thereunder, applicable to such Canacol Energy Public Filings, and did not at the time they were filed (or if amended, restated or superseded prior to the date hereof, then on the date of such filing) contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.  No Subsidiary of Canacol Energy is subject to the periodic reporting requirements of the Canadian Securities

78

Laws.  As of the date hereof and as of the Closing Date, none of the Canacol Energy Public Filings is subject of ongoing Commission or CSE review, outstanding Commission or CSE comment or outstanding Commission or CSE investigation.

(c)    Canacol Energy is in compliance in all material respects with the applicable listing and corporate governance rules and regulations of the TSX and the CSE. Canacol Energy maintains disclosure controls and procedures required by the Canadian Securities Laws and its regulations and Colombian regulations.  Such disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by Canacol Energy is recorded and reported on a timely basis to the individuals responsible for the preparation of Canacol Energy's filings with the Commission, the CSE and other public disclosure documents. Canacol Energy maintains internal control over financial reporting.  Such internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with IFRS and includes policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and Dispositions of the assets of Canacol Energy, (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with IFRS, and that receipts and expenditures of Canacol Energy are being made only in accordance with authorizations of management and directors of Canacol Energy, and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or Disposition of Canacol Energy's assets that could have a material effect on its financial statements.  Canacol Energy has disclosed, based on the most recent evaluation of its chief executive officer and its chief financial officer prior to the date of this Agreement, to Canacol Energy's auditors and the audit committee of Canacol Energy's Board of Directors (A) any significant deficiencies in the design or operation of its internal controls over financial reporting that are reasonably likely to adversely affect Canacol Energy's ability to record, process, summarize and report financial information and has identified for Canacol Energy's auditors and audit committee of Canacol Energy's Board of Directors any material weaknesses in internal control over financial reporting and (B) any fraud, whether or not material, that involves management or other employees who have a significant role in Canacol Energy's internal control over financial reporting.

(d)    Except as could not reasonably be expected to have a Material Adverse Effect, each Loan Party and each of its Restricted Subsidiaries is in compliance with all indentures, agreements and other instruments binding upon the Loan Parties or any of their respective Restricted Subsidiaries, businesses or Properties.  No default, event of default or similar event has occurred and is continuing under any such indenture, agreement or instrument, except to the extent that such default, event of default or similar event could not reasonably be expected to have a Material Adverse Effect.

Section 5.06    Legal Effect.

(a)    Each of this Agreement and each other Loan Document to which each Loan Party is a party have been duly executed and delivered by the parties thereto and are legal, valid and binding obligations of each such Person, enforceable against it in accordance with their terms, subject to bankruptcy, insolvency, reorganization, moratorium or other laws affecting

creditor's rights generally and subject to general principles of equity (if applicable) regardless of whether considered in a proceeding in equity (if applicable) or at Law.

(b)     Each of the Loan Documents is (or upon its coming into effect will be) in proper legal form under its governing law for the enforcement thereof against the parties thereto under such laws.  To ensure the legality, validity, enforceability or admissibility into evidence in Canada, Colombia (other than any applicable filing, registration or report required to be filed before the Colombian Central Bank, if applicable, in case of (i) enforcement against any party hereto organized under the laws of Colombia, or (ii) payment by any party hereto organized under the laws of Colombia) and Switzerland of the Loan Documents, it is not necessary that the Loan Documents or any other document be filed or recorded with any Governmental Authority in Canada, Colombia and Switzerland, and no Taxes are required to be paid for the legality, validity, enforceability or admissibility into evidence thereof.

Section 5.07     <u>Financial Statements</u>.  Canacol Energy has previously furnished to the Administrative Agent its Consolidated balance sheets and related statements of income, stockholder's equity and cash flows: (a) as of and for Fiscal Year 2021, audited by and accompanied by the opinion of KPMG LLP, independent public accountants and (b) as of and for the Fiscal Quarter and the portion of the Fiscal Year ended September 30, 2022, certified by its chief financial officer.  Such financial statements: (i) were prepared in good faith in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; (ii) fairly present in all material respects the financial condition of Canacol Energy and its Consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS and, in respect of such unaudited quarterly financial statements, subject to year-end audit adjustment and the absence of footnotes and (iii) show all material indebtedness and other material liabilities, direct or contingent, of Canacol Energy and its Consolidated Subsidiaries as of the date thereof, including liabilities for Taxes, material commitments and Debt.

Section 5.08     <u>No Material Adverse Change</u>.  Since December 31, 2021, there has been no event, change, condition or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

Section 5.09     <u>Ranking; Priority</u>.  The payment obligations of each Loan Party hereunder and under the other Loan Documents to which it is a party are and will at all times be unconditional general obligations of such Loan Party, and will at all times rank at least equal in right of payment with all other present and future unsubordinated Debt of such Loan Party.

Section 5.10     <u>Existing Debt</u>.  As of the Closing Date, no Loan Party nor any Restricted Subsidiary thereof has any Debt outstanding other than intercompany Debt and the Debt set forth on <u>Schedule 5.10</u> hereto.

Section 5.11     <u>No Actions or Proceedings</u>.

(a)     There is no litigation, investigation, arbitration or other proceeding pending or, to the knowledge of each Loan Party, threatened in writing against such Loan Party or

any of its Subsidiaries before any arbitrator or Governmental Authority that: (i) in the aggregate, has had or, if adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) could reasonably be expected to materially and adversely affect the legality, validity, binding effect or enforceability of any of the Loan Documents, except as specifically disclosed on Schedule 5.11 hereto.

(b)    (i) The operations of each Loan Party and each of its Subsidiaries are and have been conducted at all times in compliance with Sanctions, Anti-Money Laundering Laws and Anti-Terrorism Laws and (ii) no action, suit or proceeding by or before any court or governmental authority, authority or body or any arbitror involving any Loan Party, any of its respective Subsidiaries, or to the knowledge of any Loan Party, any of their respective Significant Shareholders, officers, directors, employees or agents, or any Person that Controls any Loan Party, with respect to Sanctions, Anti-Money Laundering Laws and Anti-Terrorism Laws is pending or, to the best knowledge of each Loan Party, threatened. Each Loan Party and each of its Subsidiaries has taken reasonable measures appropriate to the circumstances (including, as required by Applicable Law) to ensure that such Loan Party and each of its Subsidiaries is and will continue to be in compliance with all applicable current and future Sanctions, Anti-Money Laundering Laws and Anti-Terrorism Laws and Prohibited Nations Acts.

Section 5.12    Commercial Activity; Absence of Immunity.    None of the Loan Parties or any of its Restricted Subsidiaries nor any of their respective Properties is entitled to immunity on the grounds of sovereignty or otherwise from the jurisdiction of any court or from any action, suit, set-off or proceeding, or service of process in connection therewith, arising under the Loan Documents.

Section 5.13    Taxes.    Except for Taxes imposed by way of withholding on interest remitted from Colombia, there is no Tax of any kind (or any province, municipality or other political subdivision or taxing authority thereof or therein that exercises *de facto* or *de jure* power to impose such Tax) either: (a) on or by virtue of the execution, delivery or enforcement of the Loan Documents or (b) as of the date of this Agreement and the Closing Date, on any payment to be made by any Loan Party or any of its Subsidiaries pursuant to the Loan Documents. Each Loan Party and each of its Subsidiaries has (a) filed all material tax returns required to be filed by it (taking into account any applicable extensions), and (b) paid all Taxes shown to be due thereon except (i) such Taxes as are being Contested in good faith by appropriate proceedings and for which such Loan Party or the relevant Subsidiary has set aside on its books adequate reserve in accordance with IFRS or GAAP, as applicable or (ii) to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect. To the knowledge of the Loan Parties, no claim is being asserted in a proceeding against the Loan Parties (or any of its Subsidiaries) with respect to any material Taxes.

Section 5.14    Disclosure.

(a)    The Loan Parties have disclosed to the Administrative Agent and the Lenders all matters known to it, that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect. Taken as a whole, no information, report, financial statement, exhibit or schedule furnished by or on behalf of any Loan Party or any of its Restricted Subsidiaries to the Administrative Agent or any Lender in connection with the negotiation of any

81

Loan Document or included therein or delivered pursuant thereto contained, contains or will contain any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in light of the circumstances under which they were, are or will be made, not misleading; *provided* that (i) to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, such Loan Party represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with the historical audited financial statements of each Loan Party) and due care in the preparation of such information, report, financial statement, exhibit or schedule; (ii) projections as to future events are not to be viewed as facts and that actual results during the period(s) covered by such projections may differ from the projected results and that such differences may be material and that the Loan Parties make no representation that such projections will be realized and (iii) as to information, reports, exhibits or schedules prepared based on information supplied by third parties, the Loan Parties represent only that such information has been accurately reproduced from the source thereof and the Loan Parties are not aware of any material misstatement or omission therein.

(b)     As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 5.15    <u>Insurance</u>.   <u>Schedule 5.15</u> hereto sets forth a true, complete and correct description of all insurance maintained by each Loan Party as of the Closing Date.  As of the Closing Date, each Loan Party and its Restricted Subsidiaries have insurance with financially sound and reputable insurance companies, in such amounts and covering such risks and liabilities as are in accordance with Prudent Industry Practice, and all such insurance (a) complies with the requirements of <u>Section 6.07</u>, (b) is in full force and effect and (c) all premiums therefor have been duly paid.

Section 5.16    <u>Title to Property; Liens</u>.

(a)     Except for Permitted Liens, Minor Title Defects, and other Liens permitted in <u>Section 7.02</u>, each Loan Party and each of its Restricted Subsidiaries: (i) has good and marketable title to all of its Property purported to be owned by it, free and clear of all Liens, and holds such title and all of such Property in its own name and not in the name of any nominee or other Person, (ii) is lawfully possessed of a valid and subsisting leasehold estate in and to all Property that it purports to lease, and holds such leaseholds in its own name and not in the name of any nominee or other Person, (iii) except as arising or permitted under the Loan Documents, has not created and is not contractually bound to create any Lien on or with respect to any of its Properties and (iv) except under the Loan Documents and documents governing Debt permitted under <u>Section 7.01</u>, is not restricted by its Organizational Documents, contract, or Applicable Law.

(b)     Except as set forth in <u>Schedule 5.16</u> hereto, as of the Closing Date there are no Permitted Liens under <u>clause (b)</u> of the definition thereof securing payments by each Loan Party (or any of its Restricted Subsidiaries) in excess of US$500,000 (except where such payments are not yet due).

Section 5.17    <u>Use of Proceeds</u>.    The use of proceeds from the Loans as contemplated hereunder, including the application of such proceeds to Permitted Uses, complies

82

(a) in all respects with Sanctions, Anti-Money Laundering Laws and Anti-Terrorism Laws, Foreign Corrupt Practices Laws and Prohibited Nations Acts and (b) in all material respects with all other Applicable Laws. The proceeds shall be used outside Switzerland at all times while any Loans are outstanding unless the Swiss Federal Tax Administration has confirmed by way of a tax ruling that any direct or indirect on-lending to a company resident in Switzerland does not result in payments in respect of the Loans becoming subject to withholding or deduction for Swiss withholding tax.

Section 5.18    No Default.  No Default or Event of Default exists.

Section 5.19    Solvency.  Immediately after the consummation of the transactions contemplated by the Loan Documents on the Closing Date and immediately following the making of each Loan and after giving effect to the application of the proceeds of each Loan, the Loan Parties, taken as a whole, are and will be Solvent.

Section 5.20    Investment Company Act.  None of the Loan Parties is or is required to be registered as an "investment company" under the U.S. Investment Company Act of 1940, as amended.

Section 5.21    Sanctioned Person.  (a) No Loan Party, or any Person that Controls any Loan Party, any Subsidiaries, or to any of their respective Significant Shareholders, officers, directors, employees or agents is a Sanctioned Person. No Loan Party, or any Person that Controls any Loan Party, any Subsidiaries, or to the knowledge of any Loan Party, any of their respective Significant Shareholders, officers, directors, employees or agents has taken any action, directly or indirectly, that has resulted or would result in a violation by such Persons of Sanctions. None of the proceeds of the Loans will be used, contributed or made available, directly or indirectly, (i) to fund any activities, business or transactions with, in, or involving a Sanctioned Person or a Sanctioned Country or (ii) in a manner that would, directly or indirectly, result in a violation of any Sanctions by any Person.

Section 5.22    Labor Matters.

(a)    There are no strikes, work stoppages, slowdowns or lockouts pending or threatened against or involving any Loan Party or any of its Subsidiaries.

(b)    There are no unfair labor practices, grievances, complaints or arbitrations pending or, to each Loan Party's knowledge, threatened, against or involving any Loan Party or any of its Subsidiaries, nor are there any arbitrations or grievances threatened involving any Loan Party or any of its Subsidiaries.

(c)    Except as set forth in Schedule 5.22(c) hereto, there is no collective bargaining agreement covering any employee or pensioner of any Loan Party or any of its Subsidiaries.

Section 5.23    Environmental Matters.  In the ordinary course of its business, each of the Loan Parties and each of its Subsidiaries conducts an ongoing review of the effect of Environmental Laws on the business, operations and properties of such Loan Party and its Subsidiaries, in the course of which it identifies and evaluates associated liabilities and costs

(including, without limitation, any capital or operating expenditures required for clean-up or closure of properties presently or previously owned, any capital or operating expenditures required to achieve or maintain compliance with environmental protection standards imposed by law or as a condition of any license, permit or contract, any related constraints on operating activities, including any periodic or permanent shutdown of any facility or reduction in the level of or change in the nature of operations conducted thereat, any costs or liabilities in connection with off-site disposal of wastes or Hazardous Materials, and any actual or potential liabilities to third parties, including employees, and any related costs and expenses). On the basis of this review, each Loan Party has reasonably concluded that: (i) the properties presently owned, leased or operated by such Loan Party and its Subsidiaries are in compliance with all Environmental Laws; (ii) neither such Loan Party nor any of its Subsidiaries has received any written complaint, or notice of violation or liability under Environmental Laws, with regard to such Loan Party or any Subsidiary thereof, or any of their respective assets or properties; (iii) there are no administrative actions or judicial proceedings pending under any Environmental Law against such Loan Party, any Subsidiary thereof, or any of their respective assets or properties; (iv) neither such Loan Party nor any of its Subsidiaries is subject to any Environmental Liability applicable to it, in each case, except as could not reasonably be expected to have a Material Adverse Effect; and (v) such Loan Party has obtained and maintains all necessary Environmental Permits to conduct its business as currently conducted, except where the failure to so obtain and maintain such Environmental Permits could not reasonably be expected to have a Material Adverse Effect.

Section 5.24   No Set-off.   The obligations of the Loan Parties under the Loan Documents are not subject to any defense, set-off or counterclaim by any of the Loan Parties or any circumstance whatsoever which might constitute a legal or equitable discharge from its obligations thereunder.

Section 5.25   Exchange Controls.   Under current laws and regulations of Canada, Colombia, the Republic of Panama and Switzerland, and each political subdivision thereof, all interest, principal, premium, if any, and other payments due or to be made on any Loans or otherwise pursuant to the Loan Documents, may be freely transferred out of Canada, Colombia, the Republic of Panama and Switzerland and may be paid in, or freely converted into, Dollars; *provided* that, in the case of payments done by any of the Colombian Guarantors under this Agreement or any other Loan Document, a filing with the Colombian Central Bank of a foreign exchange declaration (or equivalent document at the time of registration) is required.

Section 5.26   Anti-Corruption Laws.   None of the Loan Parties, any of their Subsidiaries or any Person that Controls any of the foregoing, or to the knowledge of any Loan Party, any of their respective Significant Shareholders, officers, directors, employees or agents, or any Person that Controls any of the foregoing:

(a)   has violated or is in violation of any applicable anti-bribery or anti-corruption law or regulation enacted in any jurisdiction whether in connection with or arising from the OECD Convention Combating Bribery of Foreign Public Officials in International Business Transactions or otherwise, including the Foreign Corrupt Practices Laws;

(b)   has made, offered to make, promised to make or authorized the payment or giving of, directly or indirectly, any bribe, rebate, payoff, influence payment, kickback

or other payment or gift of money or anything of value (including meals or entertainment) to any officer, employee or ceremonial office holder of any government or instrumentality thereof, any political party or supra-national organization (such as the United Nations), any political candidate, any royal family member or any other Person who is connected or associated personally with any of the foregoing that is prohibited under any Applicable Law or otherwise for the purpose of influencing any act or decision of such payee in his official capacity, inducing such payee to do or omit to do any act in violation of his lawful duty, securing any improper advantage or inducing such payee to use his influence with a government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality ("*Prohibited Payments*"); or

(c)     has been subject to any written claim, action, proceeding, investigation, notice or demand with regard to any actual or alleged Prohibited Payment.

Section 5.27    <u>Development, Operation and Maintenance</u>.  Each Loan Party and each of its Restricted Subsidiaries has owned, acquired, operated, serviced, maintained, preserved and repaired its respective Property needed for the proper conduct of its business in accordance and compliance with (a) Prudent Industry Practices, (b) the terms and conditions of all insurance required to be maintained pursuant to <u>Section 6.07</u>, (c) all applicable Sanctions, Anti-Money Laundering Laws and Anti-Terrorism Laws, and Foreign Corrupt Practices Laws, and (d) all requirements of other Applicable Law, including Governmental Approvals, in all material respects.

Section 5.28    <u>Intellectual Property</u>.  Each Loan Party and each of its Restricted Subsidiaries owns, or is licensed to use, or has otherwise secured the right to use, all material trademarks, tradenames, copyrights, technology, know-how and processes necessary for the conduct of its business as currently conducted and for the fulfillment of its responsibilities under the Organizational Documents and the Loan Documents to which it is a party (the "*Intellectual Property*").  To such Loan Party's knowledge, no claim which would reasonably be expected to have a Material Adverse Effect has been asserted and is pending by any Person challenging or questioning the use of any such Intellectual Property or the validity or effectiveness of any such Intellectual Property, nor does such Loan Party know of any valid basis for any such claim.  To such Loan Party's knowledge, the use of such Intellectual Property by such Loan Party does not infringe on the rights of any Person, except for any infringement which could not reasonably be expected to have a Material Adverse Effect.

Section 5.29    <u>Pension, Welfare and Other Similar Plans</u>.

(a)     No steps have been taken to terminate any pension plan of any Loan Party or any of its Subsidiaries existing as of the Closing Date.  No condition exists or event or transaction has occurred with respect to any such pension plan that would reasonably be expected to result in the incurrence by any Loan Party or any of its Subsidiaries of any liability, fine or penalty (other than liabilities incurred in the ordinary course of maintaining such pension plan), that would have or be reasonably likely to have a Material Adverse Effect.  Except as would not have or be reasonably likely to have a Material Adverse Effect, each Loan Party and its Subsidiaries is in compliance with and has duly and in a timely manner paid any amounts due to any mandatory retirement fund laws.

