**<u>EXHIBIT C</u>**

*Execution Version*

---

**U.S.$500,000,000**

**5.750% SENIOR NOTES DUE 2028**

―――――――――――

**INDENTURE**

**dated as of November 24, 2021**

―――――――――――

**CANACOL ENERGY LTD.,**

**as Issuer,**

**CANACOL ENERGY INC., SHONA ENERGY LIMITED PARTNERSHIP, SHONA ENERGY HOLDING LIMITED PARTNERSHIP, SHONA ENERGY HOLDING ULC, SHONA ENERGY ULC, CANACOL ENERGY COLOMBIA S.A.S., CNE OIL & GAS S.A.S., CNEMED S.A.S., CNE ENERGY S.A.S., SHONA HOLDING GMBH, GEOPRODUCTION HOLDING GMBH, CECSA ENERGY, INC., AND CANTANA ENERGY SA.,**

**as Note Guarantors**

**and**

**CITIBANK, N.A.**

**as Trustee, Security Registrar and Paying Agent**

# TABLE OF CONTENTS

Page

ARTICLE I
DEFINITIONS

Section 1.1    Definitions..................................................................................................1
Section 1.2    Rules of Construction ............................................................................39

ARTICLE II
ISSUE, EXECUTION AND AUTHENTICATION OF NOTES;
RESTRICTIONS ON TRANSFER

Section 2.1    Creation and Designation.......................................................................40
Section 2.2    Execution and Authentication of Notes ................................................41
Section 2.3    Initial Form of Notes.............................................................................41
Section 2.4    Execution of Notes................................................................................42
Section 2.5    Certificate of Authentication.................................................................42
Section 2.6    Restrictions on Transfer of Global Notes .............................................43
Section 2.7    Restrictive Legends...............................................................................44
Section 2.8    Issuance of Definitive Notes .................................................................45
Section 2.9    Persons Deemed Owners .......................................................................45
Section 2.10   Payment of Notes..................................................................................46
Section 2.11   Additional Notes...................................................................................48
Section 2.12   Additional Amounts..............................................................................48
Section 2.13   Mutilated, Destroyed, Lost or Stolen Notes..........................................50
Section 2.14   Cancellation .........................................................................................51
Section 2.15   Registration of Transfer and Exchange of Notes ..................................51

ARTICLE III
REDEMPTION OF NOTES

Section 3.1    Applicability of Article .........................................................................52
Section 3.2    Election to Redeem ...............................................................................52
Section 3.3    Optional Redemption ............................................................................52
Section 3.4    Optional Tax Redemption......................................................................53
Section 3.5    Optional Redemption Procedures ..........................................................54
Section 3.6    Notice of Redemption ...........................................................................56
Section 3.7    Deposit of Redemption Price ................................................................57
Section 3.8    Notes Payable on Redemption Date ......................................................57
Section 3.9    Open Market Purchases ........................................................................57

ARTICLE IV
COVENANTS

Section 4.1    Covenants of the Issuer and the Note Guarantors..................................57

Section 4.2    Covenant Suspension .................................................................82
Section 4.3    Consolidation, Amalgamation, Merger, Conveyance, Sale or Lease .................83
Section 4.4    Repurchases at the Option of the Holders Upon a Change of Control
               Triggering Event .......................................................................86

## ARTICLE V
## DEFAULTS AND REMEDIES

Section 5.1    Events of Default and Remedies...................................................88

## ARTICLE VI
## DISCHARGE OF THE INDENTURE; DEFEASANCE

Section 6.1    Satisfaction and Discharge of Indenture .......................................95
Section 6.2    Repayment of Monies ...............................................................96
Section 6.3    Return of Monies Held by the Trustee........................................96
Section 6.4    Defeasance ...........................................................................96
Section 6.5    Conditions to Defeasance .......................................................97
Section 6.6    Reinstatement.........................................................................98

## ARTICLE VII
## NOTE GUARANTEES

Section 7.1    Note Guarantee .....................................................................99
Section 7.2    Note Guarantee Unconditional .................................................99
Section 7.3    Discharge Reinstatement .......................................................100
Section 7.4    Waiver by the Note Guarantors ...............................................100
Section 7.5    Subrogation and Contribution...................................................101
Section 7.6    Stay of Acceleration...............................................................101
Section 7.7    Execution and Delivery of Note Guarantee .............................101
Section 7.8    Purpose of Guaranty ..............................................................101
Section 7.9    Future Note Guarantors...........................................................101
Section 7.10   Information .............................................................................103
Section 7.11   Release of Note Guarantors ...................................................103
Section 7.12   Limitation on Note Guarantees by Swiss Note Guarantors .................104

## ARTICLE VIII
## THE TRUSTEE

Section 8.1    Duties of the Trustee; Certain Rights of the Trustee .........................105
Section 8.2    Performance of Trustee's Duties ...........................................108
Section 8.3    Resignation and Removal; Appointment of Successor Trustee; Eligibility ........110
Section 8.4    Acceptance of Appointment by Successor Trustee .............................112
Section 8.5    Trustee Fees and Expenses; Indemnity................................112
Section 8.6    Documents Furnished to the Holders .....................................114
Section 8.7    Merger, Conversion, Consolidation and Succession .........................114
Section 8.8    Money Held in Trust...............................................................114
Section 8.9    No Action Except under Specified Documents or Instructions.................114

Section 8.10   Not Acting in its Individual Capacity ...................................................114
Section 8.11   Maintenance of Agencies................................................................114
Section 8.12   Withholding Taxes; Information Reporting...........................................115
Section 8.13   Co-Trustees and Separate Trustee. ...................................................116
Section 8.14   Conflict of Interest .......................................................................117

## ARTICLE IX
## AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.1   Without Consent of the Holders .......................................................117
Section 9.2   With Consent of the Holders............................................................118
Section 9.3   Effect of Indenture Supplements ......................................................119
Section 9.4   Documents to be Given to the Trustee................................................120
Section 9.5   Notation on or Exchange of Notes.....................................................120
Section 9.6   Meetings of Holders......................................................................120
Section 9.7   Voting by the Issuer and Any Affiliates Thereof.................................121

## ARTICLE X
## MISCELLANEOUS

Section 10.1   Payments; Currency Indemnity.........................................................121
Section 10.2   Governing Law ...........................................................................122
Section 10.3   No Waiver; Cumulative Remedies .....................................................122
Section 10.4   Severability ...............................................................................122
Section 10.5   Notices ....................................................................................122
Section 10.6   Counterparts..............................................................................124
Section 10.7   Entire Agreement ........................................................................124
Section 10.8   Waiver of Jury Trial.....................................................................124
Section 10.9   Submission to Jurisdiction; Waivers; Prescription ..............................124
Section 10.10  Certificate and Opinion as to Conditions Precedent ............................125
Section 10.11  Statements Required in Certificate or Opinion ...................................125
Section 10.12  Headings and Table of Contents ......................................................126
Section 10.13  Use of English Language ...............................................................126
Section 10.14  No Recourse Against Others............................................................126
Section 10.15  Interest Act (Canada) ...................................................................126
Section 10.16  Patriot Act ................................................................................126

List of Schedules:

Schedule 1     List of Initial Note Guarantors

List of Exhibits:

Exhibit A     Form of Note
Exhibit B     Form of Certificate for Exchange or Transfer of Restricted Global Note
Exhibit C     Form of Certificate for Exchange or Transfer of Regulation S Global Note

**INDENTURE**, dated as of November 24, 2021, among **CANACOL ENERGY LTD.**, a corporation organized and existing under the laws of the Province of Alberta, Canada (or any of its permitted successors hereunder, the "*Issuer*"), the **INITIAL NOTE GUARANTORS** listed in Schedule 1 (each individually, together with its successors, an "*Initial Note Guarantor*", and collectively, the "*Initial Note Guarantors*"), and **CITIBANK, N.A.**, as trustee (together with its successors hereunder, in such capacity, the "*Trustee*"), security registrar (in such capacity, the "*Security Registrar*") and paying agent (in such capacity, the "*Paying Agent*", and together with any other paying agents under this Indenture in their respective capacities as such, the "*Paying Agents*").

WITNESSETH:

**WHEREAS**, the Board of Directors of the Issuer duly authorized the issuance of its 5.750% Senior Notes due 2028   (the "*Notes*") on November 7, 2021; and to provide for the issuance thereof the Issuer has duly authorized the execution and delivery of this Indenture; and

**NOW, THEREFORE**, in consideration of the premises and the purchase of the Notes by the Holders, the parties listed above covenant and agree as follows for the benefit of each other and for the equal and ratable benefit of the Holders.

## ARTICLE I
## DEFINITIONS

Section 1.1    *Definitions*.  The following terms, as used herein, shall have the following meanings:

"*Acceptable Commitment*" shall have the meaning specified in Section 4.1(h).

"*Additional Amounts*" shall have the meaning specified in Section 2.12.

"*Additional Assets*" shall mean (1) any property or assets (other than Indebtedness and Capital Stock) used or useful in a Related Business, (2) the Capital Stock of a Person that becomes a Restricted Subsidiary as a result of the acquisition of such Capital Stock by the Issuer or another Restricted Subsidiary or (3) Capital Stock constituting a minority interest in any Person that at such time is a Restricted Subsidiary.

"*Additional Notes*" shall have the meaning given to it under Section 2.11.

1

"*Affiliate*" of any specified Person shall mean any other Person, directly or indirectly, controlling or controlled by or under direct or indirect common control with such specified Person. For the purposes of this definition, "*control*," when used with respect to any Person, shall mean the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "*controlling*" and "*controlled*" have meanings correlative to the foregoing.

"*Affiliate Transaction*" shall have the meaning given to it under Section 4.1(i).

"*Applicable Law*" shall mean, as to any Person, any law (statutory or common), treaty, rule or regulation or determination of an arbitrator or of a Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"*Applicable Procedures*" shall have the meaning specified in Section 2.6(b).

"*Applicable Premium*" shall mean, with respect to any Note on any Redemption Date, the greater of:

(1)    1.0% of the principal amount of such Note; and

(2)    the excess of:

(a)    the present value to be calculated by an Independent Investment Banker at such Redemption Date of:

(i)    the redemption price of such Note, on November 24, 2024 (such redemption price being set forth in the applicable table appearing under Section 3.3(b)), plus

(ii)    all required interest payments due on the Note through November 24, 2024 (excluding accrued but unpaid interest to, but not including, the Redemption Date), in each case, discounted to the Redemption Date on a semi-annual basis (assuming a 360-day year consisting of twelve 30-day months) using a discount rate equal to the Treasury Rate as of such Redemption Date, plus 50 basis points; over

(b)    the then outstanding principal amount of such Note.

2

The Trustee shall have no duty to calculate or verify the Applicable Premium.

"*Asset Disposition*" shall mean any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions, including by way of merger, consolidation or Sale and Lease-Back Transaction) by the Issuer or any Restricted Subsidiary, including any disposition by means of a merger, consolidation or similar transaction; *provided,* that the sale, lease, transfer or other disposition of all or substantially all of the assets of the Issuer and its Restricted Subsidiaries taken as a whole shall not constitute an Asset Disposition and instead will be governed by <u>Section 4.3</u> and/or <u>Section 4.4</u> and not by <u>Section 4.1(h)</u>, as applicable (each referred to for the purposes of this definition as a "disposition") of:

> (1)    any shares of Capital Stock of a Restricted Subsidiary (other than directors' qualifying shares or shares required by applicable law to be held by a Person other than the Issuer or a Restricted Subsidiary); or

> (2)    any other assets of the Issuer or any Restricted Subsidiary outside of the ordinary course of business of the Issuer or such Restricted Subsidiary;

*provided*, *however*, that the following shall not constitute Asset Dispositions:

> (a)    a sale, lease, transfer or other disposition to the Issuer or a Restricted Subsidiary;

> (b)    a Permitted Investment or Restricted Payment not prohibited by <u>Section 4.1(g)</u>;

> (c)    a sale, lease, transfer or other disposition of assets with a Fair Market Value of less than U.S.$5 million (or its equivalent in any other currency);

> (d)    a sale, lease, transfer or other disposition of Temporary Cash Investments or goods held for sale in the ordinary course of business, or sales of Hydrocarbons in the ordinary course of business;

> (e)    transactions permitted under <u>Section 4.3</u>;

> (f)    the lease, assignment or sublease of any real or personal property in the ordinary course of business;

(g)     the sale, lease, transfer or other disposition of assets in a Sale and Lease-Back Transaction, if otherwise permitted pursuant to clause (25) of <u>Section 4.1(f)</u>;

(h)     the Incurrence of any Lien permitted by <u>Section 4.1(f)</u> and the sale, lease, transfer or other disposition of the asset or property subject to such Lien;

(i)     the sale or other disposition of Oil and Gas Properties to which no proved reserves are attributable (and Capital Stock in Subsidiaries owning Oil and Gas Properties to which no proved reserves are attributable), including farmouts of undeveloped acreage to which no proved reserves are attributable and assignments in connection with such farmouts;

(j)     the sale, lease or other disposition of equipment, inventory, products, services, accounts receivable or other assets in the ordinary course of business, including in connection with any compromise, settlement or collection of accounts receivable;

(k)     the licensing or sublicensing of intellectual property, including, without limitation, licenses for seismic data, in the ordinary course of business and which do not materially interfere with the business of the Issuer and any of its Restricted Subsidiaries;

(l)     surrender or waiver of contract rights or the settlement, release or surrender of contract, tort or other claims of any kind;

(m)     any disposition of Capital Stock of, or Indebtedness or other securities of, an Unrestricted Subsidiary;

(n)     a sale, lease, transfer or other disposition of obsolete, surplus or worn-out equipment or other obsolete assets or other property which is uneconomical and no longer useful for the Issuer or any Restricted Subsidiary in the ordinary course of business; and

(o)     dispositions of Oil and Gas Properties in exchange for Oil and Gas Properties; *provided,* that such exchange is made in an arm's-length free market transaction and the Fair Market Value of the Oil and Gas Property received by the Issuer or the applicable Restricted Subsidiary is not materially lower than the Fair Market

Value of the Oil and Gas Property exchanged by the Issuer or such Restricted Subsidiary.

"*Asset Disposition Offer*" shall have the meaning specified in <u>Section 4.1(h)(2)</u>.

"*Authorized Agent*" shall mean the collective reference to the Paying Agent(s), Security Registrar, any other co-security registrar appointed hereunder, and any Transfer Agent(s).

"*Authorized Officer*" shall mean, (1) in the case of the Issuer, the individual(s) (who may include directors of the Issuer) whose signatures and incumbency shall have been certified by the Issuer in an Officer's Certificate delivered to the Trustee which are legally entitled to represent the Issuer or (2) in the case of any other Person, the chairman of the board, chief executive officer, chief financial officer or accounting officer, any vice president (whether or not designated by a number or numbers or word or words added before or after the title "Vice President") or any corporate officer of such Person responsible for the administration of the transactions effected by this Indenture and the Notes.

"*Average Life*" shall mean, as of the date of determination, with respect to any Indebtedness or Preferred Stock, the quotient obtained by dividing (1) the sum of the products of the numbers of years from the date of determination to the dates of each successive scheduled principal payment of such Indebtedness or redemption or similar payment with respect to such Preferred Stock multiplied by the amount of such payment by (2) the sum of all such payments.

"*Bankruptcy Law*" shall mean the Bankruptcy Code of the United States, the *Bankruptcy and Insolvency Act* (Canada), the *Companies Creditors' Arrangement Act* (Canada), the *Winding up and Restructuring Act* (Canada), Colombian Law 1116 of 2006 (*Régimen de Insolvencia Empresarial*, as applicable to non-financial institutions and non-public utilities services companies), the Swiss Federal Debt Enforcement and Bankruptcy Act (*Bundesgesetz über Schuldbetreibung und Konkurs, SchKG*) of April 11, 1889, as each may be amended from time to time, or other U.S. federal or state law, any Canadian federal or provincial law, Colombian, Panamanian, Swiss law or the law of any other jurisdiction relating to bankruptcy, insolvency, receivership, winding-up, liquidation, administrative take-over, reorganization, plans of arrangement or any similar procedure (whether or not dealing with solvent companies), "*quiebra*" or relief of debtors.

"*Board of Directors*" shall mean, with respect to any Person, the Board of Directors of such Person or any committee thereof duly authorized to act on behalf of the Board of Directors of such Person or similar governing body in the case of a non-incorporated Person.

"*Business Day*" shall mean any day other than a Saturday, Sunday or other day on which banking institutions in Alberta, Canada, Bogota, Colombia and New York City, New York, are permitted or required by Applicable Law, decree, regulation or executive order, to remain closed.

"*Canada*" shall mean the nation of Canada, and its provinces and territories.

"*Capital Stock*" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"*Capitalized Lease Obligation*" shall mean an obligation that is required to be classified and accounted for as a capitalized lease contract for financial reporting purposes, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation; and the stated maturity thereof shall be the date of the last lease payment or any other amount due under such lease prior to the first date upon which such lease may be prepaid by the lessee without payment of a penalty. Notwithstanding any other provision in the Indenture, all obligations of any Person that are or would have been characterized as an operating lease for purposes of IAS 17 – Leases prior to the effective date of accounting pronouncement IFRS 16 – Leases as of January 1, 2019 ("IFRS 16"), shall continue to be accounted for as an operating lease (and shall not be recognized as a Capitalized Lease Obligation) (whether or not such lease obligations were in effect on such date), and thereby do not constitute Indebtedness of that Person, notwithstanding the application of IFRS 16 (on a prospective or retroactive basis or otherwise) and regardless of any change in IFRS that would otherwise require such obligation to be recharacterized as a Capitalized Lease Obligation.

"*Change of Control*" shall mean the occurrence of any of the following events:

(1)      the direct or indirect sale, lease, transfer, conveyance or other disposition (other than by way of merger, amalgamation or consolidation), in one or a series of related transactions, of all or substantially all of the assets of the Issuer and its Restricted Subsidiaries taken as a whole to any "person" (as that term is used in Section 13(d)(3) of the Exchange Act) other than to the Issuer, one of its Restricted Subsidiaries or any Permitted Holder;

(2)      the consummation of any transaction (including without limitation, any merger or consolidation) the result of which is that any "person" (as that term is used in Section 13(d)(3) of the Exchange Act), other than the Issuer, one of its Restricted Subsidiaries or any Permitted Holder, becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act), directly or indirectly, of more than 50% of the outstanding Voting Stock of the Issuer, measured by voting power rather than number of shares;

(3)    the Issuer consolidates with, amalgamates with, merges with or into, any Person, or any Person consolidates with, amalgamates with, merges with or into, the Issuer, in any such event pursuant to a transaction in which any of the outstanding Voting Stock of the Issuer or such other Person, as applicable, is converted into or exchanged for cash, securities or other property, other than any such transaction where the shares of the Voting Stock of the Issuer outstanding immediately prior to such transaction constitute, or are converted into or exchanged for, a majority of the Voting Stock of the surviving Person immediately after giving effect to such transaction; or

(4)    the adoption of a plan relating to the liquidation or dissolution of the Issuer (unless, after such liquidation or dissolution, the Successor assumes all of the obligations of the Issuer under this Indenture for the benefit of Holders of the Notes as provided hereunder).

Notwithstanding the preceding, neither a Reincorporation Transaction nor a conversion of the Issuer or any of its Restricted Subsidiaries from a limited partnership, corporation, limited liability company or other form of entity to a limited liability company, corporation, limited partnership or other form of entity or an exchange of all of the outstanding Equity Interests in one form of entity for Equity Interests in another form of entity shall constitute a Change of Control, so long as following such conversion or exchange the "persons" (as that term is used in Section 13(d)(3) of the Exchange Act) who beneficially owned the Capital Stock of the Issuer immediately prior to such transactions continue to beneficially own in the aggregate more than 50% of the Voting Stock of such entity, or continue to beneficially own sufficient Equity Interests in such entity to elect a majority of its directors, managers, trustees or other Persons serving in a similar capacity for such entity or its general partner, as applicable.

"*Change of Control Event*" means the occurrence of both a Change of Control and a Ratings Downgrade.

"*Change of Control Offer*" shall have the meaning given to it under Section 4.4.

"*Change of Control Payment*" shall have the meaning given to it under Section 4.4.

"*Change of Control Payment Date*" shall have the meaning given to it under Section 4.4.

"*Clearstream*" shall mean Clearstream Banking Luxembourg, a division of Clearstream International, *société anonyme*.

"*Code*" shall mean the United States Internal Revenue Code of 1986, as amended.

"*Colombia*" shall mean the Republic of Colombia.

"*Colombian Note Guarantors*" shall have the meaning specified in <u>Section 5.1(b)</u>.

"*Combined*" shall mean the combination of accounts of one or more Persons in accordance with IFRS.

"*Comparable Treasury Issue*" means the United States Treasury security or securities selected by an Independent Investment Banker as having an actual or interpolated maturity comparable to the term from the Redemption Date to November 24, 2024 that would be utilized, at the time of selection and in accordance with customary financial practice, in pricing new issues of corporate debt securities of a comparable maturity to the term from the Redemption Date to November 24, 2024.

"*Comparable Treasury Price*" means, with respect to any Redemption Date, (1) the average of the Reference Treasury Dealer Quotations for such Redemption Date, after excluding the highest and lowest such Reference Treasury Dealer Quotation or (2) if the Issuer obtains fewer than four such Reference Treasury Dealer Quotations, the average of all such quotations.

"*Consolidated Adjusted EBITDAX*" shall mean, for any period, without duplication, the Consolidated Net Income for such period, plus the following, without duplication and to the extent deducted (and not added back) in calculating such Consolidated Net Income:

      (1)      Consolidated Interest Expense;

      (2)      Consolidated Income Tax Expense;

      (3)      Consolidated depletion, depreciation and accretion expense of the Issuer and its Restricted Subsidiaries;

      (4)      Consolidated amortization expense or asset impairment charges of the Issuer and its Restricted Subsidiaries;

      (5)      other non-cash charges of the Issuer and its Restricted Subsidiaries (including, without limitation, any non-cash compensation expenses, non-cash unrealized gains/losses on foreign exchange translation, commodity and foreign currency derivatives and investments, loss on extinguishment of Indebtedness, doubtful account expense, gains/losses on sale or acquisition of Oil and Gas Properties or Capital Stock in Persons holding such properties, but excluding any non-cash charge to the extent it represents an

accrual of or reserve for cash charges in any future period or amortization of a prepaid cash expense that was paid in a prior period not included in the calculation); and

(6)    Consolidated exploration expense of the Issuer and its Restricted Subsidiaries,

if applicable for such period; and less, to the extent included in calculating such Consolidated Net Income and in excess of any costs or expenses attributable thereto that were deducted (and not added back) in calculating such Consolidated Net Income, non-cash gains (excluding any non-cash gain to the extent it represents the reversal of an accrual or reserve for a potential cash item that reduced Consolidated Adjusted EBITDAX in any prior period).

It being understood that, (i) the Consolidated Adjusted EBITDAX of any Person or line of business acquired by the Issuer or any of its Restricted Subsidiaries during such period shall be included on a pro forma basis for such period (assuming that the consummation of such acquisition and the Incurrence of any Indebtedness in connection therewith occurred as of the first day of such period); and (ii) the Consolidated Adjusted EBITDAX of any Person or line of business disposed of by the Issuer or any of its Restricted Subsidiaries during such period shall be excluded for such period (assuming that the consummation of such disposition and the repayment of any Indebtedness in connection therewith occurred as of the first day of such period).

Notwithstanding the preceding sentence, clauses (1) through (7) relating to amounts of a Restricted Subsidiary of the referent Person will be added to Consolidated Net Income to compute Consolidated Adjusted EBITDAX of such Person only in the same proportion that the net income of such Restricted Subsidiary was included in calculating the Consolidated Net Income of such Person.

"*Consolidated Debt to Consolidated Adjusted EBITDAX Ratio*" shall mean at any date (x) Consolidated Total Indebtedness as of such date *minus* the cash and cash equivalents of the Issuer and its Restricted Subsidiaries as of such date *divided by* (y) Consolidated Adjusted EBITDAX for the most recently ended period of four consecutive fiscal quarters for which financial statements of the Issuer have been provided to the Trustee pursuant to Section 4.1(l) (the "*trailing four quarters*"), *provided,* that:

(1)    if the Issuer or any Restricted Subsidiary has

(a)    Incurred any Indebtedness since the beginning of the trailing four quarters that remains outstanding on the date of the transaction giving rise to the need to calculate the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio or if the transaction

9

giving rise to the need to calculate the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio is an Incurrence of Indebtedness, Indebtedness at the end of such period, Consolidated Adjusted EBITDAX and Consolidated Total Indebtedness for such trailing four quarters shall be calculated on a *pro forma* basis as if such Indebtedness had been Incurred on the first day of such trailing four quarters (except that in making such computation, the amount of Indebtedness under any revolving credit facility outstanding on the day of such calculation will be deemed to be:

(i)     the average daily balance of such Indebtedness during such four fiscal quarters or such shorter period for which such facility was outstanding; or

(ii)    if such facility was created after the end of such four fiscal quarters, the average daily balance of such Indebtedness during the period from the date of creation of such facility to the date of such calculation),

(b)     repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case, other than Indebtedness Incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio, Consolidated Adjusted EBITDAX for such period shall be calculated on a *pro forma* basis as if such discharge had occurred on the first day of such period and as if the Issuer or such Restricted Subsidiary had not earned the interest income actually earned during such period in respect of cash or Temporary Cash Investments used to repay, repurchase, defease or otherwise discharge such Indebtedness;

(2)     if since the beginning of such period the Issuer or any Restricted Subsidiary shall have made any Asset Disposition, then giving *pro forma* effect to such disposition during such period on the Consolidated Adjusted EBITDAX;

(3)     if since the beginning of such period, the Issuer or any Restricted Subsidiary (by merger or otherwise) shall have made an Investment in any Person that is merged with or into the Issuer or any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made under this

Indenture, which constitutes all or substantially all of an operating unit of a business, then giving *pro forma* effect to such Investment or acquisition on the Consolidated Adjusted EBITDAX for such period, any such *pro forma* calculation may include adjustments appropriate to reflect, without duplication,

(a)     any such acquisition to the extent such adjustments may be reflected in the preparation of *pro forma* financial information in accordance with the requirements of Article 11 of Regulation S-X under the Exchange Act, as amended; and

(b)     the annualized amount of operating expense reductions reasonably expected to be realized in the six months following any such acquisition made during any of the four fiscal quarters constituting the four-quarter reference period prior to the date of determination;

*provided, however*, that in each case such adjustments are set forth in an Officer's Certificate that states (x) the amount of such adjustment or adjustments, (y) that such adjustment or adjustments are based on the reasonable good faith beliefs of the officers executing such Officer's Certificate at the time of such execution and (z) that any related Incurrence of Indebtedness is permitted pursuant to this Indenture; and

(4)     if since the beginning of such period, any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period) shall have made any Asset Disposition or any Investment or acquisition of assets that would have required an adjustment pursuant to clauses (2) or (3) above if made by the Issuer or a Restricted Subsidiary during such period, Consolidated Adjusted EBITDAX for such period shall be calculated after giving *pro forma* effect thereto as if such Asset Disposition, Investment or acquisition of assets occurred on the first day of such period.

For purposes of this definition, whenever *pro forma* effect is to be given to an acquisition of assets and the amount of income or earnings relating thereto, the *pro forma* calculations shall be determined in good faith by a responsible financial or accounting officer of the Issuer.  If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Indebtedness if such Interest Rate Agreement has a remaining term as at the date of determination in excess of twelve months).

"*Consolidated Income Tax Expense*" shall mean, with respect to any period, the provision for federal, national, state, local and foreign income taxes (including state franchise taxes

accounted for as income taxes in accordance with IFRS) of the Issuer and its Restricted Subsidiaries for such period as determined in accordance with IFRS.

"*Consolidated Interest Coverage Ratio*" shall mean at any date, (x) the Consolidated Adjusted EBITDAX for the most recently ended period of four consecutive fiscal quarters for which financial statements of the Issuer have been provided to the Trustee pursuant to Section 4.1(l) (the "*trailing four quarters*"), *divided by* (y) the Consolidated Interest Expense for such period; *provided,* that:

(1)    if the Issuer or any Restricted Subsidiary has

(a)    Incurred any Indebtedness since the beginning of the trailing four quarters that remains outstanding on the date of the transaction giving rise to the need to calculate the Consolidated Interest Coverage Ratio or if the transaction giving rise to the need to calculate the Consolidated Interest Coverage Ratio is an Incurrence of Indebtedness, Consolidated Adjusted EBITDAX and Consolidated Interest Expense for such trailing four quarters shall be calculated on a *pro forma* basis as if such Indebtedness had been Incurred on the first day of such trailing four quarters except that in making such computation, the amount of Indebtedness under any revolving credit facility outstanding on the day of such calculation will be deemed to be

(i)    the average daily balance of such Indebtedness during such four fiscal quarters or such shorter period for which such facility was outstanding, or

(ii)    if such facility was created after the end of such four fiscal quarters, the average daily balance of such Indebtedness during the period from the date of creation of such facility to the date of such calculation, or

(b)    repaid, repurchased, defeased or otherwise discharged any Indebtedness since the beginning of such period or if any Indebtedness is to be repaid, repurchased, defeased or otherwise discharged (in each case, other than Indebtedness Incurred under any revolving credit facility unless such Indebtedness has been permanently repaid and has not been replaced) on the date of the transaction giving rise to the need to calculate the Consolidated Interest Coverage Ratio, Consolidated Adjusted EBITDAX and Consolidated Interest Expense for such period shall be calculated

12

on a *pro forma* basis as if such discharge had occurred on the first day of such period and as if the Issuer or such Restricted Subsidiary has not earned the interest income, if any, actually earned during such period in respect of cash or Temporary Cash Investments used to repay, repurchase, defease or otherwise discharge such Indebtedness;

(2)     if since the beginning of such period, the Issuer or any Restricted Subsidiary shall have made any Asset Disposition, then giving *pro forma* effect to such disposition during such period on Consolidated Adjusted EBITDAX and Consolidated Interest Expenses for such period;

(3)     if since the beginning of such period, the Issuer or any Restricted Subsidiary (by merger or otherwise) shall have made an Investment in any Person that is merged with or into the Issuer or any Restricted Subsidiary (or any Person that becomes a Restricted Subsidiary) or an acquisition of assets, including any acquisition of assets occurring in connection with a transaction causing a calculation to be made hereunder, which constitutes all or substantially all of an operating unit of a business, then giving *pro forma* effect to such Investment or acquisition on the Consolidated Adjusted EBITDAX and Consolidated Interest Expense for such period, any such *pro forma* calculation may include adjustments appropriate to reflect, without duplication,

>    (a)     any such acquisition to the extent such adjustments may be reflected in the preparation of *pro forma* financial information in accordance with the requirements of Article 11 of Regulation S-X under the Exchange Act, as amended;

>    (b)     the annualized amount of operating expense reductions reasonably expected to be realized in the six months following any such acquisition made during any of the four fiscal quarters constituting the four-quarter reference period prior to the date of determination; *provided,* that in each case such adjustments are set forth in an Officer's Certificate that states:

>    >    (i)     the amount of such adjustment or adjustments,

>    >    (ii)     that such adjustment or adjustments are based on the reasonable good faith beliefs of the officers executing such Officer's Certificate at the time of such execution; and

(iii)    that any related Incurrence of Indebtedness is permitted pursuant to this Indenture; and

(4)    if since the beginning of such period, any Person (that subsequently became a Restricted Subsidiary or was merged with or into the Issuer or any Restricted Subsidiary since the beginning of such period) shall have made any Asset Disposition or any Investment or acquisition of assets that would have required an adjustment pursuant to clause (2) or (3) above if made by the Issuer or a Restricted Subsidiary during such period, Consolidated Adjusted EBITDAX and Consolidated Interest Expense for such period shall be calculated after giving *pro forma* effect thereto as if such Asset Disposition, Investment or acquisition of assets occurred on the first day of such period.

For purposes of this definition, whenever *pro forma* effect is to be given to an acquisition of assets and the amount of income or earnings relating thereto, the *pro forma* calculations shall be determined in good faith by a responsible financial or accounting officer of the Issuer. If any Indebtedness bears a floating rate of interest and is being given *pro forma* effect, the interest expense on such Indebtedness shall be calculated as if the rate in effect on the date of determination had been the applicable rate for the entire period (taking into account any Interest Rate Agreement applicable to such Indebtedness if such Interest Rate Agreement has a remaining term as at the date of determination in excess of twelve months).

"*Consolidated Interest Expense*" shall mean, for any period and with respect to the Issuer and its Restricted Subsidiaries, the aggregate amount of Consolidated interest expense (net of Consolidated interest income) accrued in respect of Indebtedness (including, but not limited to, any amount thereof capitalized) of the Issuer and its Restricted Subsidiaries during such period, as determined in accordance with IFRS.

"*Consolidated Net Income*" shall mean, for any period and with respect to the Issuer, the Consolidated net income of the Issuer and its Restricted Subsidiaries for such period as determined in accordance with IFRS, excluding the following:

(1)    consolidated deferred income taxes of the Issuer and its Restricted Subsidiaries for such period as determined in accordance with IFRS;

(2)    impairment of exploration and evaluation assets of the Issuer and its Restricted Subsidiaries for such period as determined in accordance with IFRS, which may or may not be recognized until the Maturity Date and may include the following assets and corresponding costs as of the Issue Date:

(a)    VIM-19 exploration block costs of US$6 million,

(b)    VMM-3 exploration block costs of US$13.6 million,

(c)    VMM-2 exploration block costs of US$1.6 million,

(d)    Sangretoro exploration block costs of US$4.1 million,

14

(e)     Flauta-1 exploration well costs of US$5.9 million, and

(f)     Milano-1 exploration well costs of US$5.9 million,

(3)     any amount recognized in the consolidated net income of the Issuer and its Restricted Subsidiaries for such period due to the extinguishment or substantial modification of a financial liability in accordance with IFRS 9.

"*Consolidated Net Tangible Assets*" shall mean, of any Person, the aggregate amount of assets of such Person and its Subsidiaries after deducting therefrom (to the extent otherwise included therein) all goodwill, trade names, trademarks, patents, unamortized debt discount and expense and other like intangibles, all as set forth on the most recent quarterly or annual (as the case may be) Consolidated balance sheet (prior to the relevant date of determination for which internal financial statements are available) of such Person and its Subsidiaries in accordance with IFRS.

"*Consolidated Total Indebtedness*" shall mean, as of any date and with respect to the Issuer, the Consolidated Indebtedness as of such date of the Issuer and its Restricted Subsidiaries.

"*Consolidation*" shall mean the consolidation of accounts of a Person and its Subsidiaries in accordance with IFRS; *provided* that, with respect to the Issuer, it shall mean the consolidation of the accounts of the Issuer with those of its Restricted Subsidiaries in accordance with IFRS consistently applied; *provided, however*, that Consolidation will not include consolidation of the accounts of any Unrestricted Subsidiary, but the interest of the Issuer or any Restricted Subsidiary in an Unrestricted Subsidiary will be accounted for as an investment. The term "*Consolidated*" has a correlative meaning.

"*Corporate Trust Office*" shall mean the office of the Trustee on the Initial Issue Date located at 388 Greenwich Street, 14th floor, New York, New York 10013, or such other office as the Trustee may from time to time designate in writing to the Issuer.

"*Covenant Defeasance*" shall have the meaning given to it under Section 6.4.

"*Covenant Suspension Event*" shall have the meaning specified in Section 4.2.

"*Credit Facilities*" means one or more credit or debt facilities, commercial paper facilities or Debt Issuances, in each case with banks, investment banks, insurance companies, mutual funds, other institutional lenders, institutional investors or vendors providing for, among other things, revolving credit loans, term loans, term debt, debt securities, receivables financing (including through the sale of receivables to such lenders, other financiers or to special purpose entities formed to borrow from such lenders or other financiers against such receivables), letters of credit or letter of credit guarantees, bankers' acceptances, other borrowings or Debt Issuances,

in each case, as amended, supplemented, restated or otherwise modified, in whole or in part, from time to time.

"*Currency Agreement*" shall mean, with respect to any Person, any foreign exchange contract, currency swap agreement or other similar agreement or arrangement to which such Person is a party or of which it is a beneficiary.

"*Debt Issuances*" means, with respect to the Issuer or any Restricted Subsidiary of the Issuer, one or more issuances after the Initial Issue Date of Indebtedness evidenced by notes, debentures, bonds or other similar securities or instruments.

"*Default*" shall mean any event that is, or after notice or passage of time or both would be, an Event of Default.

"*Definitive Notes*" shall have the meaning specified in <u>Section 2.3(a)</u>.

"*Designated Non-cash Consideration*" means the Fair Market Value (as determined in good faith by the Issuer) of non-cash consideration received by the Issuer or a Restricted Subsidiary in connection with an Asset Disposition that is so designated as Designated Non-cash Consideration pursuant to an Officer's Certificate, setting forth such valuation.

"*Designation*" shall have the meaning given to it under the definition of the term "*Unrestricted Subsidiary*."

"*Disqualified Stock*" shall mean, with respect to any Person, any Capital Stock that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable or exercisable) or upon the happening of any event: (1) matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise; (2) is convertible or exchangeable for Indebtedness or Disqualified Stock; or (3) is redeemable at the option of the holder thereof, in whole or in part; in each case on or prior to the 91st day after the final Maturity Date of the Notes; *provided, however,* that any Capital Stock that would not constitute Disqualified Stock but for provisions thereof giving holders thereof the right to require such Person to repurchase or redeem such Capital Stock upon the occurrence of an "asset sale" or "change of control" occurring prior to the 91st day after the final Maturity Date of the Notes shall not constitute Disqualified Stock if the "asset sale" or "change of control" provisions applicable to such Capital Stock are not more favorable to the holders of such Capital Stock than the provisions of <u>Section 4.1(h)</u> or under <u>Section 4.4</u>, as the case may be.

"*Dividend Step-Up Condition*" means, as of the date of determination, the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio is less than 2.00 to 1.00.

"*Dollars*" or "*U.S.$*" shall mean the lawful currency for the time being in the United States.

"*DTC*" shall mean The Depository Trust Company, a New York corporation.

"*DTC Participants*" shall have the meaning specified in <u>Section 2.3(b)</u>.

