Laura Davis Jones (*pro hac vice* pending)
Steven W. Golden
Mary F. Caloway (*pro hac vice* pending)
PACHULSKI STANG ZIEHL & JONES LLP
1700 Broadway, 36th Floor
New York, New York 10019
Telephone: 212-561-7700
Facsimile:  212-561-7777

*Counsel to the Foreign Representative*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>CANACOL ENERGY LTD.,[1] *et al.*<br><br>Debtors in a Foreign Proceeding. | Chapter 15<br><br>Case No. 25-12572 (DSJ)<br><br>(Joint Administration Requested) |

## MOTION FOR (I) RECOGNITION OF FOREIGN
## MAIN PROCEEDING (OR, IN THE ALTERNATIVE, FOREIGN NONMAIN
## PROCEEDING), (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
## AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

KPMG Inc., in its capacity as the court-appointed monitor (in such capacity, the "Monitor")

and the authorized foreign representative (the "Foreign Representative")  of the above-captioned

foreign debtors (collectively, the "Debtors"), which are the subject of jointly-administered

proceedings (the "Canadian Proceeding") under the *Companies' Creditors Arrangement Act*,

R.S.C. 1985, c. C-36 (as amended, the "CCAA") before the Court of King's Bench of Alberta (the

---

[1]     The Debtors, along with the last four digits of each Debtor's unique identifier, as applicable, are as follows: Canacol Energy Ltd. (2074); Cantana Energy GmbH (8873); CNE Oil & Gas S.R.L. (9803); Canacol Energy ULC (0350); Shona Holding GmbH (2126); Canacol Energy Colombia S.A.S. (5633); CNE Energy S.A.S (0691); CNE Oil & Gas S.A.S. (6580); 2498003 Alberta ULC (4611); and 2654044 Alberta Ltd. (3429).  The Foreign Representative's service address for purposes of these Chapter 15 Cases is c/o KPMG Inc., Bay Adelaide Centre, Suite 4600 333 Bay Street, Toronto, Ontario, Canada M5H 2S5.

"Canadian Court"), by and through its undersigned counsel, respectfully submits this motion (the "Motion") for recognition of the Canadian Proceeding with respect to each of the Debtors as a "foreign main proceeding" and certain related relief pursuant to 11 U.S.C. sections 105(a), 1507, 1510, 1515, 1517, and 1521 of title 11 of the United States Code (the "Bankruptcy Code"). In support of this Motion, the Foreign Representative relies on (i) the *Declaration of Katherine Forbes in Support of (I) Verified Chapter 15 Petitions, (II) Foreign Representative's Motions for Orders Granting Provisional Relief and Final Relief in Aid of Canadian Proceeding, and (III) Certain Related Relief* (the "Forbes Declaration"); (ii) the *Declaration of Raj S. Sahni in Support of (I) Verified Chapter 15 Petitions, (II) Foreign Representative's Motions for Orders Granting Provisional Relief and Final Relief in Aid of Canadian Proceeding, and (III) Certain Related Relief* (the "Sahni Declaration"), and (iii) the *Declaration of Jason Bednar in Support of (I) Verified Chapter 15 Petitions, (II) Foreign Representative's Motions for Orders Granting Provisional Relief and Final Relief in Aid of Canadian Proceeding, and (III) Certain Related Relief* (the "Bednar Declaration"), each filed contemporaneously herewith and incorporated herein by reference. In further support of this Motion, the Foreign Representative respectfully represents as follows:

## I.     PRELIMINARY STATEMENT

1.     On November 17, 2025, each of the Debtors filed with the Canadian Court the necessary materials in support of an application to commence the Canadian Proceeding pursuant

to the CCAA to, among other things, provide the breathing space and stability necessary to continue operations and preserve enterprise value.

2.       On November 18, 2025, the Canadian Court entered an interim order (the "Initial CCAA Order").[2] Among other things, the Initial CCAA Order provides for (i) the appointment of KPMG as Monitor; (ii) a stay of proceedings against the Debtors in Canada (the "Canadian Stay"); (iii) the continued implementation of the Debtors' cash management system; and (iv) authorization for the Monitor to act as the Debtors' Foreign Representative in seeking recognition of the Canadian Proceeding in this Court.  In addition, the Initial CCAA Order scheduled a further hearing (the "Comeback Hearing") for November 26, 2025, at which hearing the Canadian Debtors will seek the approval of an amended and restated initial order (the "Amended and Restated Initial CCAA Order").

3.       The Foreign Representative has now commenced these ancillary chapter 15 cases (the "Chapter 15 Cases") with respect to each of the Debtors to preserve value for all stakeholders. Specifically, these Chapter 15 Cases will prevent the Debtors' stakeholders, several of whom have contacts with the United States and are subject to personal jurisdiction of the Court, from commencing or proceeding with actions in the United States that are more properly the subject of the Canadian Proceeding or that will  interfere with the Debtors' restructuring process being conducted through the plenary Canadian Proceeding.  Recognition of the Canadian Proceeding will, among other things, ensure that the Canadian Stay is extended to and respected in the United States.  For the reasons set forth herein, the Foreign Representative submits that the relief requested in this Motion is necessary and appropriate for the benefit of the Debtors, their creditors, and other parties in interest.

---

[2]       A true and correct copy of the Initial CCAA Order is attached to the Sahni Declaration as **Exhibit 1**.

4.      Accordingly, the Foreign Representative respectfully requests entry of an order substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"): (a) recognizing the Canadian Proceeding as a "foreign main proceeding" (or, in the alternative, "foreign nonmain proceeding") pursuant to section 1517 of the Bankruptcy Code; (b) recognizing the Foreign Representative as a "foreign representative" of the Debtors as defined in section 101(24) of the Bankruptcy Code; (c) recognizing and enforcing the Initial CCAA Order and the Amended and Restated Initial CCAA Order and such further orders of the Canadian Court with respect to the Debtors as are issued prior to the hearing on this Motion; (d) applying sections 361, 362, 363, 364 and 365 of the Bankruptcy Code in these Chapter 15 Cases pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code; (e) finding that the Verified Petitions (as defined below) meet the requirements of section 1515 of the Bankruptcy Code; (f) applying sections 363, 549, and 552 of the Bankruptcy Code to a transfer of an interest of the Debtors in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate under another chapter; (g) applying section 552 of the Bankruptcy Code to property of the Debtors that is within the territorial jurisdiction of the United States; (h) entrusting the administration or realization of all of the Debtors' assets within the territorial jurisdiction of the United States to the Debtors, under the Foreign Representative's supervision; (i) providing that no action taken by the Foreign Representative in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Canadian Proceeding; any order entered in respect of this Motion, the Verified Petitions (as defined below), these Chapter 15 Cases; any further order for additional relief in these Chapter 15 Cases or any adversary proceedings or contested matters in connection therewith will be deemed to constitute a waiver of any immunity afforded the Foreign Representative, including without limitation pursuant to section 1510 of the

Bankruptcy Code; and (j) granting such other and further relief as the Court deems just and proper.[3]

## II.      JURISDICTION AND VENUE

5.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 as well as the *Amended Standing Order of Reference* dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y Feb. 2, 2012) (Preska, CJ). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(P).  The Foreign Representative confirms its consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

6.      Venue is proper under 28 U.S.C. § 1410.

7.      The statutory bases for the relief requested herein are sections 105(a), 1504, 1507, 1510, 1515, 1517, and 1521 of the Bankruptcy Code.

