**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| CANACOL ENERGY LTD., *et al.*[1] | Case No. 25-12572 (DSJ) |
| Debtors in a Foreign Proceeding. | (Jointly Administered) |

**DECLARATION OF JASON BEDNAR IN SUPPORT OF FOREIGN REPRESENTATIVE'S EMERGENCY MOTION FOR ORDER RECOGNIZING AND ENFORCING SECOND AMENDED AND RESTATED INITIAL ORDER INCLUDING DIP FINANCING AUTHORIZED THEREUNDER**

I, Jason Bednar, to the best of my information and belief, state as follows:

1. I am the Chief Financial Officer of Canacol Energy Ltd. ("Canacol", and together with its subsidiaries, the "Canacol Group"),[2] and as such, I am fully familiar with the facts and circumstances set forth herein.

2. I submit this declaration (the "Declaration") on behalf of Canacol, and its affiliated chapter 15 debtors (collectively, the "Debtors") in support of the *Foreign Representative's Emergency Motion for Order Recognizing and Enforcing Second Amended and Restated Initial Order Including DIP Financing Authorized Thereunder* (the "Motion") submitted by KPMG Inc. ("KPMG"), the court-appointed monitor (in such capacity, the "Monitor") and authorized foreign representative (in such capacity, the "Foreign Representative") of the Debtors. I am authorized to submit this Declaration on behalf of the Debtors.

---

[1] The Debtors, along with the last four digits of each Debtor's unique identifier, as applicable, are as follows: Canacol Energy Ltd. (2074); Cantana Energy GmbH (8873); CNE Oil & Gas S.R.L. (9803); Canacol Energy ULC (0350); Shona Holding GmbH (2126); Canacol Energy Colombia S.A.S. (5633); CNE Energy S.A.S (0691); CNE Oil & Gas S.A.S. (6580); 2498003 Alberta ULC (4611); and 2654044 Alberta Ltd. (3429). The Foreign Representative's service address for purposes of these Chapter 15 Cases is c/o KPMG Inc., Bay Adelaide Centre, Suite 4600 333 Bay Street, Toronto, Ontario, Canada M5H 2S5.

[2] All of the Debtors, as defined herein, are members of the Canacol Group.

3. In my role as the Chief Financial Officer of the Canacol Group, I am familiar with the history, day-to-day operations, assets, financial condition, business affairs, and books and records of each the Debtors. Except as otherwise indicated, all facts set forth in this Declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents; (c) information supplied to me by other employees of the Debtors or their affiliates, the officers and directors of the Debtors, or other professionals retained by the Debtors; or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. I am an individual over the age of 18 and, if I am called upon to testify, I will testify competently to the facts set forth herein.

4. The Canacol Group is a highly integrated oil and natural gas enterprise engaged in the exploration, development, production, processing, and sale of oil and natural gas, primarily in the country of Colombia. The Canacol Group's Colombian natural gas production[3] is a critical fuel source for Colombia's electrical grid, with a majority of its gas being sold to power generators in Colombia. Canacol Energy Ltd. ("Canacol") is the direct or indirect parent of each of the other members of the Canacol Group. Canacol centrally manages all corporate and treasury activities of the Debtors from the corporate head office in Calgary, Alberta, Canada.

5. On November 17, 2025, the members of the Canacol Group (in such capacities collectively, the "Canadian Debtors") commenced the Canadian Proceeding pursuant to the CCAA to, among other things, provide the breathing space and stability necessary to continue operations and preserve the Canacol Group's enterprise value.

---

[3] In addition to its production and sale of natural gas, the Canacol Group also produces oil, although these activities are a lesser part of the overall business.

6.      On November 18, 2025, the Canadian Court entered an interim order (the "Initial CCAA Order"). Among other things, the Initial CCAA Order provided for (i) the appointment of KPMG as Monitor; (ii) a stay of proceedings against the Debtors in Canada (the "Canadian Stay"); (iii) the continued implementation of the Debtors' cash management system; and (iv) authorization for the Monitor to act as the Debtors' Foreign Representative in seeking recognition of the Canadian Proceeding in this Court. Following a "comeback hearing" on November 26, 2025 (the "Comeback Hearing"), the Canadian Court entered an amended and restated Initial CCAA Order (the "Amended and Restated Initial CCAA Order") extending the Canadian Stay and granting certain additional relief.

