# EXHIBIT A

**Second Report**

| | |
|---|---|
| COURT FILE NUMBER | **2501-18462** |
| COURT | **COURT OF KING'S BENCH OF ALBERTA** |
| JUDICIAL CENTRE | **CALGARY** |
| APPLICANTS | **IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, RSC 1985, c C-36, AS AMENDED** |
| | **AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA ULC, CANTANA ENERGY GMBH, CNE OIL & GAS S.R.L, CANACOL ENERGY COLOMBIA S.A.S., SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S.** |
| DOCUMENT | **SECOND REPORT OF THE MONITOR** |
| | **DECEMBER 9, 2025** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT: | **MONITOR**<br>KPMG Inc.<br>Bay Adelaide Centre<br>333 Bay Street, Suite 4600<br>Toronto, ON<br>Paul van Eyk / Katherine Forbes / Duncan Lau<br>Tel:  (416) 777-8281 / (416) 777-8107 / (416) 476-2184<br>Email: pvaneyk@kpmg.ca, katherineforbes@kpmg.ca, duncanlau@kpmg.ca<br><br>**MONITOR'S COUNSEL**<br>Bennett Jones LLP<br>4500 Bankers Hall East<br>855 – 2nd Street SW<br>Calgary, AB  T2P 4K7<br>Raj S. Sahni / Kelsey Meyer / Chyna Brown<br>Tel:  (416) 777-4804 / (403) 298-3323 / (403) 298-3244<br>Email: sahnir@bennettjones.com, meyerk@bennettjones.com, brownc@bennettjones.com |

## TABLE OF CONTENTS

I.       INTRODUCTION ................................................................................ 3

II.      PURPOSE OF REPORT ...................................................................... 5

III.     TERMS OF REFERENCE ................................................................... 6

IV.      ACTIVITIES OF THE APPLICANTS ............................................... 7

V.       ACTIVITIES OF THE MONITOR ..................................................... 9

VI.      UPDATE ON THE FOREIGN PROCEEDINGS ............................. 11

VII.     UPDATE ON DIP SELECTION PROCESS ...................................... 12

VIII.    DIP FINANCING ............................................................................... 17

IX.      REPORTED CASH RECEIPTS AND DISBURSEMENTS ............ 29

X.       OTHER RELIEF ................................................................................ 31

XI.      UPDATED CASH FLOW FORECAST ........................................... 34

XII.     STAY EXTENSION ........................................................................... 38

XIII.    MONITOR'S CONCLUSION AND RECOMMENDATIONS ............ 38

**APPENDICES**

**APPENDIX "A" –**  First Report of the Monitor dated November 24, 2025 (without appendices)

**APPENDIX "B" –**   DIP Loan Agreement (redacted)

**APPENDIX "C" –**  Comparison of terms of the Final Macquarie Proposal and the DIP Loan Agreement

**APPENDIX "D" –**  DIP Loan Amendment Agreement (redacted)

**APPENDIX "E" –**  DIP Loan Terms – Market Comparison

**APPENDIX "F"–**  Cash Flow Forecast for the period from November 30, 2025, to February 7, 2026

**APPENDIX "G"–**  Cash Flow Forecast – comparison to prior forecast

**CONFIDENTIAL APPENDICES**

**CONFIDENTIAL APPENDIX "1" –** DIP Loan Agreement (unredacted)

**CONFIDENTIAL APPENDIX "2" –** DIP Loan Amendment Agreement (unredacted)

## I.      INTRODUCTION

1.      On November 18, 2025 (the "**Filing Date**"), Canacol Energy Ltd. ("**Canacol**") and its subsidiaries 2654044 Alberta Ltd. (**"265 Alberta"**), Canacol Energy ULC (**"Canacol ULC"),** 2498003 Alberta ULC (**"249 Alberta"**), Cantana Energy GmbH (**"Cantana Switzerland"**), CNE Oil & Gas S.R.L. (**"CNE Panama"**), Canacol Energy Colombia S.A.S. (**"Canacol Colombia"**), Shona Holding GmbH (**"Shona Switzerland"**), CNE Energy S.A.S. (**"CNE Energy Colombia"**), and CNE Oil & Gas S.A.S. (**"CNE O&G Colombia"** and collectively, the "**Applicants**", the "**Canacol Group**" or the "**Company**") were granted relief under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") by Order (the "**Initial Order**") of the Court of the King's Bench of Alberta (the "**Court**"). The relief granted under the Initial Order included, among other things:

(a)      granting a stay of proceedings in favour of the Applicants from November 18, 2025, to November 28, 2025 (the "**Stay Period**");

(b)      appointing KPMG Inc. as Monitor ("**KPMG**" or the "**Monitor**");

(c)      authorizing the Applicants to:

(i)      continue to use the Cash Management System;

(ii)      make payment of certain obligations incurred prior to the commencement of the Applicants' CCAA proceedings (the "**CCAA Proceedings**");

(d)      authorizing the Monitor to act as foreign representative (the "**Foreign Representative**") for the purpose of having the CCAA Proceedings recognized in any jurisdiction outside Canada including, without limitation, the United States of America (the "**United States**", or the "**U.S.**"), the Republic of Colombia ("**Colombia**"), the Republic of Panama, and/or Switzerland; and

(e)      granting the Administration Charge (as defined herein).

3

2.    KPMG, in its then capacity as proposed Monitor, provided this Court its report dated November 17, 2025 (the "**Pre-Filing Report**") in connection with the Applicants' Application for the Initial Order.

3.    On November 28, 2025, this Court granted an Order amending and restating the Initial Order (the "**ARIO**"), among other things:

(a)    granting an extension of the Stay Period to December 18, 2025;

(b)    approving an increase to the maximum amount of the Administration Charge to $1.5 million with priority ranking and granting a Directors' Charge to a maximum amount of $1.0 million;

(c)    authorizing the Applicants to make pre-filing payments to critical vendors up to the amount of $5.5 million subject to the prior approval of the Monitor ("**Critical Vendor Payments**"), and certain other pre-filing royalty and tax payments to Agencia Nacional de Hidrocarburos ("**ANH**") and other Colombian governmental and taxation authorities;

(d)    granting relief from certain securities law reporting obligations under federal, provincial and other applicable law until further order of the Court; and

(e)    approving the Prior Reports (as defined herein), and the actions, conduct and activities of the Monitor set out therein.

4.    The Applicants' Application for the ARIO (the "**Comeback Motion**") was heard on November 26, 2025. The Honourable Justice Bourque's decision in respect of the Comeback Motion, which granted the ARIO, was issued on November 28, 2025.

5.    KPMG, in its capacity as Monitor, provided this Court with its report dated November 24, 2025 (the "**First Report**" and together with the Pre-Filing Report, the "**Prior Reports**") in connection with the Comeback Motion. A copy of the First Report (without appendices) is attached hereto as **Appendix "A"**.

6.      Copies of materials and documents filed in connection with these CCAA proceedings are available on the Monitor's website at https://kpmg.com/ca/canacol (the "**Monitor's Website**").  In addition, the Monitor has arranged for a toll-free hotline 1-833-724-5456 and an email address at: canacol@kpmg.ca, through which creditors of the Applicants or other interested parties can make inquiries with the Monitor related to the CCAA Proceedings.

## II.     PURPOSE OF REPORT

7.      The purpose of this report (the "**Second Report**") is to provide this Court with information pertaining to:

(a)     the activities of the Applicants and the Monitor, respectively, since the date of the First Report;

(b)     the proceedings brought by the Foreign Representative under chapter 15 of Title 11 of the United States Code (the "**Bankruptcy Code**", and such proceedings being the "**Chapter 15 Proceedings**") and foreign proceedings in Colombia (the "**Colombian Recognition Proceedings**");

(c)     the Applicants' cash flow forecast (the "**Updated Cash Flow Forecast**") for the period from November 30, 2025, to February 7, 2025 (the "**Forecast Period**"); and

(d)     the Applicants' motion for a second amended and restated initial Order (the "**SARIO**") to continue the provisions of the ARIO and provide for, among other things:

(i)      an extension of the Stay Period to February 6, 2025;

(ii)     authorization for the Applicants to enter into the DIP Loan Agreement (as defined herein) to obtain interim debtor-in-possession (**"DIP"**) financing of up to $67 million, and the granting of a corresponding priority charge (the "**DIP Lenders' Charge**") over the Applicants' Property (as defined in the ARIO) in favour of the DIP Lenders (as defined herein);

(iii)    authorization of an increase in the maximum aggregate amount of Critical Vendor Payments permitted from $5.5 million to $15.5 million, subject to the Monitor's prior approval;

(iv)    authorizing Canacol, out of the ordinary course of business, to post cash collateral in the approximate amount of $5,200,000 to its United States bank account with Citibank (as defined herein) as security for Citibank to issue a letter of credit (the "**Citibank LC**") for the ultimate benefit of ANH as security for CNE O&G Colombia obligations to ANH; and

(v)    approval of this Second Report, and the actions, conduct and activities of the Monitor set out herein.

(b)    the Applicants' motion for an Order (the "**Sealing Order**") directing that the **Confidential Appendices** to this Second Report containing an unredacted copy of the DIP Loan Agreement and an unredacted copy of the DIP Loan Amendment Agreement (as defined herein), be sealed until one (1) year from the termination of these CCAA Proceedings, or further Order of this Court; and

(c)    materials served by counsel to Macquarie on December 8, 2025, in support of its request that the Court adjourn the Applicants' motion for the SARIO, specifically as it relates to the approval of the DIP Loan Agreement (as amended) and the granting of the DIP Lenders' Charge, or in the alternative, to advise of its opposition to the DIP financing relief sought.

## III.   TERMS OF REFERENCE

8.    Capitalized terms used but not defined in the Second Report are as defined in the First Report and in the ARIO. The materials filed by the Applicants in support of the SARIO and the Sealing Order are i) the Affidavit of Mr. Jason Bednar ("**Mr. Bednar**") affirmed on December 5, 2025 (the "**Third Bednar Affidavit**"), the supplemental Affidavit of Mr. Bednar affirmed on December 9, 2025 (the "**Fourth Bednar Affidavit**"), and ii) the reply Affidavit of Mr. Bednar affirmed on December 8, 2025 (the "**Fifth Bednar Affidavit**"). The Second Report should be read in conjunction with the Third Bednar Affidavit, the

6

Fourth Bednar Affidavit, and the Fifth Bednar Affidavit (together, the "**Bednar Affidavits**"), as certain information contained in the Bednar Affidavits has not been included herein to avoid unnecessary duplication.

9.    The Monitor has also reviewed the Affidavit of Charles Angus Pickard sworn December 8, 2025, and the Affidavit of Luis Guillermo Vélez-Cabrera served upon it on behalf of Macquarie on December 8, 2025.

10.   In preparing this Second Report, KPMG has relied solely on information and documents provided to it by the Applicants and their respective advisors, including unaudited, draft and/or internal financial information, financial projections prepared by the Applicants, discussions with management of the Applicants, and the affidavits of the Applicants' executive (collectively, the "**Information**").  In accordance with industry practice, except as otherwise described in this Second Report, KPMG has reviewed the Information for reasonableness, internal consistency, and use in the context in which it was provided. However, KPMG has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would comply with Generally Accepted Auditing Standards ("**GAAS**") pursuant to the *Chartered Professional Accountant of Canada Handbook* and, as such, KPMG expresses no opinion or other form of assurance contemplated under GAAS in respect of the Information.

11.   Future orientated financial information contained in the Updated Cash Flow Forecast is based on the Applicants' estimates and assumptions regarding future events.  Actual results will vary from the information presented even if the hypothetical assumptions occur, and variations may be material.  Accordingly, the Monitor expresses no assurance as to whether the Updated Cash Flow Forecast will be achieved.

12.   Unless otherwise stated, all monetary amounts noted herein are expressed in United States ("**US**") dollars.

## IV.    ACTIVITIES OF THE APPLICANTS

13.   Since the date of the First Report, the Applicants have been managing their operations in the normal course and pursuant to the terms of the ARIO, and working to stabilize the

business as a result of the CCAA Proceedings and to address their liquidity requirements, with the assistance of their advisors and the Monitor.

14.    The activities of the Applicants since the date of the First Report have included:

(a)    communicating with, providing information to, and addressing inquiries of creditors, employees and other stakeholders regarding the CCAA Proceedings;

(b)    managing key relationships with customers and suppliers, and working diligently to operate the business in accordance with terms of the Initial Order and ARIO, including management of cash;

(c)    working with and corresponding regularly with representatives of the Monitor regarding numerous matters in the CCAA Proceedings, including planned disbursements;

(d)    meeting with the Toronto Stock Exchange;

(e)    with the approval of the Monitor, making certain payments to trade vendors related to the period prior to the Filing Date (the "**Pre-Filing Period**") in the aggregate amount of approximately $5,169,000, which amount is within the maximum amount of $5.5 million of Critical Vendor Payments authorized pursuant to subparagraph 6(c) of the ARIO. As further discussed below, the Monitor understands that, in the Company's view, these payments were required to maintain operations and the continued supply of gas, and approved the payment of same, as Critical Vendor Payments pursuant to the ARIO;

(f)    making payment of Colombian withholding taxes in the aggregate amount of approximately US$4,815,000, and royalties due to ANH in the aggregate amount of approximately US$1,770,000, each in relation to the Pre-Filing Period and each in accordance with the ARIO;

(g)    working with the Monitor, Plexus Capital LLC ("**Plexus**"), the Applicants' chief restructuring advisor, Joe Prosperi of HWS Consulting (the "**Restructuring Advisor**") and counsel to progress the process to solicit DIP financing proposals (the

"**DIP Selection Process**"). The DIP Selection Process is further discussed in a later section of this Second Report;

(h)  working with Promigas S.A. E.S.P. ("**Promigas**"), the Company's pipeline transportation provider, to determine letters of credit ("**LCs**") or other requirements to secure the Applicants' commitments, in light of LCs in favour of Promigas expiring in late December, 2025;

(i)  working with the Monitor to prepare the Updated Cash Flow Forecast and the budgets for the DIP Financing (the **"DIP Budgets"**); and

(j)  working with legal counsel in the United States and Colombia and the Monitor, as Foreign Representative, in connection with the Chapter 15 Proceedings and the Colombian Recognition Proceedings.

## V.    ACTIVITIES OF THE MONITOR

15.    Since the date of the First Report, the Monitor's activities have included:

(a)  sending notice on November 25, 2025, within five business days of the issuance of the Initial Order, of the CCAA proceedings to all known creditors with claims greater than $1,000 against the Applicants, as required pursuant to the CCAA. Notice was also sent to other creditors, including government bodies and any other party that requested a copy;

(b)  monitoring the Applicants' cash receipts and disbursements;

(c)  as noted above, approving certain Critical Vendor Payments in the aggregate amount of approximately $5,169,000;

(d)  engaging with counsel to the Monitor in Colombia, Philippi Prietocarrizosa Ferrero DU & Uría ("**PPU**");

(e)  as Foreign Representative, progressing the Colombian Recognition Proceedings, including by filing the ARIO with the Superintendency of Companies of Colombia

(the "**Superintendency**") on December 3, 2025 and by making an amended application to the Superintendency on December 5, 2025 through a power of attorney granted to PPU to seek recognition of the CCAA Proceedings as a foreign main proceeding under that legal regime;

(f)     engaging with counsel to the Monitor in the United States, Pachulski Stang Ziehl & Jones LLP ("**PSZJ**") regarding the Chapter 15 Proceedings and its preliminary review of Macquarie's security on the Applicants' assets in the United States (as discussed in a later section of this Second Report);

(g)     also in its capacity as Foreign Representative, filing with the United States Bankruptcy Court for the Southern District of New York (the "**US Court**") a notice of the filing of the application to the Superintendency;

(h)     assisting the Applicants with their communications with stakeholders including employees, vendors, lenders, and key trade partners;

(i)     responding to various inbound phone calls and correspondence from representatives of parties expressing interest in funding any DIP requirements during the CCAA Proceedings, and enquiring with respect to other matters in the CCAA Proceedings;

(j)     working with the Applicants, Plexus, the Chief Restructuring Advisor and counsel to carry out the DIP Selection Process including preparing and reviewing diligence information contained in the virtual data room ("**VDR**"), as further described below;

(k)     attending various teleconferences and responding to inquiries raised by the Prospective DIP Lenders and their advisors during the DIP Selection Process;

(l)     assisting the Applicants, in consultation with Plexus, the Restructuring Advisor, and counsel, in reviewing the DIP term sheets submitted by the Prospective DIP Lenders (the "**DIP Proposals**") and in clarifications with the Prospective DIP Lenders on the terms within the DIP Proposals;

(m)     assisting the Applicants, in consultation with Plexus, the Restructuring Advisor, and counsel, in selecting and negotiating the successful DIP Term Sheet;

(n)     assisting the Applicants with the preparation of the Updated Cash Flow Forecast and the DIP Budgets;

(o)     attending various teleconferences and virtual meetings with representatives of the Applicants and the Applicants' counsel in respect of the Canacol Group's cash flows and liquidity requirements, operations, and the CCAA Proceedings generally;

(p)     maintaining the Service List and the Monitor's Website where all Court documents and other material documents pertaining to the CCAA Proceedings, Chapter 15 Proceedings and Colombian Proceedings are made available in electronic form;

(q)     reviewing materials served by the Applicants and by Macquarie in connection with the relief requested in the proposed SARIO; and

(r)     preparing this Second Report.

## VI.    UPDATE ON THE FOREIGN PROCEEDINGS

### Chapter 15 Proceedings

16.    As discussed in the First Report, on November 20, 2025, the US Court made the US Provisional Relief Order and the US Recognition Scheduling Order. In accordance with the US Recognition Scheduling Order, a US Court hearing concerning the Order sought in the US Recognition Proceedings (the "**US Recognition Order**") will be held on December 11, 2025.  In addition, a hearing concerning an application for recognition of any order of this Court approving DIP financing (the "**US DIP Approval Recognition Order**") is scheduled for December 18, 2025.

### Colombian Proceedings

17.    On November 25, 2025, Colombian counsel to the Applicants brought an application on behalf of Canacol Colombia, CNE O&G Colombia, Cantana Colombia (Sucursal of Cantana Switzerland) and CNEOG Colombia (Sucursal of CNE Panama) (collectively, the "**PRES Applicants**") to the Chamber of Commerce of Bogotá pursuant to the Company Recovery Process (the "**PRES**").

18.   On November 28, 2025, the Chamber of Commerce of Bogotá granted a commencement order of the PRES (the **"PRES Order"**), which granted an automatic stay of all executory proceedings and guarantees in respect of the PRES Applicants.

19.   On November 27, 2025, the Monitor as Foreign Representative made an application to the Superintendency seeking the recognition of the CCAA Proceeding as a foreign main proceeding, including provisional stays and related relief, in Colombia. A hearing in respect of the relief sought in the Colombian Recognition Proceedings (the **"Colombian Recognition Order"**) is sought for late December, 2025, or early January, 2026. The Monitor as Foreign Representative also intends to seek approval of the SARIO by the Superintendency at the hearing for the Colombian Recognition Order, should this Court see fit to approve same.

20.   On December 5, 2025, the Monitor as Foreign Representative filed a supplemental petition with the Superintendency with additional information concerning the Applicants and the CCAA Proceedings, in support of its application for the Colombian Recognition Order.

## VII.   UPDATE ON DIP SELECTION PROCESS

21.   As detailed in the First Report, the DIP Selection Process was conducted by the Applicants, Plexus, the Chief Restructuring Advisor and the Monitor to assist the Applicants in obtaining DIP financing to address the urgent liquidity needs of the Canacol Group, while preserving financial flexibility for their restructuring efforts, in an orderly fashion.

22.   The First Report details the key terms of the DIP financing sought, the key components of the DIP Selection Process, and the activities undertaken by the Applicants (with the assistance of their advisors) and the Monitor in respect of the DIP Selection Process, up to the date of the First Report; as such, these are not repeated in detail herein to avoid unnecessary duplication. A summary of the key aspects and activities in connection with the DIP Selection Process since the date of the First Report are provided below, but as fulsome details are provided in the Third Bednar Affidavit, they are not entirely repeated herein.

23.    As noted in the First Report, pursuant to the letter sent to Prospective DIP Lenders (as defined in the First Report) on or about November 21, 2025, describing the DIP Selection Process (the **"DIP Process Letter"**), the Applicants sought a two-tranche DIP facility comprising, among things:

    (a)    a Minimum DIP Amount of at least $60 million, to be funded no later than December 15, 2025 (subject to extension depending on scheduling of hearings to approve the DIP) to address the Company's short-term liquidity requirements, including to collateralize approximately $21 million of LCs expiring over the course of December 2025; and

    (b)    a Second Tranche, in an amount to be determined, to address the Company's longer-term operational needs during these CCAA Proceedings, including its drilling and exploitation efforts.

24.    The DIP Process Letter set forth a deadline for submission of binding DIP Proposals (as defined in the First Report) by no later than 5:00 pm (EST) on November 27, 2025 (the **"Submission Deadline"**).

25.    The Prospective DIP Lenders who agreed to the Applicants' confidentiality terms were granted access to the VDR, maintained by the Applicants' U.S. counsel, Nelson Mullins Riley & Scarborough LLP, to provide them with the opportunity to review the same information. The Monitor understands that certain Prospective DIP Lenders had pre-existing confidentiality provisions governing their relationship with the Applicants which were acceptable to the Applicants and that the parties agreed to rely on these rather than executing new non-disclosure agreements (the "**NDAs**"). All other Prospective DIP Lenders executed NDAs as follows:

    (a)    five (5) NDAs tailored for and executed by participants within each of the Ad Hoc Bondholder Groups (as defined in the Third Bednar Affidavit) which included, among other things, specific provisions addressing and ensuring compliance with certain U.S. Securities Laws; and

    (b)    six (6) NDAs entered into by advisors to the Ad Hoc Bondholder Groups, which did not require the U.S. Securities Law provisions noted above.

26.    The Monitor understands that, prior to the Submission Deadline, certain of the Prospective DIP Lenders communicated that they would require additional time to submit a DIP Proposal. During the Comeback Hearing on November 26, 2025, the Applicants and the Monitor became aware that Justice Mah had directed that the Applicants would be permitted to file materials for this application on December 5, 2025. Accordingly, on November 26, 2025, the Company determined, with the approval of the Monitor, to extend the Submission Deadline to 5:00 pm (EST) on December 2, 2025 (the "**Extended Deadline**"), and sent a letter to all Prospective DIP Lenders communicating same.

27.    Throughout the DIP Selection Process, the Applicants and their advisors, with the assistance of the Monitor, continued to review and refine the Company's financial position and its liquidity requirements to further specify the DIP financing requirements of the Applicants.

28.    As noted in the Third Bednar Affidavit, on December 2, 2025, the Company provided additional guidance on the DIP Selection Process in the form of a letter sent directly to the Prospective DIP Lenders (the "**Guidance Letter**"). The Guidance Letter advised, among other things, that the quantum of the Applicants' immediate DIP financing needs (i.e., the Minimum DIP Amount) had been reduced from $60 million to $45 million, by way of the following advances:

    (a)    an initial advance in the amount of $30 million (the "**Initial Advance**"), to be advanced upon: (i) the granting of an order of this Court approving DIP financing and granting a priority charge to secure same, and (ii) the US Court granting recognition and full force and effect to same; and

    (b)    the second DIP advance in the amount of $15 million (the "**Additional Advance**"), to be advanced upon: (i) satisfaction of the conditions to the Initial Advance, (ii) the Monitor being satisfied that the Additional Advance is required, and (iii) the Company delivering a draw request in respect of same.

29.     On the Extended Deadline on December 2, 2025, the following two (2) DIP Proposals were submitted:

   (a)     a binding DIP Proposal from an Ad Hoc Bondholder Group (the "**Bondholder Group Proposal**"); and

   (b)     a non-binding DIP Proposal from Macquarie (the "**Original Macquarie Proposal**" and, together with the Bondholder Group Proposal, the "**DIP Proposals**").

30.     The Company, Plexus and the Monitor reviewed the DIP Proposals, and on or before the morning of December 3, 2025, the Company and its advisors reached out to the parties who submitted the DIP Proposals to arrange calls for December 3 seeking to:

   (a)     clarify certain terms of the Bondholder Group Proposal; and

   (b)     advise Macquarie that the Original Macquarie Proposal did not meet the requirements detailed in the DIP Process Letter, including that the Original Macquarie Proposal had been submitted on a non-binding basis, and to understand if Macquarie intended to submit an updated proposal which conformed with the requirements of the DIP Process Letter.

31.     The Monitor understands that on December 3, 2025, Plexus and Macquarie communicated in respect of the Original Macquarie Proposal, and Macquarie confirmed that it intended to submit a conforming Bid Proposal. As noted in the Third Bednar Affidavit, a letter detailing the limitations of the Original Macquarie Proposal and inviting Macquarie to submit a conforming DIP Proposal was also sent by the Company's counsel to Macquarie's counsel on December 3, 2025.

32.     The Monitor understands that, on December 3 and December 4, 2025, the Company, Plexus, the Monitor, and their respective counsel participated in various meetings with the advisors for the proponents of the Bondholder Group Proposal (the "**Bondholder Proponents**") to discuss the terms of the Bondholder Group Proposal.

33.    On December 4, 2025, Macquarie submitted an updated and final DIP Proposal which remained indicative and non-binding (the **"Final Macquarie Proposal"**), the key terms of which contemplated, among other things:

(a)    that the Final Macquarie Proposal was non-binding and contemplated an initial advance of $15 million;

(b)    any further advance(s) were subject to agreement and other terms not specified;

(c)    the application of receivables to pay down Macquarie's pre-filing secured claims. In the Company's view (a view which is shared by the Monitor), repayment of pre-filing Macquarie Debt (as defined in the Pre-Filing Report) could cause a strain on the Applicants' liquidity, based on the size of the DIP financing contemplated in the Final Macquarie Proposal; and

(d)    restrictions on the Canacol Group's cash management system by making transfers of funds from any account in Colombia or the United States subject to Macquarie's prior consent.

34.    As noted in the Third Bednar Affidavit, on December 4, 2025, following conversations with the advisors to the Bondholder Proponents to discuss terms of the Bondholder Group Proposal, the Applicants received an updated binding DIP Proposal from the Bondholder Proponents (the "**Updated Bondholder Group Proposal**").

35.    Due to the indicative, non-binding nature of the Final Macquarie Proposal and the inferior advances stipulated within, as compared to the Updated Bondholder Group Proposal, the Applicants, in consultation with the Monitor and Plexus, determined that the Final Macquarie Proposal was not acceptable and that efforts should be focused on progressing the Updated Bondholder Group Proposal.

36.    On December 4, 2025, the Applicants, in consultation with their advisors and the Monitor, confirmed to the Bondholder Proponents the selection of the Updated Bondholder Group Proposal in the DIP Selection Process. On December 4 and 5, 2025, the Applicants, in consultation with their advisors and the Monitor, proceeded to negotiate the loan agreement

16

resulting from the Updated Bondholder Group Proposal (the "**DIP Loan Agreement**"), of which the Applicants are seeking this Court's approval. A redacted copy of the DIP Loan Agreement, excluding the signatures pages and commitment amounts of each of the DIP Lenders, is attached hereto as **Appendix "B"**.

37.     A summary of terms of the Final Macquarie Proposal and the DIP Loan Agreement is attached hereto as **Appendix "C"**.

38.     As noted in the responding materials filed by Macquarie, Macquarie seeks an adjournment of the Applicants' motion for the approval of the DIP Loan Agreement on the basis that, among other things, the DIP Selection Process was overly expedited and that Macquarie remains interested in providing DIP financing to the Company, with the Final Macquarie Proposal forming the basis for such continued engagement.

39.     The Monitor is of the view that the Prospective DIP Lenders, including Macquarie and the Bondholder Proponents, were treated fairly and equally during the conduct of the DIP Selection Process, albeit on an expedited timeframe given the exigencies of the situation. Further in the Monitor's view, the urgency of the Company's DIP financing need, coupled with the Court's availability in the coming weeks, does not allow for an extension to the timeline. The Monitor understands there is no Court time available on the Commercial List after December 10, 2025, and before the Company is projected to run out of liquidity (absent DIP financing) as of the week ending January 10, 2026.

## VIII.   DIP FINANCING

### DIP Loan Agreement and Proposed Sealing Order

40.     The Canacol Group and the Bondholder Proponents (in such capacity, the proposed "**DIP Lenders**") executed the DIP Loan Agreement on December 5, 2025.

