**<u>Exhibit A</u>**


**Transcript**

4903-2625-8818.1 50180.00001

Action No. 2501-18462
E-File Name: EVK25CANACOL
Appeal No._____

IN THE COURT OF KING'S BENCH OF ALBERTA
JUDICIAL CENTRE OF EDMONTON


IN THE MATTER OF THE COMPANIES'
CREDITORS ARRANGEMENT ACT,
R.S.C. 1985, c. C-36, As Amended


AND IN THE MATTER OF THE PLAN OF COMPROMISE OR ARRANGEMENT OF
CANACOL ENERGY LTD., 2654044 ALBERTA LTD., CANACOL
ENERGY ULC, 2498003 ALBERTA ULC, et al

_____

P R O C E E D I N G S
_____

Edmonton, Alberta
December 11, 2025

Transcript Management Services
Suite 1901-N, 601-5th Street SW
Calgary, Alberta, T2P 5P7
Phone: (403) 297-7392
Email: TMS.Calgary@just.gov.ab.ca

This transcript may be subject to a publication ban or other restriction on use, prohibiting the publication or disclosure of the transcript or certain information in the transcript such as the identity of a party, witness, or victim. Persons who order or use transcripts are responsible to know and comply with all publication bans and restrictions. Misuse of the contents of a transcript may result in civil or criminal liability.

## TABLE OF CONTENTS

| Description | | Page |
|---|---|---|
| December 11, 2025 | Afternoon Session | 1 |
| Decision (Stay Extension and DIP Loan) | | 3 |
| Discussion | | 12 |
| Submissions by Mr. Prophet (Sealing Order) | | 16 |
| Submissions by Ms. Meyer (Sealing Order) | | 17 |
| Submissions by Mr. Pasquariello (Sealing Order) | | 18 |
| Submissions by Mr. Prophet (Sealing Order) (Reply) | | 20 |
| Submissions by Ms. Meyer (Sealing Order) (Reply) | | 21 |
| Submissions by Mr. Oliver (Sealing Order) | | 22 |
| Submissions by Mr. Pasquariello (Sealing Order) (Reply) | | 23 |
| Submissions by Ms. Meyer (Sealing Order) (Reply) | | 23 |
| Decision (Sealing Order) | | 23 |
| Certificate of Record | | 25 |
| Certificate of Transcript | | 26 |

| | |
|---|---|
| 1 Proceedings taken in the Court of King's Bench of Alberta, Courthouse, Edmonton, Alberta | |
| 2 _____ | |
| 3 | |
| 4 December 11, 2025 | Afternoon Session |
| 5 | |
| 6 The Honourable Justice D. Mah | Court of King's Bench of Alberta |
| 7 (remote appearance) | |
| 8 | |
| 9 C.P. Prophet (remote appearance) | For Canacol Energy Ltd., 2654044 Alberta Ltd., |
| 10 | Canacol Energy ULC, 2498003 Alberta ULC, |
| 11 | Cantana Energy GmbH, CNE Oil & Gas, S.R.L, |
| 12 | Canacol Energy Colombia S.A.S., Shona |
| 13 | Holding GmbH, CNE Energy S.A.S. and CNE |
| 14 | Oil & Gas S.A.S. |
| 15 S. Gabor (remote appearance) | For Canacol Energy Ltd., 2654044 Alberta Ltd., |
| 16 | Canacol Energy ULC, 2498003 Alberta ULC, |
| 17 | Cantana Energy GmbH, CNE Oil & Gas, S.R.L, |
| 18 | Canacol Energy Colombia S.A.S., Shona |
| 19 | Holding GmbH, CNE Energy S.A.S. and CNE |
| 20 | Oil & Gas S.A.S. |
| 21 K. Yurkovich (remote appearance) | For Canacol Energy Ltd., 2654044 Alberta Ltd., |
| 22 | Canacol Energy ULC, 2498003 Alberta ULC, |
| 23 | Cantana Energy GmbH, CNE Oil & Gas, S.R.L, |
| 24 | Canacol Energy Colombia S.A.S., Shona |
| 25 | Holding GmbH, CNE Energy S.A.S. and CNE |
| 26 | Oil & Gas S.A.S. |
| 27 C. Brunet (remote appearance) | For Canacol Energy Ltd., 2654044 Alberta Ltd., |
| 28 | Canacol Energy ULC, 2498003 Alberta ULC, |
| 29 | Cantana Energy GmbH, CNE Oil & Gas, S.R.L, |
| 30 | Canacol Energy Colombia S.A.S., Shona |
| 31 | Holding GmbH, CNE Energy S.A.S. and CNE |
| 32 | Oil & Gas S.A.S. |
| 33 E.S. Dushenski (remote appearance) | For Citibank, National Association |
| 34 A.C. Maerov (remote appearance) | For Citibank, National Association |
| 35 J. Levine (remote appearance) | For Citibank, National Association |
| 36 J.L. Oliver (remote appearance) | For the Ad Hoc Committee of Senior |
| 37 | Noteholders |
| 38 K.J. Bourassa (remote appearance) | For Agents on the Revolving Credit Facility |
| 39 J. Willis (remote appearance) | For Agents on the Revolving Credit Facility |
| 40 G.H. Finlayson (remote appearance) | For the Board of Directors of Canacol Energy |
| 41 | Ltd. |

| | | |
|---|---|---|
| 1 | M. Cressatti (remote appearance) | For the Board of Directors of Canacol Energy |
| 2 | | Ltd. |
| 3 | J. Pasquariello (remote appearance) | For Macquarie Bank Ltd. |
| 4 | E. Axell (remote appearance) | For Macquarie Bank Ltd. |
| 5 | R. Chadwick (remote appearance) | For Macquarie Bank Ltd. |
| 6 | R.I. Thornton (remote appearance) | For NG Energy |
| 7 | G.F. Body (remote appearance) | For Justice Canada, Canada Revenue Agency |
| 8 | R.S. Sahni (remote appearance) | For the Monitors, KPMG Inc. |
| 9 | K. Forbes (remote appearance) | For the Monitors, KPMG Inc. |
| 10 | K.J. Meyer (remote appearance) | For the Monitors, KPMG Inc. |
| 11 | E. Buhendwa | Court Clerk |
| 12 | Z. Wong | Court Clerk |

13
_____

14

15  THE COURT:                    Good afternoon, everyone. I just want to cast my
16  eyes over the array here and make sure that everyone that should be here is here. So I see
17  Mr. Prophet, I see Ms. Meyer.

18

19  Okay, I am looking for someone from Mr. Pasquariello's firm. Oh I see Mr. Pasquariello
20  there. Okay, great.

21

22  Is there someone here from Cassels?

23

24  MR. PROPHET:                   Mr. Oliver's here, Sir.

25

26  THE COURT:                     Mr. Oliver, okay.

27

28  MR. PROPHET:                   Thank you.

29

30  THE COURT:                     That is great. All right, I think we are all here. So
31  I am going to start in a moment. I will just let you know that this will likely go on for about
32  20 minutes.