(b)    With respect to Canacol Energy,

(i)    no Canadian Pension Plan Event has occurred or could be reasonably expected to occur that has resulted in or could be reasonably expected to result in a Material Adverse Effect;

(ii)    all of its material obligations and the material obligations of any of its Subsidiaries or Affiliates, as the case may be (including registration, communication, fiduciary, funding, investment and administration obligations), required to be performed in connection with the Canadian Pension Plans and the funding agreements therefor have been performed on a timely basis in accordance with Applicable Laws.  There are no outstanding disputes concerning the assets of the Canadian Pension Plans that could reasonably be expected to have a Material Adverse Effect.  No promises of benefit improvements under the Canadian Pension Plans have been made except where such improvements could not reasonably be expected to have a Material Adverse Effect.  All contributions or premiums required to be made or paid by it or any of its Affiliates to the Canadian Pension Plans have been made on a timely basis in accordance with the terms of such plans and all Applicable Laws.  There have been no improper withdrawals or applications of the assets of the Canadian Pension Plans;

(iii)    no Canadian Pension Plan contains or has ever contained a "defined benefit provision" as defined in subsection 147.1(1) of the *Income Tax Act* (Canada);

(iv)    neither it nor any of its Affiliates is or has at any time been an employer participating in a "multiemployer plan" as defined in Income Tax Regulation 8500(1); and

(v)    each Canadian Pension Plan was fully funded on a solvency basis as of the date of the valuation last filed with the pension regulatory authorities with jurisdiction over the applicable Canadian Pension Plan.  Each such valuation was prepared in accordance with generally accepted actuarial practices.

Section 5.30    International Banking Facility.  The Borrower, a nonbank entity located outside the United States, understands that it is the policy of the Federal Reserve Board that extensions of credit by international banking facilities, such as the Loans hereunder, may be used only to finance operations of the Borrower, or that of such Borrower's Affiliates, outside the United States.

Section 5.31    Beneficial Ownership.  As of the Closing Date, the information included in the Beneficial Ownership Certification provided on or prior to the Closing Date to any Lender in connection with this Agreement is true and correct in all respects.

Section 5.32    Not an EEA Financial Institution.  The Borrower is not an EEA Financial Institution.

Section 5.33    Business Activity in Panama.  Borrower does not conduct business activities in Panama, nor does any Loan Party generate income from Panamanian sources, with the

exception of interest, financial fees or similar, that are not taxable in the Republic of Panama.

## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, Canacol Energy and, unless otherwise indicated, each other Loan Party (on a joint and several basis), shall, and shall cause each of its Restricted Subsidiaries (or for purposes of <u>Section 6.01</u>, <u>Section 6.03</u>, <u>Section 6.04</u>, <u>Section 6.05</u>, <u>Section 6.10</u>, and <u>Section 6.11</u>, its Subsidiaries), to:

Section 6.01    <u>Financial Statements</u>.    The Borrower will deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Administrative Agent:

(a)    As soon as available, but in any event within 120 days after the end of each Fiscal Year, a Consolidated balance sheet of Canacol Energy and its Subsidiaries as at the end of such Fiscal Year, and the related Consolidated statements of income or operations, changes in shareholders' equity, and cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, all in reasonable detail and prepared in accordance with IFRS, audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit, to the effect that such Consolidated financial statements present fairly in all material respects the financial condition and results of operations of Canacol Energy and its Subsidiaries on a Consolidated basis in accordance with IFRS. With such Consolidated financial statements the Borrower will also furnish a "Management's Discussion and Analysis of Financial Condition and Results of Operations" report in form and substance reasonably satisfactory to the Administrative Agent.

(b)    As soon as available, but in any event within 120 days after the end of each Fiscal Year, a statement of reserves data and information specified in Form 51-101F1 of National Instrument 51-101 – Standards of Disclosure of Oil and Gas Activities ("NI 51-101") of the Canadian Securities Administrators as at the last day of such fiscal year based upon an evaluation by an independent qualified reserves evaluator or auditor prepared in accordance with NI 51-101.

(c)    As soon as available, but in any event within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, a Consolidated balance sheet of Canacol Energy and its Subsidiaries as at the end of such Fiscal Quarter, and the related Consolidated statements of income or operations, changes in shareholders' equity, and cash flows for such Fiscal Quarter and for the portion of the Fiscal Year then ended, setting forth in each case in comparative form the figures for the corresponding Fiscal Quarter of the previous Fiscal Year and the corresponding portion of the previous Fiscal Year, all in reasonable detail, (i) certified by the chief executive officer, chief financial officer, treasurer or controller of Canacol Energy as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of Canacol Energy and its Subsidiaries in accordance with IFRS, subject only to normal year-end audit adjustments and the absence of footnotes and (ii) approved by the

Board of Directors of Canacol Energy. With such Consolidated financial statements the Borrower will also furnish a "Management's Discussion and Analysis of Financial Condition and Results of Operations" report in form and substance reasonably satisfactory to the Administrative Agent.

(d)    Promptly after the same become publicly available, copies of all financial statements, reports, notices and proxy statements sent or made available to the public generally by any Loan Party or any of its Subsidiaries, if any, and all regular and periodic reports and all final registration statements and final prospectuses, if any, filed by any Loan Party or any of its Subsidiaries with the U.S. Securities and Exchange Commission, TSX or any other securities exchange or with the Commission or any other Governmental Authority with comparable functions, or equivalent entities in each relevant jurisdiction, or distributed by any Loan Party or any of its Subsidiaries to its shareholders generally.

Documents required to be delivered under Section 6.01(a), (b) and (c) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the earliest date on which such documents are posted on, or a link to such documents is provided on (*provided* that the Administrative Agent has actually received written notice thereof (by mail, email in portable document format (".pdf") or facsimile)), (i) Canacol Energy's website on the internet at www.canacolenergy.com, (ii) the website of the Commission or (iii) any electronic form maintained by the Administrative Agent in accordance with the Loan Documents.

Section 6.02    Certificates; Other Information.  The Borrower will deliver to the Administrative Agent, in form and detail reasonably satisfactory to the Administrative Agent:

(a)    concurrently with the delivery of the financial statements referred to in Section 6.01(a) and Section 6.01(b), a duly completed Compliance Certificate signed by a Responsible Officer of Canacol Energy, (i) certifying as to whether a Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken by the Loan Parties with respect thereto, (ii) certifying compliance by the Loan Parties with Article VI and Article VII setting forth in reasonable detail the calculations required to establish the compliance by the Loan Parties with Section 7.11 and Section 10.07(b), and (iii) stating whether any change in IFRS, or in the application thereof has occurred since the date of the audited financial statements referred to in Section 5.07 or Section 6.01(a), if more recent, and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such certificate;

(b)    promptly (and, in any event, within five Business Days) after the occurrence of a Casualty Event for which Insurance Proceeds which would require the prepayment of the Loans pursuant to Section 2.04(a) have been or are reasonably likely to be paid to any Loan Party or any of its Restricted Subsidiaries, (i) written notice thereof describing in detail the nature of such Casualty Event, the Property affected thereby, the insurance covering such Casualty Event, the aggregate Net Cash Proceeds received (or expected to be received) by any Loan Party or any Restricted Subsidiary thereof and the actions proposed to be taken by the Loan Parties in connection therewith to comply with Section 2.04(a) and (ii) copies of any document related thereto (including copies of any such claim) in the possession or control of a Loan Party or any of its Restricted Subsidiaries;

88

(c)    promptly (and, in any event, within five Business Days) after the occurrence of a Taking for which Net Cash Proceeds which would require the prepayment of the Loans pursuant to <u>Section 2.04(b)</u> have been or are reasonably likely to be paid to any Loan Party or any of its Restricted Subsidiaries, (i) written notice thereof describing in detail the nature of such Taking, the Property affected thereby, the aggregate Net Cash Proceeds received (or expected to be received) by any Loan Party or any Restricted Subsidiary thereof and the actions proposed to be taken by the Loan Parties in connection therewith to comply with <u>Section 2.04(b)</u> and (ii) copies of any document associated therewith reasonably available to any Loan Party or any of its Restricted Subsidiaries;

(d)    promptly but in any event on the date that is the earlier of (x) five Business Days following the execution of any agreement or instrument relating to an Asset Sale which would require the prepayment of the Loans pursuant to <u>Section 2.04(c)</u> and (y) the date that is five Business Days prior to the date on which any Loan Party becomes required to use, or to cause any of its Restricted Subsidiaries to use, Net Cash Proceeds from any Asset Sale to prepay the Loans pursuant to <u>Section 2.04(c)</u>, a certificate from a Responsible Officer of Canacol Energy setting forth (i) a description in reasonable detail of the Property relating to such Asset Sale, (ii) the aggregate Net Cash Proceeds to be paid to such Loan Party or such Restricted Subsidiary in connection with such Asset Sale (together with calculations in reasonable detail in connection thereto), and (iii) the actions proposed to be taken by the Loan Parties in connection therewith to comply with <u>Section 2.04(c)</u>;

(e)    not later than five Business Days prior to the day on which any Loan Party becomes required to use, or to cause any of its Restricted Subsidiaries to use, Net Cash Proceeds from the Incurrence or issuance of any Debt to prepay the Loans pursuant to <u>Section 2.04(d)</u>, a certificate from a Responsible Officer of Canacol Energy setting forth a description in reasonable detail of the Debt to be Incurred or to be issued and the aggregate Net Cash Proceeds to be received by such Loan Party or such Restricted Subsidiary in connection with such Debt;

(f)    promptly and in any event within ten days after (i) Canacol Energy or any Subsidiary or Affiliate thereof knows or has reason to know that any Canadian Pension Plan Event has occurred, a statement describing such Canadian Pension Plan Event and the action, if any, that Canacol Energy or such Restricted Subsidiary or Affiliate has taken and proposes to take with respect thereto and, promptly upon the reasonable request by the Administrative Agent or a Lender, deliver to the Administrative Agent any annual information return, investment information summary or actuarial valuation report filed with the applicable pension regulator with respect to any Canadian Pension Plan pursuant to Applicable Law; and (ii) receipt thereof by Canacol Energy or any Subsidiary or Affiliate thereof, copies of each written notice from the applicable pension regulator proposing to order or ordering (x) the termination of any Canadian Pension Plan in whole or in part or (y) the appointment of an administrator of any Canadian Pension Plan;

(g)    promptly (and, in any event, within two Business Days) after any Loan Party obtains knowledge thereof, written notice of the commencement of any litigation, claim, investigation, arbitration, other proceeding or controversy pending or, to its knowledge, threatened involving or affecting any Loan Party or any of its Restricted Subsidiaries: (i) that could give rise to a Lien on any of its Properties, other than Liens permitted under <u>Section 7.02</u>, (ii) that

could reasonably be expected to have a Material Adverse Effect or (iii) relating to any of the Loan Documents;

(h)       prompt notice of the occurrence of any ERISA Event with respect to any Loan Party that, alone or together with other existing ERISA Events with respect to any Loan Party, could reasonably be expected to result in a Material Adverse Effect;

(i)       promptly (and, in any event, within two Business Days) after any Loan Party obtains knowledge thereof, written notice of any other event, change, condition or circumstance that could reasonably be expected to have a Material Adverse Effect;

(j)       promptly (and, in any event, within five Business Days) after any Loan Party obtains knowledge thereof, written details of any material non-compliance with any Applicable Law, including any Governmental Approval, Sanctions or Environmental Law, by any Loan Party or any of its Subsidiaries with respect to such Loan Party or their respective Property;

(k)       prompt (and in no event, later than five Business Days) notice (i) after receipt by any Loan Party of any written notice of the commencement, or threatened commencement, of proceedings relating to the revocation, cancellation, expropriation or modification of any material permit (including, without limitation, any such permit required for the operation of its business conducted in the Casanare, Cordoba and Sucre Departments) and (ii) after any Loan Party obtains knowledge of the occurrence of, or reasonably believes that, any permit material to any material part of its business (including, without limitation, any such permit required for the operation of its properties and assets located in the Casanare Department) (A) which requires renewal will not be renewed as and when required under Applicable Law and without imposing any further material restrictions or conditions thereon; (B) will be withdrawn, suspended, cancelled, varied, surrendered or revoked and not promptly replaced or reinstated; or (C) required to be obtained following the date hereof will not be obtained in the ordinary course or otherwise as and when necessary;

(l)       promptly, any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of such certification;

(m)       if requested by any Lender, written information setting forth in reasonable detail the actual application of the proceeds from the Loans by the Borrower;

(n)       promptly (and, in any event within two Business Days) after any Loan Party obtains knowledge of any Default, a certificate of a Responsible Officer of such Loan Party setting forth the details thereof and the action(s) that is/are being taken or is/are proposed to be taken with respect thereto; and

(o)       from time to time such other information with respect to any Loan Party or any of its Restricted Subsidiaries or the Loan Documents and/or the transactions contemplated hereby or thereby as any Lender (through the Administrative Agent) or the Administrative Agent may reasonably request, including any documentation or other evidence to enable such Lender or the Administrative Agent to carry out and be satisfied with the requirements

of all applicable Anti-Money Laundering Laws and Anti-Terrorism Laws, Foreign Corrupt Practices Laws and "know your customer" laws, regulations and codes of conduct.

Each notice delivered pursuant to this <u>Section 6.02</u> shall be accompanied by a statement of a Responsible Officer of the Loan Parties setting forth the specific details of the event or development requiring such notice and any action taken or proposed to be taken by the Loan Parties with respect thereto, if applicable.

Section 6.03    <u>Corporate Existence; Conduct of Business; Inspection; Books and Records</u>.

(a)    Do or cause to be done all things necessary to preserve, renew and keep in full force and effect (A) its legal existence and good standing under the laws of its jurisdiction of its organization and (B) the rights, licenses, concessions, permits, privileges and franchises material to the conduct of its business as a whole; *provided*, *however*, that (x) the foregoing shall not prohibit any merger, amalgamation, consolidation, liquidation or dissolution permitted under <u>Section 7.04</u> and (y) any Guarantor may change its jurisdiction of organization or incorporation from time to time upon prior written notice to the Administrative Agent, *provided*, *further*, that:

(i)    prior to and after giving effect to the consummation of such change of jurisdiction of organization or incorporation, as applicable, no Default or Event of Default shall have occurred and be continuing or could reasonably be expected to occur;

(ii)    the newly designated jurisdiction of organization or incorporation for such Guarantor is reasonably acceptable to the Administrative Agent (as directed by the Required Lenders), it being agreed by each of the parties hereto that each of the jurisdictions of incorporation of the Loan Parties as of the date of this Agreement is a jurisdiction acceptable to the Required Lenders, the latter also in view of Swiss statutory distribution limits;

(iii)    the Administrative Agent shall have received legal opinion(s) in form and substance reasonably satisfactory to the Administrative Agent from counsel reasonably acceptable to the Administrative Agent in each relevant jurisdiction(s), addressed to the Administrative Agent and each Lender and dated as of the date on or about which such change of jurisdiction of organization or incorporation, as applicable, becomes effective (but in any event no later than the date of such change of jurisdiction), to the effect that all obligations of such Guarantor hereunder or under any other Loan Document, notwithstanding such change of jurisdiction of organization or incorporation, as applicable, shall by operation of law or express agreement, continue to be legal, valid and enforceable obligations of such Guarantor and covering such other matters relating to the transactions contemplated hereby and by any other Loan Documents as the Administrative Agent may reasonably request; and

(iv)    the Administrative Agent shall have received certified copies of the articles of incorporation or association, shareholder agreements or declarations and by-laws of such Guarantor and of all corporate authority for such

Guarantor (including, without limitation, all necessary action of the Board of Directors, shareholders, or other governing body and incumbency certificates) relating to such change of jurisdiction or organization or incorporation, as applicable, as well as evidence of compliance with all required formalities under Applicable Law.

(b)    Conduct its respective businesses in accordance with Prudent Industry Practices.

(c)    Permit representatives of any Lender or the Administrative Agent, during normal business hours, at the cost and expense of the Borrower and (except during the existence of a Default) following at least three Business Days' written notice, to examine, copy and make extracts from its books and records, to inspect any of its Properties and to discuss its business and affairs with its officers, all to the extent permitted by Applicable Law and as reasonably requested by such Lender or the Administrative Agent.

(d)    Maintain a system of accounting in which full, true and correct entries shall be made of all of its Consolidated financial transactions, Consolidated assets and Consolidated liabilities in accordance with IFRS.

Section 6.04    Compliance with Applicable Laws and Contracts.

(a)    Comply with the requirements of all Applicable Laws (including Sanctions, Prohibited Nations Acts, Anti-Money Laundering Laws and Anti-Terrorism Laws, Foreign Corrupt Practices Laws and similar Applicable Laws to all of the foregoing of the United States, Canada, Colombia, the Republic of Panama, and Switzerland), and orders of any Governmental Authority which are material to each Loan Party, each Subsidiary, their respective Properties or the conduct of their respective business, except where the failure to do so (other than in respect of Sanctions, Prohibited Nations Acts, Anti-Money Laundering Laws and Anti-Terrorism Laws, Foreign Corrupt Practices Laws and similar Applicable Laws to all of the foregoing of the United States, Canada, Colombia, the Republic of Panama and Switzerland), individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)    Timely file all tax returns required to be filed by it and pay its obligations, including liabilities in respect of Taxes, before the same shall become delinquent or in default, except where (i) the validity or amount thereof is being Contested or (ii) the failure to make payment pending such Contest could not reasonably be expected to result in a Material Adverse Effect.

(c)    Implement and maintain adequate policies and procedures designed to ensure compliance with all applicable Sanctions, Foreign Corrupt Practices Laws and Anti-Money Laundering Laws and Anti-Terrorism Laws.

(d)    (i) Comply with all the terms and conditions of all contracts to which such Loan Party or Subsidiary is a party or by which any of its Properties are bound, (ii) keep each such contract in full force and effect and (iii) enforce each such contract in accordance with its terms, in each case, except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 6.05   <u>Governmental Approvals</u>.  Promptly (i) obtain, and maintain in full force and effect, all Governmental Approvals from time to time necessary for the maintenance of its corporate existence and good standing, for the conduction of its respective businesses and for its authorization, execution and delivery of the Loan Documents to which it is a party, and the due performance of all of its obligations and the exercise of all of its rights thereunder and (ii) comply with all obligations and conditions contained in, or imposed on any Loan Party or any of its Subsidiaries or Properties by all such Governmental Approvals, in each case, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect.

Section 6.06   <u>Property</u>.

(a)   Operate its Oil and Gas Properties and other material Properties or cause such Oil and Gas Properties and other material Properties to be operated in a careful and efficient manner in accordance with Prudent Industry Practices and in compliance with all applicable contracts and agreements and in compliance with all governmental requirements, including applicable proration requirements, and all Applicable Laws, rules and regulations of every other Governmental Authority from time to time constituted to regulate the development and operation of its Oil and Gas Properties and the production and sale of Hydrocarbons and other minerals therefrom, except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(b)   Maintain all of its Property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and supply such Properties in all material respects with all necessary equipment and make all necessary repairs, renewals, replacements and improvements thereto, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

(c)   Promptly pay and discharge, or make reasonable and customary efforts to cause to be paid and discharged, all delay rentals, royalties, expenses and Debt accruing under any material Concession Agreements, leases or other agreements affecting or pertaining to its Oil and Gas Properties and do all other things necessary to keep unimpaired its rights with respect thereto and prevent any forfeiture thereof or default thereunder, except where the failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(d)   Promptly perform or make reasonable and customary efforts to cause to be performed, in accordance with customary industry standards, the obligations required by any material Concession Agreements, assignments, deeds, leases, sub-leases, contracts and agreements affecting its interests in its Oil and Gas Properties and other material Properties, except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 6.07   <u>Insurance</u>.

(a)   Maintain with financially sound and reputable insurance companies that are not Affiliates of any Loan Party, insurance with respect to its Properties and business against such loss or damage (including, without limitation, insurance policies covering casualties resulting from workers compensation, collisions, civil liability, crime, business interruption,

property coverage and fire, terrorism and pollution), and of such types and in such amounts, as required by Prudent Industry Practices of such Loan Party.