"*Equity Offering*" shall mean any issuance or sale of Capital Stock (other than Disqualified Stock) of the Issuer (or any direct or indirect parent of the Issuer to the extent the net proceeds therefrom are contributed to the common equity capital of the Issuer or used to purchase equity interests (other than Disqualified Stock) of the Issuer) or warrants, options or other rights to acquire Capital Stock (other than Disqualified Stock) of the Issuer after the Initial Issue Date, other than any issuance pursuant to employee benefit plans or otherwise in compensation to officers, directors or employees.

"*Esperanza E&E Contract*" means the exploration and exploitation contract located in the Lower Magdalena basin, Colombia, where the Issuer has a 100% working interest.

"*Euroclear*" shall mean Euroclear Bank, S.A./N.V., as operator of the Euroclear System, and its successors.

"*Event of Default*" shall have the meaning specified in <u>Section 5.1(a)</u>.

"*Exchange Act*" shall mean the United States Securities Exchange Act of 1934, as amended.

"*Fair Market Value*" shall mean, with respect to any asset, the price which could be negotiated in an arm's-length free market transaction, for cash, between a willing seller and a willing buyer, neither of which is under compulsion to complete the transaction, and, unless otherwise specified herein (except for assets consisting of publicly traded securities),

(1)   if such asset has a price in excess of U.S.$20 million (or its equivalent in any other currency) as such price is determined in good faith by the Board of Directors of the Issuer or Restricted Subsidiary, as applicable, as evidenced by a resolution of such Board of Directors and certified by an Officer's Certificate as delivered to the Trustee; or

(2)   if such asset has a price of U.S.$20 million (or its equivalent in any other currency) or under, as such price is determined in good faith by an officer of the Issuer or Restricted Subsidiary, as applicable.

"*Farm-In Agreement*" means an agreement whereby a Person agrees to pay all or a share of the drilling, completion or other expenses of an exploratory or development well (which agreement may be subject to a maximum payment obligation, after which expenses are shared in accordance with the working or participation interests therein or in accordance with the agreement of the parties) or perform the drilling, completion or other operation on such well in exchange for an ownership interest in an Oil and Gas Property.

"*Farm-Out Agreement*" means a Farm-In Agreement, viewed from the standpoint of the party that transfers an ownership interest to another.

"*Fitch*" means Fitch Ratings Ltd. and its Affiliates or any successors thereof.

"*Flauta-1*" shall mean an A3 well, drilled by the Issuer in connection with the VIM-5 exploration and production contract.

"*Global Notes*" shall have the meaning specified in Section 2.1(d).

"*Governmental Authority*" shall mean any nation or government, any state, province, territory or other political subdivision thereof, any central bank (or similar monetary or regulatory authority) thereof, any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to a government and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"*Guarantee*" shall mean any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of any Person (1) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness of such other Person (whether arising by virtue of partnership arrangements, or by agreement to keep-well, to purchase assets, goods, securities or services, or to maintain financial statement conditions or otherwise) or (2) entered into for purposes of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); *provided*, *however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business. The term "Guarantee" used as a verb has a correlative meaning.

"*Guaranty*" shall mean the Guarantee pursuant to the provisions of Article VII hereto, granted by each of the Note Guarantors, jointly and severally, in favor of the Trustee and the Holders.

"*Hedging Agreement*" means (a) any and all Interest Rate Agreement, Currency Agreement, basis swaps, credit derivative transactions, forward rate transactions, commodity

swaps, commodity options, forward commodity contracts, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts or any other similar transactions or any combination of the foregoing (including any option to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, traded at the over-the-counter or standardized markets and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or are governed by any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement or any other master agreement (including such master agreement, together with any related schedules, a "*Master Agreement*") including any such obligations or liabilities under any Master Agreement.

"*Hedging Obligations*" of any Person shall mean the obligations of such Person pursuant to any Hedging Agreement.

"*Holder*" shall mean the Person in whose name a Note is registered on the Register.

"*Hydrocarbons*" means gas, casinghead gas, drip gasoline, natural gasoline, condensate, distillate, liquid hydrocarbons (other than oil), gaseous hydrocarbons, natural gas liquids, and all constituents, elements or compounds thereof and products refined or processed therefrom.

"*IFRS*" shall mean International Financial Reporting Standards as issued by the International Accounting Standards Board.

"*Incur*" shall mean issue, assume, Guarantee, incur or otherwise become liable in respect of Indebtedness; *provided*, *however*, that any Indebtedness of a Person existing at the time such Person is merged or consolidated with the Issuer or becomes a Subsidiary of the Issuer (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the effective time of such merger or consolidation or at the time it becomes a Subsidiary of the Issuer. The verb "*Incurred*" and the term "*Incurrence*" when used as a noun shall have a correlative meaning. Neither the accretion of principal of a non-interest bearing or other discount security nor the capitalization accruing of interest on Indebtedness shall be deemed the Incurrence of Indebtedness.

"*Indebtedness*" shall mean, with respect to any Person on any date of determination (without duplication):

     (1)    the principal in respect of indebtedness of such Person for borrowed money;

(2)      the principal in respect of obligations of such Person evidenced by bonds, debentures, notes or other similar instruments;

(3)      all obligations of such Person in respect of letters of credit, bankers' acceptances or other similar instruments, excluding obligations in respect of trade letters of credit or bankers' acceptances issued in respect of trade payables to the extent not drawn upon or presented, or, if drawn upon or presented, the resulting obligation of the Person is paid in ten Business Days;

(4)      all obligations of such Person to pay the deferred and unpaid purchase price of property or services (except trade payables and contingent obligations to pay earn-outs), which purchase price is due more than six months after the date of placing such property in service or taking delivery and title thereto or the completion of such services;

(5)      all Capitalized Lease Obligations of such Person;

(6)      the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any Disqualified Stock or, with respect to any Subsidiary of such Person, any Preferred Stock (but excluding, in each case, any accrued dividends or obligations payable to the Issuer or any Restricted Subsidiary);

(7)      all Indebtedness of other Persons secured by a Lien on any asset of such Person, whether or not such Indebtedness is assumed by such Person; *provided*, *however*, that the amount of Indebtedness of such Person shall be the lesser of (x) the Fair Market Value of such asset at such date of determination and (y) the amount of such Indebtedness of such other Persons;

(8)      to the extent not otherwise included in this definition, the aggregate net termination value of all Hedging Obligations of such Person; and

(9)      all obligations of the type referred to in clauses (1) through (8) above of other Persons Guaranteed by such Person or for which such Person is otherwise liable as obligor, guarantor or otherwise.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date.

The following obligations shall not be deemed to be Indebtedness for any purpose:

(a)     obligations arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided*, *however*, that such Indebtedness is extinguished within five Business Days of its Incurrence;

(b)     customer deposits and advance payments received from customers in the ordinary course of business;

(c)     accrued expenses, royalties and trade accounts payable arising in the ordinary course of business (*provided*, *however*, that any Guarantee of production or payment (but not any other contractual obligation) in respect to a royalty will constitute Indebtedness);

(d)     any indebtedness which has been defeased in accordance with IFRS or defeased pursuant to the deposit of cash or Temporary Cash Investments (in an amount sufficient to satisfy all such indebtedness obligations at maturity or redemption, as applicable, and all payments of interest and premium, if any) in a trust or account created or pledged for the sole benefit of the holders of such indebtedness, and subject to no other Liens, and the other applicable terms of the instrument governing such indebtedness;

(e)     any obligation arising from any agreement providing for indemnities, guarantees, purchase price adjustments, holdbacks, contingency payment obligations based on the performance of the acquired or disposed assets or similar obligations (other than Guarantees of Indebtedness) incurred by any Person in connection with the acquisition or disposition of assets;

(f)     natural gas balancing liabilities incurred in the ordinary course of business and consistent with past practice; and

(g)     any take-or-pay or ship-or-pay agreements in connection with the operation of the Issuer's and Restricted Subsidiary's Oil and Gas Properties.

"*Indenture*" shall mean this Indenture, as amended or supplemented from time to time.

"*Indenture Supplement*" shall mean a supplement, if any, to this Indenture that is executed and delivered pursuant to Article IX.

"*Independent Investment Banker*" means one of the Reference Treasury Dealers appointed by the Issuer.

"*Initial Issue Date*" shall mean November 24, 2021.

"*Initial Note Guarantors*" mean shall have the meaning set forth in the preamble and Schedule I of this Indenture.

"*Interest Rate Agreement*" shall mean, with respect to any Person, any interest rate protection agreement, interest rate future agreement, interest rate option agreement, interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedge agreement or other similar agreement or arrangement to which such Person is a party or a beneficiary.

"*Investment*" in any Person shall mean any direct or indirect advance, loan (other than advances to customers or suppliers in the ordinary course of business that are recorded as accounts receivable, pre-paid expenses or deposits on the balance sheet) or other extension of credit (including by way of Guarantee or similar arrangement) or capital contribution to (by means of any transfer of cash or other property to others or any payment for property or services for the account or use of others), or any purchase or acquisition of Capital Stock, Indebtedness or other similar instruments issued by such Person.

For purposes of the definition of "*Unrestricted Subsidiary*" and the covenant described in Section 4.1(g) hereof, Investment shall include the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the Fair Market Value of the net assets of any Subsidiary of the Issuer at the time that such Subsidiary is designated an Unrestricted Subsidiary; *provided*, *however*, that, upon a redesignation of such Subsidiary as a Restricted Subsidiary, the Issuer shall be deemed to continue to have a permanent "Investment" in an Unrestricted Subsidiary in an amount (if positive) equal to: (1) the Issuer's Investment in such Subsidiary at the time of such redesignation less (2) the portion (proportionate to the Issuer's equity interest in such Subsidiary) of the Fair Market Value of the net assets of such Subsidiary at the time of such redesignation. Any property transferred to or from an Unrestricted Subsidiary shall be valued at its Fair Market Value at the time of such transfer, in each case, as determined in good faith by the Board of Directors of the Issuer.  Except as otherwise provided herein, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value. For the avoidance of doubt, Investments shall not include deposits of money in the bank accounts of the Issuer or the Restricted Subsidiaries in the ordinary course of business and not for the benefit of persons other than the Issuer and the Restricted Subsidiaries in jurisdictions where they do business.

"*Investment Grade Rating*" shall mean a rating equal to or higher than BBB- (or the equivalent) by Fitch, BBB- (or the equivalent) by S&P, or Baa3 (or the equivalent) by Moody's, or an equivalent rating by any other Rating Agency.

"*Issuer*" shall have the meaning set forth in the preamble.

"*Legal Defeasance*" shall have the meaning given to it under Section 6.4.

"*Lien*" shall mean any mortgage, deed of trust, lien, security interest, pledge, hypothecation, assignment, deposit arrangement (other than deposits of money in the bank accounts of the Issuer or the Restricted Subsidiaries in the ordinary course of business) or other charge or encumbrance of any kind, including, without limitation, the lien or retained security title of a conditional vendor and any easement, right of way or other encumbrance on title to real property, any right of set off or any similar arrangement under or with respect to any insurance policy or anything analogous to any of the foregoing under the laws of any jurisdiction. For the avoidance of doubt any preference of one creditor in the ordinary course over another arising by operation of law shall not be considered as a Lien; provided that in no event shall a lease that would have been characterized as an operating lease for purposes of IFRS prior to the effective date of IFRS 16 (whether or not such lease was in effect on such date) be deemed to constitute a Lien.

"Management Group" means one or more members of the Board of Directors, the President, Chief Executive Officer, the Chief Financial Officer, the principal accounting officer, any Treasurer or Controller, or any Vice President, in each case, of the Issuer or any Note Guarantor.

"*Material Adverse Effect*" shall mean, a material adverse effect on the business, properties, management, financial position or results of operations of the Issuer, the Note Guarantors, and any Subsidiaries thereof taken as a whole or on the performance by the Issuer and the Note Guarantors of their obligations under the Notes.

"*Maturity Date*" shall mean November 24, 2028.

"*Milano-1*" shall mean an A3 well, drilled by the Issuer in connection with the Esperanza E&E Contract.

"*Moody's*" shall mean Moody's Investors Service, Inc. or any successor thereto.

"*Net Available Cash*" from an Asset Disposition shall mean cash payments received (including any cash payments received by way of deferred payment of principal pursuant to a

note or installment receivable or otherwise and proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Indebtedness or other obligations relating to the properties or assets that are the subject of such Asset Disposition or received in any other non-cash form) therefrom, in each case net of:

(1)     all legal fees and expenses, title and recording tax expenses, commissions and other fees and expenses incurred, and all federal, state, provincial, foreign and local taxes required to be paid or accrued as a liability under IFRS, as a consequence of such Asset Disposition;

(2)     all payments, including any prepayment premiums or penalties, made on any Indebtedness that is secured by any assets subject to such Asset Disposition, in accordance with the terms of any Lien upon or other security agreement of any kind with respect to such assets, or that shall by its terms, or in order to obtain a necessary consent to such Asset Disposition, or by Applicable Law be repaid out of the proceeds from such Asset Disposition;

(3)     all distributions and other payments required to be made to minority interest holders in Subsidiaries or joint ventures as a result of such Asset Disposition; and

(4)     appropriate amounts to be provided by the seller as a reserve, in accordance with IFRS, against any liabilities associated with the property or other assets disposed of in such Asset Disposition and retained by the Issuer or any Restricted Subsidiary after such Asset Disposition.

"*Net Cash Proceeds*" with respect to any Equity Offering shall mean the cash proceeds of such issuance or sale net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, discounts or commissions and brokerage, consultant and other fees and expenses actually Incurred in connection with such issuance or sale and net of taxes paid or payable as a result thereof.

"*Note Guarantee*" shall mean the unconditional guarantee, on a joint and several basis, of the full and prompt payment of all obligations of the Issuer under this Indenture and the Notes, in accordance with Article VII and the other terms of this Indenture.

"*Note Guarantors*" shall mean, collectively, each of, (a) initially, the Initial Note Guarantors and (b) any existing or future Restricted Subsidiary of the Issuer that becomes a Note Guarantor in respect of the Notes by providing a Note Guarantee after the Initial Issue Date pursuant to the terms of this Indenture, in each case, until the Note Guarantee of such Person has been released in accordance with the provisions of this Indenture.

24

"*Notes*" shall have the meaning specified in the recitals hereto and shall also include any Additional Notes issued in accordance with <u>Section 2.11</u>.

"*OECD*" shall mean the Organization for Economic Co-operation and Development.

"*Officer's Certificate*" shall mean a certificate signed by an officer of the Issuer, any of the Note Guarantors or any Restricted Subsidiary, as the case may be, and delivered to the Trustee.  As used herein, "officers" means the Chief Executive Officer, the President, the Chief Financial Officer, the principal accounting officer, any Treasurer or Controller, or any Vice President of the Issuer (whether or not designated by a number or numbers or word or words added before or after the title "Vice President"), any Note Guarantor or any other Restricted Subsidiary, as the case may be.

"*Oil and Gas Business*" shall mean:

(1)    the business of acquiring, exploring, exploiting, developing, producing, operating, marketing, transporting and disposing of interests in oil, natural gas, liquefied natural gas and other Hydrocarbon properties or products produced in association with any of the foregoing;

(2)    any business relating to oil and gas field sales and services;

(3)    any business relating to processing of natural gas;

(4)    any midstream oil and gas services, including gas processing, water treatment, pipelines and flowlines; and

(5)    any business or activity relating to, arising from, or necessary, appropriate or incidental to the activities described in the foregoing clauses (1) through (4) of this definition.

"*Oil and Gas Properties*" shall mean all properties, including without limitation, equity or other ownership interests directly or indirectly therein, and any interests in any concession or license to explore or produce oil and natural gas.

"*Opinion of Counsel*" shall mean a written opinion of counsel in the applicable jurisdiction, who may be an employee of or counsel for the Issuer and the Note Guarantors, containing customary exceptions and qualifications.

"*Other Taxes*" shall mean any and all stamp, documentary or similar taxes, or any other excise or property taxes or similar levies that arise in any jurisdiction from or on account of the execution, delivery, registration, recording or enforcement of the Notes or this Indenture or any documentation with respect thereto.

"*Outstanding*" when used with respect to the Notes, shall mean, as of the date of determination, all Notes theretofore authenticated and delivered under this Indenture, except:

(1)    Notes theretofore canceled by the Trustee or delivered to the Trustee for cancellation;

(2)    Notes, or portions thereof, for whose payment or redemption money in the necessary amount has been theretofore deposited with the Trustee or any Paying Agent (other than the Issuer) in trust or set aside and segregated in trust by the Issuer (if the Issuer shall act as its own Paying Agent) for the Holders of such Notes; *provided* that, if such Notes are to be redeemed, pursuant to Article III, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(3)    Notes which have been defeased or as to which the Issuer has effected covenant defeasance pursuant to Section 6.4 hereof; and

(4)    Notes which have been paid pursuant to the provisions of Section 2.13 hereof or in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to the provisions of this Indenture, other than any such Notes in respect of which there shall have been presented to the Trustee proof satisfactory to it that such Notes are held by a protected purchaser in whose hands such Notes are valid obligations of the Issuer;

*provided*, *however*, that in determining whether the Holders of the requisite principal amount of the Outstanding Notes have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes owned by the Issuer or its Subsidiaries shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes which a Responsible Officer of the Trustee actually knows to be so owned shall be so disregarded. Notes so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the reasonable satisfaction of the Trustee the pledgee's right so to act with respect to such Notes and that the pledgee is not any of the Issuer or its Subsidiaries.

"*Paying Agent*" shall have the meaning set forth in the preamble.

"*Payment Date*" shall mean May 24  and November 24 of each year, commencing on May 24, 2022.

"*Permitted Business*" shall mean the Oil and Gas Business and any Related Business.

"*Permitted Business Investment*" shall mean any Investment and expenditure made in the ordinary course of, and of a nature that is or shall have become customary in, the Oil and Gas Business as a means of actively exploiting, exploring for, acquiring, developing, processing, gathering, marketing or transporting natural gas, other Hydrocarbons and minerals (including with respect to plugging and abandonment) through agreements, transactions, interests or arrangements that permit one to share risks or costs of such activities or comply with regulatory requirements regarding local ownership, including without limitation, (a) ownership interests in natural gas, other Hydrocarbons and minerals properties, liquefied natural gas facilities, processing facilities, gathering systems, pipelines, storage facilities or related systems or ancillary real property interests; (b) Investments in the form of or pursuant to operating agreements, concession agreements, working interests, royalty interests, mineral leases, processing agreements, Farm-In Agreements, Farm-Out Agreements, contracts for the sale, transportation or exchange of natural gas, other Hydrocarbons and minerals, production sharing agreements, participation agreements, development agreements, area of mutual interest agreements, unitization agreements, pooling agreements, joint bidding agreements, service contracts, joint venture agreements, partnership agreements (whether general or limited), subscription agreements, stock purchase agreements, stockholder agreements and other similar agreements (including for limited liability companies) with third parties; and (c) direct or indirect ownership interests in drilling rigs and related equipment, including, without limitation, transportation equipment.

"*Permitted Holders*" means one or more of the following (i) members of the Management Group, (ii) any spouse, descendant, heirs or estate of the individuals referred to in the preceding clause (i), and (iii) any non-natural Person that is an Affiliate of any of the Persons referred to in the preceding clauses (i) and (ii) and with respect to which a Person or Persons listed in the preceding clauses (i) and (ii) owns the majority of the aggregate of the total voting power of the Voting Stock in such non-natural Person, on a fully diluted basis.

"*Permitted Investment*" shall mean:

(1)     an Investment by the Issuer or any Restricted Subsidiary in the Issuer, a Restricted Subsidiary or a Person that will, upon the making of such Investment, become a Restricted Subsidiary; *provided*, *however*, that the primary business of such Person is a Related Business;

(2)     an Investment by the Issuer or any Restricted Subsidiary in another Person if as a result of such Investment such other Person is merged or consolidated with or into,

or transfers or conveys all or substantially all its assets to, the Issuer or a Restricted Subsidiary; *provided*, *however*, that such Person's primary business is a Related Business;

(3)     Temporary Cash Investments;

(4)     receivables owing to the Issuer or any Restricted Subsidiary if created or acquired in the ordinary course of business;

(5)     payroll, travel and similar advances to cover matters that are expected at the time of such advances ultimately to be treated as expenses for accounting purposes and that are made in the ordinary course of business;

(6)     stock, obligations or securities received in settlement or resolution of (or foreclosure with respect to) debts created in the ordinary course of business and owing to the Issuer or any Restricted Subsidiary or in satisfaction of judgments including as a result of the bankruptcy or reorganization of any Person;

(7)     an Investment by the Issuer or any Restricted Subsidiary in any Person to the extent such Investment represents the non-cash or deemed cash portion of the consideration received for an Asset Disposition that was made pursuant to and in compliance with the covenant described under Section 4.1(h) hereof;

(8)     any Investment existing on the Initial Issue Date and any extension, modification or renewal of any such Investments (but not any such extension, modification or renewal to the extent it involves additional advances, contributions or other investments of cash or property, other than reasonable expenses incidental to the structuring, negotiation and consummation of such extension, modification or renewal);

(9)     Hedging Obligations permitted under clause (2)(h) of Section 4.1(e) hereof;

(10)    Guarantees of Indebtedness permitted under the covenant described under Section 4.1(e) hereof;

(11)    Permitted Business Investments;

(12)    the portion of any Investment that is made with Capital Stock of the Issuer (other than Disqualified Stock);

(13)    Investments in the Notes;

(14)    Guarantees of performance or other obligations (other than Indebtedness) arising in the ordinary course in the Permitted Business, including obligations under oil and natural gas exploration, development, joint operating, and related agreements and licenses, concession or operating leases related to the Permitted Business; and

(15)    additional Investments having an aggregate Fair Market Value, taken together with all other Investments made pursuant to this clause (15) that are at the time outstanding, not to exceed the greater of (x) U.S.$50 million (or its equivalent in any other currency) and (y) 5.0% of the Consolidated Net Tangible Assets of the Issuer and its Restricted Subsidiaries at the time of such Investment (with the Fair Market Value of each Investment being measured at the time made and without giving effect to subsequent changes in value).

"*Person*" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, other entity or governmental authority.

"*Place of Payment*" shall have the meaning specified in <u>Section 3.6(e)</u>.

"*Preferred Stock*" shall mean, with respect to the Capital Stock of any Person, any class or classes (however designated) that is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of common Capital Stock of such Person.

"*Purchase Money Obligation*" shall mean:

(1)    mortgage financings, purchase money obligations or other Indebtedness (including Guarantees provided by the Issuer or any Restricted Subsidiary to Colombian regulatory authorities) incurred or assumed for the purpose of financing or refinancing all or any part of the purchase price, lease, expense or cost of any property or asset (including capital assets), tangible or intangible used in any Related Business (including the documented cost of exploration, design, development, acquisition, construction (including capitalized interests), installation, improvement, transportation, integration and prepaid maintenance and all reasonable and documented related fees or expenses); or

(2)    Indebtedness Incurred in connection with any lease financing transaction (whether such lease will be treated as an operating lease or a Capitalized Lease Obligation in accordance with IFRS).

"*QIB*" shall mean a "qualified institutional buyer" as such term is defined from time to time for purposes of Rule 144A.

"*Rating Agencies*" shall mean Fitch, Moody's and S&P or, if any of Fitch, Moody's or S&P shall not make a rating on the Notes publicly available, such other "nationally recognized statistical rating organization" (within the meaning of Rule 15c3-1(c)(2)(vi)(F) under the Exchange Act) as the Issuer may select (as certified by a resolution of the Board of Directors of the Issuer) as a replacement agency for Fitch, Moody's or S&P or each of them, as the case may be.

"*Ratings Downgrade*" means the rating of the Notes is lowered from their rating then in effect as a result of any event or circumstance comprising or arising as a result of, or in respect of, a Change of Control (or pending Change of Control) by at least two of the Rating Agencies on any date during the period (the "*Trigger Period*") from the date of the public announcement by the Issuer of a Change of Control (or pending Change of Control) until the end of the 60-day period following public announcement by the Issuer of the consummation of such Change of Control (which Trigger Period shall be (i) extended following the consummation of the Change of Control so long as the rating of the Notes is under publicly announced consideration for possible downgrade by any of the Rating Agencies or (ii) reduced in the event of a Rating Reaffirmation to the date on which the Rating Reaffirmation has been obtained). In the event that fewer than two Rating Agencies are then providing a rating for the Notes at the commencement of any Trigger Period, then a "Ratings Downgrade" shall be deemed to have occurred during that Trigger Period. Notwithstanding the foregoing, no Ratings Downgrade shall be deemed to have occurred as a result of any event or circumstance comprising or arising as a result of, or in respect of, a Change of Control unless and until such Change of Control has actually been consummated.

"*Rating Reaffirmation*" means, in connection with a Change of Control, a written reaffirmation from each Rating Agency then rating the notes stating that the credit rating on the notes, which was in effect immediately prior to a public notice of such Change of Control or of the intention of the Issuer or any Person to effect such Change of Control, will not be decreased as a result of such Change of Control.

"*Record Date*" shall mean, with respect to any payment of principal or interest on any Note, the fifteenth day prior to the due date for such payment (whether or not a Business Day) (which for the avoidance of doubt will be May 9 and November 9 of each year).

"*Redemption Date*" means when used with respect to any Note to be redeemed, the date fixed for such redemption by or pursuant this Indenture.

"*Reference Treasury Dealer Quotation*" means, with respect to each Reference Treasury Dealer and any Redemption Date, the average, as determined by the Independent Investment

Banker, of the bid and asked price for the Comparable Treasury Issue (expressed in each case as a percentage of its principal amount) quoted in writing to the Independent Investment Banker by such Reference Treasury Dealer at 3:30 p.m. New York City time on the third Business Day preceding such Redemption Date.

"*Reference Treasury Dealers*" means any of Citigroup Global Markets Inc. or Credit Suisse Securities (USA) LLC, or any of their respective affiliates that are primary United States government securities dealers and up to three other leading primary United States government securities dealers in New York City reasonably designated by the Issuer; *provided* that, if any of the foregoing shall cease to be a primary United States government securities dealer in New York City (a "*Primary Treasury Dealer*"), the Issuer will substitute therefor another Primary Treasury Dealer.

"*Refinance*" shall mean, in respect of any Indebtedness, to refinance, extend, renew, refund, repay, replace, prepay, redeem, defease or retire, in whole or in part, or to issue other Indebtedness in exchange or replacement for, in whole or in part, such Indebtedness. "*Refinanced*" and "*Refinancing*" shall have correlative meanings.

"*Refinancing Indebtedness*" shall mean Indebtedness that is Incurred to Refinance any Indebtedness of the Issuer or any Restricted Subsidiary existing on the Initial Issue Date or Incurred in compliance with this Indenture (including Indebtedness that Refinances Refinancing Indebtedness); *provided*, *however*, that:

(1)     the Refinancing Indebtedness has a Stated Maturity no earlier than the Stated Maturity of the Indebtedness being Refinanced;

(2)     the Refinancing Indebtedness has an Average Life at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the then Average Life of the Indebtedness being refinanced;

(3)     such Refinancing Indebtedness is Incurred in an aggregate principal amount (or if issued with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if issued with original issue discount, the aggregate accreted value) then outstanding of the Indebtedness being Refinanced *plus* the amount of accrued and unpaid interest thereon, any premium paid to the holders of the Indebtedness being refinanced and reasonable fees and expenses incurred in connection therewith; and

(4)     if the Indebtedness being Refinanced is subordinated in right of payment to the Notes, such Refinancing Indebtedness is contractually subordinated in right of payment to the Notes at least to the same extent as the Indebtedness being Refinanced;

*provided further* that Refinancing Indebtedness shall not include Indebtedness of the Issuer or a Restricted Subsidiary that Refinances Indebtedness of an Unrestricted Subsidiary.

"*Register*" shall have the meaning specified in <u>Section 2.15(a)</u>.

"*Regulation S*" shall mean Regulation S under the Securities Act.

"*Regulation S Global Note*" shall have the meaning specified in <u>Section 2.1(d)</u>.

"*Reincorporation Transaction*" shall have the meaning specified in <u>Section 4.3</u>.

"*Related Business*" shall mean the Oil and Gas Business and any business related, ancillary or complementary to the businesses of the Issuer and its Restricted Subsidiaries on the Initial Issue Date as described in the offering memorandum dated November 15, 2021 related to the Notes and shall include any expansion of any such Related Business into other jurisdictions in addition to jurisdictions in which the Issuer and its Restricted Subsidiaries operate on the Initial Issue Date.

"*Relevant Taxing Jurisdiction*" shall mean Canada, Colombia or any jurisdiction in which a Note Guarantor or the Issuer (including a Successor) is organized or resident for Tax purposes or through which payment on the Notes is made, including any political subdivision thereof.

"*Required Holders*" shall mean holders of not less than 50% in aggregate principal amount of Outstanding Notes.

"*Responsible Officer*" shall mean, with respect to the Trustee, except as otherwise provided in the Indenture, any officer assigned to the Trust and Agency unit (or any successor division or unit) of the Trustee located at the Corporate Trust Office of the Trustee who shall have direct responsibility for the administration of this Indenture and, for certain purposes of the Indenture, also means, with respect to a particular matter, any other officer to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject, who shall have direct responsibility for the administration of this Indenture.

"*Restricted Global Note*" shall have the meaning given to it under <u>Section 2.1(d)</u>.

"*Restricted Payments*" shall have the meaning specified in <u>Section 4.1(g)</u>.

"*Restricted Subsidiary*" shall mean any Subsidiary of the Issuer (including the Issuer) that is not an Unrestricted Subsidiary.

"*Reversion Date*" shall have the meaning specified in <u>Section 4.2</u>.

"*Revocation*" shall have the meaning given to it under the definition of the term "*Unrestricted Subsidiary*."

"*Rule 144A*" shall mean Rule 144A under the Securities Act.

"*S&P*" shall mean Standard & Poor's Ratings Group, Inc. or any successor thereto.

"*Sale and Lease-Back Transaction*" shall mean any arrangement with any Person (other than the Issuer or a Restricted Subsidiary), or to which any such Person is a party, providing for the leasing to the Issuer or a Restricted Subsidiary for a period of more than three years of any property or assets (whether real, personal or mixed, now owned or hereafter acquired) that have been or are to be sold or transferred by the Issuer or such Restricted Subsidiary to such Person or to any other Person (other than the Issuer or a Restricted Subsidiary) to which funds have been or are to be advanced by such Person on the security of the leased property or assets.

"*Sangretoro*" shall mean the exploration and production contract located in the Caguán Putumayo basin, operated by the Issuer, with a 100% working interest.

"*SEC*" shall mean the United States Securities and Exchange Commission.

"*Securities Act*" shall mean the United States Securities Act of 1933, as amended.

"*Senior Indebtedness*" shall mean all unsubordinated Indebtedness of the Issuer, the Note Guarantors or of any Restricted Subsidiary, whether outstanding on the Initial Issue Date or Incurred thereafter.

"*SFC*" shall mean the Colombian Financial Superintendency (*Superintendencia Financiera de Colombia*).

"*Significant Subsidiary*" means, with respect to the Issuer or any Restricted Subsidiary as of the last day of any fiscal quarter of the Issuer (for purposes of this definition, the "reference date"), a Restricted Subsidiary which (i) EBITDAX for the fiscal quarter ended on the reference date (determined on a stand-alone basis in accordance with IFRS), represents 5.0% or more of

the Consolidated Adjusted EBITDAX for the fiscal quarter ended on the reference date, or (ii) assets as of the reference date (determined on a stand-alone basis in accordance with IFRS) represent 5.0% or more of the Consolidated Net Tangible Assets as of the reference date. For purposes of this definition, the term "*EBITDAX*" with respect to any Person shall have a correlative meaning with the meaning of the term "*Consolidated Adjusted EBITDAX,*" *provided,* that each reference to the Issuer in the definition of "*Consolidated Adjusted EBITDAX*" shall be deemed a reference to such Person but shall disregard any reference to the Subsidiaries of such Person.

"*Starter Amount*" means U.S.$40 million.

"*Stated Maturity*" shall mean, with respect to any Indebtedness, the date specified in such Indebtedness as the fixed date on which the final payment of principal of such Indebtedness is due and payable, including, with respect to any principal amount that is then due and payable pursuant to any mandatory redemption or prepayment provision, the date specified for the payment thereof (but excluding any provision providing for the repurchase or prepayment of such Indebtedness at the option of the holder thereof upon the happening of any contingency beyond the control of the obligor thereunder unless such contingency has occurred).

"*Subordinated Obligation*" shall mean Indebtedness of the Issuer or any Restricted Subsidiary (whether outstanding on the Initial Issue Date or thereafter Incurred) (1) the terms of which provide that, (a) no principal amount in respect of such obligation will become due and payable until after all principal, interest, Additional Amounts and any other amounts owing with respect to the Notes have been paid in full, and (b) in the event that (A) an installment of interest with respect to such obligation is not paid on the applicable Payment Date or (B) the principal of (or premium, if any, on) any such obligations is not paid on the Stated Maturity or other date set for redemption, then the failure to make such payment on such Payment Date, maturity date or other Redemption Date shall not be a default under such obligation until after all principal, interest, Additional Amounts and any other amounts owing with respect to the Notes have been paid in full and (2) which United States, Canadian, Colombian, Panamanian, Swiss law or any other jurisdiction in which a Subsidiary of the Issuer is domiciled, as applicable, recognizes (whether in any reorganization or administrative takeover proceeding or otherwise) as being subordinated or junior in right of payment to the Notes.

"*Subsidiary*" shall mean, with respect to any Person (the "*parent*") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be Consolidated with those of the parent in the parent's Consolidated financial statements if such financial statements were prepared in accordance with IFRS as of such date, as well as any other Person (1) of which Capital Stock representing more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held; or (2) that is, as of such date, otherwise controlled by the parent or one or more Subsidiaries of the parent.

"*Successor*" has the meaning given to it under <u>Section 4.3</u>.

"*Successor Guarantor*" has the meaning given to it under <u>Section 4.3</u>.

"*Suspended Covenants*" shall have the meaning specified in <u>Section 4.2</u>.

"*Suspension Date*" shall have the meaning specified in <u>Section 4.2</u>.

"*Suspension Period*" shall have the meaning specified in <u>Section 4.2</u>.

"*Swiss Note Guarantor*" shall have the meaning specified in <u>Section 7.12</u>.

"*Taxes*" shall have the meaning specified in <u>Section 2.12</u>.

"*Temporary Cash Investments*" shall mean any of the following:

(1)     Investments in direct obligations of the United States, Canada or any agency thereof or obligations Guaranteed by the United States, Canada or any agency thereof, or obligations of or Guaranteed by any foreign country (other than Colombia) recognized by the United States or Canada whose long-term debt rating is rated "A-" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act);

(2)     Investments in time deposit accounts, certificates of deposit and money market deposits maturing within 365 days of the date of acquisition thereof issued by a bank or trust company that is organized under the laws of the United States or Canada, any state, province or territory thereof or any foreign country recognized by the United States or Canada having capital, surplus and undivided profits aggregating in excess of U.S.$50 million (or its equivalent in any other currency) and a long-term debt is rated "A" (or such similar equivalent rating) or higher by at least one nationally recognized statistical rating organization (as defined in Rule 436 under the Securities Act);

(3)     Investments in repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (1) above entered into with a bank meeting the qualifications described in clause (2) above;

(4)     Investments in commercial paper, maturing not more than 365 days after the date of acquisition, issued by a corporation (other than an Affiliate of the Issuer)

organized and in existence under the laws of the United States, Canada, any state, province or territory or any foreign country recognized by the United States or Canada, in all events not excluding Colombia, with a rating at the time as of which any Investment therein is made of "P2" (or higher) according to Moody's; "A2" (or higher) according to S&P; F1 (or higher) according to Fitch; or, in the case of investments made in Canada, "A2" or "P2" (or higher) according to Dominion Bond Rating Service Limited or Canada Bond Rating Service; or, in the case of Investments made in Colombia, rated at least "A" by Duff and Phelps de Colombia;

(5)    Investments in securities with maturities of six months or less from the date of acquisition issued or fully Guaranteed by any state, province, commonwealth or territory of the United States or Canada, or by any political subdivision or taxing authority thereof, and rated at least "A" by S&P or "A" by Moody's, or F3 (or higher) according to Fitch, in the case of Investments made in Colombia, rated at least "A" by Duff and Phelps de Colombia and "A" by BRC Investor Services; and

(6)    (a)    Investments in marketable direct obligations issued or unconditionally Guaranteed by Colombia, any agency or political subdivision thereof, or rated "BB+" or higher by a Colombian rating organization licensed by the SFC,

(b)    Investments in time deposits or certificates of deposit of a Colombian bank or financial institution, the commercial paper or other short-term unsecured debt obligations of which (or in the case of a bank or financial institution that is the principal subsidiary of a holding company, the holding company) are rated "A" or higher by a Colombian rating organization licensed by SFC, and maturing within one year from the date of acquisition thereof by the Issuer or a Restricted Subsidiary,

(c)    Investments in repurchase obligations with a term of not more than 60 days for underlying securities of the types described in subclause (a) above entered into with a bank meeting the qualifications described in subclause (b) above,

(d)    Investments in securities issued by (or representing shares of) Colombian companies rated "A" or higher by a Colombian rating organization licensed by the SFC, or

(e)    Investments in certificates of deposit, time deposit accounts and money market accounts maturing not more than one year after the deposit of cash or acquisition thereof issued by (i) any of the largest ten banks (based on assets of the last December 31)

organized under the laws of Colombia or (ii) any other bank organized under the laws of Colombia, so long as the outstanding amount of such Investments in any such bank does not exceed at any one time U.S.$5 million (or its equivalent in any other currency).

"*Transfer Agent*" shall have the meaning specified in <u>Section 2.15(a)</u>.

"*Treasury Rate*" means, with respect to any Redemption Date, the rate per annum equal to the semi-annual equivalent yield to maturity or interpolated maturity (on a day count basis) of the Comparable Treasury Issue, assuming a price for the Comparable Treasury Issue (expressed as a percentage of its principal amount) equal to the Comparable Treasury Price for such Redemption Date. The Treasury Rate will be calculated by the Independent Investment Banker on the third Business Day preceding the Redemption Date.

"*Trustee*" shall have the meaning specified in the preamble hereto.

"*United States*" or "*U.S.*" shall mean the United States of America, its fifty states and the District of Columbia.