8.      The Foreign Representative has properly commenced these Chapter 15 Cases under sections 1504 and 1509 of the Bankruptcy Code by the filing of verified petitions for recognition of the Canadian Proceeding (the "Verified Petitions") as to each Debtor under section 1515 of the Bankruptcy Code.

## III.      BACKGROUND

### A.      The Debtors' Business Operations.

9.      The Debtors are a highly integrated oil and natural gas enterprise engaged in the exploration, development, production, processing, and sale of oil and natural gas, primarily in the

---

[3]      The Foreign Representative has also filed the *Motion for Provisional Relief Pursuant of Section 1519 of the Bankruptcy Code* (the "Provisional Relief Motion") concurrently herewith.

country of Colombia.  Canacol Energy Ltd. ("Canacol"), the direct or indirect parent of each of the other Debtors (collectively, with Canacol, the "Canacol Group"), centrally manages all corporate and treasury activities of the Debtors from the corporate head office in Calgary, Alberta, Canada (the "Head Office").  Canacol leases the Head Office pursuant to a lease agreement with Morguard 9th Avenue Limited Partnership.

10.     Exploration is the search phase. It typically involves reviewing geological information and acquiring modern subsurface imaging; drilling a limited number of exploration wells where the data indicates promising gas accumulations; and, if an exploration well confirms a discovery, conducting follow-up appraisal work and preparing a development plan.

11.     If a discovery is commercial, the Canacol Group develops it by drilling producing wells and connecting those wells to its central gas treatment facility, known as Jobo. At Jobo, the natural gas is treated to meet sales specifications by removing moisture and trace impurities. The Canacol Group's gas is dry and predominantly methane, which generally requires minimal processing and results in a comparatively low emissions footprint.  After treatment and measurement at Jobo, the gas enters third-party pipelines that transport it to end markets.  Natural gas is delivered to customers, primarily for electricity generation, as well as to industrial and distribution clients.

12.     The Debtors' Colombian natural gas production[4] is a critical fuel source for Colombia's electrical grid, with a majority of its gas being sold to power generators in Colombia. The Canacol Group sells gas to Colombian customers pursuant to standard form gas offtake agreements (collectively, the "Offtake Agreements") between a Debtor within the Canacol Group

---

[4]     In addition to its production and sale of natural gas, the Canacol Group also produces oil, although these activities are a lesser part of the overall business.

and a customer. Revenues generated from Offtake Agreements are paid (1) directly into the Deposit Accounts (defined below)[5] operated by the Canacol Group (approximately 36% of revenues in the most recent quarter); and (2) into a trust (the "Promigas Trust") held for Promigas S.A. E.S.P. ("Promigas"), as beneficiary (approximately 64% of revenues in the most recent fiscal quarter).

13.     Promigas is an oil and gas infrastructure company that transports a large portion of Colombia's natural gas.  The Debtors have an arrangement with Promigas for the transport of a portion of Canacol's natural gas through Promigas's network of pipelines. The Promigas Trust provides a mechanism by which Promigas is guaranteed payment of its gas transportation fees charged to the Debtors.  Offtake payments for supply transported by Promigas are paid in full to the Promigas Trust.  Promigas then deducts its transport fees and the residual amounts are remitted to the Debtors, specifically into deposit accounts operated by the Canacol Group at Davivienda S.A. and Banco de Occidente, S.A. in Colombia and Citibank, N.A. in New York (collectively, the "Deposit Accounts").[6]

14.     As discussed below, in accordance with the loan documents in effect between Canacol and Macquarie (defined below), these Deposit Accounts are subject to deposit account control agreements (each, a "DACA").  In the ordinary course of business, the Debtors use funds in these Deposit Accounts to fund their operations.

15.     In addition to the Deposit Accounts, the Debtors operate six (6) general operating accounts in New York and Calgary at Citibank, JP Morgan, and Bank of Nova Scotia.  These

---

[5]     As described in further detail below, the bank accounts receiving payments that are not being made to the Promigas Trust (defined below) are subject to deposit account control agreements in favor of Macquarie (defined below).

[6]     The Deposit Accounts located in the United States are held in the names of Debtors Canacol Columbia, CNE O&G Columbia and CNE Panama.

accounts are used for the general purposes of the Debtors' business.  The Debtors also maintain

several accounts that are used for local banking needs in Colombia.  By the Initial CCAA Order,

the Canadian Court authorized the Debtors to continue their cash management system.

> i.     **Employees**.

16.     In the aggregate, the Debtors employ approximately 381 full-time employees

across various jurisdictions.

| **Canacol** | |
|:---:|:---:|
| Location and Number of Employees | |
| Canada: | 29 |
| **CNE Panama (through its Sucursal, CNEOG Colombia)** | |
| Location and Number of Employees | |
| Colombia: | 202 |
| **CNE O&G Colombia** | |
| Location and Number of Employees | |
| Colombia: | 138 |
| **Canacol Colombia** | |
| Location and Number of Employees | |
| Colombia: | 12 |

17.     In addition to full-time employees, the Canacol Group engages the services of

professionals on a contract or consultant basis in Canada, Colombia and the United States.

18.     The 29 employees that are employed by Canacol (the Canadian parent of the

Canacol Group) are generally comprised of seven (7) senior executives and higher level finance,

geological, and technical experts.  Canacol's employees are responsible for working with the

Canacol Group's subsidiaries (including Debtors CNE Panama, CNE O&G Colombia, and Canacol Colombia) to implement the Canacol Group's operational and financial goals. None of the Canadian employees are unionized, and Canacol does not administer any pension plans.

19.     Employees that are employed by CNE Panama (through its Sucursal, as defined and discussed below), CNE O&G Colombia, and Canacol Colombia in respect to field operations in Colombia are members of either the People First Worldwide (PFW) or Union Syndicato Obrera (USO) trade unions.

   ii.     **Corporate Structure**.