6.      The Canacol Group is in a severe liquidity crisis. It requires DIP Financing in the immediate term in order to maintain its oil and gas production operations. The failure of the Canacol Group to obtain financing immediately would not only destroy any prospect of a successful restructuring but would also result in a cascading material impairment to the Canacol Group's ability to sustain its critical and substantial supply of natural gas to the Colombian power grid. It is essential at this time to avoid the prospect of a disorderly disruption to the Canacol Group's operations in Colombia, which in all cases would have a material effect on end-use consumers in that country.

7.      Part of the Canacol Group's immediate liquidity requirements arise from collateralization and/or replacement costs in respect of certain of the expiring letters of credit (the "Expiring LCs"). The relevant Expiring LC's are a material element necessary for the Canacol Group's ongoing operations and their replacement or collaterization is critical.

8.      The Canadian Debtors and their chief restructuring advisor, Joe Prosperi of HWS Consulting (the "Restructuring Advisor") worked to establish an orderly, transparent and fair

process (the "DIP Solicitation Process") for the identification of a DIP lender and the completion of DIP Financing, including inviting the Canadian Debtors' existing lenders and ad hoc noteholder groups to participate in the DIP Solicitation Process.

9. The DIP Solicitation Process was managed and administered by Plexus, under the oversight of and with the participation of the Monitor. In light of the urgent liquidity needs of the Canacol Group, and due to limited availability of the Canadian Court leading into the holiday season (based on information provided by Canadian counsel), it was necessary that the DIP Solicitation Process proceed on an abridged timeline. Notwithstanding the tight timelines, the DIP Solicitation Process ensured that all interested parties were treated equally and transparently and received identical access to information and diligence materials.

10. Given the urgent need for financing, the Canadian Debtors determined, in consultation with their advisors and the Monitor, that the most likely parties to provide financing at the scale and speed required would be their existing lenders, namely, Macquarie Bank Ltd. ("Macquarie"), the lenders party to the Syndicate Credit Agreement (the "RCF Lenders"), and two separate ad hoc groups of noteholders (collectively, the "Ad Hoc Bondholder Groups", and each an "Ad Hoc Bondholder Group") (collectively, the "Prospective DIP Participants").

11. During the Comeback Hearing, the Canadian Court indicated that the Canadian Debtors would be permitted to file court materials for an application to approve DIP Financing on December 5, 2025. This permitted an extension of the deadlines under the DIP Solicitation Process for the receipt of DIP Financing proposals.

12. During the due diligence process, the Canadian Debtors, their advisors, including the Restructuring Advisor, the Monitor and Plexus worked diligently to:

    (a)     respond to numerous inquiries from each of the Prospective DIP Participants and their advisors;

(b)  arrange virtual meetings between the Prospective DIP Participants, management and/or technical teams of the Canadian Debtors, Plexus and the Monitor to address due diligence questions; and

(c)  continue to review the Canadian Debtors' financial position and DIP Financing needs to provide real-time updated guidance to each of the Prospective DIP Participants regarding the Canadian Debtors' financing requirements.

13.  All Prospective DIP Participants were given an opportunity to present DIP Financing proposals. At the conclusion of the DIP Solicitation Process, the Canadian Debtors selected the DIP Financing Proposal submitted by one of the Ad Hoc Bondholder Groups (in such capacity, the "DIP Lenders").