41.     A summary of the material terms of the DIP Loan Agreement is provided below (all capitalized terms not otherwise defined in this section are as defined in the DIP Loan Agreement):

| Terms | Details |
|---|---|
| **Borrowers** | Canacol, 265 Alberta, Canacol ULC, 249 Alberta, Canacol Colombia, CNE Energy Colombia, and CNE O&G Colombia |
| **Guarantors** | Cantana Switzerland, Shona Switzerland, CNE O&G Panama, Cantana Energy Sucursal Colombia, CECSA Midstream S.A. E.S.P. Sucursal Colombia, CNEOG Colombia Sucursal Colombia, CECSA Energy Inc. Sucursal Colombia |
| **DIP Lenders** | Each of the entities identified as "Lender" under the DIP Loan Agreement |
| **DIP Facility** | Credit facility up to a maximum amount of $67 million (the "**DIP Facility**"), comprising the following: <br><br> 1. delayed-draw term loan sub-facility in the maximum principal amount of $45 million (the "**Tranche A Sub-Facility**"), by way of the following advances: <br> • "Initial Advance" up to $15 million <br> • "Subsequent Advance" up to $30 million, to be drawn by way of a single subsequent advance by the Borrowers by February 15, 2026, or this part of the facility will be terminated <br><br> 2. letter of credit sub-facility to renew and/or replace certain expiring letters of credit (the "**Tranche B Letters of Credit**") in the aggregate maximum amount of $20 million (the "**Tranche B Sub-Facility**"); and <br><br> 3. letter of credit sub-facility for new letters of credit (the "**Tranche C Letters of Credit**") to be issued for and on behalf of one or more of the Loan Parties as specified in the Cash Flow Forecast in the aggregate maximum amount of $2 million (the "**Tranche C Sub-Facility**") |
| **Material Condition(s) to Advances** | Conditions to advances on all facilities are as follows: <br> • delivery of a cash flow forecast as approved by the Monitor <br> • the DIP Approval Order <br><br> Conditions to the Initial Advance and Subsequent Advance on the Tranche A Sub-Facility are as follows: <br><br> Initial Advance: <br> • the US Recognition Order <br> • the US DIP Approval Recognition Order |

18

| | |
|---|---|
| | • Borrowers' compliance with the Monitor-approved cash flow forecast<br>• agreement between the Borrowers and the DIP Lenders as to the terms of a sale and investment solicitation process (a "**SISP**")<br><br>Subsequent Advance:<br>• all Initial Advance conditions are satisfied<br>• the Colombian Recognition Order<br>• the Colombian DIP Approval Recognition Order<br>• completion of the Colombian DIP Security Documents |
| | Conditions to advances under the Tranche B Sub-Facility and the Tranche C Sub-Facility are as follows:<br>• proceeds must be used for disbursements in accordance with the Monitor-approved cash flow forecast (including any expiring letters of credit to be replaced by a Tranche B Letter of Credit)<br>• delivery of a notice including all particulars of the letter of credit being requested |
| **Interest rate** | Payable on first business day of each month as follows:<br>• 13% per annum on the outstanding principal amount of Tranche A Sub-Facility on account of interest accrued during the immediately preceding month to and including the date of the Subsequent Advance; and<br>• 11% per annum on the (full) outstanding principal amount of the Tranche A Sub Facility on account of interest accrued from and after the date of the Subsequent Advance during the immediately preceding month or portion of such month |
| **Commitment Fee** | 5% of the maximum amount of the DIP Facility Commitment Amount under the Tranche A Sub-Facility |
| **Expenses** | **LC Fees:** (1) participation fee to each DIP Lender in respect of its participations in Letters of Credit, which shall accrue at 5% on the average daily amount of such DIP Lender's LC Exposure; (2) the applicable Issuing Bank fronting fee, which shall accrue at the rate of 0.25% per annum on the average daily amount of the LC Exposure; and (3) the Issuing Bank's standard fees with respect to the issuance, amendment, renewal, extension of any LC.<br><br>**Lenders' Fees and Expenses:** all reasonable and documented fees, expenses and disbursements of the Tranche A Lenders, the Fronting Lender, and the DIP Agent (if applicable) and the fees, |

19

| | |
|---|---|
| | expenses, and disbursements of their advisors, and the Notes Trustee and counsel to the Notes Trustee incurred in connection with the Borrowers, the Restructuring Proceedings and the DIP Loan Agreement. |
| **Maturity date** | The earliest of: <br> 1. June 30, 2026; <br> 2. The effective date of (a) the sale of all or substantially all of the assets, property or business of any of the Borrowers or (b) a Plan of Arrangement; <br> 3. the consummation of a transaction pursuant to the SISP; <br> 4. the termination of the CCAA Proceedings, the appointment of a receiver, the bankruptcy of one or more of the Loan Parties, or any similar or other types of liquidation proceeding in respect of any one or more of the Loan Parties in Colombia under Colombian law; or <br> 5. the occurrence of an Event of Default. |
| **Security** | • A valid, binding, continuing, enforceable, fully-perfected, and non-avoidable super-priority CCAA Court-ordered lien and charge over all present and after acquired property, assets and undertakings of the Borrowers by way of a DIP Lenders' Charge. <br> • The US DIP Approval Recognition Order; <br> • The Colombian Recognition Order; and <br> • The Colombian DIP Security Process. |
| **Events of default** | Notable Events of Default include, but are not limited to: <br> • a Variance Report disclosing a negative variance of (i) more than 15.0% actual receipts for such testing period; (ii) more than 15% actual receipts for the cumulative period commencing on the date of the initial Cash Flow Forecast and ending on the last day of such testing period; (iii) more than 10.0% actual disbursements for such testing period; and (iv) more than 10% actual disbursements for the cumulative period commencing on the date of the initial Cash Flow Forecast and ending on the last day of such testing period (in each case, a "**Permitted Variance**") <br> • Borrowers fail to satisfy the Minimum Liquidity Test at any time which does not permit the aggregate of unrestricted cash and undrawn Tranche A commitments available to the Borrowers to fall below $13 million through and including March 31, 2026 and $17 million thereafter |

| | |
|---|---|
| | • Any Loan Party that fails to perform or observe the covenants which include an Affirmative Covenant to fully and completely withdraw, terminate or otherwise discontinue the PRES on or before December 19, 2025<br><br>• The Borrowers' non-compliance with any term or condition of the SISP, including not satisfying any milestone required in the SISP by the relevant date |
| **Milestones** | Borrowers agree to cause each of the following milestones:<br><br>1. By *December 12, 2025*, US Recognition Order shall have been issued by the US Court<br><br>2. By *December 15, 2025*, DIP Approval Order (i.e., the SARIO) shall have been issued<br><br>3. By *December 19, 2025*, US DIP Approval Recognition Order shall have been issued by the US Court<br><br>4. By *December 22, 2025*, Loan Parties shall have retained a sale advisor satisfactory to the DIP Lenders to assist the Loan Parties with the transactions contemplated by the SISP on terms and conditions satisfactory to the DIP Lenders<br><br>5. By *December 28, 2025*, Colombia Recognition Order shall have been issued by the Colombian Court<br><br>6. By *January 7, 2026*, Colombian DIP Approval Recognition Order shall have been issued by the Colombian Court<br><br>7. By *January 20, 2026*, CCAA Court shall have issued a SISP Approval Order and an order approving a key employee retention plan, each in form and substance satisfactory to the Lenders<br><br>8. By *January 23, 2026*, Colombian DIP Security Process must be completed<br><br>9. By *February 14, 2026*, SISP Approval Order must be recognized and approved by Colombian Court<br><br>10. The Loan Parties shall have received non-binding letters of intent, received binding bids for potential sale, investment and/or restructuring transactions, obtained approval of the CCAA Court for such a transaction (and recognition thereof by the US Court and Colombian Court) and consummated such a transaction, in each case by the dates contemplated in the SISP |

21

| | 11. By *June 30, 2026*, completion and closing of a transaction of the successful bid selected in the SISP or an acceptable Plan of Arrangement has become effective |
|---|---|
| **Use of Funds** | Drilling, exploration and exploitation efforts may not be conducted without prior written consent of the DIP Lenders |
| | Proceeds cannot be used to pay pre-filing obligations without prior written consent of the DIP Lenders (if already approved by Court, consent is not required) |

42.   On December 8, 2025, the Company and the DIP Lenders executed an amendment to the DIP Loan Agreement (a copy of which is attached here to as **Appendix "D"**, without signature pages). That amendment confirmed that the DIP Loan Agreement is now binding without requiring agreement between the Borrowers and the DIP Lenders on the initial Cash Flow Forecast, provided that any advances under the DIP Loan Agreement will be subject to agreement between the Borrowers and the DIP Lenders as to the initial Cash Flow Forecast (in the case of the Initial Advance) and updated Cashflow Forecasts (in the case of Subsequent Advances). This clarification was sought by the Company and provided by the DIP Lenders to confirm that the DIP Lenders were waiving any requirement for an initial Cash Flow Forecast to be agreed upon before the DIP Loan Agreement became binding and effective.

43.   The Monitor understands that the signature pages and commitment amounts have been redacted from the DIP Loan Agreement appended to the Third Bednar Affidavit as the identity of each of the proposed DIP Lenders, their commitment amounts and the names of their authorized signatories constitute confidential commercial information, the disclosure of which may prejudice the DIP Lenders by disclosing confidential and highly sensitive financial information about the DIP Lenders' participation in the Amended DIP Loan Agreement (defined below). The Monitor further understands that each of the DIP Lenders are also bondholders of the Company's Senior Notes and that the Senior Notes are trading, and that further, the DIP Lenders desired to keep their respective commitments under the DIP Facility confidential as further lenders may decide to participate in the DIP Facility.

44.     Unredacted copies of the DIP Loan Agreement and the DIP Loan Amendment Agreement (together, the "Amended DIP Loan Agreement") have been filed with the Court as **Confidential Appendix "1"** and **Confidential Appendix "2"** to this Second Report, respectively. The Monitor respectfully requests that this Court grant the Sealing Order sealing the unredacted DIP Loan Agreement and DIP Loan Amendment Agreement until one (1) year following the termination of these CCAA Proceedings, or further Order of this Court.

45.     The Monitor has reviewed the unredacted Amended DIP Loan Agreement and is of the view, based on its knowledge of the DIP Lenders within the restructuring and financial industry, that the DIP Lenders have the wherewithal to consummate the DIP Financing transaction.

46.     The Updated Cash Flow Forecast projects the draw of the Initial Advance during the week ending December 27, 2025, and that funding is required before this Court has availability to hear any further motion by the Applicants for approval of DIP financing, should the motion scheduled to be heard on December 10, 2025, be adjourned. Per the terms of the Amended DIP Loan Agreement, the Initial Advance is to be funded once the Material Conditions in respect of the Initial Advance are fulfilled, including an agreement between the Borrowers and the Lenders in respect of the terms of the SISP.

47.     Critical Vendor Payments have been included in the Updated Cash Flow Forecast to the maximum remaining amount under the proposed $15.5 million limit, and do not require further consent from the DIP Lenders prior to payment subject to the issuance of the SARIO.

48.     The Amended DIP Loan Agreement contemplates a Tranche B Sub-Facility in the maximum amount of $20 million to renew and/or replace certain expiring LCs and a Tranche C Sub-Facility in the maximum amount of $2 million for new LCs as may be required in connection with the Company's business.  The Monitor understands that to the extent such facilities are required in the form of LCs, the providers thereof must be financial institutions capable of providing LCs and that there have been discussions between counsel

for the DIP Lenders and counsel for the RCF Lenders with regard to provision of those LCs if required in the future.

49.     The Monitor also understands that the Lenders' Fees and Expenses and the Plexus fee noted above are included in the Updated Cash Flow Forecast as well as the DIP Budgets that continue to be progressed between the proposed DIP Lenders and the Company.

**Monitor's Recommendation on DIP Financing**

50.      Taking into consideration the above, the Monitor is supportive of the Amended DIP Loan Agreement for the following reasons:

(a)     the Applicants have a critical and immediate need for interim financing, without which, based on the Updated Cash Flow Forecast, the Applicants will be unable to maintain their oil and gas production operations in Colombia and advance the restructuring process during the Forecast Period. The Monitor understands from the Third Bednar Affidavit that the failure of the Canacol Group to obtain financing immediately would not only destroy any prospect of a successful restructuring but additionally result in a cascading material impairment to the Canacol Group's ability to sustain its critical and substantial supply of natural gas to the Colombian power grid, which would have material effect on end-use consumers in Colombia;

(b)     the DIP Facility will allow the Applicants to continue to operate, including funding capital expenditures (with prior written consent of the DIP Lenders, when required), operating expenses, payroll and LCs that require cash collateralization. The DIP Facility is intended to provide adequate funding to the Applicants for their liquidity needs up to and including June 30, 2026, subject to the consummation of a potential transaction pursuant to the SISP. The DIP Facility draws are further discussed below in the context of the Applicants' liquidity needs in the Forecast Period. The Company and the Lenders continue to work on finalizing the DIP Budgets;

(c)     as discussed above, the Amended DIP Loan Agreement was the result of the only binding DIP Proposal submitted in the DIP Selection Process, and the only DIP

Proposal which provided for adequate committed financing for the Applicants' liquidity needs in the Forecast Period;

(d)     the Monitor believes that approval of the DIP Facility is in the best interests of the Applicants' stakeholders and will advance the Applicants' restructuring process, including launching and progressing a SISP. The Monitor does not believe that creditors of the Applicants will be prejudiced by the approval of the DIP Facility. To the contrary, creditors will benefit from the approval of the DIP Facility, as it will allow the business of the Applicants to continue to operate, which will enhance value versus the alternative, being a likely discontinuation of operations and the potential liquidation of the Applicants' assets;

(e)     the Amended DIP Loan Agreement meets the requirements of the DIP Selection Process. The Bondholder Group Proposal was received by the Extended Deadline, on a binding basis, with reasonable conditions to funding, and in a sufficient amount of short-term financing as required by the Guidance Letter. As noted above, while not yet secured, the Monitor as Foreign Representative is seeking a hearing for the Colombian Recognition Order in late December, 2025, or early January, 2026. Recognition of the CCAA Proceedings and the SARIO is not a funding condition to the Initial Advance, which is contemplated to be drawn at the end of December, 2025;

(f)     the Monitor reviewed the fee and interest terms of DIP facilities in amounts greater than CAD$20 million and approved by the Canadian courts in CCAA proceedings[1]. Based on the Monitor's review of the DIP financing market within these parameters, the interest rates stipulated in the Amended DIP Loan Agreement are within the ranges of similar facilities approved by the Canadian courts in CCAA proceedings, albeit at the higher end of the range. The Monitor notes that the commitment fees of the proposed DIP Facility are higher than the DIP financing facilities reviewed in the market. The Monitor understands that the commitment fee and the Lender's Fees and Expenses are driven by the Company's urgent liquidity needs, the highly compressed timeframe in which to address those liquidity needs due to factors at least in part

---

[1] Source: "DIP Tracker" database maintained by *Insolvency Insider*

outside of the Company's control, the multi-tranche nature of the DIP Facility, and the large number of participating lenders. In the face of the Applicants' urgent liquidity needs and the lack of viable alternative DIP Proposals, the Monitor is of the view that the DIP Loan Agreement is not overly prejudicial to any party and should be approved. A schedule of DIP market terms reviewed is attached hereto as **Appendix "E"**.

**Proposed DIP Lenders' Charge**

51. The Monitor understands that Macquarie does not have security over any of the Applicants' property located in Canada.

52. The Monitor's U.S. counsel, PSZJ, has conducted a preliminary review of the asserted liens of Macquarie against the Canacol Group's assets in the United States, which indicated that pursuant to a security agreement dated as of September 10, 2024, Macquarie's lien on the U.S. assets of the applicable Canacol Group borrowers appears to be limited to three bank accounts at Citibank, N.A. ("**Citibank**") and the proceeds thereof, plus one bank account at Citibank held by CNEOG Colombia (Sucursal of CNE Panama).

53. Pursuant to a Deposit Account Control Agreement dated as of September 10, 2024, Macquarie appears to have perfected its security interest in each of the foregoing accounts by control with the agreement of Citibank.

54. PPU reviewed the Macquarie loan and security agreements, which, on PPU's preliminary review, appear to create a valid security interest in favour of Macquarie over collateral located in Colombia, subject to standard qualifications and assumptions.

55. As noted above, the Applicants are seeking the DIP Lenders' Charge, in the amount of up to $67 million plus fees and expenses of the proposed DIP Lenders.

56. The terms of the DIP Loan Agreement require that the DIP Lenders' Charge rank in priority to all other encumbrances, except for the Administration Charge.

57. Accordingly, the Applicants are also seeking a provision for priority ranking of the DIP Lenders' Charge, in the following order, in priority to all other security, charges and

26

encumbrances in favour of any person over the Property other than the Administration Charge granted pursuant to the ARIO:

(a)     First – the Administration Charge (up to a maximum amount of the Canadian dollar equivalent of US$1,500,000), as approved in the ARIO;

(b)     Second – the DIP Lenders' Charge (up to a maximum amount of all amounts due and owing under the DIP Loan Agreement from time to time); and

(c)     Third – the Directors' Charge (up to a maximum amount of the Canadian dollar equivalent of US$1,000,000), as approved in the ARIO, but subordinate to the DIP Lenders' Charge.

58.     As noted in the First Report, the Canacol Group reported assets with a net book value of approximately $1.3 billion as at September 30, 2025. The Fifth Bednar Affidavit discusses the affiant's view that, based on a recent comparable transaction, the realizable value of the Canacol Group's assets would be at least $900 million under similar transaction economics, based on the Company's reserves.

59.     As of the date of the Initial Order, the Monitor understands the amount outstanding under the debt owed to Macquarie, being the only secured creditor of the Canacol Group, was approximately $38 million, although Macquarie has asserted that the amount is approximately $40 million including interest and other costs.

60.     Macquarie asserts that its position as the Company's sole secured creditor is materially prejudiced by the granting of the DIP Lenders' Charge. The Monitor notes that the Affidavit of Luis Guillermo Vélez-Cabrero sworn December 8, 2025 includes Mr. Vélez-Cabrero's opinion on two questions: (1) Under Colombian law, is it permissible for a court of competent jurisdiction to order the priming of the security interests of the secured creditor; and (2) Would a Colombian court of competent jurisdiction recognize an order of a foreign court which orders the priming of security interests of a secured creditor where the subject collateral assets are located in Colombia. In the view of the Monitor's counsel in Colombia, PPU, these issues will need to be (and are properly) determined by the

Colombian Court upon hearing submissions from the Company, other interested parties (including Macquarie and the DIP Lenders) and the Monitor.

61. As noted above, Macquarie is requesting that this Court grant an adjournment of the relief sought with respect to the DIP Loan Agreement and the DIP Lenders' Charge, or in the alternative, opposes this Court approving the same.

62. The Monitor is of the view that the granting, the amount, and the priority of the proposed DIP Lenders' Charge is reasonable in the circumstances, considering:

(a)    the Updated Cash Flow Forecast;

(b)    the Applicants' urgent need for liquidity to operate during these CCAA Proceedings;

(c)    that the DIP Lenders' Charge, including its priority, is a requirement of the Amended DIP Loan Agreement;

(d)    the Monitor's understanding that the failure of the Canacol Group to obtain financing immediately would eliminate any prospect of a successful restructuring, but would also result in a cascading material impairment to the Canacol Group's ability to sustain its critical and substantial supply of natural gas to the Colombian power grid, thus affecting end-use consumers in Colombia;

(e)    that the Amended DIP Loan Agreement is the result of the only viable DIP Proposal received in the DIP Selection Process;

(f)    the lack of any material prejudice to any creditor or other stakeholder of the Canacol Group. This is particularly the case where, as noted above, the Monitor understands, as set out in Fifth Bednar Affidavit, that the Canacol Group recently reported total assets with a net book value of approximately $1.3 billion, and that based on a recent comparable transaction, the Canacol Group's assets would have yielded greater than $900 million on similar transaction terms. The Fifth Bednar Affidavit also sets out that on March 20, 2025, Canacol published its release summarizing the Canacol Group reserve report from Boury Global Energy Consultant Ltd. (**"BGEC"**), an internationally

recognized firm specializing in the valuation of oil and gas reserves, for the year ending December 31, 2024 (the **"2024 Reserve Report"**). Based on BGEC's conclusions:

(i)     the Canacol Group had proved or 1P natural gas reserves of 254.1 billion cubic feet equivalent ("**Bcfe**") with an after-tax net present value of $1,084,400,000; and

(ii)    the Canacol Group had proved plus probable or 2P reserves of 598.8 Bcfe, with an after-tax net present value of $1,987,200,000;

(g)   as a result of the foregoing, the amount of the proposed Charges, including the DIP Lenders' Charge, plus the amount of the Macquarie Debt, is far less than the referenced asset values.

63.   Further, in consideration of the foregoing, and particularly the Updated Cash Flow Forecast, the Applicants' urgent need for liquidity before the week ending January 10, 2026 in order to continue operating, the disruption to the Company's critical and substantial supply of natural gas to the Colombian power grid that would result if that urgent need for liquidity is not resolved, the lack of any material prejudice to any creditor or stakeholder, and the lack of available Court time on the Commercial List between December 10, 2025 and the end of December, the Monitor is not supportive of Macquarie's request for an adjournment of the Company's application.

64.   Accordingly, the Monitor recommends that the Court approve the proposed DIP Lenders' Charge in the proposed priority ranking.

## IX.    REPORTED CASH RECEIPTS AND DISBURSEMENTS

65.   The Applicants' consolidated cash flow projection for the period from November 23, 2025, to December 20, 2025 (the **"November 23 Cash Flow Forecast"**) was filed with the Court in support of the Comeback Motion.

66.   The Applicants have continued to provide the Monitor with their cooperation and access to their books and records. The Monitor has worked with the Applicants to prepare analyses of their reported weekly cash flows as compared to the November 23 Cash Flow Forecast.

67.   A comparison of the Applicants' reported cash receipts and disbursements for the one-week period ended November 29, 2025, as compared to the November 23 Cash Flow Forecast is summarized below.

| The Canacol Group Summary of Reported Receipts and Disbursements For the 1-week period from November 23, 2025 - November 29, 2025 In USD ($000's); unaudited | Actual | Forecast | Variance |
|---|---|---|---|
| **Receipts** | | | |
| Receipts | 14,674 | 18,409 | (3,735) |
| **Total receipts** | **14,674** | **18,409** | **(3,735)** |
| | | | |
| **Operating disbursements** | | | |
| Pre-filing expenses | (576) | (4,839) | 4,263 |
| Operating expenses | (63) | (1,880) | 1,817 |
| Royalties | (1,779) | (1,807) | 28 |
| Salaries and bonuses | (1,184) | (1,731) | 547 |
| Capital expenditures | - | (1,472) | 1,472 |
| Tax payable | (4,815) | (4,815) | (0) |
| Letters of credit | - | - | - |
| Professional fees | (284) | (200) | (84) |
| **Total operating disbursements** | **(8,701)** | **(16,744)** | **8,043** |
| **Net cash flow** | **5,974** | **1,666** | **4,308** |
| **Opening cash** | 18,883 | 18,031 | 852 |
| Net cash flow | 5,974 | 1,666 | 4,308 |
| **Ending cash** | **24,857** | **19,697** | **5,160** |

68.   As reflected in the summary table above, the Applicants reported a net cash flow of approximately $6.0 million in the week ended November 29, 2025. As at November 29, 2025, the Applicants reported a cash balance of approximately $24.9 million, $5.2 million higher than forecast.

69.   The favourable ending cash variance of approximately $5.2 million can be summarized as follows:

(a)   a $0.8 million favourable variance in opening cash due to a conservative estimate of opening cash when preparing the November 23 Cash Flow Forecast;

(b)   a $3.7 million unfavourable variance in cash receipts. The Monitor understands that this amount was received earlier in the month of November, and part of this variance is reflected in the opening cash favourable variance;

30

(c)     an $8.0 million favourable variance in operating disbursements due to:

(i)     lower than projected Critical Vendor Payments ($4.3 million less than November 23 Cash Flow Forecast), which are expected to reverse in the coming weeks as the Company has continued to determine Critical Vendor Payments necessary for ongoing operations. The Applicants made Critical Vendor Payments of approximately $4.0 million in the week ended December 6, 2025; and

(ii)    positive timing variances relating to payment of operating expenses ($1.8 million) and capital expenditures ($1.5 million) anticipated to reverse during the Forecast Period.

## X.    OTHER RELIEF

**Critical Vendor Payments**

70.    Pursuant to the ARIO, the Applicants were authorized to make Critical Vendor Payments up to an aggregate maximum amount of $5.5 million, with the prior approval of the Monitor.

71.    As noted above, as at the date of this Second Report, the Canacol Group has made Critical Vendor Payments to certain critical suppliers in partial payment of amounts owing prior to the Filing Date, in the aggregate amount of approximately $5,169,000. The Critical Vendor Payments made to date primarily relate to ongoing drilling and maintenance capital expenditures and transportation expenses to vendors that are critical for ongoing operations of the Canacol Group, and the payments were made with the approval of the Monitor.

72.    The Applicants, in consultation with the Monitor, have determined that Critical Vendor Payments totaling up to $15.5 million will be necessary during the Forecast Period, including the $5,169,000 already disbursed. Accordingly, the Applicants are seeking approval in the SARIO to increase the maximum aggregate amount permitted for Critical Vendor Payments from $5.5 million to $15.5 million.

73.     As discussed in the Prior Reports, the Critical Vendor Payments are primarily proposed to be paid to the Company's critical vendors in Colombia who are not easily replaceable and are essential, specialized service providers whose continued support is required to maintain safe, continuous operations in Colombia's oil and gas fields, and are therefore critical to the Applicants being able to continue in business. The Monitor understands that these critical vendors may withhold services or repossess critical assets absent payment of outstanding Pre-Filing Period amounts, notwithstanding the granting of the ARIO, and that this may continue to be the case in Colombia even upon recognition of the ARIO and the SARIO pursuant to the Colombian Recognition Proceedings.

74.     The Monitor supports the relief being requested by the Applicants in this regard, for the following reasons:

(a)     the Monitor understands that the Critical Vendor Payments are intended to be reserved for vendors which are essential to avoiding business disruptions and safety and environmental risks, and to maintaining stable operations to provide for supply continuity and to maximize stakeholder value;

(b)     as noted in the Prior Reports, the Canacol Group reported approximately $108 million in trade and other payables as at September 30, 2025 (the "**September Payables**"). Upon further review of the Company's financial reporting, the September Payables appear to include approximately $61 million related directly to amounts payable to vendors and suppliers of the Canacol Group, with the remainder relating to payroll, transportation payables to Promigas, royalties, taxes, and interest payable. The Monitor and the Company have spent significant time reviewing and considering those vendors which are deemed critical and evaluating the Company's alternatives for maintaining operations, and have determined that a limit in the amount of $15.5 million is appropriate, and is significantly less than the approximate $61 million owing to vendors and suppliers; and

(c)     consistent with the ARIO, the Critical Vendor Payments are only sought to be made with the prior approval of the Monitor.

32

**LC Relief**

75.     As further described in the Fourth Bednar Affidavit, the Canacol Group has an LC of approximately $5.2 million that is due to expire on December 12, 2025 and requires cash collateralization. This LC was issued by Scotiabank Colpatria (now DaviBank) in support of CNE O&G Colombia's obligations to the ANH.

76.     The Monitor understands that under Colombian law, a party to the PRES Order, as is the case with CNE O&G Colombia, may not post cash collateral (e.g., for replacement LCs) or pledge assets to secure post-filing credit without prior, express, and specific authorization from a bankruptcy judge in Colombia.

77.     Accordingly, the Applicants are seeking approval from this Court to take the following steps:

(a)     Canacol, which is not a party subject to the PRES Order, will post cash collateral in the approximate amount of $5.2 million from an account it holds with ScotiaBank to a U.S. bank account that it holds with Citibank;

(b)     once the cash collateral is posted with Citibank, Citibank will then issue the Citibank LC to a bank in Colombia; and

(c)     the Applicants are currently in discussions with Banco Santander Colombia and potentially other banks regarding the issuance of a replacement LC to ANH, upon being granted the Citibank LC, in support of the obligations of CNE O&G Colombia to the ANH.

78.     The Monitor supports the relief being requested by the Applicants in this regard, for the following reasons:

(a)     the Monitor understands that replacing the LC for the benefit of ANH in the amount of $5.2 million is critical for continued operations of CNE O&G Colombia and that without a replacement LC, the ANH may revoke CNE O&G Colombia's exploration, production and exploitation permits;

(b)     the issuance of the Citibank LC is a practical solution to the impact of the PRES Order on the Company's normal financing arrangements;

(c)     there is no cash impact to this arrangement, as the Updated Cash Flow Forecast already reflects cash collateralization required for the replacement of the LC; and

(d)     the Monitor understands that the DIP Lenders support the issuance of the Citibank LC.

## XI.    UPDATED CASH FLOW FORECAST

79.     The Applicants, with the assistance of the Monitor, have prepared the Updated Cash Flow Forecast for the purpose of projecting the estimated liquidity needs of the Applicants during the proposed Stay Period. A copy of the Updated Cash Flow Forecast, accompanying notes and a report containing prescribed representations regarding the preparation of the Updated Cash Flow Forecast are attached hereto as **Appendix "F"**.

80.     The Updated Cash Flow Forecast has been prepared on a conservative basis using probable and hypothetical assumptions set out in the notes to the Updated Cash Flow Forecast. The Updated Cash Flow Forecast reflects the Applicants' estimates of receipts and disbursements, on a weekly basis, over the Forecast Period.  A summary of the Updated Cash Flow Forecast is provided below.

| The Canacol Group 10-Week Cash Flow Forecast In USD ($000's); unaudited | |
|---|---:|
| **Receipts** | |
| Receipts | 49,592 |
| **Total receipts** | **49,592** |
| | |
| **Operating disbursements** | |
| Pre-filing expenses | (14,263) |
| Operating expenses | (11,591) |
| Royalties | (5,876) |
| Payroll | (4,499) |
| Capital expenditures | (28,009) |
| Tax payable | (3,973) |
| Letters of credit | (7,930) |
| DIP fees and interest | (4,940) |
| Professional fees | (3,691) |
| **Total operating disbursements** | **(84,772)** |
| | |
| **Net cash flow** | **(35,180)** |
| | |
| **Opening cash** | 24,857 |
| Net cash flow | (35,180) |
| DIP draw | 47,000 |
| **Ending cash** | **36,676** |

81.    Forecast operating cash receipts over the Forecast Period total approximately $49.6 million, primarily related to collections of monthly payments from the customers of the Canacol Group in connection with its sales through the long-term, fixed-price Offtake Agreements. The forecast cash receipts are net of transportation costs paid to Promigas pursuant to the Promigas Trust (as defined in the Pre-Filing Report).

82.    Forecast operating disbursements over the Forecast Period total approximately $84.8 million and primarily consist of:

(a)    capital expenditures ($28.0 million), include costs of drilling and workovers, compression, and other activities for the purpose of producing natural gas and crude oil for sale;

(b)    Critical Vendor Payments ($14.3 million), conservatively representing the maximum available balance, as at November 30, 2025, of the $15.5 million Critical Vendor Payments limit sought in the SARIO (including the approximate amount of $4 million paid in the week ended December 6, 2025). Critical Vendor Payments will continue to be limited to what is necessary to preserve value and maintain operations, and can only be made in consultation with, and with the consent of, the Monitor;

(c)     operating expenses ($11.6 million), inclusive of general and administrative expenses;

(d)     projected cash collateralization of expiring LCs and new LCs to be placed ($7.9 million). A new LC of $2.6 million is forecast to be placed in January and is intended to be funded by Tranche C of the DIP Facility. The Updated Cash Flow Forecast contemplates the amount of the Citibank LC;

(e)     royalty payments ($5.9 million), of which approximately $2.4 million relate to the Pre-Filing Period, including payment of the October royalties, and November royalties up to the Filing Date;

(f)     DIP fees and interest ($4.9 million) which includes payment of commitment fees and interest pursuant to the Amended DIP Loan Agreement, as well as fees paid to Plexus, as further described in the notes to the Updated Cash Flow Forecast at **Appendix "F"**; and

(g)     taxes payable ($4.0 million), reflecting withholding taxes.

83.     Net cash outflows of approximately $35.2 million are forecast over the Forecast Period, before projected draws under the proposed DIP Facility.