33

34  MS. MEYER:                     Justice Mah, it's Kelsey Meyer from Bennett
35  Jones on behalf of the Monitor.

36

37  THE COURT:                     Yes.

38

39  MS. MEYER:                     I did want to just give you an update with respect
40  to the US proceeding which was heard this morning.

41

1  THE COURT:                              Okay.
2
3  MS. MEYER:                              This morning, the US Bankruptcy Court heard
4      the motion for foreign recognition of these proceedings in the US and granted that motion,
5      there being no objections to it, and the Judge held particularly that Canada is the centre of
6      main interest for all of the debtor entities as part of his decision.
7
8  THE COURT:                              Thank you.
9
10  MS. MEYER:                             Thank you.
11
12  **Decision (Stay Extension and DIP Loan)**
13
14  THE COURT:                             Just give me a moment to set up. All right, this
15      decision comes after a rather spirited hearing before me yesterday concerning a stay
16      extension and approval of a DIP loan and charge under the *CCAA*.
17
18      The applicant is Canacol Group, an international group of companies engaged in oil and
19      gas exploration and production with a headquarters in Calgary, operations in Columbia and
20      financing through New York. Canacol Energy Ltd. and its associated companies comprise
21      Canacol Group. I will refer to the group as Canacol, the entities under *CCAA* protection in
22      these proceedings, throughout these reasons.
23
24      Canacol obtained an initial order from Justice Johnston on November 18th, 2025 and an
25      amended and restated initial order from Justice Bourque on November 8th, 2025. Under
26      the latter, the stay is set to expire on December 18th, 2025. Aside from stay extension to
27      February 6th, 2026, Canacol also seeks approval of a DIP loan in charge with respect to
28      proposed interim financing from what was called the ad hoc bond holder group.
29
30      This DIP facility contemplates DIP funding to a maximum of $67 million US comprised
31      of an initial advance, referred to as tranche A, of $15 million US and a subsequent advance,
32      tranche B, of $30 million US. Tranche B contemplates renewal or replacement of certain
33      lapsing letters of credit up to $20 million US. There is also a Tranche C which contemplates
34      new letters of credit up to $2 million.
35
36      Any DIP loan order granted by this Court requires confirmation in the US Court and at
37      least with respect to Tranche B, recognition in Columbia. The date for the US application
38      in the Southern District of New York is December 18th, which date has already been
39      procured and I was just updated by Ms. Meyer that the motion for foreign recognition was
40      heard and granted this morning. Tranche A requires a commitment fee payable to the DIP
41      lender of 5 percent of the maximum commitment amount in any event.

4

1
2    Canacol's senior lender, Macquarie Bank, opposes the DIP loan part of the application on
3    several grounds: That the DIP solicitation process was unduly rushed and flawed given that
4    the priming charge, in its view, is contrary to Columbian law. Approval by the Alberta
5    Court would set a negative and far-reaching precedent with implications for international
6    comity. Approval would cause uncertainty in the *CCAA* proceedings. Approval would
7    prejudice Macquarie as senior secured lender and there is something better out there to help
8    Canacol in its current situation.
9
10   Macquarie asked for an adjournment of the application so that this -- something different
11   might be worked out, and also to ensure procedural fairness in this application because
12   materials were late breaking and Macquarie Bank has all kinds of factual questions which
13   it says needs to be answered. Macquarie, alternatively, opposes the DIP loan and charge
14   application on its merits. Macquarie is owed $37.5 million more or less and is the first
15   position secured creditor.
16
17   The application for DIP loan approval was supported by the ad hoc committee of senior
18   noteholders, the proposed DIP lender, as well as Canacol's Board of Directors, and the RFC
19   lender. The ad hoc committee represents 75 percent of the senior unsecured noteholders
20   who, in aggregate, hold $300 million in unsecured debt, while the other creditor is a
21   syndicate lender holding $200 million in unsecured debt.
22
23   All of the application is supported by the Monitor, who of course is a Court appointed
24   officer, and who provided his rationale for support in its second report which was filed
25   with the Court. The application's proponent, Canacol, the Monitor, and the other parties
26   who appeared by counsel and supported the DIP loan, all oppose the adjournment. Counsel
27   for Canacol and the Monitor suggest that Macquarie is engaging in a campaign of
28   disruption motivated only by the desire to get paid before anyone else and soon.
29
30   The main question raised by Macquarie is what is the rush? And I need to give some
31   background to the question of how this rush has occurred. First, I should say that this Court
32   was satisfied in the person of Justice Johnston that the *CCAA* applied in Canacol's
33   circumstances, and that the initial order should be granted in the first place. Then Justice
34   Bourque ordered the stay extended to December 18th in a comeback hearing that gave rise
35   to the ARIO.
36
37   During the hearing before Justice Bourque, the DIP selection process was modified, that is
38   it was extended so that the approval application could be presented before me yesterday.
39   Due to the stay expiry on December 18th, Canacol had first proposed earlier dates in
40   December, December 16th of 17th, as the date for this application. As it turned out, there
41   was no available court time in either Edmonton or Calgary for the rest of the calendar year.

1    It was because another matter had fallen off yesterday's docket that the hearing date of
2    December 10th was offered and counsel for Canacol seized that date.
3
4    Given the short timeframe, filing deadlines for the application were required to be varied.
5    I directed that the applicant's materials be filed on December 5th and response materials
6    by December 8th. Counsel for the Monitor took it upon themselves but did advise me and
7    other parties that its material would be filed thereafter but before the hearing, in accordance
8    with its practice. Canacol also felt behooved to file a late reply affidavit and Amended
9    Notice of application.
10
11   When I read Macquarie's materials yesterday, I became concerned that the Court might
12   have put the parties in a difficult position because of unavailability of court time and short
13   filing deadlines. I tried to broker a solution of sorts by offering a date later in the first week
14   of January, at least for the DIP portion of the application. Macquarie's counsel was the only
15   taker for that suggestion. In the result, because I felt the adjournment request and the merits
16   of the DIP fund application were inextricable, I decided to hear both at the same time.
17
18   Now I should say that no one ever plans on having a liquidity crisis. I imagine that initiation
19   of *CCAA* proceedings is a last resort measure in the face of dire corporate fortunes that are
20   finally deemed by the company unlikely to change.
21
22   In any event, Justice Johnston saw fit to grant the initial order on November 18th and I did
23   not go behind that. Similarly, Justice Bourque saw fit to grant the amended and restated
24   initial order on November 28th, and I do not question that. It did result in the DIP
25   solicitation process following an extremely truncated timeline. Some of the questions that
26   faced me is whether the short length of the timeline is unfair to and prejudices Macquarie.
27
28   Argument in the application focussed primarily on the propriety of the DIP fund proposal,
29   particularly with respect to the priming charge. I did not hear much argument on the stay
30   extension itself, although DIP loan approval and stay extension go hand in glove. For
31   reasons that I hope become apparent, I am going to deal with the DIP fund application first
32   and then move to the stay extension, although intuitively it seems like it should go the other
33   way around. As I said, the adjournment application and consideration of the merits of the
34   DIP loan and charge request are dealt with together.
35
36   Canacol and the Monitor said that the main reason for the DIP loan is exigency. Canacol
37   contemplates a double track approach within this restructuring, a plan of arrangement, or a
38   sales and investment solicitation process, or some combination. It cannot proceed with
39   either normal operations in the meantime or restructuring efforts without injection of cash
40   flow from a DIP lender.
41