(b)     No provision of this <u>Section 6.07</u> or any other provision of any Loan Document shall impose on the Administrative Agent or any Lender any duty or obligation to verify the existence or adequacy of the insurance coverage maintained by any Loan Party or any of its Restricted Subsidiaries, nor shall the Administrative Agent or any Lender be responsible for the representations or warranties made by or on behalf of any Loan Party or any of its Restricted Subsidiaries to any insurance company or underwriter.

Section 6.08    <u>Ranking; Priority</u>.  Take all actions as may be necessary to ensure that its obligations under the Loan Documents to which it is a party will at all times constitute direct, unconditional and unsubordinated general obligations thereof ranking at least equal in right of payment with all other present and future senior secured and unsubordinated Debt thereof.

Section 6.09    <u>Use of Proceeds</u>.  Use the proceeds of the Loans (less any fees and expenses due and payable under <u>Section 2.08</u> and <u>Section 11.03</u>) solely for Permitted Uses.

Section 6.10    <u>Environmental Matters</u>.

(a)     (i) Comply with all applicable Environmental Laws and obtain, comply with and maintain any and all Environmental Permits necessary for its operations as conducted and as planned, and (ii) use its commercially reasonable efforts to cause all of its tenants, subtenants, contractors, subcontractors and invitees to comply with all Environmental Laws, and obtain, comply with and maintain any and all Environmental Permits, applicable to any of them, in each case, except to the extent failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(b)     Comply with all orders and lawful directives regarding Environmental Laws issued to any Loan Party or to any of its Subsidiaries by any Governmental Authority, other than such orders and lawful directives as to which an appeal or other challenge has been timely and properly taken in good faith, except to the extent failure to do so could not reasonably be expected to result in a Material Adverse Effect.

(c)     Promptly (and, in any event, within five Business Days) notify the Administrative Agent and provide copies upon receipt of any material written claims, complaints, notices of violation or information requests by any Governmental Authority related to any actual, alleged or potential non-compliance with or liability under applicable Environmental Laws or Environmental Permits.

(d)     Promptly (and, in any event, within five Business Days upon the occurrence thereof) give written notice to the Administrative Agent of any release or discovery of Hazardous Materials at any of its properties that is reasonably likely to require material expenditures to investigate and/or remediate said Hazardous Materials.

(e)     Promptly (and, in any event, within five Business Days upon the occurrence thereof) give written notice to the Administrative Agent of the occurrence of any environmental, social or labor related event or circumstance that has had or could reasonably be

expected to have a Material Adverse Effect, and within 30 days of the occurrence thereof, provide a written report describing in reasonable detail such event or circumstance and the actions proposed to be taken by the Loan Parties in connection therewith.

Section 6.11    Maintenance of Corporate Separateness.  Each Loan Party shall, and shall cause each of its Subsidiaries to, satisfy customary corporate formalities, including the holding of regular Board of Directors' and shareholders' meetings or action by directors or shareholders without a meeting and the maintenance of corporate records, in accordance with the relevant Organizational Documents and Applicable Law.  None of the Loan Parties or any of their respective Subsidiaries shall conduct its or their affairs in a manner which is reasonably likely to result in the corporate or other existence of any Loan Party or any of its Subsidiaries being ignored, or in the assets and liabilities of any Loan Party or any of its Subsidiaries being substantively consolidated with those of any other such Person in a bankruptcy, reorganization or other insolvency proceeding.

Section 6.12    Beneficial Ownership. The Borrower shall promptly, but in no event later than ten Business Days, notify the Administrative Agent of any changes to the information provided in the Beneficial Ownership Certification most recently delivered to the Administrative Agent.

Section 6.13    Colombian Central Bank Requirements. In case of payment of an Obligation arising out of any Loan Document by any Guarantor organized under the laws of Colombia in benefit of the Lenders, the Borrower shall cause such Colombian Guarantor to effectively file and register an "Active Indebtedness Loan Registration Form No. 7" (*Formulario No. 7, Registro de Endeudamiento Externo otorgado a No Residentes*) with an authorized intermediary of the foreign exchange market in Colombia to register an international loan before the Colombian Central Bank (*Banco de la República de Colombia*), and the filing of the "*International loan foreign exchange form*" (*Declaración de cambio por endeudamiento externo*); and (ii) no later than six Business Days after the date of the Initial Borrowing , the Borrower shall cause CNEMED S.A.S. to substitute the foreign indebtedness registration before the Colombian Central Bank from the Existing Bridge Loan to the CNEMED Intercompany Loan.

Section 6.14    Payment of Obligations. The Borrower will, and will cause each of its Subsidiaries to, pay, discharge or otherwise satisfy as the same shall become due and payable, all of its obligations and liabilities, including Tax liabilities, unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with IFRS are being maintained by the Borrower or such Subsidiary, except to the extent that the failure to do so could not reasonably be expected to have a Material Adverse Effect.

Section 6.15    ESG Reporting. Upon request by the Administrative Agent, the Borrower will furnish to the Administrative Agent information relating to measures on ESG matters and its environmental, social and governance ("ESG") compliance as agreed upon by the Borrower and the Administrative Agent. The Borrower agrees to report such ESG compliance by completing the Administrative Agent's standard form of ESG questionnaire on an annual basis.

## ARTICLE VII

## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder remains unpaid or unsatisfied, Canacol Energy and, unless otherwise indicated, each other Loan Party shall not, nor shall it permit any of its Restricted Subsidiaries (or for purposes of Section 7.04, Section 7.10, Section 7.16, Section 7.17, Section 7.18, Section 7.19, Section 7.20 and Section 7.21, its Subsidiaries) to, directly or indirectly:

Section 7.01    Debt.  Incur any additional Debt, *provided*, *however*, that the Loan Parties and its Restricted Subsidiaries may Incur in additional Debt so long as no Default exists or would result therefrom and so long as the Loan Parties and its Restricted Subsidiaries are in compliance with the Financial Covenants set forth on Section 7.11, immediately prior to and after giving effect to the Incurrence of such Debt.

Section 7.02    Limitations on Liens.  Create, assume or suffer to exist any Lien on any of its Property, including any real property, whether now owned or hereafter acquired by it, except:

(a)    Liens created pursuant to any Loan Document;

(b)    Permitted Liens;

(c)    Liens existing on the date hereof and listed on Schedule 5.16;

(d)    Liens securing Purchase Money Debt; *provided* that (i) such Lien does not at any time encumber any Property other than the Property financed by such Debt, (ii) the aggregate principal amount of the Debt secured thereby does not exceed the cost or Fair Market Value, whichever is lower, of the fixed or capital asset being acquired on the date of acquisition, (iii) such Lien secures only principal amounts raised for the purposes of such acquisition, construction or creation, together with any costs, expenses, interest and fees incurred in relation thereto and (iv) such Lien is created or arises on or before 90 days after the completion of such acquisition, construction or improvement of the applicable fixed or capital asset;

(e)    Liens on the Property of any Loan Party or any Restricted Subsidiary thereof securing Debt in an aggregate principal amount which, when taken together with all other Liens on the property or assets of the Loan Parties and their Restricted Subsidiaries Incurred pursuant to this clause (e) and outstanding on the date of such Incurrence, does not exceed the greater of (x) US$50,000,000 (or the Dollar Equivalent thereof) and (y) 7.5% of Consolidated Net Tangible Assets; *provided* that immediately before and after the Incurrence of such Debt and the creation of such Lien, no Default shall exist or would result therefrom;

(f)    Liens securing Debt in respect of Sale and Leaseback Transactions in an aggregate principal amount outstanding not to exceed at any time the greater of (x) US$25,000,000 (or the Dollar Equivalent thereof) and (y) 3.0% of the Consolidated Net Tangible Assets; any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any Lien referred to in the foregoing clauses (a) through (d)

or of any Debt secured thereby; *provided*, that the principal amount of Debt so secured thereby shall not exceed the principal amount of Debt so secured at the time of such extension, renewal or replacement (plus accrued and unpaid interest and reasonable fees and expenses Incurred in connection therewith), and that such extension, renewal or replacement Lien shall be limited to all or part of the property that secured the Lien extended, renewed or replaced (plus improvements on or additions to such Property); and

(g)     Liens (other than Liens securing Debt) on, or related to, assets to secure all or part of the costs incurred in the ordinary course of the Oil and Gas Business for the exploration, drilling, development, production, processing, transportation, marketing, storage or operation thereof, including, for the avoidance of doubt, the trust guaranteeing the approximately 300 km pipeline to be constructed between El Jobo plant and the Trasmetano pipeline at Estación Tasajeras, in connection with the long-term firm take-or-pay gas sales contract with Empresas Publicas de Medellín E.S.P., dated August 26, 2021.

Any reference herein or in any other Loan Document to Liens permitted hereby or thereby or the right of any Loan Party or any of its Restricted Subsidiaries to create any Liens are not intended to and do not subordinate any Liens in favor of the Administrative Agent and the Lenders to such Liens or give priority to any Person over the Administrative Agent and the Lenders.

Section 7.03    Limitations on Investments.  Make or acquire any Investment, other than:

(a)     cash and Cash Equivalents in the ordinary course of business;

(b)     Investments existing on the date hereof and set forth on Schedule 7.03 and any extension, modification or renewal of any such Investments (but not any such extension, modification or renewal to the extent it involves additional advances, contributions or other investments of cash or property, other than reasonable expenses incidental to the structuring, negotiation and consummation of such extension, modification or renewal);

(c)     Investments made with (i) the proceeds of contributions in cash to Canacol Energy in form of subscriptions of newly issued Equity Interests of Canacol Energy, (ii) newly issued Equity Interests of Canacol Energy, (iii) proceeds from Dispositions permitted by Section 7.05(e) or Section 7.05(g) or (iv) a combination of the foregoing;

(d)     Investments made on or after the Closing Date related to or arising from the development of the Medellin Pipeline, in any event not to exceed US$25,000,000 (or the Dollar Equivalent thereof) in aggregate at any time, so long as all the relevant environmental permits have not been obtained;

(e)     Loans or advances to employees, officers or directors in the ordinary course of business of any Loan Party, in each case only as permitted by Applicable Law, but in any event not to exceed US$2,000,000 (or the Dollar Equivalent thereof) in aggregate at any time outstanding;

(f)     Investments in stock, obligations or securities received in settlement of debts arising from Investments permitted under this Section 7.03 or from accounts receivable

and other similar obligations arising in the ordinary course of business, which Investments are obtained by any Loan Party as a result of a bankruptcy or other insolvency proceeding of, or difficulties in collecting from, the obligor in respect of such obligations; *provided* that the Borrower shall give the Administrative Agent prompt written notice in the event that the aggregate amount of all Investments held at any one time under this Section 7.03(f) exceeds US$3,000,000 (or the Dollar Equivalent thereof);

(g)      Investments by any Loan Party or any Restricted Subsidiary thereof in any Loan Party or any Restricted Subsidiary of any Loan Party, including Investments relating to or arising from the Permitted Reorganization;

(h)      other Investments that do not exceed at any time the greater of (x) US$50,000,000 (or the Dollar Equivalent thereof) and (y) 5.0% of the Consolidated Net Tangible Assets;

(i)      an Investment by Canacol Energy or any of its Restricted Subsidiaries in another Person if as a result of such Investment such other Person is merged, amalgamated or consolidated with or into, or transfers or conveys all or substantially all its assets to, Canacol Energy or any of its Restricted Subsidiaries; *provided*, *however*, that such Person's primary business is the Oil and Gas Business or any business permitted under Section 7.08;

(j)      receivables owing to Canacol Energy or any of its Restricted Subsidiaries if created or acquired in the ordinary course of business;

(k)      payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(l)      Hedging Agreements otherwise permitted under Section 7.01;

(m)      Guaranties of Debt otherwise permitted under this Agreement;

(n)      Investments and expenditures made in the ordinary course of, and of a nature that is or shall have become customary in, the Oil and Gas Business as a means of actively exploiting, exploring for, acquiring, developing, processing, gathering, marketing or transporting natural gas, other Natural Gas Products (including with respect to plugging and abandonment) through agreements, transactions, interests or arrangements that permit one to share risks or costs of such activities or comply with regulatory requirements regarding local ownership, including without limitation, (i) ownership interests in natural gas, other Natural Gas Products properties, liquefied natural gas facilities, processing facilities, gathering systems, pipelines, storage facilities or related systems or ancillary real property interests; (ii) Investments in the form of or pursuant to operating agreements, concession agreements, working interests, royalty interests, mineral leases, processing agreements, farm-in agreements, farm-out agreements, contracts for the sale, transportation or exchange of natural gas, other Natural Gas Products, production sharing agreements, participation agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling agreements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), subscription agreements, stock purchase agreements, stockholder agreements and other similar

agreements (including for limited liability companies) with third parties; and (iii) direct or indirect ownership interests in drilling rigs and related equipment, including, without limitation, transportation equipment;

(o)    the portion of any Investment that is made with Equity Interests of Canacol Energy (other than Disqualified Stock);

(p)    Investments in the notes issued pursuant to the Indenture; and

(q)    Guaranties of performance or other obligations (other than Debt) arising in the ordinary course of business, including obligations under oil and natural gas exploration, development, joint operating, and related agreements and licenses, concession or operating leases,

provided that if, after giving effect on a *pro forma* basis to the consummation of any Investment of the type permitted by this Section 7.03, Canacol Energy would not satisfy the requirements set forth in Section 10.07(b) (assuming for purposes of such determination that the "reference date" (as used in such Section 10.07(b)) is the last day of the Fiscal Quarter most recently ended prior to the date on which such Investment is consummated), Canacol Energy causes one or more of its Subsidiaries to become, as soon as reasonably practicable, and in any event not later than ten days, following the date of consummation of such Investment, Additional Guarantors pursuant to Section 10.07(a) so that, after giving effect to such Investment and such Persons becoming Additional Guarantors, Canacol Energy satisfies the requirements set forth in Section 10.07(b) as of such determination date,

provided further, that notwithstanding anything to the contrary, nothing in this Section 7.03 shall permit investments in Oil Business which, after giving proforma effect to such Investment, would make the Oil Properties owned by Loan Parties to exceed ten percent (10%) of the Company's Consolidated Total Assets.

Section 7.04    Fundamental Changes.  Subject to Section 7.05, merge, consolidate or amalgamate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its Property (whether now owned or hereafter acquired) to or in favor of any Person, or liquidate, apply to be wound up or dissolve, except that, so long as no Default exists or would result therefrom:

(a)    any Restricted Subsidiary of Canacol Energy or any other Guarantor may merge, consolidate or amalgamate with (i) Canacol Energy (*provided* that Canacol Energy shall be the continuing or surviving Person or, in the case of an amalgamation, the amalgamated entity resulting from such amalgamation shall continue to be liable for the obligations of Canacol Energy under the Loan Documents), or (ii) any one or more other Restricted Subsidiaries of Canacol Energy (*provided* that when any Loan Party is merging, consolidating or amalgamating with another Restricted Subsidiary of Canacol Energy, such Loan Party shall be the continuing or surviving Person or, in the case of an amalgamation, the amalgamated entity resulting from such amalgamation shall continue to be liable for all of the obligations of the amalgamating entities under the Loan Documents);

(b)    any Restricted Subsidiary of Canacol Energy or any other Guarantor may Dispose of all or substantially all of its assets (upon voluntary liquidation, winding up, dissolution or otherwise) to Canacol Energy or to another Restricted Subsidiary of Canacol Energy; *provided* that if the transferor in such a transaction is a Loan Party then the transferee must either be Canacol Energy or another Loan Party.

The Borrower shall provide written notice to the Administrative Agent at least ten Business Days prior to the consummation of any transaction permitted under this Section 7.04 involving any Loan Party. With respect to any such transaction involving a Loan Party, upon request, the Borrower shall deliver to the Administrative Agent as promptly as practicable thereafter (i) legal opinion(s) in form and substance reasonably satisfactory to the Administrative Agent from counsel reasonably acceptable to the Administrative Agent or Loan Parties, as may be applicable, in each relevant jurisdiction(s), addressed to the Administrative Agent and each Lender and dated as of the date on or which such transaction becomes effective (but in any event no later than the date of consummation of such transaction), to the effect that all obligations of the Loan Parties involved, if applicable, hereunder or under any other Loan Document, notwithstanding the effectiveness of such transaction, shall by operation of law or express agreement, continue to be legal, valid and enforceable obligations of the surviving Loan Party (or in the case of an amalgamation, the amalgamated entity resulting from such amalgamation) and covering such other matters relating to the transactions contemplated hereby and by any other Loan Documents as the Administrative Agent may reasonably request, and (ii) certified copies of the articles of incorporation, association or amalgamation, shareholder agreements or declarations and by-laws of such surviving entity (or in the case of an amalgamation, the amalgamated entity resulting from such amalgamation) and of all corporate authority for such entity (including, without limitation, all necessary action of the Board of Directors, shareholders, or other governing body and incumbency certificates) relating to such transaction as well as evidence of compliance with all required formalities under Applicable Law.

Section 7.05    Asset Sales.    Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of damaged, obsolete or worn out Property that is immaterial in nature, whether now owned or hereafter acquired, in the ordinary course of business;

(b)    Dispositions of Hydrocarbons and other Property in the ordinary course of business;

(c)    Dispositions of Property by any Loan Party or any Restricted Subsidiary thereof to another Loan Party or Restricted Subsidiary thereof;

(d)    Dispositions permitted by Section 7.04;

(e)    the sale or other disposition of Oil and Gas Properties to which no proved reserves are attributable (and Equity Interests in Restricted Subsidiaries owning Oil and Gas Properties to which no proved reserves are attributable), including farmouts of undeveloped acreage to which no proved reserves are attributable and assignments in connection with such farmouts;

(f)      Dispositions of Property with a Fair Market Value of less than US$5,000,000 (or the Dollar Equivalent thereof);

(g)      any Disposition or series of Dispositions of any Property or Equity Interest of Canacol Energy or any Restricted Subsidiary thereof, not exceeding, individually or in the aggregate, during any Fiscal Year with other Dispositions actually made pursuant to this Section 7.05(g), 15% of the Consolidated Total Assets;

(h)      an Investment or Restricted Payment not otherwise prohibited by Section 7.06;

(i)      Disposition of Cash Equivalents or goods held for sale in the ordinary course of business;

(j)      the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(k)      Dispositions of assets in a Sale and Leaseback Transaction, if otherwise permitted pursuant to Section 7.02;

(l)      the Incurrence of any Lien permitted by Section 7.02 and the disposition of the asset or Property subject to such Lien;

(m)      Dispositions of equipment, inventory, products, services, accounts receivable or other assets in the ordinary course of business, including in connection with any compromise, settlement or collection of accounts receivable;

(n)      the licensing or sublicensing of intellectual property, including, without limitation, licenses for seismic data, in the ordinary course of business and which do not materially interfere with the business of Canacol Energy and any of its Restricted Subsidiaries;

(o)      surrender or waiver of contract rights or the settlement, release or surrender of contract, tort or other claims of any kind;

(p)      any disposition of Equity Interests in, or Debt or other securities of, an Unrestricted Subsidiary;

(q)      a sale, lease, transfer or other disposition of obsolete, surplus or worn-out equipment or other obsolete assets or other property which is uneconomical and no longer useful for Canacol Energy or any Restricted Subsidiary in the ordinary course of business;

(r)      Dispositions of Oil and Gas Properties in exchange for Oil and Gas Properties; *provided*, that such exchange is made in an arm's-length free market transaction and the Fair Market Value of the Oil and Gas Property received by Canacol Energy or the applicable Restricted Subsidiary is not materially lower than the Fair Market Value of the Oil and Gas Property exchanged by Canacol Energy or such Restricted Subsidiary; and

(s)    any other Disposition but only to the extent that the Loan Parties comply with Section 2.04(c) in respect of such Disposition;

*provided* that any Disposition pursuant to clauses (a) through (g) shall be for Fair Market Value.