"*Unrestricted Subsidiary*" shall mean (1) any Subsidiary of the Issuer that at the time of determination shall be designated an Unrestricted Subsidiary by the Board of Directors of the Issuer; and (2) any Subsidiary of an Unrestricted Subsidiary. The Board of Directors of the Issuer may designate any Subsidiary of the Issuer (including any newly acquired or newly formed Subsidiary) as an "*Unrestricted Subsidiary*" under the Indenture (a "*Designation*") only if:

(1)     neither the Issuer nor any Restricted Subsidiary thereof will at any time provide credit support for, subject any of its property or assets (other than the Capital Stock of any such Subsidiary to be Designated as an Unrestricted Subsidiary) to the satisfaction of, or Guarantee, any Indebtedness of any Unrestricted Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness) or be directly or indirectly liable for any Indebtedness of any Unrestricted Subsidiary unless such credit support or Indebtedness was permitted to be Incurred as Indebtedness under <u>Section 4.1(e)</u>;

(2)     no Default or Event of Default shall have occurred and be continuing at the time of or immediately after giving effect to such Designation, and any transactions between the Issuer or any other Restricted Subsidiary thereof and such Subsidiary, as applicable, are in compliance with <u>Section 4.1(j)</u>;

(3)    such Subsidiary and its Subsidiaries own no Capital Stock or Indebtedness of, and hold no Lien on any property of, the Issuer or any other Restricted Subsidiary of the Issuer; and

(4)    at the time of Designation, (i) the Subsidiary to be so Designated has total consolidated assets of U.S.$1,000 or less or (ii) the Issuer would be permitted under the Indenture to make an Investment under the applicable provisions in Section 4.1(g) at the time of Designation (assuming the effectiveness of such Designation and treating such Designation as an Investment at the time of Designation) in an amount equal to the Fair Market Value of the Issuer's Investment in such Subsidiary on such date (as determined in accordance with the second paragraph of the definition of "*Investment*").

In addition, the Issuer may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "*Revocation*") if:

(a)    no Default or Event of Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(b)    all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of this Indenture.

Any such Designation or Revocation shall be evidenced by prompt delivery to the Trustee of a copy of the resolution of the Board of Directors of the Issuer giving effect thereto accompanied by an Officer's Certificate as to compliance with the foregoing provisions.

"*U.S. Government Obligations*" shall mean direct obligations (or certificates representing an ownership interest in such obligations) of the United States (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States is pledged and that are not callable or redeemable at the issuer's option.

"*VIM-5*" shall mean the exploration and production contract located in the Lower Magdalena basin, Colombia, operated by the Issuer, where the Issuer has a 100% working interest.

"*VIM-19*" shall mean the exploration and production contract located in the Lower Magdalena Valley basin, which was operated by the Issuer with a 100% working interest, which as of the date hereof is the process of being relinquished.

"*VMM-2*" shall mean the exploration and production contract for unconventional reservoirs, located in the Middle Magdalena Valley basin, operated ConocoPhillips Colombia Ventures Ltd. and in which the Issuer has a 20% working interest.

"*VMM-3*" shall mean the exploration and production contract, located in the Middle Magdalena Valley basin, operated ConocoPhillips Colombia Ventures Ltd. and in which the Issuer has a 20% working interest.

"*Voting Stock*" of a Person shall mean all classes of Capital Stock or other interests (including partnership interests) of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

Section 1.2    <u>*Rules of Construction*</u>.  (a)  The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to this Indenture as a whole and not to any particular provisions of this Indenture and any subsection, Section, Article and Exhibit references are to this Indenture unless otherwise specified.

(c)    The term "documents" includes any and all documents, instruments, agreements, certificates, indentures, notices and other writings, however evidenced (including electronically).

(d)    The term "including" is not limiting and (except to the extent specifically provided otherwise) shall mean "including (without limitation)."

(e)    Unless otherwise specified, in the computation of periods of time from a specified date to a later specified date, the word "from" shall mean "from and including," the words "to" and "until" each shall mean "to but excluding," and the word "through" shall mean "to and including."

(f)    The words "may" and "might" and similar terms used with respect to the taking of an action by any Person shall reflect that such action is optional and not required to be taken by such Person.

(g)    Unless otherwise expressly provided herein: (i) references to agreements (including this Indenture) and other documents shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent that such amendments and other modifications are not prohibited by this Indenture or the Notes and (ii) references to any Applicable Law are to be construed as including all statutory and regulatory provisions or rules

consolidating, amending, replacing, supplementing, interpreting or implementing such Applicable Law.

(h)    With respect to any monetary amount in a currency other than Dollars, such amount shall be deemed the Dollar equivalent thereof determined by the amount of Dollars obtained at the time of determination by converting the foreign currency involved in such computation into Dollars at the spot rate for the purchase of Dollars with the applicable foreign currency as quoted on the Reuters 3000 Xtra system (or its successor) at approximately 11:00 a.m. (New York City time) on the date not more than two Business Days prior to such determination.  For purposes of determining whether any Indebtedness can be incurred or any transaction with Affiliates or any Investment can be made or undertaken, the Dollar equivalent of such Indebtedness, transaction or Investment shall be determined on the date incurred, made or undertaken and no subsequent change in the computation of the Dollar equivalent thereof shall cause such transaction which may otherwise be incurred, made or undertaken to have been incurred, made or undertaken in violation of this Indenture.

(i)    The term "will" shall be construed to have the same meaning and effect as the word "shall."

(j)    The term "or" is not exclusive.

## ARTICLE II
## ISSUE, EXECUTION AND AUTHENTICATION OF NOTES;
## RESTRICTIONS ON TRANSFER

Section 2.1    _Creation and Designation_.  (a)  There is hereby created a series of Notes to be issued pursuant to this Indenture and to be known as the "5.750% Senior Notes due 2028." The Notes shall be issued in fully registered form, without interest coupons, with such applicable legends as are set forth in Section 2.7 and with such omissions, variations and insertions as are permitted by this Indenture.   Each Note will be issued in minimum denominations of U.S.$200,000 and in integral multiples of U.S.$1,000 in excess thereof and shall be substantially in the form attached hereto as Exhibit A.  The Notes may have such letters, numbers or other marks of identification and such legends or endorsements printed or typewritten thereon as may be required to comply with any Applicable Law or to conform to general usage.

(b)    The aggregate principal amount of the Notes that may be authenticated and delivered under this Indenture is unlimited.

(c)    If any term or provision contained in the Notes shall conflict with or be inconsistent with any term or provision contained in this Indenture, then the terms and provisions of this Indenture shall govern with respect to the Notes.

(d)    Restricted notes initially will be represented by one or more notes in registered, global form without interest coupons (collectively, the "*Restricted Global Notes*"). Regulation S notes initially will be represented by one or more notes in registered, global form without interest coupons (collectively, the "*Regulation S Global Notes*" and, together with the Restricted Global Notes, the "*Global Notes*").

Section 2.2    *Execution and Authentication of Notes*.    Upon the written order of the Issuer directing the Trustee to authenticate and deliver the Notes and delivery by the Issuer of sufficient executed Notes, the Trustee shall duly authenticate and deliver the Notes in authorized denominations.

Section 2.3    *Initial Form of Notes*.    (a)  The Notes, upon original issuance, shall be issued in the form of typewritten or printed Global Notes registered in the name of DTC or its nominee, and (other than DTC or its nominee) no Holder investing in the Notes shall receive a definitive note representing such Holder's interest in the Notes except to the extent that definitive, fully registered, non-global Notes ("*Definitive Notes*") have been issued in accordance with Section 2.8.  Unless and until Definitive Notes are so issued in exchange for such Global Notes, DTC will make book entry transfers among the DTC Participants and receive and transmit distributions of principal and interest on such Global Notes to the DTC Participants.

(b)    Neither any members of, nor participants in, DTC (the "*DTC Participants*") nor any other Persons on whose behalf DTC Participants may act (including Euroclear and Clearstream and accountholders and participants therein) shall have any rights under this Indenture with respect to any Global Note, and DTC or its nominee, as the case may be, may be treated by the Issuer, the Trustee and any agent thereof (including any Authorized Agent) as the absolute owner and Holder of such Global Note for all purposes whatsoever. Unless and until Definitive Notes are issued in exchange for such Global Notes pursuant to Section 2.8: (i) the Issuer, the Trustee and any agent thereof (including any Authorized Agent) may deal with DTC and its nominee for all purposes (including the making of distributions on the Global Notes) as the authorized representatives of the Persons holding beneficial interests in such Global Notes and (ii) the rights of such beneficial owners shall be exercised only through DTC and its nominee and shall be limited to those established by Applicable Law and agreements among such DTC Participants, DTC and such nominee.  Notwithstanding the foregoing, nothing herein shall prevent the Issuer or the Trustee from giving effect to any written certification, proxy or other authorization furnished by DTC or such nominee or impair, as between DTC, the DTC Participants and any other Persons on whose behalf a DTC Participant may act, the operation of the customary practices of such Persons governing the exercise of the rights of a Holder. Neither the Trustee nor any agent shall have responsibility for any actions taken or not taken by DTC or the depository.

(c)    The aggregate principal balance of the Regulation S Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, in connection with a corresponding decrease or increase in the aggregate principal balance of the Restricted Global Note, as provided in Section 2.6.

(d)    The aggregate principal balance of the Restricted Global Note may from time to time be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC, in connection with a corresponding decrease or increase in the aggregate principal balance of the Regulation S Global Note, as provided in <u>Section 2.6</u>.

(e)    Neither the Trustee nor any agent of the Issuer or the Trustee (including any Authorized Agent) shall have any responsibility or obligation to any DTC Participant or any other Person with respect to the accuracy of the records of DTC (or its nominee) or of any DTC Participant or any other Person, with respect to any ownership interest in the Notes or with respect to the delivery of any notice (including any notice of redemption) or the payment of any amount or delivery of any Notes (or other security or property) under or with respect to the Notes. The Trustee and any agent of the Issuer or the Trustee (including any Authorized Agent) may rely (and shall be fully protected in relying) upon information furnished by DTC with respect to the DTC Participants and any beneficial owners of the Notes.

Section 2.4    *Execution of Notes*.  Each Note shall be executed on behalf of the Issuer by one of its Authorized Officer(s). Such signature may be the manual or facsimile signature of such Authorized Officer(s).  With the delivery of this Indenture, the Issuer is furnishing, and from time to time hereafter may (and, at the request of the Trustee, shall) furnish, an officer's certificate identifying and certifying the incumbency and specimen signatures of its Authorized Officers. Until the Trustee receives a subsequent Officer's Certificate updating such list, the Trustee shall be entitled to rely conclusively upon the last such Officer's Certificate delivered to it for purposes of determining the Issuer's Authorized Officers.  Typographical and other minor errors or defects in any signature shall not affect the validity or enforceability of any Note that has been duly executed by the Issuer and authenticated and delivered by the Trustee.

In case any Authorized Officer of the Issuer who shall have signed any Note shall cease to be an Authorized Officer of the Issuer before the Note so signed shall be authenticated and delivered by the Trustee or disposed of by or on behalf of the Issuer, such Note nevertheless may be authenticated and delivered or disposed of as if the Person who signed such Note on behalf of the Issuer had not ceased to be such Authorized Officer.  Any Note signed on behalf of the Issuer by a Person who, as at the actual date of his/her execution of such Note, is an Authorized Officer of the Issuer, shall be a valid and binding obligation of the Issuer notwithstanding that at the date hereof any such Person is not an Authorized Officer of the Issuer.

Section 2.5    *Certificate of Authentication*.  The form of the Trustee's certificate of authentication to be borne by the Notes shall be substantially as follows:

FORM OF TRUSTEE'S CERTIFICATE OF AUTHENTICATION

Dated:  ___, _____

This is one of the Notes referred to in the within-mentioned Indenture

CITIBANK, N.A., as Trustee


By: _____
Authorized Signatory

Only such Notes as shall bear the Trustee's certificate of authentication and are executed by the Trustee by manual signature of one or more of its authorized signatories shall be entitled to the benefits of this Indenture or be valid or obligatory for any purpose.  Such certification by the Trustee upon any Note executed by or on behalf of the Issuer shall be conclusive evidence that such Note has been duly authenticated and delivered hereunder.  Each Note shall be dated the date of its authentication.

Section 2.6   *Restrictions on Transfer of Global Notes*.  Notwithstanding any other provisions hereof to the contrary:


(a)   Except as provided in Section 2.8, a Global Note may not be transferred, in whole or in part, to any Person other than DTC or a nominee thereof, and no such transfer to any such other Person may be registered (any such transfer being null and void ab initio); *provided,* that this Section 2.6(a) shall not prohibit any transfer of a beneficial interest in a Global Note effected in accordance with the other provisions of this Section.  Any transfer of a Global Note (or beneficial interests therein) shall be in the authorized denominations.


(b)   If the owner of a beneficial interest in the Restricted Global Note wishes at any time to exchange its beneficial interest therein for a beneficial interest in the Regulation S Global Note, or to transfer such beneficial interest to a Person who wishes to take delivery thereof in the form of a beneficial interest in the Regulation S Global Note, then such exchange or transfer may be effected, subject to the applicable rules and procedures of DTC, Euroclear and Clearstream (the "*Applicable Procedures*") and minimum denomination requirements, only in accordance with this Section 2.6(b).  Upon receipt by the Trustee at its Corporate Trust Office of: (i) written instructions given in accordance with the Applicable Procedures from a DTC Participant directing the Trustee to credit or cause to be credited to a specified DTC Participant's account a beneficial interest in the Regulation S Global Note in a principal balance equal to that of the beneficial interest in the Restricted Global Note to be so exchanged or transferred, (ii) a written order given in accordance with the Applicable Procedures containing information regarding the account of the DTC Participant (and the Euroclear or Clearstream account, as the case may be) to be credited with, and the account of the DTC Participant to be debited for, such beneficial interest and (iii) a certificate in substantially the form of Exhibit B given by the holder of such beneficial interest in the Restricted Global Note, the Trustee shall approve the instructions at DTC to reduce the balance of the Restricted Global Note, and to increase the balance of the Regulation S Global Note, by the amount of the beneficial interest in the Restricted Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the DTC Participant (which may be the DTC Participant for Euroclear or Clearstream or both, as the case may be) for the benefit of such Person specified in such instructions a beneficial interest in the Regulation S Global Note having a principal balance

43

equal to the amount by which the balance of the Restricted Global Note was reduced upon such exchange or transfer.

(c)     If the owner of a beneficial interest in the Regulation S Global Note wishes at any time to exchange its beneficial interest therein for a beneficial interest in the Restricted Global Note, or to transfer such beneficial interest to a Person who wishes to take delivery thereof in the form of a beneficial interest in the Restricted Global Note, then such exchange or transfer may be effected, subject to the Applicable Procedures and minimum denomination requirement, only in accordance with this Section 2.6(c).  Upon receipt by the Trustee at its Corporate Trust Office of: (i) written instructions given in accordance with the Applicable Procedures from a DTC Participant directing the Trustee to credit or cause to be credited to a specified DTC Participant's account a beneficial interest in the Restricted Global Note in a principal balance equal to that of the beneficial interest in the Regulation S Global Note to be so exchanged or transferred, (ii) a written order given in accordance with the Applicable Procedures containing information regarding the account of the DTC Participant (and, if applicable, the Euroclear or Clearstream account, as the case may be) to be debited with, and the account of the DTC Participant to be credited for, such beneficial interest and (iii) a certificate in substantially the form set forth in Exhibit C given by the holder of such beneficial interest in the Regulation S Global Note, the Trustee shall approve the instructions at DTC to reduce the balance of the Regulation S Global Note and to increase the balance of the Restricted Global Note, by the principal balance of the beneficial interest in the Regulation S Global Note to be so exchanged or transferred, and to credit or cause to be credited to the account of the DTC Participant for the benefit of such Person specified in such instructions a beneficial interest in the Restricted Global Note having a principal balance equal to the amount by which the balance of the Regulation S Global Note was reduced upon such exchange or transfer.

(d)     If a Global Note or any portion thereof (or beneficial interest therein) is exchanged for a Definitive Note pursuant to Section 2.8, then such Definitive Note may in turn be exchanged (upon transfer or otherwise) for other Definitive Notes only in accordance with such procedures, which shall be substantially consistent with the provisions of this Section (including any certification requirement intended to ensure that transfers and exchanges of Definitive Notes comply with Rule 144A, Regulation S, Canadian securities laws or the contractual restrictions on transfer into Canada as described in the applicable legend, as the case may be) and any Applicable Laws, as may be adopted from time to time by the Issuer.

Section 2.7     *Restrictive Legends*.  (a) Global Notes shall bear restrictive legends in substantially the form set forth in Exhibit A hereof.  Definitive Notes shall be in substantially the form set forth in Exhibit A hereof excluding the Global Notes Legend set forth thereon.

(b)     The required legends set forth on Exhibit A may be removed from a Global Note if there is delivered to the Issuer and the Trustee such evidence satisfactory to the Issuer, which shall include an Opinion of Counsel, as may reasonably be required by the Issuer that neither such legend nor the restrictions on transfer set forth therein are required to ensure that transfers of such Note (or beneficial interests therein) will not violate the registration

requirements of the Securities Act or Canadian securities laws, as the case may be, or the contractual restrictions on transfer into Canada as described in the applicable legend. Upon provision of such evidence satisfactory to the Issuer, the Trustee, at the written direction of the Issuer, shall authenticate and deliver in exchange for such Note, a Note (or Notes) having an equal aggregate principal balance that does not bear such legend. If such a legend required for a Note has been removed as provided above, then no other Note issued in exchange for all or any part of such Note shall bear such legend unless the Issuer has reasonable cause to believe that such other Note is a "restricted security" within the meaning of Rule 144 under the Securities Act and instructs the Trustee to cause a legend to appear thereon.

(c)    The Trustee shall have no obligation or duty to monitor, determine or inquire as to compliance with any restrictions on transfer imposed under this Indenture or Applicable Law with respect to any transfer of any interest in any Note (including any transfers between or among DTC Participants or owners of beneficial interests in any Note) other than to require delivery of such certificates and other documentation or evidence as are expressly required by, and to do so if and when expressly required by, this Indenture, and to examine the same to determine material compliance as to form with the express requirements hereof.

Section 2.8    *Issuance of Definitive Notes*.  If (a) DTC notifies the Trustee in writing that it is unwilling or unable to continue as the depository for a Global Note, or that it ceases to be a "clearing agency" registered under the Exchange Act and (b) the Issuer is unable to locate a qualified successor depository within 90 days of such notice, then the Trustee shall notify all applicable Holders, through DTC, of the occurrence of any such event and of the availability of Definitive Notes to beneficial owners.  Upon the giving of such notice and the surrender of the Global Notes by DTC, accompanied by registration instructions, the Trustee shall deliver Definitive Notes (which shall be in definitive, fully registered, non-global form without interest coupons) for the Global Notes.  If Definitive Notes are to be issued in accordance with this Section 2.8, then the Issuer shall promptly make available to the Trustee a reasonable supply of Definitive Notes.  Unless counsel to the Issuer determines otherwise in accordance with Applicable Law and the procedures set forth in Section 2.7(b), any such Definitive Notes shall bear the appropriate transfer-restriction legends.

Until Definitive Notes are ready for delivery, the Issuer may prepare and, upon receipt of written instructions by the Issuer, the Trustee shall authenticate temporary Notes. Temporary Notes shall be substantially in the form of Definitive Notes but may have variations that the Issuer considers appropriate for temporary Notes. Without unreasonable delay, the Issuer shall prepare and, upon receipt of written instructions by the Issuer, the Trustee shall authenticate Definitive Notes and deliver them in exchange for temporary Notes.  Until so exchanged, the Holders of temporary Notes shall have all of the rights and obligations under this Indenture as Holders of Definitive Notes.

Section 2.9    *Persons Deemed Owners*.  Before due presentation of a Note for registration of transfer, the Trustee and any Authorized Agent or other agent of the Issuer or the Trustee shall treat the Person in whose name any Note is registered as the owner of such Note for the purpose of receiving distributions and for all other purposes whatsoever, and neither the

Trustee nor any Authorized Agent or other such agent of the Issuer or the Trustee shall be affected by any notice to the contrary.

Section 2.10    *Payment of Notes*.  (a) On or prior to 11:00 a.m., New York City time, on the Business Day prior to any Payment Date and/or Maturity Date the Issuer will deposit or cause to be deposited with the Paying Agent in the Borough of Manhattan, the City of New York, in immediately available funds, a sum in Dollars sufficient to pay the principal of, and interest (and premium and Additional Amounts, if any) due on each Note on such Payment Date and/or Maturity Date.

(b)    Principal of, and interest (and premium and Additional Amounts, if any) on, the Notes will be considered paid on the date due if the Paying Agent holds, as of 11:00 a.m., New York City time on the due date, money deposited by or on behalf of the Issuer in immediately available funds in Dollars and designated for and sufficient to pay all principal of, and interest (and premium and Additional Amounts, if any) on the Notes then due.  The Paying Agent will return to the Issuer upon written request therefore from the Issuer, no later than two Business Days following the date of receipt of such written request, the amount of any payment in excess of the total amount required to be paid on all of the Outstanding Notes.

(c)    Each Note shall bear interest at a rate of 5.750% per annum from the issue date of such Note or from the most recent Payment Date to which interest has been paid, as the case may be, payable semi-annually in arrears on each Payment Date commencing on May 24, 2022 until the principal thereof is paid or duly provided for.  All interest shall be computed on the basis of a 360-day year of twelve 30-day months and will be payable to the Holders of record on the applicable Record Date. For the purposes solely of disclosure under the *Interest Act* (Canada), (i) whenever any interest or fees to be paid on the Notes is to be calculated using a rate based on a year of 360 days or 365 days (or any period that is less than a calendar year), as the case may be, the rate determined pursuant to such calculation, when expressed as an annual rate, is equivalent to (x) the applicable rate based on a year of 360 days or 365 days (or such other period that is less than a calendar year), as the case may be, (y) multiplied by the actual number of days in the calendar year in which the period for which such interest or fee is payable (or compounded) ends, and (z) divided by 360 or 365 (or such other period that is less than a calendar year), as the case may be, (ii) the principle of deemed reinvestment of interest does not apply to any interest calculation under the Notes, and (iii) the rates of interest stipulated in the Notes are intended to be nominal rates and not effective rates or yields. Based on the foregoing and solely for the purposes of disclosure under the *Interest Act* (Canada) and without affecting the amount of interest payable on the notes, the effective annual interest rate (i) for a year of 365 days is 5.830% and (ii) for a year of 366 days is 5.850%. The Issuer shall notify the Trustee in writing whenever any interest is calculated on the basis of a period of time other than a calendar year. Payments due on a date other than a Business Day shall be made on the next succeeding Business Day and such extension of time shall not be included in computing interest and fees in connection with that payment.  The principal amount of the Notes will be repaid on the Maturity Date.

(d)    If any provision of this Indenture or any Note would obligate the Issuer or any Note Guarantor to make any payment of interest or other amount payable to the Holders of record, the Paying Agent or the Trustee in an amount or calculated at a rate which would be prohibited by Applicable Law or would result in a receipt by the Holders of record, the Paying Agent or the Trustee of interest at a criminal rate (as such terms are construed under the *Criminal Code* (Canada)) then, notwithstanding such provisions, such amount or rate shall be deemed to have been adjusted with retroactive effect to the maximum amount or rate of interest, as the case may be, as would not be so prohibited by Applicable Law or so result in a receipt by the Holders of record, the Paying Agent or the Trustee of interest at a criminal rate, such adjustment to be effected, to the extent necessary, as follows: firstly, by reducing the amount or rate of interest required to be paid to the Holders of record, the Paying Agent or the Trustee under this Indenture or the applicable Note, and thereafter, by reducing any fees, commissions, premiums and other amounts required to be paid to the Holders of record, the Paying Agent or the Trustee which would constitute "interest" for purposes of Section 347 of the *Criminal Code* (Canada).

(e)    The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law to the extent that such interest is an allowed claim enforceable against the debtor under any Bankruptcy Law) on overdue principal and premium, if any, at a rate equal to 1.00% per annum in excess of the interest rate on the Notes, and to the extent lawful, it will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law to the extent that such interest is an allowed claim against the debtor under such Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) from time to time on demand at the same rate.  The Issuer will pay to the Holders such defaulted interest in any lawful manner on a special record date.  The Issuer will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment.  The Issuer will fix or cause to be fixed each such special record date and payment date, *provided*, *however*, that no such special record date will be less than ten days prior to the related payment date for such defaulted interest.  At least ten days before the special record date, the Issuer will deliver or cause to be delivered to Holders a notice that states the special record date, the related payment date and the amount of such defaulted interest to be paid.

(f)    Except as specified in Section 2.10(g), payments of all amounts that become due and payable in respect of any Note shall be made by the Paying Agent without surrender or presentation of such Note to the Paying Agent.  The Paying Agent shall have no responsibility regarding notations of payment on a Note and shall be responsible only for maintaining its records in accordance with this Indenture.  Absent manifest error, the records of the Paying Agent shall be controlling as to payments in respect of the Notes.

(g)    Notwithstanding Section 2.10(b), payment of principal of any Note shall be made only against surrender of such Note at the Corporate Trust Office of the Trustee (or such other location as the Trustee shall notify the applicable Holder).

(h)     Payments to Holders shall be by electronic funds transfer in immediately available funds to an account maintained by such Holder with a bank having electronic funds transfer capability upon written application to the Trustee (received by the Trustee not later than the relevant Record Date) by a Holder holding Notes or, if not, by check sent by first class mail to the address of such Holder appearing on the Register as of the relevant Record Date; *provided*, *however*, that the final payment in respect of any Note shall be made only as provided in Section 2.10(g).  Unless such designation for payment by electronic funds transfer is revoked in writing, any such designation made by such Holder shall remain in effect with respect to any future payments to such Holder.

Section 2.11    *Additional Notes*.  Subject to the limitations set forth under Section 4.1(e), the Issuer may, without notice to, or the consent of, the Holders, Incur additional Indebtedness. At the Issuer's option, this additional Indebtedness may consist of additional Notes ("*Additional Notes*") issued in one or more transactions, which have identical terms (other than issue price, Initial Issue Date, first Payment Date and date from which the interest thereon will accrue) as the Notes issued on the Initial Issue Date. Any Additional Notes will be consolidated and form a single class with the Notes issued on the Initial Issue Date, so that, among other things, Holders of any Additional Notes will have the right to vote together with Holders of Notes issued on the Initial Issue Date as one class under the Indenture for all purposes; *provided*, *however*, that if such Additional Notes are not fungible with the Notes for U.S. federal income tax purposes, the Additional Notes will have a separate CUSIP number.

Section 2.12    *Additional Amounts*.  (a)  All payments to be made in respect of the Notes or the Note Guarantees, as the case may be, are to be made free and clear of, and without deduction or withholding for or on account of, any present or future taxes, duties, levies, imposts, assessments, fees, deductions or withholdings, or other governmental charges (including penalties, interest and other liabilities related thereto) (collectively, "*Taxes*") except to the extent such amounts are imposed by Applicable Law. In the event that any Taxes imposed by a Relevant Taxing Jurisdiction are required by Applicable Law to be deducted or withheld from any payment required to be made in respect of the Notes (including payments of principal, premium, if any, redemption price or interest) or the Note Guarantees, as the case may be, then the amount of such payment shall be increased by (and the applicable payor will pay, together with such payments) such additional amounts ("*Additional Amounts*") as may be necessary in order that the amount actually received by the Holder of the Notes in respect of such payment, after withholding or deduction for or on account of such Taxes, is an amount equal to the amount that would have been received by the Holder of the Notes in respect of such payment had no such Taxes (including any Taxes payable in respect of such Additional Amounts) been required to be so deducted or withheld. Furthermore, the amount of any Taxes required to be withheld or deducted from any payment made in respect of the Notes or the Note Guarantees, as the case may be, shall be withheld or deducted from such payment (as increased by any Additional Amounts) and paid to the taxing authority imposing such Taxes in accordance with Applicable Law.

(b)     Notwithstanding the preceding sentences, no such Additional Amounts (including Taxes payable in respect of such Additional Amounts) will be payable in respect of:

(1)     any Tax assessed or imposed by reason of the Holder or beneficial owner of the Notes having any actual or deemed present or former connection (other than the mere ownership of such Note or the receipt of such payment in respect thereof) with a Relevant Taxing Jurisdiction (including, without limitation, being a citizen of a Relevant Taxing Jurisdiction, carrying on business or having a permanent establishment in a Relevant Taxing Jurisdiction, being organized under the laws of a Relevant Taxing Jurisdiction, or being an actual or deemed resident of a Relevant Taxing Jurisdiction);

(2)     any estate, inheritance, gift, personal property, capital gains, sales, use, excise, transfer or other similar Tax imposed with respect to any Note;

(3)     any such Taxes that would not have been imposed but for the failure of the Holder or beneficial owner of the Notes to comply with any certification, identification, information, documentation or other reporting requirement to the extent (a) such compliance is required by applicable law or an applicable treaty as a precondition to exemption from, or reduction in the rate of deduction or withholding of, such Taxes, and (b) at least 30 days in advance of the first Payment Date with respect to which the obligor with respect to a payment shall apply this clause (3), such obligor shall have notified in writing each Holder or the beneficial owner of the Notes that Taxes will be imposed unless an applicable compliance certification, identification, information, documentation or other reporting requirement is satisfied;

(4)     any Taxes imposed in connection with a Note presented for payment by, or on behalf of, a Holder or beneficial owner thereof who would have been able to avoid such tax by presenting the relevant Note, to the extent commercially reasonable, to another paying agent in the United States;

(5)     any Tax payable other than by withholding or deduction; or

(6)     Canadian withholding Taxes imposed on a payment to the Holder or beneficial owner with which the payor does not deal at arm's length for the purposes of the Income Tax Act (Canada) at the time of making such payment; or

(7)     any combination of the circumstances described in clauses (1) through (6).

(c)     Also, such Additional Amounts will not be payable with respect to any payment to a Holder of a Note who is a fiduciary, partnership, limited liability company or any person other than the sole beneficial owner of such payment to the extent that a beneficiary or settlor with respect to such fiduciary or a member of such partnership or limited liability company or a beneficial owner would not have been entitled to the Additional Amounts had such beneficiary, settlor, member or beneficial owner been in the place of such Holder.

(d)    In addition, the Issuer shall pay any and all Other Taxes imposed by a Relevant Taxing Jurisdiction imposing such Other Taxes in accordance with Applicable Law.

(e)    On the Business Day prior to any relevant payment date, the Issuer will deposit or cause to be deposited with the Trustee at its Corporate Trust Office, in immediately available funds, a sum in Dollars sufficient to pay the Additional Amounts, if any, due on each note on such relevant payment date. The applicable payor will (or will cause its paying agent to) (1) make any required withholding or deduction, and (2) remit the full amount deducted or withheld to the applicable taxing authority in the Relevant Taxing Jurisdiction in accordance with applicable law. The applicable payor will (or will cause its paying agent to) provide to the Trustee certified copies of tax receipts or, if such tax receipts are not reasonably available, such other documentation evidencing the payment of any Taxes so deducted or withheld from each Relevant Taxing Jurisdiction imposing such Taxes.

(f)    If the applicable payor and/or paying agent will be obligated to pay Additional Amounts with respect to any payment under or with respect to the Notes or the Note Guarantees, as the case may be, the applicable payor will (or will cause its paying agent to ) deliver to the Trustee, at least three Business Days prior to the relevant payment date, an Officer's Certificate stating the fact that such Additional Amounts will be payable, the amounts so payable (and that such amounts will be provided to the Trustee on the Business Day immediately preceding the Payment Date for distribution on the Payment Date) and will set forth such other information necessary to enable the Trustee to pay such Additional Amounts to Holders of Notes or beneficial owners on the Payment Date. Each such Officer's Certificate shall be relied upon by the Trustee without further enquiry until receipt of a further Officer's Certificate addressing such matters.

(g)    The foregoing obligations to pay Additional Amounts will survive any termination, defeasance or discharge of the Indenture and any transfer by an investor of its Notes (or beneficial interest therein).

(h)    Whenever in this Indenture or in the Notes, there is mentioned, in any context, (i) the payment of principal, premium, if any, or interest, (ii) redemption prices or purchase prices in connection with the redemption or purchase of Notes or (iii) any other amount payable under or with respect to any Note, such mention shall be deemed also to refer to any Additional Amounts which may be payable as set forth in this Indenture or in the Notes.

Section 2.13    *Mutilated, Destroyed, Lost or Stolen Notes*.    In case any Note shall become mutilated, defaced, destroyed, lost or stolen, the Issuer will execute and the Trustee will, upon written direction by the Issuer, authenticate, register and deliver a new Note of like tenor (including the same date of issuance) and equal principal amount registered in the same manner, dated the date of its authentication and bearing interest from the date to which interest has been paid on such Note, in exchange and substitution for such Note (upon surrender and cancellation thereof in the case of mutilated or defaced Notes) or in lieu of and in substitution for such Note. In case a Note is destroyed, lost or stolen, the applicant for a substitute Note shall furnish the

Issuer and the Trustee (a) such security or indemnity as may be required by them to save each of them harmless and (b) satisfactory evidence of the destruction, loss or theft of such Note and of the ownership thereof.  Upon the issuance of any substituted Note, the Trustee may require the payment by the registered Holder thereof of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any fees and expenses (including those of the Trustee) connected therewith. With respect to mutilated, defaced, destroyed, lost or stolen definitive Notes, a Holder thereof may obtain new definitive registered Notes from the office of the Transfer Agent.

Notwithstanding any statement herein, the Issuer reserves its right to impose such transfer, certificate, exchange or other requirements, and to require such restrictive legends on Notes, as it may determine are necessary to ensure compliance with the securities laws of the United States and the states therein and any other applicable laws.

Section 2.14   _Cancellation_.   (a)   All Notes surrendered for payment, exchange or redemption, or deemed lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee by such Person and shall be promptly canceled by the Trustee (or, if lost or stolen and not yet replaced pursuant to Section 2.13, delivered to the applicable Holder). No Note shall be authenticated in lieu of or in exchange for any Note canceled as provided in this Section except as expressly permitted by this Indenture.  All canceled Notes held by the Trustee shall be handled by it in accordance with its standard retention policy.

(b)   Any Note(s) (or beneficial interests therein) that are acquired by the Issuer may be canceled upon the election of the Issuer to do so, _provided_, _however_, that no cancellation may be made between a Record Date and the next Payment Date.  In order to effect such cancellation, the Issuer shall send to the Trustee a written order to cancel any such Notes together with the surrender Notes (or instruct at DTC to cancel such Notes).  Upon receipt of any such order the Trustee shall promptly cause such principal amount to be cancelled (including, if applicable, to approve any instructions at DTC).  Upon any such cancellation, the remaining unpaid principal amount of the Notes shall be reduced to take into effect such cancellation and the calculation of interest (and other calculations under this Indenture) shall take into effect such cancellation.

Section 2.15   _Registration of Transfer and Exchange of Notes_. (a) The Issuer hereby initially appoints the Security Registrar as transfer agent for the Notes. The Security Registrar shall register Notes and transfers and exchanges thereof as provided herein.  The Security Registrar and each transfer agent and co-security registrar (if any) appointed with respect to the Notes shall be referred to collectively as the "_Transfer Agent_."   The Security Registrar shall cause to be kept at the office or agency to be maintained by it in accordance with Section 7.11 a register (the "_Register_") in which, subject to restrictions on transfer set forth herein, and such other reasonable regulations as it may prescribe, the Security Registrar shall provide for: (i) the registration of the Notes and (ii) the registration of transfers and exchanges of the Notes as provided herein.  The Trustee shall preserve, in as current a form as is reasonably practicable, the names and addresses of Holders received by the Trustee.

(b)     Upon surrender for registration of transfer of any Note at the Corporate Trust Office or such other office or agency maintained by the Trustee in accordance with <u>Section 7.11</u>, the Trustee shall authenticate and deliver, in the name of the designated transferee (and, if the transfer is for less than all of the applicable Note, the transferor), one or more new Note(s) executed by the Issuer in authorized denominations of a like aggregate principal balance and deliver such new Note(s) to the applicable Holder(s).

(c)     Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed or accompanied by a written instrument of transfer in a form reasonably satisfactory to the Trustee (or the applicable Transfer Agent) duly executed by the applicable Holder or its attorney duly authorized in writing.

(d)     No service charge shall be charged to a Holder for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any Tax or other governmental charge payable in connection therewith.

(e)     All Notes surrendered for registration of transfer or exchange shall be canceled and subsequently handled by the Trustee in accordance with its standard retention policy.

In addition to the other provisions herein, the Issuer reserves the right to impose such transfer, certificate, exchange or other requirements, and to require such restrictive legends on a Note, as it may determine are necessary to ensure compliance with the securities laws of the United States and the states thereof and any other Applicable Laws.

## ARTICLE III
## REDEMPTION OF NOTES

Section 3.1     *Applicability of Article*.  Except as set forth in this <u>Article III</u> or in the Notes, the Notes are not redeemable at the option of the Issuer. Notes that are redeemable before the Maturity Date shall be redeemable in accordance with their terms and in accordance with this <u>Article III</u>.

Section 3.2     *Election to Redeem*.  The election of the Issuer to redeem any Notes shall be authorized by a Board of Directors' resolution of the Issuer and evidenced by an Officer's Certificate delivered to the Trustee.   In the case of any redemption of Notes prior to the expiration of any restriction on such redemption provided in the terms of such Notes or elsewhere in this Indenture, or pursuant to an election by the Issuer which is subject to a condition specified in the terms of such Notes or elsewhere in this Indenture, the Issuer shall furnish the Trustee with an Officer's Certificate evidencing compliance with such restriction or condition.

Section 3.3     *Optional Redemption*.

(a)      *Optional Redemption upon Equity Offering*. At any time and from time to time prior to November 24, 2024, the Issuer may on any one or more occasions redeem up to an aggregate of 35% of the aggregate principal amount of notes (including, for greater certainty, any Additional Notes) then outstanding under the Indenture using the Net Cash Proceeds (and in an amount not greater than the aggregate of such Net Cash Proceeds) of one or more Equity Offerings, upon not less than 10 nor more than 60 days' notice, at a redemption price of 105.750% of the principal amount of the notes being redeemed, plus Additional Amounts and accrued and unpaid interest, if any, to the applicable Redemption Date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant Payment Date); *provided,* that:

(i)      at least 65% of the aggregate principal amount of the Notes originally issued under this Indenture on the Initial Issue Date remain Outstanding immediately after the occurrence of such redemption (excluding Notes held by the Issuer and its Subsidiaries); and

(ii)      each such redemption occurs within 180 days of the date of the closing of any such Equity Offering.