20.     As shown in the below organizational structure chart, Canacol is the parent company of each of the other Debtors within the Canacol Group. Each other corporate member of the Canacol Group is a direct or indirect subsidiary of Canacol, with ownership percentages and jurisdictions of formation as noted below:



21.     In 2024, the Canacol Group completed a normal-course corporate restructuring, on notice to and with the consent of its lenders (as applicable). As a result of this restructuring, certain

guarantors under Canacol's then-existing financing arrangements changed through various mergers, amalgamations, and transactions, such that the remaining successor entities providing guarantees are now as follows:[7]

| Guarantor (Predecessor) | Guarantor (Current) |
|---|---|
| "Canacol Energy Inc." | Canacol ULC |
| "Geoproduction Holding GmbH" and "Canacol Holding GmbH" | Shona Switzerland |
| "Shona Energy Limited Partnership" and "Shona Energy Holdings Limited Partnership", Shona Energy Holding ULC" and "Shona Energy ULC" | 249 Alberta and 265 Alberta |
| "Cantana Energy S.A." | Cantana Switzerland |

**B.    Management of the Canacol Group.**

22.    The names, titles, and residence of each of the directors and officers of Canacol are summarized in the following table:

| Name | Title | Location of Residence |
|---|---|---|
| Charle Gamba | Director, President, Chief Executive Officer | Toronto, Ontario |
| Michael Hibberd | Director, Chairman | Calgary, Alberta |
| David Winter | Director | Calgary, Alberta |
| Francisco Diaz | Director | Bogotá, Colombia |
| Gustavo Gattass | Director | Rio de Janeiro, Brazil |
| Valentina Garbarini | Director | Madrid, Spain |
| Silvestre Tovar Leopardi | Director | Maranda State, Venezuela |
| Jason Bednar | Chief Financial Officer | Calgary, Alberta |

---

[7]    In addition, each of "Shona Energy Holding ULC", "Shona Energy ULC" were dissolved while and "CECSA Energy, Inc." changed its name to VMM Holdco Inc..

| Ravi Sharma | Chief Operating Officer | Houston, Texas |
|---|---|---|
| Anthony Zaidi | Vice President of Business Development, General Counsel and Corporate Secretary | Panama City, Panama |
| Tracy Whitmore | Vice President of Tax and Corporate Affairs | Calgary, Alberta |
| Carolina Orozco | Vice President Investor Relations and Communications | London, United Kingdom |
| Aurora Juan | Vice President of Development | Calgary, Alberta |

23.     The directors of Canacol ULC, 265 Alberta, and 249 Alberta (the "Canadian Subsidiaries") are (1) Jason Bednar, (2) Tracy Whitmore, and (3) Anthony Zaidi.

24.     The directors and officers of Cantana Switzerland and Shona Switzerland (collectively, the "Swiss Subsidiaries") are (1) Andres Valenzuela Pachon (director and president of the management), (2) Jason Bednar (director and manager), (3) Gerry McEvoy (director and manager), (4) Stefan Smith (director and manager), and (5) Tracy Whitmore (director and manager).

25.     Canacol Colombia, CNE Energy Colombia, and CNE O&G Colombia (collectively, the "Colombian Subsidiaries") do not have directors and officers in the typical sense; rather they employ lawyers who act as "legal representatives." The Colombian Subsidiaries' legal representatives do not have executive decision making powers but are directed by the executive management of Canacol.

26.     All ultimate decisions regarding exploration and related operations are made out of the Head Office in Calgary, Alberta, Canada. The Canacol Group conducts its "on-the ground" operations through Canacol's direct and indirect Debtor subsidiaries and branches (known as

"Sucursals"),[8] but such Debtors and Sucursals are merely executing the business and operational decisions made by the executive team domiciled primarily in Canada.

27.    Treasury functions, including financial reporting for the Canacol Group, are similarly concentrated in Canada.  The Debtors file consolidated financial statements for the entire enterprise, including reports issued in accordance with applicable law as a result of Canacol's common stock trading on the Toronto Stock Exchange (TSX: CNE).  All reporting is done out of Canada. The staff in charge of operational finances are located in the Head Office in Calgary, Alberta, Canada.

### C.    The Debtors' Capital Structure.[9]

### i.    Macquarie Bank Ltd. Secured Credit Facility.

28.    Canacol is the borrower under a Credit and Guarantee Agreement dated September 3, 2024 with Macquarie Bank Ltd ("Macquarie") as Administrative Agent, Collateral Agent, and Sole Lead Arranger and Bookrunner (the "Macquarie Credit Agreement" and the facility thereunder, the "Macquarie Credit Facility").[10]

29.    The Macquarie Credit Facility is a secured term loan facility for an aggregate commitment of US$75,000,000.  As of November 17, 2025, the indebtedness owing to Macquarie under this facility is US$37,500,000.

30.    The maturity date of the Macquarie Credit Facility is September 15, 2026, subject to earlier maturity, which may be triggered by failure by the Canacol Group to meet certain

---

[8]    Sucursals are registered with the Colombian Chamber of Commerce.  I have been advised by counsel and believe that Sucursals do not have independent legal existence separate and apart from their parent company, and all assets and property of each Sucursal are held for the account of the parent company.

[9]    The summaries provided herein are qualified in their entirety by the provisions of the relevant credit documents.

[10]    A true and correct copy of the Macquarie Credit Agreement is attached to the Bednar Declaration as **Exhibit "A".**

specified production metrics, or failure to provide required reporting. The Canacol Group's average total realized contractual sales volume for the last two consecutive months as of June 30, 2025, was below the requisite production metric, thereby triggering the accelerated amortization event clause under the Macquarie Credit Agreement.  As a result, the Macquarie Credit Facility began to amortize over eight equal monthly installments starting on September 15, 2025.

31.    Following the corporate restructuring described above, the Macquarie Credit Facility is guaranteed by each of the Debtors other than Canacol (collectively, the "Macquarie Guarantors").

32.    As security for the Macquarie Credit Facility, the Macquarie Credit Agreement contemplates U.S., Colombian and Panamanian collateral documents that are intended to give Macquarie (i) a first-priority security interest against the Canacol Group's assets in Colombia, (ii) springing control over the Deposit Accounts, and (iii) pledges of the shares of key subsidiaries.

33.    Pursuant to Section 10.4 of the Macquarie Credit Agreement, the Macquarie Credit Facility is governed by the laws of the State of New York.  Section 10.4 of the Macquarie Credit Agreement also contains a forum selection clause that provides the parties have consented to the jurisdiction of state courts in New York and federal courts in the Southern District of New York with respect to any action related to the Macquarie Credit Facility.

### ii.    Revolving Syndicated Credit Facility (Unsecured)

34.    Canacol, as borrower, is party to a Revolving Credit and Guarantee Agreement dated February 14, 2023, (the "Revolving Credit Agreement" and the facility thereunder, the "Revolving Credit Facility") with Deutsche Bank Trust Company Americas, as Administrative

Agent, and CitiGroup Global Markets Inc. Deutsche Bank, AG and JP Morgan Chase Bank, N.A., as joint lead arrangers and joint bookrunners, and a syndicate of lenders.[11]

35.    The facility is an unsecured revolving credit facility with an aggregate commitment of US$200,000,000, available for multiple draws during the availability period.