14.  The material terms and conditions of the proposed DIP Financing are as follows (capitalized terms in this section not otherwise defined in this Declaration have the meanings given them in the agreement documenting the DIP Financing):

| Borrowers | Canacol, 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Canacol Energy Colombia S.A.S., CNE Energy S.A.S., and CNE Oil & Gas S.A.S. |
|---|---|
| Guarantors | Cantana Energy GmbH, Shona Holding GmbH, CNE Oil & Gas S.R.L., Cantana Energy Sucursal Colombia, CECSA Midstream S.A. E.S.P. Sucursal Colombia, CNEOG Colombia Sucursal Colombia, and CECSA Energy Inc. Sucursal Colombia |
| DIP Facility | Credit facility up to a maximum amount of US$67,000,000, comprised of the following sub-facilities:<br><br>(i) delayed-draw term loan sub-facility in the maximum principal amount of US$45,000,000 (the "Tranche A Sub-Facility"), by way of the following advances:<br>• "Initial Advance" up to the maximum amount of US$15,000,000;<br>• "Subsequent Advance" up to the maximum amount of US$30,000,000<br>    ○ It is a requirement of the DIP Loan Commitment Letter, dated as of December 2, 2025, by and between Borrowers, Guarantors, and each of the Lenders party thereto (as amended from time to time, the "Commitment Letter") that the Subsequent Advance be drawn by the Borrowers by February 15, 2026, or this part of the facility will be automatically terminated. |

| | |
|---|---|
| | (ii) letter of credit sub-facility to renew and/or replace certain Expiring LCs (the "Tranche B Letters of Credit"), in the aggregate maximum amount of US$20,000,000 (the "Tranche B Sub-Facility"); and<br><br>(iii) letter of credit sub-facility for new letters of credit (the "Tranche C Letters of Credit") to be issued for and on behalf of one or more of the Loan Parties (as defined in the Commitment Letter) as specified in the Cash Flow Forecast in the aggregate maximum amount of US$2,000,000 (the "Tranche C Sub-Facility") |
| Material Condition(s) to Advances | *All Facilities*<br>- Delivery of a Cash Flow Forecast as approved by the Monitor<br>- The DIP Approval Order<br><br>*Tranche A Sub-Facility*<br>Initial Advance Conditions<br>- The US Recognition Order<br>- The US DIP Approval Recognition Order<br>- Borrowers' compliance with the Cash Flow Forecast<br>- Agreement between the Borrower and the DIP Lender as to the terms of a sale and investment solicitation process (a "SISP").<br><br>Subsequent Advance Conditions<br>- All Initial Advance conditions satisfied<br>- The Colombian Recognition Order<br>- The Colombian DIP Approval Recognition Order<br>- The Colombian DIP Security Documents<br><br>*Tranche B Sub-Facility / Tranche C Sub-Facility*<br>- Proceeds must be used for disbursements in accordance with the Cash Flow Forecast (including any Expiring LC's to be replaced by a Tranche B Letter of Credit)<br>- Delivery of a notice including all particulars of the Letter of Credit being requested |
| Permitted Variance (vs. Cash Flow Forecast) | a negative variance of (i) more than 15.0% actual receipts for such testing period; (ii) more than 15% actual receipts for the cumulative period commencing on the date of the initial Cash Flow Forecast and ending on the last day of such testing period; (iii) more than 10.0% actual disbursements for such testing period; and (iv) more than 10% actual disbursements for the cumulative period commencing on the date of the initial Cash Flow Forecast and ending on the last day of such testing period. |