84.     Accordingly, the Applicants will be required to draw on the proposed DIP Facility in order to have sufficient funds to operate the business in the normal course. The Updated Cashflow Forecast projects borrowings under the DIP Facility in the amount of $47.0 million over the Forecast Period, representing full draws under the Tranche A and Tranche C Sub-Facilities. Under the Amended DIP Loan Agreement, the Applicants must draw on the Tranche A Sub-Facility in two advances, with the entire amount of the Subsequent Advance to be drawn at once, regardless of the Company's liquidity position. The Subsequent Advance of the Tranche A Sub-Facility is forecast to be drawn during the week ending January 31, 2025, after the conditions to the Subsequent Advance are fulfilled by the Company (including the completion of the DIP Security Process as stipulated by the Milestones pursuant to the Amended DIP Loan Agreement). Accordingly, the Updated Cash Flow Forecast reflects a draw in the full $30 million amount of the Subsequent

Advance. Without the Subsequent Advance, the Company is not projected to have adequate liquidity to operate through to the end of the Stay Period.

85.    The Updated Cash Flow Forecast does not include any draws in respect of the Tranche B Sub-Facility as expiry dates of the existing LCs it is intended to address are outside of the Forecast Period.

86.    As evidenced in the Updated Cash Flow Forecast, without access to borrowings under the DIP Facility, the Applicants lack sufficient liquidity to maintain operations and ensure cash collateralization of expiring LCs during the Forecast Period. The DIP Facility will provide the Applicants with sufficient funding during the Forecast Period to ensure continued operations during the CCAA Proceedings.

87.    The Monitor notes that the Updated Cash Flow Forecast has been prepared solely for the purpose described above, and readers are cautioned that it may not be appropriate for other purposes.

**Comparison of the Updated Cash Flow Forecast to the November 23 Cash Flow Forecast**

88.    The November 23 Cash Flow Forecast appended to the First Report was provided for the period from November 23, 2025, to December 20, 2025, and forecast ending cash of approximately $6.8 million at the end of the period.

89.    In comparison, the Updated Cash Flow Forecast forecasts ending cash of approximately $7.8 million on December 20, 2025, representing a favourable variance in projected ending cash of approximately $1 million, attributed primarily to:

(a)    the favourable opening cash variance of approximately $0.8 million in the week ended November 29, 2025, as discussed above;

(b)    approximately $3.3 million in favourable timing variances in payments of operating expenses ($1.9 million) and capital expenditures ($1.5 million) initially forecast in the week ended November 29, 2025, which are now expected to be paid in the week ending December 27, 2025, outside of the November 23 Cash Flow Forecast period; partially offset by

37

(c)    a $3.7 million unfavourable variance in cash receipts in the week ended November 29, 2025, as discussed above.

90.    A comparison schedule of the November 23 Cash Flow Forecast and the Updated Cash Flow Forecast, up to December 20, 2025, is appended hereto as **Appendix "G"**.

## XII.    STAY EXTENSION

91.    The current Stay Period expires on December 18, 2025. The Applicants are seeking an extension of the stay of proceedings to February 6, 2026, which the Monitor understands is intended to provide the Company with time in which to develop a SISP to be approved by this Court, as is also required pursuant to the terms of the DIP Loan Agreement, should the Court see fit to approve same.

92.    The Monitor supports the Applicants' request for an extension of the stay of proceedings to February 6, 2026, for the following reasons:

(a)    the Applicants are acting in good faith and with due diligence and circumstances exist that make an extension of the stay appropriate as set out below;

(b)    the granting of the extension of the Stay Period should not materially prejudice any creditor of the Applicants as the Updated Cash Flow Forecast reflects that the Applicants are projected to have sufficient funding to continue to operate in the normal course through the proposed stay extension period, provided that the Amended DIP Loan Agreement is approved by this Court and recognition is granted by the US Court and the Colombian Court as required; and

(c)    the extension of the Stay Period is anticipated to provide sufficient time for the Company, with the assistance of its advisors and the Monitor, and in consultation with the DIP Lenders to engage a sales agent and develop the SISP.

## XIII.    MONITOR'S CONCLUSION AND RECOMMENDATIONS

93.    For the reasons set out in this Second Report, the Monitor is of the view that the relief requested by the Applicants in the proposed SARIO and the Sealing Order is both

appropriate and reasonable. The Monitor is also of the view that the Applicants are acting in good faith and with due diligence. Granting the relief sought by the Applicants will provide the Applicants with the best opportunity to explore restructuring options under the CCAA under supervision of the Monitor, which would seek to maximize creditor and stakeholder value.

94.    Based on the foregoing, the Monitor respectfully recommends that this Court approve the relief sought by the Applicants in the proposed SARIO and Sealing Order.


All of which is respectfully submitted this 9th day of December 2025.


**KPMG Inc.**
**In its capacity as Monitor of**
**Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Cantana Energy GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S.**
**and not in its personal or corporate capacity**


Per:


_____

**Paul van Eyk**
**CPA, CA-IFA, CIRP, LIT, Fellow of INSOL**
President


_____

**Katherine Forbes**
**CPA, CA, CIRP, LIT**
Senior Vice President

# Appendix "A"

| COURT FILE NUMBER | **2501-18462** |
|---|---|
| COURT | **COURT OF KING'S BENCH OF ALBERTA** |
| JUDICIAL CENTRE | **CALGARY** |
| APPLICANTS | **IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, RSC 1985, c C-36, AS AMENDED** |
| | **AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA ULC, CANTANA ENERGY GMBH, CNE OIL & GAS S.R.L, CANACOL ENERGY COLOMBIA S.A.S., SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S.** |
| DOCUMENT | **FIRST REPORT OF THE MONITOR** |
| | **NOVEMBER 24, 2025** |
| ADDRESS FOR SERVICE AND CONTACT INFORMATION OF PARTY FILING THIS DOCUMENT: | **MONITOR** |

**FILED DIGITALLY**
2501 18462
Nov 25, 2025
8:22 AM
JUDICIAL CENTRE OF CALGARY
CLERK OF THE COURT

**MONITOR**
KPMG Inc.
Bay Adelaide Centre
333 Bay Street, Suite 4600
Toronto, ON
Paul van Eyk / Katherine Forbes / Duncan Lau
Tel: (416) 777-8281 / (416) 777-8107 / (416) 476-2184
Email: pvaneyk@kpmg.ca, katherineforbes@kpmg.ca, duncanlau@kpmg.ca

**MONITOR'S COUNSEL**
Bennett Jones LLP
4500 Bankers Hall East
855 – 2nd Street SW
Calgary, AB  T2P 4K7
Raj S. Sahni / Kelsey Meyer / Chyna Brown
Tel: (416) 777-4804 / (403) 298-3323 / (403) 298-3244
Email: sahnir@bennettjones.com, meyerk@bennettjones.com, brownc@bennettjones.com

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................. 2

II.     PURPOSE OF REPORT....................................................................................... 3

III.    TERMS OF REFERENCE .................................................................................... 4

IV.     ACTIVITIES OF THE APPLICANTS ................................................................ 6

V.      ACTIVITIES OF THE MONITOR...................................................................... 8

VI.     CHAPTER 15 PROCEEDINGS............................................................................ 9

VII.    PRE-FILING PAYMENTS.................................................................................. 10

VIII.   UPDATED CASH FLOW FORECAST .............................................................. 13

IX.     DIP SELECTION PROCESS ............................................................................... 16

X.      STAY EXTENSION .............................................................................................. 19

XI.     PROPOSED COURT ORDERED CHARGES.................................................... 20

XII.    RELIEF FROM SECURITIES FILINGS........................................................... 24

XIII.   MONITOR'S CONCLUSION AND RECOMMENDATIONS ............................. 24

**APPENDICES**

**APPENDIX "A" –**  Pre-Filing Report of the Monitor dated November 17, 2025 (without appendices)

**APPENDIX "B" –**  Cash Flow Forecast for the period from November 23, 2025, to December 20, 2025

**APPENDIX "C" –**  Letter from Canacol Energy Ltd. to prospective DIP lenders

1

## I.    INTRODUCTION

1.    On November 18, 2025 (the "**Filing Date**"), Canacol Energy Ltd. ("**Canacol**") and its subsidiaries 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Cantana Energy GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S. (collectively, the "**Applicants**", the "**Canacol Group**" or the "**Company**") were granted relief under the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**") by Order (the "**Initial Order**") of the Court of the King's Bench of Alberta (the "**Court**"). The relief granted under the Initial Order included, among other things:

(a)    a stay of proceedings in favour of the Applicants from November 18, 2025, to November 28, 2025 (the "**Stay Period**");

(b)    the appointment of KPMG Inc. as Monitor ("**KPMG**" or the "**Monitor**");

(c)    authorizing the Applicants to:

(i)    continue to use the Cash Management System;

(ii)    make payment of certain obligations incurred prior to the commencement of the Applicants' CCAA proceedings (the "**CCAA Proceedings**");

(d)    authorizing the Monitor to act as foreign representative for the purpose of having the CCAA Proceedings recognized in any jurisdiction outside Canada including, without limitation, the United States of America (the "**United States**"), the Republic of Colombia ("**Colombia**"), the Republic of Panama, and/or Switzerland;

(e)    granting the Administration Charge (as defined herein); and

(f)    scheduling a hearing for the Applicants' application for further relief (the "**Comeback Motion**") on November 26, 2025.

2.    KPMG, in its then capacity as Proposed Monitor, provided this Court with a report dated November 17, 2025 (the "**Pre-Filing Report**") in connection with the Applicants'

application for the Initial Order. A copy of the Pre-Filing Report (without exhibits) is attached hereto as **Appendix "A"**.

3.   Copies of materials and documents filed in connection with these CCAA proceedings are available on the Monitor's website at https://kpmg.com/ca/canacol (the "**Monitor's Website**").  In addition, the Monitor has arranged for a toll-free hotline 1-833-724-5456 and an email address at: canacol@kpmg.ca, through which creditors of the Applicants or other interested parties can make inquiries with the Monitor related to the CCAA Proceedings.

## II.   PURPOSE OF REPORT

4.   The purpose of this report (the "**First Report**") is to provide the Court with information pertaining to:

(a)   the activities of the Applicants and the Monitor, respectively, since the issuance of the Initial Order;

(b)   the Applicants' proceedings under Chapter 15 of Title 11 of the United States Code (the "**Bankruptcy Code**", and such proceedings being the "**Chapter 15 Proceedings**");

(c)   the Applicants' cash flow forecast (the "**Updated Cash Flow Forecast**") for the period from November 23, 2025, to December 20, 2025 (the "**Forecast Period**"); and

(d)   The Applicants' Comeback Motion for an Order amending and restating the Initial Order (the "**ARIO**") to provide for, among other things:

(i)   an extension of the Stay Period to December 18, 2025;

(ii)   an increase the quantum and providing for the priority ranking of the Administration Charge;

(iii)   the granting of the Directors' Charge (as defined herein);

(iv)  authorization for the Applicants to:

(A)  make payment of obligations owing in respect of goods and services supplied to the Applicants prior to the Filing Date by critical vendors, to the extent required to ensure ongoing supply of critical goods and services, subject to prior approval by the Monitor, up to a maximum aggregate amount of $5.5 million (such payments, being the "**Critical Vendor Payments**");

(B)  make pre-filing royalty payments to the Agencia Nacional de Hidrocarburos ("**ANH**") (the National Hydrocarbon Agency) or other governmental and/or regulatory authorities in Colombia, in consultation with the Monitor; and

(C)  make remittances or payments of amounts payable to Colombian taxation authorities in respect of and including, without limitation, regional, municipal and national withholding taxes and value-added taxes, which are entitled at law to be paid in priority to claims of secured creditors and that are attributable to or in respect of the carrying on of the Business by the Applicants.

(v)  relief for Canacol and representatives of the Applicants from certain securities law reporting obligations under federal, provincial and other applicable law (the "**Securities Filings**") until further order of the Court; and

(vi)  approval of the Pre-Filing Report and this First Report, and the actions, conduct and activities of the Monitor set out therein.

## III.    TERMS OF REFERENCE

5.    Capitalized terms used but not defined in the First Report are as defined in the Pre-Filing Report. Included in the materials filed by the Applicants in support of the Comeback Motion and the ARIO is the Affidavit of Mr. Jason Bednar affirmed on November 22, 2025

4

(the "**Bednar Comeback Affidavit**"). The First Report should be read in conjunction with the Pre-Filing Report, the Bednar Affidavit (as defined in the Pre-Filing Report) sworn in support of the Initial Order, and the Bednar Comeback Affidavit, as certain information contained in each of the Pre-Filing Report, the Bednar Affidavit, and the Bednar Comeback Affidavit, respectively, has not been included herein in order to avoid unnecessary duplication.

6.    In preparing this First Report, KPMG has relied solely on information and documents provided to it by the Applicants and their respective advisors, including unaudited, draft and/or internal financial information, financial projections prepared by the Applicants, discussions with management of the Applicants, and the affidavits of the Applicants' executive (collectively, the "**Information**").  In accordance with industry practice, except as otherwise described in the Report, KPMG has reviewed the Information for reasonableness, internal consistency, and use in the context in which it was provided. However, KPMG has not audited or otherwise attempted to verify the accuracy or completeness of the Information in a manner that would comply with Generally Accepted Auditing Standards ("**GAAS**") pursuant to the *Chartered Professional Accountant of Canada Handbook* and, as such, KPMG expresses no opinion or other form of assurance contemplated under GAAS in respect of the Information.

7.    Future orientated financial information contained in the Updated Cash Flow Forecast is based on the Applicants' estimates and assumptions regarding future events.  Actual results will vary from the information presented even if the hypothetical assumptions occur, and variations may be material.  Accordingly, the Monitor expresses no assurance as to whether the Updated Cash Flow Forecast will be achieved.

8.    Unless otherwise stated, all monetary amounts noted herein are expressed in United States ("**US**") dollars.

## IV.    ACTIVITIES OF THE APPLICANTS

9.    Since the date of the Initial Order, the Applicants have been managing their operations in the normal course and working to stabilize the business as a result of the CCAA Proceedings, with the assistance of the Monitor.

10.    As discussed in the Bednar Comeback Affidavit, the activities of the Applicants since the date of the Initial Order have included:

(a)    communicating with, providing information to, and answering questions of creditors, employees and other stakeholders regarding the CCAA Proceedings;

(b)    managing key relationships with customers and suppliers, and working diligently to operate the business in accordance with terms of the Initial Order;

(c)    working with and corresponding regularly with representatives of the Monitor regarding numerous matters in the CCAA Proceedings, including planned disbursements;

(d)    making certain payments to trade vendors related to the period prior to the Filing Date in the aggregate amount of approximately $660,000, which is within the maximum amount of $2 million authorized in the Initial Order as Critical Vendor Payments pursuant to subparagraph 6(c) of the Initial Order. As further discussed below, the Monitor understands that, in the Company's view, these payments were required to maintain operations and the continued supply of gas, and the payments were approved by the Monitor;

(e)    making payments in the aggregate amount of approximately $1,807,000 to ANH in respect of pre-filing royalty payments owing for the month of September 2025 (the "**September Royalties**"), which exceeded the amount set out in the Initial Order of $1,657,000 by approximately $150,000. As discussed below, the Monitor understands that the September Royalties payments were higher than anticipated as additional information regarding September 2025 amounts owing was reconciled by the Applicants following the granting of the Initial Order, and further, that these

payments are necessary to retain the Company's natural gas exploration and production rights in Colombia. As set out below, the Monitor's view is that the Applicants have the authority to pay the additional $150,000 amount owed to ANH pursuant to paragraph 8(c) of the Initial Order;

(f)     arranging for payments of withholding taxes in the aggregate amount of approximately $4,760,000 to Colombian taxation authorities (such payments being payments of "**Withholding Taxes**"). The Monitor understands that the Withholding Taxes are of a nature or kind which are entitled at law to be paid in priority to claims of secured creditors, and that the obligations are incurred by the Applicants in the course of doing business, as contemplated in paragraph 8(c) of the Initial Order. As at the date of this First Report, the Monitor understands that these payments have not yet been made but are intended to be initiated before the hearing for the Comeback Motion.

(g)     receiving various inbound phone calls and correspondence from representatives of parties expressing interest in funding any interim financing ("**DIP**") requirements during the CCAA Proceedings, and enquiring with respect to other matters in the CCAA Proceedings;

(h)     working with the Monitor, Plexus Capital ("**Plexus**"), the Applicants' chief restructuring advisor, Joe Prosperi of HWS Consulting (the "**Restructuring Advisor**"), and counsel to develop an urgent process to solicit proposals from the existing lender groups to provide DIP financing (the "**DIP Selection Process**"). The DIP Selection Process is further discussed in a later section to this First Report;

(i)     working with the Monitor to prepare the Updated Cash Flow Forecast;

(j)     working with US and Colombian counsels and the Monitor, as foreign representative, in connection with the Chapter 15 Proceedings and the planned Colombian Recognition Proceedings (as defined below), and executing certain documents in respect of same;

(k)    preparing a press release announcing the granting of the US Provisional Relief Order and the US Recognition Scheduling Order (each as defined below); and

(l)    seeking to schedule a hearing date for approval of any offer of DIP financing obtained through the DIP Selection Process.

## V.    ACTIVITIES OF THE MONITOR

11.    Since the date of the Initial Order, the Monitor's activities have included:

(a)    arranging for notice of the CCAA Proceedings to be published in the November 25, 2025, edition of the *Globe and Mail* (National Edition), as required pursuant to the Initial Order;

(b)    filing prescribed documents with the Office of the Superintendent of Bankruptcy, pursuant to the CCAA;

(c)    implementing procedures for the monitoring of the Applicants' cash flows and to allow for payments to be made by the Applicants in accordance with the terms of the Initial Order;

(d)    with the assistance of its counsel, filing, in its capacity as foreign representative, the petition materials required to seek interim recognition of the CCAA Proceedings in the Chapter 15 Proceedings;

(e)    executing certain documents, in its capacity as foreign representative, in support of the application for recognition proceedings in Colombia. As at the date of this First Report, the Monitor, in its capacity as foreign representative, is in the process of making an application to the Superintendency of Companies of Colombia through a power of attorney granted to the Applicants' Colombian counsel seeking the recognition of the CCAA Proceeding as a foreign main proceeding, including provisional stays and related relief in Colombia (the "**Colombian Recognition Proceedings**");

(f)    assisting the Applicants with the preparation of the Updated Cash Flow Forecast;

8

(g)   assisting the Applicants with their communications with stakeholders including employees, vendors, lenders, and key trade partners;

(h)   receiving various inbound phone calls and correspondence from representatives of parties expressing interest in funding any DIP requirements during the CCAA Proceedings, and enquiring with respect to other matters in the CCAA Proceedings;

(i)   working with the Applicants, Plexus, the Restructuring Advisor, and counsel to develop and carry out the DIP Selection Process;

(j)   in collaboration with Plexus, assisting the Applicants in evaluating their DIP financing requirements during the CCAA Proceedings;

(k)   as further discussed below, approving certain Critical Vendor Payments, in the aggregate amount of approximately $660,000;

(l)   attending various teleconferences and in-person meetings with representatives of the Applicants and the Applicants' counsel in respect of the Canacol Group's cash flows and liquidity requirements (as further discussed below), operations, and the CCAA Proceedings generally;

(m)   maintaining the Service List, and the Monitor's Website where all Court documents and other material documents pertaining to the CCAA Proceedings and the Chapter 15 Proceedings are available in electronic form;

(n)   reviewing materials served by the Applicants in connection with the Comeback Motion; and

(o)   preparing this First Report.

## VI.   CHAPTER 15 PROCEEDINGS

12.   In accordance with the Initial Order, on November 19, 2025, the Monitor in its capacity as authorized foreign representative of the Canacol Group filed petitions for relief under chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court, Southern

District of New York (the "**US Court**") recognizing the CCAA Proceedings as a "foreign main proceeding". These filings commenced the Chapter 15 Proceedings as proceedings ancillary to those pending in this Court. In addition to the petitions, the Monitor filed certain motions for provisional and ancillary relief (the "**US Provisional Relief**").

13.     On November 20, 2025, motions for the US Provisional Relief were heard before the Honorable Judge Jones, who granted the orders sought as follows:

(a)     an Order Granting Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code (the "**US Provisional Relief Order**") in respect of the US Provisional Relief requested by the Foreign Representative; and

(b)     an Order Scheduling Recognition Hearing and Specifying the Form and Manner of Service and Notice (the "**US Recognition Scheduling Order**"), scheduling a hearing of the US Recognition Proceedings for December 11, 2025.

14.     Copies of the US Provisional Relief Order and the US Recognition Scheduling Order are attached as Exhibit "C" and Exhibit "D", respectively, to the Bednar Comeback Affidavit. Copies of the materials filed, and orders made, in the Chapter 15 Proceedings have also been, and will continue to be, made available on the Monitor's Website.

## VII.    PRE-FILING PAYMENTS

**Critical Vendor Payments**

15.     Pursuant to the Initial Order, the Applicants were authorized to make payments in respect of amounts owing for goods and services supplied by certain critical third-party suppliers prior to the Filing Date (the "**Critical Vendor Payments**"), up to an aggregate maximum amount of $2 million, and subject to the prior approval of the Monitor.

16.     As noted above, the Canacol Group has made Critical Vendor Payments to certain critical suppliers in partial payment of amounts owing prior to the Filing Date, in the aggregate amount of approximately $660,000. The Critical Vendor Payments made to date primarily relate to ongoing drilling and maintenance capital expenditures and transportation expenses

to vendors that are critical for ongoing operations of the Canacol Group, and the payments were made with the approval of the Monitor.

17. The Applicants, in consultation with the Monitor, have determined that Critical Vendor Payments totaling up to $5.5 million will be necessary during the Forecast Period, including the $660,000 already disbursed. Accordingly, the Applicants are seeking approval in the ARIO to increase the maximum aggregate amount permitted for Critical Vendor Payments from $2 million to $5.5 million.

18. As discussed in the Pre-Filing Report, the Critical Vendor Payments are primarily proposed to pay for the Company's critical vendors in Colombia who are not easily replaceable and are essential, specialized service providers whose continued support is required to maintain safe, continuous operations in Colombia's oil and gas fields and are therefore critical to the Applicants being able to continue in business. The Monitor understands that these critical vendors may withhold services or repossess critical assets absent payment of outstanding pre-filing amounts, notwithstanding the granting of the Initial Order, and that this may continue to be the case in Colombia even upon recognition of the Initial Order pursuant to the Colombian Recognition Proceedings.

19. The Monitor supports the relief being requested by the Applicants in this regard, for the following reasons:

(a) the Monitor understands that the Critical Vendor Payments are intended to be reserved for vendors which are essential to avoiding business disruptions and safety and environmental risks, and to maintaining stable operations to provide for supply continuity and to maximize stakeholder value;

(b) as noted in the Pre-Filing Report, the Canacol Group reported approximately $108 million in accounts payable for the period ended September 30, 2025; the $5.5 million in Critical Vendor Payments authorization proposed by the Applicants is a small fraction of the Company's trade obligations; and

(c) consistent with the Initial Order, the Critical Vendor Payments are only sought to be made with the approval of the Monitor.

**Royalty Payments to ANH**

20.     As noted in the Pre-Filing Report, royalties are determined in accordance with a sliding scale depending on produced volume of oil and gas. The Monitor understands that royalties are paid monthly, 60 days after production, and further, that these payments are necessary to preserve the Company's natural gas exploration and production rights in Colombia.

21.     Pursuant to the Initial Order, the Applicants were entitled to make payments to ANH and other government and regulatory authorities for royalties arising prior to the Filing Date in the amount of $1,657,000, which amount was intended to represent royalties payable related to the month of September, 2025.

22.     As noted above, following the issuance of the Initial Order, the Applicants are arranging to pay the September Royalties owing, in the amount of approximately $1,807,000, on or about the due date. The Monitor understands that the September Royalties are higher than anticipated (and higher than the amount expressly permitted in paragraph 6(d) of the Initial Order) by $150,000 as the Applicants gathered further information on the September Royalties owing following the granting of the Initial Order, ultimately determining that the amount owing was greater than $1,657,000.  The Monitor understands from the Company and its Colombian counsel that the payment to ANH is a critical payment to a governmental authority in the nature of "taxes, assessments or levies of any nature or kind which are entitled at [Colombian] law to be paid in priority to claims of secured creditors and that are attributable to or in respect of the carrying on of the Business by the Applicants", as is contemplated in paragraph 8(c) of the Initial Order.  On that basis, the Monitor agrees with the Applicants' view that paragraph 8(c) authorizes the Applicants to pay the additional $150,000 amount owed to ANH.

23.     As part of the Comeback Motion, the Applicants are seeking the Court's approval to pay further pre-filing royalty obligations for the months of October 2025 and November 2025 (up to the Filing Date), as they become due in December 2025 and January 2026, respectively. The Monitor understands that while the precise amount of royalty payments outstanding cannot be determined at this time, in particular as the month of November has

not yet concluded, the Company estimates that the remaining pre-filing royalty obligations will not exceed $3.5 million.

24.     As further detailed in the Bednar Comeback Affidavit, Canacol's interests in its oil and gas properties were acquired pursuant to the exploration and production contracts (each an "**E&P Contract**") with ANH. Exploration and production rights provided under the E&P Contracts are critical to ongoing business and operations of the Applicants. The Monitor understands that royalties are legally mandated, and payments of royalties are essential for the duration of the CCAA Proceedings to ensure the E&P Contracts are not disrupted or terminated. Accordingly, the Monitor supports the relief being requested by the Applicants in this regard.

**Withholding Taxes**

25.     The Monitor understands that there are tax amounts owing to Colombian taxation authorities in respect of amounts withheld on customer receipts, and vendor payments for capital expenditures and operating expenses pertaining to the period prior to the Filing Date. The Monitor further understands from the Applicants and their Colombian counsel that these amounts constitute priority payables, that failing to remit these taxes is a criminal offence in Colombia, may result in penalties to the Company, and that the Colombian entities within the Canacol Group will not be permitted to file the Colombian Recognition Proceedings if there is a payment default on such Withholding Taxes. Accordingly, as included in the Updated Cash Flow Forecast further discussed below, the Monitor understands the Applicants intend to make all outstanding priority Colombian tax payments so they may carry on in the normal course in accordance with Colombian law, as authorized by paragraph 8 (c) of the Initial Order.

**VIII.   UPDATED CASH FLOW FORECAST**

26.     The Applicants, with the assistance of the Monitor, have prepared the Updated Cash Flow Forecast for the purpose of projecting the estimated liquidity needs of the Applicants during the Forecast Period. A copy of the Updated Cash Flow Forecast, accompanying notes and

a report containing prescribed representations regarding the preparation of the Updated Cash Flow Forecast are attached hereto as **Appendix "B"**.

27.    The Updated Cash Flow Forecast has been prepared on a conservative basis using probable and hypothetical assumptions set out in the notes to the Updated Cash Flow Forecast. The Updated Cash Flow Forecast reflects the Applicants' estimates of receipts and disbursements on a weekly basis over the Forecast Period.

28.    The Monitor understands that the Forecast Period extends only through December 20, 2025 (and not through December 27, 2025, being the ending date in the Cash Flow Forecast prepared in support of the Initial Order), as the Company and the Monitor are continuing to evaluate the impact of the expiry of approximately $21 million of letters of credit (**"LCs"**) by the end of December that require cash collateralization or replacement. Further, the Monitor understands that the Company is projecting to have sufficient liquidity only through the week ending December 20, 2025, and not beyond, absent securing a DIP facility. As further discussed below, the Monitor expects that the Applicants will seek approval of a DIP facility prior to the end of the Forecast Period.

| The Canacol Group 4-Week Cash Flow Forecast In USD ($000's); unaudited | |
| --- | --- |
| **Receipts** | |
| Receipts | 23,892 |
| **Total receipts** | **23,892** |
| | |
| **Operating disbursements** | |
| Pre-filing expenses | (4,839) |
| Operating expenses | (4,486) |
| Royalties | (4,336) |
| Payroll | (1,929) |
| Capital expenditures | (7,010) |
| Tax payable | (6,405) |
| Letters of credit | (5,298) |
| Professional fees | (800) |
| **Total operating disbursements** | **(35,102)** |
| | |
| **Net cash flow** | **(11,210)** |
| | |
| **Opening cash** | 18,031 |
| Net cash flow | (11,210) |
| **Ending cash** | **6,821** |

29.    Forecast operating cash receipts over the Forecast Period total approximately $23.9 million, primarily related to collections of monthly payments from the customers of the

Canacol Group in connection with its sales through the long-term, fixed-price Offtake Agreements.

30.   Forecast operating disbursements over the Forecast Period total approximately $35.1 million and primarily consist of:

(a)   capital expenditures ($7.0 million);

(b)   Withholding Taxes ($6.4 million);

(c)   projected cash collateralization of expiring LCs ($5.3 million), reflecting cash collateralization for a portion of the aggregate $21 million of LCs expiring in December (the balance of the $21 million of LCs expire by December 31, 2025, but outside of the Forecast Period);

(d)   pre-filing payments ($4.8 million, discussed further below); and

(e)   royalty payments ($4.3 million), of which approximately $3.5 million relate to the pre-filing period, including payment of the September Royalties anticipated to be paid prior to the hearing for the Comeback Motion.

31.   Net cash outflow is forecasted to be approximately $11.2 million over the Forecast Period.

32.   As discussed above, the proposed ARIO contemplates an increase to the authorized amount of Critical Vendor Payments from $2 million per the Initial Order, to $5.5 million, of which $660,000 has already been paid. Accordingly, for conservatism, the maximum remaining amount of $4.8 million under the proposed increased limit of Critical Vendor Payments has been included in the Updated Cash Flow Forecast. Critical Vendor Payments will be limited to what is necessary to preserve value and maintain operations, and can only be made in consultation with, and with the consent of, the Monitor.

33.   The Monitor notes that the Updated Cash Flow Forecast has been prepared solely for the purpose described above, and readers are cautioned that it may not be appropriate for other purposes, including for the DIP Selection Process (discussed below).

## IX.    DIP SELECTION PROCESS

34.    As noted above, the DIP Selection Process was developed by the Applicants, Plexus, the Restructuring Advisor, and the Monitor to: i) establish an orderly, transparent and fair process for the identification of a DIP lender; and ii) assist the Applicants in obtaining DIP financing to address the urgent liquidity needs of the Canacol Group, while preserving financial flexibility for their restructuring efforts.