1  The Monitor provided an updated cashflow statement for the period November 30, 2025
2  to February 7th, 2026, which assumes the DIP loan prepared as of December 9th. Canacol
3  is schedule to run out of cash more or less as of January 10th, 2026. The Monitor also
4  provided a brief variance report at appendix G of the second report. I understood from
5  Monitor's counsel that the Monitor became involved only shortly before the initial order
6  itself and Canacol's financial state, from the Monitor's perspective, continues to evolve as
7  more information becomes known and events develop. I accept this explanation.
8
9  Canacol and the Monitor both say that without the DIP loan, the margin is virtually
10  eliminated. Therefore, Canacol's stands in danger of what has been described as an orderly
11  wind down in Columbia should the security be enforced, along with, as it was explained to
12  me, sudden supply disruption to customers, basically the Government of Columbia, and
13  subsequent disruption to the electrical grid and for energy end users in that country.
14
15  Canacol's counsel says in this case, the most important or at least controversial of the
16  statutory factors governing whether DIP funding should be approved under section 11.2(4)
17  is the existence or not of material prejudice to any creditor. In this case, Macquarie was the
18  only one before the Court alleging such prejudice.
19
20  Macquarie's objections, whether contextually as part of an adjournment application or in
21  opposition outright to the merits of the proposed DIP fund, are grouped as follows:
22  Procedural prejudice; substantive prejudice; the unlikelihood of Columbian approval;
23  uncertainty and disfunction within the *CCAA* process; and there is a better way to help
24  Canacol, we just have to find it.
25
26  So I will start with the procedural prejudice. It takes two forums. First, the rushed manner
27  in which the DIP solicitation process unfolded, not giving Macquarie enough time to
28  meaningfully respond with its own DIP plan. And second, the compacted timeframe for
29  Court approval of this DIP loan, which means that Macquarie has not had the opportunity
30  to meaningfully question the need for a priming charge for the DIP or the DIP at all.
31
32  Details of the DIP selection process were set out in the Monitor's first report which was
33  before Justice Bourque. During or as a result of that hearing, the deadline for responding
34  with a DIP funding proposal was extended to December 5th. The whole of the selection
35  process with updates is described at paragraphs 21 to 39 of the second report.
36
37  The Monitor gives an opinion that those parties interested in the process had access to the
38  same information and the same opportunity to generate a compliant proposal. I appreciate
39  that the process was truncated in terms of timeline. However, in the circumstances, there
40  is a limited universe from which a DIP lender might emerge. I suspect that the entire
41  universe was likely represented before the Court yesterday.

1
2   I am not satisfied that Macquarie was put to any disadvantage compared to any other person
3   interested in submitting a DIP fund proposal or with the interim lender who is now before
4   the Court. As the Monitor says, everyone had the same information, access to the data
5   room, and the same opportunity. The ad hoc committee submitted an acceptable compliant
6   proposal. Macquarie, after two cracks, did not.
7
8   With regard to the other form of procedural prejudice, I accept that there has been scant
9   time for testing the information put forward by the Monitor or questioning on affidavits.
10  Counsel differ about whether such questioning could have taken place. Here, I say the
11  Court must repose a certain degree of confidence in what the Monitor says as a Court
12  appointed officer. Macquarie may have questions. It could have and should have asked
13  those questions while the DIP selection process was underway. There was nothing
14  preventing Macquarie from asking questions between November 28th and December 10th
15  if it needed clarification about some of the financial information.
16
17  I accept what counsel say about the nature of *CCAA* proceedings, how opportunities open
18  and close and decisions must sometimes be made on the fly, as it were. This was described
19  by Canacol counsel as insolvency proceedings unfolding in real time. So there are times
20  when the Court must be called upon to choose between competing policy objectives.
21
22  One set of such objectives would be that which underlies the *CCAA*, that is avoiding the
23  social and economic cost of large corporate failure and allowing a large, distressed
24  company breathing space to emerge from financial distress with a reasonable plan
25  supervised by the Court.
26
27  The competing objective here are the procedural fairness concerns in that, as Macquarie
28  says, it does not have time to question the information presented by Canacol and the
29  Monitor which as a party in this litigation, it says it has a right to do in order to put a better
30  record before the Court for a decision.
31
32  I cannot do both here. The reason I cannot do both is because January 10th, 2026, according
33  to the most recent cash flow statement, represents a hard stop. If I adjourn to the latter part
34  of the first week of January, Canacol misses its December 18th date with the Court in the
35  SDNY. It seems unlikely that US Court approval could be achieved in 1 or 2 days after a
36  hearing by this Court during the latter part of the first week of January. It is just too close.
37
38  So what I need to consider is really what underlies Macquarie's concern about procedural
39  fairness and its desire to delay so that Macquarie can, for example, conduct questioning or
40  otherwise put the Monitor's figures to the test. I think the Monitor's counsel asked a fair
41  question when she said: (as read)

1

2          An adjournment to what end? What is the purpose of an adjournment?
3          What does Macquarie propose to achieve? Is it going to come up with
4          a better proposal? What is the real objective here?

5

6    Canacol's counsel pointed me to paragraph 62 of Mr. Picard's (phonetic) affidavit where
7    he says, I don't mind a defund if it second to Macquarie's security. The Monitor's counsel
8    pointed me to the November 24th, 2025 letter from Macquarie's counsel to Canacol's
9    counsel and the Monitor's counsel which, at the top of page 2, reiterates Macquarie's
10   position that any DIP funding should be secondary to its security.

11

12   Macquarie's counsel argued before me that an alternative structure which Macquarie would
13   accept is either having the DIP fund in a junior position or requiring the DIP loan to pay
14   out the Macquarie loan. The upshot of all of this is that Macquarie seeks to be paid out
15   right away and be done with Canacol. That is a completely understandable position. In
16   business and in litigation, the prime motivation is self-interest. There is nothing wrong with
17   that.

18

19   However, it is not compatible with the *CCAA* objective of fair treatment for all creditors
20   and stakeholders. Once the *CCAA* is invoked, as it has been here, broader interests come
21   into play. Even the interests of third parties, who may be residents of another country but
22   are end users of Canacol's output, they are part of the equation.