Section 7.06    Restricted Payments.  With respect to Canacol Energy, declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so unless the conditions under clauses (a) and (b) below are satisfied:

(a)    at the time of, and after giving effect to, the declaration and the making of the proposed Restricted Payment the following conditions are satisfied:

(i)    no Default or Event of Default has occurred and is continuing or would occur as a result of the proposed Restricted Payment;

(ii)    the Loan Parties are in compliance with Section 7.11; and

(iii)    Canacol Energy has Cash and/or Cash Equivalents equal to or greater than $30,000,000; and

(b)    such Restricted Payment complies with any of clauses (i) to (iii) below:

*(i)*    the aggregate amount of such Restricted Payment and all other Restricted Payments declared or made subsequent to the Closing Date made pursuant to this Section 7.06(b)(i) would not exceed an amount equal to the sum of:

(A) (x) 50%, or (y) 75% solely if the Dividend Step-Up Condition is met at the time of and after giving effect to such Restricted Payment, in each case, of Consolidated Net Income accrued during the period (treated as one accounting period) from July 1, 2018 to the end of the most recent fiscal quarter for which financial statements have been delivered to the Administrative Agent pursuant to Section 6.01 prior to the date of such Restricted Payment (or, in case such Consolidated Net Income will be a deficit, minus 100% of such deficit), *plus*

(B)  the aggregate Net Cash Proceeds and Fair Market Value of any property received by the Borrower from the issue or sale of its Equity Interests (other than Disqualified Stock) or other capital contributions subsequent to the Closing Date (other than Net Cash Proceeds received from an issuance or sale of such Equity Interests to a Restricted Subsidiary of the Borrower); *plus*

(C) (i) the amount of a Guarantee of the Borrower or any Restricted Subsidiary upon the unconditional release in full of the Borrower or such Restricted Subsidiary from such Guarantee if such Guarantee was previously treated as a Restricted Payment; and (ii) in the event that the Borrower or any Restricted Subsidiary makes an Investment in a Person that, as a result of or in connection with such Investment, becomes a Restricted Subsidiary, an amount equal to the Borrower's or such Restricted Subsidiary's existing Investment in such Person; *provided*, that any amount added pursuant

102

to clauses (i) and (ii) of this clause (C) shall not exceed the amount of such Guarantee or Investment previously made and treated as a Restricted Payment and not previously added pursuant to this subparagraph (C); *provided*, *however*, that no amount will be included under this clause (C) to the extent it is already included under clause (A) above; *plus*

(D) the amount by which Debt of the Borrower or any Restricted Subsidiary is reduced on the balance sheet of the Borrower or any Restricted Subsidiary upon the conversion or exchange subsequent to the Closing Date of any such Debt for Equity Interests (other than Disqualified Stock) of the Borrower (less the amount of any cash or the Fair Market Value of other property (other than such Equity Interests) distributed by the Borrower or any Restricted Subsidiary upon such conversion or exchange); *plus*

(E) the amount equal to the net reduction of Investments (other than Permitted Investments) made by the Borrower or any Restricted Subsidiary in any Person resulting from repurchases or redemptions of such Investment by such Person, proceeds realized upon the sale of such Investment, repayments of loans or advances or other transfers of assets (including by way of dividend or distribution) by such Person to the Borrower or any Restricted Subsidiary or the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary or the merger, amalgamation or consolidation of an Unrestricted Subsidiary into any of the Borrower or a Restricted Subsidiary; *provided*, that any amount added pursuant to this clause (E) shall not exceed the amount of such Investment previously made and treated as a Restricted Payment; provided, however, that no amount will be included under this clause (E) to the extent it is already included under clause (A) above; *plus*

(F) US$40,000,000; or

(ii) the repurchase, redemption or other acquisition of any Equity Interests in the Borrower or any direct or indirect parent of the Borrower or any of its Restricted Subsidiaries held by any current or former officer, director, employee or consultant (or their transferees, estates or beneficiaries) of the Borrower or any of its Restricted Subsidiaries pursuant to any equity subscription agreement, shareholder agreement, employment agreement, stock option plan, equity incentive or other plan or similar agreement, in each case in effect as of the Closing Date, in an aggregate amount not to exceed US$40,000,000 (or its equivalent in any other currency) during each Fiscal Year of the Borrower; or

(iii) Restricted Payments (including, without limitation, the purchase, redemption, retirement or otherwise acquisition for value of any Equity Interests of the Borrower held by Persons other than the Borrower or a Restricted Subsidiary) in an aggregate amount which, when taken together with all Restricted Payments made pursuant to this Section 7.06(b)(iii), shall not exceed US$35,000,000 (or its equivalent in any other currency) at any time.

Section 7.07   Change in Line of Business; Etc. (a) Engage in any material line of business substantially different from those lines of business conducted by Canacol Energy and its

Restricted Subsidiaries on the date hereof or any business substantially related or incidental thereto, (b) without giving ten Business Days' prior written notice to the Administrative Agent, change its name or take any other action (other than those permitted hereunder) that could reasonably be expected to adversely affect the priority, perfection or validity of the Liens created by the Loan Documents, (c) change its country of domicile (except as permitted by <u>Section 6.03</u>), (d) make or permit any material change in its accounting policies and/or reporting practices except as required by a change in IFRS or (e) change its Fiscal Year.

Section 7.08    <u>Transactions with Affiliates</u>.  Directly or indirectly: (a) pay any funds to or for the account of any Affiliate, (b) make any Investment in any Affiliate (whether by acquisition of Equity Interests or Debt, by loan, advance, transfer of property, Guaranty or other agreement to pay, purchase or service, directly or indirectly, any Debt or otherwise), (c) Dispose of any Property, tangible or intangible, to or from any Affiliate or (d) participate in, or effect, any transaction with any Affiliate, in each case, involving aggregate consideration in excess of US$5,000,000 (or the Dollar Equivalent thereof), except in the case of <u>clauses (a)</u> through <u>(d)</u> above, on an arm's-length basis for Fair Market Value and *provided* that all of the material terms thereof could have been obtained from a third party that was not an Affiliate. The Borrower shall furnish to the Administrative Agent: (i) a certificate signed by a Responsible Officer of Canacol Energy, no later than ten Business Days following the end of any calendar quarter, with respect to any transactions (or series of related transactions) described in <u>clauses (a)</u> through <u>(d)</u> above with a fair market value between US$10,000,000 and US$20,000,000 (or the Dollar Equivalent thereof) in the aggregate occurring during such calendar quarter and (ii) a report from an Independent Financial Advisor no later than 30 days following the end of any calendar quarter, with respect to any transactions (or series of related transactions) described in <u>clauses (a)</u> through <u>(d)</u> above with a fair market value in excess of US$20,000,000 (or the Dollar Equivalent thereof) in the aggregate occurring during such calendar quarter, in each case certifying the Fair Market Value of such transaction and certifying that each such transaction was conducted on an arm's-length basis and that all of the material terms thereof could also have been obtained from a third party upon similar circumstances, and describing in reasonable detail each such transaction. The provisions of this <u>Section 7.08</u> shall not apply to any transaction between or among Loan Parties and their Restricted Subsidiaries not involving any other Person.

Section 7.09    <u>Organizational Documents; Separateness</u>.

(a)    Amend, modify or otherwise change any of its Organizational Documents in any way that would materially adversely affect the rights and/or remedies of the Lender Parties under the Loan Documents; *provided, however*, that the Permitted Reorganization, shall not be deemed to materially adversely affect the rights and/or remedies of the Lender Parties under the Loan Documents.

(b)    Permit any bank account of any Loan Party or its Subsidiaries to be commingled with any bank account of any other Person.

(c)    Take any action, or conduct its affairs in a manner, that could reasonably be expected to result in its corporate existence being ignored by any court of competent jurisdiction or in their respective assets and/or liabilities being substantively consolidated with

those of any other Person (other than Canacol Energy and its Restricted Subsidiaries) in a bankruptcy, reorganization or other insolvency proceeding.

Section 7.10   Use of Proceeds.

(a)    Use the proceeds of the Loans for any reason other than for the Permitted Uses of such Loans.

(b)    Use the proceeds of the Loans directly or indirectly for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter be in effect or for any purpose which violates or is inconsistent with the provisions of Regulation U or Regulation X of the Board of Governors of the Federal Reserve System of the United States (or any successor).

(c)    Offer or give, directly or indirectly, any part of the proceeds of the Loans to any governmental official or employee, political party official, political party, candidate for political office, official of any public international organization or anyone else acting in an official capacity (each, an "*Official*") in order to obtain, retain or direct business by: (i) influencing any act or decision by such Official, (ii) inducing such Official to act in violation of his, her, or its lawful duty, (iii) securing any improper advantage or (iv) persuading such Official to influence any act or decision of a government or party or public international organization, in each case, in violation of any Applicable Law (including any Foreign Corrupt Practices Laws).

(d)    Utilize the proceeds derived from any transaction contemplated under this Agreement to engage in any transaction, activity or conduct that would violate applicable Anti-Money Laundering Laws and Anti-Terrorism Laws, Foreign Corrupt Practices Laws or Sanctions.

(e)    Use the proceeds outside Switzerland while any Loans are outstanding unless the Swiss Federal Tax Administration has confirmed by way of a tax ruling that any direct or indirect on-lending to a company resident in Switzerland does not result in payments in respect of the Loans becoming subject to withholding or deduction for Swiss withholding tax.

Section 7.11   Financial Covenants.

(a)    Consolidated EBITDAX to Consolidated Interest Expense Ratio. Permit the Consolidated EBITDAX to Consolidated Interest Expense Ratio to be, as of the last day of each Fiscal Quarter, less than 2.50:1.00.

(b)    Consolidated Leverage Ratio.   Permit the Consolidated Leverage Ratio to be, as of the last day of each Fiscal Quarter, greater than 3.50:1.00.

Section 7.12   Sale or Discount of Receivables.   Other than with respect transactions involving the discount or sale of accounts receivables between any of the Loan Parties or any Restricted Subsidiary, discount or sell (with or without recourse) any of its notes receivable or accounts receivable, except for receivables obtained by each of the Loan Parties or any Restricted Subsidiary in the ordinary course of business or the settlement of joint interest billing accounts in the ordinary course of business or discounts granted to settle collection of accounts

receivable or the sale of defaulted accounts arising in the ordinary course of business in connection with the compromise or collection thereof and not in connection with any financing transaction.

Section 7.13 <u>Gas Imbalances, Take or Pay or Other Prepayments</u>.  Permit gas imbalances, take or pay or other prepayments which would require each Loan Party or any of its Restricted Subsidiaries to deliver Hydrocarbons produced from the Oil and Gas Properties at some future time, without then or thereafter receiving full payment therefor, to exceed 12.0% of the aggregate annual production of gas from the Oil and Gas Properties as of the last day of the most recently ended calendar year.

Section 7.14 <u>Burdensome Agreements</u>.   Suffer to exist any consensual encumbrance or restriction on the ability of any such Restricted Subsidiary: (i) to pay, directly or indirectly, dividends or make any other distributions in respect of its Equity Interests or pay any Debt or other obligation owed to any of the Loan Parties; (ii) to make loans or advances to any of the Loan Parties; (iii) to transfer any of its Property to any of the Loan Parties, except for:

(a)     restrictions or encumbrances under the Loan Documents;

(b)     restrictions or encumbrances under Applicable Law;

(c)     restrictions or encumbrances under any document or instrument governing Purchase Money Debt; *provided* that any such restriction contained therein relates only to the asset or assets constructed or acquired in connection therewith;

(d)     any restrictions or encumbrances regarding licenses or sublicenses by the Loan Parties and their Restricted Subsidiaries of intellectual property in the ordinary course of business (in which case such restriction shall relate only to such Intellectual Property);

(e)     customary restrictions, encumbrances or conditions contained in agreements relating to the sale of a Restricted Subsidiary or assets pending such sale; *provided* that such restrictions and conditions apply only to the Restricted Subsidiary or assets that are to be sold and such sale is permitted hereunder;

(f)     customary provisions in leases and other contracts restricting the assignment thereof;

(g)     customary provisions in joint venture agreements and other similar agreements applicable to joint ventures and applicable solely to such joint venture and/or Equity Interests therein;

(h)     restrictions or encumbrances under any document or instrument governing Debt incurred pursuant to any Debt outstanding on the date hereof and listed on <u>Schedule 5.10</u>;

(i)     with respect to any Property acquired from a Person which is merged or amalgamated with or into Canacol Energy or any of its Restricted Subsidiaries, or by reason of any Liens on any property or assets, or relating to or arising under the Debt, of any Person or other entity existing at the time such Person or other entity becomes a Restricted Subsidiary, or any

restriction or encumbrance relating to Debt of any such Person and, in any such case, that is not created as a result of or in connection with or in anticipation of any such transaction, and any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any such encumbrance or restriction, so long as the terms are substantially identical to such encumbrance or restriction (other than with respect to the duration thereof); *provided, however,* that any such Lien created to secure or provide for the payment of any part of the purchase price of such Person shall not be permitted by this clause (i); *provided further*, that such Liens may not extend to any other property owned by Canacol Energy or any of its Restricted Subsidiaries (other than improvements, accessions, upgrades, accessories and products and proceeds in respect of the property subject to such Liens at the time of such acquisition);

(j)     with respect to any property or assets existing at the time of acquisition thereof and which are not created as a result of or in connection with or in anticipation of such acquisition and any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any such encumbrance or restriction, so long as the terms are substantially identical to such encumbrance or restriction (other than with respect to the duration thereof); *provided, however* that any such encumbrance or restriction created to secure or provide for the payment of any part of the purchase price of such Person shall not be permitted by this clause (j); *provided further*, that such encumbrance or restriction may not extend to any other property owned by Canacol Energy or any of its Restricted Subsidiaries;

(k)     in the case of restrictions or encumbrances on the ability of any of Canacol Energy's Restricted Subsidiaries to make loans or advances to Canacol Energy or any other Restricted Subsidiary or to transfer any of its property or assets to Canacol Energy or any other Restricted Subsidiary, restrictions or encumbrances (1) that exist by virtue of any transfer of, agreement to transfer, option or right with respect to, or Lien on, any property or assets of Canacol Energy or any of its Restricted Subsidiaries not otherwise prohibited by this Agreement, (2) that restrict in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license or similar contract, or the assignment or transfer of any such lease, license or other contract or contractual right or (3) contained in mortgages, pledges or other security agreements permitted under this Agreement securing Debt of Canacol Energy or any of its Restricted Subsidiaries to the extent such encumbrances or restrictions restrict the transfer of the property subject to such mortgages, pledges or other security agreements;

(l)     restrictions or encumbrances arising or agreed to in the ordinary course of business, not relating to Debt, and that do not, individually or in the aggregate, detract from the value of the property or assets of Canacol Energy or any of its Restricted Subsidiaries in any manner material to Canacol Energy and its Restricted Subsidiaries;

(m)     restrictions or encumbrances imposed by purchase money obligations for property acquired in the ordinary course of business or by Capital Lease Obligations permitted under this Agreement on the property so acquired, but only to the extent that such encumbrances or restrictions restrict the transfer of the Property;

(n)     restrictions or encumbrances contained in mortgages, pledges or other security agreements permitted under this Agreement securing Debt of the Borrower or a

107

Restricted Subsidiary to the extent such encumbrances or restrictions restrict the transfer of the property subject to such mortgages, pledges or other security agreements;

(o)    restrictions or encumbrances existing on the Closing Date and any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any such encumbrance or restriction, so long as the terms are substantially identical to such encumbrance or restriction (other than with respect to the duration thereof);

(p)    restrictions or encumbrances imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all the Equity Interests or assets of Canacol Energy or any of its Restricted Subsidiaries pending the closing of such sale or disposition; *provided*, that the sale or disposition is permitted under this Agreement; and

(q)    restrictions or encumbrances resulting from restrictions on cash or other deposits or other customary requirements imposed by customers or suppliers under contracts entered into in the ordinary course of business.

Section 7.15    Optional Payments.

(a)    Make or offer to make any optional or voluntary payment, prepayment, repurchase or redemption of, or otherwise optionally or voluntarily defease or segregate funds with respect to any Debt that is junior and subordinate in right of payment to any of the obligations of the Loan Parties under the Loan Documents.

(b)    Amend, modify, waive or otherwise change or consent or agree to any amendment, modification, waiver or other change to, any of the terms of any Debt that is junior and subordinate in right of payment to any of the obligations of the Loan Parties under the Loan Documents in a manner that is adverse to the Lenders and the Administrative Agent in any material respect.

Section 7.16    Canadian Pension Plans.  With respect to Canacol Energy or any of its Subsidiaries or Affiliates, maintain, sponsor, fund or contribute to a Canadian Pension Plan which contains or has ever contained a "defined benefit provision" as defined in subsection 147.1(1) of the Income Tax Act (Canada).

Section 7.17    Funds to Repay Loans.  Permit any part of the funds used in repayment of the Loans to be derived from a transaction with, or proceeds from, a Sanctioned Person or Sanctioned Country.

Section 7.18    Sanctioned Person.  Become a Sanctioned Person and Canacol Energy shall not permit any Person that owns or Controls Canacol Energy to become a Sanctioned Person.

Section 7.19    Repayment of Loans.  Use funds that were the subject of money laundering activities or any other activities unlawful under Applicable Law to make any payments to the Lenders under this Agreement or otherwise make any payment to any Lender hereunder that would cause such Lender to be in violation of any Applicable Law.

Section 7.20   <u>Investment Company Act</u>.  Take (or permit any Subsidiary to take) any action that could reasonably be expected to result in such Loan Party, any other Loan Party or any Subsidiary thereof being required to be registered as an "investment company" under the U.S. Investment Company Act of 1940, as amended.

Section 7.21   <u>Anti-Corruption Laws</u>.  Permit (or permit any other Person acting on its behalf) to corruptly give, offer, pay, promise to pay, or otherwise authorize the payment of, directly or indirectly, any money or anything of value to any Foreign Official for the purpose of influencing any act or decision of such Foreign Official or of such Foreign Official's government, or to secure any improper advantage, for the purpose of obtaining or retaining business for or with, or directing business to, any Person, in each case in violation of any Foreign Corrupt Practices Laws.

Section 7.22   <u>Business Activity in Panama</u>.  The Borrower shall not engage in business activities in Panama nor shall any Loan Party generate income from Panamanian sources, with the exception of interest, financial fees or similar, that are not taxable in the Republic of Panama.