(b)      *Optional Redemption prior to November 24, 2024*. At any time prior to November 24, 2024, the Issuer may on any one or more occasions redeem all or a part of the notes, upon not less than 10 nor more than 60 days' notice, at a redemption price equal to 100% of the principal amount of the notes redeemed, plus (i) the Applicable Premium as of, (ii) Additional Amounts to, if any, and (iii) accrued and unpaid interest, if any, to, but not including the applicable Redemption Date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant Payment Date).

(c)      *Optional Redemption on or after November 24, 2024*. On or after November 24, 2024, the Issuer may, on any one or more occasions, redeem all or a part of the notes upon not less than 10 nor more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus Additional Amounts and accrued and unpaid interest, if any, on the notes redeemed, to but not including the applicable Redemption Date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant Payment Date), if redeemed during the twelve month period beginning on November 24 of the years indicated below:

| Year | |
|---|---|
| 2024 ................................................................................................. | 102.875% |
| 2025 ................................................................................................. | 101.438% |
| 2026 and thereafter ......................................................................... | 100.000% |

Section 3.4      <u>*Optional Tax Redemption*</u>.  The Notes may be redeemed at the Issuer's election in whole but not in part on any date prior to the Maturity Date, by the giving of notice as provided in <u>Section 10.5</u> at a price equal to the outstanding principal amount thereof, together

with any Additional Amounts and accrued and unpaid interest to, but not including, the Redemption Date, if, as a result of:

(a)    any change in, or amendment to, laws or treaties (or any regulation or rulings promulgated thereunder) of a Relevant Taxing Jurisdiction; or

(b)    any change in the official application, administration or interpretation of such laws, treaties, regulations or rulings (including by virtue of a holding, judgment, or order by a court of competent jurisdiction) or a change in published administrative practice in a Relevant Taxing Jurisdiction,

in each case, which amendment, change, application, administration or interpretation is enacted or promulgated (or in the case of changes described in clause (b), publicly announced) on or after the date of the offering memorandum (or, in the case of a jurisdiction that becomes a Relevant Taxing Jurisdiction on a date after the date of the offering memorandum, such later date), the Issuer, a Note Guarantor or Successor, as the case may be, has become or would become obligated to pay any Additional Amounts on the next date on which any amount would be payable with respect of such notes and the Issuer, the Note Guarantor or the Successor, as the case may be, determines in good faith that such obligation cannot be avoided by taking commercially reasonable measures available to it; provided, however, that no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the relevant entity would be obligated to pay such Additional Amounts.

Notice of redemption pursuant to this _Section 3.4_ will be given at least ten days but not more than 60 days before the Redemption Date to each Holder of the Notes to be redeemed. Prior to the giving of notice of redemption of such Notes pursuant to this Indenture, the Issuer will deliver to the Trustee an Officer's Certificate and a written opinion of such Relevant Taxing Jurisdiction counsel independent of the Issuer and its Affiliates to the effect that the Issuer, Note Guarantor, or Successor, as the case may be, has or will become obligated to pay such Additional Amounts as a result of such change, amendment, application, administration or interpretation.

Section 3.5    _Optional Redemption Procedures_.

(a)    In the event that less than all of the Notes are to be redeemed at any time, selection of Notes for redemption will be made by the Trustee in compliance with the requirements governing redemptions of the principal securities exchange, if any, on which Notes are listed or if such securities exchange has no requirement governing redemption or the Notes are not then listed on a securities exchange, on a pro rata basis or by lot (or, in the case of Notes issued in global form, based on a method in accordance with the procedures of DTC). If Notes are redeemed in part, the remaining outstanding amount must be at least equal to U.S.$200,000 and be an integral multiple of U.S.$1,000 in excess thereof.

(b)    Notes shall be excluded from eligibility for selection for redemption if they are identified by registration and certificate number in a written statement signed by an

Authorized Officer of the Issuer and delivered to the Trustee at least ten days prior to the Redemption Date as being owned of record and beneficially by, and not pledged or hypothecated by either (i) the Issuer, or (ii) a Person specifically identified in such written statement which is an Affiliate of the Issuer.

(c)    The Trustee shall promptly notify the Issuer in writing of the Notes selected for redemption and, in the case of any Notes selected for partial redemption, the principal amount thereof to be redeemed.

(d)    For all purposes of this Indenture, unless the context otherwise requires, all provisions relating to the redemption of Notes shall relate, in the case of any Notes redeemed or to be redeemed only in part, to the portion of the principal amount of such Notes which has been or is to be redeemed.

(e)    Notes called for redemption will become due on the date fixed for redemption. The Issuer will pay the redemption price for any Note together with accrued and unpaid interest thereon and Additional Amounts, if any, to, but excluding, the Redemption Date. On and after the Redemption Date, interest will cease to accrue on Notes or portions thereof called for redemption as long as the Issuer has deposited with the Paying Agent funds in satisfaction of the applicable redemption price pursuant to the Indenture. Upon redemption of any Notes by the Issuer, such redeemed Notes will be cancelled or, to the extent so requested by the Issuer, remain outstanding. The Issuer may designate at its option a third party to call the Notes for mandatory purchase in lieu of exercising its right to optional redemption under the Indenture; *provided,* that any call by a third party shall be treated as if such call was made by the Issuer.

(f)    In the event that Holders of not less than 90.0% of the aggregate principal amount of the Outstanding Notes validly tender and do not withdraw such Notes in a Change of Control Offer, Asset Disposition Offer or other tender offer and the Issuer (or a third party making the offer) purchases all of the Notes validly tendered and not withdrawn by such Holders, the Issuer or third party offeror, as applicable, will have the right, upon not less than ten nor more than 60 days' prior notice, given not more than 30 days following the purchase pursuant to such offer described above, to redeem (in the case of the Issuer) or purchase (in the case of a third party offeror) all of the Notes that remain outstanding following such purchase at a redemption price or purchase price, as the case may be, equal to the price paid to each other Holder in such offer (which shall be at least equal to par) plus, to the extent not included in such price, accrued and unpaid interest on the Notes that remain outstanding, to but not including the Redemption Date (subject to the right of Holders of record on the relevant Record Date to receive interest due on an interest Payment Date that is on or prior to the Redemption Date).

(g)    Notice of any redemption of the Notes in connection with a corporate transaction (including an Equity Offering, an Incurrence of Indebtedness or a Change of Control Offer) may, at the Issuer's discretion, be given prior to the completion thereof and any such

redemption or notice may, at the Issuer's discretion, be subject to one or more conditions precedent, including, but not limited to, completion of the related transaction. If such redemption or purchase is so subject to satisfaction of one or more conditions precedent, such notice shall describe each such condition, and if applicable, shall state that, in the Issuer's discretion, the Redemption Date may be delayed until such time as any or all such conditions shall be satisfied, or such redemption or purchase may not occur and such notice may be rescinded in the event that any or all such conditions shall not have been satisfied by the Redemption Date, or by the Redemption Date as so delayed. In addition, the Issuer may provide in such notice that payment of the redemption price and performance of the Issuer's obligations with respect to such redemption may be performed by another Person.

Section 3.6    _Notice of Redemption_.  Notice of any redemption will be given to the Holders in accordance with the provision set out under <u>Section 10.5</u>. Notice of any redemption will be provided to the Trustee, Security Registrar, Paying Agent and Transfer Agent no later than five Business Days prior to the date that the notice of redemption is sent to Holders (or such shorter period as the Trustee may accept). If Notes are to be redeemed in part only, the notice of redemption will state the portion of the principal amount thereof to be redeemed.

All notices of redemption shall identify the Notes to be redeemed and shall state:

(a)    the Redemption Date;

(b)    the redemption price;

(c)    that on the Redemption Date the redemption price will become due and payable upon each such Note to be redeemed and, if applicable, that interest thereon will cease to accrue on and after said date;

(d)    if any Note is being redeemed in part, the portion of the principal amount of such Note to be redeemed and that, after the Redemption Date upon surrender of such Note, a new Note in a principal amount equal to the unredeemed portion thereof, if any, will be issued in the name of the Holder thereof upon cancellation of the original Note (or appropriate adjustments to the amount and beneficial interests in a Global Note will be made, as appropriate);

(e)    the place or places where such Notes are to be surrendered for payment of the redemption price (the "_Place of Payment_"); and

(f)    CUSIP(s), and, if applicable, ISIN(s), and that no representation is made as to the correctness or accuracy of the CUSIP and/or ISIN numbers, if any, listed in such notice or printed on the Notes.

Section 3.7    *Deposit of Redemption Price*.  By 11:00 a.m., New York City time, at least one Business Day prior to any Redemption Date, the Issuer shall deposit with the Trustee or with a Paying Agent an amount of money in immediately available funds in Dollars sufficient to pay the redemption price of the Notes.

Section 3.8    *Notes Payable on Redemption Date*.  Notice of redemption having been given as set forth in <u>Section 3.5</u> or <u>Section 3.7</u>, the Notes shall, on the Redemption Date, become due and payable at the redemption price therein specified, and from and after such date (unless the Issuer shall default in the payment of the redemption price) the Notes shall cease to bear interest.  Upon surrender of any Note for redemption in accordance with said notice, such Note shall be paid by the Issuer at the redemption price, together with accrued and unpaid interest to, but not including, the Redemption Date.

If any Note called for redemption shall not be so paid upon surrender thereof for redemption, the principal thereof (and premium, if any) and accrued and unpaid interest thereon, as applicable, shall, until paid, bear interest from the Redemption Date at the rate prescribed therefor in the Note.

Section 3.9    *Open Market Purchases*.  The Issuer or any of its Subsidiaries may at any time purchase any Note in the open market or otherwise at any price in compliance with applicable securities laws.  Any Note so purchased by the Issuer may be surrendered to the Trustee for cancellation.

# ARTICLE IV
# COVENANTS

Section 4.1    *Covenants of the Issuer and the Note Guarantors*.  The Issuer and the Note Guarantors agree that so long as any amount payable by it under this Indenture or the Notes remains unpaid, they shall, and shall cause its Restricted Subsidiaries, as applicable, to comply with the following:

(a)    <u>Rule 144A Information</u>.  For so long as any of the Notes remain Outstanding and are "restricted securities" within the meaning of Rule 144(a)(3) under the Securities Act, the Issuer shall furnish, upon the request of any Holder, such information as is specified in Rule 144A(d)(4) under the Securities Act: (i) to such Holder, (ii) to a prospective purchaser of such Note (or beneficial interests therein) who is a QIB designated by such Holder and (iii) to the Trustee for delivery to any applicable Holders or such prospective purchaser so designated, in each case in order to permit compliance by such Holder with Rule 144A in connection with the resale of such Note (or beneficial interest therein) in reliance upon Rule 144A. All such information shall be in the English language.

The Issuer may, in lieu of delivering such information to such Holder or prospective purchaser, post the information specified above on its website. Such website may be password protected so long as the Issuer (i) notifies the Holder or prospective purchaser , as

applicable, of postings to the website (including through the information dissemination procedures of the depositary for the Notes) and (ii) provides the Holder or prospective purchaser, as applicable, with access to such website.

        (b)     <u>Notice of Default; Compliance Certificate</u>.

        (i)     The Issuer will furnish to the Trustee, not later than ten Business Days after the Issuer obtains knowledge thereof, written notice of any Default, signed by an Authorized Officer of the Issuer, describing such Default and the steps that the Issuer proposes to take in connection therewith.

        (ii)     Within 120 days after the end of each fiscal year ending on December 31 of each year of the Issuer ending after the date hereof or at any other time at the request of the Trustee, the Issuer shall deliver to the Trustee a certificate which need not comply with <u>Section 10.11</u>, executed by the principal executive officer, the principal financial officer or the principal accounting officer of the Issuer and one other Authorized Officer of the Issuer, as to such officer's knowledge of the Issuer's compliance with all conditions and covenants under this Indenture, such compliance to be determined (solely for the purpose of this <u>Section 4.1(b)(ii)</u>) without regard to any period of grace or requirement of notice under this Indenture.

        (c)     <u>Maintenance of Books and Records</u>.  The Issuer will, and will cause each of its Subsidiaries to, maintain books, accounts and other records in accordance, in all material respects, with IFRS and the Issuer will cause its Subsidiaries organized under laws of any other jurisdiction to maintain their books and records in accordance, in all material respects, with the generally accepted accounting principles of the applicable jurisdiction.

        (d)     <u>Further Assurances</u>.  The Issuer will, at its own cost and expense, execute and deliver to the Trustee all such other documents, instruments and agreements and do all such other acts and things as may be reasonably necessary in order to give effect to this Indenture or the Notes.

        (e)     <u>Limitation on Indebtedness</u>.  (1) The Issuer will not, and will not permit any Restricted Subsidiary to, Incur, directly or indirectly, any Indebtedness; *provided*, *however*, that the Issuer or any Restricted Subsidiary may Incur Indebtedness if on the date of such Incurrence and after giving effect thereto and the application of proceeds therefrom, (i) the Consolidated Interest Coverage Ratio would be no less than 2.5:1.0, (ii) the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio would be no greater than 3.25:1.00 and (iii) no Default or Event of Default shall have occurred and be continuing (or would result therefrom);

(2)    Notwithstanding the foregoing clause (1), the Issuer and its Restricted Subsidiaries may Incur the following Indebtedness:

(a)    Indebtedness:

(i)    of the Issuer and any Restricted Subsidiary outstanding on the Initial Issue Date; and

(ii)    consisting of Guarantees of any Indebtedness otherwise permitted by and made in accordance with the provisions of this Section 4.1(e);

(b)    Indebtedness of a Restricted Subsidiary Incurred and outstanding on or prior to the date on which such Restricted Subsidiary was acquired by the Issuer or a Restricted Subsidiary or otherwise became a Restricted Subsidiary (other than Indebtedness Incurred as consideration of, or to provide all or any portion of the funds or credit support utilized to consummate, or otherwise in contemplation of, the transaction or series of related transactions pursuant to which such Restricted Subsidiary became a Subsidiary of, or was otherwise acquired by, the Issuer or a Restricted Subsidiary); *provided*, *however*, that on the date that such Restricted Subsidiary is acquired by the Issuer or a Restricted Subsidiary, either (x) the Issuer and the Restricted Subsidiaries would have been able to Incur U.S.$1.00 of additional Indebtedness pursuant to the foregoing clause (1), after giving *pro forma* effect to the Incurrence of such Indebtedness pursuant to this subclause (b) and the repayment of any Indebtedness in connection with such transaction, and the acquisition of such Restricted Subsidiary, or (y) the Consolidated Interest Coverage Ratio would be no less than the Consolidated Interest Coverage Ratio immediately prior to such transactions, and the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio would be no greater than the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio immediately prior to the transactions, in each case after giving effect to the repayment of any Indebtedness in connection with such transactions;

(c)    Indebtedness of another Person Incurred and outstanding on or prior to the date on which such Person consolidates with or merges with or into the Issuer or a Restricted Subsidiary (other than Indebtedness Incurred as consideration of, or to provide all or any portion of the funds or credit support utilized to consummate, or

otherwise in contemplation of, the transaction or series of related transactions pursuant to which such Person consolidates with or merges with or into the Issuer or a Restricted Subsidiary); *provided, however*, that on the date that such transaction is consummated, either (x) the Issuer and the Restricted Subsidiaries would have been able to Incur U.S.$1.00 of additional Indebtedness pursuant to the foregoing <u>clause (1)</u> after giving *pro forma* effect to the Incurrence of such Indebtedness pursuant to this <u>subclause (c)</u> and the repayment of any Indebtedness in connection with such transaction, and such consolidation or merger, or (y) the Consolidated Interest Coverage Ratio would be no less than the Consolidated Interest Coverage Ratio immediately prior to such transactions, and the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio would be no greater than the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio immediately prior to the transactions, in each case after giving effect to the repayment of any Indebtedness in connection with such transactions;

(d)   Indebtedness in respect of bankers' acceptances, bank guarantees, warehouse receipts, deposits, promissory notes, workers' compensation claims, self-insurance obligations or similar bids or bonds and Guarantees provided by the Issuer or any Restricted Subsidiary in the ordinary course of business (other than such obligations of the type referred to in <u>subclause (k)</u>);

(e)   Indebtedness arising under agreements providing for indemnification, adjustment of purchase price or similar obligations, in each case Incurred or assumed in connection with the acquisition or disposition of a business, assets or Capital Stock; *provided, however*, that, in the case of a disposition, the maximum aggregate liability in respect of such Indebtedness will at no time exceed the gross proceeds actually received by the Issuer or such Restricted Subsidiary in connection with such disposition;

(f)   Purchase Money Obligations and Capitalized Lease Obligations in an aggregate principal amount at any one time outstanding not in excess of the greater of (x) U.S.$35 million (or its equivalent in any other currency) and (y) 4.0% of Consolidated Net Tangible Assets;

(g)   Hedging Obligations of the Issuer or any Restricted Subsidiary Incurred for the purpose of fixing or hedging interest rate risk or currency and commodity prices fluctuations in the ordinary course of business or with respect to Indebtedness permitted to be

Incurred by the Issuer or any Restricted Subsidiary pursuant to the Indenture, and in each case not for speculative purposes; *provided, however*, that increases in Hedging Obligations as a result of fluctuations in foreign currency, commodity prices, exchange rates or interest rates shall not be deemed an Incurrence of Indebtedness;

(h)    Refinancing Indebtedness, including Refinancing Indebtedness Incurred to defease the Notes as provided in <u>Section 6.4</u> to the extent the proceeds therefrom are applied concurrently to defease the Notes;

(i)    Indebtedness of the Issuer or any Restricted Subsidiary evidenced by the Notes or the Note Guarantee;

(j)    Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided, however*, that such Indebtedness is extinguished within five Business Days of its incurrence;

(k)    Indebtedness consisting of letters of credit, bonds or surety obligations required by governmental authorities (including without limitation for the benefit of the *Agencia Nacional de Hidrocarburos of Colombia*) in connection with the operation of the Issuer's and Restricted Subsidiaries' Oil and Gas Properties in the ordinary course of business;

(l)    Indebtedness of the Issuer owed to and held by any Restricted Subsidiary of the Issuer or Indebtedness of a Restricted Subsidiary owed to and held by the Issuer or any other Restricted Subsidiary; *provided, however*, that:

(i)    any subsequent issuance or transfer of any Capital Stock or any other event that results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any subsequent transfer of any such Indebtedness (except to the Issuer or a Restricted Subsidiary) shall be deemed, in each case, to constitute the Incurrence of such Indebtedness by the issuer thereof; and

(ii)      if the Issuer is the obligor on such Indebtedness, such Indebtedness is expressly subordinated to the prior payment in full in cash of all obligations with respect to the Notes, unless the Restricted Subsidiary is a Note Guarantor;

(m)      Indebtedness arising under cash management obligations, cash management services and other Indebtedness in respect of netting services, automatic clearing house arrangements, employees' credit or purchase cards, overdraft protections and similar arrangements in each case incurred in the ordinary course of business;

(n)      Indebtedness Incurred under one or more Credit Facilities in an aggregate principal amount not to exceed at any time outstanding the greater of (x) U.S.$75 million (or its equivalent in any other currency) and (y) 10.0% of Consolidated Net Tangible Assets;

(o)      accounts payable to trade creditors created or assumed in the ordinary course of business or which is customary in the Oil and Gas Business in connection with the obtaining of goods or services and Indebtedness representing deferred compensation to employees, consultants or independent contractors of the Issuer or any Restricted Subsidiary incurred in the ordinary course of business; and

(p)      Indebtedness of the Issuer or any of its Restricted Subsidiaries in an aggregate principal amount which, when taken together with all other Indebtedness of the Issuer and its Restricted Subsidiaries outstanding on the date of such Incurrence (other than Indebtedness permitted by subclauses (a) through (o) above) does not exceed at any time outstanding the greater of (x) U.S.$75 million (or its equivalent in any other currency) and (y) 10.0% of Consolidated Net Tangible Assets.

For purposes of determining the compliance with this Section 4.1(e):

(x)      Indebtedness permitted by this Section 4.1(e) (including clause (1) above), need not be permitted solely by reference to one provision permitting such Indebtedness but may be permitted in part by one such provision and in part by one or more other provisions of this Section 4.1(e) permitting such Indebtedness, as determined by the Issuer in its sole discretion; and

(y)    In the event that Indebtedness meets the criteria of more than one of the types of Indebtedness described in this Section 4.1(e) including clause (1) above, the Issuer, in its sole discretion, shall classify (and from time to time may reclassify) such item of Indebtedness, in any manner that complies with this Section 4.1(e); and

(3)    Notwithstanding the foregoing, the Issuer may not Incur any Indebtedness pursuant to clause (2) above if the proceeds thereof are used, directly or indirectly, to Refinance any Subordinated Obligations, unless such Indebtedness will be subordinated to any obligations owed under the Notes and the Indenture to at least the same extent as such Subordinated Obligations.

For purposes of determining compliance with any Dollar-denominated restriction on the Incurrence of Indebtedness, the Dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred; *provided*, *however*, that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing Indebtedness does not exceed the principal amount of such Indebtedness being refinanced.

Notwithstanding any other provision of this Section 4.1(e), the maximum amount of Indebtedness that the Issuer or any Restricted Subsidiary may Incur pursuant to this Section 4.1(e) shall not be deemed to be exceeded solely as a result of fluctuations in the exchange rate of currencies. The principal amount of any Indebtedness, if Incurred in a different currency from the Indebtedness being refinanced, shall be calculated based on currency exchange rate applicable to the currencies in which such Refinancing Indebtedness is denominated that is in effect on the date of such refinancing.

Accrual of interest, accrual of dividends, payment of interest in the form of additional Indebtedness, payment of dividends in the form of shares of Preferred Stock, accretion or amortization of original issue discount will not be deemed to be an Incurrence of Indebtedness for purposes of this Section 4.1(e).

(f)    <u>Limitation on Liens</u>. The Issuer will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create, Incur or suffer to exist any Lien on any property, assets, income or profits of the Issuer or any Restricted Subsidiary without effectively providing that the Notes (together with, if the Issuer so determines, any other Indebtedness or obligation then existing or thereafter created ranking equally with the Notes) shall be secured

equally and ratably with (or prior to) the Indebtedness secured by such Lien so long as such Indebtedness shall be so secured, except that the foregoing provisions shall not apply to:

(1)    Liens in existence on the Initial Issue Date;

(2)    Liens that secure Indebtedness owing by a Restricted Subsidiary to the Issuer and/or one or more other Restricted Subsidiaries or by the Issuer to one or more Restricted Subsidiaries;

(3)    Liens on any property or assets acquired from a Person that is merged with or into the Issuer or any Restricted Subsidiary, or any Liens on the property, Capital Stock, assets, income or profits of any Person, existing at the time such Person becomes a Restricted Subsidiary and, in either case, is not created as a result of or in connection with or in anticipation of any such transaction (unless such Lien was created to secure or provide for the payment of any part of the purchase price of such Person); *provided*, *however*, that such Liens may not extend to any other property, assets, income or profits of the Issuer or any Restricted Subsidiary (other than improvements, accessions, upgrades, accessories and products and proceeds in respect of the property subject to such Liens at the time of such acquisition);

(4)    any Lien on any property or assets existing at the time of acquisition thereof, including any acquisition by means of a merger or consolidation, and that is not created as a result of or in connection with or in anticipation of such acquisition (unless such Lien was created to secure or provide for the payment of any part of the purchase price of such property or assets); *provided*, *however*, that such Liens may not extend to any other property, assets, income or profits of the Issuer or any Restricted Subsidiary (other than improvements, accessions, upgrades, accessories and products and proceeds in respect of the property subject to such Liens at the time of such acquisition);

(5)    any Lien on the Capital Stock of an Unrestricted Subsidiary;

(6)    Liens (including extensions and renewals) with respect to Purchase Money Obligations and Capitalized Lease Obligations incurred pursuant to subclause (f) of clause (2) under Section 4.1(e);

(7)    Liens imposed by contract or law, including landlords', operators', vendors', carriers', warehousemen's and mechanics' Liens and other

similar Liens, on the property or assets of the Issuer or any Restricted Subsidiary arising in the ordinary course of business and securing payment of obligations that are not more than 90 days past-due or are being contested in good faith by appropriate proceedings;

(8)    Liens on the property or assets of the Issuer or any Restricted Subsidiary Incurred in the ordinary course of business to secure the performance of tenders, bids, statutory obligations, appeal bonds and deposits (including, without limitation, as security for contested taxes or import or customs duties), government contracts, workers compensation, unemployment insurance and social security claims, return-of-money bonds, or other obligation of a like nature and Incurred in a manner consistent with industry practice, in each case which are (x) not Incurred in connection with the borrowing of money, the obtaining of advances or credit or the payment of the deferred purchase price of property or assets in the operation of the business of the Issuer and the Restricted Subsidiaries, and (y) not obligations of the type referred to in subclause (k) of clause (2) under Section 4.1(e);

(9)    easements, rights of way, restrictions, or defects or irregularities in title and other similar charges or encumbrances which do not interfere in any material respect with the business of the Issuer or any Restricted Subsidiary;

(10)   Liens on Indebtedness Incurred to defease all of the Outstanding Notes as permitted under Section 6.4 to the extent the proceeds therefrom are applied concurrently to defease the Notes;

(11)   Liens arising solely by virtue of any statutory or common law provision relating to banker's liens, rights of set-off or similar rights or remedies as to deposit accounts or other funds maintained with a creditor depository institution; *provided*, *however*, that (x) such deposit account is not a dedicated cash collateral account and is not subject to restrictions against access by the Issuer or any Subsidiary of the Issuer in excess of those set forth by regulations promulgated by the Board of Governors of the Federal Reserve System of the United States or analogous Canadian, Colombian Panamanian and Swiss governmental authorities and (y) such deposit account is not intended by the Issuer or any Subsidiary of the Issuer to provide collateral to such depository institution;

(12)   Liens arising out of judgments or awards against the Issuer or a Restricted Subsidiary which do not give rise to an Event of Default;

(13)    Liens imposed by law for taxes, assessments or governmental charges;

(14)    Liens arising out of governmental concessions or licenses (including under contracts with governmental entities or agencies for technical evaluation or exploration and development rights of oil and natural gas fields) held by the Issuer or a Restricted Subsidiary;

(15)    Liens to secure the Notes or the Note Guarantees;

(16)    Liens securing Hedging Obligations Incurred pursuant to subclause (g) of clause (2) under Section 4.1(e) so long as the related Indebtedness is, and is permitted to be, secured by a Lien substantially on the same property securing such Hedging Obligations;

(17)    Leases and subleases of real property by the Issuer or any Restricted Subsidiary as lessor which do not materially interfere with the ordinary conduct of the business of the Issuer or any of its Restricted Subsidiaries;

(18)    Liens of lessors (including sublessors) of property leased by such lessors to the Issuer, any Note Guarantor or any Restricted Subsidiary thereof, restrictions and prohibitions on encumbrances and transferability with respect to such property and the Issuer's, the Note Guarantor's or such Restricted Subsidiary's interests therein imposed by such leases, and Liens encumbering such lessors' titles and interests in such property and to which the Issuer's, the Note Guarantor's or such Restricted Subsidiary's leasehold interests may be subject or subordinate, in each case, whether or not evidenced by UCC financing statement filings or other documents of record, *provided,* that such Liens do not encumber property of the Issuer, any Note Guarantor or such Restricted Subsidiary thereof other than the property that is the subject of such leases and items located thereon;

(19)    any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any Lien referred to in the foregoing clauses (1) through (18) or of any Indebtedness secured thereby; *provided,* that the principal amount of Indebtedness so secured thereby shall not exceed the principal amount of Indebtedness so secured at the time of such extension, renewal or replacement (plus accrued and unpaid interest and reasonable fees and expenses Incurred in connection therewith), and that such extension, renewal or replacement Lien shall be limited to all or part of the property that secured the Lien extended, renewed or replaced (plus improvements on or additions to such property); or

66

(20)    Liens on the property or assets of the Issuer or any Restricted Subsidiary in an aggregate principal amount which, when taken together with all other Liens on the property or assets of the Issuer or any Restricted Subsidiary Incurred pursuant to this clause (20) and outstanding on the date of such Incurrence, does not exceed the greater of (x) U.S.$75 million (or its equivalent in any other currency) and (y) 10.0% of Consolidated Net Tangible Assets;

(21)    Liens arising under joint venture agreements, partnership agreements, operating agreements, oil and gas leases or subleases, assignments, purchase and sale agreements, division orders, contracts for the sale, purchasing, processing, transportation or exchange of gas, unitization and pooling declarations and agreements, development agreements, technical evaluation agreements, area of mutual interest agreements, overriding royalty agreements, marketing agreements, rights of first refusal, rights of first offer, licenses, sublicenses, net profits interests, participations agreements, Farm-Out Agreements, Farm-In Agreements, gas balancing or deferred production agreements, injection, repressuring and recycling agreements, salt water or other disposal agreements, seismic or other geophysical permits or agreements, carried working interest, joint operating, unitization, royalty, sales and similar agreements or arrangements relating to the exploration or development of, or production from, Oil and Gas Properties entered into in the ordinary course of business in a Permitted Business;

(22)    Liens on pipelines or pipeline facilities that arise by operation of law;

(23)    Liens reserved in oil and gas mineral leases for bonus or rental payments and for compliance with the terms of such leases;

(24)    Liens (other than Liens securing Indebtedness) on, or related to, assets to secure all or part of the costs incurred in the ordinary course of the Oil and Gas Business for the exploration, drilling, development, production, processing, transportation, marketing, storage or operation thereof, including, for the avoidance of doubt, the trust guaranteeing the approximately 300 km pipeline to be constructed between El Jobo plant and the Trasmetano pipeline at Estación Tasajeras, in connection with the long-term firm take-or-pay gas sales contract with Empresas Publicas de Medellín E.S.P., dated August 26, 2021;

(25)    Liens securing Indebtedness in respect of Sale and Lease-Back Transactions permitted to be Incurred under Section 4.1(e) in an aggregate principal amount outstanding not to exceed the greater of (x) U.S.$25

million (or its equivalent in any other currency) and (y) of 3.0% Consolidated Net Tangible Assets;

(26)    Liens securing Indebtedness Incurred pursuant to each of <u>subclauses (k)</u> or <u>(n)</u> of <u>clause (2)</u> under <u>Section 4.1(e)</u>;

(27)    Liens, titles and interests of licensors of software and other intangible property licensed by such licensors to the Issuer, any Note Guarantor or any Restricted Subsidiary thereof, restrictions and prohibitions on encumbrances and transferability with respect to such property and the Issuer's or the Note Guarantor's or such Restricted Subsidiary's interests therein imposed by such licenses, and Liens encumbering such licensors' titles and interests in such property and to which the Issuer's or the Note Guarantor's or such Restricted Subsidiary's license interests may be subject or subordinate, in each case, whether or not evidenced by UCC financing statement filings or other documents of record; *provided,* that such Liens do not encumber property of the Issuer or the Note Guarantor or any Restricted Subsidiary thereof other than the property that is the subject of such licenses; and

(28)    Liens securing obligations arising under cash management obligations, cash management services and other Indebtedness in respect of netting services, automatic clearing house arrangements, employees' credit or purchase cards, overdraft protections and similar arrangements in each case incurred in the ordinary course of business.

Liens or deposits required by any contract or statute or other regulatory requirements in order to permit the Issuer or a Restricted Subsidiary to perform any contract or subcontract made by it with or at the request of a governmental entity or any department, agency or instrumentality thereof, or to secure partial progress, advance or any other payments to the Issuer or any Restricted Subsidiary by a governmental entity or any department, agency or instrumentality thereof pursuant to the provisions of any contract or statute shall not be deemed to create Indebtedness secured by Liens.

(g)    <u>Limitation on Restricted Payments</u>.  (1)  The Issuer will not, and will not permit any Restricted Subsidiary to, directly or indirectly, (the actions described in <u>subclauses (1)</u> through <u>(4)</u> below being herein referred to as "*Restricted Payments*"):

(1)    declare or pay any dividend or make any distribution on or in respect of their Capital Stock (including any such payment in connection with any merger or consolidation involving the Issuer or any Restricted Subsidiary) or similar payment to the direct or indirect holders of their Capital Stock,

except for dividends or distributions payable solely in the form of issuance of additional Capital Stock (other than Disqualified Stock of the Issuer or a Restricted Subsidiary or Preferred Stock of a Restricted Subsidiary) and except dividends or distributions payable to the Issuer or another Restricted Subsidiary (and, if such Restricted Subsidiary has shareholders other than the Issuer or other Restricted Subsidiaries, to its other shareholders on a pro rata basis or basis more favorable to the Issuer or other Restricted Subsidiary, based on their respective holdings of the applicable classes of Capital Stock);

(2)    purchase, redeem, retire or otherwise acquire for value any Capital Stock of the Issuer held by Persons other than the Issuer or a Restricted Subsidiary (other than a purchase, redemption, retirement or other acquisition for value that would constitute a Permitted Investment);

(3)    purchase, repurchase, redeem, defease or otherwise acquire or retire for value, prior to scheduled maturity, scheduled repayment or scheduled sinking fund payment, any Subordinated Obligations (other than the purchase, repurchase, redemption, defeasance or other acquisition of Subordinated Obligations (x) purchased, repurchased, redeemed, defeased or otherwise acquired in anticipation of satisfying a sinking fund obligation, principal installment or a final maturity, in each case, due within one year of the date of such purchase, repurchase, redemption, defeasance or other acquisition or (y) owing to or held by the Issuer or a Restricted Subsidiary); or

(4)    make any Investment (other than a Permitted Investment) in any other Person, unless at the time the Issuer or such Restricted Subsidiary makes such Restricted Payment (including, without limitation, any purchase, redeem, retire or otherwise acquire for value any Capital Stock of the Issuer held by Persons other than the Issuer or a Restricted Subsidiary) the following conditions are satisfied:

(i)    no Default (other than a Default arising under or from a breach in the performance of Section 4.1(l)) or Event of Default has occurred and is continuing or would occur as a result thereof;

(ii)    the Issuer could Incur at least U.S.$1.00 of additional Indebtedness under clause (1) of Section 4.1(e) after giving effect to the Restricted Payment; or

(iii)    the aggregate amount of such Restricted Payment and all other Restricted Payments (excluding Restricted Payments permitted by <u>subclauses (a)</u>, <u>(b)</u>, <u>(d)</u>, <u>(e)</u>, <u>(f)</u> and <u>(h)</u> of <u>clause (2)</u>, below) declared or made subsequent to the Initial Issue Date would not exceed the sum of, without duplication:

(A)    (x) 50% or (y) if the Dividend Step-Up Condition is met at the time of and after giving effect to such Restricted Payment, 75%, in each case of Consolidated Net Income accrued during the period (treated as one accounting period) from July 1, 2018 to the end of the most recent fiscal quarter for which financial statements have been delivered to the Trustee under the Indenture prior to the date of such Restricted Payment (or, in case such Consolidated Net Income will be a deficit, minus 100% of such deficit); *plus*

(B)    the aggregate Net Cash Proceeds and Fair Market Value of any property received by the Issuer from the issue or sale of its Capital Stock (other than Disqualified Stock) or other capital contributions subsequent to the Initial Issue Date (other than Net Cash Proceeds received from an issuance or sale of such Capital Stock to a Restricted Subsidiary of the Issuer); *plus*

(C)    (1) the amount of a Guarantee of the Issuer or any Restricted Subsidiary upon the unconditional release in full of the Issuer or such Restricted Subsidiary from such Guarantee if such Guarantee was previously treated as a Restricted Payment; and

(2) in the event that the Issuer or any Restricted Subsidiary makes an Investment in a Person that, as a result of or in connection with such Investment, becomes a Restricted Subsidiary, an amount equal to the Issuer's or such Restricted Subsidiary's existing Investment in such Person;

*Provided,* that any amount added pursuant to clauses (1) and (2) of this clause (C) shall not exceed the amount of such Guarantee or Investment

70

previously made and treated as a Restricted Payment and not previously added pursuant to this clause (iii); *provided*, *however*, that no amount will be included under this clause (C) to the extent it is already included under clause (A) above; *plus*

(D)     the amount by which Indebtedness of the Issuer or any Restricted Subsidiary is reduced on the balance sheet of the Issuer or any Restricted Subsidiary upon the conversion or exchange subsequent to the Initial Issue Date of any such Indebtedness for Capital Stock (other than Disqualified Stock) of the Issuer (less the amount of any cash or the Fair Market Value of other property (other than such Capital Stock) distributed by the Issuer or any Restricted Subsidiary upon such conversion or exchange); *plus*

(E)     the amount equal to the net reduction of Investments (other than Permitted Investments) made by the Issuer or any Restricted Subsidiary in any Person resulting from repurchases or redemptions of such Investment by such Person, proceeds realized upon the sale of such Investment, repayments of loans or advances or other transfers of assets (including by way of dividend or distribution) by such Person to the Issuer or any Restricted Subsidiary or the redesignation of an Unrestricted Subsidiary as a Restricted Subsidiary or the merger or consolidation of an Unrestricted Subsidiary into any of the Issuer or a Restricted Subsidiary; *provided,* that any amount added pursuant to this <u>clause (E)</u> shall not exceed the amount of such Investment previously made and treated as a Restricted Payment; *provided*, *however*, that no amount will be included under this <u>clause (E)</u> to the extent it is already included under <u>clause (A)</u> above; *plus*

(F)     the Starter Amount.