36.    The facility under the Revolving Credit Agreement matures on February 14, 2027. As of November 17, 2025, the indebtedness owing to the lenders under this facility is US$200,000,000.

37.    Following the corporate restructuring previously described above, the facility is guaranteed by the following subsidiaries of Canacol: Canacol ULC, Canacol Colombia, CNE O&G Colombia, CNE Energy Colombia, CNE Panama, Shona Switzerland, Cantana Switzerland, 249 Alberta, and 265 Alberta (collectively, the "RCF Guarantors").

38.    Pursuant to Section 11.11 of the Revolving Credit Agreement, the Revolving Credit Facility is governed by the laws of the State of New York.  Section 11.12 of the Revolving Credit Agreement also contains a forum selection clause that the parties have consented to the jurisdiction of state courts in New York and federal courts in the Southern District of New York (in each case sitting in the Borough of Manhattan) with respect to any action related to the Revolving Credit Facility.

### iii.    Indenture (Unsecured)

39.    Canacol, as issuer, is party to an indenture dated November 24, 2021, (the "Indenture") with Citibank, N.A., as Trustee, Security Registrar and Paying Agent, providing for the issuance of Canacol's 5.75% Senior Notes due 2028.[12]

---

[11]    A true and correct copy of the Revolving Credit Agreement (without schedules and exhibits) is attached to the Bednar Declaration as **Exhibit "B".**

[12]    A true and correct copy of the Indenture is attached to the Bednar Declaration as **Exhibit "C".**

40.     The Indenture governs the issuance of senior unsecured notes by Canacol in an aggregate principal amount of US$500,000,000.

41.     The notes bear interest at a fixed rate of 5.75% per annum, payable semi-annually in arrears on May 24 and November 24 of each year. On March 26, 2025, Canacol repurchased US$5,000,000 of unsecured notes on the open market for US$2,750,000.00, such that the aggregate principal amount of the notes outstanding is now US$495,000,000. The notes mature on November 24, 2028.

42.     The notes are guaranteed on a senior unsecured basis by the following subsidiaries of Canacol (following the corporate restructuring previously described above): Canacol ULC, Canacol Colombia, CNE O&G Colombia, CNE Energy Colombia, CNE Panama, Shona Switzerland, Cantana Switzerland, 249 Alberta, and 265 Alberta (collectively, the "Note Guarantors").

43.     Pursuant to Section 10.2 of the Indenture, the notes are governed by the laws of the State of New York.  Section 10.9 of the Indenture also contains a forum selection clause that provides the parties to the Indenture or the Notes have consented to the jurisdiction of state courts in New York and federal courts in the Southern District of New York (in each case sitting in Manhattan) with respect to any action related to the Indenture or the notes or the transactions contemplated thereby.

### iv.     Letters of Credit

44.     As of October 31, 2025, the Canacol Group had letters of credit outstanding totaling US$61,272,727. Certain of these letters of credit expire in November, 2025 or December, 2025 and will need to be renewed or replaced at that time.

###### v.      Trade Payables

45.      As of September 30, 2025, the Debtors estimate that they owe approximately $107.607 million to trade creditors in the aggregate. Most, but not all, of the Debtors' trade creditors are located in Colombia.

### IV.      EVENTS LEADING TO THE CANADIAN PROCEEDING

#### A.      The Arbitral Award

46.      Earlier this year, the Colombian Arbitration and Conciliation Center of the Bogotá Chamber of Commerce ordered CNE O&G Colombia and CNE Panama to pay approximately US$22,000,000 to a customer following a contractual dispute (the "Arbitral Award"). The Arbitral Award becomes binding on November 20, 2025. Canacol is reviewing the award and it is separately pursuing an international arbitration claiming sums exceeding US$76 million.

#### B.      Diminished Production and Unsuccessful Exploration Efforts

47.      The Canacol Group's ability to produce consistent volumes of natural gas from specific fields naturally declines over time as reserves are depleted. Absent new reserves being discovered through exploration, overall production diminishes over time. The exploration of new fields involves a high degree of geological risk and may not yield commercially viable results. Where exploration efforts are unsuccessful, the Debtors' ability to replace produced volumes becomes limited.

48.      Despite the Canacol Group's extensive onshore position, recent exploration efforts (requiring significant capital expenditure) failed to establish commercially recoverable reserves. Specifically, as of December 31, 2024, Canacol's proven reserves replacement ratio had decreased to 30%, from 32% in 2023, and 56% in 2022. The lack of success in replacing 100% of produced reserves, along with limited exploration success and diminishing production from established wells, have directly impacted the Debtors' revenue generation while fixed operating costs have

increased. The financial strain that has resulted from these operational challenges has also precluded the Canacol Group from pursuing further exploration, leaving it unable to source new revenues from new producing reservoirs.  In this regard, the Debtors have not had access to the capital required to begin exploration activities on over 180 fields.

C.    <strong>Impending Payment Defaults Under Canacol's Debt Facilities</strong>

49.    Based on their current cash flow position, the Debtors will not be able to remit significant scheduled payments that are due to its lenders this month.

50.    Under the terms of the Macquarie Credit Agreement, where an "Accelerated Amortization Event" has occurred (as is the case), installments of principal, in addition to interest, are due on the 15th day of each calendar month until maturity (each a "Macquarie Amortization Payment").

51.    Under the Revolving Credit Facility, payments of interest (each a "RCF Interest Payment") are payable in arrears on each "Payment Date", meaning the last day of each 3-month interest period.

52.    Finally, pursuant to the Indenture, semi-annual interest payments (each an "Indenture Interest Payment") are due on the 24th day of May and November of each calendar year until maturity.

53.    In light of the foregoing, the following payments are due by Canacol to its secured and unsecured lenders in November:

(a) Macquarie Amortization Payment: due on November 18, 2025, in the amount of US$6,746,972.69;

(b) RCF Payment: due on November 21, 2025, in the approximate amount of US$4,454,312.89; and

(c) Indenture Interest Payment: due on November 24, 2025, in the amount of US$14,231,250.00.

(collectively, the "November Payments").

54.     The Debtors do not have sufficient liquidity to make the November Payments when due.  As a result, the Debtors are at immediate risk of defaulting under the Macquarie Credit Agreement, and subsequently, the Revolving Credit Agreement and Indenture (the "Impending Payment Defaults"). A payment default under the Macquarie Credit Agreement would result in cross defaults under the Revolving Credit Agreement and Indenture (the "Cross Defaults", and together with the Impending Payment Defaults, the "Impending Defaults"). The Impending Defaults may entitle such creditors to enforce their remedies against the Debtors.