| | |
|---|---|
| Interest | Interest is payable by the Borrowers on the first Business Day of each calendar month:<br>• at the rate of 13% per annum on the outstanding principal amount of Tranche A Sub-Facility on account of interest accrued during the immediately preceding month to and including the date of the Subsequent Advance; and<br>• at the rate of 11% per annum on the (full) outstanding principal amount of Tranche A Sub Facility on account of interest accrued from and after the date of the Subsequent Advance during the immediately preceding month or portion of such month. |
| Milestones | By December 12, 2025:<br>• US Recognition Order shall have been issued by the US Court<br>By December 15, 2025:<br>• The DIP Approval Order (i.e., the SARIO) shall have been issued by the CCAA Court<br>By December 19, 2025:<br>• The US DIP Approval Recognition Order shall have been issued by the US Court<br>By December 22, 2025:<br>• Borrowers shall have retained a sale advisor to assist with the SISP<br>By December 28, 2025:<br>• Colombian Recognition Order shall have been issued by the Colombian Court<br>By January 7, 2026:<br>• Colombian DIP Approval Recognition Order shall have been issued by the Colombian Court<br>By January 20, 2026:<br>• The CCAA Court shall have issued a SISP Approval Order<br>• The CCAA Court shall have issued an order, approving a key employee retention plan satisfactory to the Lenders<br>By January 23, 2026:<br>• Completion of the Colombian DIP Security Process<br>By February 14, 2026<br>• SISP approval order of the CCAA Court shall have been recognized and approved by a Colombian Court<br>By June 30, 2026:<br>• Closing of a transaction selected pursuant to the SISP; or<br>• An Acceptable Plan of Arrangement has become effective. |
| Fees and Expenses | *Commitment Fee*: 5% of the maximum amount of such Lender's DIP Facility Commitment Amount under the Tranche A Sub-Facility;<br><br>*LC Fees:* (1) participation fee to each Lender in respect of its participations in Letters of Credit, which shall accrue at 5% on the |

|  | |
|---|---|
|  | average daily amount of such Lender's LC Exposure; (2) the applicable Issuing Bank fronting fee, which shall accrue at the rate of 0.25% per annum on the average daily amount of the LC Exposure; and (3) the Issuing Bank's standard fees with respect to the issuance, amendment, renewal, extension of any LC.<br><br>*Lenders' Fees and Expenses:* all reasonable and documented fees, expenses and disbursements of the Tranche A Lenders, the Fronting Lender, and the DIP Agent (if applicable) and the fees, expenses, and disbursements of their advisors, and the Notes Trustee and counsel to the Notes Trustee incurred in connection with the Borrowers, the Restructuring Proceedings and the Commitment Letter. |
| Maturity Date | The earliest of:<br>• June 30, 2026;<br>• the effective date of (a) the sale of all or substantially all of the assets, property or business of any of the Borrowers or (b) a Plan of Arrangement;<br>• the consummation of a transaction pursuant to the SISP;<br>• the termination of the CCAA Proceedings, the appointment of a receiver, the bankruptcy of one or more of the Loan Parties, or any similar or other types of liquidation proceeding in respect of any one or more of the Loan Parties in Colombia under Colombian law; or<br>• the occurrence of an Event of Default |
| Security | • The DIP Lenders' Charge<br>• The US DIP Approval Recognition Order;<br>• The Colombian Recognition Order; and<br>• The Colombian DIP Security Process. |

15. The DIP Financing requires that the DIP Lenders' Charge on the Canadian Debtors' Property have priority over all other liens or encumbrances of any person (with the exception of the beneficiaries of the Administration Charge under the Initial CCAA Order, the Amended and Restated Initial CCAA Order and the SARIO), up to the maximum aggregate amount of all amounts due and owing under the DIP Financing from time to time.

16. I have been advised by legal counsel that the DIP Lenders will not advance funds under the DIP Financing unless the DIP Lenders' Charge is granted and recognized and enforced in the United States.

17. I have been further advised by legal counsel that, if granted, the DIP Lenders' Charge will rank in priority over all other pre-filing security, including those of Macquarie[4]. I understand that Macquarie will be given notice of the Motion, as it was of the Canadian filings.

18. It is my view that no prejudice to such parties will result from the proposed priority of the DIP Lenders Charge (in addition to the other charges), in light of the value of the assets of the Canacol Group, which well exceeds the indebtedness owing to Macquarie and the amounts secured (or proposed to be secured) by the DIP Lenders' Charges.

19. The amount of the DIP Financing and of the DIP Lenders' Charge was considered in consultation with the Monitor.

20. The terms of the DIP Financing were negotiated in good faith and at arms-length.

21. In my business judgment, the proposed DIP Financing from the DIP Lenders represents the best financing option available to the Debtors under the circumstances and it should be recognized and enforced in the United States as approved by the Canadian Court.

---

[4] Macquarie was also a Prospective DIP Participant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 9th day of December 2025
Calgary, Alberta
Canada

_____
Jason Bednar