35.    On or about November 21, 2025, Canacol, on behalf of the Applicants, sent a letter to the Prospective DIP Lenders (as defined below) describing the DIP Selection Process (the "**DIP Process Letter**", a copy of which is attached as Exhibit "B" of the Bednar Comeback Affidavit, and hereto as **Appendix "C"**).

36.    The parties to whom the DIP Process Letter was sent include two (2) separate ad hoc committees of certain holders of the Senior Notes (each a "**Bondholder Group**"), the RCF lenders, Macquarie, and parties who have expressed an interest in providing DIP financing to the Applicants (the "**Prospective DIP Lenders**"). Plexus is leading the interfacing efforts with Prospective DIP Lenders who choose to participate in the DIP Selection Process.

37.    In accordance with the DIP Selection Process, as of the date of this First Report, all Prospective DIP Lenders who agree to the Applicants' confidentiality terms have, or will prior to the Submission Deadline (as defined below) have, the opportunity to receive the same information.

38.    The key terms of the DIP financing sought (not an exhaustive list) as described in the DIP Process Letter are:

(a)    the Applicants are seeking a two-tranche DIP facility (the "**DIP Financing**") as follows:

(i)    the first tranche, in the amount of at least $60 million (the "**Minimum DIP Amount**"), to be used to fund the Company's short-term liquidity

requirements, including to collateralize approximately $21 million of LCs expiring over the course of December 2025; and

(ii)     a second tranche, in an amount to be determined, to address the Company's longer-term operational needs during these CCAA Proceedings, including its drilling and exploitation efforts (the "**Second Tranche**").

(b)    The Minimum DIP Amount is to be funded no later than December 15, 2025, although this date may be extended depending upon the scheduling of the DIP approval hearings with this Court and the US Court. In line with the DIP Process Letter, the Monitor understands that the Applicants are requesting a Court hearing in advance of a US Court hearing in the Chapter 15 Proceedings currently scheduled for December 18, 2025, for recognition of any DIP approval order granted by this Court.

(c)    **Security:** subject to an order of the Court and recognition of the same by the US Court, the DIP Financing will be afforded a super-priority charge on the current and future assets, undertakings and properties of the Applicants located in Canada and the United States that rank in priority to all other charges, save and except for the Administration Charge, subject to an order of the Court granting same. While the DIP Process Letter refers to security only over assets in Canada and the United States, the Monitor understands that this clarification is intended to advise Prospective DIP Lenders of specific limitations on court-ordered charges in the legal framework of the Colombian Recognition Proceedings.

(d)    **Material conditions:** the DIP Process Letter states that the DIP Financing will be conditional on an order of the Court approving same, and related recognition in the Chapter 15 Proceedings, however it shall not be conditional on approval of the DIP Financing in the Colombian Recognition Proceedings. As at the time of preparation of this Report, it is anticipated that Court approval of the DIP Financing sought in December will be limited to the Minimum DIP Amount at that time. Funding of the Second Tranche thereafter is to be conditional only on Court approval of same;

(e)  **Repayment:** the DIP Financing can be replaced at any time by the Company with a DIP financing facility from another party whether in connection with a recapitalization transaction or otherwise (an "**Alternative DIP**"). The Monitor understands that such flexibility in the DIP Financing is essential to the Applicants' broader restructuring efforts;

(f)  **Maturity date:** the DIP Financing will mature on the earlier of:

(i)  the closing of an Alternative DIP;

(ii)  consummation of a plan of arrangement or compromise or other restructuring, recapitalization or sale transaction in respect of the Canacol Group, or all or substantially all of its property and assets; and

(iii)  a mutually acceptable maturity date based on the size of the DIP Financing relative to the Applicants' liquidity needs.

39.  The key components of the DIP Selection Process as described in the DIP Process Letter are as follows:

(a)  **Submission deadline:** Prospective DIP Lenders must submit a binding term sheet capable of acceptance by the Company, with no requirement for credit committee or other internal approvals (each a "**DIP Proposal**"), by no later than 5:00 p.m. (Eastern Time) on November 27, 2025 (the "**Submission Deadline**"). The Company, with the approval of the Monitor, may extend the Submission Deadline in its discretion. As at the date of this First Report, the Submission Deadline has not been extended;

(b)  **DIP Proposal selection:**

(i)  following the Submission Deadline, the Company, in consultation with the Monitor, will review the DIP Proposals and select a successful proposal on or around November 29, 2025 (subject to discretionary extension, which has not been done at the date of this First Report);

(ii)     in evaluating proposals, the Company, in consultation with the Monitor, may consider any of the following factors (not an exhaustive list): sizing, structure and availability, refinancing optionality and flexibility, cost of the DIP Financing (including fees), covenants, the proposed security package and intercreditor arrangements, execution and closing certainty (including any conditions to funding), the scope of required documentation, and the Prospective DIP Lender's track record, sector expertise, and familiarity with the Company's business and operations, as well as governance expectations;

(iii)    the Company may, in consultation with the Monitor, conduct negotiations with one or more Prospective DIP Lenders in connection with any DIP Proposals, and may request additional information or meetings with any Prospective DIP Lender;

(iv)    the Company shall be required to accept neither the DIP Proposal with the lowest cost of financing, nor any DIP Proposal whatsoever. Selection of any DIP Proposal shall be subject to final approval by the Company's board of directors and the Court; and

(v)     the DIP Selection Process may be amended, suspended or terminated at any time or for any reason, in consultation with the Monitor.

40.    As at the date of this First Report, the Monitor understands that certain interested parties have negotiated or are negotiating the scope and terms of confidentiality agreements in the DIP Selection Process to be granted access to the virtual data room containing diligence information.

## X.    STAY EXTENSION

41.    The current Stay Period expires on November 28, 2025. The Applicants are seeking an extension of the stay of proceedings to December 18, 2025, which the Monitor understands is intended to provide the Company with time in which to secure a DIP Facility, as is anticipated to be required no later than December 20, 2025.

19

42.    The DIP Selection Process contemplates closing of the selected and court-approved DIP Proposal by no later than December 15, 2025, but also contemplates that the DIP Selection Process may be amended at any time or for any reason in consultation with the Monitor. In consideration of the current uncertainty as to timing of Court approval of the selected DIP Proposal and recognition of the same by the US Court, a stay extension to December 20, 2025, will allow some flexibility for the scheduling of those court hearings.

43.    The Monitor supports the Applicants' request for an extension of the stay of proceedings to December 18, 2025, for the following reasons:

(a)    the Applicants are acting in good faith and with due diligence and circumstances exist that make an extension of the stay appropriate as set out below;

(b)    the extension of the Stay Period will provide the Applicants the opportunity to seek bids, negotiate and definitively enter into a DIP term sheet subject to this Court's approval, and seek this Court's approval and recognition of the same by the US Court, with a view to furthering its restructuring under the CCAA; and

(c)    the granting of the extension of the Stay Period should not materially prejudice any creditor of the Applicants as the Updated Cash Flow Forecast reflects that the Applicants are projected to have sufficient funding to continue to operate in the normal course through the proposed stay extension period.

## XI.    PROPOSED COURT ORDERED CHARGES

44.    The proposed ARIO provides for two (2) priority charges (collectively the "**Proposed Charges**") on the current and future assets, undertakings and properties of the Applicants wherever located, including all proceeds thereof, that rank in priority to all other charges, in the following order:

(a)    First, the Administration Charge (as defined below, to the maximum amount of $1.5 million); and

(b)    Second, the Directors' Charge (as defined below, to a maximum of $1 million).

**Administration Charge**

45.    The Initial Order provided for a charge on all Property of the Applicants in favour of the
Monitor, counsel to the Monitor, and the Applicants' counsel (collectively, the
"**Insolvency Professionals**"), as security for their respective fees and disbursements
incurred in connection with the CCAA Proceedings (the "**Administration Charge**") in the
aggregate amount of $1,000,000 for the initial 10-day stay period. The Initial Order granted
the Administration Charge over all Property of the Applicants, in priority to all
Encumbrances, saved and except for the secured claims of Macquarie, as sole secured
lender.

46.    As part of the Comeback Motion, the Applicants are now seeking:

(a)    that the Administration Charge be ranked in priority to all other security, charges and
encumbrances in favour of any person over the Property, including Macquarie; and

(b)    an increase in the Administration Charge to $1.5 million.

47.    The Insolvency Professionals include corporate and restructuring counsel of the Applicants
in Canada, the United States and Colombia, and restructuring counsel of the Monitor in
Canada and the United States.

48.    The Monitor is in the process of arranging an independent legal review of the validity,
enforceability and priority of the security granted by the Applicants in respect of the
Macquarie Debt.

49.    The Monitor is of the view that the increased Administration Charge, and its proposed
ranking, are reasonable and appropriate in the circumstances, having considered, among
other things:

(a)    the work completed to date in preparation for the CCAA Proceedings and since the
date of the Initial Order, including preparation for the Comeback Motion, the DIP
Selection Process, the Chapter 15 Proceedings and the Colombian Recognition
Proceedings by the Insolvency Professionals, which has been material;

21

(b)    the size of the court-ordered charge has been calculated in consultation with the Monitor, taking into account the expected future costs of all of the Insolvency Professionals covered by the Administration Charge in respect of the CCAA Proceedings and the recognition proceedings, and the cadence of payment of invoices, including as projected in the Updated Cash Flow Forecast;

(c)    the size and ranking of the court-ordered charge is comparable to the size and ranking of court-ordered charges granted in similar proceedings requiring foreign court recognition; and

(d)    the proposed ranking of the Administration Charge is not anticipated to prejudice Macquarie. As noted in the Pre-Filing Report and in the Bednar Affidavit,[1] as of September 30, 2025, the Canacol Group reported total assets with a net book value of approximately $1.3 billion and total liabilities with a net book value of $900 million. The Monitor understands the total liabilities include the amount outstanding under the Macquarie Debt (as defined in the Pre-Filing Report), which at the date of the Initial Order was approximately $38 million.

**Directors' Charge**

50.    As discussed in the Pre-Filing Report, in their Application for the Initial Order, the Applicants sought a charge in the maximum amount of CAD $1 million to secure the Applicants' indemnity obligations to the current directors and officers of the Applicants (the "**Directors and Officers**") against obligations and liabilities that they may incur as directors or officers of the Applicants after the commencement of these CCAA Proceedings (the "**Directors' Charge**").

51.    The relief sought in the Initial Order contemplated that the Directors and Officers would only be entitled to the benefit of the Directors' Charge to the extent that they did not have coverage under any directors' and officers' insurance policy, or to the extent such coverage were to be insufficient to pay an indemnified amount. As further discussed in the Pre-Filing

---

[1] Bednar Affidavit, paras 80 and 88.

report, the Monitor understands that the Applicants maintain directors' and officers' liability insurance (the "**D&O Insurance**").

52.     Due to the availability of coverage provided by the D&O Insurance, the Court did not consider a Directors' Charge necessary to secure the Applicants' indemnity obligations to the Directors and Officers in the initial 10-day stay period. Accordingly, the Court did not grant the Directors' Charge in the Initial Order.

53.     As part of the Comeback Motion, the proposed ARIO provides for the Directors' Charge:

(a)     up to a maximum amount of $1 million;

(b)     ranking in priority to all other charges, except for the Administration Charge; and

(c)     from which the Directors and Officers will only benefit to the extent that coverage under existing D&O Insurance is not available, or should the Retention Amount (as defined below) become payable.

54.     As noted in the Bednar Comeback Affidavit, the Monitor understands that the D&O Insurance policy includes a per claim retention amount of CAD$1 million (the "**Retention Amount**") which would require payment before the insurers respond to any claim that is submitted. The Monitor understands the Company has not set aside or paid the Retention Amount into trust in case of a claim against the D&O Insurance policy, and that the Company thus does not have funds available to pay the Retention Amount if required. As further noted in the Bednar Comeback Affidavit, it is anticipated that Mr. Michael Hibberd, Chairman of Canacol, will provide an affidavit (the "**Hibberd Affidavit**") in support of the Applicants' motion for the Directors' Charge. The Monitor may have further comments on the proposed Directors' charge upon reviewing the Hibberd Affidavit.

55.     As discussed in the Pre-Filing Report, the Monitor understands that due to the potential for personal liability, the Directors' Charge is critical to the continued involvement of the Directors and Officers during the CCAA Proceedings. As the Applicants will require the participation and experience of the Directors and Officers to facilitate the successful restructuring in the proposed CCAA Proceedings, including in operating the business and

working with stakeholders, the Monitor believes that the Directors' Charge (both the amount and the priority ranking) is required and reasonable in the circumstances.

## XII.   RELIEF FROM SECURITIES FILINGS

56.   As discussed in the Pre-Filing Report, the Bednar Affidavit and the Bednar Comeback Affidavit, Canacol is a publicly traded corporation and a reporting issuer with common shares currently listed on the TSX (Canada) and the BVC (Colombia). Canacol was also listed on the OTCQX International Premier (Singapore) and was delisted from OTCQX, effective November 20, 2025.

57.   Further, Canacol has scheduled a meeting with the Continued Listing Committee of the TSX for delisting review on November 27, 2025 (the "**TSX Delisting Meeting**").

58.   The Applicants are seeking authorization to suspend certain of Canacol's Canadian securities filing requirements until the TSX delisting outcome is determined so that no further expenses in relation to the Securities Filings may be incurred, and to allow the Canacol Group to wholly focus on its business and restructuring efforts.

59.   The Monitor understands that there will be no prejudice to stakeholders of the Canacol Group in connection with this relief, as all pertinent information in respect of the CCAA Proceedings will be made available on the Monitor's Website. Further, the Applicants do not intend to restrict any securities regulator or stock exchange from taking any measures or exercising any authority available to them under section 11.2(2) of the CCAA as a result of the failure to make any securities disclosure.

60.   Accordingly, the Monitor supports the relief being requested by the Applicants in this regard.

## XIII.   MONITOR'S CONCLUSION AND RECOMMENDATIONS

61.   For the reasons set out in this First Report, the Monitor is of the view that the relief requested by the Applicants in the proposed ARIO is both appropriate and reasonable. The Monitor is also of the view that the Applicants are acting in good faith and with due diligence. Granting the relief sought by the Applicants will provide the Applicants with the

best opportunity to explore restructuring options under the CCAA under supervision of the Monitor, that would seek to maximize creditor and stakeholder value.

62.    Based on the foregoing, the Monitor respectfully recommends that this Court approve the relief sought by the Applicant in the proposed ARIO.

All of which is respectfully submitted this 24th day of November 2025.

**KPMG Inc.**
**In its capacity as Monitor of**
**Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Cantana Energy GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S.**
**and not in its personal or corporate capacity**

Per:

**Paul van Eyk**
**CPA, CA-IFA, CIRP, LIT, Fellow of INSOL**
President

**Katherine Forbes**
**CPA, CA, CIRP, LIT**
Senior Vice President

# Appendix "B"

## CANACOL DIP LOAN COMMITMENT LETTER

This Commitment Letter is made as of December 2, 2025, by and between each of the entities designated as a lender on the signature pages hereto (collectively, the "**Lenders**" and each individually, a "**Lender**"), and Canacol Energy Ltd. (the "**Company**"), 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Canacol Energy Colombia S.A.S., CNE Energy S.A.S., and CNE Oil & Gas S.A.S. (collectively, the "**Borrowers**" and each individually, a "**Borrower**") and each of the other Loan Parties.

**RECITALS**:

A.      The Borrowers commenced proceedings (the **"CCAA Proceedings"**) under the *Companies' Creditors Arrangement Act* (the "**CCAA**") in the Court of King's Bench of Alberta (the "**CCAA Court**") and obtained an initial order dated November 18, 2025, as amended and restated on November 28, 2025 (as such order may be further amended or amended and restated but in all cases subject to the terms of this Commitment Letter including regarding any such amendments or amendments and restatements, the "**CCAA Initial Order**").  Pursuant to the CCAA Initial Order, among other things, a stay of proceedings was issued in favor of the Borrowers and KPMG Inc. ("**KPMG**") was appointed as the monitor in the CCAA Proceedings (in such capacity, the "**Monitor**").

B.      KPMG, in its capacity as the Monitor and the authorized foreign representative (in such capacity, the **"Foreign Representative"**) of the Borrowers under the CCAA Proceedings, filed a motion with the United States Bankruptcy Court for the Southern District of New York (the "**US Court**") under Chapter 15 of title 11 of the United States Bankruptcy Code (the **"Bankruptcy Code"**) for recognition of the CCAA Proceedings with respect to each of the Borrowers as a "foreign main proceeding" (the **"US Recognition Proceedings"**) and certain related relief.  The CCAA Initial Order was provisionally recognized by the US Court under the Bankruptcy Code, and the motion to, among other things, recognize the CCAA Proceedings with respect to each of the Borrowers in the United States of America as a "foreign main proceeding" under the Bankruptcy Code is scheduled on December 11, 2025.

C.      On November 25, 2025, KPMG, in its capacities as the Monitor and the Foreign Representative, filed an application with the Colombian Superintendent of Companies (the **"Colombian Court"**) pursuant to Title III of Law 1116 of 2006 of Colombian law and/or other applicable Colombian law for, among other things, recognition in Colombia of the CCAA Proceedings with respect to each of the Borrowers as a "foreign main proceeding" (the **"Colombian Recognition Proceedings"**) and certain related relief, which Colombian Recognition Proceedings have not been "admitted" by the Colombian Court as of the date of this Commitment Letter.

The Lenders and the Borrowers agree as follows:

1.      **DIP Facility**

(a)      Facility Amount: The Lenders hereby agree to make available to the Borrowers a credit facility up to a maximum amount of Sixty-Seven Million ($67,000,000) US Dollars, to provide funds for the purposes set out in section 5 during the Restructuring Proceedings (the "**DIP Facility**") comprised of the following sub-facilities (each, a **"Sub-Facility"**):  (i) new money delayed-draw term loan sub-

facility in the maximum principal amount of Forty-Five Million ($45,000,000) US Dollars (**"Tranche A"** or the **"Tranche A Sub-Facility"**) to be provided by the Lenders with a "Tranche A DIP Commitment Amount" on such Lender's signature page to this Commitment Letter (collectively, the **"Tranche A Lenders"**); (ii) letter of credit sub-facility to renew and/or replace certain letters of credit as specified in the Cash Flow Forecast (**"Pre-CCAA Filing Letters of Credit"**), in the aggregate maximum amount of Twenty Million ($20,000,000) US Dollars (**"Tranche B"** or the **"Tranche B Sub-Facility"**) to be provided by the Lenders with a "Tranche B DIP Commitment Amount" on such Lender's signature page to this Commitment Letter (collectively, the **"Tranche B Lenders"**) (such renewed or extended letters of credit under Tranche B are called the **"Tranche B Letters of Credit"**); and (iii) letter of credit sub-facility for new letters of credit to be issued for and on behalf of one or more of the Loan Parties as specified in the Cash Flow Forecast in the aggregate maximum amount of Two Million ($2,000,000) US Dollars (**"Tranche C"** or the **"Tranche C Sub-Facility"**) to be provided by the Lenders with a "Tranche C DIP Commitment Amount" on such Lender's signature page to this Commitment Letter (collectively, the **"Tranche C Lenders"**) (such new letters of credit issued under Tranche C are called the **"Tranche C Letters of Credit"**).

(b)    Advances Under Tranche A:  Subject to the satisfaction (or waiver by the Required Lenders) of the "**Conditions Precedent to the Initial Advance**" as set forth in Section 10 of this Commitment Letter, the Borrowers may request an initial advance under the DIP Facility up to the maximum amount of Fifteen Million ($15,000,000) US Dollars (the "**Initial Advance**") to be provided or caused to be provided by the Lenders (on a several but not joint basis) to the Borrowers on the Business Day which is not less than three (3) Business Days after (i) the date on which the DIP Facility is approved and the DIP Approval Order is issued by the CCAA Court and (ii) the Borrowers have delivered a Request for Advance to the Lenders in respect of such Initial Advance (which shall be funded by a fronting lender (the **"Fronting Lender"** pursuant to arrangements agreed by the Fronting Lender, the Required lenders, and the Company). The remaining unadvanced portion of Tranche A shall be advanced by way of a single subsequent advance (the "**Subsequent Advance**") which shall be provided or caused to be provided by the Lenders provided that the Borrowers deliver to the Lenders a Request for Advance not less than three (3) Business Days' prior to the Subsequent Advance, and in each case subject to satisfaction of the conditions precedent for Subsequent Advance which shall be funded by the Fronting Lender. Proceeds of all DIP Advances under Tranche A will be paid or caused to be paid by the Lenders by wire transfer to the Borrowers' Account and the Borrowers shall deliver to the Lenders with each Request for Advance the wire transfer details for a US Dollar wire into the Borrowers' Account. The Subsequent Advance must be advanced or caused to be advanced by the Lenders by February 15, 2026 failing which such unadvanced portion of Tranche A under the DIP Facility shall automatically terminate on such date without any other action or notice required whatsoever. All advances of this DIP Facility shall be used for the purposes set out in section 5, all in accordance with the Cash Flow Forecast. In the event that a DIP Agent is appointed by the Lenders after the date of this Agreement, then in such case Proceeds of all DIP Advances under Tranche A will be paid by the Lenders by wire transfer into the bank account designated in writing by the DIP Agent as the bank account into which all proceeds of DIP Advances under Tranche A shall be deposited, in which case the Borrowers shall pay and be required to pay interest

on all such DIP Advances under Tranche A notwithstanding that some or all of such proceeds may be held in such bank account maintained by the DIP Agent until such time as the all conditions precedent for such DIP Advance have been satisfied as provided for herein. Amounts repaid under Tranche A of the DIP Facility shall reduce Tranche A and may not be reborrowed. The Borrowers may repay any of the Obligations owing under Tranche A prior to the Maturity Date on one (1) Business Day's prior notice to the Lenders and subject, in each case, to the "**Application of Proceeds / Repayments**" set forth in Section 8 of this Commitment Letter. For the avoidance of doubt, all advances of Tranche A of this DIP Facility, including the Initial Advance, and the Subsequent Advance, shall be made by the Fronting Lender.  Each DIP Advance can and shall be made to the Company for and on behalf of all of the Borrowers, and the Borrower is authorized by the other Borrowers to submit each Request for Advance for and on behalf of all of the Borrowers.

(c)     Additional terms and conditions for the Tranche B Letters of Credit and the Tranche C Letters of Credit are set out on Schedule E, including without limitation (i) listing out the Pre-CCAA Filing Letters of Credit which may be replaced or renewed by the Tranche B Lender or Tranche B Lenders which will issue Tranche B Letters of Credit (ii) the Tranche C Lender or Tranche C Lenders which will issue the Tranche C Letters of Credit,  (iii) conditions precedent to be satisfied for all of such Tranche B Letters of Credit and Tranche C Letters of Credit, (iii) obligations of the Tranche B Lenders or the Tranche C Lenders, as applicable, to pay to the issuing Tranche B Lender or Tranche C Lender, as applicable, such Lender's pro rata share of such payments paid by the issuing Tranche B Lender or Tranche C Lender, as applicable, to the beneficiary thereof, (iv) fronting/issuance fees required to be paid by the Borrowers to the Tranche B Lender which issued each Tranche B Letter of Credit, (v) fronting/issuance fees required to be paid by the Borrowers to the Tranche C Lender which issued each Tranche C Letter of Credit.

In connection with Tranche B, after the execution of this Commitment Letter, the Borrowers and the Required Lenders may decide to permit one or more of the issuers of the Pre-CCAA Filing Letters of Credit to become Lenders under Tranche B hereunder on terms and conditions satisfactory to the Required Lenders and the Company.  The addition of any such additional Lenders under Tranche B shall be subject to the consent of the Required Lenders in their sole discretion.

(d)     The Lenders may, during the term of the DIP Facility, enter into discussions with other lenders to the Borrowers (including without limitation Persons which provided loans or other financial assistance to the Borrowers (or any one or more of them) prior to the date of the commencement of the CCAA Proceedings (or any of their respective advisors) provided that such Persons are party to nondisclosure agreements with the Company), regarding some or all of the Lenders and/or such other Persons providing financing for the Borrowers to support a going concern restructuring solution for the Borrowers. For certainty, this section 1(d) does not create any binding obligation on the Lenders (or any one or more of them) or the Borrowers in respect of any such possible refinancing and/or exit loan facility.

**2.     Maturity Date**

The DIP Facility shall be immediately due and payable by the Borrowers in full in cash on the earliest to occur of:

(i)      June 30, 2026;

(ii)     the effective date of (a) the sale of all or substantially all of the assets, property or business of any of the Loan Parties (other than the completion of a Proposed Sale Transaction) or (b) a Plan of Arrangement;

(iii)    the consummation of a transaction pursuant to the SISP;

(iv)     the termination of the CCAA Proceedings, the appointment of a receiver, interim receiver or a receiver manager of one or more of the Loan Parties, one or more of the Loan Parties making an assignment in bankruptcy or being adjudged bankrupt, or the appointment of an *Agente Intervenor* under Decree 633 or 1993 or the initiation of a *Liquidacion Judicial* under Law 1116 of 2006 or any other type of liquidation proceeding in respect of any one or more of the Loan Parties in Colombia under Colombian law; or

(v)      the occurrence of an Event of Default,

(such date, as may be extended in accordance with the terms hereof, being the "**Maturity Date**"). The Maturity Date of Tranche A, Tranche B, and Tranche C may extended by the Borrowers for a period of three (3) months provided that (i) the Borrowers deliver a written extension request to the Lenders not less than ten (10) days prior to the original Maturity Date, (ii) no Default or Event of Default exists on the original Maturity Date, (iii) the Borrowers shall have paid on the original Maturity Date an extension fee equal to two percent (2%) of (a) the Tranche A Sub-Facility amount payable to the Tranche A Lenders, payable to Lenders on a pro rata basis in respect of Tranche A DIP Advances and undrawn Tranche A commitments, (b) the Tranche B Sub-Facility amount, payable to each Tranche B Lender in respect of its respective Tranche B Lender's DIP Facility Commitment Amount, and (c) the Tranche C Sub-Facility amount, payable to each Tranche C Lender in respect of its respective Tranche C Lender's DIP Facility Commitment Amount, (iv) the Borrowers shall be party to a binding agreement in respect of a sale of substantially all assets or other transaction pursuant to the SISP in each case that is acceptable to the Required Lenders, and (v) the Borrowers shall have provided to the Lenders an updated Cash Flow Forecast (as defined herein) as approved by the Monitor and which shall be in form and substance satisfactory to the Lenders in their sole discretion, through and including the date to which the original Maturity Date is extended.

The DIP Facility shall terminate on the Maturity Date and all amounts outstanding under or in connection with the DIP Facility shall be repaid by the Borrowers in full in cash no later than the Maturity Date without the Lenders being required to make demand upon the Borrowers (or any one of them) therefor or to give notice to the Borrowers (or any one of them) that the DIP Facility has terminated and that the obligations are due and payable.

If any Event of Default occurs and is continuing, then the applicable Tranche B Lender or Tranche C Lender may require the Borrowers to cash collateralize the maximum obligations of such Lender in respect of any such Tranche B Letter of Credit or Tranche C Letter of Credit (such exposure for each such Letter of Credit, the "**LC Exposure**"). In such event, the Borrowers shall pay to the applicable Lenders, or in the event that the DIP Agent has been appointed the DIP Agent, the amount on account of the Maximum LC Amount for all such Letters of Credit  cash collateralize the applicable LC Exposure (in an amount equal to such LC Exposure plus any accrued or unpaid fees thereon) not later than 2:00 p.m. ET (x) in the case of the immediately preceding clauses (i) and (ii), (1) the

Business Day on which the Borrowers receive a notice thereof, if such notice is received on such day prior to 1:00 p.m. ET, or (2) if clause (1) above does not apply, the Business Day immediately following the day that the Company receives such notice or, if such day is not a Business Day, the Business Day immediately succeeding such day, in either case, by 1:00 p.m. ET on such day.  Any and all amounts paid by the Borrowers to the applicable Lenders or to the DIP Agent shall at all times be held by such Lenders or the DIP Agent, as applicable, pari passu for all of the Obligations.

**3.    Cash Flow Forecast**

Prior to any DIP Advance under the DIP Facility, the Borrowers shall deliver to the Lenders a cash flow forecast as approved by the Monitor which is required to be in form and substance satisfactory to the Lenders in their sole discretion, including, among other things, the projected cash requirements of the Borrowers (the first such cash flow forecast being called the "**Initial Cash Flow Forecast**" to be agreed to between the Borrowers and the Lenders (each in their sole discretion) and attached as Schedule D hereto prior to the acceptance of this Commitment Letter by the Loan Parties). The Initial Cash Flow Forecast may be amended by the Borrowers from time to time subject to the prior written consent of the Lenders in their sole discretion (the Initial Cash Flow Forecast and any such replacement cash flow forecast as approved by the Lenders in their sole discretion, the "**Cash Flow Forecast**").

Notwithstanding any other provision of this Commitment Letter, the Lenders shall not be obligated to make any advance under the DIP Facility which does not comply with or adhere to the Initial Cash Flow Forecast or any subsequent Cash Flow Forecast (and for certainty that have been agreed to in writing by the Lenders in their sole discretion), as applicable.

**4.    Interest and Fees**

(a)    <u>Commitment Fee</u>: The Borrowers shall pay to each of the Lenders with a Lender's DIP Facility Commitment Amount under Tranche A a commitment fee equal to five percent (5%) of the maximum amount such Lender's DIP Facility Commitment Amount under Tranche A  (the **"Commitment Fee"**), which Commitment Fee will be fully earned concurrently with the issuance of the DIP Approval Order and payable to such Lenders in full (and for certainty notwithstanding that the full amount of Tranche A will not be advanced by such Lenders for the Initial Advance) in cash from the proceeds of the Initial Advance.

The Commitment Fee shall be treated (and reported) by the parties as (i) additional amount realized, (ii) additional discount that is amortized as original issue discount or (iii) payments on the DIP Facility for United States of America federal, state and local income tax purposes. The Commitment Fee shall not be treated as payments received in exchange for services for United States of America federal, state and local income tax purposes.

(b)    <u>Interest</u>: On the first Business Day of each calendar month, the Borrowers shall pay the Lenders in cash interest:  (i) at the rate of thirteen percent (13%) per annum on the outstanding principal amount of Tranche A the DIP Facility on account of interest accrued during the immediately preceding month to and including the date of the Subsequent Advance and (ii) at the rate of eleven percent (11%) per annum on the (full) outstanding principal amount of Tranche A the DIP Facility on account

of interest accrued from and after the date of the Second Advance during the immediately preceding month or portion of such month, as applicable, provided that all conditions precedent to the Subsequent Advance have been satisfied including without limitation the condition precedent listed in section 11(c).