23

24   I have been told by counsel for the senior noteholders, who propose to be the DIP lender,
25   that his client will not accept a secondary position. That is also a reasonable position to
26   take and entirely consistent with what I say is the Supreme Court of Canada's view of
27   priming charges for DIP lenders, as expressed in the *Canada North* case where the Court
28   says they, being priming charges, are critical to encourage new investment in the company
29   as it undergoes reorganisation.

30

31   In that vein, here the DIP selection process was concluded. One DIP fund proposal was
32   acceptable to Canacol and the Monitor and is now presented. Neither of Macquarie
33   attempts at making a proposal were acceptable, nor compliant, and there is only one
34   proposal before the Court. Further, I do not accept Macquarie's attempt to undermine the
35   legitimacy of the latest cash flow rejection. I do accept both Canacol's and the Monitor's
36   explanation that ongoing capital expenditure is an innate feature of the gas extraction
37   industry.

38

39   Therefore, in my view, the slim margins shown in the latest cash flow statement are real
40   and show an actual liquidity crisis in the absence of an injunction of funds. Which leads
41   me to say that there is no procedural prejudice other than a desire to delay so as to take

1    Canacol to the brink so that Canacol, the Monitor, and the senior noteholders will change
2    their mind about having the DIP fund going second rather than first or paying out
3    Macquarie outright.

5    So this takes me to the question of substantive prejudice. The substantive prejudice argued
6    also takes two forms. The first is that Macquarie will lose its priority position to the DIP
7    lender. This is where the debate about valuation took place. After reading the transcript, I
8    saw that the same issue was argued before and decided by Justice Bourque on November
9    28th and was then relitigated before me.

11    Whatever valuation measure is used, Canacol has sufficient assets to satisfy all priming
12    charges and Macquarie's loan facility and depending on which valuation scenario is
13    accepted, maybe even some or all of the unsecured lenders at present. Further, I accept as
14    best evidence the reserve value found in Exhibit A to Mr. Bednar's December 8th, 2025
15    affidavit, even if only taking into account the value of proven reserves. But even the book
16    value or the proxy value of current bond price adequately covers Macquarie's position.

18    Further, Macquarie taking a subordinate position to the priming charge is the result of the
19    DIP lender agreeing to take on the risk of advancing additional and new funding to an
20    enterprise in distress. As I already said, that risk is undertaken for the expressed purpose
21    of advancing the public policy objectives under the *CCAA* and the price of that risk, as
22    recognised by the Supreme Court of Canada, and that price is the granting of the priming
23    charge.

25    Macquarie says that there is no risk to DIP lender in going second, but that is an argument
26    that cuts both ways. It is equally an argument against Macquarie maintaining first position.
27    That Macquarie does nothing extra to promote Canacol's reorganisation efforts, means that
28    it can and should occupy second position in the *CCAA* proceedings. I was given no reason
29    to do otherwise. I conclude therefore that there is no substantive prejudice in loss of priority
30    that accrues to Macquarie if the DIP loan and charge are approved.

32    The second form of substantial prejudice falls along the same line as Macquarie's argument
33    about the unlikelihood of Columbian approval of the priming charge for the DIP lender.
34    Macquarie says that it has rights under Columbian law. By approving the DIP loan in
35    charge, Macquarie says I would be stripping Macquarie of its rights to be paid out first or
36    to receive additional security which comes under Columbian law.

38    Further, given Mr. Valez's (phonetic) opinion, which is uncontradicted, the chances that a
39    priming charge for the second tranche of $30 million is approved in Columbia, Macquarie
40    says, is virtually zero. I have read Mr. Valez's opinion. I agree with Canacol's counsel that
41    Mr. Valez does not say that outright. His discussion of Columbian insolvency law does

1  leave room for the possibility of a priming charge to a DIP lender.
2
3  Moreover, I agree that whether Macquarie's interpretation of Columbia law is correct or
4  not is not a proper question for this Court. In effect, although counsel for Macquarie and I
5  disagree on this point, I would be applying Columbian law because the reason I would be
6  denying approval of the DIP loan is because of Columbian law, and that is something I say
7  is strictly within the purview of the Columbian Court or authority to decide.
8
9  Further, I did not consider it improper or back door to get an order in Canada and then
10  apply for recognition in Columbia. In this case, Justice Johnston found that the *CCAA*
11  applies and that means all of the *CCAA*, including section 11.2. As for Macquarie's
12  argument that a priming charge for the DIP lender in a Canadian Court order would be
13  overreach in Columbia, that is a respectfully a decision for the Columbian Court or
14  authority to make. I further do not think that the making of such an order in Canada is so
15  outrageous and unprecedented that it would throw the international order, when it comes
16  to insolvency, into disarray. The order will either be recognised in Columbia or it will not.
17
18  So I will take a moment to formally deal with the adjournment request. Adjournments are
19  all about a balancing of rights. Taking a balance of convenience approach, I conclude that
20  the harm inherent in granting an adjournment outweighs any possible prejudice to
21  Macquarie. I also find that Macquarie will not incur any procedural or substantial prejudice
22  by the granting of the order for the DIP loan in charge. So therefore, I deny the
23  adjournment.
24
25  With regard to uncertainty and disfunction within the *CCAA* process, it is premised on
26  Macquarie fighting Canacol and the Monitor every step of the way, in every jurisdiction.
27  This much is revealed on the penultimate paragraph of Mr. Picard's affidavit wherein he
28  says: (as read)
29
30          Granting such relief would create significant uncertainty in the *CCAA*
31          proceedings, potentially delay the Canacol Group's restructuring
32          objective and force litigation in the United States and Columbia,
33          diverting focus and resources from the restructuring process to the
34          detriment of the company and all stakeholders including Macquarie.
35
36  Macquarie's counsel says in his November 21st, 2025 letter to Canacol's and the Monitor's
37  counsel at the top of page 2: (as read)
38
39          It would be extremely unfortunate, time consuming, and disruptive if
40          Macquarie is jammed and forced to argue about priming and related
41          matters at the come back motion.