## ARTICLE VIII

## <u>EVENTS OF DEFAULT</u>

Section 8.01   <u>Events of Default</u>.  Each of the following shall be and constitute an "*Event of Default*":

(a)   any Loan Party fails to: (i) pay when and as required to be paid herein, any amount of principal of any Loan or (ii) pay within two or more Business Days after the same becomes due, any interest on any Loan or any other amount whatsoever payable (or to be deposited) under the Loan Documents; or

(b)   any representation or warranty made or deemed made herein or in any other Loan Document (or any amendment or modification hereof or thereof or waiver hereunder or thereunder), made by or on behalf of any Loan Party or in any certificate, financial statement or other document furnished to any Lender or the Administrative Agent pursuant to the provisions hereof or of any other Loan Document (or any amendment or modification hereof or thereof or waiver hereunder or thereunder), shall prove to have been inaccurate or misleading in any material respect (or, in the case of any such representation or warranty under this Agreement or any other Loan Document already qualified by materiality, such representation or warranty shall prove to have been incorrect) on or as of the time made or deemed made; or

(c)   any Loan Party fails to perform or observe any term, covenant or agreement contained in any of <u>Section 2.04</u>, <u>Section 6.01</u>, <u>Section 6.02</u>, <u>Section 6.03(a)</u>, <u>Section 6.05</u>, <u>Section 6.09</u>, <u>Section 10.07</u> or <u>Article VII</u>; or

(d)   any Loan Party fails to perform or observe any other covenant or agreement (not specified in <u>Section 8.01(a)</u> or <u>(c)</u> above) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier to occur of (i) a Responsible Officer of any Loan Party having knowledge thereof or (ii) receipt of notice

to the Borrower thereof by the Administrative Agent (which notice may be requested by any Lender); or

(e)    any Loan Party or any Restricted Subsidiary thereof shall fail to pay any amount or amounts, which individually or in the aggregate, are equal to or greater than US$30,000,000 (or the Dollar Equivalent thereof, if denominated in a currency other than Dollars) when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) under any Debt of any Loan Party or any Restricted Subsidiary thereof (other than Debt under this Agreement and the other Loan Documents), and such failure shall continue after the applicable notice and grace period, if any, specified in the corresponding agreements or instruments; or any other event shall occur or condition shall exist under any agreement or instrument relating to such Debt and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if as a result of such event or condition the holder or holders (or an agent or trustee on its or their behalf) thereof shall have caused or may cause such Debt to become due prior to its scheduled maturity; or

(f)    any Loan Party or any of its Restricted Subsidiaries, shall admit in writing its inability, or fail generally, to pay its debts as they become due; or

(g)    any Loan Party, or any of its Restricted Subsidiaries, shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization, arrangement, adjustment, an adjudication of bankruptcy, insolvency, judicial management, reorganization, administration or relief of debtors or other similar relief under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, including the Debtor Relief Laws, (ii) consent to the institution of any proceeding or petition described in clause (i) hereof, apply for or consent to the appointment of a receiver, receiver-manager trustee, custodian, sequestrator, conservator, administrator, bank liquidator, bank administrator, monitor or similar official for any Person, or for all or any substantial part of its respective assets, (iii) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (iv) make a general assignment for the benefit of creditors; or

(h)    (i) an involuntary proceeding or other proceeding shall be commenced or an involuntary petition shall be filed, in each case seeking liquidation, reorganization, arrangement, adjustment, an adjudication of bankruptcy, insolvency, judicial management, reorganization, administration or relief of debtors or other similar relief in respect of any Loan Party, any of its Restricted Subsidiaries, or any of its debts, or of a substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, including the Debtor Relief Laws, or (ii) the appointment of a receiver, receiver-manager, trustee, custodian, sequestrator, conservator, administrator, bank liquidator, bank administrator, monitor or similar official for any Loan Party or any of its Restricted Subsidiaries, or for a substantial part of their respective assets, shall have been entered and, in any such case described in clause (i) or (ii) hereof, such proceeding or petition shall continue undismissed or shall be not stayed for a period of 60 or more days; or

(i)    one or more final judgment(s), order(s), decree(s), award(s), settlement(s) and/or agreement(s) to settle (including any relating to any arbitration) for the payment of money in an aggregate amount in excess of US$30,000,000 (or the Dollar Equivalent

thereof) shall be rendered by one or more courts, administrative tribunals or other bodies against any Loan Party or any of its Restricted Subsidiaries, with respect to any single or related series of transactions, incidents or conditions, and such judgment(s) shall not have been paid, vacated or discharged in full within the time required by the terms of such judgment; or

(j)    any non-monetary judgment, order, decree, award, settlement or agreement to settle (including any relating to any arbitration) is rendered against or agreed by any Loan Party or any of its Restricted Subsidiaries that (in the aggregate) has had or could reasonably be expected to have a Material Adverse Effect, and a stay of execution thereof shall not be obtained within 60 days from the date of entry or agreement thereof; or

(k)    any Governmental Authority shall: (i) by imposition of moratorium laws or exchange controls that affect the making of payments in Dollars that would be applicable to the Loans or (ii) take any other action (including imposition of restrictions on currency convertibility or transfer) that, in the case of the foregoing in the aggregate, has had or could reasonably be expected to have a Material Adverse Effect or purports to render any of the Loan Documents invalid or unenforceable or to prevent or materially delay the performance or observance by any Loan Party of its obligations thereunder, and such action shall continue for 45 or more consecutive days; or

(l)    an ERISA Event with respect to any Loan Party shall have occurred that, when taken together with all other ERISA Events that have occurred with respect to any Loan Party, results in a Material Adverse Effect; or

(m)    a Canadian Pension Plan Event shall have occurred that results in a Material Adverse Effect; or

(n)    any Governmental Authority shall condemn, seize, nationalize or appropriate any substantial portion of the property of any Loan Party or any of its Restricted Subsidiaries (either with or without payment of compensation), or any Loan Party or any of its Restricted Subsidiaries shall be prevented by Applicable Law from exercising normal control over all or a substantial part of their property (and the same shall continue for 30 or more days); or

(o)    (i) the validity or enforceability of any Loan Document shall be contested in writing by any Loan Party or any of its Subsidiaries, in such a way so as to render any material provision of any such Loan Document invalid or unenforceable or to purport to delay the performance or observance by any Loan Party or any of its Subsidiaries of any of its obligations under any Loan Document, or (ii) any of the Loan Documents shall at any time after their respective execution and delivery cease to be in full force and effect for any reason other than as expressly permitted hereunder or thereunder; or

(p)    the occurrence of a Change in Control or a Key-Man Event; or

(q)    any of the Loan Parties, their Subsidiaries, directors, senior executives (including *administradores* as such term is defined pursuant to Colombian Law No. 222 of 1995, as amended from time to time), any of the shareholders of the Loan Parties (or with respect to the Borrower, any of the Persons that Controls the Borrower): (i) becomes a Sanctioned Person; or (ii) (w) is prosecuted for, (x) confesses to, (y) is indicted for, or (z) is convicted for, any

111

violation of Anti-Money Laundering Laws and Anti-Terrorism Laws, Foreign Corrupt Practices Laws, Applicable Laws relating to Sanctions, drug trafficking, terrorism, kidnapping, money laundering, financing of terrorism, funding of support of terrorist activities, corruption or crimes against the public administration; provided that no Event of Default pursuant to Section 8.01(q)(i) with respect to the directors or senior executives of the Loan Parties shall be deemed to have occurred if, within 20 Business Days after any such Loan Party obtains knowledge thereof, the Loan Parties shall remove the applicable director or senior executive from all its positions within the Loan Parties; provided further, that no Event of Default pursuant to Section 8.01(q)(ii) shall be deemed to have occurred if, within 30 Business Days after any such Loan Party obtains knowledge thereof, (A) the Loan Parties shall remove the applicable director or senior executive from all its positions within the Loan Parties, or (B) as applicable to Persons that Control the Borrower, such Person ceases to Control the Borrower.

Section 8.02    Remedies upon Event of Default.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may with the consent of, the Required Lenders, take any or all of the following actions:

(a)    declare the Commitment of each Lender to make Loans to be terminated, whereupon such Commitments shall be terminated;

(b)    declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and to the extent applicable, and all other amounts owing or payable hereunder or under any other Loan Document, to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by each Loan Party; and/or

(c)    exercise on behalf of itself and the Lenders any or all rights and remedies available to it and the Lenders under the Loan Documents;

*provided* that in the case of an Event of Default of the kind referred to in Section 8.01(f), (g), (h) or (p), the obligation of each Lender to make Loans shall automatically terminate, and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

Notwithstanding anything to the contrary set forth herein, the declaration of an Event of Default referred to in Section 8.01(f), (g), or (h) shall not: (i) prevent the commencement of a proceeding under Law 1116 of 2006 ("*Law 1116*") or any particular insolvency regime that would be applicable in Colombia, or the filing of a petition in Colombia to commence a proceeding under Law 1116 with respect to any Colombian branch or Subsidiary of a Loan Party, whether in a voluntary or involuntary manner; (ii) be construed to mean that the purpose of such Section is to prevent or create obstacles to prevent, directly or indirectly, that proceedings be commenced in Colombia under Law 1116 with respect to any Colombian branch or Subsidiary of a Loan Party; (iii) prohibit any Colombian branch or Subsidiary of a Loan Party from negotiating or entering into a restructuring agreement under Law 1116; or (iv) impose any restrictions or prohibitions, or unfavorable effects (*efectos desfavorables*) upon any Colombian branch or Subsidiary of a Loan Party for the negotiation or execution of a restructuring agreement under Law 1116.

# ARTICLE IX

# AGENCY

Section 9.01   <u>Appointment and Authority</u>.   Each of the Lenders irrevocably appoints Deutsche Bank Trust Company Americas to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to it by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders (and their respective successors and permitted assigns), and neither the Borrower nor any other Loan Party shall have rights as a third-party beneficiary of any of such provisions.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any Applicable Law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. The Administrative Agent or its respective affiliates shall not be responsible to any Lender for any recitals, statements, representations or warranties made by any Loan Party, Lender Party or any of their respective successors or assigns contained in this Agreement or any other Loan Document referred to or provided for in, or received by the Administrative Agent or any Lender under, this Agreement or any other Loan Document or in any certificate or other document referred to or provided for in, or received by the Administrative Agent or any Lender under this Agreement or any other Loan Document, for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement, the Notes, any other Loan Document or any other document referred to or provided for herein or for any failure by the Borrower or any Affiliate thereof to perform its obligations hereunder or thereunder.

Section 9.02   <u>Rights as a Lender</u>.   With respect to any Commitment and Loan made by it, the Person serving as the Administrative Agent (and its successors and permitted assigns) shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity.  The Administrative Agent and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 9.03   <u>Exculpatory Provisions</u>.

(a)   The Administrative Agent shall not have any duties or obligations except those expressly set forth in this Agreement and in the other Loan Documents.  Without limiting the generality of the foregoing, the Administrative Agent:

(i)        shall not by reason of this Agreement or any other Loan Document be a trustee or fiduciary for any Lender Party, regardless of whether a Default has occurred and is continuing;

(ii)        [Reserved]

(iii)        [Reserved]

(iv)        shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Loan Party or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

This Section 9.03(a) is intended solely for the benefit of the Administrative Agent and its respective successors and permitted assigns and is not intended to, and will not entitle, the other parties to this Agreement to any defense, claim or counterclaim, or confer any rights or benefits on any other party to this Agreement.

(b)        (i) The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 8.02 and Section 11.04) and (ii) the Administrative Agent shall not be liable for any action taken or not taken by it in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by final and non-appealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to a responsible officer of the Administrative Agent with direct responsibility for the administration of the Loan Documents in writing by the Borrower or a Lender.

(c)        The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into: (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

(d)        The Administrative Agent shall not be accountable for the use or application by any Person of disbursements properly made by the Administrative Agent in conformity with the provisions of the Loan Documents or of the proceeds of Loans or other monies received from the Loan Parties.

(e)        The Administrative Agent shall have no responsibility for interest or income on any funds held under the Loan Documents.

(f)        Whether or not explicitly set forth therein, the rights, powers, protections, immunities and indemnities granted to the Administrative Agent herein shall apply to any document entered into the Administrative Agent in connection with its role as Administrative Agent under the Loan Documents.  Each Lender authorizes and directs the Administrative Agent to enter into (a) this Agreement and the other Loan Documents to which it is a party on the date hereof on behalf of and for the benefit of such Persons, and (b) such other documents as may be required to be entered into by the Administrative Agent in connection with the performance of its role as Administrative Agent under the Loan Documents.

(g)        The Administrative Agent shall never be required to use, risk or advance its own funds or otherwise incur financial liability in the performance of any of its duties or the exercise of any of its rights and powers under the Loan Documents. In no event shall the Administrative Agent be liable, directly or indirectly, for any special, indirect, punitive or consequential damages (including without limitation lost profits), even if such Person has been advised of the possibility of such damages and regardless of the form of action. The Administrative Agent shall not be responsible for delays or failures in performance resulting from acts beyond its control. Such acts shall include, but not be limited to, acts of God, strikes, lockouts, riots, acts of war, pandemics, epidemics, governmental regulations superimposed after the fact, fire, communication line failures, computer viruses, power failures, earthquakes, terrorist attacks or other disasters or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility.

(h)        Delivery of reports, documents and other information to the Administrative Agent is for informational purposes only and the Administrative Agent's receipt of the foregoing shall not constitute constructive knowledge of any event or circumstance or any information contained therein or determinable from information contained therein. Information contained in notices, reports or other documents delivered to the Administrative Agent and other publicly available information shall not constitute actual or constructive knowledge.  Knowledge of or notices or other documents delivered to Deutsche Bank Trust Company Americas in any capacity shall not constitute knowledge of or delivery to Deutsche Bank Trust Company Americas in any other capacity under the Loan Documents or to any affiliate or other division of Deutsche Bank Trust Company Americas, and information actually known by Deutsche Bank Trust Company Americas, acting in any capacity other than as the Administrative Agent, shall not be attributed or imputed to the Administrative Agent.

(i)        In each instance where the Administrative Agent is required to forward reports, documents or other information to the Lenders, it shall be sufficient for the Administrative Agent to make such report, document or other information available on SyndTrak, DXSyndicate™, Intralinks, Debtdomain, FirmEx or any similar website, and such information shall be deemed delivered upon posting.

(j)        In connection with the delivery of any information to the Administrative Agent by any other Person to be used in connection with the preparation or distribution of calculations or reports, the Administrative Agent is entitled to conclusively rely on the accuracy of any such information and shall not be required to investigate or reconfirm its accuracy and shall not be liable in any manner whatsoever for any errors, inaccuracies or incorrect information resulting from the use of this information.

(k)     The Administrative Agent shall not be responsible or liable for (i) the environmental condition or any contamination of, or Release of Hazardous Materials on, at, to, or from, any property owned or operated by any Loan Party or any of its Subsidiaries or for any diminution in value of a property as a result of any contamination of such site by any Hazardous Material, or (ii) any claims by or on behalf of the Borrower or the Lenders or any other Person arising from contamination of a property owned or operated by any Loan Party or any of its Subsidiaries by any Hazardous Material, and shall have no duty or obligation to assess the environmental condition of a property or with respect to compliance of such property under Environmental Laws or applicable permits issued thereunder.

(l)     The Administrative Agent shall not be under any obligation to effect or maintain insurance or to renew any policies of insurance or to inquire as to the sufficiency of any policies of insurance carried by the Borrower, or to report, or make or file claims or proof of loss for, any loss or damage insured against or that may occur, or tokeep itself informed or advised as to the payment of any taxes or assessments, or to requireany such payment to be made.

(m)     Notwithstanding anything else to the contrary herein, whenever reference is made in this Agreement to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communication from, or other direction given or action to be undertaken or to be (or not to be) suffered or omitted by the Administrative Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by the Administrative Agent, it is understood that in all cases the Administrative Agent shall be fully justified in failing or refusing to take any such action under this Agreement if it shall not have received such written instruction, advice or concurrence of the Required Lenders or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents or any agreement to which the Lenders and the Administrative Agent  is a party and acting in accordance with such documents (such Lenders being referred to herein as the "Relevant Lenders"), as the Administrative Agent deems appropriate. Upon receipt of such written instruction, advice or concurrence from the Relevant Lenders, the Administrative Agent shall take such discretionary actions in accordance with such written instruction, advice or concurrence; *provided* that, the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or Applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law. This provision is intended solely for the benefit of the Administrative Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

Section 9.04    <u>Reliance by the Administrative Agent</u>.

(a)     The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person(s). The Administrative Agent also may rely upon

116

any statement made to it orally or by telephone and believed by it to have been made by the proper Person(s), and shall not incur any liability for relying thereon.

(b)     In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.

(c)     The Administrative Agent may consult with legal counsel (who may, but need not, be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 9.05    Delegation of Duties.  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.   The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the Loans as well as activities as Administrative Agent.  The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and non-appealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Section 9.06    Resignation or Removal of the Administrative Agent.

(a)     The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower, and the Administrative Agent may be removed by the Required Lenders if there is a material breach by the Administrative Agent of any of its duties or obligations hereunder or under any other Loan Documents.  Upon receipt of any such notice of resignation or removal, as the case may be, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in a G-7 Country or Switzerland or an Affiliate of any such bank with an office in a G-7 Country or Switzerland.  If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation or the Required Lenders' removal of the retiring Administrative Agent, as the case may be (or such earlier day as shall be agreed by the Required Lenders) (the "*Resignation Effective Date*"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above or petition a court of competent jurisdiction to appoint a successor Administrative Agent for all purposes under the Loan Documents and the appointment of such successor Administrative Agent shall be binding on all parties. The costs and expenses (including its attorney's fees and expenses) incurred by the Administrative Agent in connection with such proceeding shall be paid by the Borrower. Notwithstanding the foregoing, whether or not a

117

successor has been appointed, such resignation or removal shall become effective in accordance with such notice on the Resignation Effective Date.

(b)     With effect from the Resignation Effective Date: (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above.  Upon the acceptance of a successor's appointment as the Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring or removed Administrative Agent, and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents if not already discharged in accordance with the provisions of this Section 9.06.  The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Sections 2.08 and 11.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (i) while the retiring or removed Administrative Agent was acting as Administrative Agent, and (ii) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

(c)     Any Person into which the Administrative Agent may be merged or converted or with which it may be consolidated, or any Person resulting from any merger, conversion or consolidation to which the Administrative Agent shall be a party, or any Person succeeding to the business of the Administrative Agent shall be the successor of the Administrative Agent without the execution or filing of any paper with any party hereto or any further act on the part of any of the parties hereto, except where an instrument of transfer or assignment is required by law to effect such succession, anything herein to the contrary notwithstanding.

Section 9.07    Non-Reliance on Administrative Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 9.08    Arrangers.  Anything herein to the contrary notwithstanding, no Arranger shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity as the Administrative Agent or a Lender hereunder.

Section 9.09    <u>Administrative Agent may File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)    Acting at the direction of the Required Lenders, to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due to the Lenders and the Administrative Agent under <u>Sections 2.08</u> and <u>11.03</u>) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Sections 2.08</u> and <u>11.03</u>.

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize the Administrative Agent to vote in respect of the claim of any Lender or in any such proceeding.