(2)     The provisions of the foregoing <u>clause (1)</u> shall not prohibit:

(a)   any purchase, repurchase, retirement, defeasance or other acquisition or retirement for value of Capital Stock of the Issuer or Subordinated Obligations made by exchange for, or out of the proceeds of the substantially concurrent sale of, Capital Stock of the Issuer (other than Disqualified Stock or other than Capital Stock issued or sold to a Subsidiary of the Issuer);

(b)   (1) any purchase, repurchase, redemption, defeasance or other acquisition or retirement for value of Subordinated Obligations made by exchange for, or out of the proceeds of the substantially concurrent sale of, Indebtedness that is permitted to be Incurred pursuant to clause (2) of Section 4.1(e), and (2) any purchase, repurchase, redemption or other acquisition or retirement for value of Disqualified Stock made by exchange for, or out of the proceeds of the substantially concurrent sale of Disqualified Stock;

(c)   dividends paid in accordance with applicable law after the date of declaration thereof if at such date of declaration such dividend would have complied with this Section 4.1(g); *provided*, *however*, that the payment or declaration, but not both the payment and the declaration, of such dividend will be included in the calculation of the amount of Restricted Payments pursuant to clause (1)(iii) above;

(d)   repurchases of Capital Stock deemed to occur upon the exercise of stock options, warrants or other convertible or exchangeable securities to the extent such Capital Stock represents a portion of the exercise price thereof;

(e)   any cash discount with respect to the contractual exercise price made to holders of the Issuer's warrants in connection with the exercise of such warrants by the holders thereof;

(f)   the repurchase, redemption or other acquisition of any Capital Stock of the Issuer or any direct or indirect parent of the Issuer or any of its Restricted Subsidiaries held by any current or former officer, director, employee or consultant (or their transferees, estates or beneficiaries) of the Issuer or any of its Restricted Subsidiaries pursuant to any equity subscription agreement, shareholder agreement, employment agreement, stock option plan, equity incentive or other plan or similar agreement, in each case in effect as of the Initial Issue Date, in an aggregate amount not to exceed U.S.$50 million (or its equivalent in any other currency) in

each calendar year of the Issuer (with unused amounts in any calendar year being carried over to succeeding calendar years, subject to a maximum roll-over amount of U.S.$50 million (or its equivalent in any other currency) in any calendar year); *provided* that, such amount in any calendar year may be increased by an amount not to exceed:

(i)     the cash proceeds received by the Issuer from the sale of Capital Stock (other than Disqualified Stock) of the Issuer to employees, directors, officers or consultants of the Issuer or any of its Restricted Subsidiaries that occurs after the Initial Issue Date, *plus*

(ii)    the cash proceeds of key man life insurance policies received by the Issuer or any of its Restricted Subsidiaries after the Initial Issue Date;

(g)     the repurchase, redemption or other acquisition of any Capital Stock of the Issuer or any direct or indirect parent of the Issuer or any of its Restricted Subsidiaries held by any current or former officer, director, employee or consultant (or their transferees, estates or beneficiaries) of the Issuer or any of its Restricted Subsidiaries upon death, disability, retirement, severance or termination of employment of such officer, director, employee or consultant, in each case pursuant to the terms of the agreements under which such Capital Stock was issued, in an aggregate amount not to exceed U.S.$2 million (or its equivalent in any other currency) in each calendar year of the Issuer (with unused amounts in any calendar year being carried over to succeeding calendar years, subject to a maximum roll-over amount of U.S.$2 million (or its equivalent in any other currency) in any calendar year);

(h)     Capital Stock repurchased in the open market to equity-settle stock-based compensation awarded to employees or directors of the Issuer or its Subsidiaries in the ordinary course of business; and

(i)     Restricted Payments (including, without limitation, the purchase, redemption, retirement or otherwise acquisition for value of any Capital Stock of the Issuer held by Persons other than the Issuer or a Restricted Subsidiary) in an amount which, when taken together with all Restricted Payments made pursuant to this clause (i) shall not exceed U.S.$50 million (or its equivalent in any other currency) at any time; *provided*, *however*, that no Default (other than a

Default arising under or breach in the performance of <u>Section 4.1(l))</u> or Event of Default shall have occurred and be continuing or would occur as a result thereof.

The amount of all Restricted Payments (other than cash) shall be the Fair Market Value on the date of such Restricted Payment of the asset(s) or securities proposed to be paid, transferred, issued, purchased, repurchased, redeemed, retired, defeased or otherwise acquired by the Issuer or such Restricted Subsidiary, as the case may be, pursuant to such Restricted Payment. The Fair Market Value of any cash Restricted Payment shall be its face amount. The Fair Market Value of any non-cash Restricted Payment or non-cash properties received in respect of the sale or issuance of Capital Stock, shall be determined by the management of the Issuer acting in good faith.

(h)     <u>Limitation on Sale of Assets</u>.

(1)     The Issuer will not, and will not permit any Restricted Subsidiary to, make any Asset Disposition unless:

(A)     the Issuer or such Restricted Subsidiary receives consideration at the time of such Asset Disposition at least equal to the Fair Market Value of the shares and/or assets subject to such Asset Disposition;

(B)     at least 75% of the consideration thereof received by the Issuer or such Restricted Subsidiary is in the form of cash, cash equivalents or Temporary Cash Investments; *provided*, *however*, that the following shall be deemed to be cash for the purposes of this subclause (B): (i) the amount (without duplication) of any Consolidated liabilities (as shown on the Issuer's, or such Restricted Subsidiary's, most recent Consolidated balance sheet or in the notes thereto) of the Issuer or such Restricted Subsidiary (other than Subordinated Obligations) that is expressly assumed by a party other than the Issuer or a Restricted Subsidiary in connection with such Asset Disposition; (ii) the amount of any securities, notes or other assets received by the Issuer or such Restricted Subsidiary from such transferee that is converted by the Issuer or such Restricted Subsidiary into cash, cash Equivalents or Temporary Cash Investments (to the extent of the cash, cash equivalents or Temporary Cash Investments received) within 180 days following the closing of such Asset Disposition; (iii) any Designated Non-cash Consideration received by the Issuer or any Restricted Subsidiary in such Asset Disposition having an aggregate Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this

74

clause (iii) that is at that time outstanding, not to exceed the greater of (x) U.S.$35 million (or its equivalent in any other currency) and (y) 5.0% of Consolidated Net Tangible Assets and (iv) assets of comparable Fair Market Value received in exchange for any disposed asset; *provided*, *however*, that any such assets are normally used or useful in a Related Business; and

(C)     within 360 days of the later of the date of such Asset Disposition and the receipt of such Net Available Cash, the Issuer or a Restricted Subsidiary shall apply an amount equal to 100% of the Net Available Cash from such Asset Disposition:

(i) to repay and permanently reduce any Indebtedness which is secured by a Lien or any Senior Indebtedness;

(ii) to make capital expenditures or to reinvest in Permitted Investments (including, without limitation, in Additional Assets); or

(iii) to make an Asset Disposition Offer to purchase Notes pursuant to and subject to the conditions set forth in clause (2) below.

Following the application of such Net Available Cash pursuant to clauses (i), (ii) or (iii) above, the amount of Net Available Cash shall be reset at zero and the Issuer or the Restricted Subsidiary shall be entitled to use any remaining proceeds for any corporate purposes to the extent permitted under the Indenture.

Notwithstanding the foregoing, in the event the Issuer or any of its Restricted Subsidiaries enters into a binding agreement committing to make capital expenditures or any Permitted Investment in compliance with clause (ii) above within 360 days after the receipt of any Net Available Cash from an Asset Disposition (an "*Acceptable Commitment*"), such commitment will be treated as a permitted application of the Net Available Cash from the date of the execution of such agreement until the earlier of (i) the date on which such capital expenditure, acquisition or investment is consummated or such expenditure made or such agreement is terminated, and (ii) the 180th day after the expiration of the aforementioned 360-day period; *provided,* that if any Acceptable Commitment is later canceled or terminated for any reason before such Net Available Cash is applied, then such Net Available Cash shall be required to be applied in accordance with this Section 4.1(h) from and after the date of such cancelation or termination.

Notwithstanding the foregoing provisions of this Section 4.1(h), the Issuer and the Restricted Subsidiaries will not be required to apply any Net Available Cash in accordance with this Section 4.1(h) unless the aggregate Net Available Cash from all Asset Dispositions that is not applied in accordance with this Section 4.1(h) exceeds U.S.$25 million (or its equivalent in any other currency), in which case the Issuer and/or the Restricted Subsidiary shall be required to apply in accordance with this Section 4.1(h) all Net Available Cash that has not previously been applied in accordance with this Section 4.1(h).

(2)     In the event of an Asset Disposition that requires an Asset Disposition Offer to purchase the Notes pursuant to clause 1(C)(iii) of this this Section 4.1(h), the Issuer will be required to offer to purchase Notes tendered pursuant to an offer by the Issuer for the Notes (an "*Asset Disposition Offer*") at a purchase price of 100% of their principal amount plus accrued and unpaid interest (including premium and Additional Amounts, if any) thereon, to, but not including, the date of purchase.

(3)     The Issuer will comply with the requirements of Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder to the extent those laws and regulations are applicable in connection with each repurchase of Notes pursuant to an Asset Disposition Offer. To the extent that the provisions of any securities laws or regulations conflict with the provisions of this Indenture, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under any provisions of this Indenture by virtue of such conflict.

(i)     <u>Limitation on Transactions with Affiliates</u>.  The Issuer will not, and will not permit any Restricted Subsidiary to, make any payment to, or sell, lease, transfer or otherwise dispose of any of their properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee, with, or for the benefit of, any Affiliate (each, an "*Affiliate Transaction*") involving aggregate consideration in excess of U.S.$5 million (or its equivalent in any other currency) for any Affiliate Transaction or series of related Affiliate Transactions, unless:

(1)     the Affiliate Transaction is on terms that are not materially less favorable to the Issuer or the relevant Restricted Subsidiary than those that would have been obtained in a comparable arm's-length transaction by the Issuer or such Restricted Subsidiary with a Person that is not an Affiliate;

(2)     the Issuer delivers to the Trustee with respect to any Affiliate Transaction or series of related Affiliate Transactions involving an aggregate consideration in excess of U.S.$10 million (or its equivalent in any other currency), a resolution of the Board of Directors, set forth in an Officer's Certificate, stating that such Affiliate Transaction complies with this

<u>Section 4.1(i)</u> and that such Affiliate Transaction has been approved by a majority of the disinterested members of the Board of Directors; and

(3)     the Issuer delivers to the Trustee with respect to any Affiliate Transaction or series or related Affiliate Transactions involving an aggregate consideration in excess of U.S.$20 million (or its equivalent in any other currency), an opinion as to the fairness to the Issuer or relevant Restricted Subsidiary of such Affiliate Transaction from a financial point of view issued by an accounting, appraisal or investment banking firm of international standing.

The foregoing provisions will not apply to the following:

(1)     transactions between or among the Issuer and/or any of its Restricted Subsidiaries or between or among two or more Restricted Subsidiaries;

(2)     Permitted Investments and Restricted Payments not prohibited by <u>Section 4.1(g)</u> hereof;

(3)     the payment of compensation (including severance arrangements and amounts paid pursuant to employee benefit plans), indemnification, reimbursement or advancement of out-of-pocket expenses and provisions of liability insurance to officers, directors, employees and consultants of the Issuer or any Restricted Subsidiary of the Issuer, so long as the Board of Directors of the Issuer or such Restricted Subsidiary, as the case may be, in good faith shall have approved the terms thereof;

(4)     payments or other actions taken under any agreement or guarantee in effect as of the Initial Issue Date or any amendment, supplement, restatement, replacement, renewal, extension, refinancing thereof or thereto (so long as the renewed or replaced agreement, when taken as a whole, is not materially more disadvantageous to the Issuer or such Restricted Subsidiary than the original agreement in effect on the Initial Issue Date) or any transaction contemplated thereby;

(5)     the issuance or sale of Capital Stock (other than Disqualified Stock) of the Issuer;

(6)     any transaction of the Issuer or any Restricted Subsidiary with a Person that is not an Affiliate and that is merged with or into the Issuer, any Restricted Subsidiary or any Affiliate of the Issuer or any Restricted

Subsidiary, and, in any such case, such transaction is not entered into as a result of or in connection with or in anticipation of such merger or such Person becoming a Subsidiary of the Issuer, any Restricted Subsidiary or any Affiliate of the Issuer or any Restricted Subsidiary;

(7)     any employment, consulting, service or termination agreement, or reasonable and customary indemnification arrangements, entered into by the Issuer or any of its Restricted Subsidiaries with officers and employees of the Issuer or any of its Restricted Subsidiaries and the payment of compensation to officers and employees of the Issuer or any of its Restricted Subsidiaries including amounts paid pursuant to employee benefit plans, employee stock option or similar plans, in each case in the ordinary course of business;

(8)     transactions in the ordinary course of the Issuer's and its Restricted Subsidiaries midstream Oil and Gas Business, on an arm's-length basis and consistent with past practice; and

(9)     payments by or to the Issuer and the Restricted Subsidiaries pursuant to tax payment arrangements among the Issuer and the Restricted Subsidiaries on customary terms; *provided,* that payments by the Issuer and the Restricted Subsidiaries under any such tax payment arrangements shall not exceed the excess (if any) of the amount they would have paid on a standalone basis over the amount they actually pay directly to governmental authorities.

(j)     <u>Limitation on Dividend and Other Payment Restrictions Affecting Restricted Subsidiaries</u>.  The Issuer will not, and will not permit any Restricted Subsidiary to, create or otherwise cause or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Restricted Subsidiary to:

(1)     pay dividends or make any other distributions permitted by Applicable Law on any Capital Stock of such Restricted Subsidiary owned by the Issuer or any other Restricted Subsidiary;

(2)     pay any Indebtedness owed to the Issuer or any other Restricted Subsidiary;

(3)     make loans or advances to the Issuer or any other Restricted Subsidiary; or

(4)     transfer any of its property or assets to the Issuer or any other Restricted Subsidiary,

*provided*, *however*, that this prohibition shall not apply to any encumbrances or restrictions:

(a)     imposed by this Indenture and the Notes;

(b)     existing under or by reason of Applicable Law other than solely on account of the action or inaction of the Issuer or Restricted Subsidiary;

(c)     with respect to any property or assets acquired from a Person which is merged with or into the Issuer or any Restricted Subsidiary, or by reason of any Liens on any property or assets, or relating to or arising under the Indebtedness, of any Person or other entity existing at the time such Person or other entity becomes a Restricted Subsidiary, or any restriction or encumbrance relating to Indebtedness of any such Person and, in any such case, that is not created as a result of or in connection with or in anticipation of any such transaction, and any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any such encumbrance or restriction, so long as the terms are substantially identical to such encumbrance or restriction (other than with respect to the duration thereof); *provided*, *however* that any such Lien created to secure or provide for the payment of any part of the purchase price of such Person shall not be permitted by this <u>Section 4.1(j)</u>; *provided further*, that such Liens may not extend to any other property owned by the Issuer or any Restricted Subsidiary (other than improvements, accessions, upgrades, accessories and products and proceeds in respect of the property subject to such Liens at the time of such acquisition);

(d)     with respect to any property or assets existing at the time of acquisition thereof and which are not created as a result of or in connection with or in anticipation of such acquisition and any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any such encumbrance or restriction, so long as the terms are substantially identical to such encumbrance or restriction (other than with respect to the duration thereof); *provided*, *however* that any such encumbrance or restriction created to secure or provide for the payment of any part of the purchase price of such Person shall not

be permitted by this <u>Section 4.1(j)</u>; *provided further*, that such encumbrance or restriction may not extend to any other property owned by the Issuer or any Restricted Subsidiary;

(e)      in the case of encumbrances or restrictions addressed under <u>clauses (3)</u> or <u>(4)</u> above:

(i)      that exist by virtue of any transfer of, agreement to transfer, option or right with respect to, or Lien on, any property or assets of the Issuer or any Restricted Subsidiary not otherwise prohibited by this Indenture;

(ii)      that restricts in a customary manner the subletting, assignment or transfer of any property or asset that is subject to a lease, license or similar contract, or the assignment or transfer of any such lease, license or other contract or contractual right; or

(iii)      contained in mortgages, pledges or other security agreements permitted under this Indenture securing Indebtedness of the Issuer or a Restricted Subsidiary to the extent such encumbrances or restrictions restrict the transfer of the property subject to such mortgages, pledges or other security agreements;

(f)      arising or agreed to in the ordinary course of business, not relating to Indebtedness, and that do not, individually or in the aggregate, detract from the value of the property or assets of the Issuer or any Restricted Subsidiary in any manner material to the Issuer and its Restricted Subsidiaries;

(g)      imposed by Purchase Money Obligations for property acquired in the ordinary course of business or by Capitalized Lease Obligations permitted under this Indenture on the property so acquired, but only to the extent that such encumbrances or restrictions restrict the transfer of the property;

(h)      by reason of Liens that secure Indebtedness otherwise permitted to be incurred under <u>Section 4.1(e)</u> and that limit the right of the debtor to dispose of the assets subject to such Liens;

(i)     existing on the Initial Issue Date and any extension, renewal or replacement (or successive extensions, renewals or replacements), in whole or in part, of any such encumbrance or restriction, so long as the terms are substantially identical to such encumbrance or restriction (other than with respect to the duration thereof);

(j)     imposed pursuant to an agreement entered into for the sale or disposition of all or substantially all the Capital Stock or assets of the Issuer or such Restricted Subsidiary pending the closing of such sale or disposition; *provided*, that the sale or disposition is permitted under this Indenture; and

(k)     resulting from restrictions on cash or other deposits or other customary requirements imposed by customers or suppliers under contracts entered into in the ordinary course of business.

(k)     <u>Financial Reporting</u>.  The Issuer shall, within 60 days after the end of each fiscal quarter of each fiscal year (other than the final fiscal quarter of any fiscal year) and 120 days after the end of each fiscal year of the Issuer, provide to the Trustee and to the Holders copies of an unaudited (with respect to a fiscal quarter) or audited (with respect to a fiscal year) Consolidated balance sheet, statements of income and statements of cash flows of the Issuer, in a form substantially similar to the financial statements included in the offering memorandum, dated November 15, 2021 relating to the Notes, prepared in accordance with IFRS and presented in the English language. The audited information provided with respect to a fiscal year shall also include a report thereon by the Issuer's certified independent public accountants. For so long as any of the notes are outstanding, the above information will be made available at the specified offices of each listing agent.

The Issuer shall also, within 120 days after the end of each fiscal year of the Issuer, provide to the Trustee and to the Holders a statement of reserves data and information specified in Form 51-101F1 of National Instrument 51-101 – Standards of Disclosure of Oil and Gas Activities ("NI 51-101") of the Canadian Securities Administrators as at the last day of such fiscal year based upon an evaluation by an independent qualified reserves evaluator or auditor prepared in accordance with NI 51-101.

The Trustee's receipt of such reports shall not constitute actual or constructive notice of any information contained therein or determinable from information contained therein, including the Issuer's compliance with any of its covenants under the Indenture as to which the Trustee will be entitled to conclusively rely upon on an Officer's Certificate.

The Issuer may, in lieu of delivering such information to the Trustee and Holders, post the copies specified above on its website no later than the date that the Issuer is required to

provide those reports to the Trustee and to the Holders of the notes. Such website may be password protected so long as the Issuer provides access thereto to a Holder, upon request. The Trustee shall have no obligation to verify that the Issuer has provided such reports to the Holders or has posted such report on its website.

(l)    <u>Maintenance of Existence and Properties</u>.  The Issuer will, and will cause each of its Restricted Subsidiaries to (i) maintain in effect its corporate or limited liability company or other organization existence and all registrations necessary therefor; (ii) take all reasonable actions to maintain all rights, privileges, titles to property, franchises and the like necessary or desirable in the normal conduct of its business, activities or operations; and (iii) keep all its material property used or useful for the operation of its business in good working order or condition (subject to ordinary wear and tear); *provided*, that the foregoing <u>paragraphs (i)</u>, <u>(ii)</u> and <u>(iii)</u> shall not require the Issuer to preserve the existence of any Restricted Subsidiary or maintain any such right, privilege, title to property, license or franchise or property if the Board of Directors of the Issuer shall determine in good faith that (i) the maintenance or preservation thereof is no longer necessary or desirable in the conduct of the business of the Issuer and (ii) the non-maintenance or non-preservation thereof would not be reasonably expected to have a Material Adverse Effect.

(m)    <u>Payment of Taxes and Claims</u>.  Except to the extent failure to do so would not be reasonably expected to have a Material Adverse Effect, the Issuer will, and will cause each of its Subsidiaries to, pay all material taxes, assessments and other governmental charges imposed upon it or any of its property in respect of any of its franchises, businesses, income or profits before any penalty or interest accrues thereon, and pay all claims (including claims for labor, services, materials and supplies) for amounts which have become due and payable and which by law have or might become a Lien upon its property, except if such charge or claim is being contested in good faith by appropriate proceedings promptly initiated and diligently conducted and if such reserves or other appropriate provision, if any, as shall be required by IFRS shall have been made therefor.

(n)    <u>Limitation on Line of Business</u>. The Issuer will not, and will not permit any Restricted Subsidiary, to engage in any business other than a Related Business.

Section 4.2    *Covenant Suspension*.  During any period of time that: (a) the Notes have an Investment Grade Rating from at least two Rating Agencies and (b) no Default or Event of Default has occurred and is continuing under the Indenture (the occurrence of the events described in the foregoing <u>clauses (a)</u> and <u>(b)</u> being collectively referred to as a "*Covenant Suspension Event*"), the Issuer and its Restricted Subsidiaries will not be subject to <u>Section 4.1(e)</u>, <u>Section 4.1(g)</u>, <u>Section 4.1(j)</u>, <u>Section 4.1(h)</u> (except in respect of Asset Dispositions in connection with Sale and Lease-Back Transactions), <u>Section 4.1(i)</u>, <u>clause (4)</u> of <u>Section 4.3</u> and <u>Section 4.1(n)</u> (collectively, the "*Suspended Covenants*").

Upon the occurrence of a Covenant Suspension Event (such date, the "*Suspension Date*"), the amount of Net Available Cash Proceeds that has not been invested or applied as provided under <u>Section 4.1(h)</u> shall be set at zero.

In the event that, on any date subsequent to any Suspension Date (the "*Reversion Date*"), the Notes cease to have an Investment Grade Rating from any two Rating Agencies, or a Default or Event of Default occurs and is continuing, then the Issuer and its Restricted Subsidiaries shall thereafter again be subject to the Suspended Covenants with respect to future events. The period of time between the Suspension Date and the Reversion Date is referred to in this description as the "*Suspension Period*." Notwithstanding the reinstatement of the Suspended Covenants, no Default or Event of Default will be deemed to have occurred as a result of a failure to comply with the Suspended Covenants during the Suspension Period (or upon termination of the Suspension Period or after that time based solely on events that occurred and were completed during the Suspension Period).

On the Reversion Date all Indebtedness incurred during the Suspension Period and outstanding on the Reversion Date will be classified as having been incurred or issued pursuant to Section 4.1(e) (to the extent such Indebtedness would be permitted to be incurred or issued thereunder as of the Reversion Date and after giving effect to Indebtedness incurred or issued prior to the Suspension Period and outstanding on the Reversion Date). To the extent such Indebtedness would not be so permitted to be incurred or issued pursuant to Section 4.1(e), such Indebtedness will be deemed to have been outstanding on the Initial Issue Date, so that it is classified as permitted under clause (2)(a) of Section 4.1(e). Calculations made after the Reversion Date of the amount available to be made as Restricted Payments under Section 4.1(g), will be made as though Section 4.1(g) had been in effect since the Initial Issue Date and throughout the Suspension Period. Accordingly, Restricted Payments made during the Suspension Period will reduce the amount available to be made as Restricted Payments under clause (1) of Section 4.1(g).

The Issuer shall give the Trustee written notice of any Covenant Suspension Event and in any event not later than five Business Days after such Covenant Suspension Event has occurred. In the absence of such notice, the Trustee shall assume the Suspended Covenants apply and are in full force and effect. The Issuer shall give the Trustee written notice of any occurrence of a Reversion Date not later than five Business Days after such Reversion Date. After any such notice of the occurrence of a Reversion Date, the Trustee shall assume the Suspended Covenants apply and are in full force and effect. The Trustee shall have no duty to notify Holders of a Covenant Suspension Event or Reversion Date.

Section 4.3    *Consolidation, Amalgamation, Merger, Conveyance, Sale or Lease*.  The Issuer will not consolidate with, amalgamate with, merge with or into, or wind up into (whether or not the Issuer is the surviving corporation), or sell, assign, convey, transfer, lease or otherwise dispose of all or substantially all of its properties and assets, in one or more related transactions, to any Person unless:

> (1)    the resulting, surviving or transferee Person (if not the Issuer) shall be a Person organized and existing under the laws of Canada (or any province or territory thereof), Colombia, Panama, Switzerland, the United States, any state of the United States or the District of Columbia, or any state

member of the OECD whose sovereign debt is rated BBB or higher by Fitch, BBB or higher by S&P and Baa2 or higher by Moody's;

(2)     if not the Issuer, the Issuer shall be obligated under this Indenture to cause the Person formed by such consolidation or into which the Issuer is merged or amalgamated or the Person which acquires by conveyance or transfer, or which leases, the Issuer's properties and assets substantially as an entirety (determined on a consolidated basis, with its Restricted Subsidiaries) (the "*Successor*"), to expressly assume, by an Indenture Supplement to the Indenture, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, the performance of every covenant of the Issuer in the Indenture;

(3)     immediately after giving effect to such transaction on a *pro forma* basis (and treating any Indebtedness which becomes an obligation of the resulting, surviving or transferee Person as a result of such transaction as having been issued by such Person at the time of such transaction) no Default or Event of Default would occur;

(4)     immediately after giving effect to such transaction, either (x) the Successor would be able to Incur at least an additional U.S.$1.00 of Indebtedness pursuant to <u>clause (1)</u> of <u>Section 4.1(e)</u>, or (y) the Consolidated Interest Coverage Ratio would be no less than the Consolidated Interest Coverage Ratio immediately prior to such transactions, and the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio would be no greater than the Consolidated Debt to Consolidated Adjusted EBITDAX Ratio immediately prior to the transactions;

(5)     all requisite governmental approvals therefor shall have been obtained;

(6)     the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation, conveyance, transfer or lease complies with the Indenture and, if a Indenture Supplement is required in connection with such transaction, such Indenture Supplement complies with the Indenture and that all conditions precedent provided for in the Indenture relating to such transaction have been complied with, and, in the case of the opinion of counsel, that such Indenture Supplement is the legal, valid and binding obligations of the Successor Guarantor; and

(7)     each Note Guarantor (unless it is the other party to the transactions above, in which case clause (1) shall apply) shall have by Indenture Supplement confirmed that its Note Guarantee shall apply to such Person's obligations in respect of the Indenture and the Notes.

In addition, the Issuer will not permit any Note Guarantor to consolidate with, amalgamate with, merge with or into, or wind up into (other than any merger with or into or winding up into the Issuer or another Note Guarantor or to the extent the Note Guarantor is the surviving Person), or sell, assign, convey, transfer, lease or otherwise dispose of all or substantially all of its properties and assets, in one or more related transactions, to any Person (other than to the Issuer or another Note Guarantor) unless:

(1)     (a)     if such Person remains a Note Guarantor, the resulting, surviving or transferee Person (the "*Successor Guarantor*") is a Person organized and validly existing under the laws of Canada (or any province or territory thereof), Colombia, Panama, Switzerland, the United States, any state of the United States or the District of Columbia, or any state member of the OECD whose sovereign debt is rated BBB or higher by Fitch, BBB or higher by S&P and Baa2 or higher by Moody's;

(b)     the Successor Guarantor, if other than such Note Guarantor and unless such Successor Guarantor is not required to be a Note Guarantor hereunder, expressly assumes, by an Indenture Supplement to the Indenture, executed and delivered to the Trustee, in form reasonably satisfactory to the Trustee, all the obligations of such Note Guarantor under the Indenture and its Note Guarantee;

(c)     except to the extent that the Successor Guarantor is not required to be a Note Guarantor hereunder, the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that such consolidation, merger, amalgamation, conveyance, transfer or lease complies with the Indenture and, if a Indenture Supplement is required in connection with such transaction, such Indenture Supplement complies with the Indenture and that all conditions precedent provided for in the Indenture relating to such transaction have been complied with and, in the case of the opinion of counsel, that such Indenture Supplement is the legal, valid and binding obligations of the Successor Guarantor; and

(2)     the transaction, to the extent constituting an Asset Disposition, is made in compliance with Section 4.1(h) (it being understood that only such portion of the Net Available Cash as is required to be applied on the date of such transaction in accordance with the terms of the Indenture needs to be applied in accordance therewith at such time).

Subject to certain limitations described in this Indenture, the Successor Guarantor will succeed to, and be substituted for, such Note Guarantor under the Indenture and the Note Guarantee of such Note Guarantor.

Notwithstanding the foregoing, any Note Guarantor may consolidate with, amalgamate with, merge with or into, or transfer all or part of its properties and assets to a Note Guarantor or the Issuer or merge with a Restricted Subsidiary of the Issuer solely for the purpose of reincorporating or continuing the existence of the Note Guarantor in the jurisdiction of such Note Guarantor, any province or territory of Canada (or under the federal laws of Canada), Colombia, Panama, Switzerland, the United States, any state of the United States or the District of Columbia, or any state member of the OECD whose sovereign debt is rated BBB or higher by Fitch, BBB or higher by S&P and Baa2 or higher by Moody's, so long as the amount of Indebtedness of such Note Guarantor and its Restricted Subsidiaries is not increased thereby, and the resulting entity remains or becomes a Note Guarantor to the extent otherwise required under the Indenture (a "*Reincorporation Transaction*").

For purposes of this Section 4.3, the sale, assignment, transfer, lease, conveyance or other disposition of all or substantially all of the properties or assets of one or more Subsidiaries of the Issuer, which properties or assets, if held by the Issuer instead of such Subsidiaries, would constitute all or substantially all of the properties or assets of the Issuer on a Consolidated basis, shall not be deemed to be the transfer of all or substantially all of the properties or assets of the Issuer so long as such transfer is to one or more Subsidiaries of the Issuer that are Restricted Subsidiaries. Any Subsidiary of the Issuer that is a Restricted Subsidiary may consolidate with, amalgamate with, merge with or into, or dispose of all or part of its properties or assets to the Issuer or to another Restricted Subsidiary that is a Subsidiary of the Issuer.

Upon any consolidation with, combination with, amalgamation with or merger with or into, or any transfer of all or substantially all of the properties and assets of the Issuer's or Note Guarantor's, as the case may be, properties and assets substantially as an entirety (determined on a Consolidated basis with its Restricted Subsidiaries) in accordance with this Section 4.3, in which the Issuer or Note Guarantor, as the case may be, is not the continuing corporation, the Successor or Successor Guarantor, as the case may be, formed by such consolidation, combination, amalgamation, merger or into which the Issuer or Note Guarantor, as the case may be, is consolidated, combined, amalgamated, merged or to which such conveyance, lease or transfer is made shall succeed to, and be substituted for, and may exercise every right and power of, the Issuer or Note Guarantor, as the case may be, under this Indenture and the Notes with the same effect as if such Successor or Successor Guarantor, as the case may be, had been named as such, except in the case of a lease, and the Issuer or Note Guarantor, as the case may be, shall be discharged from all covenants and obligations under this Indenture and the Notes.

Section 4.4    *Repurchases at the Option of the Holders Upon a Change of Control Triggering Event*.  If a Change of Control Event occurs, each Holder will have the right to require the Issuer to repurchase all or any part (equal to at least U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof) of that Holder's Notes pursuant to a Change of Control

Offer (as defined below) on the terms set forth in the Indenture. No such purchase in part shall reduce the Outstanding principal amount at maturity of the Notes held by any Holder to below U.S.$200,000. In the Change of Control Offer, the Issuer will offer a "*Change of Control Payment*" in cash equal to 101% of the aggregate principal amount of Notes repurchased plus accrued and unpaid interest and Additional Amounts, if any, on the Notes repurchased, to the date of purchase (subject to the right of the Holders of record on the relevant Record Date to, but not including, receive interest and Additional Amounts, if any, on the relevant Payment Date).

Within 30 days following any Change of Control Event, the Issuer will make a "*Change of Control Offer*" by giving notice to the Trustee and each Holder of notes by giving such notice in accordance with <u>Section 10.5</u>, describing the transaction or transactions that constitute the Change of Control Event, the occurrence of a Change of Control Event and offering to repurchase notes on the date specified in the notice (the "*Change of Control Payment Date*"), which date will be no earlier than 30 days and no later than 60 days from the date such notice is delivered, pursuant to the procedure required by the Indenture and described in such notice.

The Issuer will comply, to the extent applicable, with the requirements of Section 14(e) of the Exchange Act and any other applicable securities laws or regulations in connection with the repurchase of Notes pursuant to this <u>Section 4.4</u>. To the extent that the provisions of any applicable securities laws or regulations conflict with provisions of this <u>Section 4.4</u>, the Issuer will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under this covenant by virtue of its compliance with such securities laws or regulations.

On the Change of Control Payment Date, the Issuer will, to the extent lawful:

(1)     accept for payment all Notes or portions of Notes properly tendered pursuant to the Change of Control Offer;

(2)     deposit with the Paying Agent an amount equal to the Change of Control Payment in respect of all Notes or portions of Notes properly tendered; and

(3)     deliver or cause to be delivered to the Trustee the Notes properly accepted, together with an Officer's Certificate stating the aggregate principal amount of Notes or portions of Notes being purchased by the Issuer.

The Paying Agent in respect of such Change of Control Offer will promptly deliver each Holder of Notes properly tendered the Change of Control Payment for such Notes, and, upon receipt of a written order from the Issuer, the Trustee will promptly authenticate and deliver (or cause to be transferred by book entry) to each Holder a new Note equal in principal amount to

any unpurchased portion of the notes surrendered, if any; *provided*, *however* that each new note will be in a principal amount of U.S.$200,000 or an integral multiple of U.S.$1,000 in excess thereof. The Issuer will publicly announce the results of the Change of Control Offer on or as soon as practicable after the Change of Control Payment Date.

The provisions described above that require the Issuer to make a Change of Control Offer following a Change of Control Event shall apply whether or not any other provisions of the Indenture are applicable. Except as described above with respect to a Change of Control Event, the Indenture does not contain provisions that permit the Holders to require that the Issuer repurchase or redeem the Notes in the event of a takeover, recapitalization or similar transaction.

The Issuer will not be required to make a Change of Control Offer upon a Change of Control Event if a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements, set forth in this Indenture, that are applicable to a Change of Control Offer made by the Issuer and such third party purchases all Notes properly tendered and not withdrawn under the Change of Control Offer.

## ARTICLE V
## DEFAULTS AND REMEDIES

Section 5.1   *Events of Default and Remedies*.   (a)   Events of Default.   "*Event of Default*," wherever used herein with respect to this Indenture and the Notes, means any one of the following events (which will constitute Events of Default whatever the reason for any such Event of Default and whether it is voluntary or involuntary or is effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(i)     default in the payment of any interest (or Additional Amounts, if any) on any Note when it becomes due and payable and such default shall continue unremedied for a period of 30 days;

(ii)     default in the payment of any principal (or premium, if any) on any Note when it becomes due and payable, whether on any amortization date, the Maturity Date, upon optional redemption, required repurchase or otherwise;

(iii)     default in the performance, or breach, of any covenant, agreement or obligation of the Issuer, any Note Guarantor or any Restricted Subsidiary contained in this Indenture (including any default under or breach in the performance of Section 4.1(g), irrespective of whether the Issuer, any Note Guarantor or any Restricted Subsidiary has the power (corporate or otherwise) to cause compliance with such Section 4.1(g)), this Indenture, the Notes, the Note Guarantee or any of the transaction documents, and continuance of such default or breach for a period of 30 consecutive days after there has

been given, by registered or certified mail, to the Issuer by the Trustee or to the Issuer and the Trustee by the Holders of at least 25% in aggregate principal amount of the Outstanding Notes a written notice specifying such default or breach and requiring it to be remedied and stating that such notice is a "*Notice of Default*" hereunder; or

(iv)    with respect to any of the Issuer, any Note Guarantor or any Restricted Subsidiary, any final and non-appealable judgment or order for the payment of money in excess of U.S.$30 million (or its equivalent in other currencies), to the extent not covered by insurance as acknowledged in writing by the insurer, is rendered against the Issuer, any Note Guarantor or any Restricted Subsidiary and such judgment or order remains undischarged or unstayed for a period of 60 days after such judgment becomes final and non-appealable; or

(v)    either:

(A)    the Issuer, any Note Guarantor or any Restricted Subsidiary shall default (as principal or guarantor or other surety) in the payment of principal of any Indebtedness in the principal amount of at least U.S.$30 million in the aggregate (or its equivalent in any other currency) and such default shall have continued for more than any applicable period of grace and any time for payment of such amounts has not been expressly extended, or

(B)    Indebtedness of the Issuer, any Note Guarantor or any Restricted Subsidiary is accelerated by the holders thereof because of a default, and the total amount of such accelerated Indebtedness exceeds U.S.$30 million (or its equivalent in any other currency);

(vi)    the Note Guarantee of any of the Note Guarantors under this Indenture shall fail to be in full force and effect or is declared null and void or any of the obligors thereunder denies in writing that it has any further liability under this Indenture and the Note Guarantee, or gives written notice to such effect (other than by reason of the termination of this Indenture or the release of the Note Guarantee in accordance with the terms of this Indenture);

(vii)    the entry of a decree or order by a court having jurisdiction in the premises adjudging the Issuer, any Note Guarantor or any Restricted Subsidiary bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, winding up, arrangement, adjustment or composition of or in respect of the Issuer, any Note Guarantor or any Restricted Subsidiary under applicable Bankruptcy Law, or appointing

a receiver, receiver-manager, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator, custodian, conservator, administrator, bank liquidator, bank administrator, monitor or other similar official of the Issuer, any Note Guarantor or any Restricted Subsidiary or of all or any substantial part of its respective property, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

(viii)   to the extent permitted by Applicable Law, the institution by the Issuer, any Note Guarantor or any Restricted Subsidiary of proceedings to be adjudicated bankrupt or insolvent, or the consent by it to the institution of bankruptcy or insolvency proceedings against it, or the filing by it of a petition or answer or consent seeking reorganization, dissolution, winding up, an arrangement of debt or relief under applicable Bankruptcy Law, including for the avoidance of doubt, the filing of a notice of intention under the *Bankruptcy and Insolvency Act* (Canada), an application under the *Companies' Creditors Arrangement Act* (Canada) or any proposal to compromise, arrange or reorganize any of its debts or obligations under the *Business Corporations Act* (Alberta) or any similar provision of Canadian federal or provincial corporate law, or the consent by it to the filing of any such petition or to the appointment of a receiver, receiver-manager, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator, custodian, conservator, administrator, bank liquidator, bank administrator, monitor or other similar official of the Issuer, any Note Guarantor or any Restricted Subsidiary or of all or any substantial part of its respective property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due.