### D.      Prior Efforts to Raise Capital

55.     Since 2024, the Canacol Group has made significant and focused efforts to obtain additional liquidity from both current and outside lenders.  In connection with these efforts, Canacol engaged Plexus Capital ("Plexus") to assist in sourcing, negotiating, and consulting as to the terms of potential financing opportunities.  Plexus has, since 2010, worked closely with the Canacol Group in securing new financing opportunities, and has successfully assisted the Debtors in obtaining reserve-based lending, term loan facilities, acquisition financings, private and public bond placements, and bridge facilities.

56.     Over the past year, and with the assistance of Plexus, the Canacol Group has attempted to negotiate several financing arrangements but, as of the date hereof, none have closed.

57.     Given the significant liquidity constraints and impending defaults under its loan agreements, the Debtors commenced the Canadian Proceeding to preserve enterprise value while they evaluate their restructuring options in the Canadian Proceeding.

### V.      RELIEF REQUESTED

58.     To ensure the effective and economic administration of the Debtors' restructuring efforts, prevent the disruption of business, and recognize the legal effect of the Canadian

Proceeding in the United States, the Debtors require the protection afforded to foreign debtors pursuant to chapter 15 of the Bankruptcy Code.

59.    The Foreign Representative seeks entry of the Proposed Order (a) recognizing the Canadian Proceeding as a "foreign main proceeding" (or, in the alternative, "foreign nonmain proceeding") as to each of the Debtors pursuant to section 1517 of the Bankruptcy Code; (b) recognizing the Foreign Representative as a "foreign representative" of the Debtors as defined in section 101(24) of the Bankruptcy Code; (c) recognizing and enforcing the Initial CCAA Order and the Amended and Restated Initial CCAA Order and such further orders of the Canadian Court with respect to the Debtors as are issued prior to the hearing on this Motion; (d) applying sections 361, 362, 363, 364 and 365 of the Bankruptcy Code in these Chapter 15 Cases pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code; (e) finding that the Verified Petitions meet the requirements of section 1515 of the Bankruptcy Code; (f) applying sections 363, 549, and 552 of the Bankruptcy Code to a transfer of an interest of the Debtors in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate under another chapter; (g) applying section 552 of the Bankruptcy Code to property of the Debtors that is within the territorial jurisdiction of the United States; (h) entrusting the administration or realization of all of the Debtors' assets within the territorial jurisdiction of the United States to the Debtors, under the Foreign Representative's supervision; (i) providing that no action taken by the Foreign Representative in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Canadian Proceeding; any order entered in respect of this Motion, the Verified Petitions, these Chapter 15 Cases; any further order for additional relief in these Chapter 15 Cases or any adversary proceedings or contested matters in connection therewith will be deemed to constitute a waiver of any immunity afforded the Foreign

Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code; and

(j) granting such other and further relief as the Court deems just and proper.

## VI.    BASIS FOR RELIEF

60.    Chapter 15 of the Bankruptcy Code is designed to protect and maximize the value of a debtor's assets and to facilitate the rehabilitation and reorganization of businesses. The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in its home country.

61.    Chapter 15 of the Bankruptcy Code authorizes the Court to recognize a "foreign proceeding," as defined by section 101(23) of the Bankruptcy Code, upon the proper commencement of a case under chapter 15 by a "foreign representative," as defined by section 101(24) of the Bankruptcy Code.  Chapter 15 further authorizes the Court to grant assistance in the United States to a foreign representative in connection with a foreign proceeding, including by granting injunctive and other relief pursuant to sections 1519, 1520, and 1521 of the Bankruptcy Code.

62.    Consistent with these principles, the Foreign Representative commenced ancillary proceedings for the Debtors under chapter 15 of the Bankruptcy Code to obtain recognition of the Canadian Proceeding and certain related relief.  The Foreign Representative believes that these Chapter 15 Cases will complement the Debtors' plenary proceedings in Canada to ensure the effective and economic administration of the Debtors' restructuring efforts and prevent adverse actions in the United States.  Further, the Foreign Representative submits that recognition of the Canadian Proceeding and the related relief requested herein will not undermine the rights that United States creditors typically would enjoy in a chapter 11 proceeding because creditors will have the right to participate in the Canadian Proceeding.  Finally, granting recognition of the Canadian Proceeding and the related relief requested by the Foreign Representative is consistent

with the goals of international cooperation with and assistance to foreign courts recognized by section 1501(a) of the Bankruptcy Code.

### A.    THE DEBTORS ARE ELIGIBLE FOR CHAPTER 15 RELIEF

63.    Section 109(a) of the Bankruptcy Code provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title."[13]    Courts have applied section 109(a) of the Bankruptcy Code to chapter 15 eligibility.[14] Decisions interpreting section 109(a) of the Bankruptcy Code as applied to foreign debtors under other chapters of the Bankruptcy Code unanimously hold that a debtor satisfies the section 109 requirement even when it only has a nominal amount of property in the United States.[15] Effectively, if a debtor has any property in the United States, section 109(a) of the Bankruptcy Code is satisfied.

64.    For purposes of satisfying section 109(a) of the Bankruptcy Code's requirement that a debtor must have property in the United States in order to be a debtor, courts have held that contracts governed by United States law, a retainer held by United States counsel, or claims or causes of action against United States entities are each sufficient to allow a foreign entity to be a chapter 15 debtor.[16]

---

[13]    11 U.S.C. § 109 (a).

[14]    *See, e.g., Drawbridge Sp. Opp. Fund LP v. Barnet (In re Barnet)*, 737 F.3d 238, 247 (2d Cir. 2013).

[15]    *See GMAM Inv. Funds Tr. v. Globo Comunicacoes e Partipacoes S.A. (In re Globo Comunicacoes e Partipacoes S.A.)*, 317 B.R. 235, 249 (S.D.N.Y. 2004) (stating that courts have repeatedly found that there is "'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings") (quoting *In re Aerovias Nacionales de Colombia S.A. (In re Avianca)*, 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003)); *see also In re Global Ocean Carriers Ltd.*, 251 B.R. 31, 38-39 (Bankr. D. Del. 2000) (holding that approximately $10,000 in a bank account and the unearned portions of retainers provided to local counsel constituted a sufficient property interest for chapter 15 purposes).