(c)     Upon the occurrence and continuance of an Event of Default, the Borrowers shall be required to pay interest in cash at the applicable plus 2.0% on account of all of the Obligations from and after the date of the occurrence of such Event of Default. Such default interest shall be payable in cash on demand.

Interest (including any default interest hereunder) shall be calculated and compounded monthly for the actual number of days elapsed in the period during which it accrues based on a year of 365 days. For the purposes of the *Interest Act* (Canada) the yearly rate of interest to which the rate is equivalent is the rate multiplied by the number of days in the year for which the calculation is made and divided by 365.

No interest or fee to be paid hereunder shall be paid at a rate exceeding the maximum rate permitted by applicable law. In the event any such interest or fee exceeds such maximum rate, such interest or fee shall be reduced or refunded, as the case may be, so as to be payable at the highest rate recoverable under applicable law.

The theory of deemed reinvestment shall not apply to the calculation of interest or payment of fees or other amounts hereunder and all interest and fees payable by the Borrowers to the Lenders shall accrue from day to day and be computed as described herein in accordance with the "nominal rate" method of interest calculation.

## 5.     Use of Funds

The proceeds from the advances of the DIP Facility shall be used solely for the following purposes in each case in accordance with and subject to the Cash Flow Forecast: (i) operation of the businesses of the Borrowers; (ii) reasonable and documented costs, expenses and professional fees including the fees and disbursements of legal counsel and financial advisor to the Borrowers, legal counsel to the Company's directors, the Monitor, legal counsel to the Monitor; (iii) costs, expenses and professional fees including the fees and disbursements of legal counsel and financial advisors to the Tranche A Lenders (which shall be Cassels Brock & Blackwell LLP, Davis Polk & Wardwell LLP, Garrigues, S.L.P. and Houlihan Lokey Assessoria Financeira Ltda), the Notes Trustee and counsel to the Notes Trustee, and DIP Agent and counsel to the DIP Agent (if any), and (iv) the issuance, renewal, extension, replacement or cash collateralization of Pre-CCAA Filing Letters of Credit, which are necessary for ongoing business operations (primarily regulatory and concession obligations) during the Restructuring Proceedings and as specifically contemplated by the Cash Flow Forecast. No Loan Party will conduct drilling, exploration or exploitation efforts (or any other activities associated with the development of new producing factors) without the prior written consent of the Lenders in their sole discretion, and for certainty, the Cash Flow Forecast shall not contemplate the use of any monies of any of the Loan Parties (including without limitation the proceeds of any DIP Advance) for such purpose without the prior written consent of the Lenders in their sole discretion (the **"Exploration Covenant"**). No Loan Party will pay for or incur any expense for any capital expenditures or development unless any such expenses are expressly listed in the Cash Flow Forecast, and in such case no Loan Party shall pay for or incur any such expense in excess of any such amounts permitted in the Cash Flow Forecast (without giving effect to any Permitted Variance). For certainty, no Loan Party shall use

the proceeds of any DIP Advance under Tranche A or any other monies to cash collateralize any Pre-CCAA Filing Letters of Credit.

For greater certainty, the Borrowers may not use the proceeds of the DIP Facility to pay any pre-filing obligations of the Borrowers without the prior written consent of the Lenders; it being agreed by the Lenders that such consent is not required for the Borrowers to pay (i) amounts authorized to be paid by the CCAA Initial Order granted prior to the date of this Commitment Letter to the extent specifically identified in the Cash Flow Forecast, (ii) professional advisor and legal fees and disbursements as may be set forth in the Cash Flow Forecast  for the pre-filing period incurred in contemplation of the CCAA Proceedings, or (iii) any other amounts owing by the Borrowers to the extent specifically identified in the Cash Flow Forecast.

## 6.    Expenses

The Borrowers shall pay to the Lenders within seven (7) days of written request all reasonable and documented fees, expenses and disbursements of the Tranche A Lenders, the Fronting Lender, and the DIP Agent (if applicable) and the fees, expenses, and disbursements of their advisors (being Cassels Brock & Blackwell LLP, Davis Polk & Wardwell LLP, Garrigues, S.L.P. and Houlihan Lokey Assessoria Financeira Ltda), and the Notes Trustee and counsel to the Notes Trustee incurred in connection with the Borrowers, the Restructuring Proceedings or the preparation, negotiation, execution, delivery, administration, monitoring, interpretation or enforcement of this Commitment Letter and whether incurred prior to or after the commencement of the Restructuring Proceedings (collectively, the "**Lenders' Fees and Expenses**"), for the duration of the Restructuring Proceedings until all Obligations have been repaid to the Lenders in full. Interest shall accrue on all amounts payable to the Lenders (or their respective advisors) under this section 6 at the rate of interest prescribed by section 4(b) hereof from and after the date which is seven (7) days after any account is delivered by any Lender (or advisor, as applicable) to the Borrowers if such invoice is not paid in full within such seven (7) day period. The Borrowers agree to pay to the Lenders (or advisors, as applicable) from the Initial Advance all Lenders' Fees and Expenses incurred to and including the date of such Initial Advance provided that the Lenders deliver invoices (in summary format and which shall not be required to include time entry) for such Lenders' Fees and Expenses to the Borrowers at least two (2) Business Days prior to the date of the Initial Advance.

## 7.    DIP Charge and DIP Security

Subject to the terms of the DIP Approval Order, all obligations, indebtedness and liabilities of the Borrowers under or in connection with the DIP Facility shall be secured by a valid, binding, continuing, enforceable, fully-perfected, and non-avoidable super-priority CCAA Court-ordered lien and charge over all present and after acquired property, assets and undertakings of the Borrowers (whether tangible, intangible, real, personal or mixed) including a pledge of all shares or other investment property owned by each Borrower (provided that while any and all shares or other ownership interest in each Loan Party which is organized under the laws of Colombia or any subsidiaries of a Loan Party which is organized under the laws of Colombia law shall be required to be pledged and the subject of a Lien granted under the Colombian DIP Security Documents, the Lenders acknowledge that the Loan Parties may not be able to deliver to the Lenders (or if applicable the DIP Agent) physical possession of such share or ownership certificates as such share or other ownership certificates are currently held by Credicorp as collateral agent for Macquarie Bank), whether now owned or hereafter acquired and wherever

located, and for certainty including without limitation all properties and assets of the Loan Parties which are the subject of the Liens granted in favor of Macquarie Bank or Credicorp as collateral agent for Macqaurie Bank and securing the Macquarie Pre-CCAA Indebtedness (the "**DIP Charge**"). The DIP Charge shall be in priority to all security interests and charges except the administration charge granted pursuant to the CCAA Initial Order to the maximum amount of $1,500,000.

The Loan Parties shall deliver or cause to be delivered to the Lenders, issued by the applicable Restructuring Court, or otherwise complete by the applicable date specified herein (i) the US DIP Approval Recognition Order, (ii) the Colombian Recognition Order, and (iii) the Colombian DIP Security Process.

## 8.    Application of Proceeds / Repayments /Sharing of Payments by Lenders

Other than proceeds from the Proposed Sale Transactions which are expressly contemplated to be received by the Company in the initial Cash Flow Forecast, all net proceeds (net of the actual and reasonable sale or other disposition fees, costs and expenses and a reasonable reserve for applicable taxes, in each case in amounts acceptable to the Lenders) received from the sale or other disposition of any assets of any Loan Party outside of the ordinary course of business and all payments from or account of insurance proceeds and/or condemnation awards received by any one or more of the Borrowers (the "**Net Proceeds**"), and subject to an order of the CCAA Court approving same in form and substance satisfactory to the Lenders, shall be paid to the Lenders and applied as a repayment of the Obligations. For certainty, all of the Obligations shall rank *pari passu*.

Borrowers shall be required to make a repayment of amounts owing under the DIP Facility to the Lenders (i) in the event that (A) the Borrower's unrestricted cash and cash equivalents *plus* unexpired and undrawn Tranche A Commitments available to the Borrowers for a DIP Advance (for certainty, meaning that as of the date of such calculation, all conditions precedent for such DIP Advance are satisfied except for the delivery of a Request for Advance) *minus* disbursements set out in the Cash Flow Forecast that were unpaid at the time forecasted as a result of timing exceeds (B) the Minimum Liquidity Covenant plus a cushion of Forty-Two Million ($42,000,000) US Dollars at any time (the **"Liquidity Sweep Threshold"**), all amounts in excess of the Liquidity Sweep Threshold; and/or (ii) if the Borrower receives receipts of greater than Five Million ($5,000,000) US Dollars which are not contemplated in the Cash Flow Forecast, an amount equal to all receipts in excess of such amount. The Borrowers shall be required to seek an order of the CCAA Court within five (5) Business Days of the occurrence of the Borrower's receipt of the amounts in (i) or (ii) authorizing distribution of such amounts to the DIP Lenders. Any and all such amounts repaid by the Borrowers pursuant to this paragraph shall be paid to the Lenders, or if the DIP Agent has been appointed the DIP Agent, and shall at all times be held by such Lenders or the DIP Agent, as applicable, pari passu for all of the Obligations.

All monies received by the Lenders in repayment of amounts owing under the DIP Facility, whether by way of debit as aforesaid or otherwise, may be applied and allocated by the Lenders to such parts of the outstanding DIP Facility, whether by principal, interest, fees or other costs, as the Lenders may determine in their sole discretion.

9.      **Conditions Precedent to Effectiveness**

This Commitment Letter shall become effective upon satisfaction of each of the following conditions precedent:

(a)      each Loan Party has executed and delivered this Commitment Letter to the Lenders;

(b)      the Lenders shall have had a reasonable opportunity to review advance copies of, and shall be reasonably satisfied with, all materials filed or to be filed by the Loan Parties in the CCAA Court in connection with the application for the DIP Approval Order;

(c)      the CCAA Court shall have issued the DIP Approval Order approving, among other things, the DIP Facility and creating the DIP Charge with the priority specified herein, and such DIP Approval Order is in form and substance satisfactory to the Lenders in their sole discretion; and

(d)      each of the Borrowers and each of the Lenders, each in its sole discretion, shall have agreed to the Initial Cash Flow Forecast and such Initial Cash Flow Forecast shall have been attached as Schedule D to this Commitment Letter.

10.      **Conditions Precedent to the Initial Advance**

The obligation of the Lenders to make the Initial Advance or issuance, amendment, increase or extension of a Letter of Credit hereunder is subject to the prior satisfaction, or waiver by the Lenders, of each of the following conditions precedent:

(a)      the Lenders and the Fronting Lender shall have received a request for advance under the DIP Facility in advance of the date for the requested Initial Advance as required by the terms hereof in the form of Schedule C attached hereto (a **"Request for Advance"**), and in the case of any Tranche B Letters of Credit or Tranche C Letters of Credit, the Borrowers shall have provided such information and delivered any additional documents required by the terms of Schedule E and the Issuing Banks shall have issued, as applicable, the Tranche B letters of Credit or the Tranche C Letters of Credit; each Borrower confirms and agrees the Company has the authority to deliver all Requests for Advances under this Commitment Letter and including any Letters of Credit requests for the renewal or issuance of any Letters of Credit (including for greater certainty, any Subsequent Advances) for and on behalf of all the Borrowers and any such request for advance delivered by the Company shall be binding on all the Borrowers;

(b)      the Lenders shall be satisfied that each Loan Party has complied with and is continuing to comply in all material respects with all applicable laws, regulations and policies in relation to its business;

(c)      the Lenders shall be satisfied that there are no Liens ranking in priority to the DIP Charge on any property and assets of the Borrowers in any jurisdiction, other than (i) in Canada and the U.S., as specifically set forth in the DIP Approval Order and (ii) Liens granted by the Borrowers to Macquarie Bank prior to the commencement of the CCAA Proceedings over property and assets of certain of the Borrowers in Colombia (and for certainty not in any other countries) (such Liens which are valid and perfected liens being collectively called the **"Macquarie Pre-CCAA Perfected**

**Liens"**) and securing indebtedness of such Loan Parties to Macquarie Bank incurred prior to the commencement of the CCAA Proceedings (the **"Pre-CCAA Filing Macquarie Indebtedness"**), unless otherwise expressly agreed to in writing by the Lenders;

(d)     no Default or Event of Default has occurred and is continuing on the date of the proposed advance or will occur after giving effect to the making of such advance;

(e)     each of the CCAA Initial Order and the DIP Approval Order shall be in full force and effect, and, in each case, shall not have been vacated, stayed, revised, modified or amended in any manner adverse to the Lenders without the prior written consent of the Lenders and no leave to appeal or appeal has been sought in connection therewith;

(f)     the US Recognition Order shall have been issued by the US Court and shall be in full force and effect, and shall not have been vacated, stayed, revised, modified or amended in any manner adverse to the Lenders without the prior written consent of the Lenders;

(g)     the US DIP Approval Recognition Order shall have been issued by the US Court and shall be in full force and effect, and shall not have been vacated, stayed, revised, modified or amended in any manner adverse to the Lenders without the prior written consent of the Lenders;

(h)     the Borrowers are in compliance with the current Cash Flow Forecast as at the date of the proposed DIP Advance subject to a Permitted Variance;

(i)     the Loan Parties are in compliance with all existing Restructuring Court Orders;

(j)     the Guarantors shall have delivered a guarantee to the Lenders in form and substance satisfactory to the Lenders in their sole discretion;

(k)     the Borrowers shall have delivered to the Lenders customary secretary's certificates and authorizing directors' resolutions, in form and substance satisfactory to the Lenders acting reasonably;

(l)     the Lenders shall have received all fees and other amounts then due and payable under this Commitment Letter, including reimbursement or payment of Lenders' Fees and Expenses (for certainty, including fees and expenses of their advisors as provided for herein), which amounts shall be paid out of the proceeds of the applicable advance; and

(m)     the terms of the SISP Approval Order and the SISP (each as defined below) shall have been agreed to between Loan Parties and the Lenders.

## 11.    Conditions Precedent to Subsequent Advances

The obligation of the Lenders to make any Subsequent Advance or the issuance, amendment, increase, or extension of a Letter of Credit is subject to the prior satisfaction, or waiver by the Lenders, of each of the following conditions precedent:

(a)     the Lenders and the Fronting Lender shall have received a Request for Advance under the DIP Facility in advance of the date for the requested Subsequent Advance as required by the terms of this Commitment Letter;

(b)      all conditions precedent in section 10 immediately above in this Commitment Letter shall have been and continue to be satisfied on the date of such proposed Subsequent Advance and in respect of such Subsequent Advance;

(c)      each of the Colombian Recognition Order and the Colombian DIP Approval Recognition Order shall have been issued and shall be in full force and effect, and neither the Colombian Recognition Order nor the Colombian DIP Approval Recognition Order shall have been vacated, stayed, revised, modified or amended in any manner adverse to the Lenders without the prior written consent of the Lenders and no leave to appeal or appeal has been sought in connection therewith;

(d)      (i) the applicable Loan Parties shall have delivered DIP Security Documents (governed by the laws of Colombia) to the Lenders creating Liens over all of the present and future property and assets of each of such Loan Parties in Colombia (the **"Colombian DIP Security Documents"**) and such Colombian DIP Security Documents or notices or lien filings in respect thereof shall have been filed or registered in all applicable governmental or other offices to perfect the Liens created under such Colombian DIP Security Documents and (ii) the Liens created by the Colombian DIP Security Documents shall rank in priority to all other Liens (collectively, the **"Third Party Colombian Liens"**) held by or granted in favor of all other Persons including without limitation all Liens granted in favor of Macquarie Bank and securing the Macquarie Pre-CCAA Indebtedness (and if applicable any agents for such other Persons) (the **"Third Party Colombian Lien Holders"**) against such property and assets and any proceeds received or realized from any of such Liens; and in the case of this section 11(d)(ii) which priority shall be obtained pursuant to the Colombian DIP Approval Recognition Order. The (A) delivery of the Colombian DIP Security Documents, (B) the perfection of the Liens granted to the Lenders thereunder under Colombian law, and (C) the issuance by the Colombian Court of the Colombian DIP Approval Recognition Order are collectively called the **"Colombian DIP Security Process"**;

(e)      the Lenders intend to appoint an agent to act as administrative agent and/or collateral agent for and on behalf of all of the Lenders (in such case the **"DIP Agent"**); in the event that the Lenders notify the Company that the Lenders elect to appoint a DIP Agent, then in such case the parties agree to enter into an amended and restated Commitment Letter with such DIP Agent as a condition precedent to any Subsequent Advance with the same terms and conditions herein and additional customary provisions for a DIP Facility of this nature with an administrative agent for the lenders, in form and substance satisfactory to the parties hereto (and for certainty with the indemnities granted herein by the Borrowers also being granted in favor of the DIP Agent and its applicable **"Indemnified Persons"**); the Lenders' Fees and Expenses will include and will be deemed to include all present and future reasonable fees and expenses of the DIP Agent and any advisors (including without limitation legal counsel) retained by the DIP Agent; and

(f)      all Restructuring Milestones required to be completed prior to the date of such Subsequent Advance has been completed and/or satisfied.

12.     **Representations and Warranties**

To induce the Lenders to enter into this Commitment Letter and to make advances hereunder, each Loan Party hereby represents and warrants to the Lenders as follows (and for certainty, each of such representations and warranties shall be ongoing and deemed to be made on each day on which this Commitment Letter is in effect (including before any DIP Advance is advanced by the Lenders to the Borrowers) and/or on which any Obligations are owing to the Lenders:

(a)     it is validly formed and existing under the laws of its jurisdiction of incorporation or formation;

(b)     it has the power and capacity, and the legal right, to own or lease and operate its property, to carry on its business as now conducted and as proposed to be conducted, and subject to CCAA Court approval of this Commitment Letter, to enter into, execute, deliver and perform its obligations under this Commitment Letter;

(c)     each Loan Party has taken all necessary action to authorize the execution, delivery and performance of this Commitment Letter. Subject to the issuance of the DIP Approval Order, and the terms thereof, no consent or authorization of, filing with, notice to or other act by, or in respect of, any governmental authority or any other person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Commitment Letter;

(d)     this Commitment Letter has been duly executed and delivered by each Loan Party and, subject to the issuance of the DIP Approval Order, and the terms thereof, this Commitment Letter constitutes a legal and legally binding obligation of each Loan Party, enforceable against it in accordance with the terms hereof;

(e)     the entering into, execution, delivery and performance of this Commitment Letter do not and will not conflict with, contravene, violate or result in a breach of: (i) such Loan Party's articles, bylaws, or other constating documents or any resolutions of directors, shareholders, partners or similar governing body, as applicable, or the provisions of any shareholders agreement, partnership agreement or declaration of trust; or (ii) any applicable law, subject to the issuance of the DIP Approval Order;

(f)     all material rights and governmental licenses, approvals, and authorizations necessary to operate the businesses of each Loan Party have been issued and obtained and are in full force and effect;

(g)     the businesses operated by the Loan Parties have been conducted, in accordance with all applicable laws in all material respects;

(h)     each Loan Party and its properties and businesses comply in all material respects, and the use of its properties comply in all material respects, with all applicable environmental laws; no Loan Party has any knowledge of any facts which result in, or constitute, or are likely to give rise to, non-compliance with any environmental laws in any material respect;

(i)    each Loan Party owns, leases or has the lawful right to use all of the material properties and undertaking necessary for the conduct of the businesses of such Loan Party;

(j)    the recitals in the "Recitals" section above in this Commitment Letter are true and correct and form part of this Commitment Letter;

(k)    other than the Inactive Subsidiaries, none of the Loan Parties owns or controls, directly or indirectly, any subsidiaries or branches;

(l)    none of the Inactive Subsidiaries has (i) any active business operations, (ii) any material liabilities, (iii) issued in its name or holds any government or regulatory license or approval which is used or relied on by any Loan Party, or (iv) any property or assets (including any monies in any bank account) which, together with all of the other Inactive Subsidiaries, which have an aggregate value in excess of $100,000 (of all such clauses when taken together collectively called the **"Inactive Subsidiaries Representations"**); and

(m)    each of the Loan Parties and each of their subsidiaries and each of the Colombian branches has good and valid title to, or legally binding property right in, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, in each case free and clear of all Liens other than those Liens permitted by Section 7.01 of the Macquarie Credit Agreement (as same exists on the date of this Commitment Letter) and except for minor defects in title as could not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the operations, financial condition, and/or future prospects of the Loan Parties taken as a whole.

## 13.    Affirmative Covenants

Each Loan Party covenants and agrees with the Lenders to do the following:

(a)    each Loan Party shall operate and maintain its respective properties and businesses in accordance with industry practice and in accordance with applicable law and all Restructuring Court Orders;

(b)    permit the Lenders or their Advisors, on reasonable notice, to visit, inspect, appraise and conduct examinations of any or all of the collateral and make abstracts from any of its books and records at any reasonable time and as often as may reasonably be desired and to discuss its business operations, properties and financial and other conditions with its officers, employees and (during the continuance of an Event of Default and in the presence of its financial officer) its independent public accountants, subject to solicitor-client privilege, all Restructuring Court Orders, applicable privacy laws and applicable confidentiality obligations of the Lenders;

(c)    use reasonable efforts to keep the Lenders apprised on a timely basis of all material developments with respect to the business and affairs of the Loan Parties and the Restructuring Proceedings;

(d)    deliver to the Lenders the reporting and other information from time to time reasonably requested by the Lenders, including but not limited to the next weekly Cash Flow Forecast with comparisons to actual results, monthly financial

statements, forms of reporting provided to other lenders (including borrowing base certificates) as requested by the Lenders, and any other information pertaining to the business and affairs of the Loan Parties as reasonably requested by the Lenders;

(e)     use the proceeds of the DIP Facility in a manner consistent with the restrictions set out herein and in all cases in accordance with the Cash Flow Forecast;

(f)     comply with the provisions of the CCAA Initial Order, the DIP Approval Order, and all other Restructuring Court Orders, as each may be subsequently amended;

(g)     preserve, renew and keep in full force and effect all material licenses, permits and government approvals necessary to operate its businesses;

(h)     maintain at all times with financially sound and reputable insurers, insurance with respect to its properties and business against loss or damage of the kinds insured against by reputable companies in the same or similar businesses, such insurance to be of types and in amounts (with deductible amounts) consistent with then prudent industry standards of companies engaged in the same or similar kinds of businesses; all insurance coverages maintained shall be satisfactory to the Lenders acting reasonably and the Loan Parties shall use commercially reasonable efforts to cause the applicable insurers to name the Lenders as first mortgagee and loss payee on all property insurance and an additional insured on all liability insurance and use commercially reasonable efforts to ensure that each property insurance policy shall contain a mortgage clause satisfactory to the Lenders which shall provide thirty days' advance written notice to the Lenders prior to any non-renewal, cancellation or amendment of such property insurance policy; the Loan Parties shall deliver or cause to be delivered to the Lenders certified copies of policies of insurance which are required to be kept in force hereunder in respect of the Borrowers and the other Loan Parties or certificates of insurance in respect thereof and thereafter, shall provide to the Lenders certified copies or certificates of the insurance as from time to time may be reasonably requested by the Lenders; each of the Loan Parties hereby assigns and transfers to the Lenders any and all proceeds now or hereafter payable to such Loan Party under any present or future insurance policy in respect of which such Loan Party is the insured or a loss payee;

(i)     duly and punctually pay or cause to be paid to the Lenders all principal, interest, fees and other amounts payable by it under this Commitment Letter on the dates, at the places and in the amounts set forth herein;

(j)     forthwith notify the Lenders of the occurrence of any Default or Event of Default or of any event or circumstance which could reasonably be expected to result in a material adverse change to the Cash Flow Forecast;

(k)     comply in all material respects with all applicable laws, rules and regulations applicable to its business, including environmental laws;

(l)     authorize the Monitor to (i) meet and communicate with the Lenders and (ii) provide regular reports to the Lenders with respect to the DIP Facility and the Restructuring Proceedings;

(m)     provide the Lenders and their respective counsel with drafts of all court filings to be filed with any Restructuring Court at least two (2) Business Days prior to such filing or with as much notice as possible if such two (2) Business Day notice is not practicable and in all cases consider, and where reasonably possible, accept the reasonable comments of the Lenders;

(n)     not permit the sum of (i) the aggregate unrestricted cash and cash equivalents of the Borrowers and (ii) unexpired and undrawn Tranche A commitments available to the Borrowers for a DIP Advance (for certainty, meaning that as of the date of such calculation, all conditions precedent for such DIP Advance are satisfied except for the delivery of a Request for Advance) to equal less than (x) $13 million through and including March 31, 2026 and (y) $17 million thereafter (the **"Minimum Liquidity Test"**);

(o)     deliver to the Lenders the following financial reporting within the timeline specified: (1) within 14 days of the end of each calendar month, internal operating financial statements (in other words, financial statements without (x) the recording of certain non-cash items such as deferred tax expense/recovery, (y) comparatives and (z) notes, for each of the Loan Parties), (2) within 35 days of the end of a fiscal quarter, unaudited consolidated quarterly financial statements prepared in accordance with IFRS for each of the Loan Parties, and (3) within 80 days of the end of the fiscal year, unaudited consolidated annual financial statements for each of the Loan Parties prepared in accordance with IFRS; and the Borrowers agree to meet, and to cause their senior management and accountants to meet, with the Lenders and their advisors to discuss the monthly reporting within one (1) Business Day following delivery of the month financial statements in clause (1) above;

(p)     deliver to the Lenders every two weeks (by Wednesday after the end of each two calendar week period for the preceding two calendar weeks most recently completed) written reports listing details of accounts receivable, aged accounts receivable, production volumes, and commodity price realization, and such other information reasonably requested by the Lenders, in form and substance satisfactory to the Lenders;

(q)     by no later than December 31, 2025, (1) retain a new qualified reserve consultant (in addition to the Borrowers' existing reserve consultant) satisfactory to the Lenders and on terms (including without limitation scope of work) satisfactory to the Lenders; and (2) retain a new qualified technical consultant satisfactory to the Lenders and on terms (including without limitation scope of work) satisfactory to the Lenders; provided that the technical consultant's engagement will be limited solely to providing technical assessments and reports on engineering, operational and maintenance matters relating to the Borrowers' assets and operations;

(r)     provide the new qualified reserve consultant and technical consultant with full access to all of its properties, assets and business records, including but not limited to all of its wells, by no later than five (5) days after the date on which such qualified reserve consultant and technical consultant is retained (provided the technical consultant's engagement shall be limited as set forth in (q)(2) above and shall be given access commensurate with its engagement);

(s)     comply with the Cash Flow Forecast at all times subject only to a Permitted Variance;

(t)        shall cause each of the following milestones (each individually, a "**Restructuring Milestone**" and collectively, the "**Restructuring Milestones**") to occur by the dates specified (unless otherwise agreed to in writing by the Lenders):

(i)        by no later than December 12, 2025, the US Recognition Order shall have been issued by the US Court;

(ii)       by no later than December 15, 2025, the DIP Approval Order shall have issued by the CCAA Court;

(iii)      by no later than December 19, 2025, the US DIP Approval Recognition Order shall have been issued by the US Court;

(iv)       by no later than December 22, 2025, the Loan Parties shall have retained a sale advisor satisfactory to the Lenders to assist the Loan Parties with the transactions contemplated by the SISP on terms and conditions satisfactory to the Lenders;

(v)        by no later than December 28, 2025, the Colombian Recognition Order shall have been issued by the Colombian Court;

(vi)       by no later than January 7, 2026, the Colombian DIP Approval Recognition Order shall have been issued by the Colombian Court;

(vii)      by no later than January 20, 2026, the CCAA Court shall have issued a Restructuring Court Order approving a sale and investment solicitation process (the "**SISP**") (each of such SISP and Restructuring Court Order to be in form and substance satisfactory to the Lenders in their sole discretion) (the "**SISP Approval Order**"); for certainty the SISP shall provide among other things: (1) approval of the retention by the Loan Parties of the sale advisor satisfactory to the Lenders, (2) for the solicitation of sale, investment and restructuring (i.e., plan) proposals; (3) that the Lenders shall be permitted to participate in the SISP in accordance with its terms including as a bidder and to credit bid all or certain of the Obligations and/or other obligations owing to the Lenders in their other capacities relative to the Borrowers in connection with any transactions agreed to by the Borrowers and the applicable Lenders;

(viii)     by no later than January 20, 2026, the CCAA Court shall have issued a Restructuring Court Order approving a key employee retention plan in form and substance satisfactory to the Lenders;

(ix)       by no later than January 23, 2026, the Colombian DIP Security Process shall have been completed;

(x)        by no later than February 14, 2026, the SISP Approval Order shall have been recognized and approved by a Restructuring Court Order issued by the Colombian Court;

(xi)       the Loan Parties shall have received non-binding letters of intent, received binding bids for potential sale, investment and/or restructuring transactions, obtained approval of the CCAA Court for such a transaction (and recognition thereof by the US and Colombian Courts) and consummated

such a transaction, in each case by the dates contemplated in the SISP; and

(xii)  by no later than June 30, 2026, either (1) the transaction of the successful bid selected in the SISP shall have been completed and closed or (2) if the SISP has been terminated in accordance with its terms, an Acceptable Plan of Arrangement has become effective;

(u)  promptly do all such further acts and things and execute and deliver all such further documents as may be reasonably required by the Lenders in connection with this Commitment Letter, the other Loan Documents, the DIP Facility, and the transactions contemplated hereby and thereby;

(v)  to cause the Loan Parties (collectively, the **"Chamber of Commerce Loan Parties"**) that commenced a reorganization process with the Bogota Chamber of Commerce pursuant to Law 2437 of 2024, Articles 4 and 7, and Resolution 2025-01-3474515 of the Superintendency of Companies (a **"Colombia Chamber of Commerce Proceeding"**) to fully and completely withdraw, terminate or otherwise discontinue the Colombia Chamber of Commerce Proceeding, and in any event such Colombia Chamber of Commerce Proceeding shall be fully and completely withdrawn, terminated or otherwise discontinued on or before December 19, 2025;

(w)  deliver to the Lenders as promptly as practicable written notice of any material events in the conduct of its businesses and in the Restructuring Proceedings that does or could reasonably be expected to affect the DIP Security, the assets, businesses and operations of the Loan Parties, or the ability of the Loan Parties to repay the Obligations when due;

(x)  deliver prompt notice to the Lenders immediately upon any Loan Party becoming aware of (i) any Default or Event of Default, (ii) any circumstance that has caused or could reasonably be expected to cause a Default or Event of Default, (iii) any representation or warranty contained herein or in any other Loan Document being untrue or incorrect, or (iv) any contravention or non-compliance by any Loan Party with any term or condition of any Loan Document; and

(y)  promptly pay or cause to be paid (including taking any necessary action) to the Lenders following the happening of any loss or damage in respect of the property or assets of any Loan Party or any other loss giving rise to a claim under any policy of insurance maintained by any Loan Party all proceeds of insurance in the event that claim for payment of insurance proceeds is greater than $100,000 or in the event the aggregate amount of insurance proceeds received by the borrower from more than one claim is greater than $100,000.