1
2    This prediction has come true and it lends credence to Canacol's counsel's suggestion that
3    Macquarie seeks to act as a spanner in the works in the hope that it will get paid out and
4    fast.
5
6    I agree that a course of litigating hard in every jurisdiction is Macquarie's choice.
7    Macquarie also says that I should not succumb to the lurid scenario of Columbians groping
8    in the dark. Macquarie says the world will not necessarily come to an end. Macquarie says
9    the noteholders have -- or the subordinate creditors have $500 million at risk, somehow
10   they will step up. Well as the counsel for the noteholders says, they've staked their ground,
11   I can't rely on them to come through if this DIP loan and charge application is not granted.
12
13   For the sake of Canada's international standing, I do not want to invite a scenario involving
14   Columbians without electricity. It is a matter of considering the interests of downstream
15   stakeholders, even if they live in another country. Approving the DIP loan in charge
16   introduces certainty, rather than diminishes it. It gives Canacol a lifeline until the end of an
17   extended stay period, so as to crystallise its reorganisation efforts. On the other hand,
18   having nothing in place would create uncertainty.
19
20   The last point is whether there is a better way and how to find it. There is no obvious better
21   way that presents itself. The only viable proposal before the Court comes from the
22   committee of senior noteholders. The only suggestion for the Court from Macquarie is that
23   Macquarie gets paid from the DIP loan or the DIP loan takes a subordinate position, but
24   that is not the proposal before the Court.
25
26   So in looking at the factors in section 11.2(4), I conclude that I should exercise discretion
27   to approve the DIP loan as presented, along with the charge under (2). From the evidence,
28   I infer that the company's management has the confidence of the majority of the creditors
29   at least in terms of dollar value, although I acknowledge that does not include Macquarie
30   whose loan amount is secured but relatively small in comparison to the unsecured creditors.
31   I am of the view that the DIP loan would enhance the prospect of a viable compromise or
32   arrangement being made in respect of the company, and that the nature and value of the
33   company's property justifies the loan.
34
35   I have spoken at length about prejudice, both procedural and substantive, and I conclude
36   that Macquarie would not be materially prejudices as a result of the charge. Of course, the
37   Monitor supports the granting of the loan, as do the unsecured creditors holding $5 million
38   in debt.
39
40   As for the commitment fees, yes, they are high. But the Monitor's counsel has explained
41   the circumstances and again, there is no acceptable alternative before the Court that will

1    provide relief to Canacol's liquidity problem at present other than this DIP loan, and so the
2    fees are by no means a dealbreaker. I therefore make the order granting the DIP loan and
3    charge as requested.
4
5    I move then to the stay extension. The reason I put the stay extension second is because
6    Macquarie questioned, maybe not in as many words, the good faith and due diligence of
7    Canacol in the DIP selection process and with regard to presenting the DIP application to
8    the Court. The statutory criteria for a stay extension are of course that it is appropriate in
9    the circumstances, and that the applicant has acted in good faith and with due diligence.
10
11   At the beginning of the decision, I discussed some of the background giving rise to the
12   need for a DIP loan. Those circumstances provide justification for extending the stay, that
13   is so that Canacol can continue on its path towards restructuring for the benefit of all
14   stakeholders. As I have disposed of Macquarie's main arguments with regard to possible
15   lack of good faith and due diligence, I find that the statutory criteria are met and I grant the
16   stay to February 6th, 2026.
17
18   Now I will move onto the ancillary relief, which I do not think is controversial. First, the
19   letters of credit are part of the DIP loan proposal. They accordingly are also approved if
20   specific approval is required. I will just note here again that it is new money being
21   advanced, in some cases, to replace expired letters of credit and would not constitute queue
22   jumping.
23
24   With regard to payments to critical venders, I heard no real argument against payment and
25   as I said, it follows the granting of the DIP loan order. I accept the Monitor's
26   recommendations in that regard.
27
28   Finally, respecting approval of the Monitor's activities to date. Now that I have disposed
29   of Macquarie's objections, there is no impediment to approving the activities as described
30   in the Monitor's second report which are set out in, I say, a transparent and comprehensive
31   manner and I so approve those activities.
32
33   So what that leaves me with, Mr. Prophet, is a discussion of your forms of order and your
34   application for a sealing order.
35
36   **Discussion**
37
38   MR. PROPHET:                          Thank you. Thank you Justice. So the most up-
39   to-date form of the order that you have would've been provided to the Commercial
40   Coordinator at about 11 AM on Wednesday. That reflects some of the letter of credit
41   arrangements that were in discussion between the ad hoc Bondholder participants in the

1    DIP loan and representatives of the RCF Lending Group as probable providers of at least
2    an interim letter of credit at the time.
3
4    So that is the form of the order I would like to speak with you about. There is a slight tweak
5    to that order, but I can do that, if you will on the fly, it's in paragraph 30. So, if you have
6    that, that I think is really our best (INDISCERNIBLE).
7
8    THE COURT:                          Okay. Let me just bring it up.
9
10   MR. PROPHET:                        Mr. Barrick (phonetic) I believe of the
11   Commercial Coordinator's Office would have dealt with that through you.
12
13   THE COURT:                          Yes. Okay. That would have been sent
14   yesterday?
15
16   MR. PROPHET:                        It would have at -- it came from our office to the
17   Commercial Coordinator at 11 AM and again it was just reflective of some --
18
19   THE COURT:                          Okay. So at 11 AM, so I think I have the right
20   one. Let me try to identify it by -- there is some identifying numbers in the lower lefthand
21   corner, can I read those to you, Mr. Prophet?
22
23   MR. PROPHET:                        Possibly, let me just -- or the document itself or
24   the email?
25
26   THE COURT:                          The document itself.
27
28   MR. PROPHET:                        Yes, so you can do that.
29
30   THE COURT:                          Okay.
31
32   MR. PROPHET:                        The document itself -- are you in the Word
33   document or the PDF?
34
35   THE COURT:                          I am in the Word document.
36
37   MR. PROPHET:                        Very good.
38
39   THE COURT:                          So there is a little number in the bottom lefthand
40   corner.
41

1   MR. PROPHET:                        Yes.
2
3   THE COURT:`                         91710284/5.
4
5   MR. PROPHET:                        That is -- that is the correct -- that is the correct
6   number and that is the correct order with one change --
7
8   THE COURT:                          Okay.
9
10  MR. PROPHET:                        -- which I can take you to.
11
12  THE COURT:                          Okay.
13
14  MR. PROPHET:                        And I can just highlight the evolutionary
15  changes, but let's go to the one change that was made subsequent to that email, it's in
16  paragraph 34, it's semantic only, but it's worth looking it.
17
18  If you go to 34 --
19
20  THE COURT:                          Yes, I am there.
21
22  MR. PROPHET:                        So the words after the parenthetical in the second
23  last line of the 34, beginning: (as read)
24
25          Including without limitation as a result of any new parties joining as
26          lenders thereunder …
27
28  THE COURT:                          Right.
29
30  MR. PROPHET:                        That should be moved into the brackets, to be
31  inserted after: (as read)
32
33          Amended and restated from time to time, including without limitation
34          as a result of any new parties joining as lenders thereunder, the
35          commitment letter.
36
37  THE COURT:                          Okay. So just --
38
39  MR. PROPHET:                        It's just a --
40
41  THE COURT:                          -- just moved the closed bracket -- just move the