Section 9.10    <u>Indemnification</u>.    The Lenders agree to indemnify the Administrative Agent (to the extent not reimbursed under <u>Section 11.03</u>, but without limiting the obligations of the Borrower under <u>Section 11.03</u>) ratably in accordance with the aggregate principal amount of the Loans held by the Lenders, for any and all losses, liabilities, claims, obligations, damages or expenses (including the fees and disbursements of counsel) incurred by it arising out of or by reason of any investigation in any way relating to or arising out of this Agreement or any other Loan Documents to which the Administrative Agent is a party or the transactions contemplated hereby (including the costs and expenses that the Borrower is obligated to pay under <u>Section 11.03</u>, but excluding, other than additional administrative costs and expenses resulting from a Default or Event of Default, normal administrative costs and expenses incident to the performance of its agency duties hereunder) or the enforcement of any of the terms hereof or of any such other documents; *provided* that no Lender shall be liable for any of the foregoing to the extent that it arises solely from the gross negligence or willful misconduct of the Administrative Agent as determined by a final, non-appealable judgment by a court of competent jurisdiction.  In no event shall any Lender be liable to the Administrative Agent for any punitive or consequential

damages in connection with any of the Loan Documents. The obligations of the Lenders under this <u>Section 9.10</u> shall survive the termination of this Agreement, the repayment of the Loans and/or the earlier resignation or removal of the Administrative Agent.

Section 9.11   <u>Erroneous Payment</u>.

(a)   If the Administrative Agent (x) notifies a Lender, or any Person who has received funds on behalf of a Lender (any such Lender or other recipient (and each of their respective successors and assigns), a "<u>Payment Recipient</u>") that the Administrative Agent has determined in its reasonable discretion (whether or not after receipt of any notice under immediately succeeding <u>clause (b)</u>) that any funds (as set forth in such notice from the Administrative Agent) received by such Payment Recipient from the Administrative Agent or any of its Affiliates were erroneously or mistakenly transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Lender or other Payment Recipient on its behalf) (any such funds, whether transmitted or received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise, individually and collectively, an "<u>Erroneous Payment</u>") and (y) demands in writing the return of such Erroneous Payment (or a portion thereof), such Erroneous Payment shall at all times remain the property of the Administrative Agent pending its return or repayment as contemplated below in this <u>Section 9.11</u> and held in trust for the benefit of the Administrative Agent, and such Lender shall (or, with respect to any Payment Recipient who received such funds on its behalf, shall cause such Payment Recipient to) promptly, but in no event later than two Business Days thereafter (or such later date as the Administrative Agent may, in its sole discretion, specify in writing), return to the Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made, in same day funds (in the currency so received), together with interest thereon (except to the extent waived in writing by the Administrative Agent) in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to the Administrative Agent in same day funds at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect. A notice of the Administrative Agent to any Payment Recipient under this <u>clause (a)</u> shall be conclusive, absent manifest error.

(b)   Without limiting immediately preceding <u>clause (a)</u>, each Lender or any Person who has received funds on behalf of a Lender (and each of their respective successors and assigns), agrees that if it receives a payment, prepayment or repayment (whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise) from the Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in this Agreement or in a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by the Administrative Agent (or any of its Affiliates), or (z) that such Lender or other such recipient, otherwise becomes aware was transmitted, or received, in error or by mistake (in whole or in part), then in each such case:

(i)   it acknowledges and agrees that (A) in the case of immediately preceding <u>clauses (x)</u> or <u>(y)</u>, an error and mistake shall be presumed to have

been made (absent written confirmation from the Administrative Agent to the contrary) or (B) an error and mistake has been made (in the case of immediately preceding clause (z)), in each case, with respect to such payment, prepayment or repayment; and

(ii)    such Lender shall use commercially reasonable efforts to (and shall use commercially reasonable efforts to cause any other recipient that receives funds on its respective behalf to) promptly (and, in all events, within one Business Day of its knowledge of the occurrence of any of the circumstances described in immediately preceding clauses (x), (y) and (z)) notify the Administrative Agent of its receipt of such payment, prepayment or repayment, the details thereof (in reasonable detail) and that it is so notifying the Administrative Agent pursuant to this Section 9.11(b).

For the avoidance of doubt, the failure to deliver a notice to the Administrative Agent pursuant to this Section 9.11(b) shall not have any effect on a Payment Recipient's obligations pursuant to Section 9.11(a) or on whether or not an Erroneous Payment has been made.

(c)    Each Lender hereby authorizes the Administrative Agent to set off, net and apply any and all amounts at any time owing to such Lender under any Loan Document, or otherwise payable or distributable by the Administrative Agent to such Lender under any Loan Document with respect to any payment of principal, interest, fees or other amounts, against any amount that the Administrative Agent has demanded to be returned under immediately preceding clause (a).

(d)

(i)    (In the event that an Erroneous Payment (or portion thereof) is not recovered by the Administrative Agent for any reason, after demand therefor in accordance with immediately preceding clause (a), from any Lender that has received such Erroneous Payment (or portion thereof) (and/or from any Payment Recipient who received such Erroneous Payment (or portion thereof) on its respective behalf) (such unrecovered amount, an "Erroneous Payment Return Deficiency"), upon the Administrative Agent's notice to such Lender at any time, then effective immediately (with the consideration therefor being acknowledged by the parties hereto), (A) such Lender shall be deemed to have assigned its Advances (but not its Commitments ) with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Class") in an amount equal to the Erroneous Payment Return Deficiency (or such lesser amount as the Administrative Agent may specify) (such assignment of the Advances (but not Commitments) of the Erroneous Payment Impacted Class, the "Erroneous Payment Deficiency Assignment") (on a cashless basis and such amount calculated at par plus any accrued and unpaid interest (with the assignment fee to be waived by the Administrative Agent in such instance)), and is hereby (together with the Borrower) deemed to execute and deliver an Assignment and Assumption Agreement with respect to such Erroneous Payment Deficiency Assignment, and such Lender shall deliver any Notes evidencing such Advances to the Borrower or the Administrative Agent (but the failure of such Person to deliver any such Notes shall not affect the effectiveness of the foregoing assignment), (B) the Administrative Agent as the assignee Lender shall be deemed to have acquired the Erroneous Payment Deficiency Assignment, (C) upon such deemed acquisition, the

Administrative Agent as the assignee Lender shall become a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment and the assigning Lender shall cease to be a Lender, as applicable, hereunder with respect to such Erroneous Payment Deficiency Assignment, excluding, for the avoidance of doubt, its obligations under the indemnification provisions of this Agreement and its applicable Commitments which shall survive as to such assigning Lender, (D) the Administrative Agent and the Borrower shall each be deemed to have waived any consents required under this Agreement to any such Erroneous Payment Deficiency Assignment, and (E) the Administrative Agent will reflect in the Register its ownership interest in the Advances subject to the Erroneous Payment Deficiency Assignment. For the avoidance of doubt, no Erroneous Payment Deficiency Assignment will reduce the Commitments of any Lender and such Commitments shall remain available in accordance with the terms of this Agreement.

(ii)    Subject to Section 11.03 (but excluding, in all events, any assignment consent or approval requirements (whether from the Borrower or otherwise)), the Administrative Agent may, in its discretion, sell the Advances acquired pursuant to an Erroneous Payment Deficiency Assignment and upon receipt of the proceeds of such sale, the Erroneous Payment Return Deficiency owing by the applicable Lender shall be reduced by the net proceeds of the sale of the Advances (or portion thereof), and the Administrative Agent shall retain all other rights, remedies and claims against such Lender (and/or against any recipient that receives funds on its respective behalf). In addition, an Erroneous Payment Return Deficiency owing by the applicable Lender (x) shall be reduced by the proceeds of prepayments or repayments of principal and interest, or other distribution in respect of principal and interest, received by the Administrative Agent on or with respect to the Advances acquired from such Lender pursuant to an Erroneous Payment Deficiency Assignment (to the extent that the Advances are then owned by the Administrative Agent) and (y) may, in the sole discretion of the Administrative Agent, be reduced by any amount specified by the Administrative Agent in writing to the applicable Lender from time to time.

(e)    The parties hereto agree that (x) irrespective of whether the Administrative Agent may be equitably subrogated, in the event that an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, the Administrative Agent shall be subrogated to all the rights and interests of such Payment Recipient (and, in the case of any Payment Recipient who has received funds on behalf of a Lender to the rights and interests of such Lender) under the Loan Documents with respect to such amount (the "Erroneous Payment Subrogation Rights") (provided that the Borrower's obligations under the Loan Documents in respect of the Erroneous Payment Subrogation Rights shall not be duplicative of such obligations in respect of any Advances that have been assigned to the Administrative Agent under an Erroneous Payment Deficiency Assignment) and (y) an Erroneous Payment shall not pay, prepay, repay, discharge or otherwise satisfy any obligations owed by the Borrower; provided that this Section 9.11(e) shall not be interpreted to increase (or accelerate the due date for), or have the effect of increasing (or accelerating the due date for), the obligations of the Borrower relative to the amount (and/or timing for payment) of the obligations that would have been payable had such Erroneous Payment not been made by the Administrative Agent; provided, further, that for the avoidance of doubt,

immediately preceding clauses (x) and (y) shall not apply to the extent any such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by the Administrative Agent from the Borrower for the purpose of making such Erroneous Payment.

(f)    To the extent permitted by applicable law, no Payment Recipient shall assert any right or claim to an Erroneous Payment, and hereby waives, and is deemed to waive, any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by the Administrative Agent for the return of any Erroneous Payment received, including, without limitation, waiver of any defense based on "discharge for value" or any similar doctrine.

(g)    Each party's obligations, agreements and waivers under this <u>Section 9.11</u> shall survive the resignation or replacement of the Administrative Agent, any transfer of rights or obligations by, or the replacement of, a Lender, the termination of the Commitments and/or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

# ARTICLE X

## GUARANTY

Section 10.01  <u>Guaranty</u>.

(a)    For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each Guarantor jointly and severally (*de manera solidaria*) hereby unconditionally and irrevocably Guaranties the full and punctual payment and performance (whether at stated maturity, upon acceleration or otherwise) of all Obligations, in each case as primary obligor and not merely as surety and with respect to all such obligations howsoever created, arising or evidenced, whether direct or indirect, absolute or contingent, now or hereafter existing, or due or to become due. This is a Guaranty of payment and not merely of collection.

(b)    All payments made by each Guarantor under this <u>Article X</u> shall be payable on demand in the manner required for payments by the Borrower hereunder, including: (i) the obligation to make all such payments in Dollars, free and clear of, and without deduction for, any Taxes (other than Excluded Taxes) and the obligations set out in <u>Article III</u> of this Agreement, (ii) the obligation to pay interest at the Default Rate until such time as the subject Event of Default is cured or waived and (iii) the obligation to pay all amounts due under the Loans in Dollars.

Section 10.02  <u>Guaranty Unconditional</u>.  The obligations of each Guarantor under this <u>Article X</u> shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligation(s) of any Loan Party under the Loan Documents and/or any Commitment(s) under the Loan Documents, by operation of law or otherwise (other than with respect to any such extension, renewal, settlement, waiver or release agreed in

accordance with the terms hereunder as expressly applying to the obligations of each Guarantor under this <u>Article X</u>);

(b)    any modification or amendment of or supplement to this Agreement or any other Loan Document (other than with respect to any modification, amendment or supplement agreed in accordance with the terms hereunder as expressly applying to the obligations of each Guarantor under this <u>Article X</u>);

(c)    any change in the ownership, control, name, objects, businesses, assets, capital structure or constitution of the Lenders, the Administrative Agent, the Borrower, or any other Loan Party, or any reorganization (whether by way of reconstruction, consolidation, amalgamation, merger, transfer, sale, lease or otherwise) of the Lenders, the Administrative Agent, the Borrower, any other Loan Party, or their respective businesses;

(d)    the existence of any claim, set-off or other rights that any Guarantor may have at any time against any Loan Party, any Lender Party or any other Person, whether in connection herewith or with any unrelated transactions;

(e)    any invalidity or unenforceability relating to or against any Loan Party for any reason of any Loan Document, or any provision of Applicable Law purporting to prohibit the performance by any Loan Party of any of its obligations under the Loan Documents (other than any such invalidity or unenforceability with respect solely to the obligations of each Guarantor under this <u>Article X</u>);

(f)    any other act or omission to act or delay of any kind by any Loan Party, any Lender Party or any other Person or any other circumstance whatsoever that might, but for the provisions of this <u>Section 10.02</u>, constitute a legal or equitable discharge of the obligations of any Loan Party under the Loan Documents.

Section 10.03    <u>Discharge Only Upon Payment in Full; Reinstatement in Certain Circumstances</u>.  The obligations of each Guarantor hereunder shall remain in full force and effect until all of the Borrower's Obligations under the Loan Documents shall have been paid or otherwise performed in full and all of the Commitments shall have terminated.  If at any time any payment made under this Agreement or any other Loan Document is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization or similar event of any Loan Party or any other Person or otherwise, then the obligations of such Guarantor hereunder with respect to such payment shall be reinstated at such time as though such payment had been due but not made at such time.

Section 10.04    <u>Waiver by Each Guarantor</u>.  Each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law: (a) notice of acceptance of the Guaranty provided in this <u>Article X</u> and notice of any liability to which this Guaranty may apply, (b) all notices that may be required by Applicable Law or otherwise to preserve intact any rights of any Lender Party against any Loan Party, including any demand, presentment, protest, proof of notice of non-payment, notice of any failure on the part of any Loan Party to perform and comply with any covenant, agreement, term, condition or provision of any agreement and any other notice to any other party that may be liable in respect of the obligations guaranteed hereby

(including any Loan Party) except any of the foregoing as may be expressly required hereunder, (c) any right to the enforcement, assertion or exercise by the Administrative Agent or any Lender Party of any right, power, privilege or remedy conferred upon such Person under the Loan Documents or otherwise, and (d) any requirement that any Lender Party exhaust any right, power, privilege or remedy, or mitigate any damages resulting from a default, under any Loan Document, or proceed to take any action against any Loan Party or any other Person under or in respect of any Loan Document or otherwise. Without limiting the generality of the foregoing, each Guarantor hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, all rights and benefits set forth in, but not limited to, in regards to (i) any Guarantor organized under the laws of Colombia, the excussion (*beneficio de excusión*) in the terms of articles 2383 and 2384 of the Colombian Civil Code and (ii) any Guarantor organized under the laws of Panama, domicile (*domicilio*), division (division), priority (*orden*), excussion (*beneficio de excusion*), presentation (*presentacion*), protest (*protesto*), any notice of having disregarded any document covered by this guarantee, and any future requirement in the event of late payment (mora). Further, each Guarantor organized under the laws of Panama irrevocably and unconditionally waives its right to require the Borrower to release such Panamanian Guarantor from this guarantee if: (x) the Borrower is less Solvent than it was as of the date hereof, (y) the Debt under this Agreement becomes due and payable; or (z) five (5) years have passed since the issuance of the Guarantee that has been contracted indefinitely.

Section 10.05 <u>Subrogation</u>.  Upon a Guarantor making any payment under this <u>Article X</u>, such Guarantor shall be subrogated to the rights of the payee against the Borrower with respect to such obligation; *provided* that such Guarantor shall not enforce any payment by way of subrogation, indemnity, contribution or otherwise, or exercise any other right, against any Loan Party (or otherwise benefit from any payment or other transfer arising from any such right) so long as any obligations under the Loan Documents (other than on-going but not yet incurred indemnity obligations) remain unpaid and/or unsatisfied.

Section 10.06 <u>Stay of Acceleration</u>.  If acceleration of the time for payment of any amounts payable under the Loan Documents is stayed due to any event described in <u>Section 8.01(f)</u>, <u>(g)</u> or <u>(h)</u>, then all such amounts otherwise subject to acceleration under this Agreement shall nonetheless be payable by each Guarantor hereunder immediately upon demand by the Administrative Agent.

Section 10.07 <u>Additional Guarantors</u>.

(a)    From time to time any one or more Restricted Subsidiaries of Canacol Energy (other than the Loan Parties) (each, an "*Additional Guarantor*") may, upon written notice to the Administrative Agent and each Lender, become a Guarantor hereunder by delivering to the Administrative Agent a Joinder Agreement, substantially in the form of <u>Exhibit J</u> (a "*Joinder Agreement*"), duly executed by such Additional Guarantor or Additional Guarantors, as applicable; *provided* that in the case of each Additional Guarantor or Additional Guarantors, as applicable, that become a Guarantor pursuant to this <u>Section 10.07(a)</u>, each such Additional Guarantor or Additional Guarantors, as applicable, shall deliver to the Administrative Agent simultaneously with the Joinder Agreement, (i) upon request of the Administrative Agent in writing, a legal opinion addressed to the Administrative Agent and each Lender and issued by a counsel to such Additional Guarantor or Additional Guarantors, as applicable, in each relevant jurisdiction

reasonably acceptable to the Administrative Agent and the Lenders, covering such matters relating to the applicable Joinder Agreement and the transactions contemplated hereby and thereby as the Administrative Agent and the Lenders may reasonably request and (ii) upon request of the Administrative Agent or any Lender in writing, such documentation and evidence as is reasonably requested by the Administrative Agent or any such requesting Lender in order for the Administrative Agent or such Lender to carry out all necessary "know your customer" or other checks in relation to the identity of the Additional Guarantor that it is required to carry out in relation to the transactions contemplated in the Loan Documents. The execution and delivery of any Joinder Agreement shall not require the consent of any other Loan Party hereunder. The rights and obligations of each Loan Party hereunder shall remain in full force and effect notwithstanding any Additional Guarantor becoming a party to this Agreement.

(b)    If, as of the last day of any Fiscal Year (for purposes of this Section 10.07(b), the "*reference date*"), (i) the EBITDAX of the Guarantors as of the reference date, for the Rolling Period (determined on a Combined basis in accordance with IFRS), represents less than 90% of the Consolidated EBITDAX for such Rolling Period, (ii) the sales of the Guarantors as of the reference date, for such Rolling Period (determined on a Combined basis in accordance with IFRS), represent less than 90% of the Consolidated sales of Canacol Energy and its Subsidiaries for such Rolling Period or (iii) the total assets of the Guarantors as of the reference date (determined on a Combined basis in accordance with IFRS) represent less than 90% of the Consolidated Total Assets as of the reference date, Canacol Energy shall, at its sole cost and expense, within the earlier of (x) 90 days following such reference date, and (y) ten days following the date on which audited financial statements of Canacol Energy for the Fiscal Year ended on such reference date are actually delivered (or otherwise made available) pursuant to Section 5.07 to the Administrative Agent, cause one or more of its Subsidiaries to become Additional Guarantor(s) hereunder, by executing and delivering to the Administrative Agent a Joinder Agreement in accordance with Section 10.07(a), so that, (A) the EBITDAX of such Additional Guarantors together with the EBITDAX of the Guarantors party to this Agreement as of the reference date, in each case, for such Rolling Period (determined on a Combined basis), represents at least 90% of the Consolidated EBITDAX for such Rolling Period, (B) the sales of such Additional Guarantors together with the sales of the Guarantors party to this Agreement as of the reference date, in each case, for such Rolling Period (determined on a Combined basis), represent at least 90% of the Consolidated sales of Canacol Energy and its Subsidiaries for such Rolling Period and (C) the total assets of such Additional Guarantors together with the total assets of the Guarantors party to this Agreement as of the reference date, in each case (determined on a Combined basis), represent at least 90% of the Consolidated Total Assets as of such reference date. As used in this Section 10.07(b), the term "*EBITDAX*" with respect to any Person shall have a correlative meaning with the meaning of the term "Consolidated EBITDAX"; *provided* that each reference to Canacol Energy in the definition of "Consolidated EBITDAX" shall be deemed a reference to such Person but shall disregard any reference to the Subsidiaries of such Person.

(c)    If, at any time, any Restricted Subsidiary of the Loan Parties that is not a Guarantor hereunder Guaranties any Debt incurred by Canacol Energy or any of its Restricted Subsidiaries at any time outstanding in an aggregate principal amount in excess of U.S.$ 10,000,000, the Loan Parties shall cause such Restricted Subsidiary to become (concurrently with (and on the same day of) the execution and delivery of such Guaranty) an Additional

126

Guarantor hereunder, by executing and delivering to the Administrative Agent a Joinder Agreement in accordance with Section 10.07(a).