(b)    Acceleration of Maturity; Rescission and Annulment.  If an Event of Default (other than an Event of Default specified in Section 5.1(a)(vii) and (viii) with respect to the Issuer) occurs and is continuing, then in every such case the Trustee or the Holders of at least 25% in aggregate principal amount of the Outstanding Notes may declare the principal amount of all the Notes to be due and payable immediately (including all Additional Amounts thereon), by a notice in writing to the Issuer (and to the Trustee if given by Holders), and upon any such declaration such principal amount shall become immediately due and payable.

If an Event of Default described in Section 5.1(a)(vii) and (viii) with respect to the Issuer, any Note Guarantor or any Restricted Subsidiary occurs and is continuing, then and in every such case, the principal amount of all the Notes, together with all accrued interest thereon, shall, without any notice to the Issuer or any other act on the part of the Trustee or any Holder, become and be immediately due and payable. Notwithstanding anything to the contrary set forth herein, the declaration of an Event of Default described in Section 5.1(a)(vii) and (viii) shall not: (i) prevent Canacol Energy Colombia S.A.S., CNE Oil & Gas S.A.S. and any other Note Guarantor incorporated under Colombian law (the "Colombian Note Guarantors") from commencing any proceeding or filing any petition in Colombia under the Law 550 of 1999 and Law 1116 of 2006, or the equivalent laws that may replace them in the future (the "Colombian  Insolvency Law"); (ii) be construed to mean that the purpose of such section is to prevent or restrict, directly or

indirectly, for proceedings to be commenced in Colombia under the Colombian Insolvency Law against the Colombian Note Guarantors; (iii) prohibit the Colombian Note Guarantors from negotiating or entering into a restructuring agreement under the Colombian Insolvency Law; or (iv) impose any restrictions or prohibitions, or disadvantageous effects (*efectos desfavorables*) upon the Colombian Note Guarantors for the negotiation or execution of a restructuring agreement under the Colombian Insolvency Law.

At any time after such a declaration of acceleration with respect to the Notes has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as provided in this <u>Article V</u>, the Required Holders, by written notice delivered to the Issuer and the Trustee, may rescind and annul such declaration and its consequences if:

      (i)      the Issuer has paid or deposited with the Trustee and/or any Paying Agents a sum sufficient to pay (A) all overdue interest, if any, on all Notes, (B) the principal of (and premium, if any, on) any Notes which have become due otherwise than by such declaration of acceleration and interest thereon at the rate or rates prescribed therefor in such Notes, (C) to the extent that payment of such interest is lawful, interest upon any overdue interest at the rate or rates prescribed therefor in such Notes, and (D) all sums paid or advanced by the Trustee hereunder and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

      (ii)      all Events of Default with respect to the Notes, other than the non-payment of the principal of and accrued interest on the Notes which have become due solely by such declaration of acceleration, have been cured or waived as provided in <u>clause (m)</u> below.

No such rescission shall affect any subsequent Default or impair any right consequent thereon.

(c)    <u>Collection of Indebtedness and Suits for Enforcement by Trustee</u>.  The Issuer covenants that if: (i) Default is made in the payment of any interest on any Note when such interest becomes due and payable and such Default continues for a period of 30 days, or (ii) Default is made in the payment of the principal of (or premium, if any, on) any Note at the maturity thereof, the Issuer will pay to the Trustee, for the benefit of the Holders, the whole amount then due and payable on such Notes for principal (and premium, if any) and interest, if any, and, to the extent that payment of such interest shall be legally enforceable, interest on any overdue principal (and premium, if any) and on any overdue interest, at the rate or rates prescribed therefor in such Notes, and, in addition thereto, such further amount as shall be sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel. If the Issuer fails to pay such amount forthwith upon such demand, the Trustee, in its own name and as trustee of an express trust, may institute a judicial proceeding for the collection of the sums so due and unpaid and may prosecute such proceeding to judgment or final decree, and may enforce the same

against the Issuer, the Note Guarantors or any other obligor upon the Notes and collect the moneys adjudged or decreed to be payable in the manner provided by law out of the property of the Issuer, the note Guarantors or any other obligor upon such Notes, wherever situated.

If an Event of Default occurs and is continuing, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Holders by such appropriate judicial proceedings as the Trustee shall deem most effective to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or to enforce any other proper remedy.

(d)     <u>Trustee May File Proofs of Claim</u>.  In case of the pendency of any receivership, insolvency, liquidation, bankruptcy, reorganization, administrative take-over, arrangement, adjustment, composition or other judicial proceeding relative to the Issuer or the material property of the Issuer or its creditors, the Trustee (irrespective of whether the principal of the Notes shall then be due and payable as therein expressed or by declaration or otherwise and irrespective of whether the Trustee shall have made any demand on the Issuer for the payment of overdue principal or interest) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(i)     to file and prove a claim for the whole amount of principal (and premium, if any) and interest owing and unpaid in respect of the Notes and to file such other papers or documents as may be necessary or advisable in order to have the claims of the Trustee (including any claim for the reasonable compensation, expenses, disbursements and advances of the Trustee, its agent and counsel and any other amounts due to the Trustee under <u>Section 8.5</u>) and of the Holders allowed in such judicial proceedings; and

(ii)     to collect and receive any moneys or other property payable or deliverable on any such claims and to distribute the same in accordance with the terms hereof; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Holder to make such payments to the Trustee.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or accept or adopt on behalf of any Holder any plan of reorganization, arrangement, adjustment or composition affecting the Notes or the rights of any Holder or to authorize the Trustee to vote in respect of the claim of any Holder in any such proceeding.

(e)     <u>Trustee May Enforce Claims Without Possession of Notes</u>.  To the extent permitted under Applicable Law, all rights of action (including without limitation the right to file proofs of claim) under this Indenture may be enforced by the Trustee without the possession of any of the Notes or the production thereof in any trial or other proceeding relating thereto.  To

the extent permitted under Applicable Law, any suit or proceeding instituted by the Trustee shall be brought in its name as Trustee without the necessity of joining any Holders as plaintiffs or defendants.  Any recovery of judgment shall be for the benefit of the Holders, subject to the provisions of this Indenture.

(f)     Application of Money Collected.   To the extent permitted under Applicable Law, any monies collected by the Trustee pursuant to this Section 5.1 or otherwise received by the Trustee, and after an Event of Default any money or other properties distributable in respect of the Issuer's obligations under this Indenture, shall be applied (i) *first*, to the Trustee, its agents and legal counsel and the Authorized Agents in payment of all amounts due pursuant to Section 8.5 hereof, (ii) *second*, to the payment of interest accrued on the Notes and any premium and Additional Amounts thereon, (iii) *third*, to the payment of the outstanding principal amount of the Notes and (iv) *fourth*, to the Issuer.  The Trustee may fix a record date and payment date for any payment by it to Holders pursuant to this Section 5.1.

(g)     Rights and Remedies of Holders.  A Holder shall not have any right to institute any suit, action or proceeding for the enforcement of this Indenture, or for the exercise of any other remedy hereunder unless (i) such Holder has previously given written notice to the Trustee of a continuing Event of Default with respect to the Notes, (ii) Holders of more than twenty-five percent (25%) in aggregate principal amount of Outstanding Notes shall have made written request to the Trustee to institute proceedings in respect of such Event of Default in its own name as Trustee thereunder, (iii) such Holder or Holders have offered to the Trustee indemnity satisfactory to it against the costs, expenses and liabilities to be Incurred in compliance with such request, (iv) the Trustee during the 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding, and (v) no direction inconsistent with such written request has been given to the Trustee during such 60-day period by the Required Holders; *provided*, *however*, that no one or more Holders shall have any right to affect, disturb or prejudice in any manner whatsoever the benefit of this Indenture afforded the Notes by its or their action, or to enforce, except in the manner provided herein, any remedy, right or power hereunder.  Any suit, action or proceeding shall be instituted and maintained in the manner provided herein for the benefit of the Holders of all Outstanding Notes.

(h)     Unconditional Right of Holders to Receive Principal, Premium and Interest.  Notwithstanding any other provision in this Indenture, any Holder shall have the right which is absolute and unconditional, to receive payment of the principal of (and premium and Additional Amounts, if any) and interest, if any, on such Note on the dates specified in the Notes as the fixed date on which the principal of such Note or any installment of interest on such Note is due and payable (or, in the case of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

(i)     Restoration of Rights and Remedies.  If the Trustee or any Holder has instituted any proceeding to enforce any right or remedy under this Indenture and such proceeding has been discontinued or abandoned for any reason, or has been determined

adversely to the Trustee or to such Holder, then and in every such case, subject to any determination in such proceeding, and to the extent permitted under Applicable Law, the Issuer, the Trustee and the Holders shall be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Holders shall continue as though no such proceeding had been instituted.

(j)      Rights and Remedies Cumulative.  Except as otherwise provided with the respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes, no right or remedy herein conferred upon or reserved to the Trustee or to the Holders is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by Applicable Law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

(k)      Delay or Omission Not Waiver.  No delay or omission of the Trustee or of any Holder to exercise any right or remedy accruing upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article or by law to the Trustee or to the Holders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Holders, as the case may be.

(l)      Control by Holders.  The Required Holders shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee, with respect to the Notes; *provided, however*, that (i) such direction shall not be in conflict with any rule of law or with this Indenture or subject the Trustee to personal liability, (ii) the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction, and (iii) the Trustee shall have received indemnity or security satisfactory to it against the costs, expenses and liability incurred in connection therewith.

(m)      Waiver of Past Defaults.  Subject to Section 5.1(b), the Required Holders may, on behalf of all Holders, waive any past Default hereunder and its consequences, except a Default (i) in the payment of the principal of (or premium, if any) or interest, if any, on any Note, or (ii) in respect of a covenant or provision hereof that cannot be modified or amended without the consent of the Holder of each Outstanding Note affected.  Upon any such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose under this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

(n)      Undertaking for Costs.  To the extent permitted under Applicable Law, all parties to this Indenture agree, and each Holder by its acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or

remedy under this Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this clause shall not apply to any suit instituted by the Trustee, or to any suit instituted by any Holder for the enforcement of the payment of the principal of (or premium, if any) or interest, if any, on any Note on or after the dates specified in the Notes as the fixed date on which the principal of such Note or any installment of interest on such Note is due and payable (or, in the case of redemption, on or after the Redemption Date).

## ARTICLE VI
## DISCHARGE OF THE INDENTURE; DEFEASANCE

Section 6.1   *Satisfaction and Discharge of Indenture*. This Indenture will be discharged and will cease to be of further effect (except as to surviving rights of registration of transfer or exchange of the Notes as expressly provided for herein) when:

(a)   the Issuer has irrevocably deposited or caused to be deposited with the Trustee as funds in trust for such purpose an amount in Dollars or U.S. Government Obligations sufficient to pay and discharge the entire Indebtedness on the Notes that have not, prior to such time, been delivered to the Trustee for cancellation, for principal of, premium, if any, and any Additional Amounts and accrued and unpaid interest on the Notes to the date of such deposit (in the case of Notes which have become due and payable) or to the Stated Maturity or Redemption Date, as the case may be and the Issuer has delivered irrevocable instructions to the Trustee under this Indenture to apply the deposited money toward the payment of the Notes at the applicable installment date or on the Redemption Date, as the case may be and either:

(i)   all Notes that have been authenticated and delivered (other than destroyed, lost or stolen Notes that have been replaced or paid and Notes for whose payment money has been deposited in trust or segregated and held in trust by the Issuer and thereafter repaid to the Issuer or discharged from such trust as provided for in this Indenture) have been delivered to the Trustee for cancellation; or

(ii)   all Notes that have not been delivered to the Trustee for cancellation (x) have become due and payable (by reason of the mailing of a notice of redemption or otherwise), (y) will become due and payable at Stated Maturity within one year or (z) are to be called for redemption within one year under arrangements satisfactory to the Trustee for the giving of notice of redemption by the Trustee in the Issuer's name, and at the Issuer's expense;

(b)   the Issuer has paid or caused to be paid all sums payable by the Issuer under this Indenture; and

(c)     the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel, each stating that:

(i)     all conditions precedent provided in this Indenture relating to the satisfaction and discharge of this Indenture have been satisfied; and

(ii)     such satisfaction and discharge will not result in a breach or violation of, or constitute a Default under, this Indenture or any other agreement or instrument to which the Issuer or any Subsidiary is a party or by which the Issuer or any Subsidiary is bound.

Section 6.2     _Repayment of Monies_.  Following the satisfaction and discharge of this Indenture as described in Section 6.1, all investments and monies then held by the Trustee under this Indenture shall, upon written demand of the Issuer, be repaid or, as the case may be, released, assigned or transferred to the Issuer, and thereupon the Trustee shall be released from all further liability with respect to such investments and monies.

Section 6.3     _Return of Monies Held by the Trustee_.  Subject to abandoned property law, any monies deposited with or paid to the Trustee for the payment of the principal, premium or Additional Amounts (if any), interest or any other amount due with respect to any Note and not applied but remaining unclaimed for three years after the date upon which such principal, premium or Additional Amounts (if any), interest or other amount shall have become due and payable, shall (to the extent not required to escheat to any governmental authority), upon written demand of the Issuer, be repaid by the Trustee to or for the account of the Issuer, the receipt of such repayment to be confirmed promptly in writing by or on behalf of the Issuer, and, to the extent permitted by Applicable Law, the Person claiming such payment of principal, premium or Additional Amounts (if any), interest or any other amount shall thereafter look only to the Issuer for any related payment that it may be entitled to receive, and all liability of the Trustee with respect to such monies shall thereupon cease.

Section 6.4     _Defeasance_.  The Issuer may, at its option, at any time elect to have either clause (a) or clause (b) of this Section 6.4 applied to all Outstanding Notes upon compliance with the conditions set forth in this Section 6.4.

(a)     Upon the Issuer's election of the "_Legal Defeasance_" option applicable to this Section 6.4(a), and subject to the satisfaction of the conditions set forth in Section 6.5, the Issuer shall be deemed to have paid and discharged the entire Indebtedness represented by the Outstanding Notes, except for:

(i)     the rights of the Holders to receive payments in respect of the principal of, premium, if any, interest and Additional Amounts, if any, on the Notes when such payments are due;

(ii)     the Issuer's obligations with respect to the Notes concerning issuing temporary Notes, registration of Notes, mutilated, destroyed, lost or stolen Notes and the maintenance of an office or agency for payments;

(iii)    the rights, powers, trust, duties, indemnity protections and immunities of the Trustee, as set forth in this Indenture, and the Issuer's obligations in connection therewith; and

(iv)     this Section 6.4(a).

Subject to compliance with this Section 6.4, the Issuer may exercise its option under this Section 6.4(a) notwithstanding the prior exercise of its option under this Section 6.4(a).

(b)      Upon the Issuer's election of the "*Covenant Defeasance*" option applicable to this clause (b), and subject to the satisfaction of the conditions set forth in Section 6.5 hereof, the Issuer and/or any Restricted Subsidiary, need not comply with the covenants set forth in Sections 4.1(a), 4.1(d), 4.1(e), 4.1(f), 4.1(g), 4.1(h), 4.1(i), 4.1(j), 4.1(k), 4.1(l), 4.1(m), 4.1(n), 4.1(p), and 4.1(q) (for the avoidance of doubt, the Issuer and/or any Restricted Subsidiary must continue to comply with the covenants set forth in Sections 4.1(b), 4.1(c) and 4.1(o) upon the Issuer's election of the "*Covenant Defeasance*" option applicable to this clause (b) and satisfaction of the conditions set forth in Section 6.5). In addition, upon the Issuer's exercise of the option under this clause (b), subject to the satisfaction of the conditions set forth in Section 6.5, Section 5.1(iii) and 5.1(iv) hereof will no longer constitute Events of Default.

Section 6.5     *Conditions to Defeasance*.  In order to exercise the options set forth in clause (a) or clause (b) of Section 6.4 above with respect to the Notes:

(a)      the Issuer shall irrevocably deposit with the Trustee, in trust, for the benefit of the Holders, cash in Dollars, non-callable U.S. Government Obligations, or a combination thereof, in each case in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, premium, if any, interest and Additional Amounts, if any, on the Notes on the stated dates for payment thereof or on the applicable Redemption Date, as the case may be;

(b)      in the case of Section 6.4(a), the Issuer shall have delivered to the Trustee (i) an Opinion of Counsel, from counsel who is reasonably acceptable to the Trustee, confirming that, subject to customary assumptions and exclusions:

(i)      the Issuer has received from, or there have been published by, the United States Internal Revenue Service a ruling, or

(ii)     since the issuance of the Notes, there has been a change in the applicable U.S. federal income tax law,

in either case to the effect that, and based thereon such Opinion of Counsel shall confirm that the Holders for tax purposes will not recognize income, gain or loss for U.S. federal income tax purposes, as applicable, as a result of such Legal Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Legal Defeasance had not occurred;

(c)     in the case of Section 6.4(b), the Issuer shall have delivered to the Trustee (i) an Opinion of Counsel, from counsel who is reasonably acceptable to the Trustee, confirming that, subject to customary assumptions and exclusions, the Holders will not recognize income, gain or loss for U.S. federal income tax purposes as a result of such Covenant Defeasance and will be subject to U.S. federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such Covenant Defeasance had not occurred;

(d)     no Default or Event of Default shall have occurred and be continuing on the date of such deposit pursuant to clause (a) of this Section 6.5 (except such Default or Event of Default resulting from the failure to comply with Section 4.1(e) of this Indenture as a result of the borrowing of funds required to effect such deposit);

(e)     such Legal Defeasance or Covenant Defeasance shall not result in a breach or violation of, or constitute a default under any material agreement or instrument to which, the Issuer or any of its Subsidiaries is a party or by which the Issuer or any of its Subsidiaries is bound (other than a Default or Event of Default pursuant to this clause (d) above);

(f)     the Trustee shall have received an Officer's Certificate of the Issuer stating that the deposit was not made by the Issuer with the intent of preferring the Holders over any other creditors of the Issuer or with the intent of defeating, hindering, delaying or defrauding any other creditors of the Issuer or others; and

(g)     the Trustee shall have received an Officer's Certificate of the Issuer and an Opinion of Counsel (which Opinion of Counsel may be subject to customary assumptions and exclusions) each stating that all conditions precedent provided for or relating to the Legal Defeasance or the Covenant Defeasance, as the case may be, have been complied with.

Section 6.6     _Reinstatement_. If the Trustee is unable to apply any money or U.S. Government Obligations in accordance with Section 6.4 by reason of any legal proceeding or by reason of any order or judgment of any court or Governmental Authority enjoining, restraining or otherwise prohibiting such application, the Issuer's obligations under this Indenture and the Notes shall be revived and reinstated as though no deposit had occurred pursuant to Section 6.4, until such time as the Trustee or Paying Agent is permitted to apply all such money or U.S.

Government Obligations in accordance with <u>Section 6.4</u>; *provided*, *however*, that, if the Issuer has made any payment of principal of or interest on the Outstanding Notes of any series because of the reinstatement of its obligations, the Issuer shall be subrogated to the rights of the Holders of such Notes to receive such payment from the money or U.S. Government Obligations held by the Trustee or Paying Agent.

## ARTICLE VII
## NOTE GUARANTEES

Section 7.1    <u>*Note Guarantee*</u>.    Subject to the provisions of this Article, the Note Guarantors hereby absolutely, irrevocably and unconditionally Guarantee, jointly and severally, to each Holder and to the Trustee the full and punctual payment (whether at an installment date or the Maturity Date, upon redemption, purchase pursuant to an offer to purchase or acceleration or otherwise) of the principal, premium, interest and all other amounts that may come due and payable under each Note and the full and punctual payment of all other amounts payable by the Issuer under this Indenture as they come due. Upon failure by the Issuer to pay punctually any such amount, each of the Note Guarantors shall, without duplication, forthwith pay the amount not so paid at the place and time and in the manner specified in this Indenture. This Guaranty constitutes a direct, joint and several, general, and unconditional primary obligation of each Note Guarantor which will at all times rank at least *pari passu* with all other present and future senior unsecured obligations of such Note Guarantor, except for such obligations as may be preferred by provisions of law that are both mandatory and of general application.

Section 7.2    <u>*Note Guarantee Unconditional*</u>.    To the extent permitted by Applicable Law, the obligations of the Note Guarantors hereunder are unconditional and absolute and, without limiting the generality of the foregoing, will not be released, discharged or otherwise affected by:

(a)    any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of the Issuer under this Indenture or any Note, by operation of law or otherwise;

(b)    any modification or amendment of or supplement to this Indenture or any Note;

(c)    any change in the corporate existence, structure or ownership of the Issuer, or any insolvency, bankruptcy, reorganization, plan of arrangement or other similar proceeding affecting the Issuer or its assets or any resulting release or discharge of any obligation of the Issuer contained in this Indenture or any Note;

(d)    the existence of any claim, set-off or other rights which any of the Note Guarantors may have at any time against the Issuer, the Trustee or any other Person, whether in

connection with this Indenture or any unrelated transactions, *provided,* that nothing herein prevents the assertion of any such claim by separate suit or compulsory counterclaim;

(e)     any invalidity or unenforceability relating to or against the Issuer for any reason of this Indenture or any Note, or any provision of Applicable Law purporting to prohibit the payment by the Issuer of the principal of or interest on any Note or any other amount payable by the Issuer under this Indenture;

(f)     any other act or omission to act or delay of any kind by the Issuer, the Trustee or any other Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of or defense to any of the Note Guarantors' obligations hereunder; or

(g)     any defenses (other than full and unconditional payment) or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms of the Note Guarantee or this Indenture.

Section 7.3    *Discharge Reinstatement*.  Subject to Section 7.11, the Note Guarantors' obligations hereunder will remain in full force and effect until the principal of, premium (if any), and interest on the Notes and all other amounts payable by the Issuer under this Indenture have been indefeasibly paid in full. If at any time any payment of the principal of, premium, if any, or interest on any Note or any other amount payable by the Issuer under this Indenture is rescinded or must be otherwise restored or returned upon the insolvency, bankruptcy, arrangement or reorganization of the Issuer or otherwise, the Note Guarantors' obligations hereunder with respect to such payment will be reinstated as though such payment had been due but not made at such time.

Section 7.4    *Waiver by the Note Guarantors*.  (a) To the extent permitted by Applicable Law, each of the Note Guarantors unconditionally and irrevocably waives acceptance hereof, presentment, demand, protest and any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Issuer or any other Person. The Guaranty constitutes a Guarantee of payment and not of collection.

(b)     To the extent permitted by Applicable Law, each of the Note Guarantors expressly waives irrevocably and unconditionally:

(i)     Any right it may have to first require any Holder of the Notes to proceed against, initiate any actions before a court of law or any other judge or authority, or enforce any other rights or security or claim payment from the Issuer or any other Person (including any Note Guarantor or any other guarantor) before claiming it under this Indenture;

100

(ii)     Any right to which it may be entitled to have the assets of the Issuer or any other Person (including any Note Guarantor or any other guarantor) first be used, applied or depleted as payment of the Issuer's or the Note Guarantors' obligations hereunder, prior to any amount being claimed from or paid by any of the Note Guarantors hereunder; and

(iii)     Any right to which it may be entitled to have claims hereunder divided between the Note Guarantors.

Section 7.5     *Subrogation and Contribution*.   Upon making any payment with respect to any obligation of the Issuer under this Article, each paying Note Guarantor will be subrogated to the rights of the payee against the Issuer with respect to such obligation; *provided*, *however*, that such Note Guarantor shall not be entitled to enforce, or to receive any payments arising out of or based upon, such right of subrogation until the principal of (and premium, if any) interest, Additional Amounts on all Notes and any other amounts due under this Indenture shall have been paid in full.

Section 7.6     *Stay of Acceleration*.   If acceleration of the time for payment of any amount payable by the Issuer under this Indenture or the Notes is stayed upon the insolvency, bankruptcy or reorganization of the Issuer, all such amounts otherwise subject to acceleration under the terms of this Indenture are nonetheless payable by the Note Guarantors forthwith on demand by the Trustee.

Section 7.7     *Execution and Delivery of Note Guarantee*.   The execution by each of the Note Guarantors of this Indenture evidences the Note Guarantee of such Note Guarantor, whether or not the person signing as an officer of such Note Guarantor still holds that office at the time of authentication of any Note. The delivery of any Note by the Trustee after authentication constitutes due delivery of the Note Guarantee set forth in this Indenture on behalf of each Note Guarantor.

Section 7.8     *Purpose of Guaranty*.   The Issuer and the Trustee hereby acknowledge that the purpose and intent of each of the Note Guarantors in executing this Indenture and providing the Note Guarantee is to give effect to the agreement of such Note Guarantor to Guarantee the payment of any such amounts due by the Issuer under the Notes and this Indenture, whether such amounts are in respect of principal, interest or any other amounts (including Additional Amounts). Therefore, each of the Note Guarantors agrees that if the Issuer shall fail to pay in full when due (whether at stated maturity, by acceleration or otherwise) any principal, interest or any other amounts (including Additional Amounts) with respect to this Indenture and the Notes, such Note Guarantor shall promptly pay the same, without any demand or notice whatsoever.  The Trustee shall promptly deposit in the account designated by the Trustee to receive payments from the Issuer with respect to the Notes any funds it receives from any of the Note Guarantors under or pursuant to this Note Guarantee in respect of the Notes.

Section 7.9     *Future Note Guarantors*.   (a) The Issuer will not permit any Restricted Subsidiary that is not a Note Guarantor to become obligated, directly or indirectly, as principal obligor or pursuant to a Guarantee under any Indebtedness (in the aggregate, at any one time

outstanding) the principal amount of which exceeds U.S.$10 million (or its equivalent in any other currency), unless such Restricted Subsidiary is a Note Guarantor (at the sole cost and expense of the Issuer) pursuant to this <u>Article VII</u> within 30 days after such Incurrence or Guarantee by executing and delivering to the Trustee a Indenture Supplement providing its Note Guarantee (and delivers to the Trustee an Opinion of Counsel with respect thereto), which Note Guarantee will rank senior in right of payment to or equally in right of payment with such Person's other Indebtedness or Guarantee of such other Indebtedness, as applicable.

(b)      If the Issuer or any Restricted Subsidiary thereof acquires or creates any Significant Subsidiary, or any Restricted Subsidiary becomes a Significant Subsidiary, on or after the Initial Issue Date, then that Significant Subsidiary must become a Note Guarantor, execute a Indenture Supplement providing for its Note Guarantee and deliver to the Trustee an Opinion of Counsel with respect thereto; *provided,* that (i) the Note Guarantee of such Significant Subsidiary will be limited to the maximum amount that would not result in a breach or violation by such Significant Subsidiary of any provision of any agreement to which it is a party existing at the time of such acquisition or creation, only to the extent that such provision was not adopted in connection with, or in contemplation of, such acquisition or creation or to avoid providing a Note Guarantee, and (ii) such Significant Subsidiary shall not be required to execute any such Indenture Supplement if the execution or enforcement of such Indenture Supplement and the resultant Note Guarantee thereunder is prohibited by, or in violation of, any Applicable Law to which such Significant Subsidiary is subject and it has delivered to the Trustee an Opinion of Counsel to that effect.

(c)      In the event that the Issuer causes any of its Subsidiaries to become a Note Guarantor under this Indenture, the provisions of <u>Section 2.12</u> shall be applicable to any such future Note Guarantor with its jurisdiction of organization substituted for references to Canada (or any province or territory thereof), Panama, Colombia, and Switzerland, as applicable.

(d)      The Issuer shall have the right, at any time and from time to time, as of the last day of the fiscal quarter of the Issuer most recently ended (for purposes of this paragraph, the "*reference date*"), to request by written notice to the Trustee the release of one or more Note Guarantors from its Note Guarantee in accordance with the terms of this Indenture, but only to the extent that, for the two consecutive fiscal quarters of the Issuer ended on the reference date, after giving effect to the proposed release of the applicable Note Guarantor hereunder, (i) the EBITDAX of the Note Guarantors for the two consecutive fiscal quarters of the Issuer ended on the reference date (determined on a Combined basis in accordance with IFRS and disregarding for such determination EBITDAX of the Note Guarantor which Note Guarantee is expected to be released), represents at least 90.0% of the Consolidated Adjusted EBITDAX for such two consecutive fiscal quarters of the Issuer ended on the reference date, (ii) the total assets (other than Capital Stock of any Note Guarantor) of the Note Guarantors (determined on a Combined basis in accordance with IFRS and disregarding for such determination, assets of the Note Guarantor which Note Guarantee is expected to be released) as of the reference date, represent at least 90.0% of the Consolidated Net Tangible Assets as of such reference date and (iii) such Note Guarantor is not a Significant Subsidiary at the time of such release; *provided,* that the Issuer shall not have such right to request the release of such Note Guarantor if, at the time of such release, the applicable Note Guarantor is otherwise obligated, directly or indirectly, as principal obligor or pursuant to a Guarantee under any Indebtedness (in the aggregate, at any one time

outstanding) the principal amount of which exceeds U.S.$10 million (or its equivalent in any other currency). In connection with such request, the Issuer shall deliver to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent to such release under the Indenture have been complied with.

(e)    For purposes of this <u>Section 7.9</u>, the term "EBITDAX" with respect to any Person shall have a correlative meaning with the meaning of the term "Consolidated Adjusted EBITDAX," *provided*, that each reference to the Issuer in the definition of "Consolidated Adjusted EBITDAX" shall be deemed a reference to such Person but shall disregard any reference to the Subsidiaries of such Person.

Section 7.10    <u>*Information*</u>.    Each Note Guarantor assumes all responsibility for being and keeping itself informed of the Issuer's and each other Note Guarantor's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the obligations incurred under this Indenture and the nature, scope and extent of the risks that such Note Guarantor assumes and incurs hereunder, and agrees that neither the Trustee nor any Holder will have any duty to advise such Note Guarantor of information known to it or any of them regarding such circumstances or risks.

Section 7.11    <u>*Release of Note Guarantors*</u>.    The Note Guarantee of a Note Guarantor will automatically and unconditionally be released without the need for any action by any party:

(a)    in connection with any sale or other disposition of all or substantially all of the Capital Stock of a Subsidiary of the Issuer that is a Note Guarantor (including by way of consolidation or merger or otherwise) to a Person that is not (either before or after giving effect to such transaction) the Issuer or a Restricted Subsidiary of the Issuer, if the sale or other disposition of such Capital Stock of that Note Guarantor is otherwise permitted by the Indenture;

(b)    in connection with the merger or consolidation of a Note Guarantor that is a Subsidiary of the Issuer with the Issuer or, in the case of any Note Guarantor, any other Note Guarantor;

(c)    if the Issuer properly designates any Restricted Subsidiary that is a Note Guarantor as an Unrestricted Subsidiary under the Indenture or the applicable Note Guarantor otherwise ceases to be a Restricted Subsidiary in accordance with the Indenture;

(d)    upon the Legal Defeasance or Covenant Defeasance or satisfaction and discharge of the Indenture;

(e)    upon a liquidation or dissolution of a Note Guarantor permitted under the Indenture;

(f)     solely in the case of a Note Guarantee created pursuant to the covenant described in the first paragraph under "—Future Note Guarantors," upon the release or discharge of the Indebtedness or Guarantee that resulted in the creation of such Note Guarantee pursuant to that covenant, except a discharge or release by or as a result of payment under such Indebtedness or Guarantee;

(g)     upon satisfaction of the conditions set forth in the third paragraph under "—Future Note Guarantors"

(h)     solely in the case of a Note Guarantee by a Significant Subsidiary created pursuant to the covenant described in the third paragraph under "—Future Note Guarantees," if the applicable Note Guarantor ceases to be a Significant Subsidiary and at the time of such release, the applicable Note Guarantor is not otherwise obligated, directly or indirectly, as principal obligor or pursuant to a Guarantee under any Indebtedness (in the aggregate, at any one time outstanding) the principal amount of which exceeds U.S.$10 million (or its equivalent in any other currency); or

(i)     upon payment in full of the aggregate principal amount of all notes then outstanding and all other obligations under the Indenture and the notes then due and owing.

If the Issuer requests the Trustee to execute a release in connection with the foregoing, the Issuer shall deliver to the Trustee an Officer's Certificate and an Opinion of Counsel stating that all conditions precedent to such release under the Indenture have been complied with.

Section 7.12    *Limitation on Note Guarantees by Swiss Note Guarantors*.   Any Note Guarantee, indemnity, obligation and/or liability granted, incurred, undertaken, assumed or otherwise agreed by any Note Guarantor incorporated in Switzerland shall be limited to the following:

(a)     Notwithstanding anything to the contrary herein, the fulfilment of any guarantee, indemnity, obligation and/or liability granted, incurred, or undertaken (hereinafter, "*Obligation*") by any Note Guarantor incorporated in Switzerland or any other member of the group incorporated in Switzerland (hereinafter, "*Swiss Note Guarantor*") under this Indenture and the application of proceeds from the realization of any security interest over any asset (hereinafter, "*Security*") granted by any Swiss Note Guarantor in relation to any obligation, undertaking, indemnity or liability of another member of the group (other than the relevant Swiss Note Guarantor or any of its Subsidiaries) (hereinafter, "*Up- and Cross-stream Obligation*") shall, if and to the extent required by mandatory law, be limited to the amount of that Swiss Note Guarantor's freely available equity (hereinafter, "*Limitation*"). For the purpose of this Section 7.12, freely available equity means the amount equal to the maximum amount in which the relevant Swiss Note Guarantor can make a dividend payment to its share- or quotaholders under Swiss law at that point in time.

(b)     If an Up- and Cross-stream Obligation is subject to the Limitation, the Limitation shall not release the relevant Swiss Note Guarantor from the fulfilment of its Obligations or the application of proceeds from the realization of a Security beyond the Limitation, but merely postpone the fulfilment of its Obligations or the application of proceeds from the realization of a Security until such time as it is again permitted notwithstanding the Limitation. The relevant Swiss Note Guarantor and any holding company of such Swiss Note Guarantor shall take, or cause to be taken, any action, including, without limitation, the passing of any share- or quotaholders' resolution to approve any payment or other performance under this Indenture or arranging for an interim balance sheet (audited, if applicable) (or any other confirmations from such Swiss Note Guarantor's auditors), which may be required as a matter of Swiss mandatory law in force at the time it is required to make a payment or perform other obligations under this Indenture in order to allow a prompt payment and performance of other obligations under this Indenture with a minimum of limitations.

(c)     To the extent that the fulfilment of an Obligation or the application of proceeds from the realization of a Security in relation to an Up-and-Cross-stream Obligation are subject to Swiss federal withholding tax (*Verrechnungssteuer*), the Swiss Note Guarantor shall use its best efforts to procure that the fulfilment of an Obligation or the application of proceeds from the realization of a Security can be made without deduction of Swiss withholding tax by discharging the liability of such tax by notification pursuant to applicable law rather than payment of the tax.

(d)     If the fulfilment of an Obligation or the application of proceeds from the realization of a Security in relation to Up- and Cross-stream Obligations would be subject to the Limitation, then the Swiss Note Guarantor shall, upon request of the Trustee, to the extent permitted by applicable law revalue upward or realize any of its assets that are shown in its balance sheet with a book value that is significantly lower than the market value of such assets, in case of realization, however, only if such assets are not necessary for the Swiss Note Guarantor's business (*nicht betriebsnotwendig*).

## ARTICLE VIII
## THE TRUSTEE

Section 8.1     *Duties of the Trustee; Certain Rights of the Trustee*.  (a) The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture.  If an Event of Default exists, then the Trustee shall exercise the rights and powers vested in it by this Indenture and use the same degree of care and skill in their exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(b)     None of the Trustee, any agent of the Trustee or any Affiliate of the Trustee shall be liable for any act or omission made in connection with this Indenture or the Notes except in the case of its own gross negligence or willful misconduct.  In furtherance, and not in limitation, of the Trustee's rights and protections hereunder, and unless otherwise

specifically provided in this Indenture, the Trustee shall (subject to the terms hereof) grant such consents, make such requests and determinations and take or refrain from taking such actions as are permitted (but not expressly required) to be granted, made or taken by the Trustee, as the Required Holders shall direct in writing (in each case, subject to clause (c)).  No provision of this Indenture shall be construed to relieve the Trustee from liability for its gross negligence or willful misconduct; *provided*, *however*, that:

(i)     the duties and obligations of the Trustee shall be determined solely by the express provisions of this Indenture and the Trustee shall not be liable except for the performance of such duties and obligations as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee;

(ii)     in the absence of bad faith on the part of the Trustee, the Trustee may conclusively rely as to (a) the truth of the statements and the correctness of the opinions expressed in and upon any statements, certificates or opinions furnished to the Trustee pursuant to this Indenture and conforming to the requirements of this Indenture, and as to (b) any standing orders of any certificate that has been provided to it and not replaced by a new certificate; and

(iii)     the Trustee shall not be liable for any error of judgment made in good faith by any of its Responsible Officers unless it shall be conclusively determined in a court of competent jurisdiction that the Trustee was grossly negligent in ascertaining the pertinent facts, nor shall the Trustee be liable with respect to any action taken, suffered or omitted to be taken by it in good faith in accordance with the written direction of the Required Holders under, or believed by it to be authorized or permitted by, this Indenture, and shall not be liable for accepting, or acting upon, any decision made by the Holders in accordance herewith.

(c)     (i)     The Trustee may conclusively rely upon, and shall be protected in acting or refraining from acting upon, and shall not be bound to make any investigation into the facts or matters stated in, any resolution, certificate, statement, instrument, instruction, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness, guaranty or other paper or document (whether in original and/or facsimile form) reasonably believed by it to be genuine and to have been signed or presented by the proper Person(s).  The Trustee, in its discretion, may make such further inquiry or investigation into such facts or matters as it may see fit, and, if the Trustee shall determine to make such further inquiry or investigation, it shall be entitled to examine the books, records and premises of the Issuer, personally or by agent or attorney , during reasonable business hours and upon reasonable notice, at the sole cost of the Issuer and shall incur no liability or additional liability of any kind by reason of such inquiry or investigation.

(ii)     The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request, order or direction of the Required Holders unless the Required Holders shall have furnished to (or caused to be furnished to) the Trustee security or indemnity reasonably satisfactory to it against the costs, expenses and liabilities, including attorneys' fees and expenses, that might be incurred by the Trustee therein or thereby.  Subject to such provision for indemnification, the Required Holders will have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee.

(iii)    Nothing in this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it.