[16]    *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 699–700 (Bankr. S.D.N.Y. 2017) ("The Foreign Debtors satisfy section 109(a)'s requirement of property in the United States. Each of the four Foreign Debtors paid its New York counsel a separate $250,000 retainer, for a total of $1 million, currently held in counsel's client trust account in New York, where they will remain pending final billing in these proceedings.); *In re Berau Capital Res. Pte Ltd*, 540 B.R. 80, 82 (Bankr. S.D.N.Y. Oct. 28, 2015) ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the [indenture] satisfies the section 109(a)

65.     Each of the Debtors is eligible to be a debtor under section 109(a) of the Bankruptcy

Code because they have property and property rights in the United States.  Each Debtor has

property in the United States, including cash held in certain accounts and contractual rights.  Each

of the Debtors (except for Canacol ULC, 265 Alberta, and 249 Alberta) holds cash in bank

accounts with Citibank in New York**.**  Additionally, as discussed above, each Debtor is either a

borrower or guarantor under one or more of the Macquarie Credit Agreement, the Revolving Credit

Agreement, and the Indenture.  Each of the Debtors and the Macquarie Guarantors each have rights

under the Macquarie Credit Agreement that contains New York choice of law and forum selection

clauses.  Similarly, the applicable Debtors and the RCF Guarantors each have rights under the

Revolving Credit Agreement that contains New York choice of law and forum selection clauses.

Lastly, the applicable Debtors and the Notes Guarantors each have rights under the U.S. dollar-

denominated notes and Indenture that contain New York choice of law and forum selection

clauses.  For these reasons, the Debtors satisfy the requirements under section 109(a) of the

Bankruptcy Code.

## B.     THE CANADIAN PROCEEDING SHOULD BE RECOGNIZED AS A FOREIGN MAIN PROCEEDING.

66.     Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a

court shall enter the Order recognizing a foreign proceeding as a foreign main proceeding if

(a) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of

the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body,

and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code.[17]   As

---

‘property in the United States’ eligibility requirement.”); *In re Octaviar Admin. Pty Ltd*, 511 B.R. 361, 370 (Bankr. S.D.N.Y. 2014) (“Octaviar possessed property in the form of claims or causes of action sufficient to satisfy section 109(a) of the Bankruptcy Code.”).

[17]     *See*  11 U.S.C. § 1517.

explained below, the Canadian Proceeding, the Foreign Representative, and the Verified Petitions satisfy all of the foregoing requirements.

**A.    <u>The Canadian Proceeding is a Foreign Proceeding</u>.**

67.    Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.[18]

68.    Courts have held that a "foreign proceeding" is one:

a.    in which "acts and formalities [are] set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;"

b.    that has either a judicial or an administrative character;

c.    that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

d.    that is located in a foreign country;

e.    that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.    in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

g.    which proceeding is for the purpose of reorganization or liquidation.[19]

---

[18]    11 U.S.C. § 101(23).

[19]    *See In re Agro Santino, OOD*, 653 B.R. 79, 89 (Bankr. S.D.N.Y. 2023) (citing *In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012)); *see also In re Overnight & Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors).

As set forth in the Sahni Declaration, the Canadian Proceeding satisfies such requirements and, therefore, qualifies as a "foreign proceeding" for purposes of section 101(23) of the Bankruptcy Code.

69.     **First**, the Canadian Proceeding is comprised of proceedings commenced pursuant to the CCAA, a Canadian law that governs corporate reorganizations and provides for an arrangement of a company's financial obligations.[20]   For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets."[21] Because the Canadian Proceeding operates under such statutory framework, it satisfies the first factor of section 101(23) of the Bankruptcy Code.

70.     **Second**, the Canadian Proceeding is judicial in character.  A reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers."[22] Here, the Debtors have petitioned and will petition the Canadian Court for orders governing their restructuring process.  After proper notice and hearing, the Canadian Court may then sanction the relief requested thereunder after having considered the statutory requirements under the CCAA.

71.     **Third**, the Canadian Proceeding is collective in nature in that all affected creditors are allowed to participate.  In *Betcorp*, for instance, the bankruptcy court discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors" and a non-collective proceeding, such as a "receivership remedy instigated at the

---

[20]     *See* CCAA § 44(a–e).

[21]     *In re Irish Bank Resol. Corp. Ltd.*, 538 B.R. 692, 697 (D. Del. 2015) (quoting *In re Betcorp*, 400 B.R. 266, 278 (Bankr. D. Nev. 2009)).

[22]     *In re ABC Learning Ctrs.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010), *aff'd*, 728 F.3d 301 (3d Cir 2013).

request, and for the benefit, of a single secured creditor."[23]   Importantly, the Canadian Proceeding

will not prohibit the Debtors' creditors from participating in the Debtors' restructuring efforts.

72.     **Fourth**, the Canadian Proceeding, including the Canadian Court, is located in a

foreign country, namely, Canada.

73.     **Fifth**, as described above, the CCAA, which governs the Canadian Proceeding,

relates to the adjustment of debt.

74.     **Sixth**, the Canadian Proceeding subjects the Debtors' assets and affairs to the

supervision of the Canadian Court during the pendency of the proceedings.

75.     **Finally**, the objective of the Canadian Proceeding is to effectuate a restructuring,

which will be overseen by the Canadian Court pursuant to the CCAA.   Therefore, the Foreign

Representative submits that the Debtors have commenced the Canadian Proceeding for the purpose

of reorganization, as required by section 101(23) of the Bankruptcy Code.

76.     Because the Canadian Proceeding satisfies all of the criteria required by section

101(23) of the Bankruptcy Code, it is a foreign proceeding entitled to recognition under chapter

15 of the Bankruptcy Code.   United States courts have frequently recognized collective

proceedings under the CCAA as "foreign proceedings."   *See, e.g.*, *In re Iovate Health Sciences

International Inc.*, Case No. 25-11958 (MG) (Bankr. S.D.N.Y. Nov. 12, 2025) (recognizing a

Canadian proceeding as a foreign proceeding); *In re STS Renewables Ltd.*, Case No. 25-10884

(KBO) (Bankr. D. Del. June 10, 2025) (same); *In re Nexii Building Solutions Inc.*, Case No. 24-

10026 (JKS) (Bankr. D. Del. Feb. 9, 2024) (same); *In re Lighthouse Immersive Inc.,* Case No. 23-

11021 (LSS) (Bankr. D. Del. Jul. 27, 2023) (same); *In re IMV Inc.*, Case No. 23-10589 (KBO)

---

[23]     *See* 400 B.R. at 281.

(Bankr. D. Del. May 8, 2023) (same); *In re CDS U.S. Holdings, Inc.*, Case No. 20-11719 (CSS)

(Bankr. D. Del. Aug. 11, 2020) (same).