## 14.    Negative Covenants

Each Loan Party covenants and agrees not to do any of the following without the prior written consent of the Lenders:

(a)  transfer, lease or otherwise dispose of all or any of its property, assets or undertakings (for certainty including in connection with or pursuant to any Proposed Sale Transaction) outside of such dispositions of less than a material portion of its property or assets in the ordinary course of business with non-affiliates, except (i) in compliance with the DIP Approval Order or any other order

of the CCAA Court (including without limitation the SISP Approval Order) approving same, any such order to be in form and substance acceptable to the Lenders acting reasonably, or (ii) with the prior written consent of the Lenders;

(b)    make any payment of principal or interest in respect of obligations owed by the Loan Parties to parties other than the Lenders as at the date of the DIP Approval Order, except in accordance with this Commitment Letter, the DIP Approval Order and the Cash Flow Forecast;

(c)    create or permit to exist, without the prior approval of the Lenders, indebtedness for borrowed money or guarantees of any indebtedness, except, in each case, as set out in the DIP Approval Order;

(d)    create, incur, assume or permit to exist any liens that secure any obligations on any property or assets owned by any borrower securing indebtedness for borrowed money or guarantees of indebtedness for borrowed money, except, in each case, as set out in the DIP Approval Order or with the prior written approval of the Lenders;

(e)    enter into any transaction with any affiliate or any of its or its affiliates' respective direct or indirect equity holders, senior officers, directors, managers or employees, except in the ordinary course of business for a bona fide business purpose and not for any other purpose and upon fair and reasonable terms comparable to arm's length transactions of a similar type and in each case, subject to the Cash Flow Forecast; for certainty excluding any key employee incentive or retention plan that is approved by the Lenders and the CCAA Court;

(f)    make any investments or acquisitions of any kind, direct or indirect, in any business or otherwise except as expressly provided for in the Cash Flow Forecast;

(g)    make any type of payment, or otherwise satisfy any claim, purported claim, liability, or other obligation, including without limitation of any pre-CCAA filing claim, that is not contemplated by the Cash Flow Forecast subject to a Permitted Variance;

(h)    amalgamate, consolidate with or merge into or enter into any similar transaction with any other entity, allow any change of control to occur, or create or acquire any new subsidiary or become a general partner in any partnership;

(i)    apply for or consent to, any Restructuring Court Order, or amendment or modification to an existing Restructuring Court Order which adversely affects or could reasonably be expected to adversely effect the Lenders;

(j)    seek or apply to vary, supplement, revoke, terminate or discharge the DIP Approval Order, the US DIP Approval Recognition Order or the Colombian DIP Approval Recognition Order (other than any variation or supplement which is not adverse and could not reasonably be expected to be adverse to the interests of the Lenders) or the Monitor's role as monitor in the CCAA Proceedings;

(k)    file or support the confirmation of any Plan of Arrangement or liquidation other than an Acceptable Plan of Arrangement;

(l)    incur any additional indebtedness (including without limitation any equipment lease or financing lease obligations);

(m)    conduct or pay for the costs of any exploration activities or capital expenditures unless consented to by the Lenders in their sole discretion;

(n)    use any monies including without limitation any proceeds of the DIP Facility except in accordance with the Cash Flow Forecast subject to a Permitted Variance;

(o)    declare or make, directly or indirectly, any Corporate Distribution;

(p)    unless otherwise expressly permitted hereunder, purchase or otherwise acquire any shares or other equity interest or assets constituting the purchase of a business or make any capital contribution to or otherwise invest in or make any advance or loan to or make any provision of financial assistance, either directly or indirectly, to any Person without the prior written consent of the Lenders in their sole discretion;

(q)    permit any of the Inactive Subsidiaries, at any time, to not be in compliance with all of the Inactive Subsidiaries Representations;

(r)    without the prior written consent of the Lenders, sell any of its assets, equity interests, claims, contractual rights, or other interests, except (i) for worn out or obsolete equipment, or (ii) as permitted pursuant to the SISP;

(s)    (i) enter into any material transaction outside the ordinary course of its business or (ii) amend or modify any existing agreements or transaction terms, in each case, without the consent of the Lenders unless otherwise approved by a Restructuring Court Order;

(t)    amalgamate or merge with or into any other entity or enter into any similar transaction, except as may be expressly permitted pursuant to the SISP;

(u)    enter into any joint venture, "farmout", or any other similar transactions;

(v)    amend its organizational documents or take any action to authorize or cause its dissolution;

(w)    contribute, transfer, assign or otherwise make any type of payment to (i) with respect to any Loan Party organized in Colombia, that will be held by such Loan Party outside of the territorial jurisdiction of the United States, Canada or Colombia; and (ii) with respect to any other Loan Party, that will be held by such Loan Party outside of the territorial jurisdiction of the United States or Canada (or Switzerland for non-material administrative payments solely in accordance with the Cash Flow Forecast);

(x)    apply for or consent to any Restructuring Court Order that materially adversely affects or could reasonably be expected to materially adversely affect the Lenders; or

(y)    enter into any new material agreements or amend or renegotiate any existing material agreements without the consent or approval of the Lenders; or

**15.    Indemnity and Release**

Each Loan Party agrees to indemnify and hold harmless the Lenders (and each of them) and each of their respective directors, officers, employees, agents, attorneys, advisors

and affiliates (all of such persons and entities being referred to hereafter as "**Indemnified Persons**") from and against any and all actions, suits, proceedings (including any investigations or inquiries), claims, losses, damages, liabilities or expenses of any kind or nature whatsoever (including without limitation Lenders' Fees and Expenses) which may be incurred by or asserted against or involve any Indemnified Person as a result of or arising out of or in any way related to or resulting from the Restructuring Proceedings or this Commitment Letter (and for certainty including any other Loan Documents or the transactions contemplated thereby), and, upon demand, to pay and reimburse any Indemnified Person for any reasonable legal costs on a solicitor and his/her/its own client basis or other out-of-pocket expenses incurred in connection with investigating, defending or preparing to defend any such action, suit, proceeding or claim whether or not any Indemnified Person is a party to any action or proceeding out of which any such expenses arise; provided, however, no Loan Party shall be obligated to indemnify pursuant to this section any Indemnified Person against any loss, claim, damage, expense or liability to the extent it resulted from the gross negligence or willful misconduct of such Indemnified Person as finally determined by a court of competent jurisdiction.

The indemnities granted under this Commitment Letter shall survive any termination of the DIP Facility and/or this Commitment Letter.

16. **Events of Default**

The occurrence of any one or more of the events that are usual and customary for debtor-in-possession financings of this type, including each of the following events, shall constitute an event of default ("**Event of Default**") under this Commitment Letter and the DIP Facility:

(a)     the entry of an order dismissing the Restructuring Proceedings (or any of them with the exception of the Chambers of Commerce Proceeding) or lifting the stay (or any equivalent thereof) in the Restructuring Proceedings (or any of them) to permit the enforcement of any debt obligations or Liens against the Loan Parties (or any of them) or any of their respective properties or assets or the appointment of a receiver, interim receiver or similar official in respect of any one or more of the Loan Parties or some or all of their respective properties or assets;

(b)     the entry of an order granting any Lien or any other claim a super priority status or a Lien equal or superior in priority to the DIP Charge, without the Lenders' prior written consent, but for certainty excluding the prior ranking Liens by way of court ordered charges in the CCAA Proceedings as specifically referenced and consented to by the Lenders in this Commitment Letter;

(c)     the entry of an order staying, reversing, vacating or otherwise modifying the DIP Facility, the DIP Approval Order, the US DIP Approval Recognition Order, the Colombian DIP Approval Recognition Order, or any other Restructuring Court Order which adversely affects or could reasonably be expected to adversely affect the Lenders or the issuance of any Restructuring Court Order or any order of any applicable court having the equivalent effect, without the prior written consent of the Lenders;

(d)     failure of the Borrowers to pay any amounts when due under this Commitment Letter, the DIP Facility, any Restructuring Court Order, or any related loan documents or other agreements entered into in connection herewith or therewith;

(e)     any representation, warranty, certification or other statement of fact made or deemed made by any Loan Party herein, or any amendment or modification hereof is false or inaccurate in any material respect on or as of the date made or deemed made;

(f)     failure of any Loan Party to perform or observe any covenant (including but not limited to each covenant under Sections 13 and 14 herein), term, condition or agreement in this Commitment Letter (other than as set out in this section 16), any loan documents entered into in connection with the DIP Facility, or any Restructuring Court Order relating to or affecting the DIP Facility; provided that where such failure is capable of being cured, such failure has continued for more than five (5) Business Days (the **"Cure Period"**) after the earlier to occur of (i) any one or more of the Loan Parties having knowledge of such default or (ii) written notice of such default from the Lenders to the Borrowers; notwithstanding anything to the contrary and for greater certainty, the Cure Period does not and is not intended to apply to any (i) covenants, terms, conditions or agreements that are not customarily subject to cure periods in debtor-in-possession financings of this type or (ii) other clauses listed in this section 16 or elsewhere;

(g)     any Loan Party ceases or threatens to cease to carry on business in the ordinary course, except where such cessation occurs in connection with a sale of all or substantially all of the assets of such Loan Party consented to by the Lenders or is otherwise approved pursuant to a Restructuring Court Order;

(h)     if a Plan of Arrangement that is not an Acceptable Plan of Arrangement shall be filed by any of the Loan Parties in the CCAA Proceedings or any other Restructuring Proceedings, or the Borrowers and/or the Loan Parties (or any one or more of them) shall propose or support, or fail to oppose, any such plan or motion filed by a Person other than such Borrowers and/or Loan Parties;

(i)     any Loan Party shall file a motion seeking, or take any action supporting a motion seeking, or any Restructuring Court shall issue, an order, authorizing the sale or liquidation its assets unless, in each case, either (i) (A) the Lenders consent to the filing of such motion, and (B) any order approving the sale or liquidation expressly provides for application of cash proceeds in accordance with the terms of this Commitment Letter and is otherwise in form and substance reasonably satisfactory to the Lenders, or (ii) the order approving such sale or liquidation contemplates payment in full in cash of all the Obligations;

(j)     any event or occurrence that materially adversely affects the Loan Parties, their business or their assets, in each case taken as a whole, as determined by the Lenders in their discretion;

(k)     any default under, or any termination of, (i) any contract or agreement to which any Loan Party is party with Promigas S.A. E.S.P or any of its affiliates, or (ii) any material contract to which any Loan Party is a party and such default or termination has or could reasonably be expected to have a material adverse effect on the operations, financial condition, and/or future prospects of the Loan Parties taken as a whole;

(l)     any change of control of any one or more of the Loan Parties without the consent of the Lenders;

(m)     the Loan Parties do not complete and satisfy any of the Restructuring Milestones by the date on which any such Restructuring Milestone is required to be completed or satisfied;

(n)     any governmental or regulatory license or approval issued to any Loan Party is terminated, revoked, or suspended and such termination, revocation, or suspension has or could reasonably be expected to have a material adverse on the operations, financial condition, and/or future prospects of the Loan Parties taken as a whole;

(o)     the Borrowers, and if applicable the Loan Parties, do not comply with any term or condition of the SISP, including without limitation not satisfying any milestone action required to be completed in the SISP by the date on which such milestone action item is required to be completed under the SISP and remaining in compliance with such action item thereafter, as applicable;

(p)     any Variance Report is not delivered to the Lenders within two (2) days after the date on which such Variance Report is required to be delivered hereunder;

(q)     a Variance Report discloses a negative variance of (i) more than 15.0% actual receipts for such testing period; (ii) more than 15% actual receipts for the cumulative period commencing on the date of the initial Cash Flow Forecast and ending on the last day of such testing period; (iii) more than 10.0% actual disbursements for such testing period; and (iv) more than 10% actual disbursements for the cumulative period commencing on the date of the initial Cash Flow Forecast and ending on the last day of such testing period (in each case, a "**Permitted Variance**");

(r)     the Borrowers fail to satisfy the Minimum Liquidity Test at any time including as reported in any Variance Test;

(s)     the filing of any court application or motion by any Loan Party in any Restructuring Proceeding or with any other court seeking any of the matters set forth in clauses (a), (b) or (c) in this Section 16, or failure by the Loan Parties to use reasonable good faith efforts to oppose any Person that brings an application or motion for any such relief;

(t)     the aggregate amount of the DIP Advances under Tranche A exceeds the Maximum Amount;

(u)     any violation or breach of any Restructuring Court Order by any Loan Party;

(v)     the priority of the Liens as contemplated hereby created pursuant to or under the DIP Security in favor of the Lenders is varied without the consent of the Lenders or any of such Liens does not have the priority required hereunder for any reason in any jurisdiction;

(w)     any Loan Party commences an action or any other proceeding in any Restructuring Proceeding or in any other court (i) to obtain any form of relief against the Lenders (or any one or more of them) including without limitation a proceeding to recover damages from the Lenders or to obtain payment of any amounts purported to be owing by the Lenders (or any one or more of them) to any Loan Party if the Lenders (or any one or more of them) disputes any of the same or (ii) to challenge in any

way the enforceability of any of the Loan Documents or the Liens granted under or pursuant to the DIP Security;

(x)     any Loan Party seeks to, or consents to, any amendment of the SISP without the prior written consent of the Lenders;

(y)     the expiry without further extension of the stay of proceedings in the CCAA Proceedings or in any of the other Restructuring Proceedings;

(z)     the making of any payment of any kind by any Loan Party that is not permitted by this Commitment Letter including without limitation pursuant to the Exploration Covenant;

(aa)    the making of any payment or expenditure of any monies which is not in accordance with the Cash Flow Forecast;

(bb)    the failure to remain in compliance with the Cash Flow Forecast subject to any Permitted Variances; (for certainty, in the event that the Lenders consent to any one or more of the Loan Parties making any payments or using any monies for any matter or thing contemplated by the Exploration Covenant, any default by the Loan Parties in exceeding the permitted amount of payment or use of monies will constitute an Event of Default regardless of whether such default would or would not be within a Permitted Variance, which Permitted Variance does not and shall not apply to any such permitted amounts or payments) (for certainty the five day cure period in clause (f) above does not apply to this event);

(cc)    the denial or purported repudiation by any Loan Party of the legality, validity, binding nature, or enforceability of this Commitment Letter or any other Loan Documents, or any Loan Party commencing any action or proceeding in any Restructuring Proceeding for a declaration or order to such effect;

(dd)    this Commitment Letter or any other Loan Document (and for certainty including without limitation the DIP Security) ceases to be enforceable;

(ee)    except as stayed by order of a Restructuring Court, the entry of one or more final judgements, writs of execution, garnishment or attachment representing a claim or claims in excess of $100,000 or the equivalent amount thereof in any other currency, in the aggregate, against any Loan Party or the property and assets of the Loan Parties which are subject to the Liens in favor of the Lenders that is not released, bonded, satisfied, discharged, vacated, stayed or accepted for payment by an insurer within 30 days after its or their entry, commencement or levy;

(ff)    the occurrence of a material reduction in production from the operations of the Loan Parties taken as a whole or any material production outages or stoppages which continue for more than five (5) days;

(gg)    Agencia Nacional de Hidrocarburos or any other Colombian governmental or regulatory authority takes any action or issues any order or ruling which has or could reasonably be expected to be material adverse to the business operations of the Loan Parties in Colombia; or

(hh)    incorporate, create, or organize any new subsidiaries or branches after the date of this Commitment Letter.

17.    **Remedies**

If any Event of Default shall have occurred and be continuing, the Required Lenders may, subject to the applicable provisions of the DIP Approval Order and any subsequent Restructuring Court Orders issued in the Restructuring Proceedings specifically relating to the DIP Facility and the rights and remedies or the Lenders in connection therewith, by written notice to the Borrowers, take any or all of the following actions:

(a)    declare all or any portion of the DIP Facility to be suspended or terminated, whereupon the DIP Facility shall forthwith be suspended or terminated;

(b)    declare all or any portion of the Obligations hereunder to be immediately due and payable, without presentment, demand, protest, or other notice of any kind, all of which are hereby expressly waived by the Loan Parties, whereupon all obligations, liabilities and indebtedness hereunder shall become due and payable by the Loan Parties (for certainty, as specified above, the Obligations shall become due and owing upon the occurrence of an Event of Default without the requirement of the Lenders to make a written demand for payment or any other notice or action whatsoever);

(c)    set-off or combine any amounts then owing by the Lenders to any Loan Party against the obligations of the Borrowers to the Lenders;

(d)    exercise all rights and remedies available to the Lenders (i) hereunder, (ii) under and pursuant to the DIP Approval Order, the US DIP Approval Recognition Order, the Colombian DIP Approval Recognition Order, all other applicable Restructuring Court Orders, (iii) under the Restructuring Proceedings, or (iv) under applicable law;

(e)    upon prior written notice to the CCAA Court (or any other Restructuring Court, as may be applicable), apply to the CCAA Court (or any other Restructuring Court, as may be applicable) for an order, on terms acceptable to the Lenders, for the appointment of a receiver, interim receiver, or receiver and manager or similar office of some or all of the assets and business of the Loan Parties (or any one or more of them) or a trustee in bankruptcy of the Loan Parties (or any one or more of them), or for the appointment of an *Agente Intervenor* under Decree 633 or 1993 or the initiation of a *Liquidacion Judicial* under Law 1116 of 2006 in respect of any one or more of the Loan Parties in Colombia under Colombian law;

(f)    subject to obtaining prior approval from the applicable Restructuring Court (to the extent that such prior approval is required), exercise the powers and rights of a secured party under applicable law relating to the enforcement of Liens granted or issued in favor of the Lenders;

(g)    upon prior written notice to the CCAA Court, apply to the CCAA Court for an order, on terms acceptable to the Monitor and the Lenders, providing the Monitor with the power, in the name of and on behalf of the Borrowers, to take all necessary steps in the Restructuring Proceedings or otherwise exercise their respective rights under applicable law and in equity; and

(h)    use (for certainty, on the instructions of the Required Lenders in accordance with the definition thereof and section 19(q)) any or all of the Obligations as a credit bid and/or to pay for some or all of the purchase price in connection with any purchase

of some or all of the properties and assets of the Borrowers (or any one or more of them).

The rights and remedies of the Lenders under this Commitment Letter and the other Loan Documents are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, including under the CCAA in the CCAA Proceedings, under the Bankruptcy Code in the US Recognition Proceedings, and under applicable Colombian law in the Colombian Recognition Proceedings.

18.    **Cash Flow Forecast Additional Provisions**

The Cash Flow Forecast will continue to be the Cash Flow Forecast hereunder until such time as a revised Cash Flow Forecast may be approved by the Lenders in accordance with this section 18.

The Borrowers may deliver to the Lenders an updated and revised Cash Flow Forecast to replace the then current Cash Flow Forecast no more frequently than every two weeks (unless otherwise consented to in writing by the Lenders in their sole discretion), and in each case such proposed revised Cash Flow Forecast shall have been reviewed and approved by the Monitor prior to its delivery by the Borrowers to the Lenders. If (i) the Lenders in their sole discretion, approve such proposed revised Cash Flow Forecast (for certainty, in writing) or (ii) do not deliver to the Borrowers written notice within four (4) Business Days (provided that Lenders that hold Notes are provided with an adequate opportunity to become restricted and receive the information subject to confidentiality agreements containing acceptable "cleansing" timeline and mechanics) after the date of receipt by the Lenders of a proposed revised Cash Flow Forecast that such proposed revised Cash Flow Forecast is not acceptable to the Lenders, then in either case such proposed revised Cash Flow Forecast shall become the replacement Cash Flow Forecast automatically and without further action and same shall be deemed to have been accepted by the Lenders.  For greater certainty, any replacement Cash Flow Forecast must also be approved in advance in writing by the Monitor.

On or before 5:00 p.m. Toronto time of Wednesday of every week commencing on the Wednesday following the date on which the Initial Advance occurs, the Borrowers shall deliver to the Lenders and the Monitor a (i)  with calculations in form and substance satisfactory to the Lenders and the Monitor acting reasonably (the "**Variance Report**") setting forth for all Loan Parties (i) actual receipts and disbursements for the preceding week for each line item in the Cash Flow Forecast for such previous week, and (ii) actual receipts and disbursements on a cumulative basis since the beginning of the period covered by the then operative Cash Flow Forecast, in each case as against the then operative Cash Flow Forecast, and setting forth all the variances, on a line-item and aggregate basis in comparison to the amounts set forth in respect thereof in the then operative Cash Flow Forecast.  Each Variance Report shall include (i) reasonably detailed explanations for any variances for either receipts or disbursements, in each case exceeding five percent (5%) of the Cash Flow Forecast for each line item in the Cash Flow Forecast and all items on a cumulative basis during the relevant period and (ii) detailed calculations for the Minimum Liquidity Test as at the end of the relevant period.

19.    **Miscellaneous**

(a)    The parties agree that this Commitment Letter is conclusively deemed to be made under, and for all purposes to be governed by and construed in accordance with, the laws of the State of New York and the federal laws applicable therein. The parties hereto do hereby irrevocably submit and attorn to the non-exclusive jurisdiction of the CCAA Court for all matters arising out of or relating to this Commitment Letter, or any of the transactions contemplated hereby without prejudice to the rights of the Lenders to commence proceedings in other jurisdictions in which any assets secured by the DIP Charge may be situated including without limitation in the other Restructuring Courts.

(b)    At any time and from time to time after the Initial Advance the Lenders, or any of them, may require that that all or any portion of the indebtedness owing by the Borrowers hereunder to such Lender be evidenced by notes in form satisfactory to the Lenders which and to facilitate such issuance the Borrowers covenant and agree to promptly (i) take all actions and execute and deliver all documents reasonably requested by the Lenders to effect such issuance; (ii) pay for all reasonable costs and expenses incurred by the Borrowers and the Lenders in connection therewith; (iii) take such actions as may be required under applicable securities laws to ensure that such notes are and remain free trading securities in Canada and the United States of America including, without limitation, filing all continuous disclosure documents required to be filed under applicable securities laws; and (iv) applying for, obtaining and maintaining a rating for such notes from a recognized rating agency acceptable to the Lenders, acting reasonably.

(c)    Whenever an amount of money is referred to herein, such amount shall, unless otherwise expressly stated, be in US Dollars.

(d)    All payments required to be made hereunder shall be made for value on the required day in same day immediately available funds.

(e)    All notices, requests, demands, or other communications hereunder or under any other Loan Document to any of the parties shall be in writing and shall be delivered by prepaid same day or overnight courier or sent by email to the address of email address of the applicable party listed on such party's signature page of this Commitment Letter (or such other address as any such party may subsequently advise the other parties in writing as its replacement address or email address). Any notice or other communication shall be deemed to have been given, received and made on a Business Day so long as it is actually received prior to 5:00 p.m. (Toronto time) on such Business Day, and otherwise shall be deemed to have been made on the next following Business Day (for certainty, any such notice given, received or made on a day which is not a Business Day shall be deemed to have been made on the next following Business Day).

(f)    None of the Loan Parties shall be permitted to assign any of their rights or Obligations hereunder or under any other Loan Document.

Any Lender may assign its rights and obligations under this Commitment Letter and the DIP Facility, in whole or in part, or grant a participation in its respective rights and obligations hereunder, (i) at any time to an affiliate; (ii) to another Lender; (iii) after the occurrence and continuance of an Event of Default to any Person; (iv)

prior to the Maximum Amount having been advanced by the Lenders to the Borrowers, a Lender may assign its funded portion of the DIP Facility and in such case such Lender shall provide prompt notice of such assignment to the Borrowers and the Monitor; (v) prior to the Maximum Amount having been advanced by the Lenders to the Borrowers, (x) a Tranche A Lender may assign its unfunded portion of the DIP Facility with the prior written consent of the Monitor including the assigning Lender providing the Monitor with reasonable evidence that such proposed assignee has the financial capacity to fulfill the obligations of such applicable Lender hereunder and (y) a Tranche B Lender or a Tranche C Lender may assign its unfunded portion of Tranche B or Tranche C, as applicable, with the prior consent of the Required Lenders acting reasonably and the prior consent of the Monitor including the assigning Lender providing the Monitor with reasonable evidence that such proposed assignee has the financial capacity to fulfill the obligations of such applicable Lender hereunder, and in such case such Trance B Lender or Tranche C Lender shall provide prompt notice of such assignment to the Borrowers and the Monitor; and in each such case the assigning Lender and the assignee Lender entering into an agreement to confirm such assignment and assumptions of obligations by the assignee Lender and the agreement of such assignee Lender to be bound by the terms of this Commitment Letter and the other Loan Documents.

(g)    All payments to be made by or on behalf of any Borrower or any other Loan Party on account of the Obligations and/or under any Loan Documents shall be made free from any present or future tax (withholding or otherwise), deduction, duty or governmental charge or levy (such taxes, deductions, duties, governmental charges and levies (other than taxes on the income, capital or paid-up capital of any Lender) or any other taxes which come into effect hereafter to replace such taxes, being hereinafter collectively called the **"Taxes"**). Each Loan Party shall pay any and all Taxes in addition to all payments required to be paid by such other Loan Party to the Lenders hereunder.  If any Taxes are deducted or withheld from any such payment, the applicable Loan Party shall promptly pay to the applicable Lender(s) in the currency in which such payment is to be made the equivalent of the amounts so deducted or withheld with relevant receipts addressed to such Lender(s).  Without limiting the generality of the foregoing, if any Lender becomes liable for any Taxes as a result of a payment having been made by a Loan Party to such Lender without such Taxes having been deducted or withheld as may be required by applicable law, such Loan Party covenants and agrees to indemnify and hold harmless the Lender for any and all such Taxes payable by such Lender in respect of such payment, and such indemnity obligation shall survive the repayment of the Obligations and the termination of this Commitment Letter.

(h)    If, for the purpose of obtaining a judgment in any court, it is necessary to convert a sum due to the Lenders in any currency (the "**Original Currency**") into another currency (the "**Other Currency**"), the parties agree that the rate of exchange used shall be that at which, in accordance with normal banking procedures, the Lenders may purchase the Original Currency with the Other Currency on the Business Day preceding the day on which the final judgment is given or, if permitted by applicable law, on the day on which the judgment is paid or satisfied. The obligations of the Borrowers in respect of any sum due in the Original Currency from it to the Lenders shall, notwithstanding any judgment in any Other Currency, be discharged only to the extent that on the Business Day following receipt by the Lenders of any sum

adjudged to be so due in the Other Currency, the Lenders may, in accordance with normal banking procedures, purchase the Original Currency with the Other Currency. If the amount of the Original Currency so purchased is less than the sum originally due to the Lenders in the Original Currency, the Borrowers agree, as a separate obligation and notwithstanding the judgment, to indemnify the Lenders against any loss and, if the amount of the Original Currency so purchased exceeds the sum originally due to the Lenders in the Original Currency, the Lenders shall remit such excess to the Borrowers.

(i)     Time shall be of the essence of this Commitment Letter.

(j)     This Commitment Letter constitutes the whole and entire agreement between the parties hereto and cancels and supersedes any prior agreements, undertakings, declarations and representations, written or verbal, in respect of the subject matter of this Commitment Letter.

(k)     This Commitment Letter may be executed in counterparts and by direct electronic transmission including without limitation by pdf email or DocuSign (and by different parties hereto in different counterparts), each of which shall constitute an original, and all of which counterparts when taken together shall constitute one agreement. All references herein to sections or schedules are sections or schedules of this Commitment Letter, unless expressly specified otherwise.

(l)     The obligation of the Lenders to fund the DIP Facility shall automatically terminate without any notice or other action being required whatsoever on December 31, 2025, if the Initial Advance has not been advanced by the Lenders by such date, provided that the failure of the Initial Advance to be completed by such date is not caused by a default by the Lenders of their obligations hereunder.

(m)    This Commitment Letter is open for acceptance by the Borrowers until 5:00 p.m. ET on December 5, 2025, and if this Commitment Letter is not signed and accepted by all of the Borrowers and delivered by the Borrowers to the Lenders by such time on such date without any changes to this Commitment Letter, then this Commitment Letter shall automatically terminate without any notice or other action being required whatsoever and the agreement and the obligation of the Lenders to fund the DIP Facility shall be revoked and terminated.

(n)     The covenants and obligations of the Borrowers hereunder and under all Loan Documents (including without limitation the obligation to repay the Obligations when due) are and shall at all times be joint and several. The covenants and obligations of the Lenders hereunder and under all Loan Documents (including without limitation the obligation of each Lender to fund its Lender's DIP Facility Commitment Amount are and shall at all times be several (and not joint and several).

(o)     The Lenders shall be permitted, in their discretion and without notice to the Borrowers, to communicate and have meetings and discussions with other parties who may have an interest in becoming a Lender hereunder or in connection with (i) any potential transaction involving the Borrowers for loans (including any possible future interim financing (i.e. "DIP loan") facility to, among other things, repay the DIP Facility) or other capital solutions or (ii) an acquisition transaction

for some or all of the property and assets of the Borrowers or any one or more of them.

(p)    No amendment, waiver of or consent in connection with any provisions of this Commitment Letter or any other Loan Document is or shall be effective unless it is in writing and signed by the applicable Required Lenders as provided for herein for such amendment, waiver or consent (and in the case of amendments, also executed by all of the Borrowers).  Such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which it is given.