1    closed bracket --
2
3    MR. PROPHET:                        Correct.
4
5    THE COURT:                        -- I can do that.
6
7    MR. PROPHET:                         Well move the -- in fact, move that phrase into
8    just before the defined term, so it would read --
9
10    THE COURT:                        Oh I see. Okay.
11
12    MR. PROPHET:                         (as read)
13
14                     Amended and restated from time to time, including without limitation
15                     as a result of any new parties joining as lenders thereunder, the defined
16                     term commitment letter.
17
18    THE COURT:                        Okay. I think I can do that.
19
20    MR. PROPHET:                         I can -- Sir I can --
21
22    THE COURT:                        Or you can just send me one, yes.
23
24    MR. PROPHET:                         Why don't I just send you one and I'll copy the
25    parties, if that's okay with you.
26
27    THE COURT:                        Yes, that is --
28
29    MR. PROPHET:                         Cause I don't need -- shall I go through the
30    Commercial Coordinator? I'm happy to do that, of course.
31
32    THE COURT:                        Yes you can go through the Commercial
33    Coordinator.
34
35    MR. PROPHET:                         We will do that. Apart from that, there are no
36    changes to the order that was sent to you approximately 11 AM yesterday. It contains an
37    update from the SARIO form that was with our December 5 application, but you will have
38    looked at that. I'm happy to go through it with you --
39
40    THE COURT:                        You do not have to go through it with me.
41

1    MR. PROPHET:                              Very good.
2
3    THE COURT:                               Okay.
4
5    **Submissions by Mr. Prophet (Sealing Order)**
6
7    MR. PROPHET:                              Okay. Sir, on the sealing order, the most
8    convenient place to stop on that is my amended application on page 10. It's in paragraph
9    33. So, as your finding that --
10
11   THE COURT:                               Okay, I am there, yes.
12
13   MR. PROPHET:                              So what we are addressing by way of sealing are
14   two confidential appendices to the Monitor's 2nd Report. These contain the signature
15   blocks and commitment amounts for the participates in the ad hoc DIP lenders DIP
16   commitment. There's also a second confidential appendix if just an amendment to the DIP
17   loan commitment that arose, I believe over the weekend, it's a small technical amendment,
18   not much turns on it. It's in the -- I think it's in the Monitor's Report, the actual -- the
19   amendment, we can go to it, but I think everyone's at ad idem that it's an appropriate
20   amendment.
21
22   In any event, the rationale for the sealing has to make the *Sierra Club* and *Sherman Estate*
23   test that we're all familiar with in circumstances like this and that is that while the principle
24   of Court openness is an important value of our Courts, where the prejudice that may be
25   caused by observing the principle, at least in the immediate term outweighs the public
26   interest then in that, then sealing is appropriate. And an important commercial interest or
27   interests, has been often identified as a rationale to implement a sealing order in the sense
28   that the damage of such an important commercial interest is prejudice set out that in the
29   appropriate case will outweigh the public interest in open court proceedings.
30
31   The important commercial interest here is as follows: the -- it's twofold in essence. It is the
32   case and counsel for the ad hoc group of Bondholders can confirm this, that the participants
33   in the DIP loan do not know each of them what their commitments are. You Sir, do know,
34   the Monitor knows and the company obviously knows, but none of the individual
35   participants know what each other's commitment is. Part of the rationale for the that, as I
36   understand it, is to provide for more equitable, if you will, governance within the DIP loan
37   group.
38
39   And so, in order to preserve that balance and not provide for domination for the group by
40   one or the other of the participants, it is described by the ad hoc Bondholder Group as an
41   important commercial interest that none of the commitments be made public and none of

1  the names of the people providing those commitments.
2
3  Now, further on the later point, the people providing the commitments are significant
4  financial players, but their identity may influence the way that bonds currently trade and
5  so, it is the view of the ad hoc group of Bondholders and the Monitor supports this as does
6  the company, that disclosure of the identities of these DIP participants may have an
7  influence on continued trading in the market. Certainly it will be made public to the market
8  that a DIP loan with the terms that you've approved has been made, and so the market will
9  know that and that's relevant information, but speculation based on the identity of the
10  individuals in the DIP loan seems to be an unwarranted interference in the functioning of
11  the public market for these bonds that continue to trade.
12
13  So that -- I guess the evenness of that market is another reason, commercial interest that
14  would be prejudiced by disclosure. So on that basis --
15
16  THE COURT:                                Okay. Can I ask you this, sir -- Mr. Prophet.
17
18  MR. PROPHET:                              Yes.
19
20  THE COURT:                                What I haven't heard yet is some kind of
21  limitation on scope and duration.
22
23  MR. PROPHET:                              Yes, there is, yes. It's important. The limitation
24  sought is 1 year after the termination of the *CCAA* proceedings and of course, that's a
25  critical principle. And that length of time is chosen as a reasonable period of time after
26  which the business circumstances no matter what happens in these proceedings, pertaining
27  to the Canacol Group, will have stabilised to the point that it will be irrelevant to know
28  who participated by that time.
29
30  THE COURT:                                All right.
31
32  MR. PROPHET:                              Those are my submissions in support of the
33  sealing order. I did provide it, through the Commercial Coordinator to your office, I hope
34  it's got to you, the Monitor may have further submissions on that, I invite the Monitor's
35  counsel to address that if you wish, Sir.
36
37  THE COURT:                                Ms. Meyer, anything?
38
39  **Submissions by Ms. Meyer (Sealing Order)**
40
41  MS. MEYER:                                No, Justice Mah. Thank you. I will just mention

1   that the Monitor's understanding of this is set out at paragraphs 43 and 44 of the 2nd Report
2   and the Monitor is supportive of the sealing order sought.
3
4   THE COURT:                                All right.
5
6   MS. MEYER:                                Subject to any questions you may have.
7
8   THE COURT:                                No questions.
9
10  MR. PROPHET:                              I guess I should just -- sorry Sir.
11
12  THE COURT:                                Go ahead.
13
14  MR. PROPHET:                              I was just going to say I should end that the
15  Monitor and the finance people at the Monitor firm are aware of the identity of these people
16  and these are serious players and are -- their covenants are good in the Monitor's view.
17
18  THE COURT:                                Any other counsel wish to make submissions
19  with regard to the sealing order, the application for the sealing order? Yes, Mr.
20  Pasquariello?
21
22  **Submissions by Mr. Pasquariello (Sealing Order)**
23
24  MR. PASQUARIELLO:                         Now, I'm prepared to reply, Sir, if there are any
25  others that would make submissions in support, I just wanted to let you know that I will be
26  replying.
27
28  THE COURT:                                Okay. I do not think there is anyone else, Mr.
29  Pasquariello, so go ahead.
30
31  MR. PASQUARIELLO:                         Okay. Thank you. Sorry. So, Sir, as I mentioned
32  in my opposition, Macquarie is of the view that the identities and the holdings of the DIP
33  lenders should be disclosed to this Court.
34
35  Those parties are benefitting from the *CCAA* proceedings. They're benefiting now by way
36  of a court order charge in those proceedings, these proceedings are open and the
37  commercial interest that my friend described is not a general commercial interest. It's a
38  commercial interest as amongst that particular group and the governance of that group, as
39  compared to the disclosure in these proceedings and the stakeholders in this proceeding.
40
41  It would be, in my respectful submission, extremely prejudicial and unfair for Macquarie