Section 10.08 <u>Termination</u>. The provisions of this <u>Article X</u> shall remain in effect until the payment in full in cash of all Obligations and irrevocable termination of this Agreement.

Section 10.09 <u>Swiss Guaranty Limitations</u>. Any Guaranty (including the Guaranty provided under <u>Article X</u>), indemnity, obligation and/or liability granted, incurred, undertaken, assumed or otherwise agreed by any Swiss Guarantor shall be limited to the following:

(a) Notwithstanding anything to the contrary herein, the fulfilment of any guarantee, indemnity, obligation and/or liability granted, incurred, or undertaken (hereinafter, "*Swiss Guaranty Obligation*") by any Swiss Guarantor under this Agreement and the application of proceeds from the realization of any security interest over any asset (hereinafter, "*Security*") granted by any Swiss Guarantor in relation to any obligation, undertaking, indemnity or liability of another member of the group (other than the relevant Swiss Guarantor or any of its Subsidiaries) (hereinafter, "*Up- and Cross-stream Obligation*") shall, if and to the extent required by mandatory Applicable Law, be limited to the amount of that Swiss Guarantor's freely available equity (hereinafter, "*Limitation*"). For the purpose of this <u>Section 10.09</u>, freely available equity means the amount equal to the maximum amount in which the relevant Swiss Guarantor can make a dividend payment to its share- or quotaholders under Swiss law at that point in time.

(b) If an Up- and Cross-stream Obligation is subject to the Limitation, the Limitation shall not release the relevant Swiss Guarantor from the fulfilment of its Swiss Guaranty Obligations or the application of proceeds from the realization of a Security beyond the Limitation, but merely postpone the fulfilment of its Swiss Guaranty Obligations or the application of proceeds from the realization of a Security until such time as it is again permitted notwithstanding the Limitation. The relevant Swiss Guarantor and any holding company of such Swiss Guarantor shall take, or cause to be taken, any action, including, without limitation, the passing of any share- or quotaholders' resolution to approve any payment or other performance under this Agreement or arranging for an interim balance sheet (audited, if applicable) (or any other confirmations from such Swiss Guarantor's auditors), which may be required as a matter of Swiss mandatory Applicable Law in force at the time it is required to make a payment or perform other obligations under this Agreement in order to allow a prompt payment and performance of other obligations under this Agreement with a minimum of limitations.

(c) To the extent that the fulfilment of a Swiss Guaranty Obligation or the application of proceeds from the realization of a Security in relation to an Up-and-Cross-stream Obligation are subject to Swiss federal withholding tax (*Verrechnungssteuer*), the Swiss Guarantor shall use its best efforts to procure that the fulfilment of a Swiss Guaranty Obligation or the application of proceeds from the realization of a Security can be made without deduction of Swiss withholding tax by discharging the liability of such tax by notification pursuant to Applicable Law rather than payment of the tax.

(d) If the fulfilment of a Swiss Guaranty Obligation or the application of proceeds from the realization of a Security in relation to Up- and Cross-stream Obligations would be subject to the Limitation, then the Swiss Guarantor shall, upon request of the

Administrative Agent, to the extent permitted by Applicable Law revalue upward or realize any of its assets that are shown in its balance sheet with a book value that is significantly lower than the market value of such assets, in case of realization, however, only if such assets are not necessary for the Swiss Guarantor's business (*nicht betriebsnotwendig*).

# ARTICLE XI

# MISCELLANEOUS

Section 11.01 <u>Delay or Omission</u>. No failure on the part of the Administrative Agent to exercise and no delay or omission in exercising, and no course of dealing with respect to, any right, power or privilege under any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege under any Loan Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The remedies provided in the Loan Documents are cumulative and not exclusive of any other remedies provided by Applicable Law.

Section 11.02 <u>Notices; Effectiveness; Electronic Communications</u>.

(a) <u>Notices Generally</u>. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in <u>clause (b)</u> below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier or email as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i) if to a Loan Party or the Administrative Agent, to the address, email address or telephone number specified for such Person on <u>Annex II</u>; and

(ii) if to any Lender, to the address, telecopier number, email address or telephone number specified in its Administrative Questionnaire.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier or email shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in <u>clause (b)</u> below shall be effective as provided in such <u>clause (b)</u>.

(b) <u>Electronic Communications</u>.

(i) Notices and other communications to the Lenders shall be in writing, in English, and may be delivered or furnished by electronic communication (including email and Internet or intranet websites (including debt domain)) pursuant to procedures approved by the Administrative Agent; *provided* that the foregoing shall not apply to notices to any Lender pursuant to <u>Article II</u> if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by

128

electronic communication.  The Administrative Agent or the Borrower may agree to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by them; *provided* that approval of such procedures may be limited to particular notices or communications.

(ii)    Unless the Administrative Agent otherwise prescribes: (A) notices and other communications sent to an email address shall be deemed received upon the sender's receipt of an acknowledgment from the intended recipient (such as by the "return receipt requested" function, as available, return email or other written acknowledgment); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its email address as described in the foregoing clause (A) of notification that such notice or communication is available and identifying the website address therefor.

(iii)    The Borrower hereby agrees, unless directed otherwise by the Administrative Agent or unless the email address referred to below has not been provided by the Administrative Agent to the Borrower, that it will, or will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under Article VI, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that: (A) is or relates to the Notice of Borrowing, (B) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (C) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (D) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "*Communications*"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an email address as directed by the Administrative Agent. In addition, the Borrower agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

(c)    Change of Address, Etc.  Each Loan Party and the Administrative Agent may change its address, telecopier, telephone number or email address for notices and other communications hereunder by notice to the other parties hereto.  Each Lender may change its address, telecopier, telephone number or email address for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record: (i) an effective address, contact name, telephone number, telecopier number and email address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(d)    Reliance by the Administrative Agent and Lenders.    The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if: (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof.  The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance in good faith by such Person on each notice purportedly given by or on behalf of the Borrower.  All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

Section 11.03  Expenses; Indemnity; Damage Waiver.

(a)    Costs and Expenses.  Whether or not the transactions contemplated in this Agreement and the other Loan Documents are consummated, the Borrower shall pay: (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Arrangers and their respective Affiliates (including any fees due under the applicable Fee Letter as set forth therein, the fees and expenses of Stikeman Elliot LLP, special Canadian counsel to the Lenders, Brigard & Urrutia, special Colombian counsel to the Lenders, Skadden, Arps, Slate, Meagher & Flom LLP, special New York counsel to the Lenders, Homburger AG, special Swiss counsel to the Lenders, Allen & Overy LLP, special Swiss counsel to the Administrative Agent, and any other counsel or advisors to the Administrative Agent, and printing, reproduction, document delivery, communication and travel costs) in connection with the syndication of the Loans, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the reasonable and documented fees, charges and disbursements of one counsel for the Administrative Agent and a single counsel for the Lenders for each relevant jurisdiction, unless the Lenders have conflicting interests that cannot reasonably be represented by such single counsel for each relevant jurisdiction, in which case such expenses shall include the reasonable and documented fees, charges and disbursements of no more than such number of counsels as are necessary to represent such conflicting interests of the Lenders in each relevant jurisdiction) in connection with the enforcement or protection of its rights or any enforcement or collection proceedings: (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section or (B) in connection with the Loans made hereunder, including all such reasonable and documented out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b)    Indemnification by the Borrower.  The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each Arranger, each Lender and each Related Party of any of the foregoing Persons (each of the foregoing Persons, an "*Indemnitee*") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including reasonable and documented out-of-pocket fees, charges and disbursements of any counsel for any Indemnitee, limited only to one primary counsel in each applicable jurisdiction, and one additional primary counsel in case of an actual conflict) incurred by any Indemnitee or asserted against any Indemnitee by any Person (including the Borrower or

any other Loan Party) arising out of, in connection with, or as a result of: (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, or any hedging arrangement related thereto, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by any Loan Party or any of its Subsidiaries, or any Environmental Liability related in any way to any Loan Party or any of its Subsidiaries or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any other Loan Party, and regardless of whether any Indemnitee is a party thereto; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses: (A) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (B) result from a claim brought by any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if such Loan Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction. To the extent that any undertaking in this clause may be unenforceable because it is violative of any Applicable Law or public policy, the Borrower shall contribute the maximum portion that it is permitted to pay and satisfy under Applicable Law to the payment and satisfaction of such undertaking. This <u>Section 11.03(b)</u> shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    <u>Reimbursement by Lenders</u>. To the extent that the Borrower for any reason fails to pay any amount required under <u>clause (a)</u> or <u>(b)</u> of this <u>Section 11.03</u> to be paid by them to the Administrative Agent (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender, severally agrees, to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's Applicable Percentage at such time) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this <u>clause (c)</u> are subject to the provisions of <u>Section 2.11(e)</u>.

(d)    <u>Waiver of Consequential Damages, Etc.</u>  To the fullest extent permitted by Applicable Law, each Loan Party shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in <u>clause (b)</u> above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through

131

telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)      <u>Survival</u>.  Each party's obligations under this <u>Section 11.03</u> shall survive the termination of the Loan Documents and payment of the obligations hereunder.

Section 11.04 <u>Amendments; Waivers; Etc.</u>  Except as otherwise expressly provided in this Agreement, any provision of this Agreement may be modified, supplemented or waived only in an agreement in writing signed by the Borrower and the Required Lenders (or the Administrative Agent upon the instruction of the Required Lenders); *provided* that no such agreement shall:

(a)      waive any condition set forth in <u>Section 4.01</u> or <u>Section 4.02</u>, without the written consent of each Lender;

(b)      increase the Commitment of any Lender without the written consent of such Lender;

(c)      reduce the principal amount of any Loan or reduce the rate of interest thereon (other than the Default Rate) or reduce any interest, fees or premiums payable hereunder, without the written consent of each Lender directly affected thereby;

(d)      postpone any scheduled date of payment of the principal amount of any Loan or any date for the payment of any interest, fees, premiums or other Obligations payable hereunder or reduce the amount of, waive or excuse any such payment (other than mandatory prepayments under <u>Section 2.04</u>), or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly affected thereby;

(e)      change <u>Section 2.12</u> in a manner that would alter the manner in which payments are shared, without the written consent of each Lender;

(f)      except in connection with any transaction permitted hereunder, release any Guarantor in whole or in part from its obligation under its Guaranty hereunder without the written consent of each Lender; or

(g)      change any of the provisions of this Section or the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender;

*provided*, *further*, that no such agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent.

Section 11.05 <u>Successors and Assigns</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, except that the Borrower may not assign or transfer any of their rights or obligations under this

Agreement or any other Loan Document without the prior written consent of each Lender (any attempt to do so being null and void *ab initio*).

Section 11.06  <u>Third-Party Beneficiaries</u>.  This Agreement is made and entered into for the sole protection and legal benefit of the parties hereto, the Lender Parties and their permitted successors and assigns (all of which, if not parties hereto, are third-party beneficiaries hereof for purposes of enforcing their respective rights hereunder) and no other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement.

Section 11.07  <u>Assignments and Participations</u>.

(a)    Subject to the following conditions and in compliance with Applicable Law, any Lender may assign all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) to (x) an Eligible Assignee or (y) with the prior written consent of the Administrative Agent (such consent not to be unreasonably withheld) (*provided* that no such consent of the Administrative Agent shall be required if an Event of Default exists):

(i)    any such partial assignment (other than to another Lender, an Affiliate of a Lender or a Reference Participant) shall be in an amount at least equal to US$3,000,000 or an integral multiple of US$1,000,000 in excess thereof (or, if less, all of such Lender's remaining Loan or Commitment hereunder); *provided* that concurrent assignments to an assignee and one or more other assignees that are Affiliates of such assignee will be treated as a single assignment for purposes of determining whether such minimum amount has been satisfied;

(ii)    any partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitments assigned;

(iii)    upon each such assignment, the assignor and assignee shall deliver an Assignment and Assumption to the Administrative Agent;

(iv)    unless it is a Lender prior to such assignment, the assignee shall deliver to the Administrative Agent an Administrative Questionnaire and all tax forms required under <u>Section 3.04(f)</u>;

(v)    the assignee shall deliver to the Administrative Agent such documentation and evidence as is reasonably requested by the Administrative Agent (for itself or on behalf of any Lender) or any Lender in order for the Administrative Agent or such Lender to carry out all necessary "know your customer" or other checks in relation to the identity of the assignee that it is required to carry out in relation to the transactions contemplated in the Loan Documents;

(vi)    the Administrative Agent and/or any such Lender shall be satisfied with the results of all "know your client" or other checks (*it being understood* that nothing in the Agreement shall oblige the Administrative Agent to carry out any "know

133

your customer" or other checks in relation to the identity of any Person on behalf of any Lender and each Lender shall be solely responsible for any such checks it is required to carry out and may not rely on any statement in relation to such checks made by the Administrative Agent or by any Person to the Administrative Agent); and

(vii)    no such assignment shall be made to: (1) any Loan Party or any Subsidiary or Affiliate thereof, (2) or any of its Subsidiaries or any Person that, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this subclause (2), or (3) for so long as no Event of Default shall have occurred and is continuing, a Person that is not a bank, trust company, savings and loan association or other financial institution, any pension plan, any investment company, any insurance company or similar financial institution subject to the supervision of a financial regulatory authority in its jurisdiction of incorporation.

(b)    Upon the effective date of the assignment to be effected by an Assignment and Assumption and register thereof pursuant to clause (c) below, the assignee shall have, to the extent of such assignment, the obligations, rights and benefits of a Lender hereunder holding the Commitment or Loans (or portion thereof) assigned to it and specified in such Assignment and Assumption (in addition to the Commitment or Loans, if any, theretofore held by such assignee) and the assigning Lender shall, to the extent of such assignment of its Commitment, be released from the Commitment (or portion thereof) so assigned. Within five Business Days after its receipt of notice that the Administrative Agent has received and accepted an executed Assignment and Assumption and each applicable original predecessor Note (for delivery to the Borrower) (as described below), the Borrower shall execute and deliver to the Administrative Agent (for delivery to the relevant assignee Lender), if requested by such assignee Lender, a new Note evidencing such assignee Lender's assigned Loans and Commitments and, if the assignor Lender has retained Loans and Commitments hereunder (and if requested by such Lender), a replacement Note in the principal amount of the Loans and Commitments retained by the assignor Lender hereunder (such Note to be in exchange for, but not in payment of, the predecessor Note previously held by such assignor Lender). Each such Note shall be dated the date of the predecessor Note.  The assignor Lender shall have marked each predecessor Note "exchanged" and delivered each of them to the Administrative Agent (for return to the Borrower).  Accrued interest on that part of each predecessor Note evidenced by a new Note, and accrued fees, shall be paid as provided in the Assignment and Assumption.  Accrued interest on that part of each predecessor Note evidenced by a replacement Note shall be paid to the assignor Lender.  Accrued interest and accrued fees shall be paid at the same time or times provided in this Agreement.  Upon its receipt of an Assignment and Assumption executed by an assigning Lender and an assignee together with (except in the case of an assignment by a Lender to an Affiliate of such Lender) payment by the assignee Lender to the Administrative Agent of an assignment fee of US$3,500 (which fee may be waived or reduced in the discretion of the Administrative Agent), the Administrative Agent shall: (x) promptly accept such Assignment and Assumption and (y) on the effective date determined pursuant thereto, record the information contained therein in the Register and give notice of such acceptance and recordation to the assigning Lender, its assignee and the Borrower. Notwithstanding the foregoing, no such assignment shall be allowed if the assignor thereof (if it is assigning less than all of its Loans or Commitments) would, after such assignment, have less than US$1,000,000 in Loans (such amount to be reduced on a pro rata basis upon the receipt of any payment of principal on the Loans) or Commitments unless the assignee is a Reference Participant.

(c)     The Administrative Agent, acting solely for this purpose as non-fiduciary agent of the Borrower, shall maintain at its address referred to in Section 11.02 a copy of each Assignment and Assumption delivered to it and a register (the "*Register*") for the recordation of the names and addresses of the Lenders and the principal amounts of (and stated interest on) the Commitments of, or Loans owing to, each Lender from time to time.  The parties hereto shall treat each Person whose name is recorded in the Register as the owner of a Loan or other obligations hereunder as the owner thereof for all purposes of this Agreement and the other Loan Documents, notwithstanding any notice to the contrary.  Any assignment of any Loan or other obligation hereunder shall be effective only upon appropriate entries with respect thereto being made in the Register.  The Register shall be available for inspection by the parties hereto at any reasonable time (in each case during the normal business hours of the Administrative Agent) and from time to time upon reasonable prior notice.

(d)     Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations or enter into any other agreement to transfer the risk to one or more financial institutions or other entities (a "*Participant*") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that: (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 3.04(d) with respect to any payments made by such Lender to its Participant(s).  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in Section 11.04 that affects such Participant.  Each Loan Party agrees that each Participant shall be entitled to the benefits of Section 3.01, Section 3.03 and Section 3.04 (subject to the requirements and limitations therein, including the requirements under Section 3.04(f) (*it being understood* that the documentation required under Section 3.04(f) shall be delivered by the participating Lender)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section; *provided* that such Participant (A) agrees to be subject to the provisions of Section 3.05 as it were an assignee under clause (b) of this Section 11.07 and (B) shall not be entitled to receive any greater payment under Section 3.01, and Section 3.04, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.

(e)     Each Lender that sells a participation agrees, at the request of the Borrower and at the expense of the Borrower, to use reasonable efforts to cooperate with the Borrower to effect the provisions of Section 3.05 with respect to any Participant.  To the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of Section 2.13 as though it were a Lender; *provided* that such Participant agrees to be subject to Section 2.12(a) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name

and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "*Participant Register*"); *provided*, *further*, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Commitments, Loans or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(f)    In addition to the assignments, participations and risk transfers permitted under this Section, any Lender may, without notice or consent of the Administrative Agent or any other Person and without payment of any fee: pledge or assign a security interest in all or any portion of its rights under this Agreement and the other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a federal reserve bank or (ii) enter into an agreement with one or more financial entities (each, an "*Investor*") that transfers or hedges the risk of non-payment under the Loan Documents or both; *provided* that no Lender shall be released from its obligations under this Agreement or the other Loan Documents by having entered into any such transactions.

(g)    Any assignment in contravention of the provisions of this Section shall be null and void *ab initio*.

Section 11.08 <u>Survival</u>.  The obligations of the Borrower under <u>Section 3.01</u>, <u>Section 3.03</u>, <u>Section 3.04</u>, <u>Section 11.03</u>, <u>Section 11.11</u>, <u>Section 11.12</u>, <u>Section 11.13</u>, <u>Section 11.14</u>, <u>Section 11.15</u>, and the obligations of the Lenders under <u>Section 11.03(c)</u>, shall survive the repayment of the Loans and the termination of the Commitments; *provided* that each Lender's obligations under <u>Section 11.03(c)</u> shall only apply to the extent that the event with respect to which any indemnification is payable thereunder occurred at the time that such Lender maintained a Loan or Commitment hereunder.

Section 11.09 <u>Captions</u>.  The table of contents and captions and section headings appearing herein are included solely for convenience of reference and are not intended to affect the interpretation of any provision of this Agreement.