(iv)    As a condition to the taking of or omitting to take any action by it hereunder, the Trustee may consult with counsel of its selection and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action reasonably taken or omitted by it hereunder in good faith and in reliance thereon.

(v)     For all purposes under this Indenture, the Trustee shall not be deemed to have notice or knowledge of any Default or Event of Default unless written notice thereof is received by a Responsible Officer of the Trustee at its Corporate Trust Office and such notice states that it is a Default or Event of Default; *provided*, that the Trustee shall be deemed to have notice of the failure of the Issuer to deliver funds (as long as the Trustee is acting as Paying Agent), reports or certificates to the Trustee when scheduled to be delivered to the Trustee under this Indenture.  The Trustee may withhold notice to the Holders of any Default except on payment or principal of, or interest, if any, on the Notes if and so long as a Responsible Officer of the Trustee in good faith determines that it is in the interest of the Holders to do so.

(vi)    Any request or direction of a Holder, the Issuer or any other Person to the Trustee shall be sufficiently evidenced by a written request or order signed in the name of such Person by an Authorized Officer of such Person.  Any resolution adopted by any such Person in connection with such a request or direction shall be sufficiently evidenced by a copy of such resolution certified by the secretary, assistant secretary or similar officer in the United States or, outside the United States, the official or person who performs the functions that are normally performed by a secretary or assistant secretary in the United States (including, in the case of the Issuer, the Secretary General or similar officer) of such Person to have been duly adopted and to be in full force and effect.

(vii)    Whenever in the administration of this Indenture the Trustee shall deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, conclusively rely upon an Officer's Certificate.

(viii)    Whether or not expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to this Article VIII.

Section 8.2    *Performance of Trustee's Duties*.  (a) The Trustee shall not be responsible for and makes no representation as to the validity or adequacy of this Indenture or the Notes, it shall not be accountable for the Issuer's use of the proceeds from the Notes, and it shall not be responsible for any statement of the Issuer in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Trustee's certificate of authentication.

(b)    The Trustee may, in the execution and exercise of all or any of the powers, authorities and discretions vested in it by this Indenture, act by Responsible Officer(s) of the Trustee (or duly-authorized officers of its Affiliates), and the Trustee may also execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, attorneys, accountants, custodians or nominees and the Trustee shall not be responsible for any misconduct or negligence on the part of any such agents, attorneys, accountants, custodians or nominees appointed with due care by the Trustee.

(c)    The Trustee, any Paying Agent, Security Registrar or any other agent of the Issuer, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Issuer with the same rights it would have if it were not the Trustee, Paying Agent, Security Registrar or such other agent.

(d)    The Trustee shall not be required to provide, on its own behalf, any surety, bond or other kind of security in connection with the execution of any of its trusts or powers under this Indenture or the performance of its duties hereunder.

(e)    The recitals contained herein, in the Notes or any offering materials, except for the Trustee's certificate of authentication, shall not be taken as the statements of the Trustee, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representations as to the validity or sufficiency of this Indenture, the Notes or any offering materials.

(f)    The Trustee shall not be accountable for the use or application by any Person of any funds deposited in or withdrawn from any account, or required to be so deposited

or withdrawn, other than any funds held by or on behalf of the Trustee and over which the Trustee has exclusive dominion and control.  Furthermore, the Trustee shall not be accountable for the use or application of any securities or other property or the proceeds thereof that shall be used by the Issuer or any other Person (except itself) other than in accordance with this Indenture.

(g)     The Trustee shall (i) not be responsible for the payment of any interest with respect to amounts held by it and (ii) have no obligation to invest or reinvest any amounts held by it.

(h)     No provision of this Indenture shall be deemed to impose any duty or obligation on the Trustee to take or omit to take any action, or suffer anything to exist, in the performance of its duties or obligations under this Indenture, or to exercise any right or power hereunder, to the extent that taking or omitting to take such action, suffering such thing to exist, or exercising such right or power, would violate Applicable Law binding upon it.  No provision of this Indenture shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts or to exercise any such right, power, duty or obligation, or which would render the Trustee liable to any Person in any such jurisdiction or the State of New York.

(i)     The rights, privileges, protections, immunities and benefits provided to the Trustee hereunder (including its right to be indemnified) are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder as Paying Agent, Security Registrar and Transfer Agent and in its capacities under this Indenture and the Notes and to each of its agents, custodians and other Persons duly employed by the Trustee hereunder or thereunder, and to each other Authorized Agent appointed hereunder.

(j)     The permissive rights of the Trustee enumerated herein shall not be construed as duties.

(k)     To the extent that this Indenture or any law requires the approval, consent or authorization of the SFC, any other Colombian regulator or any other regulator, none of the Trustee or any other agent shall have any duty or obligation to determine whether such approval, consent or authorization is required or any duty or obligation to obtain such consent. The Issuer shall notify the Trustee and any other agents, as applicable, in writing if the approval, consent or authorization of the SFC, any other Colombian regulator or any other regulator is required for any action pursuant to this Indenture or any law and whether or not such consent has been obtained by the Issuer.

(l)     Notwithstanding any provision herein to the contrary, in no event shall the Trustee be liable for any failure or delay in the performance of its obligations hereunder because

109

of circumstances beyond its control, including, but not limited to, acts of God, flood, war (whether declared or undeclared), terrorism, fire, riot, strikes or work stoppages for any reason, embargo, government action, including any laws, ordinances, regulations or the like which restrict or prohibit the providing of the services contemplated by this Indenture or the Notes, inability to obtain material, equipment, or communications or computer facilities (hardware or software), or the failure of equipment or interruption of communications or computer facilities, and other causes beyond its control whether or not of the same class or kind as specifically named above.

(m)     In no event shall the Trustee be responsible or liable for special, indirect, consequential or punitive loss or damage of any kind whatsoever (including, but not limited to, loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action.

(n)     The Trustee may request that the Issuer deliver an Officer's Certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Indenture, which Officer's Certificate may be signed by any person authorized to sign an Officer's Certificate, including any person specified as so authorized in any such certificate previously delivered and not superseded.

(o)     The Trustee shall have no duty to ascertain or inquire as to the performance or observance of any of the terms of this Indenture and the Notes or any other documents or agreements entered into in connection with the transactions contemplated hereby or thereby, by the Issuer or any other party thereto or bound thereby or to perform or observe or cause the performance or observance of any thereof.  The Trustee shall not be responsible for the calculation or other determination of any amounts referred to in or contemplated by this Indenture, the Notes or any other documents or agreements entered into in connection with the transactions contemplated hereby or thereby, or for any inaccuracy in the information obtained by the Issuer or any Note Guarantor or any future by the Trustee to perform its duties as set forth herein as a result of any inaccuracy or incompleteness.

(p)     Any action taken, or omitted to be taken, by the Trustee in good faith pursuant to this Indenture upon the request or authority or consent of any person who, at the time of making such request or giving such authority or consent, is the holder of any Note shall be conclusive and binding upon the future holders of the Notes and upon Notes executed and delivered in exchange therefor in or in place thereof.

(q)     If any party fails to deliver a notice relating to an event the fact of which, pursuant to this Indenture, requires notice to be sent to the Trustee, the Trustee may conclusively and without liability rely on its failure to receive such notice as if no such event occurred.

Section 8.3     _Resignation and Removal; Appointment of Successor Trustee; Eligibility_. (a) The Trustee may resign and be discharged of the trust created by this Indenture by giving at

110

least 90 days' written notice to the Issuer and the Holders, and such resignation shall take effect upon receipt by the Trustee of an instrument of acceptance of appointment executed by a successor trustee as provided in Section 8.4.

(b)    The Trustee may be removed as trustee at any time, with or without cause, upon 90 days prior written notice by the Required Holders delivered to the Trustee and the Issuer, and (unless such notice provides otherwise) such removal shall take effect upon receipt by the Trustee of an instrument of acceptance of appointment executed by a successor trustee as provided in Section 8.4.

(c)    If at any time any of the following occurs:

(i)    the Trustee ceases to be eligible to act as the Trustee in accordance with clause (d) and fails to resign after written request for such resignation by the Issuer or the Required Holders, or

(ii)    the Trustee becomes incapable of acting, or (in its individual capacity) shall be adjudged a bankrupt or insolvent or a receiver or liquidator of the Trustee (in its individual capacity) or of its property shall be appointed, or any public officer takes charge or control of the Trustee (in its individual capacity) or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then the Issuer (so long as no Default or Event of Default with respect to any Notes exists) may remove the Trustee.

If the Trustee resigns or is removed or if a vacancy exists in the office of Trustee for any reason, the Issuer will promptly appoint or request the Trustee in writing to appoint a successor Trustee meeting the eligibility requirements in clause (d) by notifying the Trustee in writing.  Within one year after the successor Trustee takes office, Required Holders may appoint a successor Trustee reasonably acceptable to the Issuer to replace the successor Trustee appointed by the Issuer.

(d)    If at any time the Trustee shall resign, be removed or become incapable of acting as trustee hereunder, or if at any time a vacancy shall occur in the office of the Trustee for any other cause, then the Issuer may appoint a qualified successor trustee.  If no such successor trustee is appointed by the Issuer within 30 days after: (i) the Trustee's delivery of notice of resignation, (ii) the Trustee's receipt of notice of removal or (iii) the occurrence of such vacancy, then the Issuer, the Trustee or the Required Holders may request, at the expense of the Issuer, a court of competent jurisdiction to make such appointment.

(e)     Any Trustee, however appointed, shall (i) be a licensed bank or trust company having a corporate trust department (or a branch, Subsidiary or other Affiliate thereof) organized and doing business under the laws of the United States or any State thereof and authorized under such laws to exercise corporate trust powers in the United States, (ii) have a combined capital and surplus of at least U.S.$100,000,000 (or its equivalent in any other currency), (iii) be subject to supervision or examination by the United States federal and state authorities, and (iv) not be affiliated (as that term is defined in Rule 405 under the Securities Act) with the Issuer.  If at any time the Trustee ceases to be eligible to act as trustee in accordance with this paragraph, then the Trustee shall resign immediately as Trustee as specified in <u>clause (a)</u> or may be removed as specified in <u>clause (c)</u>.

Section 8.4     <u>*Acceptance of Appointment by Successor Trustee*</u>.  (a) Any successor Trustee appointed as provided in <u>Section 8.3</u> shall execute, acknowledge and deliver to the Holders, the Issuer and to its predecessor Trustee an instrument accepting such appointment hereunder, and, subject to <u>Section 8.3</u>, upon the resignation or removal of the predecessor Trustee, such appointment shall become effective and such successor trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee herein; *provided*, *however*, that the Trustee ceasing to act shall, on request of the Issuer or the successor Trustee, upon payment of its charges, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject nevertheless to its lien, if any, provided for in <u>Section 8.5</u>.  Upon written request of any such successor Trustee, the Holders and the Issuer shall execute any and all instruments in writing for fully and certainly vesting in and confirming to such successor Trustee all such rights and powers.

(b)     No successor Trustee shall accept appointment as provided in this Section unless at the time of such acceptance such successor Trustee shall be eligible to act as the Trustee under <u>Section 8.3(e)</u>.

(c)     Upon acceptance of appointment by a successor trustee as provided in this Section, the successor trustee shall notify each Holder of such appointment by first-class mail (or overnight courier) at its last address as shall appear in the Register, and shall mail (or overnight courier) a copy of such notice to the Issuer.  If the acceptance of appointment is substantially contemporaneous with the resignation of the previous Trustee, then the notice required by the preceding sentence may be combined with the notice required by <u>Section 8.3</u>.

Section 8.5     <u>*Trustee Fees and Expenses; Indemnity*</u>.  (a) The Issuer covenants and agrees to pay to each of the Trustee and each Authorized Agent from time to time, and the Trustee shall be entitled to, compensation as agreed in writing between the Issuer and the Trustee and the Issuer and such Authorized Agent from time to time (which compensation shall not be limited by any provision of Applicable Law in regard to the compensation of a trustee of an express trust).

112

(b)     The Issuer and the Note Guarantors, jointly and severally covenant and agree to pay or reimburse, or cause the payment or reimbursement of, the Trustee and each predecessor Trustee and each Authorized Agent, upon its request, for all expenses, disbursements and advances reasonably incurred or made by or on behalf of it in accordance with this Indenture (including the compensation of, reasonable expenses and disbursements of its counsel and of all agents and other Persons not regularly in its employ), except any such expense, disbursement or advance as may arise from its own gross negligence or willful misconduct.

(c)     The Issuer and the Note Guarantors, jointly and severally shall indemnify each of the Trustee and any predecessor Trustee, each Authorized Agent and their officers, employees, directors and agents for, and shall hold them harmless against, any and all loss, damage, claim, liability or expense, including Taxes (other than Taxes based upon, measured by or determined by the income of such Person), arising out of or in connection with this Indenture or the Notes, and the transactions contemplated thereby, including the acceptance or administration of the trust hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Issuer, or any Holder or any other Person) or liability in connection with the exercise or performance of any of its powers, rights or duties hereunder or thereunder (including with respect to enforcement of its rights to indemnity hereunder), except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct.

(d)     In addition to and without prejudice to its other rights hereunder, when the Trustee incurs expenses or renders services in connection with any Event of Default, the expenses (including the compensation of, duly documented reasonable expenses of and disbursements by its counsel) and the compensation for its services are intended to constitute expenses of administration under any applicable United States federal or state or non-U.S. bankruptcy, insolvency or other similar law.

(e)     To secure the Issuer's obligations under this Section, the Trustee may withhold or set-off any amounts due and owing to it under this <u>Section 8.5</u> from any money or property held or collected by the Trustee in its capacity as Trustee, except for such money and Property which is held in trust to pay the principal of (and premium, if any), or interest, on particular Notes.

(f)     "*Trustee*" for purposes of this Section shall include any predecessor Trustee; *provided*, *however*, that the gross negligence or willful misconduct of any Trustee hereunder shall not affect the rights of any other Trustee hereunder.

(g)     The provisions of this Section shall survive the satisfaction, discharge and termination of this Indenture or payment of the Notes and the resignation or removal of the Trustee and/or any Authorized Agent.

Section 8.6    *Documents Furnished to the Holders*.  As promptly as practicable after, and in any event within 30 days after the receipt by the Trustee of notice or its knowledge of any Event of Default with respect to any Note (or an event that would be a Default with respect to any Note with the expiration of any applicable grace period, giving of notice or both), the Trustee shall, subject to Section 8.1(c)(v), give notice of such Event of Default to all Holders of Outstanding Notes as their names and addresses appear on the Register.

Section 8.7    *Merger, Conversion, Consolidation and Succession*.  Any Person or other entity into which the Trustee may be merged or converted or with which it may be consolidated, or any Person or other entity resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any Person or other entity succeeding to all or substantially all of the corporate trust business of the Trustee (including this transaction), shall be the successor of the Trustee hereunder (*provided,* that such corporation or other entity shall be otherwise qualified and eligible hereunder) without the execution or filing of any paper or any further action on the part of any of the parties hereto.  If any Notes shall have been authenticated but not delivered by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 8.8    *Money Held in Trust*.  Money held by the Trustee hereunder shall be held by it in trust for the Holders but need not be segregated from other funds, except as provided in Sections 6.1 and 6.4.  The Trustee shall not have any personal liability for interest upon or investment of any such monies unless agreed to in writing.

Section 8.9    *No Action Except under Specified Documents or Instructions*.  The Trustee shall not manage, control, use, sell, dispose of or otherwise deal with any part of the Issuer's property (excluding any Notes) except (a) in accordance with the powers granted to and the authority conferred upon the Trustee pursuant to this Indenture and the Notes and (b) in accordance with any document or instruction delivered to the Trustee pursuant hereto.

Section 8.10    *Not Acting in its Individual Capacity*.  Except as provided in this Article VIII, in accepting the trusts hereby created, the entity acting as Trustee acts solely as Trustee hereunder and not in its individual capacity and, except as provided in this Article VIII, all Persons having any claim against the Trustee by reason of the transactions contemplated by this Indenture or any Note shall look only to the Issuer for payment or satisfaction thereof.

Section 8.11    *Maintenance of Agencies*.  (a)  The Issuer shall at all times maintain an office or agency where Notes may be presented or surrendered for registration of transfer or for exchange and for payment thereof and where notices and demands to or upon the Trustee in respect of the Notes and/or this Indenture may be made.  Such offices or agencies shall be initially at the Corporate Trust Office.  Written notice of any change of location thereof shall be given by the Trustee to the Issuer and the Holders.  In the event that no such notice of location or of change of location shall be given, presentations and demands may be made and notices may be given at the Corporate Trust Office; *provided*, *however* the Trustee shall not be deemed an agent of the Issuer for service of process.

(b)     The Issuer hereby initially appoints Citibank, N.A., at its Corporate Trust Office, as the Trustee hereunder and Citibank, N.A. hereby accepts such appointment. The Trustee will have the powers and authority granted to and conferred upon it in the Notes and hereby and such further powers and authority to act on behalf of the Issuer as may be mutually agreed upon by the Issuer and the Trustee, and the Trustee will keep a copy of this Indenture available for inspection during normal business hours at its Corporate Trust Office.

(c)     The Issuer hereby initially appoints The Depository Trust Company to act as depository with respect to the Global Notes.

(d)     The Issuer and the Note Guarantors shall at all times maintain a paying agent in the United States.

(e)     The Issuer hereby initially appoints the Trustee as Security Registrar and Paying Agent for the Notes.

(f)     Any Person or other entity into which any Authorized Agent (other than the Trustee, matters with respect to which are specified in Section 8.3) may be merged or converted or with which it may be consolidated, or any corporation or other entity resulting from any merger, consolidation or conversion to which any Authorized Agent shall be a party, or any corporation or other entity succeeding to all or substantially all of the corporate trust business of any Authorized Agent, shall be the successor of such Authorized Agent hereunder, if such successor corporation is otherwise eligible under this Indenture to act in the corresponding capacity, without the execution or filing of any document or any further act on the part of the parties hereto or such Authorized Agent or such successor corporation or other entity.

(g)     Any Authorized Agent (other than the Trustee, matters with respect to which are specified in Section 8.3(a)) may at any time resign by giving 30 days' written notice of resignation to the Trustee and the Issuer. The Issuer may, and at the request of the Required Holders shall, at any time terminate the agency of any Authorized Agent (other than the Trustee, matters with respect to which are specified in Section 8.3) by giving written notice of termination to such Authorized Agent and to the Trustee. Upon the resignation or termination of an Authorized Agent or in case at any time any such Authorized Agent shall cease to be eligible under this Section 8.11 (when, in either case, no other Authorized Agent performing the functions of such Authorized Agent shall have been appointed by the Issuer), the Issuer shall promptly appoint one or more qualified successor Authorized Agents to perform the functions of the Authorized Agent that has resigned or whose agency has been terminated or who shall have ceased to be eligible under this Section. The Issuer shall give written notice of any such appointment made by it to the Trustee; and in each case the Trustee shall deliver notice of such appointment to all applicable Holders as their names and addresses appear on the Register.

Section 8.12     _Withholding Taxes; Information Reporting_.     The Trustee shall comply with all backup withholding tax and information reporting requirements that it is required to

comply with under United States law (including the Code and the Treasury regulations issued thereunder) in respect of any payment on, or in respect of, the Notes. The Trustee agrees that it shall act as such withholding agent and, in connection therewith, whenever any present or future amount is required to be withheld pursuant to the Code and the United States Treasury regulations issued thereunder with respect to any amounts payable in respect of the Notes, that it shall withhold such amounts from funds it has received to make payments in respect of the Notes and timely pay the same to the United States Internal Revenue Service in the name of and on behalf of the Holders, that it shall file any necessary U.S. withholding tax statements when due. The Trustee agrees to file any other information reports as it may be required to file by the U.S. with respect to such withholding. In order to comply with certification, identification, information, documentation or other reporting requirements, the Holders shall be required to provide the Trustee with all reasonably requested forms (including Internal Revenue Service Forms W-8BEN, W-8IMY, W-8ECI, W-8EXP, W-9 and other applicable forms).

Section 8.13 _Co-Trustees and Separate Trustee_. (a) Notwithstanding any other provisions of this Indenture, at any time for the purpose of meeting any legal requirement of any jurisdiction, the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, and to vest in such Person or Persons, in such capacity and for the benefit of the Holders, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable; _provided_, _however_, that, prior to an Event of Default, no co-trustee, co-trustees, separate trustee or separate trustees shall be appointed without the prior written consent of the Issuer, which consent shall not be unreasonably withheld. Each co-trustee or separate trustee hereunder shall be required to have a combined capital and surplus (computed in accordance with Section 310(a)(2) of the Trust Indenture Act) of at least U.S.$50,000,000 and the Trustee shall, at the expense of the Issuer, provide prompt notice to holders of the appointment of any co-trustee or separate trustee.

(b)     Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)     all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(ii)     neither the Trustee nor any co-trustee or separate trustee hereunder shall be personally liable by reason of any act or omission of any other trustee, co-trustee or separate trustee hereunder; and

116

(iii)    the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them.  Every instrument appointing any separate trustee or co-trustee shall refer to this indenture and the conditions of this Article VIII.  Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection or rights (including the right to compensation, reimbursement and indemnification hereunder) to, the Trustee.  Every such instrument shall be filed with the Trustee.

Section 8.14    _Conflict of Interest_.  The Trustee represents to the Issuer that at the time of execution and delivery hereof no material conflict of interest exists between its role as trustee hereunder and its role in any other capacity and agrees that in the event of a material conflict of interest arising hereafter it will, within 90 days after ascertaining that it has such material conflict of interest, either eliminate the same or assign its appointment as trustee hereunder to a successor trustee in accordance with **Error! Reference source not found.**.  Notwithstanding the foregoing provisions of this Section 8.14, if any such material conflict of interest exists or hereafter shall exist, the validity and enforceability of this agreement and any Notes shall not be affected in any manner whatsoever by reason thereof.

## ARTICLE IX
## AMENDMENTS, SUPPLEMENTS AND WAIVERS

Section 9.1    _Without Consent of the Holders_.  The Issuer, the Note Guarantors and the Trustee may from time to time and at any time without the consent of the Holders modify, amend or supplement this Indenture or enter into a written Indenture Supplement for one or more of the following purposes:

(a)    to evidence the succession by another Person to the Issuer and the assumption by any such successor of the covenants in this Indenture and in the Notes of such series in accordance with Section 4.3;

(b)    to add to the Issuer's covenants and those of any other obligor of the Notes for the benefit of the Holders or to surrender any right or power conferred upon the Issuer or any other obligor of the Notes, as applicable, in this Indenture or in the Notes for the benefit of the Holders;

(c)    to cure any ambiguity, or to correct or supplement any provision in this Indenture or the Notes that may be defective or inconsistent with any other provision in this

Indenture or the Notes or the section under the heading "Description of the Notes" in the offering memorandum dated  November 15, 2021;

(d)    to make any other changes with respect to matters or questions arising under this Indenture or the Notes; *provided* that, such changes shall not materially adversely affect the interests of the Holders;

(e)    to evidence and provide the acceptance of the appointment of a successor trustee under this Indenture and any relevant indenture and pursuant to the terms hereof and thereof;

(f)    to comply with the rules of the Depository or with any requirement of the SEC or any Canadian, Colombian, Panamanian or Swiss securities regulator with respect to the Notes or this Indenture;

(g)    to mortgage, pledge, hypothecate or grant a security interest in favor of the Trustee for the benefit of the Holders as additional security for the payment and performance of the Issuer's obligations under this Indenture, in any property, or assets, including any of which are required to be mortgaged, pledged or hypothecated, or in which a security interest is required to be granted to the Trustee pursuant to this Indenture or otherwise;

(h)    to provide for the issuance of Additional Notes in accordance with and if permitted by the terms and limitations set forth in this Indenture; and

(i)    to add a co-issuer of the Notes, to add any additional Note Guarantors (whether required by this Indenture or otherwise) or to evidence the release of any Note Guarantor from its obligations under its Note Guarantee to the extent that such release is not prohibited by this Indenture.

The Trustee is hereby authorized but shall not be obligated to join in the execution of any such amendment or supplement or Indenture Supplement, to make any further appropriate agreements and stipulations that may be therein contained and to accept the conveyance, transfer, assignment, mortgage or pledge of any property thereunder.

Section 9.2    *With Consent of the Holders*.  (a) Subject to <u>Sections 9.6</u> and <u>9.7</u>, and only with the written consent of the Required Holders, the Issuer, the Note Guarantors and the Trustee may, from time to time and at any time, amend or supplement this Indenture or enter into a written Indenture Supplement for the purpose of adding any provisions to or changing in any manner or eliminating any of the provisions of this Indenture or any Note or of modifying in any manner the rights of the Holders in respect thereof.

(b)     Notwithstanding anything to the contrary in <u>Section 9.2(a)</u>, no amendment or waiver to this Indenture or the Notes shall, without the consent of every Holder adversely affected directly thereby:

(1)     reduce in any manner the amount of or alter the priority of, any payments that are required to be made herein on any Note;

(2)     reduce any premium and Additional Amounts in respect of any Note;

(3)     change any date of payment on any Note;

(4)     change the place of payment where, or the coin or currency in which, any Note is payable;

(5)     impair any Holder's right to institute suit for the enforcement of any payment on or after the due date therefor;

(6)     reduce the percentage of the Outstanding Notes the consent of which is required for any such amendment, or reduce such percentage required for any waiver or instruction provided for in this Indenture;

(7)     modify the Note Guarantees in any manner adverse to the Holders;

(8)     make any change or modify the rankings of the Notes in a manner that would adversely affect the Holders;

(9)     reduce the premium payable upon the redemption or repurchase of any Note or change the time at which any Note may or shall be redeemed or repurchased in accordance with this Indenture; or

(10)    modify or amend in any manner adverse to the Holders the terms and conditions of the obligation of the Issuer for the due and punctual payment of the principal of or interest on the Notes.

Section 9.3     *Effect of Indenture Supplements*. (a) Upon the effectiveness of any amendment, supplement or waiver in accordance with this <u>Article IX</u>, this Indenture, previous Indenture Supplements and the Note(s) affected thereby shall be and be deemed to be modified and amended in accordance therewith and the respective rights, limitations of rights, obligations,

duties and immunities under this Indenture of the Trustee, the Holders affected thereby and the Issuer shall thereafter be determined, exercised and enforced hereunder subject in all respects to such modifications, amendments and waivers.

(b)    After an amendment, supplement or waiver becomes effective, it shall bind every Holder unless it is of the type described in clause (b) of Section 9.2.  In case of an amendment or waiver of the type described in clause (b) of Section 9.2, the amendment or waiver shall bind each Holder who has consented to it and every subsequent Holder that evidences the same indebtedness as the Note(s) of the consenting Holder.

Section 9.4    *Documents to be Given to the Trustee*.  Before the execution thereof, the Trustee shall receive, in addition to the documents required by Section 10.11, an Officer's Certificate and Opinion of Counsel indicating that the Indenture Supplement or amendment is authorized or permitted under this Indenture and that all conditions precedent provided for in this Indenture relating to any modification, amendment or supplement have been complied with.

Section 9.5    *Notation on or Exchange of Notes*.  If an amendment, supplement or waiver changes the terms of a Note, the Trustee may require the Holder to deliver such Note to the Trustee.  At the Issuer's expense the Trustee may place an appropriate notation on the Note about the changed terms and return it to the Holder and the Trustee may place an appropriate notation on any Note thereafter authenticated.  Alternatively, if the Issuer or the Trustee so determines, the Issuer in exchange for the Note shall issue and the Trustee shall authenticate a new Note that reflects the changed terms.  Any failure to make the appropriate notation or to issue a new Note shall not affect the validity of such amendment, supplement or waiver.

Section 9.6    *Meetings of Holders*.  (a) The Trustee or the Issuer shall, upon the request of Holders holding not less than 10% in aggregate principal amount of the Outstanding Notes, or the Issuer or the Trustee may, at its respective discretion, call a meeting of Holders at any time and from time to time to make, give or take any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be made, given or taken by such Holders to be held at such time and at such place as the Trustee shall reasonably determine.  Notice of every meeting of the Holders, setting forth the time and the place of such meeting and in general terms the action proposed to be taken at such meeting, shall be given, at the expense of the Issuer, by the Issuer or the Trustee to each applicable Holder not less than ten nor more than 60 days before the date fixed for the meeting.  In case at any time the Issuer or Holders holding at least 10% of the Outstanding Notes shall have requested the Trustee to call a meeting of the Holders for any purpose, by written request setting forth in reasonable detail the action proposed to be taken at such meeting, the Trustee shall call such a meeting for such purposes by giving notice thereof.

(b)    To be entitled to vote at any meeting of Holders, a Person shall be a Holder or a Person duly appointed by an instrument in writing as proxy for a Holder.  The quorum at any meeting of Holders called to adopt a resolution shall be Holders holding not less than 50% in aggregate principal amount of the Outstanding Notes.  Any instrument given by or on behalf of any Holder in connection with any consent to any modification, amendment or

120

waiver shall be irrevocable once given and shall be conclusive and binding on all subsequent holders of such Note.  Subject to <u>Section 9.2(b)</u>, any action taken at a duly called and held meeting of any Holders shall be conclusive and binding on all Holders, whether or not they gave consent or were present at the meeting.  The Trustee may make such reasonable and customary regulations as it shall deem advisable for any meeting of Holders with respect to proof of the appointment of proxies, the record date for determining the registered Holders entitled to vote (which date shall be specified in the notice of meeting), the adjournment and chairmanship of such meeting, the appointment and duties of inspectors of such meeting, the conduct of votes, the submission and examination of proxies, certificates and other evidence of the right to vote and such other matters concerning the conduct of the meeting as it shall deem appropriate.  A record of the proceedings of each meeting of Holders shall be prepared by the party calling the meeting and a copy thereof shall be delivered to the Issuer and the Trustee.

Section 9.7   <u>*Voting by the Issuer and Any Affiliates Thereof*</u>.  Notwithstanding anything herein to the contrary, should any Notes (or beneficial interests therein) be owned by the Issuer or any Affiliate thereof, any vote to be taken by Holders (including any vote resulting from the occurrence of an Event of Default) shall exclude from such voting the vote relating to (and principal amount of) the Notes (or beneficial interests therein) of any such Person, all as set forth in the definition of "*Outstanding*" in <u>Section 1.1</u> of this Indenture.

# ARTICLE X
# MISCELLANEOUS

Section 10.1   <u>*Payments; Currency Indemnity*</u>.  (a) Except to the extent otherwise stated herein, each payment to be made hereunder or on any Note shall be made on the required payment date in Dollars and in immediately available funds at the office of the Trustee specified in <u>Section 10.5</u> or to such other office or account as may be specified by any party in a notice to the applicable sender of such payment.

(b)   Except to the extent otherwise stated, Dollars are the sole currency of payment for all sums payable under or in connection with this Indenture or any Note, including with respect to indemnities.  Any amount received or recovered in a currency other than Dollars (whether as a result of, or of the enforcement of, a judgment, decree or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer or otherwise) in respect of any sum expressed to be due on the Notes and under this Indenture shall only constitute a discharge of such obligation to the extent of the amount of Dollars that the payee of such amounts due is able to purchase in accordance with normal banking or other normal currency exchange procedures with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If such amount of Dollars is more than the amount expressed to be due on the Notes or under this Indenture, if applicable, then the payee shall reimburse such excess to the payor.  If such amount of Dollars is less than the amount expressed to be due on the Notes or under this Indenture, if applicable, then the payor shall indemnify the payee of such amounts against any loss sustained by it as a result. In any event, the payor shall indemnify the payee of such amounts against the cost of making any such purchase.  For the purposes of this <u>Section</u>

10.1(b), in the event the payee finds it impracticable to make a purchase on the date it receives the payment in a currency other than in Dollars, it will be sufficient for the payee of such amounts to certify in a reasonable manner (indicating the sources of information used) that it would have suffered a loss had an actual purchase of Dollars been made with the amount so received in such other currency on the date of receipt or recovery.  These indemnities constitute a separate and independent obligation from the other obligations hereunder, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by such payee and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any amount due hereunder or under any Note.

Section 10.2   _Governing Law_.  **THIS INDENTURE HAS BEEN DELIVERED IN NEW YORK, NEW YORK AND SHALL BE DEEMED TO BE A CONTRACT MADE UNDER AND GOVERNED BY THE INTERNAL LAWS OF THE STATE OF NEW YORK (INCLUDING FOR SUCH PURPOSE SECTIONS 5-1401 AND 5-1402 OF THE GENERAL OBLIGATIONS LAW OF THE STATE OF NEW YORK).**

Section 10.3   _No Waiver; Cumulative Remedies_.  No failure to exercise and no delay in exercising, on the part of any Person, any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exhaustive of any rights, remedies, powers and privileges provided by Applicable Law.

Section 10.4   _Severability_. Any provision of this Indenture or any Note that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof or thereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

Section 10.5   _Notices_.  (a)  All notices, instructions, directions, requests and demands delivered in connection herewith shall be in English and shall be in writing (including by fax) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when received (including by courier), addressed as follows in the case of the Trustee and the Issuer:

| If to the Trustee: | **CITIBANK, N.A.** |
| | 388 Greenwich Street, |
| | New York New York, 10013 |
| | |
| Fax: | (212)-767-2639 |
| Attention: | Agency and Trust – Canacol Energy Ltd. |

| If to the Issuer: | **CANACOL ENERGY LTD.** |
| | 2650, 585 – 8th Ave SW, |
| | Calgary, Alberta T2P 1G1 |
| | |
| Fax: | 1-403-228-6419 |
| Attention: | Jason Bednar |

(b)    The Issuer and the Trustee, by notice, may designate additional or different addresses for subsequent notices or communications.

(c)    Any notice or communication to a Holder shall be deemed to have been duly given upon the mailing of such notice by first class mail to such Holder at its registered address as recorded in the Register not later than the latest date, and not earlier than the earliest date, prescribed in this Indenture for the giving of such notice; *provided* that in the case of Global Notes, notices shall be sent to DTC or its nominees (or any successors), as the Holders thereof, and DTC will communicate such notices to the DTC Participants in accordance with its standard procedures. Any requirement of notice hereunder may be waived by the Person entitled to such notice before or after such notice is required to be given, and such waivers shall be filed with the Trustee.

(d)    If the Issuer gives a notice or communication to any Holder, it shall give a copy to the Trustee in advance of sending the notice to the Holder.

(e)    The Trustee shall promptly furnish the Issuer with a copy of any demand, notice or written communication received by the Trustee hereunder from any Holder.

(f)    The Trustee shall have the right, but shall not be required, to rely upon and comply with instructions and directions sent by e-mail, facsimile and other similar unsecured electronic methods by persons believed by the Trustee to be authorized to give instructions and directions on behalf of the Issuer.  The Trustee shall have no duty or obligation to verify or confirm that the person who sent such instructions or directions is, in fact, a person authorized to give instructions or directions on behalf of the Issuer; and the Trustee shall have no liability for any losses, liabilities, costs or expenses incurred or sustained by the Issuer as a result of such reliance upon or compliance with such instructions or directions.  The Issuer agrees to assume all risks arising out of the use of such electronic methods to submit instructions and directions to the

123

Trustee, including without limitation the risk of the Trustee acting on unauthorized instructions, and the risk of interception and misuse by third parties. The Issuer shall also cause all other such publications of such notices as may be required from time to time by applicable Colombian law, including, without limitation, those required under the applicable Colombian regulations issued by the SFC.

Section 10.6   *Counterparts*.  This Indenture may be executed on any number of separate counterparts (including by fax or electronic delivery), and all of such counterparts taken together shall be deemed to constitute one and the same instrument.

Section 10.7   *Entire Agreement*.  This Indenture, including the documents referred to herein, contains the entire understanding of the parties hereto with respect to the subject matter contained herein, and there are no promises, undertakings, representations or warranties by the parties hereto relative to the subject matter hereof not expressly specified or referred to herein.

Section 10.8   *Waiver of Jury Trial*. THE PARTIES HERETO (AND EACH HOLDER, BY ITS ACCEPTANCE OF A NOTE) HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS INDENTURE OR THE NOTES AND FOR ANY COUNTERCLAIM RELATING THERETO.  EACH PARTY (AND EACH HOLDER, BY ITS ACCEPTANCE OF A NOTE) ACKNOWLEDGES THAT THE OTHER PARTIES HERETO ARE ENTERING INTO THIS INDENTURE IN RELIANCE UPON SUCH WAIVER.

Section 10.9   *Submission to Jurisdiction; Waivers; Prescription*.  (a) Each party to this Indenture or the Notes hereby irrevocably and unconditionally submits to the jurisdiction of (i) the United States District Court for the Southern District of New York or of any New York State court (in either case sitting in Manhattan, New York City) and (ii) the courts of its own corporate domicile, in each case with all applicable courts of appeal therefrom, with respect to actions brought against it as a defendant, for purposes of all legal proceedings arising out of or relating to this Indenture or the Notes or the transactions contemplated hereby or thereby; *provided,* that nothing herein shall be deemed to limit the ability of any party to this Indenture or the Notes to bring suit in any other permissible jurisdiction.  The Issuer and each of the Note Guarantors hereby irrevocably waives, to the fullest extent permitted by Applicable Law, any objection that it may now or hereafter have to the laying of the venue of any such proceeding brought in such a court, any claim that any such proceeding brought in such a court has been brought in an inconvenient forum and any objection based on place of residence or domicile.

(b)      The Issuer and each of the Note Guarantors irrevocably appoints C T Corporation System, with address at 28 Liberty St., 42nd Floor, New York New York, 01005, United States, as its authorized agent on which any and all legal process may be served in any such action, suit or proceeding brought in the United States District Court for the Southern District of New York or in any New York State court (in either case sitting in Manhattan, New York City) in connection with this Indenture or the Notes.  The Issuer and each of the Note Guarantors agrees that service of process in respect of it upon such agent, together with written notice of such service sent to it in the manner provided for in <u>Section 10.5</u>, shall be deemed to be effective service of process upon it in any such action, suit or proceeding.  The Issuer and each of

124

the Note Guarantors agrees that the failure of such agent to give notice to it of any such service of process shall not impair or affect the validity of such service or any judgment rendered in any action, suit or proceeding based thereon.  If for any reason such agent shall cease to be available to act as such (including by reason of the failure of such agent to maintain an office in New York City), the Issuer and each of the Note Guarantors agrees promptly to designate a new agent in New York City, on the terms and for the purposes of this Section.  Nothing herein shall in any way be deemed to limit the ability of the Trustee to serve any such legal process in any other manner permitted by Applicable Law or to obtain jurisdiction over the Issuer or bring actions, suits or proceedings against it in such other jurisdictions, and in such manner, as may be permitted by Applicable Law.