     **B.**     **The Canadian Proceeding is a Foreign Main Proceeding.**

     77.     The Canadian Proceeding should be recognized as a "foreign main proceeding" as

defined in section 1502(4) of the Bankruptcy Code.  A foreign proceeding must be recognized as

a "foreign main proceeding" if it is pending in the country where the debtor has its center of its

main interests.[24]  The term "center of main interests" ("COMI") is not defined in the Bankruptcy

Code.  However, section 1516 of the Bankruptcy Code establishes a rebuttable presumption that a

debtor's registered office is its COMI.[25]

     78.     When considering the location of a debtor's COMI, a court may consider the

analogous concept of an entity's "principal place of business" or "nerve center."[26]  Courts have

identified certain non-exclusive factors that are relevant in determining a debtor's COMI,

including: (a) the location of the debtor's headquarters, (b) the location of those persons or

entities that actually manage the debtor (which, in certain instances, could be the headquarters

of a holding company), (c) the location of the debtor's primary assets, and (d) the location of the

majority of the debtor's creditors or of a majority of the creditors that would be affected by

the case.[27]  While these factors offer a "helpful guide" in determining a debtor's COMI, they are

not exclusive, consideration of these specific factors is "neither required nor dispositive," and

courts are cautioned against their "mechanical application."[28]

     79.     The Second Circuit and other courts often examine whether a Chapter 15 debtor's

---

[24]    11 U.S.C. § 1517(b).

[25]    *In re Bear Stearns HighGrade Structured Credit Strategies Master Fund*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007), aff'd, 389 B.R. 325 (S.D.N.Y. 2008).

[26]    *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 133, 137 (2d Cir. 2013).

[27]    *In re Olinda Star Ltd.*, 614 B.R. 28, 41 (Bankr. S.D.N.Y. 2020).

[28]    *Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.)*, 714 F.3d 127, 137 (2d Cir. 2013).

COMI would have been ascertainable to interested third parties, finding "the relevant principle is that the COMI lies where the debtor conducts its regular business, so that the place is ascertainable by third parties. Among other factors that may be considered are the location of headquarters, decision-makers, assets, creditors, and the law applicable to most disputes."[29]  As the Second Circuit explained, by examining factors "in the public domain," courts are readily able to determine whether a debtor's COMI is in fact "regular and ascertainable [and] not easily subject to tactical removal."[30]

80.     Here, under all the relevant criteria, Canada is the COMI of each Debtor.  As set forth in the Bednar Declaration, notwithstanding the fact that the Canacol Group's exploration and drilling operations take place in Columbia, the "nerve center" of each Debtor is in Canada. Canacol ultimately makes the determinations (both through the executive team and the senior finance, treasury, geoscience, and petrophysical Canacol employees that work from the Head Office) as to where and how the Canacol Group (through its Debtor subsidiaries) will focus its exploration, development, and production of natural gas.  Canacol also determines how cash is used and allocated to its Debtor subsidiaries.  Without access to cash from Canacol, and the centralized treasury functions Canacol provides to all entities within the Canacol Group, the other Debtors would be unable to operate.

81.     As an initial matter, Canacol, Canacol ULC, 265 Alberta, and 249 Alberta all have registered offices in Calgary, Alberta, Canada.  Accordingly, the COMI of each is presumed to be in Canada.  The Foreign Representative is unaware of any information that would serve to rebut the presumption.

---

[29]     *Fairfield Sentry*, 714 F.3d at 130.

[30]     *Id.* at 136-37; *see also In re British Am. Ins. Co.*, 425 B.R. 884, 912 (Bankr. S.D. Fla. 2010) ("The location of a debtor's COMI should be readily ascertainable by third parties."); *In re Betcorp Ltd.*, 400 B.R. 266, 289 (Bankr. D. Nev. 2009) (looking to ascertainability of COMI by creditors).

82.     Notwithstanding the fact that Cantana Switzerland, Shona Switzerland, CNE Panama, Canacol Colombia, CNE Energy Colombia, and CNE O&G Colombia (the "Non-Canadian Subsidiaries") have registered offices in Switzerland, Panama, or Colombia (as applicable), each such Debtor's COMI is Canada. As described throughout herein and in the Bednar Declaration, the Canacol Group is a highly integrated enterprise. The Non-Canadian Subsidiaries' operations are coordinated by senior management in Canada to implement the Canacol Group's exploration, development and production goals. Financial results for the Non-Canadian Subsidiaries are reported on a consolidated basis with the other members of the Canacol Group.  Such reporting is prepared in Canada.

83.     Based on these factors, the COMI of each Debtor is in Canada and, as such, the Canadian Proceeding should be recognized as foreign main proceedings as to each Debtor.

### C.     In the Alternative, the Canadian Proceeding Should Be Recognized as a Foreign Nonmain Proceeding Under Section 1517(b)(2) of the Bankruptcy Code.

84.     In the alternative, if the Court were to conclude that the Canadian Proceeding is not a foreign main proceeding (whether as a whole or with respect to any Debtor), the Canadian Proceeding should be recognized as a foreign nonmain proceeding as to any Debtor whose COMI the Court determines is not in Canada pursuant to section 1517(b)(2) of the Bankruptcy Code.  In such a circumstance, pursuant to section 1521 of the Bankruptcy Code, such Debtors should be accorded all relief available to a foreign main proceeding.

85.     A "foreign nonmain proceeding" is defined as "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment."[31]  An

---

[31]     11 U.S.C. § 1502(5); *see also* 11 U.S.C. § 1517(b)(2) (providing that a court shall recognize a foreign nonmain proceeding "if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending").

"establishment" is "any place of operations where the debtor carries out a nontransitory economic activity."[32]  "'Nontransitory economic activity' is not defined in the Bankruptcy Code, but has been referred to as 'a local place of business.'"[33]  Courts have held that an establishment requires "'a place from which economic activities are exercised on the market (i.e. externally), whether the said activities are commercial, industrial or professional.'"[34]  When it is apparent that an entity conducts operations in the country where a foreign proceeding is pending, courts will recognize the proceeding as a foreign nonmain proceeding if foreign main proceeding recognition is denied.[35]

86.     Based on the facts set forth above and in the Bednar Declaration, it is clear that each of the Debtors has—at a minimum—an "establishment" in Canada and therefore the Canadian Proceeding is entitled to recognition as foreign nonmain proceedings as to each of them.

### D.     The Chapter 15 Cases Have Been Commenced by a Duly Authorized Foreign Representative.

87.     Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall apply for recognition of the foreign proceeding.  Section 101(24) of the Bankruptcy Code defines "foreign representative":

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.[36]

88.     On November 18, 2025, the Canadian Court entered the Initial CCAA Order

---

[32]   *Id.* § 1502(2).

[33]   *In re Creative Fin. Ltd.*, 543 B.R. 498, 520 (Bankr. S.D.N.Y. 2016) (citing *In re British Am. Ins.*, 425 B.R. 884, 914-15 (Bankr S.D. Fla. 2010).

[34]   *Lavie v. Ran (In re Ran)*, 607 F.3d 1017, 1027 (5th Cir. 2010) (quoting "Council Report on the Convention on Insolvency Proceedings").