(q)    All consents, waivers or amendments to or in connection with this Commitment Letter and the other Loan Documents and the DIP Facility and the transactions contemplated hereby or thereby must be in writing and if approved in writing by the Required Lenders shall be binding on all of the Lenders including those Lenders which did not execute any such consent, waiver or amendment; and any matters, documents or other things required to be acceptable or satisfactory to the Lenders are and shall be deemed to be acceptable and satisfactory to all the Lenders if acceptable or satisfactory to the Required Lenders; but further provided that and for certainty, no consent, waiver or amendment shall be binding on the Lenders unless each of the Lenders executes a consent, waiver or amendment for any of the following matters: (a) increase the amount of any Lender's DIP Facility Commitment Amount; (b) change to the Maturity Date; (c) postpone or delay the date for payment of any principal, interest or other Obligations; (d) reduce the principal amount owing by the Borrowers or the rate of interest or any other fees applicable to amounts owing or to become owing hereunder or under the other Loan Documents; (e) change the pro rata commitments of any of the Lenders in connection with the DIP Facility; (f) amend this section 19(r) or the definition of "Required Lenders" or any provision providing for consent or other action by all of the Lenders; (g) discharge any Loan Party from its payment obligations under hereunder or under any other Loan Document or release any DIP Security except as may be expressly provided for in this Commitment Letter; or (h) amend the terms and conditions of the "Application of Proceeds / Repayments" section above.

(r)    The Lenders shall maintain records of the Obligations which shall constitute conclusive evidence of such Obligations absent manifest error.

(s)    In the event that any amount required to be paid hereunder is due on a day which is not a Business Day, such amount shall be paid on the next following Business Day with applicable interest adjustments.

(t)    In this Commitment Letter, capitalized words and phrases not otherwise defined herein (including the Recitals above) shall have the meanings given to them on Schedule B attached hereto.

**[Signature pages follow]**

- 33 -

## **Schedule A**

### **Guarantors**

Cantana Energy Sucursal Colombia

CECSA Midstream S.A. E.S.P. Sucursal Colombia

CNEOG Colombia Sucursal Colombia

CECSA Energy Inc. Sucursal Colombia

Cantana Energy GmbH

CNE Oil & Gas S.R.L.

Shona Holding GmbH

## **Schedule B**

### **Definitions**

(a)     "**Acceptable Plan of Arrangement**" means a Plan of Arrangement in the CCAA Proceedings that provides for the payment in full in cash of the Obligations upon the effective date of such Plan of Arrangement.

(b)     "**Borrowers' Account**" means the bank account of the Company designated by the Company in writing to the Lenders not less than three (3) Business Days prior to the date in the Initial Advance.

(c)     "**Business Day**" means any day other than a Saturday, Sunday, or statutory holiday in (i) Toronto, Canada, (ii) Calgary, Canada, or (iii) Colombia.

(d)     "**Colombia**" means the Republic of Colombia.

(e)     "**Colombian DIP Approval Recognition Order**" means an order issued by the Colombian Court in the Colombian Recognition Proceedings which, among other things (i) recognizes the DIP Approval Order and (ii) grants in favor of the Lenders a first priority charge over all property and assets of the Borrowers in Colombia including without limitation the property and assets of any branch/sucursal of any Loan Party in Colombia (subject only to any court ordered charges in the CCAA Proceedings with priority to the DIP Charge as consented to by the Lenders), in form and substance satisfactory to the Lenders.

(f)     "**Colombian Recognition Order**" means an order issued by the Colombian Court which, among other things, recognizes the CCAA Proceedings as the foreign main proceeding of the Borrowers and issues a stay of proceedings in Colombia against the Borrowers, in form and substance satisfactory to the Lenders.

(g)     "**Corporate Distribution**" means: (a) any payment, dividend or other distribution (whether in cash, securities or other property) on or in respect of capital stock or other equity interest (or any option, warrant or other right to acquire any such capital stock or other equity interest) issued or made by any Loan Party; (b) any purchase, redemption, retraction or other acquisition by any Loan Party of its capital stock or other equity interest (or any option, warrant or other right to acquire any such capital stock or other equity interest); (c) any payment by any Loan Party on account of any principal of any indebtedness owed by it to any of its respective officers, directors or shareholders or any affiliates (excluding, for certainty, reimbursement of expenses in accordance with the Cash Flow Forecast); (d) any loan to, or guarantee of the indebtedness of, other financial assistance provided to, or any other payment of any other amount to any of the directors, officers, shareholders or equity holders or management of any Loan Party or any of their respective affiliates or any Person not dealing at arm's-length with any Loan Party.

(h)     "**Default**" means any event or condition which, with the giving of notice, lapse of time or upon a declaration or determination being made (or any combination thereof), would constitute an Event of Default.

(i)     "**DIP Advance**" means the Initial Advance or any Subsequent Advance of the DIP Facility.

(j)     "**DIP Approval Order**" means an order of the CCAA Court approving, among other things, the DIP Facility and granting in favor of the Lenders a first priority charge over all property and assets of the Borrowers (subject only to any court ordered charges with priority to the DIP Charge as consented to by the Lenders), in form and substance satisfactory to the Lenders.

(k)     "**DIP Security**" means, individually and collectively, (i) the DIP Charge, (ii) the US DIP Approval Recognition Order and the Colombian DIP Approval Recognition Order, (iii) any Liens granted or created in favor of the Lenders under or pursuant to the US DIP Approval Recognition Order, the Colombian DIP Approval Recognition Order, or any other Restructuring Court Orders, or (iv) any security agreements, pledge, mortgages, charges, or other security agreements or documents (collectively, "**DIP Security Documents**" and individually a "**DIP Security Document**") granting or creating a Lien over any property or assets of the Borrowers (or any one or more of them) in favor of the Lenders including without limitation any one of more of the Colombian DIP Security Documents.

(l)     "**Guarantors**" means, collectively, all of the direct and indirect subsidiaries of the Borrowers which subsidiaries are identified on the signature pages hereto as "Guarantors" and listed on Schedule A attached hereto.

(m)    "**Inactive Subsidiaries**" means, collectively, the Inactive Pre-Filing Obligors, BrazAlta Brasil Norte Commercializacao de Petroleo Ltda., CNE Oil & Gas S.A. E.S.P., Canacol Energy Argentina S.A., CNE Energy Argentina S.A., Canacol Energy Argentina S.A., Shona Energy International Limited S.A., and Canacol Energy (USA) Ltd.

(n)     "**Inactive Pre-Filing Obligors**" means, collectively, VMM Holdco Inc. and CNEMED S.A.S.

(o)     "**Lender's DIP Facility Commitment Amount**" means each Lender's commitment amount as set out on its respective signature page attached hereto to fund a portion of Tranche A, Tranche B and/or Tranche C, subject to the terms hereof.

(p)     "**Liens**" means any liens, mortgages, charges, pledges, trusts, security interests, assignments as security, hypothecs, court order charges or administrative or similar claims in any of the Restructuring Proceedings (including without limitation the DIP Charge), or any other encumbrances or security arrangements of any nature (including any conditional sale or title retention arrangement, any capitalized lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security) (and a "**Lien**" means any one of them).

(q)     "**Loan Documents**" means this Commitment Letter, the DIP Security, and all other agreements, documents, instruments, certificates, notices and requests delivered in connection herewith or therewith.

(r)     "**Loan Parties**" means the Borrowers.

(s)     "**Macquarie Bank**" means Macquarie Bank Ltd, as the administrative agent and collateral agent pursuant to that certain Credit and Guarantee Agreement dated as of September 3, 2024, by and among Canacol Energy Ltd., as Borrower, the guarantors party thereto, the Lenders party thereto, the Hedge Providers from time

to time party thereto, the Issuing Banks from time to time party thereto, and Macquarie Bank Ltd., as Administrative Agent and Collateral Agent.

(t)    **"Macquarie Credit Agreement"** has the meaning given to that term in the definition of "Macquarie Bank".

(u)    "**Maximum Amount**" means the aggregate of the maximum principal amount of each Lender's DIP Facility Commitment Amount(s) under Tranche A, such principal amount (constituting the Maximum Amount) being Forty-Five Million ($45,000,000) US Dollars.

(v)    **"Notes"** means the 5.75% Senior Unsecured Notes due 2028 issued by the Company under the Notes Indenture.

(w)    **"Notes Indenture"** means the indenture dated as of November 24, 2021 between, among others, the Company, as issuer, the guarantors party thereto, and Citibank, N.A., as trustee, security registrar, and paying agent.

(x)    **"Notes Trustee"** means the trustee under the Notes Indenture, and any replacement trustee appointed in such capacity in accordance with the terms of the Notes Indenture.

(y)    "**Obligations**" means, without duplication, the aggregate amount of all obligations, liabilities and indebtedness of the Borrowers to the Lenders under this Commitment Letter and all obligations, contingent or otherwise, of any of the foregoing arising from (i) any guarantee made by a person  in respect thereof, including all accrued and unpaid interest and fees in respect thereof, (ii) any DIP Security Document, or (iii) any other Loan Document.

(z)    "**Person**" includes an individual, corporation, partnership, trust, unincorporated association, government, governmental authority or any other entity whatsoever.

(aa)    "**Plan of Arrangement**" means a plan of arrangement or compromise within the CCAA Proceedings.

(bb)    **"Proposed Sale Transactions"** means the proposed sale of (i) by Canacol Energy Colombia S.A.S. of: (x) its assets related to the Rancho Hermoso block or (y) its shares held in Thermoelectricia El Tesorito S.S.S. E.S.P., or (ii) of all of the equity interests in Canacol Energy Colombia S.A.S., provided that, in each case, both (i) the Lenders have consented in their sole discretion to such proposed sale and (ii) the CCAA Court has issued a Restructuring Order approving such proposed sale; and **"Proposed Sale Transaction"** means any one of such Proposed Sale Transactions.

(cc)    **"RCF Agent"** means Deutsche Bank Trust Company Americas in its capacity as the administrative agent under the RCF Loan Agreement or any replacement administrative agent appointed thereunder from time to time.

(dd)    **"RCF Lenders"** means the lenders under the RCF Loan Agreement.

(ee)    **"RCF Loan Agreement"** means the revolving credit and guaranty agreement dates as of February 14, 2023 between, among others, the Company, as borrower, Deutsche Bank Trust Company Americas, as administrative agent, and the lenders party thereto from time to time.

(ff)    **"Required Lenders"** means Lenders whose aggregate DIP Facility Commitment Amounts under Tranche A are not less than 50.1% of the maximum principal amount of Tranche A.

(gg)    **"Restructuring Courts**" means, collectively, the CCAA Court, the US Court and the Colombian Court, and "**Restructuring Courts**" means any one of them.

(hh)    "**Restructuring Court Orders**" means, collectively, (i) the CCAA Initial Order, the DIP Approval Order, and any other orders issued in the CCAA Proceedings, (ii) the US Recognition Order, the US DIP Approval Recognition Order and any other orders issued by the US Court in the US Recognition Proceedings, and (iii) the Colombian Recognition Order, the Colombian DIP Approval Recognition Order and any other orders issued by the Colombian Court in the Colombian Recognition Proceedings; and "**Restructuring Court Order**" means any one of such orders issued by any such Restructuring Court.

(ii)    "**Restructuring Proceedings**" means, collectively, the CCAA Proceedings, the US Recognition Proceedings, the Colombian Recognition Proceedings, the Chamber of Commerce Proceeding, and any other parallel insolvency proceedings(s) commenced by any one or more of the Loan Parties; and "**Restructuring Proceeding**" means any one of them.

(jj)    "**US DIP Approval Recognition Order**" means an order issued by the US Court in the US Recognition Proceedings which, among other things (i) recognizes the DIP Approval Order and (ii) grants in favor of the Lenders a first priority charge over all property and assets of the Borrowers in the United States of America (subject only to any court ordered charges in the CCAA Proceedings with priority to the DIP Charge as consented to by the Lenders), in form and substance satisfactory to the Lenders.

(kk)    "**US Recognition Order**" means an order issued by the US Court which, among other things, recognizes the CCAA Proceedings as foreign main proceedings of the Borrowers and issues a stay of proceedings in the United States of America against the Borrowers, in form and substance satisfactory to the Lenders.

## <u>Schedule C</u>

### <u>Request for Advance</u>

**TO:**        The Lenders

**AND TO:**    The Lenders' Notice Party

**AND TO:**    The Monitor

**DATE:**        _____


1. The undersigned refers to the Canacol DIP Loan Commitment Letter dated as of December 2, 2025 (as amended or restated from time to time, the "**Commitment Letter**") made among Canacol Energy Ltd. (the "**Company**"), as a borrower, the other Borrowers party thereto, as borrowers,, and the Lenders. Capitalized terms used in this Request for Advance (including with respect to the addressees hereto) have the same meanings herein as are ascribed thereto in the Commitment Letter.

2. The Company, for on behalf of all Borrowers, hereby gives the Lenders notice pursuant to the Commitment Letter that the Borrowers request a DIP Advance under the DIP Facility (the "**Requested DIP Advance**") pursuant to the Commitment Letter and for such Requested DIP Advance to be deposited into the Borrowers' Account as follows:

    a. The Requested DIP Advance is **[the Initial Advance/a Subsequent Advance]** and the Requested DIP Advance is to be made under [**Tranche A/Tranche B/Tranche C]**.

    b. Requested [**new money advance under Tranche A / LC issuance  amount under Tranche B/Tranche C]** and date: $ _____ (cash-advance or amount of LC to be issued]  Date: _____

    c. Total principal amount currently outstanding under **[Tranche A/Tranche B/Tranche C]**: (excluding the Requested DIP Advance): US$_____

    d. Availability remaining under **[Tranche A/Tranche B/Tranche C]** (excluding the Requested DIP Advance): US$_____

    e. **[Update this schedule as necessary to refer to other information for the issuance of Letter of Credit under Tranche A or Tranche B]**

3. The undersigned hereby represents and warrants and certifies to the Lenders for and on behalf of itself and all of the Borrowers as follows:

    a. the Company has full authority to execute and deliver this Request for Advance for and on behalf of the other Borrowers (all of which other Borrowers have instructed the Company to deliver this Request for Advance) and accordingly binds all of the Borrowers;

    b.  all applicable conditions precedent for the Requested DIP Advance have been and will continue to be satisfied on the date for the Requested DIP Advance;

    c.  no Default or Event of Default has occurred and is continuing or will exist on the date of the Requested DIP Advance or shall result from the Requested DIP Advance.

4.  The Requested DIP Advance shall not cause the aggregate amount of all outstanding DIP Advances to exceed the Maximum Amount or be greater than the amount shown on the Cash Flow Forecast as at the date of such Requested DIP Advance, and is consistent with the Cash Flow Forecast.

**[Signature page follows]**

## **Schedule D**

## **Initial Cash Flow Forecast**

**Schedule E**

**Terms and Conditions for Letter of Credit**

Letters of Credit.

(a)        General.  Subject to the terms and conditions set forth in the Commitment Letter, the Company may, as the applicant thereof for the support of its or its subsidiaries' obligations, request the issuance of (and the applicable Issuing Bank shall issue) Letters of Credit under Tranche C, in an amount up to the applicable Issuing Bank's Tranche C LC Commitment, denominated in Dollars [or, to the extent such Issuing Bank then issues standby letters of credit in any approved currency, in a form reasonably acceptable to the applicable Issuing Bank, at any time and from time to time during until the Maturity Date.  In the event of any inconsistency between the terms and conditions of this Commitment Letter and the terms and conditions of any form of letter of credit application or other agreement submitted by the Company to, or entered into by the Company with, any Issuing Bank relating to any Letter of Credit, the terms and conditions of this Commitment Letter shall control.  The Company unconditionally and irrevocably agrees that, in connection with any Letter of Credit issued for the support of any subsidiary's obligations as provided in the first sentence of this clause (a), the Company will be fully responsible for the reimbursement of LC Disbursements in accordance with the terms hereof, the payment of interest thereon and the payment of fees due under Section [] to the same extent as if it were the sole account party in respect of such Letter of Credit (the Company hereby irrevocably waiving any defenses that might otherwise be available to it as a guarantor or surety of the obligations of such subsidiary that is an account party in respect of any such Letter of Credit).  Notwithstanding anything herein to the contrary, the Issuing Bank shall have no obligation hereunder to issue, and shall not issue, any Letter of Credit (i) the proceeds of which would be made available to any person (A) to fund any activity or business of, with, or for the benefit of any Sanctioned Person or in any Sanctioned Country, (B) in any manner that would result in a violation of any Sanctions by any Person or (C) that could cause any Person to become a Sanctioned Person, (ii) if any order, judgment or decree of any governmental authority or arbitrator shall by its terms purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit, or any requirement of law relating to the Issuing Bank or any request or directive (whether or not having the force of law) from any governmental authority with jurisdiction over the Issuing Bank shall prohibit, or request that the Issuing Bank refrain from, the issuance of letters of credit generally or such Letter of Credit in particular or shall impose upon the Issuing Bank with respect to such Letter of Credit any restriction, reserve or capital requirement (for which the Issuing Bank is not otherwise compensated hereunder) not in effect on the date hereof, or shall impose upon the Issuing Bank any unreimbursed loss, cost or expense which was not applicable on the date hereof and which the Issuing Bank in good faith deems material to it, (iii) if the proceeds of which would be used for disbursements outside of the Cash Flow Forecast,  or (iv) if the issuance of such Letter of Credit would violate one or more policies of the Issuing Bank applicable to letters of credit generally.  Pre-CCAA Filing Letters of Credit that become Tranche B Letters of Credit and are deemed to have been issued pursuant hereto shall be subject to and governed by the terms and conditions hereof from and after the effectiveness of Tranche B.

(b)        Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions.  To request the issuance of a Letter of Credit (or the amendment, renewal or extension of an outstanding Letter of Credit), the Company shall hand deliver or fax (or transmit by electronic communication, if arrangements for doing so have been approved by the applicable Issuing Bank) to the applicable Issuing Bank and, if appointed, the DIP Agent (reasonably in advance of the requested date of issuance, amendment, renewal, or extension but in any event no less

than three (3) Business Days prior to such date in the case of a Letter of Credit denominated in Dollars [and no less than five (5) Business Days prior to such date in the case of a Letter of Credit denominated in an approved currency]) a notice requesting the issuance of a Letter of Credit, or identifying the Letter of Credit to be amended, renewed or extended, and specifying the date of issuance, amendment, renewal or extension (which shall be a Business Day), the date on which such Letter of Credit is to expire (which shall comply with <u>clause (c)</u> below), the amount of such Letter of Credit[, whether such Letter of Credit is to be denominated in Dollars or in an approved currency (and if in an approved currency, the applicable currency)], the name and address of the beneficiary thereof and such other information as shall be necessary to prepare, amend, renew or extend such Letter of Credit.  If requested by the applicable Issuing Bank, the Company also shall submit a letter of credit application on such Issuing Bank's standard form in connection with any request for a Letter of Credit.  A Letter of Credit shall be issued, amended, renewed or extended only if (and upon issuance, amendment, renewal or extension of each Letter of Credit the Company shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, renewal or extension (i) the LC Exposure of a Tranche shall not exceed the aggregate LC Commitments, (ii) the aggregate face amount of all Letters of Credit issued by the applicable Issuing Bank shall not exceed such Issuing Bank's Tranche LC Commitment of the applicable Tranche and (iii) the aggregate LC Exposure shall not exceed the aggregate commitments of all Lenders of the applicable Tranche.

(c)    <u>Expiration Date</u>.  Each Letter of Credit shall expire (or be subject to termination or non-renewal by notice from the applicable Issuing Bank to the beneficiary thereof) at or prior to the close of business on the earlier of [(i) the date six months after the date of the issuance of such Letter of Credit (or, in the case of any one-time renewal or extension thereof, six months after such renewal or extension) and (ii) the date that is five (5) Business Days prior to the Maturity Date.][1]

(d)    <u>Participations</u>.  By the issuance of a Letter of Credit (or an amendment to a Letter of Credit increasing the amount thereof), including any Tranche B Letter of Credit, and without any further action on the part of the applicable Issuing Bank or the Lenders, such Issuing Bank hereby grants to each Lender of the applicable Tranche of LC Commitments, and each such Lender hereby acquires from such Issuing Bank, a participation in such Letter of Credit equal to such Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the applicable Issuing Bank, or if appointed, to the DIP Agent, for the account of such Issuing Bank, such Lender's Applicable Percentage of each applicable LC Disbursement made by such Issuing Bank and not reimbursed by the Company on the date due as provided in <u>clause (e)</u> below or of any reimbursement payment required to be refunded to the Company for any reason.  Each Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of a Default or Event of Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)    <u>Reimbursement</u>.  If an Issuing Bank shall make any LC Disbursement in respect of a Letter of Credit, the Company shall reimburse such LC Disbursement by paying to the applicable Issuing Bank (or if appointed the DIP Agent) an amount equal to such LC Disbursement not later than 12:00 noon, New York City time, on the Business Day immediately

---

[1] NTD: Most LCs need to be in effect for 12 months. To be discussed.

following the day that the Company receives such notice, if such notice is not received prior to such time on the day of receipt.  [In the case of a Letter of Credit denominated in any approved currency, the applicable Issuing Bank shall notify the Company of the U.S. dollar equivalent of the amount of the drawing promptly following the determination thereof. If the Company fails to make such payment when due, the applicable Issuing Bank (or if appointed the DIP Agent) shall notify each Lender within the applicable Tranche of the applicable LC Disbursement, the payment then due from the Company in respect thereof [(which in the case of any payment in any approved currency shall be, with respect to each Lender, the U.S. dollar equivalent thereof]) and such Lender's Applicable Percentage thereof.  Promptly following receipt of such notice, each applicable Lender shall pay to the applicable Issuing Bank (or if appointed the DIP Agent) its Applicable Percentage of the payment then due from the Company [(which in the case of any payment in any approved currency shall be the U.S. dollar equivalent thereof)], by wire transfer of immediately available funds by 2:00 p.m., New York City time, to the account of the applicable Issuing Bank (or if appointed the DIP Agent) most recently designated by it for such purpose by notice to the Lenders in an amount equal to such Lender's Applicable Percentage, and if appointed the DIP Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from the Lenders.  Promptly following receipt by the applicable Issuing Bank or, if appointed, the DIP Agent of any payment from the Company pursuant to this paragraph, the applicable Issuing Bank shall retain such amounts for its own account or, to the extent that Lenders have made payments pursuant to this paragraph to reimburse such Issuing Bank, then to such Lenders and such Issuing Bank as their interests may appear.  Any payment made by a Lender pursuant to this paragraph to reimburse any Issuing Bank for any LC Disbursement shall not constitute a loan and shall not relieve the Company of its obligation to reimburse such LC Disbursement. [In the event that (A) a drawing denominated in any approved currency is made and (B) the Dollar amount paid by any Company in respect of the reimbursement thereof shall not be adequate on the date of that payment to purchase in accordance with normal banking procedures a sum denominated in such approved currency equal to the drawing, the Company agrees, as a separate and independent obligation, to indemnify the applicable Issuing Bank for the loss resulting from its inability on that date to purchase such approved currency in the full amount of the drawing.]

(f)      Obligations Absolute.  The Company's obligation to reimburse LC Disbursements as provided in clause (e) above shall be absolute, unconditional and irrevocable, and shall be performed strictly in accordance with the terms of this Commitment Letter under any and all circumstances whatsoever and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under a Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by an Issuing Bank under a Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit[, (iv) any adverse change in the relevant exchange rates or in the availability of any approved currency to the Company or in the relevant currency markets generally,] or (v) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions hereof, constitute a legal or equitable discharge of, or provide a right of setoff against, the Company's obligations hereunder.  Neither the DIP Agent (as applicable), the Lenders nor any Issuing Bank, nor any of their Indemnified Person, shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms

or any consequence arising from causes beyond the control of any Issuing Bank[; provided, that the foregoing shall not be construed to excuse any Issuing Bank from liability to the Company to the extent of any direct damages (as opposed to special, indirect, consequential or punitive damages, claims in respect of which are hereby waived by the Company to the extent permitted by applicable law) suffered by the Company that are caused by such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof.  The parties hereto expressly agree that, in the absence of gross negligence or willful misconduct on the part of an Issuing Bank (as finally determined by a court of competent jurisdiction), such Issuing Bank shall be deemed to have exercised care in each such determination.]  In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of a Letter of Credit, an Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)     Disbursement Procedures.  The applicable Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit.  Such Issuing Bank shall promptly notify the Company and, if appointed, the DIP Agent, by telephone (and promptly confirmed in writing) of such demand for payment and whether such Issuing Bank has made or will make an LC Disbursement thereunder; provided, that any failure to give or delay in giving such notice shall not relieve the Company of its obligation to reimburse such Issuing Bank and the Lenders with respect to any such LC Disbursement.

(h)     Interim Interest.  If an Issuing Bank shall make any LC Disbursement, then, unless the Company shall reimburse such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that the Company reimburses such LC Disbursement, at the rate per annum of 8.0% and such interest shall be payable on the date when such reimbursement is due; provided, that, if the Company fails to reimburse such LC Disbursement when due pursuant to clause (e), such rate of interest shall be increased by 2.00% per annum.  Interest accrued pursuant to this paragraph shall be for the account of the applicable Issuing Bank, except that interest accrued on and after the date of payment by any Lender pursuant to clause (e) to reimburse such Issuing Bank shall be for the account of such Lender to the extent of such payment.

[(i)     Issuing Bank Reports to the DIP Agent.  Unless otherwise agreed by the DIP Agent, each Issuing Bank shall, in addition to its notification obligations set forth elsewhere report in writing to the DIP Agent (i) periodic activity (for such period or recurrent periods as shall be requested by the DIP Agent) in respect of Letters of Credit issued by such Issuing Bank, including all issuances, extensions, amendments and renewals, all expirations and cancelations and all disbursements and reimbursements, (ii) reasonably prior to the time that such Issuing Bank issues, amends, renews or extends any Letter of Credit, the date of such issuance, amendment, renewal or extension, and the stated amount of the Letters of Credit issued, amended, renewed or extended by it and outstanding after giving effect to such issuance, amendment, renewal or extension (and whether the amounts thereof shall have changed), (iii) on each Business Day on which such Issuing Bank makes any LC Disbursement, the date and amount of such LC Disbursement, (iv) on any Business Day on which the Company fails to reimburse an LC Disbursement required to be reimbursed to such Issuing Bank on such day, the date of such failure and the amount of such LC Disbursement, and (v) on any other

Business Day, such other information as the DIP Agent shall reasonably request as to the Letters of Credit issued by such Issuing Bank.

(j)      LC Exposure Determination.  For all purposes of this Commitment Letter, the amount of a Letter of Credit that, by its terms or the terms of any document related thereto, provides for one or more automatic increases in the stated amount thereof shall be deemed to be the maximum stated amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum stated amount is in effect at the time of determination.

(k)      LC Fees. The Company agrees to pay (i) to the each Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at 5.0% on the average daily amount of such Lender's LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the effective date of the Commitment Letter to but excluding the later of the date on which such Lender's LC Commitment terminates and the date on which such Lender ceases to have any LC Exposure, and (ii) to the applicable Issuing Bank a fronting fee, which shall accrue at the rate of 0.25% per annum on the average daily amount of the LC Exposure (excluding any portion thereof attributable to unreimbursed LC Disbursements) during the period from and including the effective date of the Commitment Letter to but excluding the later of the date of termination of the LC Commitments and the date on which there ceases to be any LC Exposure, as well as the applicable Issuing Bank's standard fees with respect to the issuance, amendment, renewal or extension of any Letter of Credit or processing of drawings thereunder.  Participation fees and fronting fees accrued through and including the last day of each calendar month shall be payable on the first Business Day of each of each month for the prior month, commencing on the first such date to occur after the effective date; provided, that all such fees shall be payable on the date on which the LC Commitments terminate and any such fees accruing after the date on which the LC Commitments terminate shall be payable on demand.  Any other fees payable to any Issuing Bank pursuant to this paragraph shall be payable within 10 days after demand.  All participation fees and fronting fees shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed.  All fees payable hereunder shall be paid on the dates due, in immediately available funds, to the DIP Agent (or to an Issuing Bank, in the case of fees payable to it) for distribution, in the case of commitment fees and participation fees, to the Lenders.  Fees paid shall not be refundable under any circumstances.

Additional Defined Terms

"Applicable Percentage" means, with respect to any Lender, with respect to its LC Exposure, a percentage equal to a fraction the numerator of which is such Lender's commitment under the applicable Tranche and the denominator of which is the aggregate commitment of all Lenders of such Tranche (if the commitments have terminated or expired, the Applicable Percentage shall be determined based upon such Lender's share of the LC Exposure at that time).

"Issuing Bank" a means (a) with respect to Tranche B, **[TBD]**, and (a) with respect to Tranche C, **[TBD]**.

"LC Commitment" means (a) as to any Issuing Bank, such Issuing Bank's commitment to provide a portion of the Tranche B Sub-Facility or Tranche C Sub-Facility as an issuer, and shall not exceed such Issuing Bank's Applicable Percentage and (b) as to any Lender, such Lender's commitment to provide a portion of the Tranche B Sub-Facility or Tranche C Sub-Facility as a participating Lende, and shall not exceed such Lender's Applicable Percentage.

"LC Disbursement" means a payment made by any Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, with respect to any Tranche, the sum of (a) the U.S. dollar equivalent of the aggregate undrawn amount of all outstanding Letters of Credit of such Tranche at such time plus (b) the U.S. dollar equivalent of the aggregate amount of all LC Disbursements relating to Letters of Credit of such Tranche that have not yet been reimbursed by or on behalf of the Company at such time.  The LC Exposure of any Lender at any time shall be its Applicable Percentage of the total LC Exposure of such Tranche at such time.

"Letter of Credit" means a Tranche B Letter of Credit or a Tranche C Letter of Credit, as the context requires.

"Sanctioned Country" means, at any time, a country or territory which is the subject or target of comprehensive Sanctions (which are, as of the date hereof, Cuba, Iran, North Korea, Syria, the Crimea, Kherson, and Zaporizhzhia regions of Ukraine, and the so-called Donetsk People's Republic and Luhansk People's Republic).

"Sanctioned Person" means, at any time, (a) any person listed in any Sanctions-related list of designated Persons maintained by the U.S. government (including, without limitation OFAC and the U.S. Department of State), the United Nations Security Council, the European Union, any EU member state, the United Kingdom (including, without limitation, His Majesty's Treasury) or other relevant governmental authority (b) any person operating, located, organized or resident in a Sanctioned Country or (c) any person directly or indirectly owned, 50% or more, or controlled by, or acting or purporting to act on behalf of, any such Person or Persons described in the foregoing clauses (a) or (b).

"Sanctions" means requirements of law relating to economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including, without limitation those administered by OFAC or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any EU member state, His Majesty's Treasury of the United Kingdom or other relevant governmental authority, but excluding any Sanctions that would be considered counter-sanctions measures from the perspective of the United States.