1   not to even know who it is that the Court is approving to prime its position, which it has
2   now done by way of your order and not heard a substantive reason why not to do so.
3
4   Secondly, my friend is also seeking what he's described as a technical amendment to the
5   DIP that not much turns on it. And if that's in fact the case, I see no reason why that
6   amendment should not be made part of the record, so that the entire agreement that the
7   Court is approving is disclosed.
8
9   Again, in my respectful submission, fairness and balance, in respect of both of these issues
10  would result in disclosure and therefore, Your Honour, Macquarie would suggest that the
11  sealing order not be granted in respect of these two issues.
12
13  THE COURT:                        Can I ask you this, counsel? Does your client
14  currently know who the bondholders are? I mean not the specific individuals or the
15  subscribers to the DIP loan, but in general who they are? Is there someplace where you can
16  see a list?
17
18  MR. PASQUARIELLO:                      I don't think that's the case as unsecure holders,
19  Sir, but this is, in my respectful submission, completely different where the parties are now
20  being elevated to the position not as bondholders, but as DIP lenders in an approved order
21  by the *CCAA* Court, they're wearing a different hat in respect of their ask of you.
22
23  They are not wearing that hat and they're not asking that they be -- that the confidence be
24  provided in respect of them as bondholders, they're not all participating bondholders,
25  they're only some of the group in any event, and they are now DIP lenders not bondholders.
26  So, I would submit that that's a material difference, Sir.
27
28  THE COURT:                        Okay. And what do you say about the second
29  ground that counsel advanced and that was that there could be some effect on the market,
30  in general, just by knowing whose a player and who is not?
31
32  MR. PASQUARIELLO:                      I don't know if I'm following that, Sir, the bonds
33  don't trade on the basis of who a player is, the bonds trade on parties underlying view of
34  the enterprise value of the company, not who happens to own them. So, again, my friend
35  is giving evidence and I don't think he's an expert in bond trading, but in any event, I'll
36  reply as I did. I'm also not an expert, but since you've asked me, that's the reply. The burden
37  doesn't lie with us, it lies with the company, Sir.
38
39  THE COURT:                        Okay.
40
41  Any other counsel?

1
2    **Submissions by Mr. Prophet (Sealing Order) (Reply)**
3
4    MR. PROPHET:                              Sir, just brief reply on that. The amendment that
5    I referred to is Exhibit D to the Monitor's 2nd Report and it's just about clarifying the
6    effectiveness of the agreement. So there's no -- there's no issue about that.
7
8    My only point was the signature -- we address that just in the context of the request for a
9    sealing order, because the signature pages to this agreement are confidential appendix too,
10   so that's the only reason for mentioning it, but it is there and it is (INDISCERNIBLE).
11
12   THE COURT:                                Okay. Do you have any, Mr. Prophet, response
13   to your friend's point that this is really about the dealings of this group of investors as
14   among themselves, that there is not really a public interest, it is more of a private interest?
15
16   MR. PROPHET:                              I think there is a general interest here on both
17   supports or both grounds for the sealing order and the general interest in each -- in each
18   branch of the grounds is as follows.
19
20   The general interest and I'm not holding myself out as a bond trading expert, but it does
21   matter whose supporting the company. It doesn't matter -- maybe it doesn't matter who
22   holds the bonds, but the names of who've chosen to support the company, that matters. The
23   bonds keep trading now. So that is interesting information, the fact of the DIP is even
24   information that all that will have, but who, in particular, is supporting the company could
25   have an effect on future trading. That's my simple observation
26
27   If I was supporting it myself, that wouldn't have much of an effect, but I'm not one of the
28   signatory bondholders. That's all I'd say about that and it's a general interest to safeguard
29   market exchange on a level playing field in that sense.
30
31   So that's my first that it's not just a private, but a general commercial interest. My second
32   point about why the -- not knowing who has committed what within the bondholder DIP
33   participant group, why that's a general commercial interest, is to the extent that that
34   anonymity or the failure to know who else -- how much the other parties have in the bond
35   -- in the DIP group, facilitates the governance of that group and we're told that it does and
36   makes it more fair and more even. To the extent that that is the case, then that's a general
37   commercial interest because in future cases, it will be understood that you won't know
38   exactly who the dominant player is.
39
40   It's kind of another species of my general commercial interest in keeping confidential the
41   identity of the people who are now supporting the company. How much they're supporting

1  it and how much inter-say they're supporting it will tend to make these groups more easily
2  governed in the future if that's the expectation. So, I say those are the two general, not
3  private commercial interests.
4
5  I also just want to correct one thing. My friend said that the identities of these bondholder
6  participants in the DIP loan aren't before the Court, they're before you Justice, you know
7  exactly who they are and so there's no lack of transparency to this Court, none would ever
8  be attempted on that score. It's important that you know who they are and that the Monitor
9  provide you with comfort on that subject in terms of the bonafide Monitor has done as an
10 expert in finance.
11
12 So those are my comments in reply, Sir.
13
14 THE COURT:                          Okay.
15
16 MS. MEYER:                          Justice Mah?
17
18 THE COURT:                          Yes.
19
20 **Submissions by Ms. Meyer (Sealing Order) (Reply)**
21
22 MS. MEYER:                          Sorry, I didn't want to interrupt you, but I did
23 want to note that I do have a few other comments to add in reply, if I might.
24
25 THE COURT:                          Okay. Go ahead.
26
27 MS. MEYER:                          Thank you. My friend, Mr. Pasquariello has
28 indicated it would be -- as he said, extremely prejudicial and unfair for Macquarie not to
29 know the identities of the DIP lenders and the amounts of their commitments, but he hasn't
30 said why. And I'm not aware of any such prejudice nor is there any evidence of that.
31
32 The additional point I wanted to note is some case law that I think may be helpful. I agree
33 with Mr. Prophet's submissions that this is, as is always the case, governed by the *Sierra
34 Club* and *Sherman Estate v. Donovan* test. But more explicitly and I apologise, I don't have
35 these cases before you, but I can give you the cites, certainly in the *Sierra Club* and
36 *Sherman Estate* decision, the Supreme Court of Canada has explicitly recognised that a
37 party's legitimate commercial interest constitute an important public interest for purposes
38 of that test. That's in *Sierra Club* at paragraphs 55 and 60 to 61 and *Sherman Estate* at
39 paragraph 41. If you like I can give you those exact citations. It's *Sierra Club* is 2002 SCC
40 41, paragraphs 55 and 60 to 61. *Sherman Estate* is 2021 SCC 25 at paragraph 41.
41