Section 11.10 <u>Counterparts; Effectiveness</u>.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any of the parties hereto may execute this Agreement by signing any such counterpart.  A set of the copies of this Agreement signed by all the parties hereto shall be retained by the Borrower and the Administrative Agent. Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Facsimile, documents executed, scanned and

transmitted electronically and electronic signatures, including those created or transmitted through a software platform or application, shall be deemed original signatures for purposes of this Agreement and all matters and agreements related thereto, with such facsimile, scanned and electronic signatures having the same legal effect as original signatures. The parties agree that this Agreement or any instrument, agreement or document necessary for the consummation of the transactions contemplated by this Agreement or related hereto or thereto (including, without limitation, addendums, amendments, notices, instructions, communications with respect to the delivery of securities or the wire transfer of funds or other communications) ("Executed Documentation") may be accepted, executed or agreed to through the use of an electronic signature in accordance with applicable laws, rules and regulations in effect from time to time applicable to the effectiveness and enforceability of electronic signatures. Any Executed Documentation accepted, executed or agreed to in conformity with such laws, rules and regulations will be binding on all parties hereto to the same extent as if it were physically executed and each party hereby consents to the use of any third party electronic signature capture service providers as may be reasonably chosen by a signatory hereto or thereto. When the Administrative Agent acts on any Executed Documentation sent by electronic transmission, the Administrative Agent will not be responsible or liable for any losses, costs or expenses arising directly or indirectly from its reliance upon and compliance with such Executed Documentation, notwithstanding that such Executed Documentation (a) may not be an authorized or authentic communication of the party involved or in the form such party sent or intended to send (whether due to fraud, distortion or otherwise) or (b) may conflict with, or be inconsistent with, a subsequent written instruction or communication; it being understood and agreed that the Administrative Agent shall conclusively presume that Executed Documentation that purports to have been sent by an authorized officer of a party has been sent by an authorized officer of such party. The party providing Executed Documentation through electronic transmission or otherwise with electronic signatures agrees to assume all risks arising out of such electronic methods, including, without limitation, the risk of the Administrative Agent acting on unauthorized instructions and the risk of interception and misuse by third parties.

Section 11.11 <u>Governing Law</u>. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

Section 11.12 <u>Jurisdiction, Service of Process and Venue</u>.

(a)     Each party hereto hereby irrevocably and unconditionally submits, for itself and for its Property, to the jurisdiction of the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York (in each case sitting in the Borough of Manhattan), and any appellate court from any thereof, in any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document (other than any Note or any other Loan Document expressed to be governed by the laws of any other jurisdiction) or the transactions relating hereto and thereto or for recognition or enforcement of any judgment, and each of the parties hereto irrevocably and unconditionally agrees, to the fullest extent permitted by Applicable Law, that all claims in respect of any such suit, action or proceeding may be heard and determined in such New York state court or in such federal court. Each of the parties hereto agrees that a final action in any such suit, action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment

or in any other manner provided by Applicable Law.  Nothing in this Agreement or any other Loan Document shall affect the right that the Administrative Agent or any Lender may otherwise have to bring any suit, action or proceeding relating to this Agreement or any other Loan Document against any Loan Party or its Properties in the courts of any jurisdiction in accordance with Applicable Law.

(b)    Each Loan Party hereby irrevocably appoints C T Corporation System (the "*Process Agent*"), with an office on the date hereof at 28 Liberty St, New York, NY 10005 as its agent and true and lawful attorney-in-fact in its name, place and stead to receive on its behalf service of copies of the summons and complaint and any other process that may be served in any such suit, action or proceeding brought in any court referred to in clause (a), and agrees that the failure of the Process Agent to give any notice of any such service of process to it shall not impair or affect the validity of such service or, to the extent permitted by Applicable Law, the enforcement of any judgment based thereon.  Each Loan Party shall maintain such appointment until the satisfaction in full of all Obligations, except that if for any reason the Process Agent appointed hereby ceases to be able to act as such, then each Loan Party shall, by an instrument reasonably satisfactory to the Administrative Agent, appoint another Person in the Borough of Manhattan as such Process Agent subject to the approval of the Administrative Agent.  Each Loan Party covenants and agrees that it shall take any and all reasonable action, including the execution and filing of any and all documents, that may be necessary to continue the designation of the Process Agent pursuant to this paragraph in full force and effect and to cause the Process Agent to act as such.

(c)    Each Loan Party hereby (i) consents to the service of process in any suit, action or proceeding in the manner provided for notices in Section 11.02 and (ii) agrees that nothing herein shall in any way be deemed to limit the ability of any Person to serve any process or summons in any manner permitted by Applicable Law, to sue in any other jurisdiction, or to obtain jurisdiction over any other Person in such other jurisdictions, and in such manner, as may be permitted by Applicable Law.

(d)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents brought in any court referred to in clause (a) of this Section and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum.

(e)    To the extent that any Loan Party may be entitled to the benefit of any provision of law requiring the Administrative Agent or any Lender in any suit, action or proceeding brought in a court of Canada, Colombia, the Republic of Panama and Switzerland or other jurisdiction arising out of or in connection with this Agreement, any other Loan Document or the transactions contemplated hereby, to post security for litigation costs or otherwise post a performance bond or guaranty, or to take any similar action, each Loan Party hereby waives such benefit, in each case to the fullest extent now or hereafter permitted under the laws of Canada, Colombia, the Republic of Panama and Switzerland or, as the case may be, such other jurisdiction.

Section 11.13 <u>Waiver of Jury Trial</u>. **EACH OF THE PARTIES HERETO KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ITS RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON, ARISING OUT OF OR RELATED TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREBY, IN ANY ACTION, LITIGATION OR OTHER PROCEEDING OF ANY TYPE BROUGHT BY ANY OF THE PARTIES AGAINST ANY OTHER PARTY OR ANY OTHER PERSON, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. EACH OF THE PARTIES HERETO AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE TRIED IN A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING THAT SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THE LOAN DOCUMENTS OR ANY PROVISION THEREOF. THE AGREEMENT OF EACH PARTY HERETO TO THIS PROVISION IS A MATERIAL INDUCEMENT FOR EACH OF THE OTHER PARTIES HERETO TO ENTER INTO THIS AGREEMENT.**

Section 11.14 <u>Waiver of Immunity</u>. To the extent that any Loan Party may be or become entitled to claim for itself or its Property any immunity on the ground of sovereignty or the like from suit, court jurisdiction, attachment before judgment, attachment in aid of execution of a judgment or execution of a judgment, and to the extent that in any such jurisdiction there may be attributed such an immunity (whether or not claimed), it hereby irrevocably agrees not to claim and hereby irrevocably waives such immunity with respect to its obligations under this Agreement and the other Loan Documents.

Section 11.15 <u>Judgment Currency</u>.

(a)    This is an international loan transaction in which the specification of Dollars and payment in New York, New York is of the essence, and the obligations of the Loan Parties under this Agreement and the other Loan Documents to each Lender Party to make payments in Dollars shall not be discharged or satisfied by any tender or recovery pursuant to any judgment expressed in or converted into any other currency or in another place, except to the extent that on the Business Day following receipt of any sum adjudged to be so due in the Judgment Currency the payee may in accordance with normal banking procedures purchase Dollars in the amount originally due to the payee with the Judgment Currency. If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency (in this Section called the "*Judgment Currency*"), then the rate of exchange that shall be applied shall be that at which in accordance with normal banking procedures the payee could purchase such Dollars at New York, New York with the Judgment Currency on the Business Day preceding the day on which such judgment is rendered. The obligations of each Loan Party in respect of any such sum due from it to the payee hereunder or under any other Loan Document (in this Section called an "*Entitled Person*") shall, notwithstanding the rate of exchange actually applied in rendering such judgment, be discharged only to the extent that on the Business Day following receipt by such Entitled Person of any sum adjudged to be due hereunder in the Judgment Currency such Entitled Person may, in accordance with normal banking procedures, purchase and transfer Dollars to New York, New York with the amount of the Judgment Currency so adjudged

139

to be due; and each Loan Party hereby, as a separate obligation and notwithstanding any such judgment, agrees to indemnify such Entitled Person against, and to pay such Entitled Person on demand, in Dollars, the amount (if any) by which the sum originally due to such Entitled Person in Dollars hereunder exceeds the amount of the Dollars so purchased and transferred.

(b)     Each Loan Party waives any right it may have in any jurisdiction to pay any amount under this Agreement and the other Loan Documents to each Lender Party in a currency or currency unit other than that in which it is expressed to be payable.

Section 11.16  Interest Rate Limitation.

(a)     Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under Applicable Law (collectively the "*Charges*"), shall exceed the maximum lawful rate (the "*Maximum Rate*") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with Applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section 11.16 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

(b)     If any provision of any Loan Document would oblige any Loan Party to make any payment of interest or other amount payable to the Administrative Agent or any Lender in an amount or calculated at a rate which would be prohibited by Applicable Law or would result in a receipt by the Administrative Agent or such Lender of "interest" at a "criminal rate" (as such terms are construed under the Criminal Code (Canada)), then, notwithstanding such provision, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law or so result in a receipt by the Administrative Agent or such Lender of "interest" at a "criminal rate" such adjustment to be effected, to the extent necessary (but only to the extent necessary), first, by reducing the amount or rate of interest and thereafter, by reducing any fees, commissions, costs, expenses, premiums and other amounts required to be paid which would constitute interest for purposes of section 347 of the Criminal Code (Canada).

(c)     To the extent permitted by law, any provision of the Judgment Interest Act (Alberta) and the Interest Act (Canada), RSA 2000, c J-1 which restricts the rate of interest on any judgment debt shall be inapplicable to this Agreement and is hereby waived by each Loan Party.

Section 11.17  Use of English Language.  This Agreement has been negotiated and executed in the English language.  Except as otherwise provided in this Agreement all certificates, reports, notices and other documents and communications given or delivered pursuant to this Agreement and the other Loan Documents (including any modifications or supplements hereto or thereto) shall be in the English language, or accompanied by a certified English translation thereof,

upon which the other parties hereto shall have the right to rely for all purposes of this Agreement and the other Loan Documents.

Section 11.18  <u>Entire Agreement</u>.  This Agreement and the other Loan Documents constitute the entire agreement among the parties with respect to the subject matter hereof and thereof and supersede all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof and thereof.

Section 11.19  <u>Severability</u>.  The illegality or unenforceability in any jurisdiction of any provision hereof or of any document required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or such other document in such jurisdiction or such provision in any other jurisdiction.

Section 11.20  <u>No Fiduciary Relationship or Partnership</u>.  Each Loan Party acknowledges that neither the Administrative Agent nor any other Lender Party has any fiduciary relationship with, or fiduciary duty to, such Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Administrative Agent and the other Lender Parties, on the one hand, and any Loan Party, on the other, in connection herewith or therewith is solely that of debtor and creditor.  Nothing contained in this Agreement or any other Loan Document shall be deemed or construed to create a partnership, tenancy-in-common, joint tenancy, joint venture or co-ownership by or between any Lender, on the one hand, and any other Lender, any Loan Party or any other Person, on the other hand.  No Lender Party shall in any way be responsible or liable for the Debts, losses, obligations or duties of any Loan Party or any other Person other than itself.

Section 11.21  <u>Payments Set Aside</u>.  If a Loan Party (or any Person on its behalf) makes a payment to any Lender Party, or any Lender Party exercises its right of set-off, and such payment or the proceeds of such set-off or any part thereof subsequently is invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by such Lender Party in its discretion) to be repaid to such Loan Party (or such Person), a trustee, receiver or any other Person in connection with any insolvency proceeding or otherwise, then: (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such set-off had not occurred and (b) each Lender, severally agrees, to pay to the Administrative Agent from whom it (or any related Lender Party) received any such amounts upon demand its pro rata share of any amount so recovered from or repaid by the Administrative Agent.

Section 11.22  <u>USA Patriot Act</u>.  The Administrative Agent and each Lender that is subject to the USA Patriot Act (as hereinafter defined) hereby notifies the Borrower and each other Loan Party that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "*USA Patriot Act*"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name, address, tax identification number and other information regarding each Loan Party that will allow such Lender or Administrative Agent to identify each Loan Party in accordance with the USA Patriot Act and the Beneficial Ownership Regulation.In order to comply with the laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including, without limitation, those relating to the funding of terrorist activities and money laundering,

including Section 326 of the USA PATRIOT Act of the United States ("*Applicable AML Law*"), the Administrative Agent is required to obtain, verify, record and update certain information relating to individuals and entities which maintain a business relationship with the Administrative Agent. Accordingly, each of the parties agree to provide to the Administrative Agent, upon its request from time to time such identifying information and documentation as may be available for such party in order to enable the Administrative Agent to comply with Applicable AML Law.

Section 11.23 <u>Treatment of Certain Information; Confidentiality</u>.  Each of the Lenders and the Administrative Agent agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed: (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and other representatives (*it being understood* that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by Applicable Law or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the exercise or enforcement of rights or remedies hereunder or thereunder, (f) to: (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, any investor or prospective investor (including through special purpose vehicles), or any new lender or prospective new lender in a refinancing of all or a portion of the Loans or otherwise or (ii) any actual or prospective counterparty (or its advisors) to any swap, hedging or derivative transaction relating to the Borrower and its obligations (*it being understood* that the Persons to whom such disclosure is made pursuant to this clause (f) will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (g) to the partners, directors, officers, employees, agents, advisors, trustees and other representatives of those Persons described in subclauses (f)(i) and (ii) (*it being understood* that the partners, directors, officers, employees, agents, advisors and other representatives to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (h) on a confidential basis to the CUSIP Service Bureau or any similar agency (including any settlement service provider or numbering service provider) in connection with the issuance and monitoring of CUSIP numbers or ISINs, (i) with the consent of the Borrower or (j) to the extent such Information: (i) becomes publicly available other than as a result of a breach of this <u>Section 11.23</u> or (ii) becomes available to any Lender, the Administrative Agent or any of their respective Affiliates on a nonconfidential basis from a source other than by or on behalf of the Borrower.

For purposes of this Section, "*Information*" means all information received from any Loan Party or any of its Subsidiaries relating to any Loan Party or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to any Lender or the Administrative Agent on a nonconfidential basis prior to disclosure by any Loan Party or any of its Subsidiaries; *provided* that, in the case of information received from a Loan Party or any of its Subsidiaries after the date hereof, such information is clearly identified in writing at the time of delivery as confidential (*it being understood* that all such information shall be deemed to not be confidential unless such information is clearly identified in writing at the time of delivery as being confidential). Any Person required to maintain the confidentiality of Information as provided in

this Section 11.23 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Notwithstanding anything to the contrary in the Loan Documents, the Administrative Agent (or the Person acting as Administrative Agent, in its capacity as a Lender) may disclose to any applicable service provider appointed by the Administrative Agent (or such Lender) to provide information services, identification numbering services and/or paying agent services in respect of or in any way relating to this Agreement, any Loan, any related security and/or any Loan Party the following information (with the purpose to enable such service provider to provide its usual services (which may include syndicated loan or other financial or securities information and numbering identification services)): (i) name of any Loan Party; (ii) existence of the Loan and the Loan Documents (including the dates thereof); (iii) name of the Arrangers; (iv) date of each amendment and restatement of this Agreement; (v) amount of Commitments; (vi) currency of the Loans; (vii) ranking of the Loans; (viii) payment dates under this Agreement; (ix) pricing information; (x) changes to any of the information previously supplied pursuant to paragraphs (i) to (x) above; and (xi) such other information agreed between the Administrative Agent and any Loan Party. Each Loan Party acknowledges and agrees that such identification numbers and above-described information associated therewith may be disclosed to users of its services in accordance with the standard terms and conditions of that numbering service provider.

Section 11.24 Acknowledgment and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable, (i) a reduction in full or in part or cancellation of any such liability, (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document or (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any the applicable Resolution Authority.

*[Remainder of page intentionally left blank. Signature pages to follow.]*

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**CANACOL ENERGY LTD.**

By: _____

Name: *Jason Bednar*

Title: *CFO*

[Signature Page to Revolving Credit Facility Agreement]

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**CANACOL ENERGY INC.**

By: _____

Name: Jason Bednar

Title: CFO

[Signature Page to Revolving Credit Facility Agreement]

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**CANACOL ENERGY COLOMBIA S.A.S.**

By: _____

Name: Andres Valenzuela Beltran

Title: Legal Representative.

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**CANTANA ENERGY, S.A.**

By: _____
Name: Abraham Valles
Title: Director

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**CECSA ENERGY, INC.**

By:
Name: Obrahom Valles
Title: Director

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**CNE ENERGY S.A.S.**

By: _____

Name: Andrés Valenzuela Patrón

Title: Legal Representative.

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**CNE OIL & GAS S.A.S.**

By: _____

Name: Andrés Valenzuela Pinilla

Title: Legal Representative

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

CNE OIL & GAS, S.R.L.

By: _____
Name: Abraham Valles
Title: Director

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**CNEMED S.A.S.**

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

SHONA ENERGY LIMITED PARTNERSHIP

By: _____
Name: *Tracy Whitmore*
Title: *Director for General Partner*

[Signature Page to Revolving Credit Facility Agreement]

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**SHONA ENERGY HOLDING LIMITED PARTNERSHIP**

By: _____

Name: *Tracy Whitmore*

Title: *Director for General Partner*

[Signature Page to Revolving Credit Facility Agreement]

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**SHONA ENERGY ULC**

By: _____

Name: *Tracy Whitmore*

Title: *Director*

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**SHONA HOLDING GMBH**

By: _____
Name:    *Tracy Whitmore*
Title:    *Director*

[Signature Page to Revolving Credit Facility Agreement]

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**SHONA ENERGY HOLDING ULC**

By: _____
Name: _Tracy Whitmore_
Title: _Director_

[Signature Page to Revolving Credit Facility Agreement]

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**GEOPRODUCTION HOLDING GMBH**

By: _____

Name: *Tracy Whitmore*

Title: *Director*

4886-7825-3380 v.2 064307/00005, 1:58 PM, 12/22/2022

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**CITIGROUP GLOBAL MARKETS INC.**
as Joint Lead Arranger and Joint Bookrunner

By:_____
Name: Adrian Guzzoni
Title: Managing Director

[Signature Page to Revolving Credit Facility Agreement]

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**CITIBANK, N.A.**
as Lender


By:_____
Name: Adrian Guzzoni
Title: Managing Director

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**JPMORGAN CHASE BANK, N.A.**

By:_____
Name: Christophe Vohmann
Title:  Executive Director

[Signature Page to Revolving Credit Facility Agreement]

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**DEUTSCHE BANK, AG**

By: _____

Name:

Title:

By: _____

Name:    Raul Ferrer

Title:    Managing Director

[Signature Page to Revolving Credit Facility Agreement]

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**BANCOLOMBIA (PANAMÁ) S.A.**

By:_____

Name: Andrés Hincapié Molina

Title:  General Agent

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**Banco Davivienda S.A.**

By:_____
Name: Rodrigo Arango Echeverri
Title: Legal Representative

IN WITNESS WHEREOF, I have hereunto signed my name on the date first written above.

**BANCO LATINOAMERICANO DE COMERCIO EXTERIOR, S.A. (BLADEX)**
[Execution Version – 045754]

By:_____
*Dario E. López Zadicoff*
Name:   DARIO E. LÓPEZ ZADICOFF
Title:   VP

By:_____
*Patricio Mainardi*
Name:   Patricio Mainardi
Title:   SVP

[Signature Page to Revolving Credit Facility Agreement]