(c)    The Issuer and each of the Note Guarantors will waive any immunity (including sovereign immunity), to the fullest extent permitted by applicable law, from suit, action, proceeding or jurisdiction to which it might otherwise be entitled in any such suit, action or proceeding in any U.S. federal or New York State court in the Borough of Manhattan, the City of New York or in any competent court in Canada (or any province or territory thereof), Colombia, Panama or Switzerland .

(d)    To the extent permitted under Applicable Law, claims against the Issuer or any Note Guarantor for the payment of principal or interest and Additional Amounts in respect of the Notes or the Guarantee, as the case may be, will be prescribed unless made within six years of the due date for payment of such principal or interest and Additional Amounts.

Section 10.10  *Certificate and Opinion as to Conditions Precedent*.  Upon any request or application by the Issuer to the Trustee to take any action under this Indenture, the Issuer will furnish to the Trustee upon request:

(a)    an Officer's Certificate (which will include the statements set forth in <u>Section 10.11</u> hereof) stating that, in the opinion of the signers, all conditions precedent and covenants, if any, provided for in this Indenture relating to the proposed action have been satisfied; and

(b)    an Opinion of Counsel (which will include the statements set forth in <u>Section 10.11</u> hereof) stating that, in the opinion of such counsel, all such conditions precedent and covenants have been satisfied; *provided*, *however*, that no such Opinion of Counsel shall be delivered with respect to the authentication and delivery of any Notes on the Initial Issue Date.

Section 10.11  *Statements Required in Certificate or Opinion*.  Each certificate or opinion with respect to compliance with a condition or covenant provided for in this Indenture will include (other than the certificate set forth in <u>Section 4.1(b)</u>):

(a)    a statement that the Person making such certificate or opinion has read such covenant or condition and the definitions in this Indenture relating thereto;

(b)     a brief statement as to the nature and scope of the examination or investigation upon which the statements or opinions contained in such certificate or opinion are based;

(c)     a statement that, in the opinion of such Person, he has made such examination or investigation as is necessary to enable him to express an informed opinion as to whether or not such covenant or condition has been complied with;

(d)     a statement as to whether or not, in the opinion of such Person, such condition or covenant has been complied with; and

(e)     a statement that, in the opinion of such Person, such Officer's Certificate or Opinion of Counsel complies with the provisions of this <u>Section 10.11</u> and that the Trustee may rely on such certificate or opinion.

Section 10.12 <u>*Headings and Table of Contents*</u>. Section headings and the table of contents in this Indenture have been inserted for convenience of reference only and shall in no way restrict or otherwise modify any of the terms or provisions hereof.

Section 10.13 <u>*Use of English Language*</u>. All certificates, reports, notices, instructions, and other documents and communications given or delivered pursuant to this Indenture shall be in the English language or accompanied by a certified English translation thereof.

Section 10.14 <u>*No Recourse Against Others*</u>. An incorporator, stockholder, officer, director, employee or controlling person, as such, of the Issuer shall not have any liability for any obligations of the Issuer under the Notes, this Indenture, or for any claim based on, in respect of or by reason of such obligations or their creation. By accepting interests in a Note, each Holder waives and releases all such liability. The waiver and release shall be deemed a part of the consideration for the issue of the Notes.

Section 10.15 <u>*Interest Act (Canada)*</u>. The Issuer and each Note Guarantor acknowledges and agrees that it is able to calculate the yearly rate or percentage of interest payable under the Notes based on the disclosure and methodology described in this Indenture relating to interest and other amounts payable under this Indenture and the Notes. The Issuer and each Note Guarantor hereby irrevocably agrees, and to cause any future Note Guarantors, not to, plead or assert, by way of defense of otherwise, in an proceeding relating to this Indenture or the Notes, that the interest payable under this Indenture and the Notes and the calculation thereof has not been adequately disclosed to the Issuer, the Note Guarantor and any future Note Guarantor, whether pursuant to Section 4 of the *Interest Act* (Canada) or any other applicable law or legal principal.

Section 10.16 <u>*Patriot Act*</u>. The parties hereto acknowledge that in accordance with Section 326 of the USA Patriot Act, Citibank, N.A., like all financial institutions and in order to help fight the funding of terrorism and money laundering, is required to obtain, verify, and record information that identifies each person or legal entity that establishes a relationship or

opens an account.  Each party to this agreement agrees that it will provide Citibank, N.A. with such information with respect to such party as Citibank, N.A. may request in order for Citibank, N.A. to satisfy the requirements of the USA Patriot Act.

[signature pages follow]

**IN WITNESS WHEREOF**, the undersigned have caused this Indenture to be duly executed as of the date first above written by their respective officers hereunto duly authorized.

**CANACOL ENERGY LTD.,** as Issuer

By: _____
       Name: Jason Bednar
       Title:  CFO

**CANACOL ENERGY INC.**
(Guarantor)

By: _____
Name: Tracy Whitmore
Title:  Director

**SHONA ENERGY LIMITED PARTNERSHIP**
(Guarantor)

By: _____

Name:  Tracy Whitmore

Title:  Director for General Partner

**SHONA ENERGY HOLDING LIMITED
PARTNERSHIP**
(Guarantor)

By: _____
    Name:  Tracy Whitmore
    Title:   Director for General Partner

[Signature Page to Indenture]

**SHONA ENERGY HOLDING ULC**
(Guarantor)

By: _____

Name:  Tracy Whitmore
Title:   Director

**SHONA ENERGY ULC**
(Guarantor)

By: _____

Name: Tracy Whitmore

Title: Director

**CANACOL ENERGY COLOMBIA S.A.S.**
(Guarantor)

By: _____

Name:  Andres Valenzuela Pachon

Title:  Legal Representative

**CNE OIL & GAS S.A.S.**
(Guarantor)

By: _____

Name:  Andres Valenzuela Pachon
Title:  Legal Representative

**CNEMED S.A.S.**
(Guarantor)

By: _____

Name:    Andres Valenzuela Pachon
Title:    Legal Representative

**CNE ENERGY S.A.S.**
(Guarantor)

By: _____
    Name:   Andres Valenzuela Pachon
    Title:    Legal Representative

[Signature Page to Indenture]

**SHONA HOLDING GMBH**
(Guarantor)

By: _____
Name:    Tracy Whitmore
Title:    Director

**GEOPRODUCTION HOLDING GMBH**
(Guarantor)

By: _____

Name: Tracy Whitmore
Title:  Director

**CECSA ENERGY, INC.**
(Guarantor)

By: _____

Name: Abraham Valles
Title: Director

**CANTANA ENERGY SA**
(Guarantor)

By: _____

Name: Abraham Valles

Title:  Director

**CITIBANK, N.A.,**
as Trustee, Security Registrar and Paying Agent


By: *William Keenan*
       Name: William Keenan
       Title: Senior Trust Officer

**Schedule I**

## LIST OF GUARANTORS

1. Canacol Energy Inc.;
2. Shona Energy Limited Partnership;
3. Shona Energy Holding Limited Partnership;
4. Shona Energy Holding ULC;
5. Shona Energy ULC;
6. Canacol Energy Colombia S.A.S.;
7. CNE Oil & Gas S.A.S.;
8. CNEMED S.A.S.;
9. CNE Energy S.A.S.;
10. Shona Holding GmbH;
11. Geoproduction Holding GmbH;
12. CECSA Energy, Inc.; and
13. Cantana Energy SA.

**EXHIBIT A**
<u>to Indenture</u>

**[FORM OF] FACE OF NOTE**
**CANACOL ENERGY LTD.**


**[RESTRICTED GLOBAL NOTE]**
**[REGULATION S GLOBAL NOTE]**
**[DEFINITIVE NOTE]**


**representing**


**U.S.$**


**5.750% Senior Notes due 2028**


[Global Notes Legend][1]


UNLESS THIS NOTE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK CORPORATION ("*DTC*"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY NOTE ISSUED UPON REGISTRATION OF TRANSFER OF, OR IN EXCHANGE FOR, OR IN LIEU OF, THIS NOTE OR ANY PORTION HEREOF IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO. (OR SUCH OTHER ENTITY), HAS AN INTEREST HEREIN.


THIS NOTE IS A GLOBAL NOTE WITHIN THE MEANING OF THE INDENTURE HEREINAFTER REFERRED TO AND IS REGISTERED IN THE NAME OF A DEPOSITORY OR A NOMINEE THEREOF. THIS NOTE MAY NOT BE EXCHANGED IN WHOLE OR IN PART FOR A SECURITY REGISTERED, AND NO TRANSFER OF THIS

---

[1]    This Global Notes Legend should be included only if the Note is to be held by DTC in global form.

NOTE IN WHOLE OR IN PART MAY BE REGISTERED, IN THE NAME OF ANY PERSON OTHER THAN SUCH DEPOSITORY OR A NOMINEE THEREOF EXCEPT IN THE LIMITED CIRCUMSTANCES DESCRIBED IN THE INDENTURE.

[Restricted Securities Legend]

"THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT THIS NOTE OR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED ONLY (1) TO THE ISSUER AND ITS SUBSIDIARIES, (2) SO LONG AS THIS NOTE IS ELIGIBLE FOR RESALE PURSUANT TO RULE 144A UNDER THE SECURITIES ACT ("RULE 144A"), TO A PERSON WHO THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A) IN ACCORDANCE WITH RULE 144A, (3) IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT, (4) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT (IF AVAILABLE) OR (5) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, AND IN EACH OF SUCH CASES IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES OR OTHER APPLICABLE JURISDICTION. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, REPRESENTS AND AGREES THAT IT WILL NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO ABOVE.

UNLESS PERMITTED UNDER APPLICABLE CANADIAN SECURITIES LEGISLATION (AS IF THE SECURITIES WERE DISTRIBUTED UNDER ANY OF THE PROVISIONS LISTED IN APPENDIX D OF NATIONAL INSTRUMENT 45-102 – RESALE OF SECURITIES), THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY IN CANADA BEFORE MARCH 25, 2022."

[Regulation S Legend]

"THIS NOTE HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY OTHER SECURITIES LAWS OF ANY STATE OF THE UNITED STATES. THE HOLDER HEREOF, BY PURCHASING THIS NOTE, AGREES THAT NEITHER THIS NOTE NOR ANY INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION UNLESS SUCH TRANSACTION IS EXEMPT FROM, OR NOT SUBJECT TO, SUCH REGISTRATION.

THE FOREGOING LEGEND MAY BE REMOVED FROM THIS NOTE AFTER 40 DAYS BEGINNING ON AND INCLUDING THE LATER OF (A) THE DATE ON WHICH THE NOTES ARE OFFERED TO PERSONS OTHER THAN DISTRIBUTORS (AS DEFINED IN REGULATION S UNDER THE SECURITIES ACT) AND (B) THE ORIGINAL ISSUE DATE OF THIS NOTE.

UNLESS PERMITTED UNDER APPLICABLE CANADIAN SECURITIES LEGISLATION (AS IF THE SECURITIES WERE DISTRIBUTED UNDER ANY OF THE PROVISIONS LISTED IN APPENDIX D OF NATIONAL INSTRUMENT 45-102 – RESALE OF SECURITIES), THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY IN CANADA BEFORE MARCH 25, 2022."

[Canadian Private Placement Legend][2]

"UNLESS PERMITTED UNDER APPLICABLE CANADIAN SECURITIES LEGISLATION, THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY IN CANADA BEFORE MARCH 25, 2022."

---

[2]    The Canadian Private Placement Legend should be included on each Regulation S Global Note and Definitive Note if Notes or beneficial interests therein are initial issued to persons resident in Canada or to persons to which Canadian securities laws apply.

A-5

**CANACOL ENERGY LTD.**
**5.750 % Senior Note due 2028**

No. [___]
Principal Amount U.S.$[___]

[Registered Holder: CEDE & CO.]³                    CUSIP No. [___] and ISIN No. [___]

      **CANACOL ENERGY LTD.**, a corporation organized and existing under the laws of the Province of Alberta, Canada (the "*Issuer*").

The Issuer promises to pay to [                    ] or registered assigns, the principal amount of Notes payable on [●], 20[●].

      **INTEREST PAYMENT DATES**:    and    of each year, commencing on    , 2021.

      **RECORD DATES**:  15 days prior to each Interest Payment Date (which for the avoidance of doubt will be    and    of each year).

      Additional provisions of this Note are set forth on the reverse hereof.

*[Signature Page Follows]*

---

³    Include only if the Note is to be held by DTC.

A-6

IN WITNESS WHEREOF, the Issuer has caused this Note to be duly executed.

**CANACOL ENERGY LTD.**

By: _____

    Name:

    Title:

**TRUSTEE'S CERTIFICATE OF AUTHENTICATION**

This is one of the Notes referred to in the within-mentioned Indenture

Dated: _____, ____

Citibank, N.A., as Trustee

By: _____

    Authorized Officer

**[FORM OF] REVERSE OF NOTE**

**5.750% Senior Notes due 2028**

1.  Interest

      **CANACOL ENERGY LTD.**, a corporation organized and existing under the laws of the Province of Alberta, Canada (the "*Issuer*") promises to pay interest on the principal amount of this Note at the rate per annum shown above.

      Each Note and Additional Note shall bear interest at a rate of  5.750% per annum from the issue date of such Note or Additional Note or from the most recent interest Payment Date to which interest has been paid, as the case may be, payable semi-annually in arrears on each Payment Date commencing on **May** [  ], 2021 until the principal thereof is paid or duly provided for.  Interest on the Notes will accrue and be payable in Dollars and will be computed on the basis of a 360-day year of twelve 30-day months, and will be payable to the Holders of record on the          calendar day immediately preceding the related interest Payment Date (which for the avoidance of doubt will be          and          of each year).  The Issuer will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law to the extent that such interest is an allowed claim enforceable against the debtor under any Bankruptcy Law) on overdue principal and premium, if any, at a rate equal to 1% per annum in excess of the interest rate on the Notes or Additional Notes, and to the extent lawful, it will pay interest (including post-petition interest in any proceeding under any Bankruptcy Law to the extent that such interest is an allowed claim against the debtor under such Bankruptcy Law) on overdue installments of interest (without regard to any applicable grace period) from time to time on demand at the same rate, to the fullest extent permitted by Applicable Law.

      For the purposes solely of disclosure under the *Interest Act* (Canada), (i) whenever any interest or fees to be paid on the Note and any Additional Note is to be calculated using a rate based on a year of 360 days or 365 days (or any period that is less than a calendar year), as the case may be, the rate determined pursuant to such calculation, when expressed as an annual rate, is equivalent to (x) the applicable rate based on a year of 360 days or 365 days (or such other period that is less than a calendar year), as the case may be, (y) multiplied by the actual number of days in the calendar year in which the period for which such interest or fee is payable (or compounded) ends, and (z) divided by 360 or 365 (or such other period that is less than a calendar year), as the case may be, (ii) the principle of deemed reinvestment of interest does not apply to any interest calculation under the Note and any Additional Note, and (iii) the rates of interest stipulated in the Note and any Additional Note are intended to be nominal rates and not effective rates or yields. Based on the foregoing and solely for the purposes of disclosure under the *Interest Act* (Canada) and without affecting the amount of interest payable on the Note and any Additional Note, the nominal annual interest rate (i) for a year of 365 days is [●]% and (ii) for a year of 366 days is [●]%.

A-8

2.  Method of Payment

On the Business Day prior to any Payment Date and/or Maturity Date the Issuer will deposit or cause to be deposited with the Paying Agent in the Borough of Manhattan, the City of New York, in immediately available funds, a sum in Dollars sufficient to pay the principal of, and interest (and premium and Additional Amounts, if any) due on each Note or Additional Notes on such Payment Date and/or Maturity Date.  The Issuer will pay the Holders defaulted interest in any lawful manner on a special record date. The Issuer will notify the Trustee in writing of the amount of defaulted interest proposed to be paid on each Note and the date of the proposed payment.  The Trustee will fix or cause to be fixed each such special record date and payment date, *provided,* that no such special record date will be less than ten days prior to the related payment date for such defaulted interest.  At least ten days before the special record date, the Issuer will deliver or cause to be delivered to Holders a notice that states the special record date, the related payment date and the amount of such defaulted interest to be paid. In addition, the Issuer will pay to the Holder of this Note such premium and Additional Amounts as may become payable under Section 2.12, Section 3.3, Section 3.4 and Section 4.4 of the Indenture.

3.  Trustee, Security Registrar and Paying Agent

Initially, Citibank, N.A. (the "*Trustee*"), will act as trustee, security registrar and paying agent.

4.  Indenture

The Issuer issued the Notes under an Indenture, dated as of November  [24], 2021 (as it may be amended or supplemented from time to time in accordance with the terms thereof, the "*Indenture*"), among the Issuer, the initial note guarantors listed on Schedule I thereto, and Citibank, N.A., as trustee, security registrar and paying agent.  The Indenture imposes certain limitations on the Issuer, its Restricted Subsidiaries and the Note Guarantors.  The terms of the Notes include those stated in the Indenture.  The Notes are subject to all such terms, and Holders are referred to the Indenture for a statement of those terms.  The Notes are senior obligations of the Issuer. The aggregate principal amount of the Notes that may be authenticated and delivered under the Indenture is unlimited.  Each Holder, by accepting a Note, agrees to be bound by all of the terms and provisions of the Indenture, as amended from time to time.  Capitalized terms used herein and not defined herein have the meanings ascribed thereto in the Indenture.  In the event of a conflict between the terms of the Notes and the terms of the Indenture the terms of the indenture shall govern.  This Note is one of the Notes referred to in the Indenture.

5.  Optional Redemption

(a)   *Optional Redemption prior to November 24, 2024*. At any time prior to November 24, 2024, the Issuer may on any one or more occasions redeem all or a part of the notes, upon not less than 10 nor more than 60 days' notice, at a redemption price equal to 100% of the principal amount of the notes redeemed, plus (i) the Applicable Premium as of, (ii) Additional Amounts to, if any, and (iii) accrued and unpaid interest, if any, to, but not including

A-9

the applicable Redemption Date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant Payment Date).

(b)     *Optional Redemption on or after November 24, 2024.* On or after November 24, 2024, the Issuer may, on any one or more occasions, redeem all or a part of the notes upon not less than 10 nor more than 60 days' notice, at the redemption prices (expressed as percentages of principal amount) set forth below plus Additional Amounts and accrued and unpaid interest, if any, on the notes redeemed, to but not including the applicable Redemption Date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant Payment Date), if redeemed during the twelve month period beginning on November 24 of the years indicated below:

| Year | |
|---|---|
| 2024 .............................................................................................. | 102.875% |
| 2025 .............................................................................................. | 101.438% |
| 2026 and thereafter ......................................................................... | 100.000% |

6.   Optional Redemption Upon Equity Offerings

(a)     At any time and from time to time prior to November 24, 2024, the Issuer may on any one or more occasions redeem up to an aggregate of 35% of the aggregate principal amount of notes (including, for greater certainty, any Additional Notes) then outstanding under the Indenture using the Net Cash Proceeds (and in an amount not greater than the aggregate of such Net Cash Proceeds) of one or more Equity Offerings, upon not less than 10 nor more than 60 days' notice, at a redemption price of  105.750% of the principal amount of the notes being redeemed, plus Additional Amounts and accrued and unpaid interest, if any, to the applicable Redemption Date (subject to the right of the Holders of record on the relevant record date to receive interest due on the relevant Payment Date); provided that at least 65% of the aggregate principal amount of the Notes originally issued under the Indenture on the Initial Issue Date remain Outstanding immediately after the occurrence of such redemption (excluding Notes held by the Issuer and its Subsidiaries); and

(b)     each such redemption occurs within 180 days of the date of the closing of any such Equity Offering.

7.   Optional Tax Redemption

The Notes may be redeemed at the Issuer's election in whole but not in part on any date prior to the Maturity Date, by the giving of notice as provided in Section 10.5 of the Indenture at a price equal to the outstanding principal amount thereof, together with any Additional Amounts and accrued and unpaid interest to but not including the Redemption Date, if, as a result of:

(a)     any change in, or amendment to, laws or treaties (or any regulation or rulings promulgated thereunder) of a Relevant Taxing Jurisdiction; or

(b)     any change in the official application, administration or interpretation of such laws, treaties, regulations or rulings (including by virtue of a holding, judgment, or order by a court of competent jurisdiction) or a change in published administrative practice in a Relevant Taxing Jurisdiction,

in each case, which amendment, change, application, administration or interpretation is enacted or promulgated (or in the case of changes described in clause (b), publicly announced) on or after the date of the offering memorandum (or, in the case of a jurisdiction that becomes a Relevant Taxing Jurisdiction on a date after the date of the offering memorandum, such later date), the Issuer, a Note Guarantor or Successor, as the case may be, has become or would become obligated to pay any Additional Amounts on the next date on which any amount would be payable with respect of such notes and the Issuer, the Note Guarantor or the Successor, as the case may be, determines in good faith that such obligation cannot be avoided by taking commercially reasonable measures available to it; provided, however, that no such notice of redemption shall be given earlier than 90 days prior to the earliest date on which the relevant entity would be obligated to pay such Additional Amounts.

Notice of redemption pursuant to this <u>Section 7</u> will be given at least ten days but not more than 60 days before the Redemption Date to each Holder of the Notes to be redeemed. Prior to the giving of notice of redemption of such Notes pursuant to this Indenture, the Issuer will deliver to the Trustee an Officer's Certificate and a written opinion of such Relevant Taxing Jurisdiction counsel independent of the Issuer and its Affiliates to the effect that the Issuer, Note Guarantor, or Successor, as the case may be, has or will become obligated to pay such Additional Amounts as a result of such change, amendment, application, administration or interpretation.

8.   <u>Denominations; Transfer; Exchange</u>

Restricted Notes initially will be represented by one or more Notes in registered, global form without interest coupons (collectively, the "*Restricted Global Notes*"). Regulation S notes initially will be represented by one or more Notes in registered, global form without interest coupons (collectively, the "*Regulation S Global Notes*" and, together with the Restricted Global Notes, the "*Global Notes*"). No service charge will be made for any registration of transfer or exchange of Notes, but the Trustee may require payment of a sum sufficient to cover any Tax or other government charge payable in connection therewith.  The Notes (or beneficial interests therein) may not be transferred unless the principal amount so transferred is in an authorized denomination.

9.   <u>Persons Deemed Owners</u>

The registered Holder of this Note may be treated as the owner of this Note for all purposes.

10. <u>Unclaimed Money</u>

Subject to abandonment property law, any monies deposited with or paid to the Trustee for the payment of the principal, premium or Additional Amounts (if any), interest or any other amount due with respect to any Note and not applied but remaining unclaimed for three years after the date upon which such principal, premium or Additional Amounts (if any), interest or other amount shall have become due and payable, shall (to the extent not required to escheat to any governmental authority), upon written demand of the Issuer, be repaid by the Trustee to or for the account of the Issuer, the receipt of such repayment to be confirmed promptly in writing by or on behalf of the Issuer, and, to the extent permitted by Applicable Law, the Person claiming such payment of principal, premium or Additional Amounts (if any), interest or any other amount shall thereafter look only to the Issuer for any related payment that it may be entitled to receive, and all liability of the Trustee with respect to such monies shall thereupon cease.

11. <u>Prescription</u>

Claims against the Issuer or any Note Guarantor for the payment of principal or interest and Additional Amounts in respect of the Notes or the Guarantee, as the case may be, will be prescribed unless made within six years of the due date for payment of such principal or interest and Additional Amounts.

12. <u>Defeasance</u>

Subject to certain conditions set forth in the Indenture, the Issuer at any time may terminate certain of its obligations under the Notes and the Indenture if the Issuer deposits with the Trustee money or U.S. Government Obligations for the payment of principal and interest on the Notes to redemption or maturity, as the case may be.

13. <u>Amendment, Waiver</u>

Subject to certain exceptions set forth in the Indenture, (i) the Indenture or the Notes may be amended with the written consent of the Holders of at least 50% in aggregate principal amount of the Outstanding Notes and (ii) any default or noncompliance with any provision may be waived with the written consent of the Holders of a majority in principal amount of the Outstanding Notes.  Subject to certain exceptions set forth in the Indenture, without the consent of any Holder, the Issuer and the Trustee may, among other amendments set forth in the Indenture, amend the Indenture to cure any ambiguity, omission, defect or inconsistency or to provide for uncertificated Notes in addition to or in place of certificated Notes, or to add guarantees with respect to the Notes or to provide additional rights or benefits to the Holders or to make any change that does not adversely affect the rights of any Holder.

14. Defaults and Remedies

If an Event of Default occurs and is continuing, the Trustee or the Holders of at least 25% in aggregate principal amount of the Outstanding Notes may declare all the Notes to be due and payable immediately (including all Additional Amounts thereon).  Certain events of bankruptcy or insolvency are Events of Default which will result in the Notes being due and payable immediately upon the occurrence of such Events of Default.

Holders may not enforce the Indenture or the Notes except as provided in the Indenture. The Trustee may refuse to enforce the Indenture or the Notes unless it receives reasonable indemnity or security.  Subject to certain limitations, Holders of a majority in principal amount of the Notes may direct the Trustee in its exercise of any trust or power.  The Trustee may withhold from Holders notice of any continuing Default or Event of Default (except a Default or Event of Default in payment of principal or interest) if it determines that withholding notice is in their interest.

15. Authentication

This Note shall not be valid until an authorized signatory of the Trustee (or an authenticating agent acting on its behalf) manually signs the certificate of authentication on the other side of this Note.

16. Abbreviations

Customary abbreviations may be used in the name of a Holder or an assignee, such as TEN COM (=tenants in common), TEN ENT (=tenants by the entirety), JT TEN (=joint tenants with rights of survivorship and not as tenants in common), CUST (=custodian) and U/G/M/A (=Uniform Gift to Minors Act).

17. CUSIP and ISIN Numbers

Pursuant to a recommendation promulgated by the Committee on Uniform Note Identification Procedures the Issuer has caused CUSIP, ISIN and/or other similar numbers to be printed on the Notes and has directed the Trustee to use such numbers in notices of redemption as a convenience to Holders.  No representation is made as to the accuracy of such numbers either as printed on the Notes or as contained in any notice of redemption and reliance may be placed only on the other identification numbers placed thereon.

Governing Law

This Note shall be governed by the internal laws of the state of New York (including for such purpose sections 5-1401 and 5-1402 of the General Obligations Law of the State of New York).

18. Additional Amounts

The Issuer will pay to the Holders such Additional Amounts as may become payable under Section 2.12 of the Indenture.

19. Conversion of Currency

Dollars are the sole currency of payment for all sums payable by the Issuer under or in connection with the Notes or the Indenture, including damages.  The Issuer has agreed that the provisions of Section 10.1 of the Indenture shall apply to conversion of currency in the case of the Notes and the Indenture.  Among other things, Section 10.1 of the Indenture specifies that any amount received or recovered in a currency other than Dollars (whether as a result of, or of the enforcement of, a judgment, decree or order of a court of any jurisdiction, in the winding-up or dissolution of the Issuer or otherwise) in respect of any sum expressed to be due on the Notes and under the Indenture shall only constitute a discharge of such obligation to the extent of the amount of Dollars that the payee of such amounts due is able to purchase, in accordance with normal banking or other normal currency exchange procedures, with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If such amount of Dollars is more than the amount expressed to be due on the Notes or under the Indenture, if applicable, then the payee shall reimburse such excess to the payor. If such amount of Dollars is less than the amount expressed to be due on the Notes or under the Indenture, then the payor shall indemnify the payee of such amounts against any loss sustained by it as a result.

20. Agent for Service; Submission to Jurisdiction; Waiver of Immunities

Each of the Issuer and each Note Guarantor has irrevocably appointed CT Corporation System, with address at 28 Liberty St., 42nd Floor, New York New York, 01005, United States, as its authorized agent on which any and all legal process may be served in any such action, suit or proceeding brought in the United States District Court for the Southern District of New York or in any New York State court (in either case sitting in Manhattan, New York City).

The Issuer and each of the Note Guarantors will waive any immunity (including sovereign immunity), to the fullest extent permitted by Applicable Law, from suit, action, proceeding or jurisdiction to which it might otherwise be entitled in any such suit, action or proceeding in any U.S. federal or New York State court in the Borough of Manhattan, the City of New York or in any competent court in Canada (or any province or territory thereof), Colombia, Panama or Switzerland, as applicable.

The Issuer will furnish to any Holder upon written request and without charge to the Holder a copy of the Indenture which has in it the text of this Note in larger type.

Requests may be made to:

**CANACOL ENERGY LTD.**
[●]
Telephone: +[●]
Fax: +[●]

# [FORM OF] ASSIGNMENT FORM

To assign this Note, fill in the form below and have your signature guaranteed: (I) or (we) assign and transfer this Note to:

(Insert assignee's soc. sec. or tax I.D. no.)

(Print or type assignee's name, address and zip code)

and irrevocably appoint _____
to transfer this Note on the books of the Issuer.  The agent may substitute another to act for him.

Dated: _____          Your Name: _____
                                              (Print your name exactly as it appears on the face of this Note)


                                 Your Signature: _____
                                              (Sign exactly as your name appears on the face of this Note)


                                 Signature Guarantee*: _____


[The Transferee Certificates (Exhibits B and C to the Indenture) will be attached to the Note]

---

\* Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee)

A-16

## [FORM OF] OPTION OF HOLDERS TO ELECT PURCHASE

If you elect to have this Note purchased by the Issuer pursuant to <u>Section 4.4</u> of the Indenture, check the box below:

☐

If you elect to have only part of this Note purchased by the Issuer pursuant to <u>Section 4.4</u> of the Indenture, state the amount (in minimum denominations of U.S.$200,000 or integral multiples of U.S.$1,000 in excess thereof) you elect to have purchased; *provided*, that no purchase in part shall reduce the outstanding principal amount of maturity of the Notes held by you to below U.S.$200,000:  U.S.$_____

Dated: _____        Your Name: _____
                                                        (Print your name exactly as it appears on the face of this Note)

                                   Your Signature: _____
                                                        (Sign exactly as your name appears on this Note)

                                   Social Security or Tax Identification No._____

                                   Signature Guarantee*: _____

---

\*    Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee)

A-17

**EXHIBIT B**
**to Indenture**

### [FORM OF] CERTIFICATE FOR
### EXCHANGE OR TRANSFER OF RESTRICTED GLOBAL NOTE[4]

Citibank, N.A., as trustee
388 Greenwich Street, 14th floor
New York, New York 10013

Attention:  Global Trust Services – Global Finance Americas

Re:    **CANACOL ENERGY LTD.**
   % Senior Notes Due 20 (the "*Notes*")

Reference is hereby made to the Indenture, dated as of       , 2021 (as it may be amended or supplemented from time to time in accordance with the terms thereof, the "*Indenture*"), among the Issuer, the initial note guarantors listed on Schedule I thereto, and Citibank, N.A., as trustee, security registrar and paying agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

This letter relates to U.S.$[_____] of the Notes that are held as a beneficial interest in the Restricted Global Note (CUSIP No. [●]) with DTC in the name of [NAME OF TRANSFEROR] (the "*Transferor*").  The Transferor has requested an exchange or transfer of such beneficial interest for an interest in the Regulation S Global Note (ISIN No. [●]) to be held with [NAME OF PARTICIPANT] through DTC.  If this is a partial transfer, a minimum amount of U.S.$200,000 or any integral multiple of U.S.$1,000 in excess thereof of the Restricted Global Note (or beneficial interests therein) will remain outstanding in the name of the Transferor.

In connection with such request, the Transferor does hereby certify that such exchange or transfer has been effected in accordance with the applicable transfer restrictions set forth in the Indenture (including those described in the applicable legends set forth in the Indenture and/or on the Restricted Global Note) and (a) with respect to transfers made in reliance upon Regulation S under the Securities Act, the Transferor does hereby certify that:

---

[4]    This certification is to be made upon transfers or exchanges under Regulation S of interests in the Restricted Note pursuant to <u>Section 2.6(b)</u> of the Indenture.

B-1

(i)      the offer of the Notes (or beneficial interests therein) to be exchanged or transferred was not made to a person in the United States,

(ii)      either: (A) at the time the buy order was originated the transferee was outside the United States or the Transferor and any person acting on the Transferor's behalf reasonably believed that the transferee was outside the United States or (B) the transaction was executed in, on or through the facilities of a designated offshore securities market and neither the Transferor nor any Person acting on behalf of the Transferor knows that the transaction was pre-arranged with a buyer in the United States,

(iii)      no directed selling efforts have been made in contravention of the requirements of Rule 903 or Rule 904 of Regulation S, as applicable,

(iv)      the transaction meets any other applicable requirements of Rule 903 or Rule 904 of Regulation S and

(v)      the transaction is not part of a plan or scheme to evade the registration requirements of the Securities Act,

and (b) with respect to transfers made in reliance upon Rule 144A under the Securities Act, the Transferor hereby certifies that the Notes are being transferred in a transaction permitted by Rule 144A under the Securities Act.

Further, if the offer of the Notes (or beneficial interests therein) to be exchanged or transferred is being made to a person resident in Canada or to a person to which Canadian securities laws apply, the Transferor hereby certifies that the Notes are being transferred in accordance with the transfer restrictions applicable to trades into Canada set forth in the Indenture, including those set forth in the last paragraph of the Restricted Securities Legend on the Restricted Global Note.

This certificate and the statements contained herein are made for your benefit and for the benefit of the Issuer and the Trustee.

[Insert name of Transferor]

By: _____
      Name:
      Title:

B-2

Dated: _____

cc:
**CANACOL ENERGY LTD.**


Signature Guarantee*: _____

---

\*    Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee)

**EXHIBIT C**
**to Indenture**

**[FORM OF] CERTIFICATE FOR**
**EXCHANGE OR TRANSFER OF REGULATION S GLOBAL NOTE[5]**

Citibank, N.A., as trustee
388 Greenwich Street, 14th floor
New York, New York 10013

Attention:  Global Trust Services – Global Finance Americas

    Re:    **CANACOL ENERGY LTD.**
           % Senior Notes Due 20  (the "*Notes*")

    Reference is hereby made to the Indenture, dated as of       , 2021 (as it may be amended or supplemented from time to time in accordance with the terms thereof, the "*Indenture*"), among the Issuer, the initial note guarantors listed on Schedule I thereto, and Citibank, N.A., as trustee, security registrar and paying agent. Capitalized terms used but not defined herein shall have the meanings given to them in the Indenture.

    This letter relates to U.S.$[_____] of the Notes that are held as a beneficial interest in the Regulation S Global Note (ISIN No. [●]) with [Euroclear] [Clearstream] through DTC in the name of [NAME OF TRANSFEROR] (the "*Transferor*").  The Transferor has requested an exchange or transfer of such beneficial interest in the Notes for an interest in the Restricted Global Note (CUSIP No. [●]) to be held with [NAME OF PARTICIPANT] through DTC.  If this is a partial transfer, a minimum amount of U.S.$200,000 or any integral multiple of U.S.$1,000 in excess thereof of the Regulation S Global Note (or beneficial interests therein) will remain outstanding in the name of the Transferor.

    In connection with such request, the Transferor does hereby certify that such Notes (or beneficial interests therein) are being transferred: (a) in accordance with Rule 144A under the Securities Act to a transferee that the Transferor reasonably believes is a "qualified institutional buyer" within the meaning of Rule 144A (a "*QIB*") who is purchasing such Notes (or beneficial interests therein) for its own account or for the account of a QIB with respect to which the transferee exercises sole investment discretion, in each case in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction and (b) to a transferee that is not a Canadian resident or subject to Canadian securities laws.

---

[5]    This certification is to be made upon transfers or exchanges under Rule 144A of interests in the Regulation S Note pursuant to <u>Section 2.6(c)</u> of the Indenture.

This certificate and the statements contained herein are made for your benefit and for the benefit of the Issuer and the Trustee.

[Insert name of Transferor]

By: _____
     Name:
     Title:

Dated: _____

cc:

**CANACOL ENERGY LTD.**

Signature Guarantee*: _____

---

\*    Participant in a recognized Signature Guarantee Medallion Program (or other signature guarantor acceptable to the Trustee)

**EXHIBIT "M"** to the Affidavit of
Jason Bednar
Sworn/Affirmed before me
this ‪16‬ day of November, 2025

_____

A Commissioner for Oaths in
and for the Province of Alberta

**Cameron B.M. Brunet**
Barrister and Solicitor
Member of the Law Society of Alberta
Notary Public in and for the Province of Alberta
Commissioner for Oaths in and for the Province of Alberta

| | |
|---|---|
| COURT FILE NUMBER | |
| COURT | COURT OF KING'S BENCH OF ALBERTA |
| JUDICIAL CENTRE | CALGARY |
| MATTER | IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36, AS AMENDED |
| | AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA ULC, CANTANA ENERGY GMBH, CNE OIL & GAS, S.R.L, CANACOL ENERGY COLOMBIA S.A.S., SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S. |
| APPLICANTS | CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA ULC, CANTANA ENERGY GMBH, CNE OIL & GAS, S.R.L, CANACOL ENERGY COLOMBIA S.A.S., SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S. |
| DOCUMENT | **CONSENT TO ACT AS MONITOR** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT | **Gowling WLG (Canada) LLP**<br>1 First Canadian Place<br>100 King Street West, Suite 1600<br>Toronto ON M5X 1G5<br><br>Attn: **Clifton Prophet/ Sam Gabor/ Katherine Yurkovich**<br><br>Telephone (416) 862-3509/ (403) 298-1946/ (416) 862-4342<br>Facsimile (416) 862-7661<br>Email: clifton.prophet@gowlingwlg.com / sam.gabor@gowlingwlg.com<br><br>File No. G10088627 |

## CONSENT TO ACT AS MONITOR

**KPMG INC.** does hereby consent to act as Monitor of Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Cantana Energy GmbH, CNE Oil & Gas, S.R.L, Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S.  if appointed by the Court.

An electronic copy of this Consent to Act as Monitor shall be as effective as an original.

**DATED** at Toronto, Ontario, this 16th day of November, 2025.

**KPMG INC.**

Per:    _Katherine Forbes_
Name:    Katherine Forbes
Title:    Senior Vice President