[35]   *See, e.g., In re SPhinX, Ltd.*, 351 B.R. 103, 122 (Bankr. S.D.N.Y. 2006), *aff'd,* 371 B.R. 10 (S.D.N.Y. 2007)

[36]   11 U.S.C. § 101(24).

naming the Monitor as Foreign Representative, and authorizing and empowering the Monitor, as a foreign representative, to file chapter 15 petitions in the United States for the purpose of having the Canadian Proceeding recognized and to give effect to the Initial CCAA Order.  Accordingly, the Foreign Representative is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

## VII.    THE VERIFIED PETITIONS SATISFY THE REQUIREMENTS UNDER SECTION 1515 OF THE BANKRUPTCY CODE

89.      These Chapter 15 Cases were duly and properly commenced by filing the Verified Petitions, accompanied by all fees, documents, and information required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, including:  (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of the commencement of the Chapter 15 Cases, and (iii) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all of the Debtors' foreign proceedings that are known to the Foreign Representative; and (d) a certified copy of the Initial CCAA Order.

90.      Because the Verified Petitions and the accompanying papers satisfy section 1517 of the Bankruptcy Code, the Court should recognize the Canadian Proceeding in these Chapter 15 Cases.  Moreover, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.  Thus, these circumstances satisfy the conditions for mandatory recognition of the Canadian Proceeding under section 1517 of the Bankruptcy Code.

## VIII.   THE DISCRETIONARY RELIEF REQUESTED IS NECESSARY AND APPROPRIATE AND SHOULD BE GRANTED.

91.     In connection with recognition of the Canadian Proceeding, the Foreign Representative seeks certain related relief, including enforcement of the Initial CCAA Order and the Amended and Restated Initial CCAA Order and application of sections 361, 362, 364 and 365 of the Bankruptcy Code in these Chapter 15 Cases.  The Foreign Representative respectfully submits that such relief is warranted under sections 105(a), 1507, and 1521 of the Bankruptcy Code and the general principles of comity that underpin chapter 15.

92.     Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors."  Such relief may include:

a.     staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a) of the Bankruptcy Code;

b.     staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a) of the Bankruptcy Code;

c.     suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) of the Bankruptcy Code; and

d.     granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) of the Bankruptcy Code.

The Court may grant relief under section 1521(a) of the Bankruptcy Code if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected."[37] Similarly, section 1507 of the Bankruptcy Code provides that, "if recognition is granted," a court

---

[37]     11 U.S.C. § 1522(a).

"may provide additional assistance to a foreign representative under this title or under other laws of the United States."[38]   Finally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

93.     The Foreign Representative requests the Court exercise its discretion under sections 11 U.S.C. § 105, 1507, and 1521 to grant the relief requested insofar as such relief exceeds that which is available by recognizing the Canadian Proceeding as a foreign main proceeding (or, in the alternative, as a foreign nonmain proceeding) and  the Foreign Representative as a "foreign representative" as specified in the Bankruptcy Code. The granting of such relief is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and is necessary to effect the Canadian Proceeding.  If granted, such relief would promote all of the legislatively enumerated objectives of section 1501(a) of the Bankruptcy Code.

94.     Indeed, by the Initial CCAA Order, the Canadian Court expressly requested  the assistance of the courts in the United States in the following provisions:

> This Court hereby requests the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in any foreign jurisdiction, to give effect to this Order and to assist the Applicants, the Monitor and their respective agents in carrying out the terms of this Order.  All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Applicants, the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to the Monitor in any foreign proceeding, or to assist the Applicants and the Monitor and their respective agents in carrying out the terms of this Order.
>
> Each of the Applicants and the Monitor be at liberty and are hereby authorized and empowered to apply to   any court, tribunal,

---

[38]     11 U.S.C.  §  1507.

> regulatory or administrative body, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order and that the Monitor is authorized and empowered to act as foreign representative in respect of the within proceeding for the purpose of having these proceedings recognized in a jurisdiction outside Canada. [39]

Thus, in addition to the reasons set forth above, this Court should give full force and effect in the United States to the Initial CCAA Order in the United States under well-established principles of international comity and specifically pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.

95.    To achieve a fair and efficient administration of the Canadian Proceeding that protects all parties in interest, all creditors must be bound by the terms of the Canadian Proceeding as sanctioned by the Canadian Court.[40] If the Canadian Proceeding is not fully respected in the United States, there is a risk that certain of the Debtors' creditors and contract or lease counterparties could bring proceedings in the United States against the Debtors or other parties protected by the Initial CCAA Order and the Amended and Restated Initial CCAA Order. If such parties can effectively evade the terms of the Initial CCAA Order and the Amended and Restated Initial CCAA Order and attempt to derail the Debtors' restructuring efforts by commencing actions in the United States, the Debtors and others would be required to defend any such proceedings and deplete the Debtors' resources and prejudice their value. Therefore, the relief requested by the

---

[39]    Initial CCAA Order ¶¶ 44, 45.

[40]    *See Victrix S.S. Co. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 714 (2d Cir. 1987) ("The equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding; if all creditors could not be bound, a plan of reorganization would fail."); *In re Energy Coal S.p.A.*, 582 B.R. 619, 626–27 (Bankr. D. Del. 2018) (acknowledging the broad principles of comity applied by U.S. courts in both recognition of foreign bankruptcies and post-recognition relief granted to foreign representatives).

Debtors is required to prevent individual creditors acting to frustrate the purposes of the Canadian

Proceeding.

## IX.    CONCLUSION

96.    The Foreign Representative respectfully submits that the Verified Petitions satisfy

the requirements for the recognition of the Foreign Representative as the Debtors' "foreign

representative" and the Canadian Proceeding as the Debtors' foreign main proceeding (or, in the

alternative, as a foreign nonmain proceeding) and further requests entry of the Proposed Order,

substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein.

## X.    NOTICE

97.    The Foreign Representative will provide notice of this Motion consistent with

Bankruptcy Rule 2002(q). The Foreign Representative proposes to notify parties in interest of the

filing of the Verified Petitions and the Foreign Representative's request for entry of the Proposed

Order in the form and manner set forth in the *Foreign Representative's Motion for Order

Scheduling Recognition Hearing and Specifying the Form and Manner of Service of Notice*,

filed contemporaneously herewith. The Foreign Representative submits that, in view of the facts

and circumstances, such notice is sufficient and no other or further notice need be provided.

## XI.    NO PRIOR REQUEST

98.    No prior request for the relief sought in this Motion has been made to this or

any other court.

WHEREFORE, the Foreign Representative respectfully requests entry of the Proposed

Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein

and such other and further relief as is just and proper.


Dated: November 19, 2025                    PACHULSKI STANG ZIEHL & JONES LLP

                                            */s/ Laura Davis Jones*
                                            Laura Davis Jones
                                            Steven W. Golden
                                            Mary F. Caloway
                                            1700 Broadway, 36th Floor
                                            New York, New York 10019
                                            Telephone:  212-561-7700
                                            Facsimile:  212-561-7777

                                            *Counsel to the Foreign Representative*