# Appendix "C"

| Comparison of DIP Term Sheets[1] | | |
|---|---|---|
| **Item** | **Macquarie DIP Term Sheet** | **Bondholders DIP Term Sheet** |
| Nature of Term Sheet | Non-binding | Binding |
| Facility Amount | 1. Initial Advance of $15MM (payment one business day after submission of request and satisfying the advance conditions)<br>2. Subsequent Advances to be made on or before February 27, 2026, subject to further agreement between Borrower and DIP Lender (amount unknown) | Total $67MM comprising of the following:<br>1. Tranche A (term loan) - $45MM<br>   a. $15MM Initial Advance (December)<br>   b. $30MM Subsequent Advance, if conditions are met, described below<br>2. Tranche B - $20MM<br>3. Tranche C - $2MM |
| Interest Rate | 14% per annum, payable monthly in arrears in cash | 13% initially with a step down to 11% once the Subsequent Advance has been made, payable monthly in arrears in cash |
| Fees | Fees include:<br>1 Commitment Fee of 2% ($300,000), payable upon granting of the DIP Approval order<br>2 Exit Fee of 3% ($450,000) | Fees include:<br>1 Commitment fee of 5% of the maximum amount under Tranche A ($2,250,000)<br>2 Extension fee of 2% of the total Facility Amount (if extended beyond the Maturity Date) ($1,340,000)<br>3 If an Event of Default occurs, cash interest will be payable at above interest rate + 2% |
| Maturity Date | Earlier of May 31, 2026 (the Outside Date) and occurrence of an Event of Default, completion of a Restructuring Transaction, conversion of CCAA Proceedings into a proceeding under the BIA, or voluntary prepayment of DIP Facility by Borrower | Earlier of June 30, 2026 and effective date of Plan of Arrangement, sale, termination of CCAA and commencement of receivership, bankruptcy or liquidation proceeding, or occurrence of an Event of Default<br><br>Maturity Date can be extended by 3 months, subject to an extension fee and certain other conditions. |
| Funding Conditions | Advance conditions include: | Tranche A, Initial Advance conditions prior to funding include, but not limited to: |

[1] This Comparison of DIP Term Sheets is a summary comparison, does not include all terms of the DIP Term Sheets received by the Canacol Group, and should not be relied upon by any party as the actual terms of the DIP Term Sheets or as providing anything other than a high-level summary comparison of the same. Reference should be made to the DIP Term Sheets in that regard.

| Comparison of DIP Term Sheets[1] | | |
|---|---|---|
| **Item** | **Macquarie DIP Term Sheet** | **Bondholders DIP Term Sheet** |
| | 1. DIP Approval Order must be in effect and DIP Lender Charge (granting a priority charge over collateral located in Canada and in the US but subordinate to Permitted Priority Liens must be granted<br>2. US Recognition Order (recognizing the DIP Approval Order) must be in effect<br>3. Agreement in writing with DIP Lender in respect of terms of the DIP Budget and acceptable variance parameters<br>4. Engage financial advisor to pursue a SISP | 1. Initial Cash Flow Forecast must be agreed to<br>2. DIP Approval Order and US DIP Approval Recognition Order must be in effect<br>3. Lender fees of $1.5 million to be paid out of Initial Advance<br>4. Engage financial advisor to pursue a SISP<br>5. Terms of SISP approval order and SISP must be agreed upon with Lenders<br><br>Tranche B, Subsequent Advance conditions include, but not limited to:<br>1. Colombian Recognition Order and Colombian DIP Approval Order shall be in effect<br>2. DIP security in favor of lenders must rank in priority to all other liens, including liens in favour of Macquarie, which priority shall be obtained pursuant to the Colombian DIP Approval Recognition Order<br>3. Completion of all Restructuring Milestones required to be completed prior to the date of the Subsequent Advance |
| Use of Funds and Limitations | Use of funds:<br>1. DIP facility will be used to, among other things, fund the Borrower's obligations per the DIP budget.<br><br>Limitations Include:<br>1. Borrower may not use the DIP to pay for any expenses or costs associated with any exploration or exploitation activities, or "to pay any category of any other obligations" without prior consent<br>2. The Borrower shall repay the Senior Secured Debt Obligations in full through receipt of accounts receivables or other assets | Uses of funds are as follows:<br>1. Tranche A – mainly for operation of the business in accordance with the Cash Flow Forecast<br>2. Tranche B – for renewing and/or replacing pre-filing letters of credit<br>3. Tranche C – for issuance of new letters of credit<br><br>Limitations include:<br>1. No drilling, exploration or exploitation efforts (or any other activities associated with development of new producing factors) without prior written consent |

| Comparison of DIP Term Sheets[1] | | |
|---|---|---|
| **Item** | **Macquarie DIP Term Sheet** | **Bondholders DIP Term Sheet** |
| | | 2. Proceeds may not be used to pay pre-filing obligations without prior written consent of the lenders (if already approved by Court, consent is not required) |
| Sweeps/Repayments | Cash proceeds of sale of any Collateral out of the ordinary course of business, or any insurance proceeds paid to the Borrower in respect of such Collateral will be used to reduce the DIP borrowings | Liquidity sweep threshold: <br> 1. If unrestricted cash on hand + unused Tranche A balance exceeds the minimum liquidity covenant + cushion of $42 MM, the excess is used for DIP repayment <br> 2. If receipts are greater than forecast by $5MM, the excess is used for DIP repayment <br> Subject to Court approval. |
| Minimum Liquidity Test | N/A | $13MM to March 31, 2026 and $17MM thereafter |
| Events of Default | Events of default include, but not limited to: <br> 1. Failure of Loan Parties and DIP Lender agreeing in writing on the terms of the DIP Budget on or before December 17, 2025 <br> 2. A Restructuring Transaction acceptable to the DIP Lender fails to close and the DIP facility and the Senior Secured Debt Obligations have not been paid in full by March 31, 2026 | Events of default include, but not limited to: <br> 1. The Borrowers fail to comply with any term or condition of the SISP, including not satisfying any milestone required in the SISP by the relevant date; <br> 2. Variance Report disclosed a negative variance larger than a Permitted Variance <br> 3. The Borrowers fail to satisfy the Minimum Liquidity Test above |
| Restructuring Milestones | 1. Parties to agree to DIP Budget by December 17, 2025 or other date agreed upon <br> 2. Obtain DIP Approval Order by January 15, 2026 <br> 3. Obtain US Recognition Order by January 22, 2026 <br> 4. Restructuring Transaction to close and repayment of DIP facility and Senior Secured Debt Obligations in full by March 31, 2026 | Affirmative covenants include the following Restructuring Milestones to occur: <br> 1. US Recognition Order by December 12, 2025 <br> 2. DIP Approval Order by December 15, 2025 <br> 3. Colombian Recognition Order by December 28, 2025 <br> 4. US DIP Approval Recognition Order by December 19, 2025 <br> 5. Retain sale advisor to assist with SISP by December 22, 2025 |

| Comparison of DIP Term Sheets[1] | | |
|---|---|---|
| **Item** | **Macquarie DIP Term Sheet** | **Bondholders DIP Term Sheet** |
| | (notwithstanding the Outside Date is defined as May 31, 2026) | 6. Colombian Recognition Order by December 28, 2025<br>7. Colombian DIP Approval Recognition Order by January 7, 2026<br>8. Completion of Colombian DIP Security Process by January 23, 2026<br>9. SISP and KERP approval order by January 20, 2026<br>10. SISP Approval Order recognized by Colombian Court by February 14, 2026<br>11. Canadian approval and US and Colombian court recognition of transaction(s) in accordance with terms of SISP Approval Order<br>12. Completion / closing of transaction(s) by June 30, 2026. |

# Appendix "D"

**THIS FIRST AMENDING AGREEMENT** is made as of the 8th day of December, 2025.

Reference is made to the Canacol DIP Loan Commitment Letter made as of December 2, 2025 by and between Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Canacol Energy Colombia S.A.S., CNE Energy S.A.S., and CNE Oil & Gas S.A.S., each of the other Loan Parties party thereto, and each of the Lenders party thereto (the **"Commitment Letter"**). The Borrowers, the other Loan Partes, and the Lenders have agreed to make certain amendments to the Commitment Letter on the terms and conditions set forth in this first amending agreement (this "**Amending Agreement**", and the Commitment Letter as amended by this Amending Agreement is collectively called the **"Amended Commitment Letter"**).

**NOW THEREFORE THIS AMENDING AGREEMENT WITNESSES THAT** in consideration of the covenants and agreements contained herein and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties hereto agree as follows:

1.  **General.**   In this Amending Agreement (including the recitals) unless otherwise defined or the context otherwise requires, (i) all capitalized terms shall have the respective meanings specified in the Commitment Letter, as amended hereby and (ii) all references to section numbers are references to section numbers in the Commitment Letter, as amended hereby. The division of this Amending Agreement into sections and the insertion of headings are for convenience of reference only and shall not affect the construction or interpretation of this Amending Agreement. The terms "this Amending Agreement", "herein", "hereunder" and similar expressions refer to this Amending Agreement.

    2.  **Amendments**. The parties hereto agree to amend the Commitment Letter as follows:

    (a) Amendment to Section 3.  Section 3 of the Commitment Letter is hereby amended as follows:  the phrase "and attached as Schedule D hereto prior to the acceptance of this Commitment Letter by the Loan Parties)" is deleted and replaced with "and then attached as Schedule D hereto prior to the Initial Advance)".

    (b) Amendments to Section 9.  Section 9 of the Commitment Letter is hereby amended as follows:  Section 9(d) is deleted; the word "and" is inserted at the end of section 9(b); and the word "and" is deleted at the end of section 9(c).

    (c) Amendments to Section 10(h).  Section 10(h) of the Commitment Letter is hereby amended as follows:  The phrase "the Initial Cash Flow Forecast has been agreed to between the Borrowers and the Lenders in accordance with section 3, and" is inserted at the beginning of section 10(h).

    (d) Amendments to Section 11.  Section 11 of the Commitment Letter is hereby amended as follows:  the word "and" is deleted at the end of section 11(e); the word "and" is inserted at the end of section 11(f); and a new section 11(g) is inserted as follows:  "(g)  an updated Cash Flow Forecast showing the use of the proceeds of the Subsequent Advance has been agreed to between the Borrowers and the Lenders in accordance with section 3".

    3.   **Representations and Warranties**. All of the representations and warranties contained in the Commitment Letter in respect or in connection with the Commitment Letter are made by each such Loan Party as of the date hereof and after giving effect to this Amending Agreement.

**4.** **Conditions Precedent**. This Amending Agreement is and shall be subject to and conditional upon the execution and delivery of this Amending Agreement by the Loan Parties and the Required Lenders.

**5.** **Continuance of Commitment Letter and No Waiver**. The Commitment Letter, except as expressly amended by this Amending Agreement, does and shall continue in full force and effect and is hereby confirmed and the rights and obligations of all parties thereunder shall not be affected or prejudiced in any manner except as specifically amended herein. The Loan Parties acknowledge and confirm that none of the terms contained in this Amending Agreement shall operate or be construed as a waiver of any of the provisions of the Commitment Letter, except for any of the amendments to the Commitment Letter set out in section 2 of this Amending Agreement.

6.  **Counterparts**. This Amending Agreement may be executed in counterparts and circulated by direct electronic transmission including without limitation by pdf email or DocuSign (and by different parties hereto in different counterparts), each of which shall constitute an original, and all of which counterparts when taken together shall constitute one agreement.

**7.** **Governing Law**. The parties agree that this Amending Agreement is conclusively deemed to be made under, and for all purposes to be governed by and construed in accordance with, the laws of the State of New York and the federal laws applicable therein. The parties hereto do hereby irrevocably submit and attorn to the non-exclusive jurisdiction of the CCAA Court for all matters arising out of or relating to the Amended Commitment Letter, or any of the transactions contemplated hereby without prejudice to the rights of the Lenders to commence proceedings in other jurisdictions in which any assets secured by the DIP Charge may be situated including without limitation in the other Restructuring Courts.

**8.** **Successors and Assigns**. This Amending Agreement shall be binding on and enure to the benefit of the respective successors and permitted assigns of each of the parties hereto in accordance with the terms of the Commitment Letter.

**[Signature Pages Follow]**

# Appendix "E"

**DIP LOAN MARKET TERMS**

| Debtor | Lender | Filing Date | Jurisdiction | Industry | Commitment ($MM) | Commitment Fee[1] | Interest Rate |
|---|---|---|---|---|---|---|---|
| Asbestos Corporation Limited | CERTAIN UNDERWRITERS AT LLOYD'S et al. | 14-May-25 | Quebec | Mining | USD 20 | | 5.45%[2] |
| Mizrahi Development Group (The One) Inc. | KEB Hana Bank as trustee of IGIS Global Private Placement Real Estate Fund No. 530 | 22-Apr-25 | Ontario | Construction | 615 | | 4.50% |
| Sandvine Corporation et al. | Seaport Loan Products LLC and Acquiom Agency Services LLC as co-administrative agents. | 7-Nov-24 | Ontario | Technology | 30 | 1.00% | 12.93%[2] |
| Chesswood Group Ltd. et al. | RBC and other pre-filing lenders | 29-Oct-24 | Ontario | Financial Services | US 65 | 0.70% | 8.45%[2] |
| Mizrahi Development Group (1451 Wellington) Inc. | TCC Mortgage Holdings Inc. | 15-Oct-24 | Ontario | Real Estate | 25 | 1.50% | 10.00% |
| Teal Jones Group | Wells Fargo et al. | 25-Apr-24 | British Columbia | Lumber | The lesser of (i) $116.5 million, and (ii) the amount provided by the borrowing base plus $56 million. | 0.30% | 9.50% |
| Pride Group Holdings Inc. | RBC as agent | 27-Mar-24 | Ontario | Transportation | 30 | 1.70% | 12.50% |
| BZAM Ltd. | Cortland Credit Lending Corporation as agent | 28-Feb-24 | British Columbia | Cannabis | The lesser of (i) $41.0 million, and (ii) the Revolving Facility Limit plus $7.0 million | 0.25% | 12.5%[2] |
| Myra Falls Mine Ltd. | Trafigura US Inc. | 18-Dec-23 | British Columbia | Mining | 21 | 1.00% | 11.00% |
| Mastermind GP Inc. | CIBC | 23-Nov-23 | Ontario | Retail | 36.25 | | 5.2%[2] |
| Tacora Resources Inc. | Cargill, Incorporated | 10-Oct-23 | Ontario | Mining | 75 | 3.00% | 10.00% |
| NextPoint Financial Inc. et al. | BP Commercial Funding Trust and Drake Enterprises Ltd. | 25-Jul-23 | British Columbia | Financial Services | 25 | 1.00% | 10.43%[2] |
| LoyaltyOne Co. (dba AIR MILES®) | BMO | 10-Mar-23 | Ontario | Other | US 70 | 2.00% | 10.45%[2] |
| Coalspur Mines (Operations) Ltd. | Cline Trust Company LLC | 26-Apr-21 | Alberta | Mining | 26 | | 12.00% |
| Just Energy Group Inc. (TSX:JE) | LVS III SPE XV LP, TOCU XVII LLC, HVS XVI LLC or OC II LVS XIV LP | 9-Mar-21 | Ontario | Oil and Gas | 125 | 1%[3] | 13.00% |
| Laurentian University | Firm Capital Corporation | 1-Feb-21 | Ontario | Education | 25 | 2.00% | 10.5%[2] |
| Reitmans (Canada) Limited | Bank of Montreal and Roynat Inc. | 19-May-20 | Quebec | Retail | 60 | 0.60% | 9.45%[1] |
| Dominion Diamond Mines | Washington Diamond Lending, LLC and a syndicate of lenders | 23-Apr-20 | Alberta | Mining | 60 | | 5.25% |
| Entrec Corporation | Wells Fargo Capital Finance Corporation Canada as Administrative Agent | 14-May-20 | Alberta | Transportation | 30 | | 8.00% |
| Construction Company Limited | Zurich Insurance Company Ltd. | 3-Apr-19 | Ontario | Construction | 27.5 | | 6.00% |

Source: "DIP Loan Tracker (Excel)" database maintained by Insolvency Insider.

[1] For comparison purposes only, in instances where i) commitment fees are noted in dollars, the percentage is implied; ii) upfront, exit, or similar fees are noted, they are categorizo

[2] Interest rates based on CORRA, Prime Rate and SOFR are implied using rates as at December 5, 2025 for comparison purposes only (CORRA = 2.25%; Prime Rate = 4.45%; SOI

[3] An additional 1% Origination Fee was applicable to this DIP Loan.

# Appendix "F"

*Alberta*
**COURT OF KING'S BENCH OF ALBERTA**

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT,***
**R.S.C.1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA**
**ULC, CANTANA ENERGY GMBH, CNE OIL & GAS S.R.L, CANACOL ENERGY COLOMBIA S.A.S.,**
**SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S.**

**(collectively the "Canacol Group" or the "Applicants")**

**MONITOR'S REPORT ON CASH FLOW STATEMENT**
(paragraph 23(1)(b) of the CCAA)

The attached statement of projected cash flow of the Applicants prepared as of the 9th day of December 2025, consisting of the period from November 30, 2025 to February 7, 2026 (the "**Updated Cash Flow Forecast**"), has been prepared by management of the Applicants, in consultation with the Monitor for the purpose described in Note 1, using the probable and hypothetical assumptions set out in the notes to the Updated Cash Flow Forecast.

Our review and consultation consisted of inquiries, analytical procedures and discussions related to information supplied by management and employees of the Applicant. Since hypothetical assumptions need not be supported, our procedures with respect to them were limited to evaluating whether they were consistent with the purpose of the Updated Cash Flow Forecast. We have also reviewed the support provided by management for the probable assumptions and the preparation and presentation of the Updated Cash Flow Forecast.

Based on our review, nothing has come to our attention that causes us to believe that, in all material respects:

a)  the hypothetical assumptions are not consistent with the purpose of the Updated Cash Flow Forecast;
b)  as at the date of this report, the probable assumptions developed by management are not suitably supported and consistent with the plans of the Applicants or do not provide a reasonable basis for the Updated Cash Flow Forecast, given the hypothetical assumptions; or
c)  the Updated Cash Flow Forecast does not reflect the probable and hypothetical assumptions.

Since the Updated Cash Flow Forecast is based on assumptions regarding future events, actual results will vary from the information presented even if the hypothetical assumptions occur, and the variations may be material. Accordingly, we express no assurance as to whether the Updated Cash Flow Forecast will be achieved.

The Updated Cash Flow Forecast has been prepared solely for the purpose described in the notes thereto and readers are cautioned that it may not be appropriate for other purposes.

Dated at Toronto, in the Province of Ontario, this 9th day of December 2025.

**KPMG Inc.**
**In its capacity as Proposed Monitor of**
**Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta Ltd., Cantana Energy**
**GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S.,**
**and CNE Oil & Gas S.A.S.**

**And not in its personal or corporate capacity**

*Katherine Forbes*
_____
Katherine Forbes
CPA, CA, CIRP, LIT

*Alberta*
**COURT OF KING'S BENCH OF ALBERTA**

**IN THE MATTER OF THE** *COMPANIES' CREDITORS ARRANGEMENT ACT,*
**R.S.C.1985, c. C-36, AS AMENDED**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF**
**CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL ENERGY ULC, 2498003 ALBERTA**
**ULC, CANTANA ENERGY GMBH, CNE OIL & GAS S.R.L, CANACOL ENERGY COLOMBIA S.A.S.,**
**SHONA HOLDING GMBH, CNE ENERGY S.A.S., and CNE OIL & GAS S.A.S. (collectively the**
**"Applicants")**

**MANAGEMENT'S REPORT ON CASH FLOW STATEMENT**
(paragraph 10(2)(b) of the CCAA)

The management of the Canacol Group have developed the assumptions and prepared the attached statement of projected cash flow as of the 9th day of December 2025, consisting of the period from November 30, 2025 to February 7, 2026 (the "**Updated Cash Flow Forecast**").

The hypothetical assumptions are reasonable and consistent with the purpose of the Updated Cash Flow Forecast described in the notes therein, and the probable assumptions are suitably supported and consistent with the plans of the Applicants and provide a reasonable basis for the Updated Cash Flow Forecast. All such assumptions are disclosed in the notes therein.

Since the Updated Cash Flow Forecast is based on assumptions regarding future events, actual results will vary from the information presented, and the variations may be material.

The Updated Cash Flow Forecast has been prepared solely for the purpose described in the notes therein, using the probable and hypothetical assumptions set out therein. Consequently, readers are cautioned that the Updated Cash Flow Forecast may not be appropriate for other purposes.

Dated at Calgary, in the Province of Alberta, this 9th day of December 2025.

**Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Cantana Energy GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S.**

_____

Jason Bednar
Chief Financial Officer

**The Canacol Group**
**Cash Flow Forecast**
**In USD ($000's); unaudited**

| | | Forecast 1 | Forecast 2 | Forecast 3 | Forecast 4 | Forecast 5 | Forecast 6 | Forecast 7 | Forecast 8 | Forecast 9 | Forecast 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CCAA Week | | | | | | | | | | | | |
| Week Ending | Notes | 6-Dec-25 | 13-Dec-25 | 20-Dec-25 | 27-Dec-25 | 3-Jan-26 | 10-Jan-26 | 17-Jan-26 | 24-Jan-26 | 31-Jan-26 | 7-Feb-26 | Total |
| | 1 | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | |
| Receipts | 2 | 3,872 | 1,340 | 271 | 19,635 | - | 3,559 | 1,780 | - | 14,744 | 4,390 | 49,592 |
| **Total receipts** | | **3,872** | **1,340** | **271** | **19,635** | **-** | **3,559** | **1,780** | **-** | **14,744** | **4,390** | **49,592** |
| | | | | | | | | | | | | |
| **Operating disbursements** | | | | | | | | | | | | |
| Pre-filing expenses | 3 | (4,009) | (331) | - | - | (5,000) | - | - | - | - | (5,000) | (14,340) |
| Operating expenses | 4 | (727) | (1,075) | (727) | (3,499) | (439) | (439) | (439) | (439) | (3,165) | (565) | (11,515) |
| Royalties | 5 | - | - | (2,556) | - | - | - | - | - | (3,320) | - | (5,876) |
| Payroll | 6 | - | (198) | - | (2,320) | - | - | (231) | - | (1,750) | - | (4,499) |
| Capital expenditures | 7 | (1,846) | (1,846) | (1,846) | (3,418) | - | (3,000) | (6,927) | (3,309) | (3,309) | (2,508) | (28,009) |
| Tax payable | 8 | - | - | (1,590) | (1,500) | - | - | - | - | (883) | - | (3,973) |
| Letters of credit | 9 | (5,298) | - | - | - | (2,632) | - | - | - | - | - | (7,930) |
| DIP fees and interest | 10 | - | - | - | (4,425) | (168) | - | - | - | - | (347) | (4,940) |
| Professional fees | 11 | (172) | (172) | (172) | (300) | (460) | (460) | (460) | (460) | (460) | (575) | (3,691) |
| **Total operating disbursements** | | **(12,051)** | **(3,623)** | **(6,892)** | **(15,462)** | **(8,699)** | **(3,899)** | **(8,057)** | **(4,208)** | **(12,887)** | **(8,995)** | **(84,772)** |
| | | | | | | | | | | | | |
| **Net cash flow** | | **(8,180)** | **(2,283)** | **(6,621)** | **4,174** | **(8,699)** | **(339)** | **(6,277)** | **(4,208)** | **1,858** | **(4,605)** | **(35,180)** |
| | | | | | | | | | | | | |
| **Opening cash** | 12 | 24,857 | 16,677 | 14,395 | 7,774 | 26,948 | 20,249 | 19,909 | 13,632 | 9,424 | 41,282 | 24,857 |
| Net cash flow | | (8,180) | (2,283) | (6,621) | 4,174 | (8,699) | (339) | (6,277) | (4,208) | 1,858 | (4,605) | (35,180) |
| DIP draw | 13 | - | - | - | 15,000 | 2,000 | - | - | - | 30,000 | - | 47,000 |
| **Ending cash** | | **16,677** | **14,395** | **7,774** | **26,948** | **20,249** | **19,909** | **13,632** | **9,424** | **41,282** | **36,676** | **36,676** |

**The Canacol Group**
**10-Week Cash Flow Forecast**
**Notes and Summary of Assumptions**

**In the Matter of the CCAA Proceedings of Canacol Energy Ltd., 2654044 Alberta Ltd., Canacol Energy ULC, 2498003 Alberta ULC, Cantana Energy GmbH, CNE Oil & Gas S.R.L., Canacol Energy Colombia S.A.S., Shona Holding GmbH, CNE Energy S.A.S., and CNE Oil & Gas S.A.S.**
**(collectively the "Applicants")**

**Disclaimer**

In preparing this cash flow forecast (the "**Updated Cash Flow Forecast**"), the Applicants have relied upon unaudited financial information and have not attempted to further verify the accuracy or completeness of such information. Since the Updated Cash Flow Forecast is based on assumptions about future events and conditions that are not ascertainable, the actual results achieved during the Updated Cash Flow Forecast period will vary from the Updated Cash Flow forecast, even if the assumptions materialize, and such variations may be material. There is no representation, warranty, or other assurance that any of the estimates, forecasts or projections will be realized.

The Cash Flow Forecast is presented in US dollars. All defined terms that are not otherwise defined herein are to have the same meaning ascribed to them in the second report of the Monitor dated December 9th, 2025 (the "**Second Report**").

| | |
|---|---|
| Note 1 | **Purpose of the Cash Flow Forecast** |
| | The purpose of the Cash Flow Forecast is to present the estimated cash receipts and disbursements of the Applicants for the period from November 30, 2025 to February 7, 2026, in respect of its proceedings under the CCAA. The Cash Flow Forecast has been prepared by management of the Canacol Group, in consultation with the Monitor based on available financial information at the date of the Second Report. Readers are cautioned that this information may not be appropriate or relied upon for any other purpose. |
| Note 2 | **Receipts** |
| | The majority of the Applicants' receipts are generated through the sale of natural gas through long-term, fixed price contracts to residential and commercial end users. Customer receipts are forecast based on contracted volumes and are primarily received on a prepaid basis from their customers. |
| | Receipts are projected net of transport expenses and amounts withheld of approximately 2.5% by customers on behalf of Canacol for remittance to the Colombian government. |
| Note 3 | **Pre-Filing Payments** |
| | These disbursements relate to amounts owing for goods and services supplied prior to the filing date by certain third-party suppliers, if in the opinion of the Canacol Group, the supplier is critical to the ongoing operations and business of the Canacol Group. Pre-filing payments are subject to prior approval by the Monitor. The Applicants propose to make Critical Vendor Payments up to a maximum aggregate amount of $15.5 million, including the $5.2 million already disbursed by the Applicants between the Filing Date and December 6, 2025, in accordance with the terms of the ARIO. |
| Note 4 | **Operating Expenses** |
| | Operating expenses are composed of expenses related to producing, treating, and delivering natural gas and general business expenses, including maintenance, insurance, utilities, equipment rental, LC fees, and general and administrative costs. Operating expenses are forecast based on historical run rates. |

| | |
|---|---|
| Note 5 | **Royalties** |
| | Royalties are paid to ANH at the end of each month for the production of natural gas based on the monthly production volumes of the Canacol Group 60 days prior. |
| Note 6 | **Payroll** |
| | Payroll expenses include salaries and wages, payroll taxes and remittances, and employee benefits paid to the Applicants' employees and contractors. Payroll expenses are forecasted based on current headcount levels and are paid bi-weekly in Canada, and monthly in Colombia. |
| Note 7 | **Capital Expenditures** |
| | Capital expenditures include amounts for drilling and workovers, compression, and other costs for the purpose of producing natural gas and crude oil for sale. Capital expenditures are forecasted based on historical run rates and the Canacol Group's planned drilling efforts. For conservatism, these expenses are assumed to be paid on a cash on delivery ("COD") terms. |
| Note 8 | **Tax Payable** |
| | Tax remittances include withholding taxes paid to the Colombian government on receipts and on vendor disbursements for the previous month. |
| Note 9 | **Letters of Credit** |
| | Letters of credit disbursements include projected cash collateralization to replace expiring letters of credit. |
| Note 10 | **DIP Fees and Interest** |
| | DIP fees and interest include: |

i. commitment fees of 5% on the Tranche A advances ($45 million) and professional fees of the Lender in connection with the DIP process;
ii. professional fees in respect of Plexus; and
iii. monthly interest payments of 13% on the $15 million Initial Advance of Tranche A and 11% on the full outstanding amount of Tranche A once the Subsequent Advance is completed.

| | |
|---|---|
| Note 11 | **Professional Fees** |
| | Professional fees include payments to the Applicants' legal counsel in Canada, the US, and Colombia, the Monitor, the Monitor's legal counsel in Canada and the US, the Chief Restructuring Advisor and DIP lender's financial and legal advisors. |
| Note 12 | **Opening Cash** |
| | Opening cash balance includes amounts held in the Applicants' bank accounts, including in the Promigas Trust (as defined in the Pre-Filing Report). |
| Note 13 | **Debtor-in-possession ("DIP") Financing** |
| | The Updated Cash Flow Forecast reflects advances under the DIP Facility in the Forecast Period of $47 million, reflecting the Tranche A advances and Tranche C letters of credit facility ($2 million). |

# Appendix "G"

**The Canacol Group**
**Cash Flow Forecast Comparison**
**In USD ($000's); unaudited**

| | November 23 Forecast 20-Dec-25 | Updated Forecast [1] 20-Dec-25 | Variance |
|---|---|---|---|
| **Receipts** | | | |
| Receipts | 23,892 | 20,157 | (3,735) |
| **Total receipts** | **23,892** | **20,157** | **3,735** |
| **Operating disbursements** | | | |
| Pre-filing expenses | (4,839) | (4,915) | (76) |
| Operating expenses | (4,486) | (2,593) | 1,893 |
| Royalties | (4,336) | (4,336) | 0 |
| Salaries and bonuses | (1,929) | (1,382) | 547 |
| Capital expenditures | (7,010) | (5,538) | 1,472 |
| Tax payable | (6,405) | (6,405) | - |
| Letters of credit | (5,298) | (5,298) | - |
| Professional fees | (800) | (800) | - |
| **Total operating disbursements** | **(35,102)** | **(31,266)** | **(3,836)** |
| **Net cash flow** | **(11,210)** | **(11,109)** | **(101)** |
| **Opening cash** | 18,031 | 18,883 | 852 |
| Net cash flow | (11,210) | (11,109) | 101 |
| **Ending cash** | **6,821** | **7,774** | **953** |

[1] - includes one week of reported results for week ended November 29, 2025