1    Those cases also set out that an important commercial interest includes preserving
2    information that is intended to be confidential and where disclosure would frustrate the
3    promotion and protection of competition. That is in the *Dow Chemical Canada ULC v.*
4    *Nova Chemicals Corporation* decision of this Court 2015 ABQB 81 at paragraphs 50 to 51
5    and paragraph 54. And also *Lewis v. Uber Canada Inc.,*2023 ONSC 5134.  Also the *Dow*
6    *Chemical* case that I have just mentioned also says at paragraph 36 that whether a sealing
7    order should be granted is ultimately a matter of judicial discretion.
8
9    Now, of course, those cases that I've just mentioned or at least *Dow Chemical* once pre-
10    dates the *Sherman Estate* case, but specifically with respect to that there is a finding by this
11    Court that an important commercial interest includes preserving information that is
12    intended to be confidential and where disclosure would frustrate the promotion and
13    protection of competition. I think -- I submit that that case is perhaps helpful to this Court
14    with respect to considering whether a sealing order should be granted.
15
16    In that, I submit that the information that is sought to be sealed here, is important and
17    confidential financial information of the participants here and particularly considering the
18    influence that the disclosure of that information may have on trading of bonds, that that is
19    relevant to the consideration here.
20
21    As I mentioned at the outset, the Monitor is supportive of the sealing order request. Those
22    are my submissions, subject to any questions. Thank you.
23
24    THE COURT:                    All right. Thank you. Mr. Oliver?
25
26    **Submissions by Mr. Oliver (Sealing Order)**
27
28    MR. OLIVER:                  Thank you very much, Sir. On behalf of the
29    interim lender, I just wish to voice our support for the submissions of Mr. Prophet and Ms.
30    Meyer. From the interim lenders' perspective, this is commercially sensitive information.
31    It's disclosure would be highly prejudicial if it was made public at this time.
32
33    Of course, your job, Sir, is to balance a number of competing interests in considering this
34    issue. In that regard, I do wish to note as my friends have that both you and the Monitor
35    have seen the underlying information, the sealing that is requested is time limited and as
36    narrow as reasonably possible.
37
38    As a result we support the application for the limited time sealing order. Thank you.
39
40    THE COURT:                  Okay. Mr. Pasquariello, is there something else
41    you want to say?

1
2  **Submissions by Mr. Pasquariello (Sealing Order) (Reply)**
3
4  MR. PASQUARIELLO:                    Yes with respect, Sir, I specifically indicated I
5      was going to speak after others in support and I've had -- Ms. Meyer confirmed she had
6      nothing further. Mr. Oliver didn't speak up. I've spoken and now my friends come forward,
7      Ms. Meyer with case law, on top of it having said she had nothing to add and Mr. Prophet
8      not referencing anything.
9
10     Sir, this continues the unfortunate procedure unfairness that has continued throughout. I
11     just will leave it at that. It's just extremely disappointing, Sir.
12
13  THE COURT:                    All right. Well, that is why I came back to you at
14     the end, counsel.
15
16  **Submissions by Ms. Meyer (Sealing Order) (Reply)**
17
18  MS. MEYER:                    Sir, if I might just say very briefly on behalf of
19     the Monitor, my submissions just now are made in reply. I had no notice whatsoever that
20     Mr. Pasquariello was going to oppose the Sealing Order application. If he did mention that
21     yesterday during his submission, my apologies in that I missed it. But in any event, I do
22     submit that it is proper for reply. Thank you.
23
24  MR. PASQUARIELLO:                    It was in our brief.
25
26  **Decision (Sealing Order)**
27
28  THE COURT:                    All right. Thanks counsel. The request for
29     restricted access order or a sealing order does compromise the open courts principle and
30     whether or not one should be granted is of course governed by the authority that counsel
31     refers to which we all know about, that being the *Sierra Club* case decided by the Supreme
32     Court of Canada and as modified in *Sherman Estate*. The applicant must show on a balance
33     of probabilities that court openness presents a serious risk to an important interest, that the
34     order is necessary to prevent the risk because alternative measures are not adequate and
35     that as a matter of proportionality, the risk -- the benefits outweigh the negative effects.
36
37     In Alberta and I imagine elsewhere in Canada, commercial interest have been found to be
38     an important interest deserving of protection, particularly in the context of Court supervised
39     insolvency proceedings. The risk here as explained to me by counsel is really twofold. First
40     that the proportion of ownership of the DIP participation, if know, would adversely affect
41     the internal governance. Counsel for Macquarie, who objects to the granting of the sealing

1   order says, well that is a private matter among a group of people or entities and does not
2   concern anyone else.
3
4   I do see merit in Canacol's position because this *CCAA* proceeding is not concluded. I do
5   not know if there is going to be further applications for increased advances, I do not know
6   whether it will be the same or different DIP lender. The possibility is present that it is the
7   same lender and therefore it is important for the *CCAA* proceeding that the governance of
8   this Group operate in an appropriate fashion. So I recognise the risk there.
9
10  Secondly, with regard to the operation of the bond market, Macquarie objects to the sealing
11  order on the basis that that is simply a speculative concern, no one here is an expert in bond
12  trading, no one can say. I agree that no one here at least has identified themselves as an
13  expert in bond trading, certainly I am not, but I think I accept as a matter of logic and
14  common sense that with regard to this body of bonds, the identity of the owners and
15  proportion of ownership in this loan, could influence the market one way or another.
16
17  So, the conclusion I reach is that there is a important public interest here and that is sensitive
18  commercial information that could affect an ongoing *CCAA* proceeding or the operation of
19  the bond market itself.
20
21  I do not know and it was not suggested to me, how any sort of lesser measure might be put
22  in place to alleviate that risk apart from a sealing order. It is also part of my duty to make
23  sure that whatever means is imposed to safeguard this information, it is the least intrusive
24  as possible. So that is usually achieved through limitation in the period of time that the
25  order would be in effect.
26
27  So my conclusion here is that test in *Sierra Club* and *Sherman Estate* is met. That the means
28  that have been suggested are the least intrusive in that it is specific in time. I cannot think
29  of nor has it been proposed to me, that some other way is going to achieve what is sought
30  here and so I grant the sealing order.
31
32  Okay. Counsel, I see that my next group has arrived for my 2:00 matter. So I am going to
33  invite those counsel on the previous matter to leave if they wish and I am going to move
34  onto the other matter.
35  _____
36
37  PROCEEDINGS CONCLUDED
38  _____
39
40
41

**Certificate of Record**

I, Zoe Wong, certify that this record is the record made of the proceedings of the evidence in the proceedings in the Court of King's Bench, held in courtroom 516, virtual courtroom 86, at Edmonton, Alberta, on the 11th day of December, 2025, and that I and Esther Budendwa, were the court officials in charge of the sound-recording machine during the proceedings.

**Certificate of Transcript**

I, Tanner Zaherie, certify that

(a) I transcribed the record, which was recorded by a sound recording machine, to the best of my skill and ability and the foregoing pages are a complete and accurate transcript of the contents of the record and

(b) the Certificate of record for these proceedings was included orally on the record and is transcribed in this transcript.

TEZZ TRANSCRIPTION, Transcriber
Order Number: TDS-1099676
Dated: December 15, 2025